TOBIAS S. KELLER (SBN 151445)
*tkeller@kbkllp.com*
DARA L. SILVEIRA (SBN 274923)
*dsilveira@kbkllp.com*
**KELLER BENVENUTTI KIM LLP**
650 California Street, Suite 1900
San Francisco, California 94108
Telephone: (415) 364-6793
Facsimile: (650) 636-9251

NEEL CHATTERJEE (SBN 173985)
*NChatterjee@goodwinlaw.com*
ANDREW S. ONG (SBN 267889)
*AOng@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, California 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

HONG-AN VU (SBN 266268)
*HVu@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 S. Figueroa Street, 41st Flr.
Los Angeles, California 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Proposed Attorneys for Debtor and
Debtor in Possession Anthony S. Levandowski

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>    Debtor. | Bankruptcy Case<br>No. 20-30242 (HLB)<br><br>Chapter 11<br><br>**ANTHONY LEVANDOWSKI'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   April 30, 2020<br>Time:   10:00 a.m.<br>Crtrm:   19<br>Judge:   Hon. Hannah L. Blumenstiel |

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

## NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 30, 2020 at 10:00 a.m., or as soon as thereafter as counsel may be heard, in Courtroom 19 of the Bankruptcy Court in the Northern District of California, located at 450 Golden Gate Ave, 16th Floor, San Francisco, CA 94102 before the Honorable Hannah L. Blumenstiel, Anthony Levandowski will and hereby does move this Court for an order compelling Uber Technologies, Inc. ("Uber") to arbitrate the claims Mr. Levandowski has asserted against it.  A proposed form of order is attached hereto as Exhibit A.

As part of a transaction in which Uber acquired a company Mr. Levandowski helped start, Uber signed an Indemnification Agreement under which it agreed to indemnify Mr. Levandowski against claims brought by his former employer, Google LLC.  *See* Declaration of Neel Chatterjee, Ex. A at Ex. 1.  Uber has failed to honor its indemnity obligations.  As such, Mr. Levandowski has filed an arbitration demand with JAMS pursuant to the terms of Section 2.2(e) and 2.3 of the Indemnification Agreement.  *Id*. at §§ 2.2(e), 2.3.  Mr. Levandowski now moves for an order compelling Uber to arbitrate Mr. Levandowski's claims against it.

This Motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities in support thereof, the Declaration of Neel Chatterjee filed contemporaneously herewith, all papers and pleadings from this case on file with the Court, all other matters of which the Court may take judicial notice, any further evidence or argument offered to the Court at the hearing on this Motion, and any other matters that the Court may consider.

//

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Dated: March 30, 2020

Respectfully submitted,

By: /s/ Neel Chatterjee

Neel Chatterjee
*NChatterjee@goodwinlaw.com*
ANDREW S. ONG
*AOng@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, California  94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

Hong-An Vu
*HVu@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 S. Figueroa Street, 41st Flr.
Los Angeles, California  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Tobias S. Keller
*tkeller@kbkllp.com*
Dara L. Silveira
*dsilveira@kbkllp.com*
**KELLER BENVENUTTI KIM LLP**
650 California Street, Suite 1900
San Francisco, California  94108
Telephone: (415) 364-6793
Facsimile: (650) 636-9251

Proposed Attorneys for Debtor and
Debtor in Possession Anthony S. Levandowski

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION ................................................. 2

I.      INTRODUCTION ................................................................................................................. 1

II.     FACTS ................................................................................................................................. 2

    A.   Mr. Levandowski Establishes His Reputation as a Pioneer in Self-Driving Car Technology ........................................................................................................ 2

    B.   Mr. Levandowski Builds Google's Self Driving Car Program ............................... 3

    C.   Mr. Levandowski Joins Uber and obtains Indemnity against Claims Google May Raise ............................................................................................................ 4

    D.   Google Initiates Arbitration Against Mr. Levandowski ........................................ 9

    E.   Uber Accepts the Indemnity Obligations ............................................................. 9

    F.   Uber Refuses to Pay Expenses Relating to Google's Claims ................................ 12

III.    ARGUMENT ..................................................................................................................... 14

    A.   The Indemnification Agreement Contains an Enforceable Arbitration Provision Governing Mr. Levandowski's Claims ................................................................. 14

    B.   Uber Cannot Rescind the Agreement to Arbitrate. .............................................. 16

        1.   Rescission Based on Fraudulent Inducement Is a Question for the Arbitrator ................................................................................................ 16

        2.   Any Other Questions of Arbitrability Should be Decided by the Arbitrator. ................................................................................................ 18

    C.   Uber Cannot Rescind the Agreement as a Matter of Law .................................... 19

        1.   Uber Waiver Any Claim for Rescission ................................................... 19

        2.   Uber Cannot Show a Material Misrepresentation or Omission to Support Fraud in the Inducement ......................................................................... 22

IV.     CONCLUSION ................................................................................................................. 25

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-30242    Doc# 18    Filed: 03/30/20    Entered: 03/30/20 16:58:39    Page 4 of 30

I.      **INTRODUCTION**

Mr. Levandowski requests that the Court compel Uber Technologies, Inc. ("Uber") to arbitrate Mr. Levandowski's claims to enforce Uber's indemnity obligations. Uber has refused to arbitrate its indemnity dispute with Mr. Levandowski despite an unambiguous clause which requires it. *See* Declaration of Neel Chatterjee, Ex. 1 ("Arbitration Demand") at Ex. A ("Indemnification Agreement") at § 2.2(e) ("An Indemnified Person [Mr. Levandowski] may elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses."). Uber's sole basis to refuse to arbitrate is that it purported to rescind an indemnity obligation for a claim against Mr. Levandowski that it previously accepted and controlled for over three years. Not only is the purported rescission meritless, but Uber also agreed that any issues related to formation of the indemnity agreement would be subject to arbitration. For these reasons, Uber cannot now refuse to honor the obligations it previously accepted, and must be compelled to arbitrate this dispute.

Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks. He was one of the core engineers who built the technology for self-driving cars that ultimately led to Waymo LLC, Alphabet's leading autonomous driving company that spun out of Google. Mr. Levandowski was well-compensated for his substantial contributions to Waymo. After leaving Google, Mr. Levandowski understood that there was a significant risk that his former employer would try to strip him of the compensation that he had earned at Google.

Mr. Levandowski left Google (Waymo's predecessor) to start his own company, Ottomotto LLC ("Otto"). Otto was eventually acquired by Uber. Uber conducted extensive due diligence, including hiring an outside forensic investigation firm, Stroz Friedberg, LLC, to review the electronic devices of Mr. Levandowski and other Otto employees. Uber received the results of Stroz's investigation, which included evidence that Mr. Levandowski had files belonging to Google on his devices, as well as some indications that evidence may have been destroyed. Despite this, to induce Mr. Levandowski to work with it, Uber agreed to a broad indemnification agreement protecting Mr. Levandowski against claims brought by Google relating to his previous

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MP&A

employment. *See* Chatterjee Decl. at Ex. 1 at Ex. A §§ 2.1(a); 2.3. As Mr. Levandowski feared, just months after Uber announced its acquisition of Ottomotto and Mr. Levandowski joining Uber's self-driving initiative, Google made two arbitration demands against him. As agreed, Mr. Levandowski tendered his defense of those claims to Uber, and Uber accepted its indemnity obligations. Uber then controlled Mr. Levandowski's defense for years and paid all expenses associated with the defense. After it was clear that Mr. Levandowski could be liable for a substantial judgment, Uber reneged on its deal and refused to pay the expenses, including any potential judgment, as required by the Indemnification Agreement.

When a final judgment was entered against Mr. Levandowski, he was forced to initiate these Chapter 11 proceedings while seeking to enforce the indemnity obligations against Uber. Mr. Levandowski made a formal demand that Uber pay. Uber refused. Based upon this refusal, Mr. Levandowski has filed an arbitration demand under the Indemnification Agreement. Because Uber has made clear that it will not honor the Indemnification Agreement, Mr. Levandowski files this contemporaneous Motion to enforce his right to arbitrate his claims against Uber.

## II.  FACTS

### A.  MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY

Mr. Levandowski has had a lifelong fascination with robots and autonomous devices. Chatterjee Decl. at Ex. 1 ("Arbitration Demand") at ¶ 21. Mr. Levandowski earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley"). *Id.* at ¶ 22. In 2004, he participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles. *Id.* at ¶ 23. He was 24 years old at the time. *Id.*

The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas. *Id.* at ¶ 24. Mr. Levandowski and a team of engineers from U.C. Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations—submitted a self-driving, self-balancing, two-wheeled motorcycle. *Id.* This motorcycle, Ghostrider, competed against well-funded submissions from Stanford University, Carnegie

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Mellon, as well as established companies. After performing well in several qualifying rounds, Ghostrider was selected as a contender for the DARPA Grand Challenge. *Id.* Ghostrider now sits in the Smithsonian Museum as one of America's great innovations. *Id.* at ¶ 25.

Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr. Sebastian Thrun, a Stanford computer science professor who was also a participant in the DARPA Grand Challenge. *Id.* at ¶ 26. Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool. *Id.* at ¶ 27. VuTool was subsequently acquired by Google. *Id.*

### B. MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM

Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping with Dr. Thrun. *Id.* at ¶ 28. Mr. Levandowski helped develop the technology for the Google service now known as Street View. *Id.*

In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-driving car program at Google. *Id.* at ¶ 29. The program was named "Project Chauffeur." *Id.* Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016. *Id.* Mr. Levandowski was paid approximately $127 million by Google for his work on Project Chauffeur. *Id.* at ¶ 30. The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google. *Id.*

In early 2015, Uber announced that it was launching its own self-driving car initiative by acquiring a team of engineers from Carnegie Mellon University. *Id.* at ¶ 31. At the same time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making. *Id.* at ¶ 32. Dr. Thrun introduced Mr. Levandowski to Travis Kalanick at Uber. *Id.* at ¶ 33. After that introduction, Uber repeatedly tried to recruit Mr. Levandowski, and also encouraged him to leave Google to form a commercial partnership. *Id.* Mr. Levandowski's colleagues, and more than one of his superiors, were aware that Mr. Levandowski may be having discussions with Uber. *Id.* at ¶ 34.

After Uber's announcement in 2015 of its own self-driving car initiative, there were many discussions within Google about how to compete with Uber. *Id.* at ¶ 35. In those discussions, executives within Google expressed distaste and animosity towards Uber. *Id.* Larry Page, one of

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

Google's founders and its then-CEO, was one of the individuals expressing such views. *Id.*

Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Larry Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

*Id.* at ¶ 36 (citing to Kalanick Waymo trial testimony at 717:4-17).

Toward the end of his time at Google, Mr. Levandowski had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur. *Id.* at ¶ 37. During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving start-up outside of Google. *Id.* Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences. *Id*. ¶ 38. Based on his dealings with Google and communications with Mr. Page, Mr. Levandowski understood that "competitive" with Google meant joining or working with a large, active competitor of Google. *Id.*

## C. MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE

Mr. Levandowski left Google on January 27, 2016, and shortly thereafter, helped start Otto. *Id.* ¶ 39. Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto. *Id*. ¶ 40. As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber as a competitive act and would be very unhappy. *Id.* at ¶ 41. Mr. Levandowski also told Uber that he feared that Google would sue him and seek recovery of the substantial amounts of money that had been paid to him or were owed to him. *Id.* In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Uber's founder and then-CEO, Travis Kalanick. *Id.* at ¶ 42. In

particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick. *Id.* In response, Mr. Kalanick stated that he was not concerned about litigation, that he was prepared to fight Google to protect Mr. Levandowski, and that "Uber eats injunctions for breakfast." *Id.*

In exchange for Uber's protection from claims by Google, among other consideration, Mr. Levandowski agreed to be and was interviewed by Uber's due diligence and risk management firm, Stroz Friedberg. *Id.* at ¶ 43. He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination. *Id.* Mr. Levandowski understood and communicated to Uber that by providing such access, anything provided to Stroz either during the interview or on Mr. Levandowski's devices and accounts would be covered by the indemnity. *Id.* at ¶ 44. The investigation uncovered facts related to potential claims that might be brought by Google, including that Mr. Levandowski "(a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars." *Id.* at ¶¶ 44, 59. This investigation was a multi-month effort that spanned from March 2016 through August 2016. *Id.* at ¶ 44.

To get Mr. Levandowski to join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google may raise that were disclosed during the due diligence. *See* Arbitration Demand at Ex. A ("Indemnification Agreement").[1] The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or

---

[1] The Indemnification Agreement was originally between Apparate International C.V. ("Apparate" or "Purchaser") and Anthony Levandowski with Uber guaranteeing Apparate's performance and agreeing to be liable for any breach by Apparate. *See* Arbitration Demand, Ex. A at 3.14. On March 27, 2020, Uber informed Mr. Levandowski that Apparate "has been dissolved and any rights and obligations it would have under the Indemnification Agreement have been assumed by Uber Technologies, Inc." *See id.* at Ex. O.

deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

"Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

Arbitration Demand at ¶ 46; Ex. A at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts: (a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses incurred by such Diligenced Employee*** or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims").

Arbitration Demand at ¶ 47; Ex. A at § 2.1 (emphasis added).

"Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred.

"Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special,

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id.* at ¶ 48; Ex. A at 3.

The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii). That section reads:

(b) Notwithstanding anything herein to the contrary, ***an Indemnified Claim shall not, regardless of whether the Closing occurs, include***, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

(ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id.* at ¶ 49; Ex. A at § 2.1(b)(ii) (emphasis added).

The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski. *Id.* at ¶ 50. The agreement was also structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded. *Id.* ¶ 51. Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] Business Days of such request.

*Id.* at Ex. A, § 2.3.

If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration under the JAMS Rules to

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-30242   Doc# 18   Filed: 03/30/20   Entered: 03/30/20 16:58:39   Page 11 of 30

enforce Uber's obligations.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] Business Days of such request. **If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within such [redacted] Business Day period, such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e).** In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.

*Id.* at § 2.3(a) (emphasis added).

(e) . . . An Indemnified Person [Mr. Levandowski] may elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a). . . . Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS") and [Uber], on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.

*Id.* at § 2.2(e).

In contrast with Mr. Levandowski's right to pursue arbitration immediately after Uber's refusal to advance expenses, the Indemnification Agreement requires Uber to wait to seek through arbitration the recovery of any improperly advanced expenses until after full resolution of Google's claims either by settlement or a final non-appealable judgment:

In the event that Purchaser believes all or a portion of a Former Employer Claim is an Excluded Claim hereunder, Purchaser shall have the right (in its sole discretion), within 60 days *following the settlement or final non-appealable adjudication* of such Former Employer Claim, to initiate arbitration under Section 2.2(e) . . . . ***For the avoidance of doubt, Purchaser shall advance all Expenses incurred by the Indemnified Person(s) pursuant to Section 2.3(a) through the later to occur of the final settlement or final adjudication of such Former Employer Claim***, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d).

*Id.* at § 2.2(e) (emphasis added). After such arbitration, if an arbitrator determines that some Expenses were not covered under the Indemnification Agreement, only then would Uber be entitled to recovery of the payments it advanced for non-covered claims. *See id.*

Case: 20-30242    Doc# 18    Filed: 03/30/20    Entered: 03/30/20 16:58:39    Page 12 of 30

On August 18, 2016, shortly after Uber completed its due diligence and days after Mr. Levandowski received his second payment from Google, Uber announced that it was acquiring Otto. *Id*. at ¶ 66. In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." *Id*. at ¶ 67. Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." *Id*.

On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. *Id*. at ¶ 68.

Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying—and as the later arbitration panel determined, "interrelated"—facts. *Id*. at ¶ 69. In particular, the two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before it was acquired by Uber. *Id*. at ¶ 70. Google alleged that Mr. Levandowski violated his duties to Google by forming Tyto. *Id*. at ¶ 71. Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential information regarding compensation to recruit Google employees. *Id*. The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement. *Id*. at ¶ 72; *see also id*. at Ex. A; § 2.1(a). As a result, on November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement. *Id*. at ¶ 73.

E. **UBER ACCEPTS THE INDEMNITY OBLIGATIONS**

Mr. Levandowski provided notice as required by the Indemnification Agreement. *Id*.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-30242   Doc# 18   Filed: 03/30/20   Entered: 03/30/20 16:58:39   Page 13 of 30

After receipt of the notice, Uber accepted its obligations to indemnify and assumed control of Mr. Levandowski's defense. *Id.* at ¶ 74. Uber's counsel, Morrison & Foerster ("MoFo"), initially represented Mr. Levandowski. *Id.* at ¶ 75. As his counsel, MoFo determined the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations against him, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration. *Id.*

In February 2017, Waymo LLC—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action"). *Id.* at ¶ 76. MoFo then determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski. *Id.* at ¶ 77. As a result, MoFo sought to withdraw from representation of Mr. Levandowski. *Id.* Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense. *Id.* at ¶ 78.

For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement. *Id.* at ¶ 79. Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings and pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions. *Id.*

On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the expenses it had advanced for Mr. Levandowski to defend himself in the arbitration. Chatterjee Decl. at Ex. 1, Arbitration Demand, at ¶ 80; Ex. E. One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"— which Mr. Levandowski had exercised over a year before. *Id.* at ¶ 81. At the time, Uber was fully aware that Mr. Levandowski intended to assert his Fifth Amendment rights but never made a request that he waive his rights in the arbitration proceeding. *Id.* Nevertheless, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the Waymo court had issued an order of referral to the United States' attorney) was now a breach of the

Case: 20-30242    Doc# 18    Filed: 03/30/20    Entered: 03/30/20 16:58:39    Page 14 of 30

Indemnification Agreement. *See id.* ¶ 82. Uber requested that Mr. Levandowski waive in part his Fifth Amendment rights and testify during the arbitration. *See id.* ¶ 83. In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing. *Id.* at ¶ 84. Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify. *Id.* at ¶ 85.

Uber also raised for the first time in April 2018 that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]." *Id.* at ¶ 86. Uber's claims were false. Not only had Uber accepted its duty to indemnify Mr. Levandowski at the very outset of the arbitration proceeding where Tyto had been placed squarely at issue in Google's demands, but Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them. *Id.* at ¶ 87. In fact, Tyto was acquired by Otto with Uber's consent and at Uber's request prior to Uber closing on its acquisition of Otto. *Id.* at ¶ 88. In addition, for the last year and a half prior to April 2018, Uber received documents and information about Tyto in the Waymo action and had participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started. *See id.* ¶ 89. Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto. *Id.* Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski who was investing funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and would visit Tyto and his friends at that company to talk about technical and business matters from time to time. *See id.* at ¶ 90. And yet, Uber did not raise any issues regarding coverage until April 2018. *Id.* at ¶ 91. Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing

11

briefing. *Id.* at ¶ 92.

**F.   UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

On March 28, 2019, the arbitration panel issued an interim award finding in favor of Google. *Id*. at ¶ 93. The arbitration panel found violations of the exact claims covered by the Indemnification Agreement and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google. *Id.* The panel also awarded prejudgment interest and attorneys' fees, as it determined Google was the prevailing party. *Id.*

On May 13, 2019, in light of the interim award, Mr. Levandowski requested confirmation from Uber that it was going to abide by its obligations in the Indemnification Agreement and pay for any adverse award. Chatterjee Decl. at Ex. 1, Arbitration Demand at ¶ 94; Ex. F. In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence. *Id.*. at 95. Mr. Levandowski identified documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well and pointed out that documents from his devices were shown to witnesses at the arbitration hearing. *Id.*

On July 3, 2019, Uber's counsel responded stating that, because Mr. Levandowski breached the Indemnification Agreement, and because it believed that the interim award was primarily resulting from Excluded Claims as defined by that agreement, Uber had no contractual obligations to pay any award owed by Mr. Levandowski to Google. *See id*. at ¶ 97; Ex. H.

On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for which was rescission of the agreement. *Id*. at ¶ 98; Ex. I. Uber's letter came just days after Mr. Levandowski was indicted for over thirty counts of trade secret misappropriation and had to continue to assert his Fifth Amendment rights.[2] *Id*. at ¶ 99. Uber did not state that the Indemnification Agreement was rescinded, make any offer to restore the consideration it received

---

[2] On March 19, 2020, Mr. Levandowski agreed to plead guilty to one count of trade secret misappropriation based on his access of one Google document containing trade secret information on one occasion after he left Google and has accepted restitutionary obligations in the amount of $756,499.22. *Id.* at ¶ 99 n.2. The government agreed to dismiss all other counts against Mr. Levandowski. *Id.*

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

12

Case: 20-30242   Doc# 18   Filed: 03/30/20   Entered: 03/30/20 16:58:39   Page 16 of 30

under the agreement, or cede control of Mr. Levandowski's defense.  *Id*. at ¶ 100; *see also* Ex. I.

Uber did not address the unambiguous evidence that Mr. Levandowski's devices inspected by

Stroz had extensive information about Tyto on them.  *Id.*

Uber continued to advance payment for expenses incurred through September 25, 2019.

*Id.* at ¶ 101.  In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and

Exchange Commission.  *Id.* at ¶ 102; Ex. J.  In that filing, Uber again affirmed its indemnity

obligations, stating, "The panel's final award is expected by December 24, 2019.  Pursuant to a

contractual obligation, Uber is indemnifying both employees with respect to certain claims.

Whether Uber is ultimately  responsible for such indemnification, however, depends on the

exceptions and conditions set forth in the indemnification agreement."  *Id.*

On December 6, 2019, the arbitration panel issued a final arbitration award.  *Id*. at ¶ 103.

On December 10, 2019, Mr. Levandowski informed Uber of the final award.  *Id.* at ¶ 104; Ex. K.

Because of Uber's prior statements, Mr. Levandowski asked for clarity as to how Uber, as the

Indemnitor in control of the defense of this case, would like to proceed.  *Id.*  Specifically, Mr.

Levandowski inquired whether Uber intended to resolve the matter by paying the judgment, or

whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel

through any appeal and posting a bond to stay the judgment pending appeal.  *Id.*

On December 31, 2019, Uber responded to Mr. Levandowski's December 10 letter and

stated that it rescinded the Indemnification Agreement.  *Id.* at ¶ 105; Ex. L.  The basis for

rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose

his connection to Tyto—the same basis that Uber previously stated was a basis to seek

reimbursement under the Indemnification Agreement for Expenses paid relating to the claims

based on Tyto.  *Compare* Arbitration Demand at Exs. E and H, *with id*. at Ex. L.  Using its same

faulty allegations with a newly minted legal theory, Uber now argued that the Indemnification

Agreement never existed in the first place.  *Id.* at ¶ 106; Ex. L.  Uber offered no explanation for

the fact that the Tyto information was indisputably on the devices Stroz Freiberg had inspected

and had been squarely placed at issue the moment the arbitration demand was served.  *Id.*  Uber

stated that it would not pay any portion of the final award or advance any additional Expenses.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION: MP&A

1    *Id.* at ¶ 107.

2          In addition, for the first time in three years, Uber ceded its right to direct and control the

3    defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring

4    separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or

5    any subsequent appeals." *Id.* at ¶ 108; Ex. L.  On February 5, 2020, Uber provided payment for

6    Mr. Levandowski's Expenses through September 25, 2019.  *Id.* at ¶ 109.  Uber did not provide

7    payment for any Expenses incurred after that date.  *Id.*

8          On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment

9    in Google's favor against Mr. Levandowski in the amount of $179,786,091.24.  *Id.* at Ex. M.  On

10   March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a

11   Chapter 11 petition in this Court.  *Id.* at ¶ 111.  On March 6, 2020, Mr. Levandowski provided

12   notice to Uber about the judgment and requested advancement of payment for these Expenses

13   under Section 2.3 of the Indemnification Agreement.  *Id.* at ¶ 112; Ex. N.  In addition, Mr.

14   Levandowski requested an advance for attorneys' fees and costs in the amount of $475,571.32,

15   which Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020.  *Id.*

16         As of the filing of this Motion, Uber has not paid the Expenses submitted by Mr.

17   Levandowski on March 6 and has refused to advance any Expenses under the Indemnification

18   Agreement going forward.  *Id.* at ¶ 113; Ex. O.  As a result, Mr. Levandowski filed an arbitration

19   demand with JAMS San Francisco as permitted by the Indemnification Agreement and served

20   that demand on Uber.  Id. at Ex. P.

21   **III.    ARGUMENT**

22         **A.    THE INDEMNIFICATION AGREEMENT CONTAINS AN ENFORCEABLE
                   ARBITRATION PROVISION GOVERNING MR. LEVANDOWSKI'S CLAIMS**
23

24         Uber should be compelled to arbitrate.  Under the Federal Arbitration Act ("FAA"), a

25   party seeking to compel arbitration must show only two elements: (a) that an enforceable

26   arbitration agreement exists between the parties; and (b) that the claims at issue are within the

27   scope of the arbitration agreement.  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-

28

Case: 20-30242    Doc# 18    Filed: 03/30/20    Entered: 03/30/20 16:58:39    Page 18 of
30

84 (2002); *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000). [3]
Both elements are met here.

The Indemnification Agreement is an enforceable agreement between Mr. Levandowski and Uber under which each have been performing for over three years. Chatterjee Decl. at Ex. 1, Arbitration Demand at Ex. A. Until recently, Uber accepted its indemnity obligation, paid for Mr. Levandowski's Expenses, and controlled Mr. Levandowski's defense against the claims brought by Google. *Id*. at ¶¶ 79; 82; 101; Ex. I. Mr. Levandowski, for his part, made himself available to Uber and cooperated with Uber in support of his defense. *Id*. at ¶ 79. Uber repeatedly affirmed the existence of the Indemnification Agreement, most recently in its November 2019 10-Q filing. *Id*. at ¶ 102; Ex. J; *see also* Exs. E; H.

The claims at issue in Mr. Levandowski's arbitration demand—whether Uber is required to advance Mr. Levandowski's Expenses under the Indemnification Agreement—are within the scope of the arbitration agreement. Section 2.2(e) of the Indemnification Agreement clearly expresses the parties' intent that Mr. Levandowski, as an Indemnified Person, may elect to arbitrate to enforce Uber's obligation to advance Expenses. *See id.* at Ex. A at § 2.2(e):

> (e) . . . An Indemnified Person [Mr. Levandowski] may elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a). . . . Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS") and [Uber], on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.

*Id.* at § 2.2(e). In his arbitration demand, Mr. Levandowski requests that Uber (1) advance his expenses incurred between September 26, 2019 and February 29, 2020, and (2) continue to advance his expenses until any judgment against him becomes final and non-appealable. Id. at

---

[3] The California Arbitration Act ("CAA") applies the same standard. *See Amalgamated Transit Union Local 1277 v. Los Angeles Cty. Metro. Transp. Auth*., 107 Cal. App. 4th 673, 686 (2003) (the trial court's role in resolving a motion to compel is "ascertaining whether" the claims are ones which "on [their] face [are] governed by the contract") (citation and internal quotations omitted). California law also recognizes the same presumptions in favor of arbitration. *Rowe v. Exline*, 153 Cal. App. 4th 1276, 1282, 1288 (2007) (stating that Code of Civil Procedure Section 1281.2 "generally mandates arbitration of all claims that are subject to an enforceable arbitration agreement," and that "California arbitration law favor[s] the arbitration of disputes"); *Crown Homes, Inc. v. Landes*, 22 Cal. App. 4th 1273, 1283 (1994) ("[T]he California Supreme Court has repeatedly emphasized the strong public policy favoring arbitration.")

Case: 20-30242    Doc# 18    Filed: 03/30/20    Entered: 03/30/20 16:58:39    Page 19 of 30

Ex. P.  Mr. Levandowski's claims for advancing expenses and enforcing Uber's obligations are precisely the type of claims contemplated for arbitration under Sections 2.2(e) and 2.3.

Mr. Levandowski has shown that a valid agreement to arbitrate exists, and that his claims fall within the scope of that agreement.  Accordingly, his motion should be granted.

### B.     UBER CANNOT RESCIND THE AGREEMENT TO ARBITRATE.

Uber's assertion that the Indemnification Agreement has been rescinded is itself subject to determination by an arbitrator, and cannot be a basis for resolving Mr. Levandowski's claims in a forum other than arbitration.  Uber bears the burden to show that the agreement to arbitrate is somehow unenforceable.  *See Mortensen v. Bresnan Commc'ns, LLC,* 722 F.3d 1151, 1157 (9th Cir. 2013) ("[T]hose parties challenging the enforceability of an arbitration agreement bear the burden of proving that the provision is unenforceable."); *Kropke v. Dunbar*, 2017 WL 8186746, at *3 (C.D. Cal. Mar. 2, 2017); *Savetsky v. Pre-Paid Legal Servs.*, *Inc.*, 2015 WL 4593744, at *2 (N.D. Cal. July 30, 2015).  Uber's burden is a heavy one because of the strong presumption in favor of arbitration.  *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983) (stating that "Section 2 [of the FAA] is a congressional declaration of a liberal policy favoring arbitration agreements.").

Uber's most recent argument—that it rescinded the Indemnification Agreement—cannot meet its burden to show that the agreement is not enforceable.  The United States Supreme Court has expressly found that the arbitrator—not the court—must decide whether Uber rescinded the Indemnification Agreement.  *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967).  In any event, Uber cannot rescind the Indemnification Agreement as a matter of law.

#### 1.     Rescission Based on Fraudulent Inducement Is a Question for the Arbitrator

Uber may argue that it rescinded the Indemnification Agreement on the theory that Mr. Levandowski failed to disclose his involvement in Tyto LiDAR to Uber.  *See* Chatterjee Decl. at Ex. 1, Arbitration Demand at Ex. L.  This argument fails under express Supreme Court precedent, as well as under the facts of this case.

The arbitration provision between Uber and Mr. Levandowski is enforceable even if the

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MP&A

remainder of the agreement is not.  An arbitration provision is a separate agreement from the underlying agreement and is enforceable even where one party purports to rescind the entire contract.  *Prima Paint*, 388 U.S. 395 at 403–04.  In *Prima Paint*, the U.S. Supreme Court made clear that, under the FAA, the court is only concerned with the "making of the agreement for arbitration" and that courts should compel arbitration once they are satisfied that there were no issues relating to the arbitration provision.  *See id.*  As the Supreme Court held, challenges to the contract as a whole are outside the court's power where the parties have agreed to arbitration because "the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."  *Id.*  Because the court determined that there were no allegations that plaintiff was fraudulently induced to agree to arbitration, as opposed to other provisions in the contract, the court held that compelling arbitration was proper.  *See id.*[4]

Here, Uber has not alleged and cannot allege any fraud with respect to the parties' agreement to arbitrate disputes concerning Mr. Levandowski's request for payment of Expenses. The supposed bases for rescission or fraudulent inducement that Uber has identified have nothing to do with the arbitration provision itself.  Instead, they are based in, for example, the due diligence processes undertaken before Uber's acquisition of Otto, or whether Mr. Levandowski cooperated with Uber in the defense.  Thus, under *Prima Paint*, the Court should compel arbitration notwithstanding any argument by Uber for rescission or fraud in the inducement.  *See Prima Paint*, 388 U.S. at 406; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–46 (2006) ("unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance"); *Marrone v. Imperial Holdings Inc.*, 2013 WL 12433803, at *7–8 (C.D. Cal. Dec. 18, 2013) ("Plaintiff's fraud argument suffers from the same deficiency as his illusory promise argument; it attempts to prove that the entire series of financial transactions were obtained by fraud rather than the arbitration agreement specifically, as

---

[4] The law is the same under the CAA.  *See e.g., St. Agnes Med. Ctr. v. PacifiCare of California*, 31 Cal. 4th 1187, 1198–99 (2003) ("[A]n arbitration clause is separable from other portions of a contract, such that fraud in the inducement relating to other contractual terms does not render an arbitration clause unenforceable," and waiver of contractual arbitration rights will not be found, "even when such fraud might justify rescission of the contract as a whole.").

Case: 20-30242    Doc# 18    Filed: 03/30/20    Entered: 03/30/20 16:58:39    Page 21 of 30

1  required by Supreme Court precedent. Accordingly, the Court finds that the Loan Documents

2  clearly manifest an agreement to arbitrate and that the agreement is enforceable.") (internal

3  citations omitted).

**2.      Any Other Questions of Arbitrability Should be Decided by the Arbitrator.**

6       To the extent that Uber raises issues of whether or not this dispute is subject to the

7  arbitration provision at all, those disputes are to be determined by the arbitrator. Where, as here,

8  the parties agreed that the ***arbitrator***, and not the court, shall determine issues of arbitrability, the

9  Court should enforce the parties' agreement and refer issues concerning formation of the

10  agreement to the arbitrator. *See Prima Paint*, 388 U.S. at 397 (under the FAA, claim of

11  fraudulent inducement of entire contract was for arbitrators under arbitration clause, in absence of

12  evidence that contracting parties intended to withhold that issue from arbitration).[5]

13       The parties' agreement to the JAMS Rules in the Indemnification Agreement itself further

14  demonstrates a clear intention to arbitrate any dispute over arbitrability of Mr. Levandowski's

15  claims. Specifically, Uber and Mr. Levandowski expressly incorporated the JAMS Rules into the

16  Indemnification Agreement. *See* Chatterjee Decl. at Ex. 1, Arbitration Demand at Ex. A §§

17  2.2(e); 2.3. Under JAMS Rule 11(b), disputes concerning the formation, existence, and validity

18  of an agreement are for the arbitrator to decide:

19       Rule 11. Interpretation of Rules and Jurisdictional Challenges

20       (b) Jurisdictional and arbitrability disputes, including disputes over the formation,
         existence, validity, interpretation or scope of the agreement under which Arbitration
21       is sought, and who are proper Parties to the Arbitration, shall be submitted to and
         ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction
22       and arbitrability issues as a preliminary matter.

23  Here, the Indemnification Agreement is clear that disputes about formation are to be handled by

24  JAMS. Rescission is fundamentally a formation question. In addition, the scope of arbitration

25  and the arbitrability of disputes is squarely assigned to JAMS as well. Uber simply cannot avoid

---

26  [5] *See also Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak St.*, 35 Cal. 3d 312,
27  323 (1983) ("In the absence of indication of contrary intent, and where the arbitration clause is
    reasonably susceptible of such an interpretation, claims of fraud in inducement of contract (as
28  distinguished from claims of fraud directed to arbitration clause itself) will be deemed subject to
    arbitration.").

the express terms of the arbitration agreement.  *See, e.g.*, *Shierkatz Rllp v. Square, Inc.,* 2015 WL 9258082, at *6 (N.D. Cal. Dec. 17, 2015) ("Because . . . both the applicable AAA and JAMS rules provide that the arbitrator shall decide arbitrability, the Court concludes that the incorporation of the AAA or JAMS rules 'constitutes clear and unmistakable evidence that [the] parties agreed to arbitrate arbitrability.'") (citations omitted); *Strick v. Los Angeles Times Commc'ns LLC*, 2011 WL 13129702, at *4 (C.D. Cal. Oct. 25, 2011) (granting motion to compel noting, "The numerous references to the JAMS rules within the Agreement serve as the clear and unmistakable intent of both parties to incorporate the rules into the Agreement.  This includes rules governing arbitrability, namely, JAMS Rule 11(c) cited by Defendants.").

## C.    UBER CANNOT RESCIND THE AGREEMENT AS A MATTER OF LAW

Uber's rescission effort is also ineffective and barred in equity.  To effectuate rescission, under California Civil Code section 1691, a rescinding party must "promptly" provide notice of rescission and restore any consideration received under the contract being rescinded.  *See* Cal. Civ. Code § 1691.  Far from providing prompt notice, Uber continued to perform under the Indemnification Agreement for over a year after learning the facts that purportedly form the basis of its rescission.  Nor can Uber show that there was fraud in the inducement of the agreement. Rescission based on fraud is a heavy burden that Uber cannot meet, because it cannot show that Mr. Levandowski intended to mislead Uber with a material misrepresentation or omission.  Uber Waiver Any Claim for Rescission.

Uber waived any right to rescind the Indemnification Agreement, because it performed under the Indemnification Agreement for over a year after it knew of Mr. Levandowski's involvement in Tyto as a supposed basis for rescission.  To effectuate rescission, under California Civil Code section 1691, a rescinding party must "promptly" provide notice of rescission and restore any consideration received under the contract being rescinded.  *See* Cal. Civ. Code § 1691. Here, Uber cannot rescind the Indemnification Agreement because it has neither promptly provided notice of rescission nor restored the consideration it received from Mr. Levandowski.

*Dubeck v. California Physicians Service*, 234 Cal. App. 4th 1254 (2015) is instructive as to waiver and failure to provide notice.  In *Dubeck*, the trial court granted summary judgment in

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

favor of defendant Blue Shield, finding that it was entitled to rescission based on plaintiff's misrepresentations regarding her pre-existing conditions. *See id*. at 1256–57. The court of appeals reversed. *See id*. Blue Shield had waived the right to rescind when it performed under the policy for over a year. *See id*. at 1267–68. In addition, instead of rescinding when it undeniably knew about its right to rescind, Blue Shield cancelled the policy (which reaffirmed the existence of the agreement), retained the premiums paid, and did not assert rescission until two years later. *See id*. at 1265–66. Blue Shield's conduct was inconsistent with rescission and waived any right to rescind. *See id*.

The facts here are more compelling in Mr. Levandowski's favor than the facts against rescission in *Dubeck*. Uber was on notice that Tyto was at issue in Google's claims at least as of when Mr. Levandowski provided notice of Google's arbitration demand on November 3, 2016. *See* Chatterjee Decl. at Ex. 1, Arbitration Demand at ¶ 73; Ex. D. Even assuming, *arguendo*, that Mr. Levandowski did not disclose his involvement in Tyto during the due diligence process with Stroz Friedberg, Uber clearly knew of his involvement when it received Google's arbitration demands. Uber accepted its indemnity obligation at that time, and as in *Dubeck*, Uber performed under the Indemnification Agreement after it knew about its purported basis for rescission. Uber then paid for and controlled Mr. Levandowski's defense for more than a year before it even raised the issue of rescission by reserving its right to seek reimbursement for Tyto related claims. *See id*. at ¶¶ 79– 80; Ex. E. In addition, over the course of the Waymo proceedings, Uber learned more of the Tyto facts it now claims were not disclosed during due diligence. *Id*. at ¶¶ 89–90. And even after having knowledge of such facts, Uber continued to perform under the indemnity. *Id*. at ¶ 91. Such conduct further demonstrates that Uber has consistently affirmed the existence of its indemnity obligation.

Also as in *Dubeck*, Uber's statement that the Tyto claims were "Excluded Claims" ***under*** the Indemnification Agreement was an ***affirmation*** of the contract as a whole, which is inconsistent with rescission. As recently as Uber's November 2019 10-Q, Uber acknowledged its indemnity obligation and again affirmed the existence of the Indemnification Agreement. *See id*. at Ex. J ("Pursuant to a contractual obligation, Uber is indemnifying both employees with respect

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION: MP&A

to certain claims.  Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement.").  And as in *Dubeck*, Uber's delay of over 15 additional months in asserting rescission after the date it indisputably knew of the alleged failure to disclose Tyto waived any right it may have had to rescission.  *See Dubeck*, 234 Cal. App. 4th at 1265–66; *see also Campbell v. Title Guarantee & Trust Co*., 121 Cal. App. 374, 376–77 (1932) (reversing judgment for plaintiff for rescission where plaintiff delayed nine months in asserting claim, noting that "[thirty] days is about the utmost length of time which the courts are disposed to allow the purchaser to rescission").

Additionally, Uber's delay has made it impossible to return the consideration Uber received to complete the rescission of the Indemnification Agreement and has substantially prejudiced Mr. Levandowski.  *See* Cal. Civ. Code § 1691 ("to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind . . . (a) Give notice of rescission to the party as to whom he rescinds; and (b) Restore to the other party everything of value which he has received from him under the contract or offer to restore the same"); *Dubeck*, 234 Cal. App. 4th at 1265–66 (unreasonable delay in Blue Shield's rescission was to insured's detriment as she did not obtain and could not now obtain separate insurance for her condition); *Clanton v. Clanton*, 52 Cal. App. 2d 550, 557–58 (1942) (sustaining demurrer as to rescission claim because delay "changed conditions with resulting advantages and disadvantages to the respective parties, and obstacles arise which make it difficult, if not impossible, to restore the parties to their former status").[6]

Here, Mr. Levandowski delivered his company to Uber and thereafter dedicated his efforts to Uber in reliance on Uber's indemnification commitments.  Uber received the right to control Mr. Levandowski's defense, which it exercised for years throughout the arbitration proceedings, making strategic calls throughout the process and over the years.  It is impossible to return this right to Mr. Levandowski, and Uber's statement of December 31, 2019 that it is not directing or controlling Mr. Levandowski's defense is insufficient to restore to Mr. Levandowski what he

---

[6] *See also Neet v. Holmes*, 25 Cal. 2d 447, 458 (1944); *Palmquist v. Palmquist*, 212 Cal. App. 2d 322, 331 (1963).

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MP&A

gave up in the bargain—the ability to make his own decisions on the defense. Indeed, Uber's retention of control of his defense has been to Mr. Levandowski's detriment as Uber prohibited Mr. Levandowski from discussing possible settlement with Google. *See* Chatterjee Decl. at Ex. 1, Arbitration Demand. at ¶ 79. Mr. Levandowski also allowed Uber's due diligence firm, Stroz, nearly unfettered access to him via interview, his electronic devices, and his email and other accounts, among other things. To this day, Uber, through Stroz, remains in possession of those devices and accounts, and has made no mention of returning them to Mr. Levandowski. *See Id.* at ¶ 43. Accordingly, Uber has not returned and cannot return the consideration Mr. Levandowski provided to it in exchange for the Indemnification Agreement, and so cannot meet a necessary predicate for rescission.

### 1. Uber Cannot Show a Material Misrepresentation or Omission to Support Fraud in the Inducement.

Uber also cannot show facts to support its claim of fraud in the inducement. "Fraud in the inducement is a subset of the tort of fraud. It occurs when the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable." *Hinesley v. Oakshade Towne Center*, 135 Cal. App. 4th 289, 294–95 (2005) (internal quotations and citations omitted). To establish fraud, Uber must show, among other things, that Mr. Levandowski intended to mislead Uber with a material misrepresentation or omission, and that Uber relied on that alleged misrepresentation. *See, e.g.*, *Lazar v. Superior Court of Los Angeles,* 12 Cal. 4th 631, 638 (1996).

*First*, contrary to Uber's arguments in its correspondence, Uber had notice of Mr. Levandowski's relationship to Tyto through the Stroz investigation. Uber has never disputed that documents relating to Tyto were on the devices that Mr. Levandowski provided to Stroz as part of Uber's due diligence. *See* Chatterjee Decl. at Ex. 1, Arbitration Demand at ¶ 63. In fact, as Mr. Levandowski pointed out to Uber, several documents from Mr. Levandowski's devices were relied on by the arbitration panel for its interim and final award, and many others were shown to witnesses at the depositions. *See id.* at Ex. F. Thus, Uber's claim for rescission is factually unsupported, as Mr. Levandowski's involvement with Tyto was disclosed to Uber, and there was

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MP&A

no material misrepresentation or omission.

*Second*, Uber cannot show fraud in the inducement as a factual matter, because it cannot show intent to deceive. *See, e.g.*, *Lazar*, 12 Cal. 4th at 638 (elements of fraud require a material misrepresentation made with intent to deceive). Uber cannot show that Mr. Levandowski intended to deceive Uber. Far from concealing his involvement in Tyto, Mr. Levandowski provided Stroz access to virtually his entire life by handing over his laptops and accounts—which contain numerous documents relating to Tyto, including documents cited in the arbitration award and shown to witnesses at deposition and the final hearing. *See* Arbitration Demand at ¶ 63. Uber cannot show that Mr. Levandowski intended to deceive. *See, e.g.*, *Schwarzkopf v. Int'l Bus. Machs., Inc.*, No. C 08-2715 JF (HRL), 2010 WL 1929625, at *14 (N.D. Cal. May 12, 2010) (granting summary judgment for defendant because plaintiff "fails to identify any evidence of fraudulent intent").

*Finally*, Uber also cannot show that any alleged omission or misrepresentation was material. *See, e.g.*, *Lazar*, 12 Cal. 4th at 638 (elements of fraud require material misrepresentation); *Wagner v. S. California Edison Co.*, 2019 WL 1746127, at *4 (C.D. Cal. Apr. 18, 2019) (granting judgment for defendant on securities fraud claim because there was no material misrepresentation or omission, among other missing elements). Simply put, even assuming that Uber did not have notice of Mr. Levandowski's involvement in Tyto, there is no evidence that Uber would have acted differently. The evidence shows that Uber wanted to acquire Otto regardless of anything related to Tyto that Mr. Levandowski disclosed or that was found on his devices. Uber hired Stroz to conduct a thorough investigation of Mr. Levandowski in connection with the acquisition of Otto. A simple review of the voluminous report by Stroz demonstrates what the material concerns investigated by Uber actually were. *See* Chatterjee Decl. at Ex. 2. The vast majority of the investigation related to Mr. Levandowski's departure from Google and what potential claims could be raised. *See id.* It was facts surrounding Mr. Levandowski's departure from Google, not side projects such as Tyto, that were Uber's material considerations in deciding whether or not to acquire Otto. *See id.; see also* Arbitration Demand at ¶¶ 58–63. In fact, discussions about Mr. Levandowski's side projects were relegated

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MP&A

to an exhibit and not included at all in the main Stroz report. *See id.*

The Stroz report focused on Mr. Levandowski's retention and deletion of Google materials and communications with Google employees about a potential new business. In its summary of Mr. Levandowski's interview, Stroz informed Uber that Mr. Levandowski "(a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars." *See* Chatterjee Decl. at Ex. 1, Arbitration Demand at ¶ 59. It called Uber's attention to discrepancies between the amount of Google information Mr. Levandowski said was in his possession and what Stroz actually found. *Id.* at ¶ 64 ("However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer. . . . It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained."). Stroz also noted numerous facts relating to solicitation of Google employees. *Id.* at ¶ 62 ("While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. . . . Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google."). Stroz even informed Uber about Mr. Levandowski's deletion of information and files despite Uber's due diligence process. *Id.* at ¶ 65 ("[B]y March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control.").

Despite all of this, Uber nonetheless chose to proceed with the transaction and with indemnification agreement. *See Hinsley*, 135 Cal. App. 4th at 301 (denying rescission where plaintiff proved the existence of fraudulent statements, but could not prove justifiable reliance); *see also Okun v. Morton*, 203 Cal. App. 3d 805, 828 (1988) ("*All* of these elements must be

Case: 20-30242    Doc# 18    Filed: 03/30/20    Entered: 03/30/20 16:58:39    Page 28 of 30

1  present if actionable fraud is to be found; one element absent is fatal to recovery.") (emphasis in

2  original).  Uber cannot now argue that Mr. Levandowski's alleged failure to disclose a side

3  project like Tyto was material in the face of what it learned in the Stroz report.  Any fraudulent

4  inducement arguments by Uber fail as a result.

## IV.    <u>CONCLUSION</u>

6          Mr. Levandowski has met his burden of showing that an enforceable arbitration agreement

7  governs his dispute with Uber.  Uber, on the other hand, has no viable challenges to the

8  arbitrability of that dispute.  For the foregoing reasons, Mr. Levandowski requests that the Court

9  order Uber to arbitrate Mr. Levandowski's dispute regarding advancement of Expenses.

10         //

Dated: March 30, 2020

Respectfully submitted,

By: */s/ Neel Chatterjee*

NEEL CHATTERJEE
*NChatterjee@goodwinlaw.com*
ANDREW S. ONG
*AOng@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, California 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

HONG-AN VU
*HVu@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 S. Figueroa Street, 41st Flr.
Los Angeles, California 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Tobias S. Keller
*tkeller@kbkllp.com*
Dara L. Silveira
*dsilveira@kbkllp.com*
**KELLER BENVENUTTI KIM LLP**
650 California Street, Suite 1900
San Francisco, California 94108
Telephone: (415) 364-6793
Facsimile: (650) 636-9251

Proposed Attorneys for Debtor and Debtor in Possession Anthony S. Levandowski

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY