# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 1-800-352-JAMS
🖥 www.jamsadr.com

---

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| RESPONDENT NAME | |
| --- | --- |
| ADDRESS | |

| CITY | STATE | ZIP |
| --- | --- | --- |

| PHONE | FAX | EMAIL |
| --- | --- | --- |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
| --- | --- |
| FIRM/COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
| --- | --- | --- |

| PHONE | FAX | EMAIL |
| --- | --- | --- |

## FROM CLAIMANT

Add more claimants on **page 7**.

| CLAIMANT NAME | |
| --- | --- |
| ADDRESS | |

| CITY | STATE | ZIP |
| --- | --- | --- |

| PHONE | FAX | EMAIL |
| --- | --- | --- |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
| --- | --- |
| FIRM/COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
| --- | --- | --- |

| PHONE | FAX | EMAIL |
| --- | --- | --- |

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

AMOUNT IN CONTROVERSY (US DOLLARS) _____

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach* <u>two copies</u> *of entire agreement.*

ARBITRATION PROVISION LOCATION

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with* <u>two copies</u> *to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

SIGNATURE                                          DATE

NAME
(PRINT/TYPED)

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☐ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1.  The contract is with a consumer party, as defined in these standards;
2.  The contract was drafted by or on behalf of the non-consumer party; and
3.  The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1.  An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2.  An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3.  An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4.  An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000      ☐ $100,000 to $250,000      ☐ More than $250,000      ☐ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL


## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|
| FIRM/ COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|
| FIRM/ COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

# ATTACHMENT 1

NEEL CHATTERJEE (SBN 173985)
NChatterjee@goodwinlaw.com
ANDREW S. ONG (SBN 267889)
AOng@goodwinlaw.com
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, California  94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

HONG-AN VU (SBN 266268)
HVu@goodwinlaw.com
**GOODWIN PROCTER** LLP
601 S. Figueroa Street, 41st Flr.
Los Angeles, California  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Claimant
Anthony Levandowski

# JAMS

| | |
|---|---|
| ANTHONY LEVANDOWSKI, an individual , | Case No. |
| Claimant, | **ARBITRATION DEMAND** |
| v. | |
| UBER TECHNOLOGIES, INC. | |
| Respondent. | |

Claimant Anthony Levandowski ("Mr. Levandowski") alleges in this Arbitration Demand as follows:

## **NATURE OF CLAIM**

1. This is an action to enforce the promises Respondent Uber Technologies, Inc. ("Uber") made to Anthony Levandowski to indemnify him for claims brought by Google LLC (f/k/a Google, Inc.) ("Google").

2. Mr. Levandowski is one of the world's leading experts in self-driving technology. Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks. He was a founding member of Google's self-driving initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

3. Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up company.

4. Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr. Levandowski worked for a competitor on self-driving technology, he would face very negative consequences. Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and Travis Kalanick, Uber's then-CEO. In addition, Mr. Levandowski was aware that Mr. Page and other executives at Google viewed Uber as a very significant competitor.

5. In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto").

6. Uber expressed an interest in acquiring Otto. Because of Mr. Page's threats and known hostility towards Uber, Mr. Levandowski insisted that Uber indemnify him against claims that may be brought by Google as a condition to entering into any relationship with Uber.

7. In fact, Mr. Levandowski explained to Uber multiple times that he believed Google would likely sue him if he joined Uber. Mr. Levandowski was particularly concerned because he did not have the ability to defend himself if one of the largest companies in the world, with essentially unlimited resources, came after him.

8. Uber agreed to indemnify Mr. Levandowski for claims Google might raise against

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

him. These claims included claims Google might assert for breach of fiduciary duty, breach of the duty of loyalty, and breaches of various restrictive covenants. **Exhibit A** is a true and correct copy of the Indemnification Agreement without exhibits between Uber and Mr. Levandowski.

9. Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of a claim brought by Google, as well as any judgment in Google's favor. *See* Ex. A at 3, § 2.3.

10. In late August 2016, Uber announced that it was acquiring Otto and did in fact acquire Otto.

11. Two months later, Google served two arbitration demands on Mr. Levandowski alleging the precise claims covered by the Indemnification Agreement. Uber agreed to indemnify Mr. Levandowski without a reservation of rights.

12. Uber paid for and controlled the defense of Mr. Levandowski for nearly three years. Initially, Mr. Levandowski was represented by the same counsel that represented Uber. During the course of a separate litigation, Uber's then-counsel determined it could not jointly represent Mr. Levandowski and Uber. Uber subsequently selected and hired separate counsel for Mr. Levandowski. Uber continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected. During the arbitration proceedings, Uber controlled all litigation, including all settlement discussions with Google.

13. After Mr. Levandowski relied on Uber's control and direction for years and after an Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

14. Following entry of judgment in Google's favor, Mr. Levandowski again provided notice under Section 2.3 of the Indemnification Agreement. In response, Uber again stated that the Indemnification Agreement has been rescinded and that it would not pay for or advance any award or judgment in Google's favor or any further Expenses.

15. As such, Mr. Levandowski files this arbitration to enforce Uber's obligations to

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ARBITRATION DEMAND

pay for Expenses under Sections 2.2(e) and 2.3 of the Indemnification Agreement.

## AGREEMENT TO ARBITRATE

16.    On April 11, 2016, Uber and Mr. Levandowski executed the Indemnification Agreement.[1]  In that agreement, they agreed that Mr. Levandowski was entitled to initiate arbitration under Section 2.2(e) if Uber refused to advance Expenses incurred by Mr. Levandowski arising from claims brought by Google.

17.    Section 2.2(e) states:

> (e) . . . An Indemnified Person [Mr. Levandowski] may elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a). . . . Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS") and [Uber], on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.

*Id.* at § 2.2(e).  This right to arbitrate was reiterated in Section 2.3(a) which states, in relevant part:

> If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within such ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e).

*Id.* at § 2.3(a).

18.    Mr. Levandowski initiates this arbitration under Sections 2.2(e) and 2.3 of the Indemnification Agreement to enforce Uber's obligations to advance Expenses.

19.    The parties agreed that any arbitration would be governed by the JAMS Comprehensive Arbitration Rules.  Ex. A at § 2.2(e).  Under JAMS Rule 11(b), the arbitrator shall determine issues of arbitrability, including any disputes regarding the formation of an agreement, such as any claim for rescission asserted by Uber.  Rule 11(b) states:

**Rule 11. Interpretation of Rules and Jurisdictional Challenges**

---

[1] The Indemnification Agreement was originally between Apparate International C.V. ("Apparate" or "Purchaser") and Anthony Levandowski with Uber guaranteeing Apparate's performance and agreeing to be liable for any breach by Apparate.  *See* Ex. A at § 3.14.  On March 27, 2020, Uber informed Mr. Levandowski that Apparate "has been dissolved and any rights and obligations it would have under the Indemnification Agreement have been assumed by Uber Technologies, Inc."  *See* Ex. O.

(b) Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

20.     In correspondence between Uber and Mr. Levandowski, Uber claims to have rescinded the Indemnification Agreement.  To the extent that Uber disputes that its claim for rescission is an issue for arbitration, Mr. Levandowski requests that the arbitrator(s) decide as a preliminary matter that Uber's challenge to the formation of the Indemnification Agreement should be decided in this proceeding as discussed more fully in Mr. Levandowski's Motion to Compel Arbitration, concurrently filed in his Bankruptcy Court proceedings (Case No. No. 20-30242 (HLB)). **Exhibit P** is a true and correct copy of Mr. Levandowski's Motion to Compel Arbitration.

## FACTS

### A.     MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY

21.     Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

22.     He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

23.     In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles. He was 24 years old at the time.

24.     The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas.  Mr. Levandowski and a team of engineers from U.C. Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations—submitted a self-driving, self-balancing, two-wheeled motorcycle.  This motorcycle, Ghostrider, competed against well-funded submissions from Stanford University, Carnegie Mellon, and established companies.  After performing well in several qualifying rounds, Ghostrider was selected as a contender for the DARPA Grand Challenge.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ARBITRATION DEMAND

ACTIVE/102537049.9

25.     Ghostrider now sits in the Smithsonian Museum as one of America's great innovations.

26.     Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr. Sebastian Thrun, a former Stanford computer science professor who was also a participant in the DARPA Grand Challenge.

27.     Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool. VuTool was subsequently acquired by Google.

**B.     MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM**

28.     Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping with Dr. Thrun. Mr. Levandowski helped develop the technology for the Google service now known as Street View.

29.     In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-driving car program at Google. The program was named "Project Chauffeur." Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016.

30.     Mr. Levandowski was paid approximately $127 million by Google for his work on Project Chauffeur. The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google.

31.     In early 2015, Uber announced that it was launching its own self-driving car initiative by acquiring a team of engineers from Carnegie Mellon University.

32.     At the same time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making.

33.     Dr. Thrun introduced Mr. Levandowski to Travis Kalanick at Uber. After that introduction, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership.

34.     Mr. Levandowski's colleagues, and more than one of his superiors, were aware that Mr. Levandowski may have been having discussions with Uber.

35.     After Uber's announcement in 2015 of its own self-driving car initiative, there were many discussions within Google about how to compete with Uber. In those discussions,

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

executives within Google expressed distaste and animosity towards Uber. Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

36.     Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Larry Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

37.     Toward the end of his time at Google, Mr. Levandowski had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur. During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving start-up outside of Google.

38.     Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences. Based on his dealings with Google and communications with Mr. Page, Mr. Levandowski understood that "competitive" with Google meant joining or working with a large, active competitor of Google.

### C.     MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE

39.     Mr. Levandowski left Google on January 27, 2016, and shortly thereafter helped start Otto.

40.     Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

41.     As part of these discussions, Mr. Levandowski repeatedly told Uber that Google

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ACTIVE/102537049.9

would see Mr. Levandowski working with Uber as a competitive act and would be very unhappy. Mr. Levandowski also told Uber that he feared that Google would sue him and seek recovery of the substantial amounts of money that had been paid to him or were owed to him.

42.     In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Travis Kalanick.  In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick.  In response, Mr. Kalanick stated that he was not concerned about litigation, that he was prepared to fight Google to protect Mr. Levandowski, and that "Uber eats injunctions for breakfast."

43.     In exchange for Uber's protection from claims by Google, among other consideration, Mr. Levandowski agreed to be and was interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz").  He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination.  To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

44.     Mr. Levandowski understood and communicated to Uber that by providing such access, anything provided to Stroz either during the interview or on Mr. Levandowski's devices and accounts would be covered by the indemnity.  The investigation uncovered a great number of facts related to potential claims that might be brought by Google.  This investigation was a multi-month effort that spanned from March 2016 through August 2016.

45.     To get Mr. Levandowski to join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google may raise that were disclosed during the due diligence, including the investigation by Stroz.  *See* Ex. A.

46.     The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

"Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

*Id.* at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

47.    Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

(a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses incurred by such Diligenced Employee*** or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id.* at § 2.1(a) (emphasis added).

48.    "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

"Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special,

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id.* at 3.

49.     The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii).  That section reads:

(b) Notwithstanding anything herein to the contrary, ***an Indemnified Claim shall not, regardless of whether the Closing occurs, include***, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

(ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id.* at § 2.1(b)(ii) (emphasis added).

50.     The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski.

51.     The agreement was also structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded.  Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

**2.3.  Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within ▮▮▮▮▮▮ ▮▮▮▮▮▮ of such request.

*Id.* at § 2.3.

52.     If Uber denied a request for advancement of Expenses or otherwise failed to pay

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

ACTIVE/102537049.9

an Expense, Uber agreed that Mr. Levandowski could initiate arbitration under the JAMS Rules to enforce Uber's obligations.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within ███████ of such request. **If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within such** ████ ██████████████████**, such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e).** In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.

Ex. A at §2.3(a) (emphasis added).

(e) . . . An Indemnified Person [Mr. Levandowski] may elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a). . . . Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS") and [Uber], on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.

*Id.* at § 2.2(e).

53.     The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses.

**3.11 Specific Performance**. Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative).  Each of the Parties agrees that *this Agreement is intended to be legally binding and specifically enforceable* pursuant to its terms and that Purchaser and the *Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms* and that monetary damages would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, *a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.*

*Id.* at § 3.11 (emphasis added).

54.     In an arbitration concerning Uber's failure to advance Expenses, the agreement expressly prohibited Uber from litigating any issues concerning whether any claims or Expenses are covered by the Indemnification Agreement if the claims brought by Google were not fully

resolved either through settlement or a final, non-appealable judgment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request. If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within [redacted] period, such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e). ***In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.***

*Id.* at § 2.3(a) (emphasis added).

55.     Instead, Uber agreed that it could challenge coverage and seek ***reimbursement*** of payment for Expenses it advanced ***only after*** the resolution of a Former Employer's claims. Section 2.2(d) of the Indemnification Agreement stated:

> In the event that Purchaser believes all or a portion of a Former Employer Claim is an Excluded Claim hereunder, Purchaser shall have the right (in its sole discretion), ***within 60 days following the settlement or final non-appealable adjudication of such Former Employer Claim***, to initiate arbitration under Section 2.2(e) with the Indemnified Person(s) party to such Former Employer Claim in order to determine whether all or a portion of such Former Employer Claim is an Excluded Claim under the terms of this Agreement.

*Id.* at § 2.2(d) (emphasis added).

56.     It was only after final resolution of any arbitration between Mr. Levandowski and Uber wherein the arbitrators determined that a Former Employer Claim was not covered by the Indemnification Agreement would Uber receive reimbursement for Expenses it advanced.

> Following such arbitration, if the arbitrator(s) determines in a Final Judgment that all or a portion of such Former Employer Claim is an Excluded Claim hereunder, then Purchaser shall be entitled to receive reimbursement for, and the Indemnified Person(s) party to such Former Employer Claim shall be required to pay to Purchaser, the amount of all Expenses paid or incurred by or on behalf of Purchaser and/or its Affiliates with respect to such Excluded Claim

*Id.*

57.     In the meantime, Uber was required to advance Expenses to indemnify Mr. Levandowski for claims brought against him by Google.

> For the avoidance of doubt, ***Purchaser shall advance all Expenses*** incurred by the

Indemnified Person(s) pursuant to Section 2.3(a) ***through the later to occur of the final settlement or final adjudication*** of such Former Employer Claim, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d).

*Id.* at § 2.2(d) (emphasis added).

**D.    UBER ACQUIRES OTTO**

58.    Stroz issued a report on August 5, 2016.  The report summarized Stroz's investigation, including the interviews it conducted and the forensic work it performed relating to the devices provided by the Diligenced Employees.

59.    As summarized in the Stroz report:

> During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

60.    Stroz reported that Mr. Levandowski's devices demonstrated that during his time at Google, he downloaded documents and files relating to Project Chauffeur.

> Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016.  An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/."  These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

61.    It also reported that Mr. Levandowski downloaded Chauffeur files shortly before his departure from Google and had accessed them following his departure from Google.

> Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

62.    Stroz reported facts regarding solicitation of Google employees.

> While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ACTIVE/102537049.9

his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took lace t Levandowski's house in approximately December 2015 and January 016. These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

63. Stroz included as Exhibit 5 to its report a draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects and businesses. However, Stroz declined to include any analysis on side projects or businesses in its main report. In addition, Mr. Levandowski's devices and accounts also contained numerous documents about his side projects, including extensive information about a company named Odin Wave/Tyto, Mr. Levandowski' estate planning, and various investment entities that Mr. Levandowski had involvement with.

64. Stroz noted discrepancies in what Mr. Levandowski recalled compared to what Stroz discovered on Mr. Levandowski's devices.

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

65. Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text messages, as well as its decision not to investigate these deletions further.

Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time.

Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

66.     Nevertheless, on August 18, 2016, shortly after Uber completed its due diligence and days after Mr. Levandowski received his second large payment from Google, Uber announced that it was acquiring Otto.

67.     In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." *Id*. **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

**E.     GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI**

68.     On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

69.     Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

70.     The two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before Otto was acquired by Uber.

71.     Google alleged that Mr. Levandowski violated his duties to Google by forming Tyto. Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

information regarding compensation to recruit Google employees.

72.     The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement.

73.     As a result, on November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

### F.     UBER ACCEPTS THE INDEMNITY OBLIGATIONS

74.     Mr. Levandowski provided notice to Uber as required by the Indemnification Agreement.  After receipt of the notice, Uber accepted its obligations to indemnify and assumed control of Mr. Levandowski's defense.

75.     Uber's counsel, Morrison & Foerster ("MoFo"), initially represented Mr. Levandowski.  As his counsel, MoFo determined the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration.

76.     In February 2017, Waymo LLC—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action").

77.      MoFo then determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski.  As a result, MoFo sought to withdraw from representation of Mr. Levandowski.

78.     Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

79.     For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement.  Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings and pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions.  Mr. Levandowski complied with Uber's requirements and cooperated with is defense.

80.     On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the expenses it advanced for Mr. Levandowski to defend himself in the arbitration.  **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

81.     One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"— which Mr. Levandowski had exercised over a year before.  At the time, Uber was fully aware that Mr. Levandowski intended to assert his Fifth Amendment rights, but never made a request that he waive his rights in the arbitration proceeding.

82.     Nevertheless, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the Waymo court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

83.     Uber requested that Mr. Levandowski waive in part his Fifth Amendment rights and testify during the arbitration.

84.     In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

85.     Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

86.     Uber also raised for the first time in April 2018 that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

87.     Uber's claims were false.  Not only had Uber accepted its duty to indemnify Mr. Levandowski at the very outset of the arbitration proceeding where Tyto had been placed squarely at issue, but Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

ACTIVE/102537049.9

88.     In fact, Tyto was acquired by Otto with Uber's consent and at Uber's request prior to Uber closing on its acquisition of Otto.

89.     In addition, for the last year and a half prior to April 2018, Uber received documents and information about Tyto in the Waymo action and had participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started.  Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski,  all worked for Uber and were deposed about Tyto.

90.     Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that invested funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and would visit Tyto and his friends at that company to talk about technical and business matters from time to time.

91.     And yet, Uber did not raise any issues regarding coverage until April 2018.

92.     Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

**G.     UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

93.     On March 28, 2019, the arbitration panel issued an interim award finding in favor of Google.  The arbitration panel found violation of the exact claims covered by the Indemnification Agreement and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google.  The panel also awarded prejudgment interest and attorneys' fees, as it determined Google was the prevailing party.

94.     On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was going to abide by its Indemnification Obligations and pay for any adverse award in light of the interim award.  **Exhibit F** is a true and correct copy of Mr. Levandowski's May 13, 2019 letter.

95.     In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence.  Mr. Levandowski

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

identified documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well and pointed out that documents from his devices were shown to witnesses at the arbitration hearing.

96.     Mr. Levandowski sent Uber a follow up letter on June 27, 2019.  **Exhibit G** is a true and correct copy of that follow-up letter.

97.     On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters stating that Mr. Levandowski had breach the Indemnification Agreement, that a majority of the interim award was "attributable to an Excluded Claim," and that "Uber has no contractual obligation to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's behalf."  **Exhibit H** is a true and correct copy of Uber's July 3, 2019 letter.

98.     On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for which was rescission of the agreement.  **Exhibit I** is a true and correct copy of Uber's August 30, 2019 letter.

99.     Uber's letter came just days after Mr. Levandowski was indicted for over thirty counts of trade secret misappropriation and had to continue to assert his Fifth Amendment rights.[2]

100.     Uber did not state that the Indemnification Agreement was rescinded, make any offer to restore the consideration it received under the agreement, or cede control of Mr. Levandowski's defense.  Uber also did not address the unambiguous evidence that Mr. Levandowski's devices inspected by Stroz had extensive information about Tyto on them.

101.     Uber continued to advance payment for expenses incurred through September 25, 2019.

102.     In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission.  In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation,

---

[2] On March 19, 2020, Mr. Levandowski agreed to plead guilty to one count of trade secret misappropriation based on his access of one Google document containing trade secret information on one occasion after he left Google and has accepted restitutionary obligations in the amount of $756,499.22.  The government agreed to dismiss all other counts against Mr. Levandowski.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ACTIVE/102537049.9

Uber is indemnifying both employees with respect to certain claims. Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **Exhibit J** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

103. On December 6, 2019, the arbitration panel issued a final arbitration award.

104. On December 10, 2019, Mr. Levandowski informed Uber of the final award. **Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter. Because of Uber's previous statements, Mr. Levandowski asked for clarity as to how Uber, as the Indemnitor in control of the defense of the case, would like to proceed. Specifically, Mr. Levandowski inquired whether Uber intended to resolve the matter by paying the judgment or whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal and posting a bond to stay the judgment pending appeal.

105. On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019 letter and stated that it rescinded the Indemnification Agreement. **Exhibit L** is a true and correct copy of Uber's December 31, 2019 letter. The stated basis for rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement for Expenses paid relating to the claims based on Tyto.

106. Using its same faulty allegations with a newly minted legal theory, Uber now argued that the Indemnification Agreement no longer existed. Uber offered no explanation for the fact that the Tyto information was indisputably on the devices Stroz Freiberg had inspected and had been squarely placed at issue the moment the arbitration demand was served.

107. Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

108. In addition, for the first time in three years, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals."

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ACTIVE/102537049.9

109.    On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019.  Uber did not provide payment for any Expenses incurred after that date.

110.    On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,786,091.24. **Exhibit M** is a true and correct copy of the judgment in Google's favor.

111.    On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of California.

112.    On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement.  In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020.  **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without exhibits.

113.    On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay Google's judgment or any other Expenses.  **Exhibit O** is a copy of Uber's March 27, 2020 letter.

114.    As a result, Mr. Levandowski files this arbitration demand with JAMS San Francisco as permitted by the Indemnification Agreement.

## COUNT I

### (Specific Performance Against Uber to Pay Current Expenses)

115.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

116.    On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ACTIVE/102537049.9

out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

117.    Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

118.    As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims.  *Id.* at 3.

119.    Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within ████████████████ of a request for advancement.

120.    On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

121.    Uber has refused to advance payment for the Expenses requested in the March 6 Request.

122.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

123.    The Parties agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy.  *See id.* at § 3.11.

124.    The parties also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement.  *See id.*

125.    The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

126.     A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

127.     The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

128.     Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber advance payment for the Expenses requested on March 6, 2020 as well aspayment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far.

## COUNT II

### (Specific Performance Against Uber to Continue to Pay Expenses)

129.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

130.     On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

131.     Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

132.     As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any

ACTIVE/102537049.9

awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id*. at 3.

133.    Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within ████████████ of a request for advancement.

134.    On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

135.    Uber has refused to advance payment for the Expenses requested in the March 6 Request.

136.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

137.    The Parties agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id*. at § 3.11.

138.    The parties also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

139.    The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

140.    A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

141.    The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

142.    Google's claims are not yet resolved as Mr. Levandowski intends to appeal the judgment and there has been no settlement of Google's claims.

143.    Therefore, Mr. Levandowski seeks to enforce by this action precisely the terms

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Uber agreed to in the Indemnification Agreement—that Uber advance any Expenses incurred by Mr. Levandowski within ███████████ of a request for advancement under Section 2.3 until Google's claims are resolved either by binding judgment or settlement.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Levandowski prays for the following relief:

1. An order enforcing the obligation in the Indemnification Agreement that Uber advance payment for the Expenses in the March 6 Request;

2. An order from the Court enforcing the obligation in the Indemnification Agreement that Uber continue to advance payment for Expenses pursuant to Section 2.3 until Google's claims are resolved by either a binding judgment or settlement;

3. Attorneys' fees and costs incurred by Mr. Levandowski pursuant to Section 3.2 of the Indemnification Agreement, including fees incurred in the Bankruptcy proceeding due to Uber's failure to advance expenses; and

4. All other relief that is equitable and just.

Dated: March 30, 2020                                    Respectfully submitted,

By: /s/ *Neel Chatterjee*
Neel Chatterjee
*NChatterjee@goodwinlaw.com*
Andrew S. Ong
*AOng@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, California 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

Hong-An Vu
*HVu@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 S. Figueroa Street, 41st Flr.
Los Angeles, California 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Claimant Anthony Levandowski

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

ACTIVE/102537049.9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

## INDEMNIFICATION AGREEMENT

THIS INDEMNIFICATION AGREEMENT (as may be amended from time to time, this "**Agreement**") is made and entered into as of April 11, 2016 (the "**Agreement Date**"), by and among: (i) Apparate International C.V., a limited partnership (commanditaire vennootschap) organized under the laws of the Netherlands ("**Purchaser**"), (ii) Ottomotto LLC, a Delaware limited liability company (the "**Company**"), (iii) Otto Trucking LLC, a Delaware limited liability company, Lior Ron, as the Indemnified Persons' Representative, (iv) each of the individuals signatory hereto (together with any additional Diligenced Employees who become party to this Agreement pursuant to Section 3.13 (if any), collectively, the "**Diligenced Employees**") and (v) solely with respect to Section 3.14, Uber Technologies, Inc. a Delaware corporation ("**Parent**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Merger Agreement (as defined below).

WHEREAS, Parent, Purchaser, Zing Merger Sub 1, LLC, a Delaware limited liability company ("**Merger Sub**"), and the Company are entering into an Agreement and Plan of Merger of even date herewith (as the same may be amended or supplemented, the "**Merger Agreement**") providing for the merger of Merger Sub with and into the Company;

WHEREAS, Purchaser is agreeing to indemnify each member of the Company Group and each Diligenced Employee (each, an "**Indemnified Person**," and, collectively, the "**Indemnified Persons**") in the event of certain claims by Former Employers pursuant to the terms and subject to the conditions of this Agreement;

WHEREAS, prior to the execution of this Agreement, and as a material inducement to Purchaser's willingness to enter into this Agreement, each Diligenced Employee as of the Agreement Date has (i) initiated or completed a due diligence review by the Outside Expert to determine whether such Diligenced Employee has committed any Pre-Signing Bad Acts and (ii) certified to the Company (and in the case of the Founders certified to the Company and to Parent in a mutually agreeable form) as to the good faith, complete and truthful cooperation with such due diligence review by such Diligenced Employee and to the good faith, complete and truthful response by such Diligenced Employee to all inquiries of the Outside Expert;

WHEREAS, the Outside Expert has completed its field interviews and data collection from the Diligenced Employees that, as of the date hereof, are parties hereto ("**Completed Diligenced Employees**"), and Parent confirms to such Completed Diligenced Employees that each such Completed Diligenced Employee has cooperated with the Outside Expert in connection with the Outside Expert's examination;

WHEREAS, the Parties have agreed that the Completed Diligenced Employees' involvement in the Outside Expert examination, including interviews, device and document production, and other personal involvement of any nature, is complete and Parent will so instruct the Outside Expert;

WHEREAS, the Parties have agreed that the Outside Expert will continue to analyze the devices, materials and information provided by each Diligenced Employee solely for the purpose of completing a final report, all as provided for and only in accordance with the examination protocol attached to the Engagement Letter, dated March 4, 2016; *provided*, that the Outside Expert may give interim reports to its Clients (with the participation of the Completed Diligenced Employee's counsel) regarding any matters which the Outside Expert believes may be subject to or included in the final report; and

WHEREAS, the Parties agree that any claim that has arisen out of or resulted from any Pre-Signing Bad Acts committed by or on behalf of any member of the Company Group by a Diligenced

Employee and/or committed by any Diligenced Employee and that reasonably arises or results from any facts, circumstances, activities or events contained or disclosed on the face of such final report shall, subject to Section 2(b)(ii), constitute an Indemnifiable Claim in accordance with, and subject to, the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, and intending to be legally bound hereby, the parties hereby agree as follows:

## SECTION 1. DEFINITIONS.

As used in this Agreement, the following terms shall have the meanings specified below:

"**409A Valuation Report**" means the formal report issued by a third-party valuation firm setting forth the valuation of Parent Shares pursuant to Section 409A of the Internal Revenue Code of 1986, as amended, which valuation of such Parent Shares shall be approved by Parent's board of directors (or a compensation committee thereof).

"**Bad Acts**" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

"**Cause**" shall mean, with respect to any particular Diligenced Employee, the termination of such Diligenced Employee's employment by Parent or any Affiliate of Parent (or a successor, if appropriate) based on one or more of the following events having occurred during such person's employment with Parent or any Affiliate of Parent (or a successor, if appropriate), which with respect to clauses (A), (C), (D) and (F) below, if curable, such Diligenced Employee has not cured within twenty (20) days after prior written notice has been given to him/her by Parent (or a successor, if appropriate) specifying with reasonable particularity such occurrence: (A) such Diligenced Employee's material neglect of his/her duties and responsibilities to Parent (or a successor, if appropriate) and/or its Affiliates; (B) such Diligenced Employee's (1) commission of any act of fraud, theft or embezzlement, or (2) willful misconduct or any other unlawful act that materially harms Parent and/or any of its Affiliates; (C) (1) such Diligenced Employee's material breach of any of his/her obligations under any written agreement with Parent (or a successor, if appropriate), including without limitation, such Diligenced Employee's employment contract with Parent or the Confidential Information and Invention Assignment Agreement between such Diligenced Employee and Parent, or (2) such Diligenced Employee's material breach of any statutory duty or fiduciary duty that he/she owes to Parent; (D) such Diligenced Employee's material failure to comply with Parent's written policies, directives or rules; (E) such Diligenced Employee's indictment or conviction of, or plea of "guilty" or "no contest" to, (1) a felony under the laws of the United States or any State thereof or (2) a crime of moral turpitude; or (F) such Diligenced Employee's failure to cooperate in good faith with a governmental or internal investigation of Parent, its Affiliates or

2.

any of their respective officers or employees, if Parent has reasonably requested such Diligenced Employee's cooperation. For the avoidance of doubt, the inclusion of the definition of "Cause" in this Agreement or in any other agreement will not, in any manner, modify the "at-will" nature of such Diligenced Employee's employment contract with Parent.

"**Company Group**" means the Company and Otto Trucking LLC, a Delaware limited liability company.

"**Employee**" means any current or former employee of the Company Group.

"**Expenses**" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

"**Final Judgment**" means, with respect to any matter, the final non-appealable judgment of a court of competent jurisdiction with respect to such matter (or, the final non-appealable decision of the arbitrator(s), if the Parties elect to pursue arbitration to adjudicate such matter pursuant to Section 2.2(e)).

"**Forfeiture Share Price**" means (i) if Parent Shares are publicly traded, the average of the closing sales price of such Parent Shares as quoted on the national stock exchange on which Parent Shares are publicly traded for the twenty (20) consecutive trading days ending with the trading day that is one (1) trading day immediately preceding the date of the resolution of the relevant Forfeiture Claim, or (B) if Parent Shares are not publicly traded, the price per Parent Share as determined by Parent's most recent 409A Valuation Report prior to the date of the resolution of the relevant Forfeiture Claim.

"**Former Employer**" means, with respect to an Employee, any Person (together with such Person's Affiliates) that such Employee has previously either provided services to as an employee or a non-employee service provider.

"**Founders**" means, collectively, Anthony Levandowski and Lior Ron (and each, individually, a "**Founder**").

"**Outside Expert**" means Stroz Friedberg, LLC or such other vendor as mutually agreed to by the Company and Parent in writing.

"**Post-Signing Specified Bad Acts**" shall have the meaning set forth on Exhibit A attached hereto.

"**Pre-Signing Bad Acts**" means any Bad Act committed prior to the Agreement Date.

"**Third Party Report**" means the written report(s) produced by the Outside Expert summarizing in detail all of the facts, circumstances, activities or events obtained by the Outside Expert from any Diligenced Employee that the Outside Expert deems are reasonably related to any Bad Act of such Diligenced Employee, in each case, based on the interviews, forensic due diligence and other due diligence investigation with respect to all Diligenced Employees conducted by the Outside Expert, as jointly directed by and engaged by the Company and Parent.

**SECTION 2.   INDEMNIFICATION**

**2.1      Indemnification.**

(a)      Purchaser will indemnify and hold harmless each Diligenced Employee and the Company Group, to the maximum extent permitted by applicable Law (subject to the limitations and exclusions set forth herein), from and against any and all Expenses incurred by such Diligenced Employee or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "**Indemnified Claim**", and, collectively, the "**Indemnified Claims**"); *provided*, that notwithstanding the foregoing, if (A) the Merger Agreement is terminated in accordance with its terms prior to the Closing as a result of or by reason of a Post-Signing Specified Bad Act (that was the subject of a Former Employer Claim) being committed by or on behalf of any member of the Company Group by such Diligenced Employee and/or being committed by such Diligenced Employee (and such Post-Signing Specified Bad Act was either (x) mutually agreed to have occurred by both Purchaser and the Company or (y) determined by a Final Judgment to have occurred) or (B) following the Closing (if the Closing occurs), it is determined by a Final Judgment that a Post-Signing Specified Bad Act (that was the subject of a Former Employer Claim) was committed by such Diligenced Employee on behalf of any member of the Company Group and/or was committed by such Diligenced Employee prior to the Closing, then, in each case of clauses (A) and (B), Purchaser's indemnification obligation to such Diligenced Employee pursuant to this Agreement shall immediately become null and void and of no further force and effect and there shall be no liability on the part of Parent, Purchaser or any of their respective Affiliates to indemnify (1) such Diligenced Employee for any Indemnified Claims or (2) the Company Group for any Indemnified Claims arising out of or alleged to arise out of the actions of such Diligenced Employee.

(b)      Notwithstanding anything herein to the contrary, an Indemnified Claim shall not, regardless of whether the Closing occurs, include, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

(i)      claims that have been determined by a Final Judgment to arise or result from Bad Acts committed by any Employee other than a Diligenced Employee (and only to the extent that any such claim arises or results from Bad Acts committed by any Employee other than a Diligenced Employee), regardless of whether such Bad Acts were committed prior to or after the execution of the Merger Agreement; *provided*, for the avoidance of doubt, this subclause (i) shall not limit Purchaser's obligation to indemnify the Diligenced Employees and the Company Group for Indemnified Claims in accordance with Section 2.1(a);

(ii)      claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries

4.

in connection with the due diligence performed by the Outside Expert or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees to the Outside Expert; and

(iii)     claims that have been determined by a Final Judgment to arise or result from any Post-Signing Specified Bad Acts (that was the subject of a Former Employer Claim) committed by a Diligenced Employee on behalf of any member of the Company Group and/or committed by any Diligenced Employee (the matters excluded from Indemnified Claims in the preceding subclauses (i), (ii) and (iii) collectively, the "**Excluded Claims**" and each, an "**Excluded Claim**").

2.2     **Indemnified Claim Procedure**.

(a)     In the event that any Indemnified Person becomes aware of any actual claim, or claim threatened in writing, by any Former Employer (including any Proceeding commenced or threatened in writing to be commenced by any Former Employer) which such Indemnified Person believes is reasonably expected to result in indemnification pursuant to this Agreement (each, a "**Former Employer Claim**"), such Indemnified Person shall promptly deliver a written notice of such claim (such notice, the "**Claim Notice**") to Purchaser. The Claim Notice shall be accompanied by any documentation received by or otherwise in the possession or control of the Indemnified Person (or its Representatives) in respect of such Former Employer Claim (including the information set forth in Sections 2.2(c)(i) and 2.2(c)(ii)) and shall describe in reasonable detail (to the extent known to the Indemnified Person) and subject to a Joint Defense Agreement (as defined below) the facts, circumstances and events constituting the basis for such Former Employer Claim (including the identity and address of such Former Employer) and the amount of the damages claimed in such Former Employer Claim; *provided*, that no delay or failure on the part of an Indemnified Person in delivering a Claim Notice shall relieve Purchaser from any liability hereunder unless and to the extent Purchaser and/or its Affiliates have been actually and materially prejudiced by such delay or failure.

(b)     Purchaser shall direct and control the defense or settlement of the Former Employer Claim referred to in the Claim Notice. The Indemnified Person party to such Former Employer Claim shall be given the opportunity to participate at its own cost and expense (which shall not be included in Expenses) in, but not direct or control, the defense of such Former Employer Claim. Such Indemnified Person's participation will be subject to Purchaser's right to fully direct and control such defense and Purchaser shall have the right in its sole discretion to settle any Former Employer Claim; provided that without the prior written consent of the applicable Indemnified Person (such consent not to be unreasonably withheld, conditioned or delayed), no settlement shall be agreed to by Purchaser and/or any of its Affiliates that shall (i) require an Indemnified Person to admit that such Indemnified Person breached or violated (x) any law or (y) any obligations to any Former Employer, (ii) impose on an Indemnified Person any obligation, agreement or undertaking to take or refrain from taking any future action or (iii) involves any relief against an Indemnified Person other than monetary damages that are included as Expenses hereunder. In addition, notwithstanding anything to the contrary contained herein, if the Indemnified Person is a Founder, at the time the Claim Notice is delivered, such Founder shall advise Purchaser if such Founder reasonably believes that a conflict of interest exists with respect to the defense of such Indemnified Claim between such Founder's interests and those of Purchaser, any applicable Affiliate of Purchaser or any other Indemnified Person (including the Company Group) (a "**Conflict of Interest Claim**"). Subject to the proviso in this sentence, in the event of such Conflict of Interest Claim, such Founder may, at such Founder's sole cost and expense (which shall not be included in Expenses), engage individual counsel to act on such Founder's behalf in defense of such Conflict of Interest Claim; provided, however, that if (i) such Conflict of Interest Claim arises following the termination of the Merger Agreement or (ii) if such Conflict of Interest Claim arises prior to the Closing, but the Merger Agreement is thereafter terminated, all reasonable costs and expenses incurred in connection with such representation by such counsel shall be Expenses for purposes of this Agreement.

(c)     The Indemnified Person(s) party to such Former Employer Claim (i) shall furnish Purchaser and its Representatives with such information as such Indemnified Person(s) may have with respect to such Former Employer Claim (including copies of any summons, complaints or other pleadings which may have been served on such Indemnified Person(s) and any written claim, demand, invoice, billing or other document evidencing or asserting the same), (ii) shall provide to Purchaser and its Representatives any documents or other materials in the possession or control of such Indemnified Person(s), or that come into the possession or control of such Indemnified Person(s), that may be necessary or useful to the defense of such Former Employer Claim, subject to protection of the attorney-client privilege, the attorney work product protection, confidentiality obligations owed to third parties and other applicable privileges and protections, (iii) shall make himself or herself available to Purchaser upon reasonable notice for interviews and factual investigations and to appear at Purchaser's reasonable request to give testimony (including deposition and trial testimony) with respect to the defense of such Former Employer Claim without requiring service of a subpoena or other legal process and (iv) shall otherwise reasonably cooperate with and assist Purchaser and its Representatives in the defense of such Former Employer Claim.  Additionally, the Indemnified Person(s) shall enter into a separate confidentiality, common interest or joint defense agreement with Purchaser, in a form reasonably agreed upon in good faith between the Indemnified Person(s) and Purchaser (the "**Joint Defense Agreement**"), prior to participating in the defense of any Former Employer Claim if requested by Purchaser or the Indemnified Person(s).

(d)     In the event that Purchaser believes all or a portion of a Former Employer Claim is an Excluded Claim hereunder, Purchaser shall have the right (in its sole discretion), within 60 days following the settlement or final non-appealable adjudication of such Former Employer Claim, to initiate arbitration under Section 2.2(e) with the Indemnified Person(s) party to such Former Employer Claim in order to determine whether all or a portion of such Former Employer Claim is an Excluded Claim under the terms of this Agreement.  For the avoidance of doubt, Purchaser shall advance all Expenses incurred by the Indemnified Person(s) pursuant to Section 2.3(a) through the later to occur of the final settlement or final adjudication of such Former Employer Claim, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d).  Following such arbitration, if the arbitrator(s) determines in a Final Judgment that all or a portion of such Former Employer Claim is an Excluded Claim hereunder, then Purchaser shall be entitled to receive reimbursement for, and the Indemnified Person(s) party to such Former Employer Claim shall be required to pay to Purchaser, the amount of all Expenses paid or incurred by or on behalf of Purchaser and/or its Affiliates with respect to such Excluded Claim (or, if the arbitrator(s) determine in a Final Judgment that only a portion of the Former Employer Claim is an Excluded Claim, the amount of all Expenses incurred by Purchaser and/or its Affiliates with respect to that portion of such Former Employer Claim that was determined to be an Excluded Claim) (such amount, as determined by the arbitrator(s) in such arbitration, the "**Expense Reimbursement Amount**").  The obligations of the Indemnified Persons under this Section 2.2(d) are several and not joint, and each Indemnified Person party to such Former Employer Claim shall only be responsible for paying to Purchaser its pro-rata portion of the Expense Reimbursement Amount (based on the total number of Indemnified Person(s) party to such Former Employer Claim, unless otherwise determined by the arbitrator(s) in a Final Judgment) and such amount shall be paid by such Indemnified Person to Purchaser by wire transfer of immediately available funds to an account designated by Purchaser promptly, but in no event more than three (3) months, following the date of the Final Judgment referenced in the preceding sentence.  Purchaser and/or its Affiliates, as applicable, may offset on a dollar-for dollar basis any amounts that Purchaser and/or its Affiliates, as applicable, owe an Indemnified Person against any amounts that such Indemnified Person owes Purchaser hereunder other than compensation of base salary.  Unless otherwise provided under applicable Law and determined by a Final Judgment, no Diligenced Employee shall be personally liable for the Company Group's or any other Diligenced Employee's portion of the Expense Reimbursement Amount.

(e)     Within 60 days after the settlement or final non-appealable judgment of a Former Employer Claim, Purchaser may elect (in its sole discretion) to arbitrate (A) whether an Indemnified Claim is an Excluded Claim and/or (B) whether a Diligenced Employee is entitled to indemnification under this Agreement (subject to the terms and conditions hereof, including the proviso in Section 2.1(a) and the last sentence of Section 2.3(a)).  An Indemnified Person may elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a).  In the event of any dispute between Purchaser, on the one hand, and any Indemnified Person, on the other, as to whether a Former Employer Claim is an Excluded Claim, each reference to an "Indemnified Person" who is not a Founder in the following sentences of this Section 2.2(e) shall be replaced with "Indemnified Persons' Representative" and each such Non-Founder Indemnified Person shall acknowledge and agree that the Indemnified Persons' Representative shall, pursuant to Section 3.10, direct and control such arbitration (including the right to settle such arbitration) and that the Final Judgment of such arbitration shall be conclusive and binding on such Indemnified Person.  A Founder may, but shall not be required to, agree to be represented by the Indemnified Persons' Representative at the time of the arbitration.  Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("**JAMS**") and each of Purchaser, on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.  With respect to any matter submitted to arbitration, such arbitration shall be settled by an arbitration conducted by one arbitrator mutually agreeable to both Purchaser and the Indemnified Person.  In the event that, within fifteen (15) days after submission of any dispute to arbitration, Purchaser and the Indemnified Person cannot mutually agree on one arbitrator, then, within ten (10) days after the end of such fifteen (15) day period, Purchaser, on the one hand, and the Indemnified Person, on the other, shall each select one independent arbitrator.  The two arbitrators so selected shall select a third independent arbitrator.  The arbitrator(s) shall determine how all Expenses relating to the arbitration shall be paid (subject to Section 3.2), including the respective Expenses of each party, the fees of each arbitrator and the administrative fee of JAMS.  The arbitrator or arbitrators, as the case may be, shall set a limited time period that shall exceed no more than 180 days after the demand for arbitration is filed and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator or majority of the three arbitrators, as the case may be, to discover relevant information from the opposing parties about the subject matter of the dispute.  The arbitrator, or a majority of the three arbitrators, as the case may be, shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the same extent as a competent court of law or equity, should the arbitrators or a majority of the three arbitrators, as the case may be, determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification.  The decision of the arbitrator or a majority of the three arbitrators, as the case may be, as to the validity and amount of any claim submitted to arbitration shall, subject to any appeal permitted under the Federal Arbitration Act ("**FAA**"), be final, binding, and conclusive upon the Parties to this Agreement.  Such decision shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s).  Within thirty (30) days of a decision of the arbitrator(s) requiring payment by any Party to another Party, such Party shall make such payment to such other Party.  Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

(f)     In any Proceeding between Purchaser, on the one hand, and any member of the Company Group and/or any Diligenced Employee, on the other hand, to determine whether a Former Employer Claim is an Excluded Claim or whether an Indemnified Person is entitled to indemnification in respect of a Former Employer Claim under the terms of this Agreement, Purchaser shall have the burden of proving, as applicable, that a Former Employer Claim is an Excluded Claim under the terms of this Agreement or that an Indemnified Person is not entitled to indemnification under the terms of this Agreement in respect of a Former Employer Claim.

### 2.3 Expenses.

(a)     Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses ████████████████ of such request. If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person ████████████████████ ████, such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e). In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.

(b)     In the event that Purchaser or any of its Affiliates advance any Expenses to an Indemnified Person in respect of a Former Employer Claim in accordance with Section 2.3(a) and thereafter it is determined in a Final Judgment that such Indemnified Person was not entitled to indemnification for such Former Employer Claim because (i) it is an Excluded Claim under the terms of this Agreement, or (ii) such indemnification is determined to be null and void pursuant to the proviso in Section 2.1(a) of this Agreement, then Purchaser shall be entitled to receive reimbursement for, and such Indemnified Person shall be required to pay to Purchaser, the amount of all such Expenses paid or incurred by or on behalf of Purchaser or its Affiliates to such Indemnified Person in respect of such Excluded Claim. Such amount shall be paid by such Indemnified Person to Purchaser by wire transfer of immediately available funds to an account designated by Purchaser promptly, but in no event more than three (3) months, following the date of the Final Judgment referenced in the preceding sentence. Unless otherwise provided under applicable Law and determined by a Final Judgment, no Diligenced Employee shall be personally liable for the amount of Expenses paid by or on behalf of Purchaser or its Affiliates to the Company Group in respect of such Former Employer Claim.

### 2.4 Indemnification Limitations.

(a)     Notwithstanding anything herein to the contrary, under no circumstances shall Parent, Purchaser or any of their respective Affiliates have any obligations hereunder to indemnify any Employee that is not a Diligenced Employee, and no Employee (other than a Diligenced Employee, subject to the terms and conditions of this Agreement) shall have any right to indemnification hereunder.

(b)     Notwithstanding anything herein to the contrary, for purposes of calculating or determining the amount of Expenses resulting from, relating to or arising out of any Indemnified Claims, there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses (net of any costs or expenses actually incurred by such Indemnified Person to recover or collect such proceeds).

(c)     Each Indemnified Person's right to seek indemnification from Purchaser hereunder, subject to the terms and conditions of this Agreement (including Section 3.2), constitutes the sole and exclusive remedy of such Indemnified Person against Parent, Purchaser or any of their respective Affiliates with respect to all Expenses resulting from or arising out of any Indemnified Claims.

### 2.5 Forfeiture of Parent Shares.

(a)     Following the Closing, in the event of an Indemnified Claim against a Diligenced Employee (each, a "**Forfeiture Claim**"), ████████████████████████████████████████



**(b)**

      **(c)**    Notwithstanding anything to the contrary in the Award Agreement (including Section 4 of the Award Agreement), each Diligenced Employee unconditionally and irrevocably agrees that in the event that a Forfeiture Claim is brought against such Diligenced Employee, that until all Forfeited Parent Shares (or such lesser number as provided in Sections 2.5(a) and (b)) have been forfeited to Parent in accordance with this Section 2.5, in addition to the restrictions on transfer set forth in Section 3 of the Award Agreement, such Diligenced Employee shall not shall transfer any vested Parent Shares if

such transfer of Parent Shares (as applicable) would result in such Diligenced Employee holding a number of vested Parent Shares in an amount less than the amount of Forfeited Parent Shares (or such lesser number as provided in Sections 2.5(a) and (b)).

**2.6 Claim Survival Period.** No Indemnified Person shall be entitled to make any claims for indemnification under this Agreement, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation to indemnify any Indemnified Person for any Indemnified Claims, following the expiration of the statute of limitations for making such claims (the date of such expiration, the "**Claims Termination Date**"); *provided*, that this Section 2.6 shall not limit any Indemnified Person's right to indemnification under this Agreement in respect of any Indemnified Claim that is set forth in a Claim Notice that is timely delivered by such Indemnified Person in accordance with Section 2.2 on or before the Claims Termination Date.

**SECTION 3. MISCELLANEOUS PROVISIONS**

**3.1 Amendment.** This Agreement may only be amended (a) prior to the Effective Time, with the written approval of Purchaser, the Company and both Founders and (b) after the Effective Time, with the written approval of Purchaser and both Founders.

**3.2 Expenses.** Except as otherwise specifically provided herein and except as provided in the Merger Agreement, all fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses. In the event of any Proceeding arising under this Agreement between Purchaser, on the one hand, and any Indemnified Person(s), on the other hand (including any Proceeding in order to determine (i) whether an Indemnified Claim is an Excluded Claim or (ii) whether an Indemnified Person is entitled to the advancement of Expenses), the prevailing party (as determined by a Final Judgment in such Proceeding) shall be entitled to recover from the non-prevailing party its reasonable, out-of-pocket costs and expenses (including reasonable attorneys fees) incurred in connection with such Proceeding.

**3.3 Waiver.**

**(a)** No failure on the part of any Party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

**(b)** No Party shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

**3.4 Entire Agreement; Counterparts.** This Agreement and the documents and instruments and other agreements specifically referred to herein, including the Exhibits attached hereto, constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among or between any of the Parties with respect to the subject matter hereof and thereof. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a fax machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed counterpart and shall be

considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No Party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a Contract, and each such Party forever waives any such defense, except to the extent that such defense relates to lack of authenticity.

      **3.5**     **Applicable Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, regardless of the Laws that might otherwise govern under applicable principles of conflicts of laws thereof. Other than as set forth in Section 2.2(e), each of the Parties hereto irrevocably consents to the exclusive jurisdiction and venue of the state and federal courts located in the City and County of San Francisco in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the laws of the State of California for such persons and waives and covenants not to assert or plead any objection which they might otherwise have to such jurisdiction, venue and such process. Each Party agrees, except as otherwise provided under Section 2.2(e), not to commence any Proceedings related hereto except in such courts.

      **3.6**     **Assignability.** Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of Law or otherwise by any of the Parties hereto without the prior written consent of the other Parties hereto, and any such assignment without such prior written consent shall be null and void; *provided*, that (a) Purchaser shall be entitled to assign this Agreement and its obligations hereunder to any of its Affiliates without the prior written consent of the other Parties hereto and (b) any such assignment by Purchaser to its Affiliates shall not relieve Purchaser of any of its obligations under this Agreement regardless of when such obligations may arise; *provided further* that any Diligenced Employee shall be entitled to assign this Agreement and her, his or its obligations hereunder to any heirs without the prior written consent of the other Parties hereto.

      **3.7**     **Third Party Beneficiaries.** Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the parties hereto) any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. No covenant or other undertaking in this Agreement shall (a) constitute an amendment to any employee benefit plan, program, policy or arrangement or (b) be construed as a guarantee of continued employment or to require Parent or any of its Affiliates (including, following the Effective Time, the Company) to retain the employment of any Diligenced Employee, which employment may be terminated at any time in accordance with applicable Law.

      **3.8**     **Notices.** Any notice or other communication required or permitted to be delivered to any Party under this Agreement shall be in writing and shall be deemed properly delivered, given and received (a) upon receipt when delivered by hand, (b) upon transmission, if sent by facsimile or electronic transmission (in each case with receipt verified by electronic mail or telephone confirmation), or (c) one Business Day after being sent by overnight courier or express delivery service (with proof of delivery), *provided* that in each case the notice or other communication is sent to the address or facsimile telephone number set forth beneath the name of such Party below (or to such other address or facsimile telephone number as such Party shall have specified in a written notice given to the other Parties):

      (a)     **if to Purchaser, to:**

            Apparate International C.V.
            c/o Uber Technologies, Inc.
            1455 Market Street, 4th Floor

San Francisco, CA 94103
Attn: General Counsel

with a copy (which shall not constitute notice) to:

Cooley LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Attn: Jamie Leigh
Facsimile No.: 1.415.693.2222
Telephone No.: 1.415.693.2190
Email: jleigh@cooley.com

**(b)** **if to any member of the Company Group, to:**

Ottomotto LLC and Otto Trucking LLC



with a copy (which shall not constitute notice) to:

O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, CA 94025
Attn: Paul Sieben
Facsimile No.: 1.650.473.2601
Telephone No.: 1.650.473.2613
Email: psieben@omm.com

**(c)** **if to Anthony Levandowski (Founder), to:**

Anthony Levandowski



with a copy (which shall not constitute notice) to:

Donahue Fitzgerald LLP
1646 N. California Boulevard, Suite 250
Walnut Creek, CA 94596
Attn: John F. Gardner

Facsimile No.: (925) 746-7776
Telephone No.: (925) 746-7770
Email: JGardner@Donahue.com

**(d)      If to Lior Ron (Founder), to:**

Lior Ron



with a copy (which shall not constitute notice) to:

Levine & Baker LLP
340 Pine Street, Suite 300
San Francisco, CA 94104
Attn: Alisa J. Baker
Tel: 415-391-3510
Fax: 415-391-8488
Email: abaker@levinebakerlaw.com

**(e)      If to the Indemnified Persons' Representative (which shall constitute notice to all Diligenced Employees other than Founders), to:**

Lior Ron



with a copy (which shall not constitute notice) to:

O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, CA 94025
Attn: Paul Sieben
Facsimile No.: 1.650.473.2601
Telephone No.: 1.650.473.2613
Email: psieben@omm.com

**3.9      Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other Governmental Body declares that any term or provision hereof is invalid or unenforceable, the Parties

agree that the court or other Governmental Body making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified. In the event such court or other Governmental Body does not exercise the power granted to it in the prior sentence, the Parties shall use commercially reasonable efforts to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

### 3.10 Indemnified Persons' Representative.

(a)     In order to efficiently administer certain matters contemplated under this Agreement, including any actions that the Indemnified Persons' Representative may, in his sole discretion, determine to be necessary, desirable or appropriate in connection with the matters set forth in Section 2.3(e) or any other Proceeding between Purchaser, on the one hand, and any Diligenced Employee, on the other hand, to determine whether a Former Employer Claim is an Excluded Claim (each, a "**Representative Proceeding**"), the Indemnified Persons other than the Founders (the "**Non-Founder Indemnified Persons**"), by execution of this Agreement, subject to Section 3.10(b), have irrevocably and unconditionally designated Lior Ron as the representative of the Non-Founder Indemnified Persons (the "**Indemnified Persons' Representative**").

(b)     In the event the Indemnified Persons' Representative dies, becomes unable to perform its responsibilities hereunder or resigns from such position, the Founders shall be authorized to and shall select another representative to fill such vacancy and such substituted representative shall be deemed to be the Indemnified Persons' Representative for all purposes of this Agreement. The Founders may remove the Indemnified Persons' Representative from its position and select another representative to fill such vacancy by providing written notice to Purchaser and the Indemnified Persons' Representative. Such substituted representative shall be deemed to be the Indemnified Persons' Representative for all purposes of this Agreement.

(c)     The Non-Founder Indemnified Persons hereby agree, in addition to the foregoing, that:

(i)     the Indemnified Persons' Representative shall be appointed and constituted the true and lawful agent and attorney-in-fact of each Non-Founder Indemnified Person, with full power in his, her or its name and on his, her or its behalf to act according to the terms of this Agreement and in general to do all things and to perform all acts including (A) executing and delivering any agreements, certificates, receipts, instructions, notices or instruments contemplated by or deemed advisable in connection with this Agreement, (B) agreeing to, negotiating, giving and receiving notices in relation to, entering into settlements and compromises of, and complying with arbitration awards and orders of courts with respect to any Representative Proceeding, (C) receiving service of process for each Non-Founder Indemnified Person, and (D) taking all actions necessary or appropriate in the judgment of the Indemnified Persons' Representative for the accomplishment of the foregoing. By execution of this Agreement, the Indemnified Persons' Representative hereby accepts such appointment;

(ii)     the Indemnified Persons' Representative shall have full authority to (A) execute, deliver, acknowledge, certify and file on behalf of the Non-Founder Indemnified Persons (in the name of any or all of the Non-Founder Indemnified Persons or otherwise) any and all documents that the Indemnified Persons' Representative may, in its sole discretion, determine to be necessary, desirable or appropriate, in such forms and containing such provisions as the Indemnified Persons' Representative may, in its sole discretion, determine to be appropriate, (B) give and receive notices and other

14.

communications relating to this Agreement and the transactions contemplated hereby (except to the extent that this Agreement contemplates that such notice or communication shall be given or received by an Non-Founder Indemnified Person individually), (C) take or refrain from taking any actions (whether by negotiation, settlement, litigation or otherwise) to resolve or settle all matters and disputes arising out of or related to any Representative Proceeding, and (D) engage attorneys, accountants, financial and other advisors, paying agents and other persons necessary or appropriate in the judgment of the Indemnified Persons' Representative for the accomplishment of the foregoing;

(iii)    Parent, Purchaser and each of their respective Affiliates and their respective representatives and agents will be entitled to rely conclusively on the instructions and decisions given or made by the Indemnified Persons' Representative with respect to the Non-Founder Indemnified Persons as to any Representative Proceeding, and no Person shall have any cause of action against any of the foregoing Persons for any action taken or not taken in reliance upon any such instructions or decisions;

(iv)    all actions, decisions and instructions of the Indemnified Persons' Representative shall be conclusive and binding upon each of the Non-Founder Indemnified Persons;

(v)    no Non-Founder Indemnified Persons shall have any cause of action against the Indemnified Persons' Representative for any action taken, decision made or instruction given by the Indemnified Persons' Representative under this Agreement, except for fraud or willful breach of this Agreement on the part of the Indemnified Persons' Representative;

(vi)    the provisions of this Section 3.10 are independent and severable, are irrevocable and coupled with an interest, and shall be enforceable notwithstanding any rights or remedies that any Non-Founder Indemnified Person may have in connection with this Agreement; and

(vii)    the provisions of this Section 3.10 shall be binding upon the executors, heirs, legal representatives successors and assigns of each Non-Founder Indemnified Person, and any references in this Agreement to a Non-Founder Indemnified Person or the Non-Founder Indemnified Persons shall mean and include the successors to the Non-Founder Indemnified Persons' rights hereunder, whether pursuant to testamentary disposition, the laws of descent and distribution or otherwise.

**3.11    Specific Performance.** Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative). Each of the Parties agrees that this Agreement is intended to be legally binding and specifically enforceable pursuant to its terms and that Purchaser and the Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a non-breaching Party may be entitled at law, a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.

**3.12    Construction.**

(a)    For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders, and "or" is not exclusive.

**(b)** The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in the construction or interpretation of this Agreement.

**(c)** As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

**(d)** Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections of this Agreement and Exhibits to this Agreement.

**(e)** The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

**(f)** In this Agreement, unless the context otherwise requires, references to (i) any agreement (including this Agreement), Contract or Law are to the agreement, Contract or Law as amended, modified, supplemented or replaced from time to time, and to any section of any statute or regulation are to any successor to the section; and (ii) any Person include any heirs, successors and permitted assigns of that Person or permitted successors and assigns of that Person.

**(g)** The word (i) "will" shall be construed to have the same meaning and effect as the word "shall", (ii) "any" shall mean "any and all" unless otherwise clearly indicated by context and (iii) "or" is disjunctive but not mutually exclusive.

**(h)** Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

**(i)** No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement. No parole evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.

**(j)** The table of contents, captions and headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

**(k)** As used in this Agreement, "Business Day" means any day other than a Saturday, Sunday or other day on which banks in San Francisco, California are required to be closed.

**(l)** All references to dollar amounts or "$" are references to U.S. dollars, and all payments hereunder shall be made in U.S. dollars.

**3.13    New Diligenced Employees.** From time to time following the Agreement Date but prior to the Closing, if Parent and the Company mutually agree in writing that a potential new Employee of any member of the Company Group should complete a due diligence review by the Outside Expert to determine whether such potential new Employee has committed any Bad Acts and such Person (a) completes such due diligence review to the satisfaction of Parent (and certifies to the Company as to the good faith, complete and truthful completion of such due diligence review by such Person and that such Person has responded truthfully and in good faith to all inquiries of the Outside Expert) and (b) is hired by

any member of the Company Group with Parent's written consent, then, such Person shall be given the opportunity to execute a joinder to this Agreement in a form attached as Exhibit B hereto (a "**Joinder**") no later than 60 days following the Closing. Following the delivery by such Person to Purchaser of such a Joinder to this Agreement (which Joinder may be delivered at any time within 30 days of such person being named in an Indemnified Claim (but in no event after 60 days following the Closing)), such Person shall be deemed a Diligenced Employee for all purposes under this Agreement (including the right to be indemnified from any Indemnified Claims subject to the terms and conditions of this Agreement).

      **3.14**    **Limited Guarantee**. Parent agrees to take all action necessary to cause Purchaser to perform all of its agreements, covenants and obligations under this Agreement (subject, in each case, to the terms and limitations set forth in this Agreement, the "**Guaranteed Obligations**"). Parent unconditionally and irrevocably guarantees to the Company Group and the Diligenced Employees the full and complete performance by Purchaser of the Guaranteed Obligations and shall be liable for any breach of any covenant or obligation of Purchaser under the Guaranteed Obligations. This is a guarantee of payment and performance and not of collection. Parent hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against Purchaser in connection with the performance of its obligations set forth in this Section 3.14.

[signature page follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of the Agreement Date.

**APPARATE INTERNATIONAL C.V.,**
a Dutch law-governed limited partnership

**By: Neben, LLC**
**Title: General Partner**

By: _____

Name: Jerome Wilson

Title: Power of Attorney

**UBER TECHNOLOGIES, INC.,** solely with respect to Section 3.14

By: _____

Name: Travis Kalanick

Title: President, Chief Executive Officer and Secretary

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of the Agreement Date.

**APPARATE INTERNATIONAL C.V.,**
a Dutch law-governed limited partnership

**By: Neben, LLC**
**Title: General Partner**

By: _____
Name:
Title:  Authorized Signatory

**UBER TECHNOLOGIES, INC.,** solely with
respect to Section 3.14

By: _____
Name: Travis Kalanick
Title:  President, Chief Executive Officer and
        Secretary

[SIGNATURE PAGE TO INDEMNIFICATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of the Agreement Date.

**APPARATE INTERNATIONAL C.V.**

By: _____
Name:
Title:

**UBER TECHNOLOGIES, INC., SOLELY WITH RESPECT TO SECTION 3.14**

By: _____
Name:
Title:

**OTTOMOTTO LLC**

By: _____
Name: LIOR RON
Title: PRESIDENT

**OTTO TRUCKING LLC**

By: _____
Name: LIOR RON
Title: PRESIDENT

**INDEMNIFIED PERSONS' REPRESENTATIVE**

By: _____
Name: LIOR RON
Title:

[INDEMNIFICATION AGREEMENT]

_____
Anthony Levandowski

_____
Lior Ron

_____
Soren Juelsgaard

_____
Colin Sebern

_____
Don Burnette

# EXHIBIT B

Volume 4

Pages 623 - 858

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                          )
            Plaintiff,              )
    vs.                             ) No. C 17-00939 WHA
                                    )
UBER TECHNOLOGIES, LLC., OTTO       )
TRUCKING, LLC, and OTTOMOTTO, LLC,  )
                                    ) San Francisco, California
            Defendants.             ) Wednesday
                                    ) February 7, 2018
_____   ) 7:30 a.m.

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:
For Plaintiff:              QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN, LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                    BY:  **CHARLES KRAMER VERHOEVEN, ESQ.**
                         **JORDAN R. JAFFE, ESQ.**
                         **DAVID ANDREW PERLSON, ESQ.**
                         **MELISSA J. BAILY, ESQ.**
                         **DAVID EISEMAN, ESQ.**
                         **ANDREA PALLIOS ROBERTS, ESQ.**
                         **JAMES DUBOIS JUDAH, ESQ.**



                            QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN, LLP
                            1299 Pennsylvania Avenue, NW
                            Suite 825
                            Washington, DC 20004
                    BY:  **JARED WESTON NEWTON, ESQ.**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

*Reported By:* Debra L. Pas, CSR 11916, CRR, RMR
             Katherine Sullivan CSR 5812, CRR, RMR
             *Official Reporters - US District Court*

Debra L. Pas, CSR, CRR and Katherine Sullivan, CSR, CRR
Official Reporters - U.S. District Court - San Francisco, California
(415) 431-1477

1    these things.  This is not like he's making it up.  It's been

2    black -- and then he deletes it and destroys the evidence.

3        All right.  That's the ruling.  You can go for it.

4        Let's bring the jury in and get started.

5        Is the witness out there in the hall?  One of you get --

6    somebody bring in the witness so we can get started.

7        Angie, please bring in the jury.

8        Mr. Kalanick, you can come on up here and resume the

9    stand, please.  Thank you for being here on time.

10                      **TRAVIS KALANICK**,

11   called as a witness for the Plaintiff, having been previously

12   duly sworn, testified as follows:

13       **THE CLERK:**  All rise for the jury.

14       (Jury enters at 7:55 a.m.)

15       **THE COURT:**  Thank you.  Be seated.

16       All right.  So even before 8 o'clock.  Here's this

17   outstanding jury here on time, ready to do your country's work.

18   Thank you for that.

19       Yesterday when we broke, Mr. Kalanick was on the stand on

20   direct examination by Mr. Verhoeven.  And he can now resume the

21   examination.

22       Please, go ahead.

23       **MR. VERHOEVEN:**  Thank you, Your Honor.

24       Good morning.

25

1  BY MS. DUNN:

2  **Q.**   The question was, why did Uber think that Google might

3  bring a lawsuit following the Otto acquisition?

4  **A.**   So when we acquired the CMU team and we were eventually --

5  we acquired it because we couldn't get meetings and we couldn't

6  figure out if they were still up for partnering.

7       When we finally got the meeting, Larry made it very clear

8  that he was very upset with us and not happy that we were doing

9  autonomy.  And everything we would get in terms of a signal

10  from other people who knew him or knew people around him was

11  that generally Google was super not happy, unpumped, about us

12  doing this.

13       And so when you go and hire a group of people, a large

14  group of people, acquire a company where a large group of

15  people, you know, come from there, you know, that competitive

16  thing, those competitive juices get flowing, and that means

17  there is a higher likelihood of a lawsuit of some kind.

18  **Q.**   Now, you acknowledged that you did not read the merger

19  agreement or the indemnity treatment.  Is that correct?

20  **A.**   That's correct.

21  **Q.**   Why not?

22  **A.**   Well, as CEO of a big company, you're getting literally

23  hundreds of documents to sign a month.  Hundreds.

24       And think of each of those things you're signing is almost

25  like when you go get a mortgage or buy a house.  Like reading

<u>**I N D E X**</u>

| <u>**PLAINTIFF'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| | | |
| <u>**KALANICK, TRAVIS**</u> | | |
| (PREVIOUSLY SWORN) | 644 | 4 |
| Direct Examination resumed by Mr. Verhoeven | 645 | 4 |
| Cross-Examination by Ms. Dunn | 692 | 4 |
| Redirect Examination by Mr. Verhoeven | 728 | 4 |
| | | |
| <u>**QI, NINA**</u> | | |
| (SWORN) | 730 | 4 |
| Direct Examination by Ms. Baily | 731 | 4 |
| Cross Examination Mr. Brille | 742 | 4 |
| Redirect Examination by Ms. Baily | 751 | 4 |
| Recross Examination by Mr. Brille | 754 | 4 |
| | | |
| <u>**RON, LIOR**</u> | | |
| (SWORN) | 755 | 4 |
| Direct Examination by Mr. Perlson | 756 | 4 |
| Cross Examination  Mr. Carmody | 780 | 4 |
| Redirect Examination by Mr. Perlson | 793 | 4 |
| Recross-Examination by Mr. Carmody | 795 | 4 |
| | | |
| <u>**FRIEDBERG, ERIC**</u> | | |
| (SWORN) | 802 | 4 |
| Direct Examination by Mr. Verhoeven | 803 | 4 |

-   -   -

<u>**CERTIFICATE OF REPORTER**</u>

    We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Wednesday, February 7, 2018

# EXHIBIT C

Newsroom

News    Company info    Leadership    Media assets

France  |  Aug 18, 2016

# Rethinking transportation

Written by  Travis

Share f    🐦    ✉    •••

I'm excited to announce that Uber has acquired <u>Otto</u>, a 90-plus person technology startup whose mission is to rethink transportation, starting with self-driving trucks. Anthony Levandowski, Otto's co-founder, will now lead our combined self-driving efforts reporting directly to me—across personal transportation, delivery and trucking—in San Francisco, Palo Alto and Pittsburgh.

If that sounds like a big deal—well, it is. More and more the world of atoms is interacting with bits. In order to provide digital services in the physical world, we must build sophisticated logistics, artificial intelligence and robotics systems that serve and elevate humanity.

Newsroom      News    Company info    Leadership    Media assets



When it comes to this advanced technology stack, Otto plus Uber is a dream team. Anthony is one of the world's leading autonomous engineers: his first invention, a self-driving motorcycle called Ghostrider, is now in the Smithsonian. Just as important, Anthony is a prolific entrepreneur with a real sense of urgency.

Together, we now have one of the strongest autonomous engineering groups in the world; self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh; the practical experience that comes from running ridesharing and delivery services in hundreds of cities; with the data and intelligence that comes from doing 1.2 billion miles on the road every month.

In the last six years we've seen the profound impact that smartphone technology has had on transportation, as well as the delivery business. When people can push a button and reliably get an affordable ride across town, things change for the better—and quickly. Ridesharing helps cut drunk driving. It complements public transit, getting people to places that other means of transportation don't reach, replacing the need to own a car over time. Most important of all, the smartphone has made mass carpooling a reality. By getting more people into fewer cars, we can reduce congestion and pollution in our cities.

Of course, this is just the start, especially when it comes to safety. Over one million people die on the world's roads every year and 90 percent of these accidents are due to human error. In the US, traffic accidents are a leading cause of death for people under 25. This is a tragedy that self-driving technology can help solve. That's why our partnership with Swedish car maker

has no experience making cars. To do it well is incredibly hard, as I realized on my first visit to a car manufacturing plant several years ago. By combining Uber's self-driving technology with Volvo's state-of-the art vehicles and safety technology, we'll get to the future faster than going it alone.

Here's to a great partnership with Volvo. And to Anthony, Lior and the Otto team—welcome to Uber. We're pumped to have you on board. It's time to move.

*–Travis Kalanick, CEO and Co-Founder, Uber*



---

Share this post

   

Newsroom                    News      Company info      Leadership      Media assets

# The latest Uber news

France | Mar 24

## Supporting cities and communities around the world

France | Mar 10

## The 2020 Uber Lost & Found Index

France | Feb 12

## Uber Expands RideCheck Safety Feature To Canada

France | Dec 6, 2019

## Uber Delivers U.S. Safety Report

France | Dec 5, 2019

## Eating Together Just Got Easier: Introducing Group Ordering on Uber Eats

France | Dec 3, 2019

Newsroom

News   Company info   Leadership   Media assets

**View more news** ›

# Newsroom

News        Company info        Leadership        Media assets

English

France

Investor relations

Global citizenship

Safety

Blog

Careers

Gift cards

Uber vs. driving jobs

## Our products

Ride

Drive

Eat

Business

Freight

Health

Uber Air

Advanced Technologies Group

  

Privacy        Accessibility        Terms

# EXHIBIT D

 # Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)                    Add more respondents on page 6.

**RESPONDENT NAME**  Anthony Scott Levandowski

**ADDRESS**  2330 Cowper Street

**CITY**  Palo Alto            **STATE**  CA            **ZIP**  94301

**PHONE**            **FAX**            **EMAIL**  levandowski@gmail.com

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**            **STATE**            **ZIP**

**PHONE**            **FAX**            **EMAIL**

FROM CLAIMANT                                                      Add more claimants on page 7.

**CLAIMANT NAME**  Google Inc.

**ADDRESS**  1600 Amphitheatre Parkway

**CITY**  Mountain View            **STATE**  CA            **ZIP**  94043

**PHONE**            **FAX**            **EMAIL**

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**  Robert Van Nest & Rachael Meny

**FIRM/ COMPANY**  Keker & Van Nest LLP

**ADDRESS**  633 Battery Street

**CITY**  San Francisco            **STATE**  CA            **ZIP**  94111

**PHONE**  415-391-5400   **FAX**  4153977188   **EMAIL**  rmeny@kvn.com



# Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Arbitration Demand (Attachment A).

AMOUNT IN CONTROVERSY (US DOLLARS)



## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

**ARBITRATION PROVISION LOCATION**

The following relevant agreements contain arbitration provisions:

1. Google/Levandowski "Non-Competition and Non-Solicitation Agreement" (Attachment B, "Robots Agreement"), at Paragraph 9.

2. Google/Levandowski "Non-Competition and Non-Solicitation Agreement" (Attachment C, "510 Agreement"), at Paragraph 9.

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   Santa Clara, California

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
*See: Comprehensive Rule 16.1*

☐ *By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.*

## SUBMISSION INFORMATION

**SIGNATURE**   *Rach— M___ / A—Q—*      **DATE**   10/28/2016

**NAME (PRINT/TYPED)**   Rachael E. Meny


Completion of this section is <u>required for all consumer or employment claims initiated in California</u>.

## CONSUMER ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION as defined by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*:

☐ **YES**, this is a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

☑ **NO**, this is not a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000   ☐ $100,000 to $250,000   ☐ More than $250,000   ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

 Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT
NAME

ADDRESS

CITY                                    STATE              ZIP

PHONE                  FAX               EMAIL

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/
COMPANY

ADDRESS

CITY                                    STATE              ZIP

PHONE                  FAX               EMAIL

RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT
NAME

ADDRESS

CITY                                    STATE              ZIP

PHONE                  FAX               EMAIL

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/
COMPANY

ADDRESS

CITY                                    STATE              ZIP

PHONE                  FAX               EMAIL

 Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

**CLAIMANT NAME**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

## CLAIMANT #3

**CLAIMANT NAME**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

# ATTACHMENT A

KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
RACHAEL E. MENY - #178514
rmeny@kvn.com
JENNIFER A. HUBER - #250143
jhuber@kvn.com
THOMAS E. GORMAN - #279409
tgorman@kvn.com
W. HAMILTON JORDAN - #295004
wjordan@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Claimant
GOOGLE INC.

BEFORE JAMS (JUDICIAL ARBITRATION AND MEDIATION SERVICES)

| | |
|---|---|
| GOOGLE INC.,<br><br>     Claimant,<br><br>   v.<br><br>ANTHONY LEVANDOWSKI,<br><br>     Respondent. | **CONFIDENTIAL**<br><br>**ARBITRATION DEMAND** |

ARBITRATION DEMAND

CONFIDENTIAL

1121952

# I. INTRODUCTION

1. Claimant Google Inc. ("Google") brings this arbitration demand against a former senior employee, Respondent Anthony Levandowski. While Levandowski was still on Google's payroll, he breached his contractual obligations and duties to Google by building a company that would ultimately compete with Google's self-driving car project. Levandowski's acts included, among other things, a campaign during his employment at Google to use Google's confidential information regarding the unique skills, experiences and compensation packages of Google employees and contractors to lure them from Google to a new, competing venture named OttoMotto LLC ("Otto").

2. Levandowski assisted and/or developed competing companies during his time at Google even though his obligations to, and agreements with, Google prohibited him from taking such actions, including, among other things, by prohibiting him from soliciting Google employees and consultants to join another company during his employment at Google and prohibiting him from engaging in activities that would compete with Google.

3. As one example of Levandowski's violations of these obligations and agreements, beginning at least in the late Summer or Fall 2015, Levandowski embarked on a campaign to unlawfully use confidential Google information to target and recruit valuable Google employees by soliciting them and inducing them to leave Google to join a different company in the self-driving space. That company would ultimately become Otto. Levandowski concealed his conduct from Google management, a concealment that allowed him to profit greatly. Among other things, this concealment allowed Levandowski to ultimately collect over $120 million in incentive payments from Google for his supposed contributions to Google's self-driving car project—all while he was breaching his obligations to Google and building a company that would compete with Google.

4. Google brings this demand to obtain damages for, and to put an end to, Levandowski's breaches of contract.

5. This demand for arbitration is closely related to Google's concurrently-filed arbitration demand against both Respondent Levandowski and Otto co-founder and former

ARBITRATION DEMAND

**CONFIDENTIAL**

1 Google employee Lior Ron ("Joint Demand"). The Joint Demand asserts claims for breach of
2 contract and tortious acts that arise under, or relate to, the Google employment agreements
3 entered into by Levandowski and Ron.

4       6.      Google brings this separate demand under contracts that Levandowski signed in
5 2011 in connection with Google's purchase of two companies founded by Levandowski. As set
6 forth in this demand, Levandowski has breached at least two of those contracts: (1) a "Non-
7 Competition and Non-Solicitation Agreement" that was part of Google's acquisition of Anthony's
8 Robots, LLC and which went into effect on October 7, 2011 ("Robots Agreement"); and (2) a
9 "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of 510
10 Systems, LLC and which went into effect on October 7, 2011 ("510 Agreement").

11       7.      Out of an abundance of caution, Google brings these claims as a separate,
12 confidential Demand because the Robots Agreement and 510 Agreement each contain a
13 confidentiality clause requiring Levandowski and Google to treat as confidential any disputes
14 arising out of those agreements.[1]

15 **II.      FACTUAL ALLEGATIONS**

16       **A.      Respondent Anthony Levandowski**

17       8.      Google hired Respondent Anthony Levandowski as an engineer in April 2007.
18 Towards the end of his tenure at Google, Levandowski managed the team of engineers on
19 Google's self-driving car project that developed Google's LiDAR sensors, sensors that are crucial
20 to Google's development of a self-driving car. Levandowski abruptly resigned from Google on
21 January 27, 2016, without prior notice. On information and belief, Levandowski is now a co-
22 founder, and employee, of Otto.

23       **B.      Respondent Anthony Levandowski's Purchase Agreements with Google**

24       9.      During his employment with Google, in October 2011, Respondent Levandowski
25 sold two companies to Google: 510 Systems, LLC and Anthony's Robots, LLC. In return for

26

27 [1] Assuming that procedural distinctions in the arbitration agreements at issue can be reconciled
(including that with respect to confidentiality of the dispute), Google intends to seek
28 consolidation of the Joint Demand and this Demand into a single arbitration proceeding.

1     receiving significant payments for these two companies, Levandowski promised that he would
2     not solicit Google employees and consultants for outside ventures during his employment with
3     Google and that he would not compete with Google.

4          10.      Google is informed and believes that Levandowski breached both the non-
5     competition and non-solicitation provisions contained in the Robots Agreement and 510
6     Agreement. Google has recently discovered that, during his continued employment with Google,
7     Levandowski became involved in several competing side businesses.

8          **C.      Odin Wave/Tyto Lidar**

9          11.      On information and belief, Levandowski's involvement in competing side
10     businesses which violated the Robots Agreement and 510 Agreement began by at least 2013.

11          12.      Google is now informed and believes that, during Levandowski's tenure at
12     Google, he was involved in competing side businesses, including enterprises known as Odin
13     Wave, LLC ("Odin Wave") and Tyto Lidar LLC ("Tyto").

14          13.      Odin Wave was incorporated in or around August 2012. The physical address
15     used for Odin Wave was 2201 Dwight Way in Berkeley, California. On information and belief,
16     2201 Dwight Way is owned by Levandowski.

17          14.      In July 2013, a Google hardware vendor contacted a Google employee to inform
18     him that, on information and belief, a company named Odin Wave had just submitted an order for
19     a custom-fabricated part that was similar to a part used by Google in its unique and proprietary
20     laser technology for self-driving vehicles.

21          15.      After receiving this call, two Google employees investigated Odin Wave and
22     discovered that there appeared to be several connections between Levandowski and Odin Wave.
23     Those connections included Odin Wave's location at 2201 Dwight Way. Levandowski was
24     questioned about his affiliation with Odin Wave in mid-2013 but denied having any ownership
25     interest in Odin Wave.

26          16.      Google is now informed and believes that, by February 2014, Odin Wave LLC
27     merged with an entity named Tyto Lidar LLC ("Tyto"). Public records list Ognen Stojanovski as

28

CONFIDENTIAL

1121952

1    the manager of Tyto Lidar. On information and belief, Stojanovski is friends with Levandowski

2    and worked with Levandowski on an early, self-driving vehicle prototype.

3        17.      On information and belief, Odin Wave/Tyto was developing LiDAR sensor

4    modules which can be used in self-driving vehicles.

5        18.      Google is now informed and believes that Levandowski had some involvement

6    with Odin Wave/Tyto since at least 2013 at the same time that he was working on Google's

7    development of LiDAR sensor modules.

8        19.      In or around Spring 2015, Google—seeing a potential overlap between Tyto's

9    technology and Google's development goals for self-driving technology—began investigating

10    whether to begin buying or using Tyto's products.

11        20.      Google also investigated whether to purchase Tyto.

12        21.      Levandowski participated in Google's investigation into Tyto's products and

13    business, including at least one site visit to Tyto headquarters. Based on information and belief,

14    he was privy to Google's impressions of Tyto's products and process, including Google's

15    confidential opinion of Tyto's technology and the viability of Tyto's business. Throughout this

16    process, Levandowski never disclosed a relationship with Tyto and its employees. Based on

17    information and belief, Google now believes that Levandowski in fact had a relationship with

18    Tyto and its employees that conflicted with Levandowski's duties to Google.

19        22.      Google's interest in Tyto's products carried over into 2016, including beyond

20    Levandowski's departure from Google.

21        23.      Google is informed and believes that at least by May 18, 2016, Tyto Lidar LLC

22    had merged with Otto.

23       **D.**      **Otto**

24        24.      Google is also informed and believes that, in 2015, Levandowski began executing

25    a plan to compete with Google in the self-driving vehicle space, while he was still employed by

26    Google.

27

28

ARBITRATION DEMAND

CONFIDENTIAL

1121952

25. Google is informed and believes that Levandowski's plan—which he hatched with Google colleague Lior Ron—included taking employees and consultants from Google, including employees and consultants with access to Google confidential information and trade secrets.

26. Because Levandowski was believed to be a trusted agent of Google, Google shared confidential information with him about Google employees, including the employees' unique skills, work experiences, responsibilities, compensation, and work performance. Prior to Levandowski's and Ron's resignations, on information and belief, Levandowski misused this confidential Google information, including while actively soliciting Google employees to leave for his competing venture, Otto.

27. Google is informed and believes that, at the time Levandowski began taking steps to create a competing company and staff it with Google employees and contractors, Levandowski had not yet become eligible for, or received payment of, a substantial incentive payment related to his work on Google's self-driving car project.

28. Google is informed and believes that, in approximately August 2015, Levandowski told some Google colleagues that he had been asked to "transfer a group of people" from Google's self-driving car project to a competing company. Levandowski then attempted to solicit Google colleagues to leave Google and join Levandowski's efforts to "transfer" other employees to this competing company.

29. In late Summer 2015, one of the managers of Google's self-driving car project heard rumors of Levandowski's on-going solicitation efforts and sought to terminate Levandowski for this disloyalty. Google, however, could not confirm Levandowski's solicitation efforts at the time, and he was not terminated.

30. On information and belief, Levandowski took steps to conceal his competing and solicitation activities from Google management, in part to ensure that he received payment of the substantial incentive payment from Google. Indeed, Levandowski did not publicly release full details of his competing company until after he received the final payout of this incentive payment following his departure from Google.

ARBITRATION DEMAND

CONFIDENTIAL

1    31.    Google is informed and believes that, by Fall 2015, Levandowski had approached,
2    and/or had begun working with, Ron to lay the foundation for their new competing company.  In
3    Fall 2015, Levandowski and Ron settled on a name ("280 Systems") for their new company and
4    took steps to bring this company to fruition.  That company—280 Systems—would later be
5    renamed Otto.

6    32.    Google is also informed and believes that Levandowski's and Ron's efforts to
7    develop a competing company persisted through late 2015 and into early 2016.  Google is
8    informed and believes that, by approximately December 2015, Levandowski again began
9    approaching Google employees about leaving Google and asking them to help start a new
10   company focusing on self-driving vehicles.

11   33.    Google is informed and believes that, by January 2016, Levandowski had
12   increased and expanded his solicitations of Google employees.  As part of these efforts,
13   Levandowski made repeated efforts to solicit many of his direct reports to leave Google.
14   Levandowski's solicitations occurred both during the work day and outside of the work day,
15   including at numerous times when Levandowski solicited individuals on the Google campus.  On
16   at least some occasions, Levandowski also used his managerial role on Google's self-driving car
17   project to solicit his direct reports during the private 1-on-1 meetings he held with various Google
18   employees and to encourage his direct reports to leave Google during other meetings.

19   34.    Google is informed and believes that Levandowski took other steps to hide his
20   efforts to set up a competing company from Google.  Levandowski's steps included, but are not
21   limited to, instructing Google employees not to discuss Levandowski's business or recruitment
22   efforts via company email or on other company systems.

23   35.    Google is informed and believes that, in January 2016, Levandowski and Ron also
24   hosted at least two off-site meetings at Levandowski's Palo Alto home with the goal of
25   persuading numerous Google employees to leave Google and join Levandowski and Ron's new
26   venture.  Both Levandowski and Ron set up these meetings, attended them, and led them.  At
27   least one such meeting occurred while Levandowski and Ron were Google employees, and both
28   meetings occurred during Levandowski's employment at Google.

ARBITRATION DEMAND

CONFIDENTIAL

1121952

36. Google is informed and believes that Levandowski used these January 2016 meetings and solicitation efforts to encourage Google employees to depart Google and move to his competing venture.

37. On information and belief, acting in concert with a 280 Systems recruiter, Levandowski also sought to induce Google employees to sign written employment agreements that obligated them to quit Google and commence work immediately.

38. Google is informed and believes that Levandowski's and Ron's plan to develop a competing business included an effort to have the "entire" Laser Team on Google's self-driving car project to quit Google en masse in January 2016 and join Levandowski and Ron at their new venture. Levandowski encouraged a large group of Google employees to resign without prior notice, and upon specific day(s) designated by Levandowski and Ron.

39. Google is further informed and believes that Levandowski and Ron encouraged and/or assisted others, including both Google employees and third parties associated with 280 Systems/Otto, to solicit Google employees and contractors to leave Google for 280 Systems/Otto.

E. **Levandowski's Actions Caused Damage to Google.**

40. Levandowski's efforts to set up competing business(es) and to solicit Google employees and contractors to leave Google for his Otto business have harmed Google. This harm has included, but is not limited to, lost employees and contractors, recruiting and retention costs, and numerous other costs and damages.

41. For example, Levandowski's campaign to create a competing company named Otto and to solicit Google's employees and contractors to leave Google for Otto was a partial success. Beginning in January 2016, and continuing through at least September 2016, numerous employees and contractors have left Google to join Otto. Google is informed and believes that many—if not all—of these departures are attributable to the solicitation campaign that Levandowski initiated and spearheaded, with Ron, while he was a Google employee.

42. Google is also informed and believes that Levandowski's efforts to solicit employees and contractors from Google have continued following his departure from Google. Among other things, Levandowski provided information to Google employees about other Otto

7

1 | agents who continued to solicit Google employees and contractors to leave and join Levandowski

2 | at his new company. As a result of Levandowski's actions, Google has spent significant time and

3 | money persuading Google employees and contractors to reject Levandowski's solicitation efforts.

4 | Google ultimately has been able to convince numerous employees and contractors to stay with

5 | Google, but only after devoting significant time and resources to this effort and, in some

6 | instances, providing incentives to stay.

7 | 43. Google has incurred significant costs to search for and obtain replacements for the

8 | Google employees and contractors who have left for employment at Otto.

9 | **F. Levandowski and Ron Sell Otto to Uber**

10 | 44. Given the unique training, experience, and skills of Google's employees and

11 | contractors in the self-driving space, Levandowski's campaign to lure employees and contractors

12 | away from Google enabled Levandowski and Ron to rapidly grow and profit from their new,

13 | competing venture.

14 | 45. Google is informed and believes that Uber acquired Otto in Summer 2016. Uber

15 | reportedly paid approximately $680 million up front for the several month old company, plus a

16 | stream of future compensation. Uber recently announced that Levandowski will be in charge of

17 | Uber's self-driving-car project, and Uber has presented Levandowski as the new face of that

18 | competing project in a series of media interviews.[2]

19 | 46. Google is informed and believes that Levandowski was able to jumpstart his Otto

20 | business, and able to obtain such a lofty acquisition price for Otto, only because of

21 | Levandowski's breaches as described in this Statement of Claims, including his taking key talent

22 | from Google's self-driving project, and such other conduct as may be established at hearing.

23 |

24 |

25 | [2] *See, e.g.*, https://newsroom.uber.com/rethinking-transportation/ ("Anthony Levandowski, Otto's co-founder, will now lead our combined self-driving efforts ....");

26 | https://www.theguardian.com/technology/2016/aug/19/self-driving-car-anthony-levandowski-uber-otto-google ("Uber just announced that self-driving cars will start pick up passengers later this month in Pittsburgh. And the man leading the project ...? Anthony Levandowski.");

27 | http://www.bloomberg.com/news/features/2016-08-18/uber-s-first-self-driving-fleet-arrives-in-pittsburgh-this-month-is06r7on ("When the Otto acquisition closes, likely this month, Otto co-

28 | founder Levandowski will assume leadership of Uber's driverless car operation.").

ARBITRATION DEMAND

CONFIDENTIAL

1121952

## FIRST CAUSE OF ACTION

### Breach of Contract

47.     Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

48.     Levandowski and Google entered into numerous valid contracts in connection with Google's purchase of two companies owned by Levandowski.  Levandowski has breached at least two of those contracts:  (1) a "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of Anthony's Robots, LLC and which went into effect on October 7, 2011 ("Robots Agreement"); and, (2) a "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of 510 Systems, LLC and which went into effect on October 7, 2011 ("510 Agreement").

49.     Google fully performed its obligations under these Agreements.

50.     Levandowski breached his obligations under the Robots Agreement and the 510 Agreement in in numerous ways, including but not limited to:

### Non-Solicitation Agreements

51.     During his employment at Google, Levandowski was prohibited by contract from soliciting Google employees or consultants to leave Google or terminate their provision of services to Google.

52.     By entering the Robots Agreement, Levandowski promised not to—whether "personally or through any other Person"—"encourage, induce, attempt to induce, recruit, solicit, attempt to solicit . . . or take any other action that is intended to induce or encourage" any Google employee or consultant to leave Google or to take away other employees or consultant.  This obligation applied until the end of Levandowski's employment with Google.

53.     Under the 510 Agreement, Levandowski also promised not to—whether "personally or through any other Person"—"encourage, induce, attempt to induce, recruit, solicit, attempt to solicit . . . or take any other action that is intended to induce or encourage" any Google employee or consultant to engage in a competing business.  This obligation also applied until the end of Levandowski's employment with Google.

9

1    54.    Levandowski breached the non-solicitation obligations set forth in the 510
2    Agreement and Robots Agreement during his employment with Google.

3    55.    Levandowski's breaches of his non-solicitation obligations caused significant
4    harm to Google, including by causing a loss of key employees and contractors, causing Google to
5    expend resources to recruit, replace, and train new employees, and causing Google to pay
6    retention bonuses to fend off his solicitation efforts.

7    Non-Competition Agreements

8    56.    The Robots Agreement and 510 Agreement each also prohibit Levandowski from
9    competing with Google for at least two years following Google's purchase of 510 Systems and
10   Anthony's Robots, which occurred on October 7, 2011.

11   57.    The Agreements further provide that if Levandowski breaches his non-competition
12   obligations, the two-year term of those obligations "shall be extended by the period of the
13   duration of such breach."

14   58.    In particular, the 510 Agreement bars Levandowski from "directly or indirectly . . .
15   engag[ing]" in any "Competing Business Purpose," which is defined as any "business or
16   enterprise (including research and development), operations, activities or services that (i) are
17   related to the design, development, manufacture or commercialization [of] positioning,
18   navigation, sensor, high-speed data acquisition, 3D data analysis, machine control, or robotics
19   technologies, or (ii) provides the products and services of [Google] as such exist or are
20   contemplated as of the Closing date."

21   59.    The 510 Agreement also bars Levandowski from any involvement with any person
22   "or business that engages or participates in a Competing Business Purpose," including a
23   prohibition on Levandowski from being or becoming "an officer, director, member, stockholder,
24   owner, affiliate, salesperson, co-owner, trustee, promoter, technician, engineer, analyst,
25   employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to [that
26   person or business], or to otherwise acquire or hold any interest in, or participate in or facilitate
27   the financing, operation, management or control of [that person or business]."

28

ARBITRATION DEMAND

CONFIDENTIAL

1121952

60. The Robots Agreement contains similar restrictions, but defines a "Competing Business Purpose" as any "business or enterprise (including research and development), operations, activities or services that . . . are related to the design, development, manufacture or commercialization of autonomous vehicles or any technologies for use in autonomous vehicles."

61. Google is informed and believes that Levandowski breached all of these non-competition obligations during their initial two-year terms through his improper moonlighting activities, including—but not limited to—his involvement in Odin Wave/Tyto.

62. Google is informed and believes that Levandowski was in continuous breach of these agreements beginning before October 7, 2013 and continuing at least throughout his employment at Google.

63. Google is also informed and believes that Levandowski was in further breach of these non-competition obligations as a result of his Otto-related activities, which began by at least August 2015.

64. Levandowski's breaches of his contractual non-competition obligations harmed Google in numerous ways, including by causing a loss of key employees and contractors, causing Google to expend resources to recruit, replace, and train new employees, and causing Google to pay retention bonuses to fend off his solicitation efforts.

## III. STATEMENT OF REMEDIES SOUGHT

WHEREFORE, Claimant Google respectfully requests the following relief:

1. Judgment in Google's favor and against Levandowski on all causes of action alleged herein;

2. For damages in an amount to be proven at an arbitration hearing;

3. For injunctive relief;

4. For prejudgment and post-judgment interest; and

5. For such other and further relief as the Arbitrator may deem to be just and proper.

. ARBITRATION DEMAND

**CONFIDENTIAL**

1121952

1    Dated: October 28, 2016            KEKER & VAN NEST LLP

2

3                       By:    */s/ Rachael E. Meny*
                               ROBERT A. VAN NEST

4                                RACHAEL E. MENY
                               JENNIFER A. HUBER

5                                THOMAS E. GORMAN
                               W. HAMILTON JORDAN

6

7                                Attorneys for Claimant
                               GOOGLE INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

1121952


## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| | | | | | |
|---|---|---|---|---|---|
| **RESPONDENT NAME** | Anthony Scott Levandowski | | | | |
| **ADDRESS** | 2330 Cowper Street | | | | |
| **CITY** | Palo Alto | **STATE** CA | | **ZIP** 94301 | |
| **PHONE** | | **FAX** | **EMAIL** levandowski@gmail.com | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | |
| **FIRM/ COMPANY** | |
| **ADDRESS** | |
| **CITY** | **STATE** | **ZIP** |
| **PHONE** | **FAX** | **EMAIL** |

## FROM CLAIMANT

Add more claimants on **page 7.**

| | |
|---|---|
| **CLAIMANT NAME** | Google Inc. |
| **ADDRESS** | 1600 Amphitheatre Parkway |
| **CITY** | Mountain View | **STATE** CA | **ZIP** 94043 |
| **PHONE** | **FAX** | **EMAIL** |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Robert Van Nest & Rachael Meny |
| **FIRM/ COMPANY** | Keker & Van Nest LLP |
| **ADDRESS** | 633 Battery Street |
| **CITY** | San Francisco | **STATE** CA | **ZIP** 94111 |
| **PHONE** | 415-391-5400 | **FAX** 4153977188 | **EMAIL** rmeny@kvn.com |

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Arbitration Demand (Attachment A).

AMOUNT IN CONTROVERSY (US DOLLARS)

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

**ARBITRATION PROVISION LOCATION**

The following relevant agreements contain arbitration provisions:

1. Google/Levandowski Project Chauffeur Development Team Offer Amendment Letter (Attachment B, "Project Chauffeur Letter") and Exhibit B thereto, which is an At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement, at Paragraph 14.

2. Google/Levandowski At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement (Attachment C, "2009 Levandowski Employment Agreement"), at Paragraph 15.

3. Google/Ron At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement (Attachment D, "Ron Employment Agreement"), at Paragraph 12.

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   Santa Clara, California

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

See: *Comprehensive Rule 16.1*

☐ *By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.*

## SUBMISSION INFORMATION

**SIGNATURE** _Rach Mhul / 4. Jl_   **DATE** 10/28/2016

**NAME (PRINT/TYPED)**   Rachael E. Meny

**Completion of this section is <u>required for all consumer or employment claims initiated in California</u>.**

## CONSUMER ARBITRATION

**Please indicate if this is a CONSUMER ARBITRATION as defined by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e):***

☐ **YES**, this **is** a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

☑ **NO**, this **is not** a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS

**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000 ☐ $100,000 to $250,000 ☐ More than $250,000 ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.


## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| **RESPONDENT NAME** | Lior Ron |
| **ADDRESS** | 427 Tennyson Avenue |

| CITY | STATE | ZIP |
|---|---|---|
| Palo Alto | CA | 94301-3838 |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | lioron@gmail.com |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | |
| **FIRM/ COMPANY** | |
| **ADDRESS** | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| **RESPONDENT NAME** | |
| **ADDRESS** | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | |
| **FIRM/ COMPANY** | |
| **ADDRESS** | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |



# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| | |
|---|---|
| CLAIMANT NAME | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

## CLAIMANT #3

| | |
|---|---|
| CLAIMANT NAME | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

# ATTACHMENT A

KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
RACHAEL E. MENY - #178514
rmeny@kvn.com
JENNIFER A. HUBER - #250143
jhuber@kvn.com
THOMAS E. GORMAN - #279409
tgorman@kvn.com
W. HAMILTON JORDAN - #295004
wjordan@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Claimant
GOOGLE INC.

## BEFORE JAMS (JUDICIAL ARBITRATION AND MEDIATION SERVICES)

| | |
|---|---|
| GOOGLE INC., | |
|     Claimant, | **ARBITRATION DEMAND** |
|     v. | |
| ANTHONY LEVANDOWSKI and LIOR RON, | |
|     Respondents. | |

1121951

## I. INTRODUCTION

1. Claimant Google Inc. ("Google") brings this arbitration demand against two former, senior employees, Respondents Anthony Levandowski and Lior Ron (collectively "Respondents"). While Levandowski and Ron were still on Google's payroll, they breached their contractual obligations and duties to Google by building a company that would ultimately compete with Google's self-driving car project. Levandowski's and Ron's acts included, among other things, a campaign during their employment at Google to use Google's confidential information regarding the unique skills, experiences and compensation packages of Google employees and contractors to lure them from Google to a new, competing venture, named OttoMotto LLC ("Otto").

2. Respondents' obligations to, and agreements with, Google prohibited them from taking such actions, including, among other things, by prohibiting them from soliciting Google employees and consultants to join another company (both during and for one year following their employment), prohibiting them from engaging in activities that conflicted with their obligations to Google, and prohibiting them from taking actions that created a potential or actual conflict of interest with Google.

3. As one example of Respondents' violations of these obligations and agreements, beginning at least in the late Summer or Fall 2015, Levandowski and Ron individually and collectively embarked on a campaign to unlawfully use confidential Google information to target and recruit valuable Google employees by soliciting them and inducing them to leave Google to join a different company in the self-driving space. That company would ultimately become Otto. Levandowski and Ron concealed their conduct from Google management, a concealment that allowed them each to profit greatly. Among other things, this concealment allowed Levandowski to ultimately collect over $120 million in incentive payments from Google for his supposed contributions to Google's self-driving car project—all while he was breaching his obligations to Google and building a company that would compete with Google.

1  4. Google brings this demand to obtain damages for, and to put an end to,

2  Respondents' breaches of contract; their unlawful, unfair, and tortious interference with Google's

3  employment relationships; their breach of the duty of loyalty and the duty of a fiduciary; and

4  related torts arising from Respondents' efforts to unlawfully compete with Google and to solicit

5  Google's personnel.

6  **II.    FACTUAL ALLEGATIONS**

7  **A.    Respondents Anthony Levandowski and Lior Ron.**

8  5. Google hired Respondent Anthony Levandowski as an engineer in April 2007.

9  Towards the end of his tenure at Google, Levandowski managed the team of engineers on

10  Google's self-driving car project that developed Google's LiDAR sensors, sensors that are crucial

11  to Google's development of a self-driving car. Levandowski abruptly resigned from Google on

12  January 27, 2016, without prior notice. On information and belief, Levandowski is now a co-

13  founder, and employee, of Otto.

14  6. Google hired Respondent Lior Ron in April 2007. After Ron spent five years as a

15  product lead for Google's Maps division and then did a several-year stint at a related company,

16  Ron returned to Google in October 2014 to serve as a high-level advisor on Google mapping-

17  related initiatives. Ron abruptly resigned from Google on January 13, 2016, without any prior

18  notice. On information and belief, Ron is a co-founder of Otto.

19  7. Over the course of their employment with Google, Respondents signed contracts

20  with Google promising, among other things, not to undertake any competitive or disloyal acts

21  while employed by Google, not to engage in businesses or investments that created conflicts of

22  interest or any appearance of conflicts, and not to solicit Google employees for outside ventures.

23  8. Over the course of their employment with Google, Respondents also agreed to

24  comply with Google's Code of Conduct. Under the Code, Respondents were required to comply

25  with numerous obligations, including obligations to: (a) avoid taking actions that would create

26  any conflicts of interest or any circumstances that might reasonably create an appearance of a

27  conflict of interest; (b) not start a competing company; (c) not take any employment, advisory

28  position or board seats with certain Google competitors or business partners; (d) not use Google's

2

confidential information for improper purposes; and, (e) take certain steps before accepting any board seat with an outside company.

9. At all times relevant to this demand, Respondents Levandowski and Ron were acting in concert and conspired with and provided assistance to each other in connection with the unlawful conduct alleged herein. Each Respondent ratified or agreed to accept the benefits of the other's conduct.

**B. Odin Wave/Tyto Lidar.**

10. Google is now informed and believes that, during Levandowski's tenure at Google, he was involved in competing side businesses, including enterprises known as Odin Wave, LLC ("Odin Wave") and Tyto Lidar LLC ("Tyto").

11. Odin Wave was incorporated in or around August 2012. The physical address used for Odin Wave was 2201 Dwight Way in Berkeley, California. On information and belief, 2201 Dwight Way is owned by Levandowski.

12. In July 2013, a Google hardware vendor contacted a Google employee to inform him that, on information and belief, a company named Odin Wave had just submitted an order for a custom-fabricated part that was similar to a part used by Google in its unique and proprietary laser technology for self-driving vehicles.

13. After receiving this call, two Google employees investigated Odin Wave and discovered that there appeared to be several connections between Levandowski and Odin Wave. Those connections included Odin Wave's location at 2201 Dwight Way. Levandowski was questioned about his affiliation with Odin Wave in mid-2013 but denied having any ownership interest in Odin Wave.

14. Google is now informed and believes that, by February 2014, Odin Wave LLC merged with an entity named Tyto Lidar LLC ("Tyto"). Public records list Ognen Stojanovski as the manager of Tyto Lidar. On information and belief, Stojanovski is friends with Levandowski and worked with Levandowski on an early, self-driving vehicle prototype.

15. On information and belief, Odin Wave/Tyto was developing a LiDAR sensor modules which can be used in self-driving vehicles.

1121951

16. Google is now informed and believes that Levandowski had some involvement with Odin Wave/Tyto since at least 2013 at the same time that he was working on Google's development of LiDAR sensor modules.

17. In or around Spring 2015, Google—seeing a potential overlap between Tyto's technology and Google's development goals for self-driving technology—began investigating whether to begin buying or using Tyto's products.

18. Google also investigated whether to purchase Tyto.

19. Levandowski participated in Google's investigation into Tyto's products and business, including at least one site visit to Tyto headquarters. On information and belief, he was privy to Google's impressions of Tyto's products and process, including Google's confidential opinion of Tyto's technology and the viability of Tyto's business. Throughout this process, Levandowski never disclosed a relationship with Tyto and its employees. Based on information and belief, Google now believes that Levandowski in fact had a relationship with Tyto and its employees that conflicted with Levandowski's duties to Google.

20. Google's interest in Tyto's products carried over into 2016, including beyond Levandowski's departure from Google.

21. Google is informed and believes that at least by May 18, 2016, Tyto Lidar LLC had merged with Otto.

**C.    Otto**

22. Google is informed and believes that, in 2015, Respondents Levandowski and Ron began executing a plan to compete with Google in the self-driving vehicle space, while they were still employed by Google.

23. Google is informed and believes that Respondents' plan included taking employees and consultants from Google, including employees and consultants with access to Google confidential information and trade secrets.

24. Because Levandowski and Ron were believed to be trusted agents of Google, Google shared confidential information with them about Google employees, including the employees' unique skills, work experiences, responsibilities, compensation, and work

performance. Prior to Levandowski's and Ron's resignations, on information and belief, Respondents misused this confidential Google information, including while actively soliciting Google employees to leave for their competing venture, Otto.

26. Google is informed and believes that, at the time Levandowski began taking steps to create a competing company and staff it with Google employees and contractors, Levandowski had not yet become eligible for, or received payment of, a substantial incentive payment related to his work on Google's self-driving car project.

26. Google is informed and believes that, in approximately August 2015, Levandowski told some Google colleagues that he had been asked to "transfer a group of people" from Google's self-driving car project to a competing company. Levandowski then attempted to solicit Google colleagues to leave Google and join Levandowski's efforts to "transfer" other employees to this competing company.

27. In late Summer 2015, one of the managers of Google's self-driving car project heard rumors of Levandowski's on-going solicitation efforts and sought to terminate Levandowski for this disloyalty. Google, however, could not confirm Levandowski's solicitation efforts at the time and he was not terminated.

28. Under his employment agreements, Levandowski was required to avoid any potential conflict of interest, consult with his supervisors about any potential conflict, and to avoid any activities that conflicted with his employment at Google. Levandowski not only failed to disclose his conflicting activities, but on information and belief, he took steps to conceal his competing and solicitation activities from Google management, in part to ensure that he received payment of the substantial incentive payment from Google. Indeed, Levandowski did not publicly release full details of his competing company until after he received the final payout of this incentive payment following his departure from Google.

29. Google is informed and believes that, by Fall 2015, Levandowski had approached, and/or had begun working with, Ron to lay the foundation for their new competing company. In Fall 2015, Levandowski and Ron settled on a name ("280 Systems") for their new company and

ARBITRATION DEMAND

1121951

took steps to bring this company to fruition. That company—280 Systems—would later be renamed Otto.

30. Google is also informed and believes that Respondents' efforts to develop a competing company persisted through late 2015 and into early 2016. Google is informed and believes that, by approximately December 2015, Levandowski again began approaching Google employees about leaving Google and asking them to help start a new company focusing on self-driving vehicles.

31. Google is informed and believes that, by January 2016, Respondents had increased and expanded their solicitations of Google employees. As part of these efforts, Levandowski made concerted and repeated efforts to solicit most, if not all, of his direct reports to leave Google. Levandowski's solicitations occurred both during the work day and outside of the work day, including at numerous times when Levandowski solicited individuals on the Google campus. On at least some occasions, Levandowski also used his managerial role on Google's self-driving car project to solicit his direct reports during the private 1-on-1 meetings he held with various Google employees and to encourage his direct reports to leave Google during other meetings.

32. Google is informed and believes that Respondents took steps to hide their efforts to set up a competing company from Google. Respondents' steps included, but are not limited to, instructing Google employees not to discuss Respondents' business or recruitment efforts via company email or on other company systems.

33. Google is informed and believes that, in January 2016, Respondents Levandowski and Ron also hosted at least two off-site meetings at Levandowski's Palo Alto home with the goal of persuading numerous Google employees to leave Google and join Respondents' new venture. Both Levandowski and Ron set up these meetings, attended them, and led them. At least one such meeting occurred while both Levandowski and Ron were Google employees, and both meetings occurred during Levandowski's employment at Google.

34. Google is informed and believes that Respondents used these January 2016 meetings and solicitation efforts to encourage Google employees to depart Google and move to their competing venture.

1121951

35.     On information and belief, acting in concert with a 280 Systems recruiter, Respondents also sought to induce Google employees to sign written employment agreements that obligated them to quit Google and commence work immediately.

36.     Google is informed and believes that Respondents' plan to develop a competing business included an effort to have the "entire" Laser Team on Google's self-driving car project quit Google *en masse* in January 2016 and join Respondents at their new venture. Respondents encouraged a large group of Google employees to resign without prior notice, and upon specific day(s) designated by Levandowski and Ron.

37.     Google is further informed and believes that Levandowski and Ron encouraged and/or assisted others, including both Google employees and third parties associated with 280 Systems/Otto, to solicit Google employees and contractors to leave Google for 280 Systems/Otto.

**D.     Levandowski and Ron Hid Their Wrongful Acts upon Departure from Google.**

38.     On January 13, 2016, Ron resigned from Google, effective immediately, and without any prior notice.

39.     On January 15, 2016, Ron signed an "Exit Certification" and provided it to Google. In this Exit Certification, Ron agreed that he had "followed the terms" of Google's employment agreement, including its prohibition on soliciting Google employees while employed at Google. Google is informed and believes that Ron's certification was false or misleading when it was made on January 15, 2016.

40.     In this Exit Certification, Ron also stated that, "as of the date you sign this letter" he had advised Google of "all facts of which you are aware" that he believed might be a violation of Google's Code of Conduct. Ron also stated that he was not aware of any other current violations of Google's Code of Conduct. Google is informed and believes that Ron's certification was false or misleading when it was made.

41.     On January 27, 2016, Levandowski resigned from Google, effective immediately, and without any prior notice.

1121951

42. During his departure interview, Levandowski denied that he had solicited any Google employees to leave. Google is informed and believes that this representation was false or misleading when it was made.

43. At or around the time of his departure, Levandowski was also asked what he was planning to do next. In response, and notwithstanding his duty to disclose, Levandowski described potential future projects or endeavors that would not compete with Google's self-driving car project. Google is informed and believes that this these representations were false or misleading when they were made.

44. Shortly following his departure interview, Levandowski re-contacted the Google employee who had conducted his departure interview. During this discussion, Levandowski informed the Google employee that other Google employees were contacting Levandowski about his departure but Levandowski assured the Google employee that he was not soliciting any of these employees to leave Google. Google is informed and believes that this this representation was false and misleading when it was made.

**E. Respondents' Actions Caused Damage to Google.**

45. Respondents' efforts to set up competing business(es) and to solicit Google employees and contractors to leave Google for their Otto business have harmed Google. This harm has included but is not limited to lost employees and contractors, recruiting and retention costs and numerous other costs and damages.

46. For example, Respondents' campaign to create a competing company named Otto and to solicit Google's employees and contractors to leave Google was a partial success. Beginning in January 2016, and continuing through at least September 2016, numerous employees and contractors have left Google to join Otto. Google is informed and believes that many—if not all—of these departures are attributable to the solicitation campaign that Respondents' initiated and spearheaded while they were Google employees.

47. Google is also informed and believes that Respondents' efforts to solicit employees and contractors from Google have continued following their departures from Google. Among other things, Respondents have assisted other Otto agents to solicit Google employees

1121951

and contractors to leave and join Respondents at their new company. As a result of Respondents' actions, Google has spent significant time and money persuading Google employees and contractors to reject Respondents' solicitation efforts. Google ultimately has been able to convince numerous employees and contractors to stay with Google, but only after devoting significant time and resources to this effort and, in some instances, providing incentives to stay.

48.     Google has incurred costs to search for and obtain replacements for the Google employees and contractors who have left for employment at Otto.

**F.     Respondents Sell Otto to Uber**

49.     Given the unique training, experience, and skills of Google's employees and contractors in the self-driving space, Respondents' campaign to lure employees and contractors away from Google enabled Respondents to rapidly grow and profit from their new, competing venture.

50.     Google is informed and believes that Uber acquired Otto in Summer 2016. Uber reportedly paid approximately $680 million up front for the several month old company, plus a stream of future compensation. Uber recently announced that Levandowski will be in charge of Uber's self-driving-car project, and Uber has presented Levandowski as the new face of that competing project in a series of media interviews.[1]

51.     Google is informed and believes that Respondents were able to jumpstart their Otto business, and able to position themselves to obtain such a lofty acquisition price for Otto, only because of Respondents' unfair and unlawful conduct described in this Statement of Claims, including their taking key talent from Google's self-driving project, and such other conduct as may be established at hearing.

---

[1] *See, e.g.*, https://newsroom.uber.com/rethinking-transportation/ ("Anthony Levandowski, Otto's co-founder, will now lead our combined self-driving efforts ...."); https://www.theguardian.com/technology/2016/aug/19/self-driving-car-anthony-levandowski-uber-otto-google ("Uber just announced that self-driving cars will start pick up passengers later this month in Pittsburgh. And the man leading the project ...? Anthony Levandowski."); http://www.bloomberg.com/news/features/2016-08-18/uber-s-first-self-driving-fleet-arrives-in-pittsburgh-this-month-is06r7on ("When the Otto acquisition closes, likely this month, Otto co-founder Levandowski will assume leadership of Uber's driverless car operation.").

1121951

# III. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Breach of Contract

52.     Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

53.     Levandowski and Google entered into an "At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement," which was executed in May 2009 ("Levandowski 2009 Employment Agreement"). Levandowski's receipt of a substantial incentive payment in connection with Google's self-driving car project was contingent upon Levandowski's agreement to an At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement ("Levandowski 2012 Employment Agreement").

54.     Lior Ron and Google entered into an "At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement" on November 5, 2014. ("Ron Employment Agreement").

55.     Both Respondents also agreed, as part of their Employment Agreements, to comply with Google's Code of Conduct.

56.     Google fully performed its obligations under these Agreements.

57.     Respondents breached their obligations under the Levandowski Employment Agreements, the Ron Employment Agreement, and Google's Code of Conduct in numerous ways, including but not limited to:

Non-Solicitation Agreements

58.     Respondents Levandowski and Ron were (and are) prohibited by contract from soliciting Google workers to leave Google.

59.     By entering the Levandowski Employment Agreements, Levandowski agreed not only to abide by the Google Code of Conduct but also not to "directly or indirectly solicit, induce, recruit or encourage any of [Google's] employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of [Google]," either for himself "or for any other person or entity."

60. By entering the Ron Employment Agreement, Lior Ron promised not only to abide by the Google Code of Conduct but also not to "directly or indirectly solicit any Google's employees to leave their employment."

61. Ron and Levandowski breached their Employment Agreements by, among other things, soliciting Google employees to leave Google.

62. Levandowski's and Ron's breaches of their non-solicitation obligations have enriched Respondents at Google's expense and have caused significant harm to Google, including by causing a loss of key employees and contractors, causing Google to expend resources to recruit, replace, and train new employees, and causing Google to pay retention bonuses to fend off Respondents' solicitation efforts.

Non-Competition Agreements

63. Respondents Levandowski and Ron were prohibited by contract during their employment from competing with, or taking any acts disloyal to, Google.

64. By entering the Levandowski Employment Agreements, Levandowski agreed not to engage in any employment, occupation, or consulting directly related to "the business in which [Google] is now involved or becomes involved during the term of my employment." Levandowski also agreed not to engage in "any" activities that "conflict with" his obligations to Google. He also agreed to abide by the Google Code of Conduct, which required that he act with Google's "best interest" in mind and to avoid "personal gain . . . at the expense" of Google.

65. By entering the Ron Employment Agreement, Ron promised not to "engage in any other employment or other activities or services directly related to the business in which Google is now involved, becomes involved, or has plans to become involved . . . ." Ron also promised not to take any actions "that conflict with my obligations to Google" without Google's permission. He also agreed to abide by the Google Code of Conduct, which required that Ron avoid conflicts of interest and act in Google's best interest. All of these obligations remained in effect until Ron's departure from Google.

66. Levandowski and Ron breached the non-competition obligations of their Employment Agreements by developing a competing company while still employed at Google;

11

1121951

by collecting information from Google with plans to use it for the benefit of a Google competitor; and by soliciting Google employees to leave their employment for a competing company.

67.     Levandowski's and Ron's breaches of their contractual non-competition obligations have enriched Respondents at Google's expense and have harmed Google, including by causing a loss of key employees and contractors, causing Google to expend resources to recruit, replace, and train new employees; and causing Google to pay retention bonuses to fend off Respondents' solicitation efforts.

<u>Confidentiality Agreements</u>

68.     Respondents Levandowski and Ron were prohibited by contract—both during and following their tenures at Google—from disclosing or misusing confidential Google information acquired during the course of their employment.

69.     By entering into the Levandowski Employment Agreements, Levandowski promised to hold Google's confidential information in the strictest confidence. He agreed not to use or disclose any Google confidential information unless for Google's benefit or with Google's permission.

70.     Ron likewise promised—as part of his Employment Agreement—not to disclose or use Google confidential information unless for Google's benefit or with Google's permission.

71.     Google is informed and believes that Levandowski and Ron breached their contractual confidentiality obligations by invoking their knowledge of confidential Google salary and compensation information to make targeted and individualized job offers to Google employees.

72.     Google is informed and believes that Levandowski further breached his contractual confidentiality obligations by relying upon confidential Google information concerning the quality and desirability of Tyto Lidar LLC's products and processes and the viability and value of its business—all gleaned from Google's own due diligence into Tyto—in acquiring Tyto on Otto's behalf.

73.     Levandowski's and Ron's breaches of their confidentiality obligations have enriched Respondents at Google's expense and have harmed Google, including by causing a loss

1121951

of key employees and contractors, causing Google to pay retention bonuses to fend off Respondents' solicitation efforts and causing Google to expend resources to recruit, replace, and train new employees.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duties and/or Duties of Loyalty

74. Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

75. As a manager at Google, Levandowski owed Google fiduciary duties, including but not limited to, duties of loyalty, candor, and care.

76. As a Senior Advisor to Google's high-priority mapping initiatives, Ron owed Google fiduciary duties, including but not limited to, duties of loyalty, candor, and care.

77. Additionally, Levandowski and Ron each owed a duty of loyalty to Google due to their status as trusted agents of their principal, Google.

78. Through the acts alleged in this Statement of Claims, and such other acts as may be established at hearing, Levandowski and Ron each breached their duty of loyalty to Google, including by taking steps to assist and build competing companies during their tenure as Google employees; by soliciting Google employees to leave their employment for a competing company; by, on information and belief, encouraging other Google employees to breach their agreements with Google; and by misusing confidential Google information for their own benefit and for the benefit of what would ultimately become Otto.

79. Levandowski's and Ron's breaches of the duty of loyalty harmed Google, including by causing Google to expend resources to recruit, replace, and train new employees and causing Google to pay retention bonuses to fend off Respondents' solicitation efforts.

80. These breaches also unjustly enriched Levandowski and Ron, who were compensated handsomely during—and as a result of—their disloyal acts. Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt of a substantial monetary incentive payment from Google and, on information and belief, Respondents' receipt (and future

1121951

1  receipt) of compensation in connection with Uber's acquisition of Otto for a reported $680

2  million.

3      81.    Respondents performed the foregoing acts, conduct, and omissions fraudulently,

4  maliciously, and oppressively, with the intent and design to damage Google. By reason of this

5  conduct, Google is entitled to recover punitive damages in an amount to be determined.

6  ### THIRD CAUSE OF ACTION

7  ### Fraud-Deceit

8      82.    Claimant Google hereby incorporates by reference each of the allegations in the

9  preceding paragraphs as though fully set forth here.

10      83.    Through the acts alleged in this Statement of Claims, Levandowski concealed

11  material facts from Google and/or made affirmative misrepresentations to Google. Levandowski

12  undertook a long-ranging plan to build up a company to compete with Google, and he covertly

13  waged a disloyal campaign to persuade Google employees and contractors to join him—including

14  via 1-on-1 work meetings on the Google campus and secret meetings held off-campus.

15      84.    Levandowski was under contractual and fiduciary obligations to disclose these

16  material facts, which he instead intentionally concealed. For example, in connection with his exit

17  interview, Levandowski both concealed and made affirmative misrepresentations concerning his

18  conduct in soliciting Google employees to leave the company for his competing venture. And

19  during the months preceding his departure, Levandowski made numerous misrepresentations to

20  his direct supervisors at Google concerning his work at Google, including that he was fully

21  "committed" to Google, that he was "loyal" to Google, and that he had no intention of leaving

22  Google.

23      85.    Google is informed and believes that Levandowski intended to induce Google's

24  reliance on his concealment in order to mislead Google into believing that he was a committed

25  employee and to sustain his employment long enough for Levandowski to continue collecting a

26  generous salary, long enough to collect substantial monetary incentive payments according to his

27  compensation plan, and long enough to execute his unlawful campaign of solicitation and

28  competition.

1121951

86. Google is informed and believes that Respondent Levandowski also either aided and abetted Ron's fraud, and/or that he conspired with Ron and intended for the fraud to be committed, and that he therefore incurred tort liability.

87. Through the acts alleged in this Statement of Claims, Ron concealed material facts from Google and/or made affirmative misrepresentations to Google. Ron was under contractual and fiduciary obligations to disclose these material facts, which he instead intentionally concealed. For example, on information and belief, Ron concealed his efforts to build a company to compete with Google, and concealed his participation in a disloyal campaign to persuade Google employees and contractors to join him—including via secret meetings held off-campus. Ron also made affirmative misrepresentations or material omissions in the Exit Certification he provided to Google upon departure, including but not limited to the fact that he had advised Google of all facts that violated Google's Code of Conduct and that he was not aware of any violations of Google's Code of Conduct.

88. Google is informed and believes that Ron intended to induce Google's reliance on his concealment and affirmative misrepresentations in order to mislead Google into believing that he was a committed employee and to sustain his employment long enough for Ron to continue collecting a generous salary, and long enough to execute his unlawful campaign of solicitation and competition.

89. Google is informed and believes that Respondent Ron either aided and abetted Levandowski's fraud, and/or that he conspired with Levandowski and intended for the fraud to be committed, and that he therefore incurred tort liability.

90. Google justifiably relied on Levandowski's and Ron's deception by continuing their at-will employment and awarding them substantial compensation, incentive payments, and bonuses, all under the impression that they were loyal employees and agents.

91. As a result of Levandowski's and Ron's actions, Google sustained damages in an amount to be determined at an arbitration hearing.

92. As a result of conduct alleged herein, Respondents have been and will be unjustly enriched in an amount to be proven at an arbitration hearing. For example, Respondents have

1121951

been unjustly enriched by receiving compensation and business opportunities that rightly belong to Google. Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt of substantial monetary incentive payments from Google and, on information and belief, Respondents' receipt (and future receipt) of compensation in connection with Uber's acquisition of Otto for a reported $680 million.

93. Levandowski and Ron performed the foregoing acts, conduct, and omissions fraudulently, maliciously, and oppressively, with the intent and design to damage Google. By reason of this conduct, Google is entitled to recover punitive damages in an amount to be determined.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Contract

94. Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

95. On information and belief, Respondent Ron was aware of Levandowski's contractual obligations, including but not limited to, the obligations not to solicit and not to compete.

96. On information and belief, Respondent Levandowski was aware of Ron's contractual obligations, including but not limited to, the obligations not to solicit and not to compete.

97. On information and belief, Respondent Ron induced Levandowski's contractual breaches, including but not limited to, his breaches of his non-solicitation and non-competition obligations.

98. On information and belief, Respondent Levandowski induced Ron's contractual breaches, including but not limited to, his breaches of his non-solicitation and non-competition obligations.

99. Respondent Ron's intentional conduct disrupted Levandowski's contractual obligations and was a substantial factor in causing harm to Google.

1121951

1    100.    Respondent Levandowski's intentional conduct disrupted Ron's contractual

2    obligations and was a substantial factor in causing harm to Google.

3    101.    As a result of conduct alleged herein, Respondents have been and will be unjustly

4    enriched in an amount to be proven at an arbitration hearing.  For example, Respondents have

5    been unjustly enriched by receiving compensation and business opportunities that rightly belong

6    to Google.  Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt

7    of substantial incentive payments from Google and, on information and belief, Respondents'

8    receipt (and future receipt) of compensation in connection with Uber's acquisition of Otto for a

9    reported $680 million.

10    102.    Respondents performed the foregoing acts, conduct, and omissions fraudulently,

11    maliciously, and oppressively, with the intent and design to damage Google.  By reason of this

12    conduct, Google is entitled to recover punitive damages in an amount to be determined.

### FIFTH CAUSE OF ACTION

**Tortious Interference with Prospective Economic Advantage**

15    103.    Claimant Google hereby incorporates by reference each of the allegations in the

16    preceding paragraphs as though fully set forth here.

17    104.    Google had economic relationships with each of its solicited employees and

18    contractors that, if they had continued, would have benefited Google.

19    105.    Respondents knew of these relationships but solicited the employees and

20    contractors—including Google employees Don Burnette and Claire Delaunay, among many

21    others—to leave Google and join a venture that would ultimately become Otto with the intent of

22    disrupting their economic relationship with Google.  Respondents engaged in wrongful conduct

23    by soliciting Google employees while still employed at Google and encouraging other Google

24    employees to violate the duty of loyalty.  In concert with Otto's recruiter, Respondents

25    encouraged a group of Google employees to quit *en masse* and with little notice, which they

26    understood, or had reason to know would cause disruption and harm to Google's business.

27    106.    As a direct result of this wrongful conduct, on information and belief, numerous

28    employees and contractors thus far have terminated their economic relationships with Google and

currently work for Otto. Respondents' tortious acts caused damages to Google in an amount to be proven at the arbitration hearing.

107.    As a result of conduct alleged herein, Respondents have been and will be unjustly enriched in an amount to be proven at an arbitration hearing.  For example, Respondents have been unjustly enriched by receiving compensation and business opportunities that rightly belong to Google.  Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt of substantial monetary incentive payments from Google and, on information and belief, Respondents' receipt (and future receipt) of compensation in connection with Uber's acquisition of Otto for a reported $680 million.

108.    Respondents performed the foregoing acts, conduct, and omissions fraudulently, maliciously, and oppressively, with the intent and design to damage Google.  By reason of this conduct, Google is entitled to recover punitive damages in an amount to be determined.

## SIXTH CAUSE OF ACTION

**Unlawful Conduct and Unfair Competition under California Business and Professions Code § 17200 *et seq.***

109.    Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

110.    As alleged above, Respondents have engaged in unlawful, unfair, and/or fraudulent business practices within the meaning of California Business and Professions Code § 17200.

111.    Respondents undertook the acts described in this Statement of Claims, and such other acts as may be established at hearing, with the intent to injure Google and gain an unfair competitive advantage.

112.    The natural, probable, and foreseeable result of Respondents' conduct has been and will continue to be to injure Google's business, including but not limited to its self-driving car project, to impose substantial expenses on Google to counteract that conduct, and to injure and damage Google in other ways.

113.    The above acts, unless restrained, threaten to and will irreparably injure Google's business, goodwill, and reputation, through the disclosure of its confidential information.

18

Accordingly, Google is entitled to appropriate injunctive relief against further acts of unfair competition by Respondents.

114. As a proximate and direct result of Respondents' unlawful conduct, Google has suffered and will continue to suffer substantial actual losses, and Respondents' have been unjustly enriched in amounts for which Google is entitled to restitution.

115. Google is entitled to restitution in the amount, at a minimum, of the salary, benefits, incentive payments, and bonuses paid to Levandowski and Ron during the course of their unlawful, unfair, and/or fraudulent conduct.

116. Unless enjoined, Respondents will continue to engage in these unlawful, unfair, and/or fraudulent acts, conduct, and omissions, which have resulted, and will continue to result in, irreparable injury to Google.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment

117. Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

118. As a result of the illegal and wrongful conduct alleged herein, Respondents have been and will be unjustly enriched in an amount to be proven at an arbitration hearing.

119. Specifically, Respondents have been unjustly enriched by receiving compensation and business opportunities that rightly belong to Google.

120. Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt of over $120 million in incentive payments from Google and, on information and belief, Respondents' receipt (and future receipt) of compensation in connection with Uber's acquisition of Otto for a reported $680 million.

121. Respondents should be required to disgorge and return to Google all the ill-gotten gains that they illegally and wrongfully obtained at the expense of Google, in an amount to be determined at trial, and a constructive trust should be imposed thereto.

## IV. STATEMENT OF REMEDIES SOUGHT

WHEREFORE, Claimant Google respectfully requests the following relief:

1121951

1        1.     Judgment in Google's favor and against Respondents on all causes of action

2 alleged herein;

3        2.     For damages in an amount to be proven at an arbitration hearing;

4        3.     For restitution and disgorgement of Respondents' unjust enrichment;

5        4.     For the imposition of a constructive trust;

6        5.     For injunctive relief;

7        6.     For punitive damages;

8        7.     For restitution under Business and Professions Code § 17200;

9        8.     For reasonable attorneys' fees and costs of suit incurred herein as allowed by law

10 and contract;

11        9.     For prejudgment and post-judgment interest; and

12       10.     For such other and further relief as the Arbitrator may deem to be just and proper.

13

14 Dated: October 28, 2016                 KEKER & VAN NEST LLP

15

16                             By:    */s/ Rachael E. Meny*

17                                  ROBERT A. VAN NEST
                                 RACHAEL E. MENY

18                                  JENNIFER A. HUBER
                                 THOMAS E. GORMAN

19                                  W. HAMILTON JORDAN

20                                  Attorneys for Claimant
                                 GOOGLE INC.

21

22

23

24

25

26

27

28

1121951

# EXHIBIT E



April 2, 2018

John F. Gardner, Esq.
jgardner@donahue.com
Donahue Fitzgerald LLP
1646 N. California Blvd.
Walnut Creek, CA 94596

Neel Chatterjee
NChatterjee@goodwinlaw.com
Goodwin Procter LLP
135 Commonwealth Dr.
Menlo Park, CA 94025

Counsel:

On behalf of Uber Technologies, Inc. ("Uber"), we are writing to you to provide notice to your client, Anthony Levandowski, regarding matters relating to the April 11, 2016, Indemnification Agreement between Mr. Levandowski and Uber ("Indemnification Agreement"). We ask that you please provide a copy of this letter to Mr. Levandowski and discuss the contents of it with him, and that we then work together to arrange an in-person meeting with both you and Mr. Levandowski to discuss the matters addressed in this letter. That meeting is necessary both to prepare for the April 30 Arbitration hearing, and to determine whether any settlement of the Arbitration is possible.

As you know, Uber has been paying Mr. Levandowski's legal fees and costs to defend the claims made against him by Google, LLC ("Google") in the arbitration captioned *Google Inc. v. Levandowski and Ron* (Reference # 1100086069) (Consolidated) ("the Arbitration"). The principal purpose of this letter is to notify Mr. Levandowski that Uber intends to exercise all of its rights to disclaim or avoid liability under the Indemnification Agreement and to recover the attorney fees and costs Uber has been paying for Mr. Levandowski's defense. For the reasons set forth below, our expectation is that Uber will not be required to indemnify Mr. Levandowski for any final judgment in the Arbitration, and instead is going to be entitled to recover from Mr. Levandowski the fees and costs it has paid on his behalf.

First, Mr. Levandowski is in material breach of the Indemnification Agreement. Section 2.2(c)(iii) of the Indemnification Agreement provides that Mr. Levandowski "shall … appear at [Uber's] reasonable request to give testimony (including deposition and trial testimony) with respect to the defense of" the claims in the Arbitration. Mr. Levandowski refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment—as we understand



it, he refused to answer any question about his employment at Google, from the time his employment began in 2007 through to the date it ended in January 2016. We do not see the justification for such a broad invocation. At a minimum, Mr. Levandowski could and should testify regarding the solicitation and competition issues that are at the heart of the Arbitration. He could do that without having to testify about any allegations of improper downloading. Based on our understanding of the facts, Mr. Levandowski should be able to provide helpful testimony regarding non-solicitation and non-competition that should improve the defense of the claims in the Arbitration—unless there are facts we do not know about. We also believe that, notwithstanding any California rule to the contrary, the Arbitration panel is likely to react negatively to Mr. Levandowski's refusal to testify. We therefore request that Mr. Levandowski reconsider his refusal to testify.

Second, Mr. Levandowski is also in breach of section 2.2(c)(iv) of the Indemnification Agreement. That provision requires Mr. Levandowski to "reasonably cooperate with and assist" Uber "in the defense of" the claims in the Arbitration. Mr. Levandowski has taken a number of actions inconsistent with this provision. For example, when Uber sought to have its outside counsel (and two in-house lawyers) admitted to the Protective Order in the Arbitration in order to protect and exercise Uber's rights under the Indemnification Agreement, including the right to "direct and control" the litigation and/or settlement of the claims in the Arbitration, Mr. Levandowski chose not to support that effort. Instead, Mr. Levandowski chose to send an aggressive letter in which he stated that he would cooperate with Uber's effort to be admitted to the Protective Order only subject to a number of conditions, including the patently unreasonable condition that Uber agree to disqualify its outside counsel from any future dispute between Uber and Mr. Levandowski. This conduct was a violation of Mr. Levandowski's duty to "reasonably cooperate with and assist" Uber in the Arbitration. Likewise, Mr. Levandowski's refusal to testify was a breach of that provision (as well as of the independent provision expressly requiring his testimony). In addition, when we asked for a meeting with Mr. Levandowski before his deposition, he refused unless an Uber in-house counsel was available to attend the meeting— which was not a reasonable demand, and was not possible, thereby precluding the meeting. That too was in breach of the duty to reasonably cooperate. We hope that future efforts to cooperate will be more productive, but the actions already taken constitute an independent material breach.

Third, as you and Mr. Levandowski should already realize, certain claims Google has brought against Mr. Levandowski in the Arbitration are Excluded Claims under Section 2.1(b) of the Indemnification Agreement. For example, any claim relating to Mr. Levandowski's involvement with the Odin Wave / Tyto companies are Excluded Claims, since Mr. Levandowski provided no information to Stroz Friedberg regarding his connection to those companies. Likewise, other claims appear to be based, at least in part, on information that was not previously disclosed to Uber or Stroz Friedberg.



As you know, the Indemnification Agreement provides that as soon as there is a settlement or a final non-appealable adjudication of the claims in the Arbitration, Uber is permitted to exercise its rights under section 2 of the Indemnification Agreement to avoid any indemnification responsibility for any judgment or settlement based on Excluded Claims, and to recover any attorneys' fees and costs paid for the defense of such claims. In addition, if the Arbitration concludes with there being no award to Google, Uber is entitled to recover from Mr. Levandowski the portion of the legal fees and costs allocable to the Excluded Claims.

We hereby confirm that Uber intends to exercise all of these rights to the maximum extent. In addition, Uber intends to seek appropriate remedies, including the avoidance of any possible indemnification liability and the recovery of fees, based on Mr. Levandowski's breaches of the Indemnification Agreement referenced above, as well as any such breaches that may occur in the future.

To avoid any dispute between Uber and Mr. Levandowski, we ask Mr. Levandowski to meet with counsel for Uber to discuss our request for him to testify, the defense of the Arbitration, and the possible settlement of the Arbitration.

One additional item we would like to discuss with you and Mr. Levandowski at the proposed meeting is a request by Uber that Mr. Levandowski take appropriate steps to ensure that Uber can recover the fees that it has been paying on Mr. Levandowski's behalf. Uber is entitled to recover those fees for two reasons: (a) to the extent they relate to the defense of an Excluded Claim, and (b) as a partial remedy for Mr. Levandowski's material breaches of the Indemnification Agreement. One appropriate way to protect Uber's ability to recover those fees would be for Mr. Levandowski to place into escrow the total amount of Expenses that have been covered to date, plus any amounts that may be advanced in the future.

Please let us know once you have had a chance to discuss this letter with Mr. Levandowski and can inform us of appropriate dates and times when we might meet to discuss it further.

Sincerely,

Hamish Hume

cc:  Miles Ehrlich
     Ismail Ramsey

3

# EXHIBIT F



Neel Chatterjee
+1 650 752 3256
NChatterjee@goodwinlaw.com

Goodwin Procter LLP
601 Marshall Street
Redwood City, CA  94063

goodwinlaw.com
+1 650 752 3100

May 13, 2019

**VIA E-MAIL**

Hamish Hume, Esq.
Boies Schiller Flexner
1401 New York Avenue, NW
Washington, DC 20005

Dear Hamish:

I write on behalf of Anthony Levandowski to address several issues related to the *Google v. Levandowski* arbitration, in light of recent statements made in Uber's April 11, 2019 Form S-1 Registration Statement filed with the SEC.  Mr. Levandowski is concerned that, given Uber's statements, Uber does not intend to honor its indemnity obligations to Mr. Levandowski.  Thus, for the reasons discussed below, Mr. Levandowski requests written confirmation from Uber that it will in fact honor its various contractual obligations. Please provide written confirmation to the points below by May 31.

Mr. Levandowski has concerns that Uber will not advance the payment associated with any adverse decision, even though it is required to under the Indemnification Agreement.  These concerns stem from the fact that Uber states in its S-1 that "*[i]t is possible* that the Company will be required to advance the full amount of the award once it becomes due while it continues to contest its indemnification obligations." Uber S-1 at F-82 (emphasis added).  However,  the Indemnification Agreement unambiguously requires Uber to advance the full amount of the award once it becomes due, even if Uber intends to contest its indemnification obligations at a later date.  Specifically, the Indemnification Agreement provides, "For the avoidance of doubt, Purchaser **shall advance** all Expenses incurred by the Indemnified Person(s) pursuant to Section 2.3(a) through the later to occur of the final settlement or final adjudication of such Former Employer Claim, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d)."  Indemnification Agreement § 2.2(d) (emphasis added).  "Expenses" is defined in the Indemnification Agreement to include, among other things, "any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement."  *Id.* at 3.

The S-1 also references your April 2, 2018 letter setting forth Mr. Levandowski's alleged breaches of the Indemnification Agreement.  Mr. Levandowski disagrees that he has breached the Indemnification Agreement or that Uber has any basis to avoid its obligations under that agreement.  We have set forth our position on these issues on many occasions on our numerous, lengthy calls with your firm and people at Uber prior to the commencement of the final arbitration hearing in April 2018.  To ensure there is no misunderstanding, Mr. Levandowski responds to the points in your April 2, 2018  letter as follows:

ACTIVE/99382042.13



*First*, your letter asserts that Mr. Levandowski was in material breach of the Indemnification Agreement because he "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment." 4/2/18 Ltr. at 1. Uber has no basis to assert that Mr. Levandowski breached the agreement through the exercise of his Fifth Amendment rights. Your letter fails to acknowledge that Uber's counsel, Mr. Arturo Gonzalez, recommended that Mr. Levandowski assert his Fifth Amendment rights when Mr. Gonzalez was representing both Mr. Levandowski and Uber. ███████████

███████████████████████████████████████

Uber knew of Mr. Levandowski's intention to assert his Fifth Amendment rights throughout the arbitration proceedings. Nevertheless, the first time Uber ever made an assertion that Mr. Levandowski should waive his Fifth Amendment rights associated with the arbitration was in your April 2, 2018 letter. This request was made after Mr. Levandowski was deposed, indeed, after discovery closed, and less than a month before the arbitration hearing. Despite the untimely request, Mr. Levandowski followed the instruction given by Uber. In response to your April 2, 2018 letter, Mr. Levandowski offered to testify at the arbitration hearing as well as to sit for a second deposition to occur before the arbitration hearing to increase the likelihood the Panel would allow him to testify. In support of his request, he provided a detailed offer of proof as to what he would discuss. Specifically, in his April 20, 2018 letter to the Panel, a copy of which was provided to Uber and was revised after receiving input from Uber, Mr. Levandowski identified a variety of relevant topics on which he would testify. Uber approved Mr. Levandowski's April 20, 2018 letter to the Panel and asked for nothing further. The Panel ultimately declined to permit Mr. Levandowski to testify.

*Second*, you contend that Mr. Levandowski breached section 2.2(c)(iv) of the Indemnification Agreement by failing to "reasonably cooperate with and assist" Uber in defending the claims of the arbitration. *See* 4/2/18 Ltr. at 2. Here, you first argue that Mr. Levandowski's decision to not support Uber's attempt to sign on to the arbitration protective order was unreasonable. This contention has no merit, as the Panel independently denied Uber's motion to amend the protective order. In any event, pursuant to the common interest and joint defense doctrines, Goodwin kept Uber apprised of the progress of the arbitration, and Uber was able to fully exercise its contractual right to direct and control the defense of the arbitration based on the information provided to it. You then reference again Mr. Levandowski's "refusal to testify," but, for the reasons discussed above, this was not a breach of the Indemnification Agreement.

Mr. Levandowski also actively assisted Uber's defense of the *Waymo* litigation. For both cases, he met with Uber every time requested, provided substantial support to defend the litigation, obtained Seval Oz's ear rings, found the checks and documents associated with Page Mill Labs, and provided a roadmap to the evidence obtained from Sasha Zbrozek. Mr. Levandowski sat through each day of the arbitration and provided countless hours of support in witness preparation and investigation. Pursuant to your belated request—again, an example of Uber's control over the defense of this arbitration—Mr. Levandowski went so far as to waive his Constitutional rights and agree to testify at the arbitration hearing, but was not permitted by the Panel to do so. Lastly, you discuss Mr. Levandowski's request for the presence of an Uber in-house counsel at a meeting before his deposition as an alleged breach.



It is unclear why you believe this was "not a reasonable demand." To the contrary, it was reasonable for Mr. Levandowski to want to have an in-house person from Uber with decision-making power present at the meeting because he had been dealing with them during his time at Uber.

*Third*, you state that certain claims brought by Google in the arbitration are "Excluded Claims" under section 2.1(b) of the Indemnification Agreement, citing, in particular, claims related to Odin Wave / Tyto. We disagree with the assertion that such claims are Excluded Claims on grounds that Mr. Levandowski allegedly "provided no information to Stroz Friedberg regarding his connection to those companies." 4/2/18 Ltr. at 2. As you know, Mr. Levandowski made all of his electronic devices available to Stroz as part of the due diligence process. *See, e.g.*, Indemnification Agreement at 1 (stating that "the Parties have agreed that the Completed Diligenced Employees' involvement in the Outside Expert examination, including interviews, device and document production, and other personal involvement of any nature, is complete and Parent will so instruct the Outside Expert"). Many documents related to Odin Wave / Tyto were located on those electronic devices, including, but not limited to, Arbitration Exhibits 0166 (Odin Wave business plan), 1541.096 (photo of whiteboard discussing Odin Wave), and 1541.164 (same), which were all referenced in the Panel's Interim Award, as well as a number of other exhibits shown to witnesses at the hearing.

Uber is also obligated to indemnify Mr. Levandowski for the full amount of any monetary recovery awarded to Google because the Panel found that the remedy for the "Otto" claims is the same as the remedy for the Odin Wave/Tyto claims. In fact, the Panel found *no distinction* between the remedies to Google resulting from the two sets of claims and expressly stated that there was but a single harm and a single remedy. Under the law, if just one of multiple claims is covered under an indemnification agreement and the harm for all those claims is the same, the total amount is subject to an indemnity obligation. This issue has been resolved in numerous cases.

For example, in *In re Feature Realty Litig.*, 634 F. Supp. 2d 1163 (E.D. Wash. 2007), the court held that the indemnitee was entitled to full indemnification where a single loss would be covered under the indemnity agreement under some theories of liability but not based on others. *Id.* at 1174 ("In sum, the Court finds as a matter of law that allocation of the City's losses amongst covered and non-covered theories of liability is not required under the facts of this case and that Feature's Motion for Partial Summary Judgment Re: Allocation must be granted. There was but a single injury to be compensated based upon acts clearly covered by the policy, notwithstanding Feature's assertion of two distinct theories of recovery."). The law is the same in California and elsewhere. *See e.g.*, *Lumbermens Mut. Cas. Co. v. Corning, Inc.*, No. CV0700881DOCMLGX, 2008 WL 11337841, at *8 (C.D. Cal. Dec. 24, 2008) ("Where defense costs are allocable to both covered and non-covered claims, the insurer is not entitled to a reimbursement for those costs as they would have been expended regardless of the non-covered claims."); *Buss v. Superior Court*, 16 Cal. 4th 35, 45–46 (1997) ("Standard comprehensive or commercial general liability insurance policies provide, in pertinent part, that the insurer has a duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as damages for any covered claim . . . The insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved . . . . By definition, it entails the payment of money in order to resolve liability."); *Alexander v. CNA Ins., Co.*, 441 Pa.Super. 507, 512 (1995) (policyholder was entitled to indemnity for the entire amount paid to settle a claim seeking the same damages under alternative covered tort and



non-covered breach of contract counts); *Hawthorne v. South Bronx Community Corp*., 78 N.Y.2d 433, 438 (N.Y.1991) (insurer was obligated to pay for the entire settlement of an underlying claim where the policyholder was liable under two alternative theories only one of which fell within the policy's coverage); *Reliance Ins. Co. v. Armstrong World Indus*., Inc., 259 N.J.Super. 538, 566-68 (1992), rev'd on other grounds, 292 N.J.Super. 365 (1996) (insurer had a duty to indemnify policyholder for entire settlement amount in lawsuit seeking the same damages based on covered and uncovered theories); *United States Steel Corp. v. Hartford Acc. and Indem. Co*., 511 F.2d 96, 99 (7th Cir.1975) (underlying judgment was covered in its entirety where facts showed that the policy holder was liable for the same damages under both covered and uncovered claims)."

Here, there is no dispute that the Otto-related claims are covered under the indemnity agreement. And Uber cannot credibly dispute that the Panel found that the remedy it awarded to Google was justified based on both the Otto and the Tyto LiDar claims. Therefore, Uber is obliged to indemnify for the full amount under the law.

Please provide written confirmation as follows:

1.      Uber will not make public any further information shared with Uber or Boies Schiller under the Common Interest Agreement regarding the arbitration or the Interim Award.  Mr. Levandowski reserves all rights with respect to disclosures already made.

2.      Uber will advance the funds on any potential adverse decision, even if it is preserving its rights to seek reimbursement for those funds.

Please let me know if you would like to discuss any of the aforementioned matters further.  Mr. Levandowski continues to reserve all rights he may have against Uber with respect to Uber's dealings with him.

We look forward to your confirmation that Uber will honor its indemnity obligations.

Sincerely,

Neel Chatterjee

NC

# EXHIBIT G



I. Neel Chatterjee
+1 650 752 3256
NChatterjee@goodwinlaw.com

Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063

goodwinlaw.com
+1 650 752 3100

June 27, 2019

**VIA E-MAIL**

Hamish Hume, Esq.
Boies Schiller Flexner
1401 New York Avenue, NW
Washington, DC 20005

Dear Hamish:

I am writing on behalf of Anthony Levandowski to follow up on my May 13, 2019 letter regarding issues related to the *Google v. Levandowski* arbitration. In that letter, Mr. Levandowski requested written confirmation from Uber by May 31, 2019 that (1) Uber would advance payment associated with any adverse decision in the arbitration, as Uber is required to do under the Indemnification Agreement, and (2) Uber will not make public any further information shared with Uber or Boies Schiller under the Common Interest Agreement regarding the arbitration or the Interim Award. We have now received the panel's order denying Mr. Levandowski's request for an offset based upon the *Waymo-Uber* settlement. We also understand that Uber has deleted any copies of the Interim Award that it possesses.

To date, we have not received a written response from Uber related to its contractual obligations. Based upon our interactions with Uber and the absence of a written response, we can only conclude that Uber has accepted Mr. Levandowski's position and intends to honor its contractual obligations to advance the funds on any potential adverse decision in the arbitration, even if it is preserving its rights to seek reimbursement for those funds. As you know, Mr. Levandowski does not have the funds to satisfy the award of the arbitration panel so this issue is of the utmost importance. We also understand that Uber agrees not to make public any further information shared under the Common Interest Agreement regarding the arbitration or the Interim Award and has not retained copies of the Interim Award.

Please let me know if you would like to discuss.

Sincerely,

I. Neel Chatterjee

# EXHIBIT H



BOIES
SCHILLER
FLEXNER

July 3, 2019

Mr. Neel Chatterjee
Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063

Dear Neel:

We write in response to your letter of June 27, 2019. Your statement in the letter that Uber has a contractual obligation to "advance the funds on any potential adverse decision in the arbitration, even if it is preserving its rights to seek reimbursement for those funds" is not correct. As we stated in our letter of April 2, 2018, Mr. Levandowski materially breached the Indemnification Agreement, and, because of that breach, Uber is not obligated to advance any amounts owed in connection with the award in the arbitration. In addition, the majority of the award is attributable to an Excluded Claim not even arguably covered by the (now obsolete) indemnity.

Uber recognizes that lengthy and costly litigation may ensue if it refuses to pay any final award from the Google arbitration, and, for that reason, has been engaging with you about resolving this matter in a manner that avoids escalation of the issue to litigation. However, and importantly, it would be a serious mistake on your part to misconstrue any statement by Uber, or any failure of Uber to make a statement, as meaning that Uber's position is anything other than as set forth above and reiterated here: Uber has no contractual obligation to advance any funds to Mr. Levandowski or to Google on Mr. Levandowski's behalf.

Sincerely,

Hamish Hume

# EXHIBIT I



August 30, 2019

Mr. Neel Chatterjee
Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063

      Re:    Uber – Levandowski Dispute Over Indemnification For Google-Levandowski
             Arbitration

Dear Neel:

As you know, and as we have made clear to you in the past, Uber does not believe it has any obligation to indemnify Anthony Levandowski under the April 11, 2016 Indemnification Agreement.[1] In the spirit of compromise and good will, and to avoid a dispute, Uber has been advancing Mr. Levandowski's defense costs relating to Google's claims in the Google-Levandowski arbitration, subject to a reservation of rights. But as we have previously informed you, Uber is not going to indemnify Mr. Levandowski for any final award, and reserves its rights to seek reimbursement for some or all of the legal fees we have advanced.

We are sending you this letter to state again some of the numerous reasons why Uber is not obligated to indemnify Mr. Levandowski and will not indemnify him for the final award. Uber reserves all its rights to dispute any and all claims Mr. Levandowski may make, and this letter is not intended to be a comprehensive statement of all claims and defenses that Uber may have.

First, it is Uber's view that Mr. Levandowski fraudulently induced Uber to enter into the Indemnification Agreement. At the time that Uber approved and executed the Indemnification Agreement, Mr. Levandowski had fraudulently concealed from Uber material facts that, had they been disclosed, would have caused Uber not to enter into that agreement. Those material facts include: (a) shortly before leaving Google, and while negotiating with Uber, Mr. Levandowski downloaded approximately 14,000 proprietary Google files containing self-driving car design and technology[2]; and (b) during the time period from early 2012 until the time he left Google in

---

[1] *See* Letter of H. Hume to N. Chatterjee of April 2, 2018; Letter of H. Hume to N. Chatterjee of July 3, 2019.

[2] As you know, Uber had no knowledge of this until after Waymo filed its lawsuit in February 2017 alleging Mr. Levandowski had done so, and Uber never received or used any of those files or their contents, and Uber's employment agreement with Mr. Levandowski made clear he was prohibited from possessing or using any such material or information. The fact of the indictment, and the facts underlying that indictment, give Uber cause to believe that Mr.

1



January 2016, Mr. Levandowski had been controlling and operating a competing side business (at various times referred to as Tyto Lidar), which he owned and controlled through a series of intermediate trusts. Mr. Levandowski fraudulently concealed these facts from Uber. Had Uber known these facts, it would not have executed the Indemnification Agreement, and its board certainly would not have approved any such agreement. Accordingly, Uber's execution of that Agreement was fraudulently induced by Mr. Levandowski, and the proper remedy for that is rescission of the Indemnification Agreement.[3] For this reason alone, Mr. Levandowski is not entitled to use the agreement he fraudulently procured to force Uber to pay any final award issued by the arbitration panel presiding over the Google-Levandowski arbitration.[4] We believe the facts set forth in the indictment of Mr. Levandowski that just issued from the U.S. Attorney's office for the North District of California on August 27, 2019, confirm and support Uber's position.

      Second, even if the Indemnification Agreement is deemed not to have been fraudulently induced, it would still be null and void because Mr. Levandowski committed a "Post-Signing Specified Bad Act." Section 2.1(a) of the Agreement provides that "if . . . (B) following the Closing . . . it is determined by a Final Judgment that a Post-Signing Specified Bad Act (that was the subject of a Former Employer Claim) . . . was committed by such Diligenced Employee prior to the Closing, then . . . Purchaser's indemnification obligation to such Diligenced Employee pursuant to this Agreement shall immediately become null and void and of no further force and effect and there shall be no liability on the part of Parent, Purchaser or any of their respective Affiliates to indemnify . . . such Diligenced Employee for any Indemnified Claims . . . ." Based on all the information that has come to light since the Closing, including the facts underlying the indictment that issued August 27, 2019, it is clear that Mr. Levandowski committed several "Post-Signing Specified Bad Acts."

      As set forth in Exhibit A to the Indemnification Agreement, the definition of "Post-Signing Specified Bad Act" includes any of the following if committed after April 11, 2016, and before the Closing: (a) "retaining, not returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of

---

Levandowski misappropriated Waymo's trade secrets and intended to use the downloaded files for his economic benefit.

[3] Cal. Civ. Code § 1689(b)(1) ("a party to a contract may rescind the contract . . . if the consent of the party rescinding" was "obtained through . . . fraud."); *see LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.*, 156 Cal. App. 4th 1259, 1266-67 (2007) (holding insurer was entitled to rescind insurance policy where insured concealed material information in insurance application); *Benchmark Ins. Co. v. Dismon Corp.*, 262 F. Supp. 3d 991, 996-98 (C.D. Cal. 2017) (same).

[4] *See Eade v. Reich*, 120 Cal. App. 32, 37-38 (1932) (upholding rescission based on fraudulent inducement counterclaim advanced by a defendant in response to plaintiff's claim to enforce promissory note).



any Former Employer (in any medium or form) without the express written consent of such Former Employer." As you know, Waymo presented evidence showing that Mr. Levandowski downloaded 14,000 Google files shortly before leaving Google. Mr. Levandowski never denied this evidence, refused to testify about it (choosing instead to invoke the 5th Amendment), and has therefore never denied taking the downloaded material or stated what he did with such downloaded material (all of which severely prejudiced Uber's ability to defend against Waymo's claims, even though those claims had no merit as to Uber). Indeed, in a letter dated May 15, 2017, Uber demanded that Mr. Levandowski either attest to denying having taken any downloaded materials from Google, provide such downloaded material to Uber's outside counsel, or attest to the destruction of such downloaded material. *See* Letter of S. Yoo to A. Levandowski of May 15, 2017. Mr. Levandowski failed to comply with Uber's demands, which precipitated the termination letter Uber sent to Mr. Levandowski on May 26, 2017. *See* Letter of S. Yoo to A. Levandowski of May 26, 2017. And now Mr. Levandowski has been indicted for stealing trade secrets based on this downloading about which he refused to testify. Thus, Uber believes that the evidence will strongly support the conclusion that Mr. Levandowski committed a Post-Signing Specified Bad Act. This renders null and void any indemnification obligations that Uber may otherwise have had to Mr. Levandowski.[5]

Third, Mr. Levandowski materially breached the Indemnification Agreement by failing to cooperate in the litigation and by refusing to testify. We have written to you previously about these material breaches. *See* Letter of H. Hume to N. Chatterjee of April 2, 2018; Letter of H. Hume to N. Chatterjee of July 3, 2019. Contrary to the assertions in your letter of May 13, 2019, it was not until the week of January 8, 2018, that you confirmed to Uber that Mr. Levandowski would be refusing to testify in the Google-Levandowski arbitration and would instead be broadly invoking his 5th Amendment rights during his upcoming deposition. On January 15, 2018, we informed you that Mr. Levandowski's planned invocation was insupportably broad and that "it is Uber's view that it would be better for the defense of the claims in the [Google-Levandowski] arbitration if Mr. Levandowski would testify to the issues raised in the arbitration, rather than invoke the 5th Amendment." *See* H. Hume 1/15/2018 email to N. Chatterjee. Despite Uber's request, Mr. Levandowski broadly asserted the 5th Amendment at his deposition. Three months later, Mr. Levandowski attempted to waive his rights and submitted a proffer that demonstrated that his previous invocation was far too broad. However, given Mr. Levandowski's previous invocation (which was made contrary to Uber's request), the Panel denied his belated attempt to testify. Mr. Levandowski's refusal to testify at his deposition materially breached the Indemnification Agreement.

Fourth, even if all of the foregoing were disregarded, Uber would still not be obligated to indemnify Mr. Levandowski for any Excluded Claim. The arbitration panel found that Mr.

---

[5] These Post-Signing Specified Bad Acts were obviously "the subject of a Former Employer Claim" as referenced in § 2.1(a). These Acts were the centerpiece of the litigation brought by Waymo against Uber, Ottomotto LLC, and Otto Trucking LLC. Both Otto entities were part of the "Company Group" in the Indemnification Agreement, and therefore the Waymo claims against them met the definition of a "Former Employer Claim" set forth in the Indemnification Agreement ("Former Employer" is defined to include affiliates of former employers, and hence covers the claims brought by Waymo).



Levandowski breached his duty of loyalty to Google from early 2012 until August 2015 based solely on his misconduct relating to Tyto Lidar. That conduct was never disclosed to Uber or Stroz Friedberg during the due diligence, and therefore any claim based on Mr. Levandowski's Tyto Lidar misconduct is an Excluded Claim. The portion of the total award allocable to the Tyto Lidar misconduct is at least 75%. The principal remedy the arbitration panel awarded to Google was a disgorgement of Mr. Levandowski's Chauffeur Bonus (the total of which was $125 million). Mr. Levandowski's Chauffeur Bonus accrued in four phases: 25% of it accrued each October from 2012 to 2015. Thus, as of August 2015, at least 75% of the Chauffeur Bonus had already accrued. Since August 2015 is the first month in which the panel found Mr. Levandowski to have committed any misconduct other than the Tyto Lidar misconduct, at least 75% of the total bonus disgorgement is allocable to the Excluded Claims relating to the Tyto Lidar misconduct. In this regard, the case law makes clear that Mr. Levandowski will have the burden of proving that the panel's award is "indivisible."[6] However, in light of the facts regarding the accrual of the Chauffeur bonus, Mr. Levandowski will not be able to meet this burden. Moreover, given the allocation to Tyto Lidar, Uber is entitled to recover from Mr. Levandowski at least 75% of all attorneys' fees it has advanced for your representation of Mr. Levandowski.

Further, the Agreement provides Uber with the right to have all of the foregoing issues resolved after the entry of a final judgment in the arbitration (including the Excluded Claim issue), but before having to pay Mr. Levandowski any amount under that final judgment. Section 2.2(e) of the Indemnification Agreement provides:

> "Within 60 days after the settlement or final non-appealable judgment of a Former Employer Claim, Purchaser [Uber] may elect (in its sole discretion) to arbitrate (A) whether an Indemnified Claim is an Excluded Claim and/or (B) whether a Diligenced Employee is entitled to indemnification under this Agreement (subject to the terms and condition hereof, including the proviso in section 2.1(a) [relating to Post-Signing Bad Acts, as referenced above] and the last sentence of Section 2.3(a))."

Nothing in this provision or anywhere else in the Indemnification Agreement requires Uber to pay the amount of the "final non-appealable judgment" referenced in this provision before it initiates and completes arbitration under this provision.[7]

---

[6] *State of Cal. v. Allstate Ins. Co.*, 45 Cal. 4th 1008, 1034, 1036-37 (2009).

[7] To the contrary, both Section 2.2(d) and Section 2.3(a) confirm that Uber does not have to pay the final award itself, but just has to pay all Expenses incurred through to the time of that final award. *See* Indemnification Agreement 2.2(d) ("For the avoidance of doubt, Purchaser shall advance all Expenses incurred by the Indemnified Person(s) pursuant to Section 2.3(a) through the later to occur of the final settlement or final adjudication of such Former Employer Claim, which expenses may be subject to reimbursement pursuant to this Section 2.2(d)."); *id.* at 2.3(a) (providing that in an arbitration initiated by an Indemnified Person under this provision, Purchaser is not able to arbitrate "whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim **until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement**"). It would have been



If you wish, we are available to discuss the points made in this letter with you and your client, as you deem appropriate.[8]

Sincerely,

Hamish Hume

---

easy for the parties to state that Uber must pay the final judgment before arbitrating issues relating to an Excluded Claim, but the Indemnification Agreement does not say that. Instead, all provisions are consistent with an understanding that Uber pays the Expenses incurred through to the time of final judgment, and then can initiate arbitration over all issues that would eliminate or reduce its indemnification obligations.

[8] Based on the points set forth in this letter, Uber reiterates that it is not obligated to indemnify Mr. Levandowski for anything. Nevertheless, for the same reasons of good will and compromise to avoid a dispute, Uber will continue to pay Mr. Levandowski's cost of litigating the final portions of the Google-Levandowski arbitration, which will soon draw to a close. But Uber will not indemnify Mr. Levandowski for the final award itself.

# EXHIBIT J

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

# FORM 10-Q
_____

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the quarterly period ended September 30, 2019**
**OR**
☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from_____ to _____**
**Commission File Number: 001-38902**

_____

# UBER TECHNOLOGIES, INC.

**(Exact name of registrant as specified in its charter)**

**Not Applicable**
**(Former name, former address and former fiscal year, if changed since last report)**

_____

| | |
|---|---|
| **Delaware** | **45-2647441** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**1455 Market Street, 4th Floor**
**San Francisco, California 94103**
**(Address of principal executive offices, including zip code)**
**(415) 612-8582**
**(Registrant's telephone number, including area code)**

_____

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.00001 per share | UBER | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒
The number of shares of the registrant's common stock outstanding as of October 25, 2019 was 1,705,815,070.

_____

employment training tax, state disability insurance, and personal income tax. The Company has filed a petition with an administrative law judge of the California Unemployment Insurance Appeals Board appealing the assessment.

*Google v. Levandowski & Ron; Google v. Levandowski*

On October 28, 2016, Google filed arbitration demands against each of Anthony Levandowski and Lior Ron, former employees of Google, alleging breach of their respective employment agreements with Google, fraud and other state law violations (due to soliciting Google employees and starting a new venture to compete with Google's business in contravention of their respective employment agreements). Google seeks damages, injunctive relief, and restitution. The arbitration hearing was held from April 30 to May 11, 2018. On March 26, 2019, the arbitration panel issued an interim award, finding against each of Google's former employees and awarding $127 million against Anthony Levandowski and $1 million for which both Anthony Levandowski and Lior Ron are jointly and severally liable. In July 2019, Google submitted briefing on its request for interest, attorneys fees, and costs related to these claims. The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims. Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement. The ultimate resolution of the matter could result in a possible loss of up to $65 million or more (depending on the date of the final award) in excess of the amount accrued. Uber is not a party to either of these arbitrations.

*Taiwan Regulatory Fines*

Prior to the Company adjusting and re-launching its operating model in April 2017 to a model where government-approved rental companies provide transport services to Riders, Drivers in Taiwan and Uber Taiwan have been fined by Taiwan's Ministry of Transportation and Communications in significant numbers across Taiwan. On January 6, 2017, a new Highways Act came into effect in Taiwan which increased maximum fines from New Taiwan Dollar ("NTD") 150,000 to NTD 25 million per offense. The Company suspended its service in Taiwan from February 10, 2017 to April 12, 2017, but a number of these fines were issued to Uber Taiwan in connection with rides that took place in January and February 2017 prior to the suspension. These fines have remained outstanding while Uber appeals the tickets through the courts. Beginning in July 2018, the Taiwan Supreme Court issued a number of positive rulings in which it rejected the government's approach of issuing one ticket per ride. The Taiwan government continues to appeal these rulings to the Supreme Court.

*Copenhagen Criminal Prosecution*

In May 2017, the Danish police announced that they would use tax data about Drivers obtained from the Dutch tax authorities to prosecute Drivers for unlicensed taxi traffic. The tax data covers calendar years 2015 and prior. The prosecutor indicted four Drivers as test cases which have been heard by the Copenhagen City Court, the Appeal Court and finally the Supreme Court. In addition, on October 6, 2017, the Company has been preliminary charged with aiding and abetting illegal taxi traffic in 2015. In September 2018, the Danish Supreme Court ruled on these test cases that the Drivers were carrying out illegal taxi operations and fined them in the total amount of their earnings from performing ridesharing services. The Court also confirmed that the use of the relevant tax data obtained from the Dutch tax authorities was validly used as evidence in the prosecutions and was used to assess the fines payable.

In January 2018, the Company received another request from the Danish tax authorities through the Dutch tax authorities to disclose tax data about Drivers for years 2016 and 2017. Such tax data for years 2016 to 2017 has subsequently been provided by the Company to the Danish tax authorities.

On May 29, 2018, the Company received another set of indictment papers from the Danish prosecutor. On February 19, 2019, the Company was informed by the Danish prosecutor that it has issued a request for legal aid to the Danish prosecutor to serve additional indictment papers, relating to the Company's activity in Denmark in 2016 and 2017. On May 13, 2019, the Company was notified by the Dutch tax authorities that data related to the Company's activity in Denmark in 2016 and 2017 could not be used by Danish authorities for the purpose of attempting to establish fraud in connection with taxi licenses. The Company has not operated these services in Denmark since 2017 and currently does not have operations in Denmark.

*Malden Transportation v. Uber Technologies, Inc.*

Seven consolidated actions were filed in the United District Court for the District of Massachusetts by taxi medallion owners Malden Transportation, Inc., Anoush Cab, Inc., Dot Ave Cab, Inc., Gill & Gill, Inc., Max Luc Taxi, Inc., Sycoone Taxi, Inc., Taxi Maintenance, Inc. in late 2016 and early 2017 against the Company alleging unfair competition violations (on the grounds that the Company failed to comply with local taxi laws), as well as state and federal antitrust violations (on the grounds that the Company prices trips below cost in order to achieve a monopoly). Antitrust claims were dismissed, but the unfair competition claims remained. On May 15, 2019, Uber reached a tentative settlement with the plaintiffs in six of the seven actions, which is now finalized as to all but two plaintiffs. A bench trial of the seventh action (Anoush Cab, Inc.) began on July 18, 2019 and concluded on August 2, 2019. On September 6, 2019, the Court issued a complete defense verdict, resolving that trial in the Company's favor and finding no liability. On October 4, 2019, the Anoush plaintiffs filed a notice of appeal.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**UBER TECHNOLOGIES, INC.**

Date: November 5, 2019

By: /s/ Dara Khosrowshahi

Dara Khosrowshahi
Chief Executive Officer and Director
*(Principal Executive Officer)*

Date: November 5, 2019

By: /s/ Nelson Chai

Nelson Chai
Chief Financial Officer
*(Principal Financial Officer)*

# EXHIBIT K



I. Neel Chatterjee                                 Goodwin Procter LLP
+1 650 752 3256                                    601 Marshall Street
NChatterjee@goodwinlaw.com                         Redwood City, CA  94063

                                                   goodwinlaw.com
                                                   +1 650 752 3100

December 10, 2019


**VIA E-MAIL**

Hamish Hume, Esq.
Boies Schiller Flexner
1401 New York Avenue, NW
Washington, DC 20005

Dear Hamish:

I am writing follow up on my earlier conversation with Jessica Phillips and to notify Uber that the Panel issued its Final Award in the *Google v. Levandowski and Ron* arbitration on December 6, 2019.  We assume that Google will provide a redacted version of the Final Award at Uber's request, as it did with the Interim Award.  The final award against Mr. Levandowski is $185,614,592.81.

Through this letter, Mr. Levandowski seeks to understand what Uber intends to do going forward with respect to the arbitration proceedings in light of the Final Award.  <u>First</u>, Mr. Levandowski would like to know whether Uber intends to hire separate counsel to challenge the final award, including through any state-court proceedings to vacate the award and any appeals thereto.  <u>Second</u>, if Uber does not plan to hire separate counsel, Mr. Levandowski would like to know whether it intends to allow the Panel's award to become final and non-appealable.  <u>Finally</u>, if Uber intends to allow the award to become final at this point, Mr. Levandowski requests written confirmation that Uber will pay the total amount listed above.

For Uber's reference, the earliest that any party to the arbitration may file a petition to confirm or vacate the Final Award is ten days after service of the award, which is December 16, 2019.  *See* Cal. Civ. Proc. Code § 1288.4.  Mr. Levandowski has up to 100 days after service of the Final Award to file a petition to vacate in state court, *see* Cal. Civ. Proc. Code § 1288, though we intend to file well in advance of that deadline (unless Uber states otherwise). As a general practice, we believe it is important to file a petition sooner rather than later.

Based on your August 30, 2019 and September 27, 2019 letters, we understand that Uber's position is that it has no obligation to indemnify Mr. Levandowski for any further attorneys' fees from litigating the arbitration or for any final judgment against Mr. Levandowski.  But for the reasons that I have communicated to you previously, Mr. Levandowski disagrees entirely that Uber has no obligation to indemnify him under the Indemnification Agreement.  In particular, Mr. Levandowski did not breach the Indemnification Agreement, nor are any of the claims brought by Google "Excluded Claims" under the Agreement.  The Course of Conduct in this case, including Uber's payment of all Expenses in the case, is evidence of the understanding of the parties.

If Uber intends to challenge the Final Award, Mr. Levandowski would like to remind Uber of its obligations to pay "Expenses" under the Indemnification Agreement.  Among other Expenses, Uber's obligation applies to "any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to



be paid in settlement" prior to a "final non-appealable judgment by a court of competent jurisdiction." Indemnification Agreement, § 1 ("Expenses"). In other words, in the event of an appeal of a final award after certification by a court of competent jurisdiction, Uber is obligated under the Indemnification Agreement to advance the "Expenses" of the appeal, including posting a bond if necessary to stay the judgment pending appeal and paying Mr. Levandowski's attorneys' fees and costs associated with any appeal.

Whether or not Uber agrees with its indemnification obligations, the Indemnification Agreement has a process to resolve any dispute, which, as we have stated before, requires Uber to continue to pay any expenses incurred until after the matter is fully resolved. Specifically, section 2(d), which addresses disputes regarding whether a claim is excluded under the agreement, states that, "[f]or the avoidance of doubt, Purchaser <u>shall advance</u> all Expenses incurred by the Indemnified Person(s) pursuant to Section 2.3(a) through the later to occur of the final settlement or final adjudication of such Former Employer Claim, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d)." Thus, to the extent that Uber now asserts that any claims are excluded from the indemnity, section 2.2(d) and (e) provide a procedure to resolve that dispute—after final settlement or adjudication. But according to those procedures, Uber's mere disagreement that a claim is covered does not relieve it from its obligation to pay any Expenses.

Nor can Uber argue that it is released from its obligations under the Indemnification Agreement more generally. Mr. Levandowski has fulfilled his obligations under the Agreement, including in providing assistance to Uber and the defense of the case. As we have stated previously, Mr. Levandowski's assertion of his Fifth Amendment rights was proper, and Uber was well aware of Mr. Levandowski's decision once it was made. And at Uber's request, when Mr. Levandowski agreed to partially waive his Fifth Amendment rights, the arbitration panel would not allow him to testify. Uber cannot argue that Mr. Levandowski has otherwise failed to provide assistance or deprived Uber of the opportunity to control the defense of the arbitration. As we have reported, we believe that the treatment of Mr. Levandowski with respect to his assertion of his Fifth Amendment rights is one of the stronger arguments to vacate the arbitral ruling (although several other arguments exist).

Nevertheless, Uber has been kept apprised of developments in the arbitration and cannot identify any ways in which it has been unable to control or direct the defense of this matter. Finally, to the extent that Uber asserts that claims relating to Tyto LiDAR are not covered by the Indemnification Agreement, the panel has determined that the remedy for those claims is indistinguishable from the remedies for claims arising from Mr. Levandowski's involvement in Otto. Moreover, Uber was provided information regarding Tyto LiDAR from Mr. Levandowski's electronic devices and throughout the arbitration proceedings. Uber has continued to pay expenses for this matter since long after it should have been aware of the claims arising from Mr. Levandowski's involvement in Tyto LiDAR. It cannot now assert that these claims were not covered under the Indemnification Agreement. Uber has continued to pay Expenses for this arbitration, despite long knowing about each of these issues.

Accordingly, please let us know how Uber intends to proceed following the issuance of the Final Award. Regardless of what steps Uber chooses, Mr. Levandowski demands written assurance that Uber intends to comply with the Indemnification Agreement by either paying the arbitral award or indemnifying him, including, if necessary, advancing the cost of any bond required for appeal and any other legal expenses and costs associated with any post-award litigation and appeal.



On or before December 16, 2019, please provide Uber's written assurance of its intent to comply with its indemnification obligations as outlined above.

Sincerely,

I. Neel Chatterjee

# EXHIBIT L



December 31, 2019

Mr. Neel Chatterjee
Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063

      Re:     Uber – Levandowski Dispute Over Indemnification

Dear Neel:

      This letter responds to your letter dated December 10, 2019.

      In that letter you stated that Mr. Levandowski seeks to understand what Uber intends to do going forward with respect to the arbitration proceedings in light of the Final Award. Your letter first inquires whether Uber "intends to hire separate counsel to challenge the final award…." Your letter second asks whether Uber intends to allow the Panel's award to become final and non-appealable. Finally, your letter seeks written "confirmation" that Uber will pay the total amount of the Final Award.

      As we informed you in no uncertain terms in our letters of August 30, 2019; September 11, 2019; and September 27, 2019, Mr. Levandowski has no right to enforce the Indemnification Agreement, and Uber has no obligations to Mr. Levandowski under that Agreement, for numerous reasons, including: (1) Mr. Levandowski fraudulently induced Uber to enter into the Indemnification Agreement and Uber has therefore rescinded the Agreement; (2) Mr. Levandowski committed "Post-Signing Specified Bad Acts" rendering the Indemnification Agreement null and void by its terms, at least as to Mr. Levandowski; and (3) Mr. Levandowski materially breached the Agreement.[1] Accordingly, Uber confirms, again, that it will not pay any part of the Final Award.[2] Nor will Uber advance any expenses related to, or take any steps— including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals.

      Mr. Levandowski's position that Uber must first advance expenses and then seek reimbursement is mistaken. Because the Indemnification Agreement is rescinded, rendered null and void, and/or materially breached by Mr. Levandowski's actions, Uber has no obligations to Mr. Levandowski, including no obligation to advance expenses. You argue that Mr. Levandowski's position that Uber's "Course of Conduct in this case"—its advancement of expenses through September 25, 2019—requires Uber to continue advancing expenses. That is wrong. Uber made clear that it was advancing Mr. Levandowski's defense costs relating to Google's claims in the *Google v. Levandowski* arbitration in the spirit of compromise and good will, and subject to a reservation of rights, not based on its understanding of any legal obligation

---

[1] We note that your letter does not mention or address either Mr. Levandowski's fraudulent inducement or his post-signing bad acts.

[2] Uber has also explicitly reserved its right to seek reimbursement for some or all of the legal fees it has advanced.



under the Indemnification Agreement.  *See e.g.* Letter from H. Hume to N. Chatterjee of Aug. 30, 2019.  In any event, even if the Agreement were valid and still in force, it provides that no "course of performance or course of dealing shall be used in the interpretation or construction of this Agreement." *See* Indemnification Agreement § 3.12(i).  Therefore, the parties' "course of conduct" is irrelevant.

Additionally, even if the Indemnification Agreement were still in force (which it is not), it would not require Uber to pay for a petition to vacate absent a showing that Mr. Levandowski has reasonable grounds for pursuing such a petition, which your letter does not attempt to establish. *See Cathay Mortuary (Wah Sang) Inc. v. United Pacific Ins. Co.*, 582 F. Supp. 650, 651, 657 (N.D. Cal. 1984).

In short, Uber has no obligation to indemnify Mr. Levandowski for any expenses related to the Google arbitration.  We are available if you would like to discuss with us any of the points made in this letter.

Sincerely,

/s/ Hamish Hume

# EXHIBIT M

1    KEKER, VAN NEST & PETERS LLP
     ROBERT A. VAN NEST - # 84065
2    rvannest@keker.com
     RACHAEL E. MENY - # 178514
3    rmeny@keker.com
     BENJAMIN BERKOWITZ - # 244441
4    tgorman@keker.com
     JO W. GOLUB - # 246224
5    jgolub@keker.com
     JENNIFER A. HUBER - # 250143
6    jhuber@keker.com
     REID P. MULLEN - # 270671
7    rmullen@keker.com
     THOMAS E. GORMAN - # 279409
8    tgorman@keker.com
     W. HAMILTON JORDAN - # 295004
9    wjordan@keker.com
     MOLLY VILLAGRA - # 313648
10   mvillagra@keker.com
     TAYLOR L. REEVES - # 319729
11   treeves@keker.com
     633 Battery Street
12   San Francisco, CA 94111-1809
     Telephone:    415 391 5400
13   Facsimile:    415 397 7188

14   Attorneys for Petitioner
     GOOGLE LLC



F I L E D
San Francisco County Superior Court

MAR 04 2020

CLERK OF THE COURT
BY: _____
           Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| GOOGLE LLC, | Case No. CPF-20-516982 |
| Petitioner, | [PROPOSED] JUDGMENT |
| v. | |
| ANTHONY LEVANDOWSKI and LIOR RON, | |
| Respondents. | |

1373195

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1.    Final judgment is entered in favor of Petitioner Google LLC and against Respondent Anthony Levandowski for **$179,047,998.64**, which is composed of a principal award of **$174,786,091.24**[1] plus **$4,261,907.40**[2] in post-award prejudgment interest under Cal. Civil Code § 3289.

2.    Additionally, postjudgment interest shall accrue at the rate provided by Cal. Civ. Proc. Code § 685.010 (currently 10% *per annum*) on the amount of any money judgment that remains unsatisfied.

IT IS SO ORDERED.

Date:  March 4, 2020

_____
Hon. Ethan P. Schulman
JUDGE, SUPERIOR COURT OF CALIFORNIA

---

[1] This sum is composed of: **(a)** a $127,311,551.95 award of disgorgement and restitution, **(b)** a $45,547,474.64 award of pre-award interest, **(c)** a $1,869,596.27 award of attorneys' fees, and, **(d)** a $57,468.38 award of legal costs. *See* Corrected Final Award at p. 123, §§VIII.2.a, VIII.2.b, VIII.2.e, and VIII.2.g. Because Google has acknowledged that it received satisfaction of the joint-and-several portions of the Corrected Final Award, the joint-and-several awards are not included in this judgment.

[2] This sum has been accruing at $47,886.60 per day from the date of the Corrected Final Award (December 6, 2019) to the date of this judgment.

1373195

CPF-20-516982
GOOGLE LLC. VS. ANTHONY LEVANDOWSKI ET AL

I, the undersigned, certify that I am an employee of the Superior Court of California, County Of San Francisco and not a party to the above-entitled cause and that on March 04, 2020 I served the foregoing on each counsel of record or party appearing in propria persona by causing a copy thereof to be enclosed in a postage paid sealed envelope and deposited in the United States Postal Service mail box located at 400 McAllister Street, San Francisco CA 94102-4514 pursuant to standard court practice.

Date: March 04, 2020

By: GINA GONZALES
Deputy Clerk


INDRA N. CHATTERJEE (173985)
GOODWIN PROCTER LLP
601 MARSHALL STREET
REDWOOD CITY, CA 94063


JONATHAN A. PATCHEN (237346)
BAKER BOTTS L.L.P.
101 CALIFORNIA STREET, STE. 3600
SAN FRANCISCO, CA 94111


MEREDITH R. DEARBORN (268312)
BOIES SCHILLER FLEXNER LLP
44 MONTGOMERY STREET, 41ST FL
SAN FRANCISCO, CA 94104


THOMAS E. GORMAN (279409)
KEKER, VAN NEST & PETERS LLP
633 BATTERY ST
SAN FRANCISCO,, CA 94111

# EXHIBIT N

 **GOODWIN**

Neel Chatterjee
+1 650 752 3256
NChatterjee@goodwinlaw.com

Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063

goodwinlaw.com
+1 650 752 3100

March 6, 2020

**Via E-mail and FedEx**

Hamish Hume (hhume@bsfllp.com)
Jessica Phillips (jphillips@bsfllp.com)
Boies Schiller Flexner LLP
1401 New York Ave, NW
Washington, DC 20005

**Via FedEx**
Apparate International CV.
c/o Uber Technologies, Inc.
1455 Market Street, 4th Floor
San Francisco, CA 94103
Attn: General Counsel

Re:     **Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement**

Dear Hamish and Jessica:

Pursuant to Section 2.3 of the April 11, 2016 Indemnification Agreement, we write to request that Uber advance payment for the enclosed Expenses. Mr. Levandowski expects Uber to honor its obligations under the Indemnification Agreement. Mr. Levandowski does not view Uber's attempted rescission of the Indemnification Agreement as effective and, for that reason, Mr. Levandowski is providing this notice.

Under the Indemnification Agreement, Uber is responsible for paying for or advancing Expenses incurred by Mr. Levandowski arising out of claims brought by Google, including any adverse awards or judgments and attorneys' fees and costs incurred by Mr. Levandowski. *See* Indemnification Agreement at 3 (definition of Expenses); § 2.3.

On March 4, 2020, the court confirmed Google's arbitration award and entered judgment against Anthony Levandowski in the amount of $179,786,091.24. A copy of the judgment is enclosed.

In addition, since September 25, 2019, Mr. Levandowski has incurred $475,571.32 in attorneys' fees and costs relating to his defense against Google's claims. A copy of Goodwin Procter's invoices for time incurred from September 26, 2019 through February 29, 2020 is also enclosed for your review.

Please provide payment for these Expenses on or before March 27, 2019. In addition, please be advised that Mr. Levandowski intends to appeal the judgment and that Uber remains responsible for advancing Expenses until there is a final, non-appealable judgment or settlement of Google's claims.



Boies Schiller Flexner LLP
Apparate International CV.
March 6, 2020
Page 2

If there is anything in this letter you would like to discuss, please feel free to reach out.

Sincerely,

Neel Chatterjee

Enclosures

cc: Jamie Leigh (*via email, w/encls.*)

# EXHIBIT O



March 27, 2020

Mr. Neel Chatterjee
Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063

> Re:    Mr. Levandowski's Request for Advancement of Expenses

Dear Neel:

This letter responds to your letter dated March 6, 2020. In that letter, you requested advancement of certain expenses arising out of the arbitration between Google and Mr. Levandowski pursuant to Section 2.3 of the April 11, 2016 Indemnification Agreement.

As an initial matter, Apparate International C.V., to which you addressed your letter, has been dissolved and any rights and obligations it would have had under the Indemnification Agreement have been assumed by Uber Technologies, Inc.

As we have explained previously in our correspondence of April 2, 2018; August 30, 2019; September 11, 2019; September 27, 2019; and December 31, 2019, Uber believes that it has no obligations to Mr. Levandowski under the Indemnification Agreement, either directly or through its assumption of Apparate's obligations. Therefore, Uber will not advance any expenses related to the arbitration between Google and Mr. Levandowski, including the March 4, 2020, judgment against Mr. Levandowski; any attorneys' fees incurred in Mr. Levandowski's defense against Google's claims after September 25, 2019; or any attorneys' fees incurred by Mr. Levandowski in the future related to any appeal of the March 4, 2020, judgment. We recognize that you dispute this contention.

Notwithstanding the foregoing, in light of Mr. Levandowski's commencement of a chapter 11 bankruptcy case on March 4, 2020, insolvency counsel for Mr. Levandowski and Uber are exploring a consensual process for resolving the disputes under the indemnification agreement.

We are available if you would like to discuss this letter.

Sincerely,

/s/ Hamish Hume