**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DARA L. SILVEIRA (Cal. Bar No. 274923)
(dsilveira@kbkllp.com)
650 California Street, Suite 1900
San Francisco, California 94108
Telephone: (415) 364-6793
Facsimile: (650) 636-9251

BRETT M. SCHUMAN (SBN 189247)
*bschuman@goodwinlaw.com*
JENNIFER BRIGGS FISHER (SBN 241321)
*JFisher@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

*Attorneys for Anthony S. Levandowski,*
*Debtor and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>          Debtor. | Bankruptcy Case No. 20-30242 (HLB)<br>Chapter 11<br><br>**MOTION TO (I) DETERMINE TAX EFFECT OF SETTLEMENT PAYMENT OR, IN THE ALTERNATIVE, (II) FIND THE DEBTOR'S PLAN FEASIBLE WITHOUT RESERVING FOR TAXES THEREON (IRS/FTB)**<br><br>Date:   April 21, 2022<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  (Tele/Video Appearances Only)<br>         United States Bankruptcy Court<br>         Courtroom 19, 16th Floor<br>         San Francisco, CA 94102<br><br>Objection Deadline: April 1, 2022 |

**TABLE OF CONTENTS**

Page

I.
BACKGROUND AND EVIDENTIARY DISCUSSION

A. Prefiling Events and the Indemnification Agreement ........................................ 2

B. The Chapter 11 Case and the Uber AVP .......................................................... 3

C. The Global Settlement ...................................................................................... 4

D. Proceedings Giving Rise to the Motion .......................................................... 5

II.
ARGUMENT

A. The Court Has Authority to Grant the Relief Requested ................................. 5

B. The Uber Settlement Payment Is Either Not Taxable, Or The Plan's Omission Of Tax Reserves Does Not Impact The Feasibility Of The Plan ................................ 7

    1. The Indemnification Agreement And The Uber Settlement Payment Is Analogous To A Non-Taxable Insurance Payment ............................... 8

    2. The Deemed Payment By The Debtor to Google Provides The Debtor No Tax Benefit And The Deemed Payment By Uber to Debtor Is Non-Taxable ........................................................................................................ 13

    3. The Uber Settlement Payment Is A Working Condition Fringe Of The Debtor's Employment With Uber .................................................... 15

    4. The Uber Settlement Payment Is A Deductible Reimbursement For the Debtor's Activity That The Panel Found Was On Behalf Of Uber .................... 20

Case: 20-30242    Doc# 946    Filed: 03/31/22    Entered: 03/31/22 11:49:33    Page 2 of 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amerco & Subsidiaries v. Commissioner*,
   96 TC 18 (1991)..........................................................................................8, 9

*Estate of Backemeyer v. Commissioner*,
   147 T.C. No. 17 (2016)......................................................................................13

*C.I.R. v. Glenshaw Glass Co.*,
   348 U.S. 426 (1955)............................................................................................7

*Centex Homes v. R-Help Constr. Co.*,
   32 Cal. App. 5th 1230 (Cal. Ct. App. 2019), *reh'g denied* (Apr. 3, 2019),
   *review denied* (June 19, 2019) ..........................................................................8

*City of S. Pasadena v. Mineta*,
   284 F.3d 1154 (9th Cir. 2002) ...........................................................................4

*Computer Task Group, Inc. v. Brotby (In re Brotby)*,
   303 B.R. 177 (9th Cir. BAP 2003)......................................................................6

*Dobson v. Commissioner*,
   320 U.S. 489 (1943)..........................................................................................13

*Elbaz v. Commissioner*,
   109 T.C.M. 1229 (2015) ...................................................................................13

*Hillsboro Nat. Bk. v. Commissioner*,
   460 US 370 (1983).............................................................................................13

*Hillsboro Nat'l Bank v. Commissioner*,
   460 U.S. 370 (1983)..........................................................................................13

*Kilen v. United States (In re Kilen)*,
   129 B.R. 538 (Bankr. N.D. Ill. 1991) ................................................................5

*RSUI Indem. Co. v. Murdock*,
   248 A.3d 887 (Del. 2021) ..................................................................................9

*Schwartz v. Gardiner (In re Schwartz)*,
   192 B.R. 90 (Bankr. N.J. 1996) .........................................................................5

*U.S. v. Gilmore*,
   372 U.S. 39 (1963)............................................................................................17

*United States v. Robertson*,
　　980 F.3d 672 (9th Cir. 2020) ................................................................4

*United States v. Ruiz*,
　　536 U.S. 622 (2002).................................................................................4

Anthony Scott Levandowski, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves (the "Motion") this Court pursuant to Sections 105, 503, 505, 506, 507, and 1129 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 3012 and 9014 of the Federal Rules of Bankruptcy Procedure to determine that the payment contemplated in the Settlement Agreement between the Debtor, Google LLC ("Google") and Uber Technologies, Inc. ("Uber") does not give rise to gross income for the Debtor or, in the alternative, to find the Debtor's proposed plan feasible without reserving for taxes thereon.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND AND EVIDENTIARY DISCUSSION.

#### A. Prefiling Events and the Indemnification Agreement.

In 2015, while employed at Google, the Debtor started a self-driving vehicle company, Ottomotto fka 280 Systems ("Otto"). After he left Google, he sold Otto to Uber. On the same day that he entered into an Agreement and Plan of Merger to sell Otto to Uber, and in connection with that transaction, Debtor entered into an Indemnification Agreement with Uber dated April 11, 2016 (the "Indemnification Agreement"). The Agreement and Plan of Merger contemplated a subsequent closing after completion of diligence. As a condition to Uber's obligations to consummate the acquisition of Otto, Uber hired the Debtor and other former Google employees then employed by Otto to work in Uber's autonomous vehicle business. *See* Fisher Decl. Ex. A [Agreement and Plan of Merger by and among Ottomotto LLC, Uber Technologies, Inc., Apparate International C.V., Zing Merger Sub I, LLC, and the Company Unitholder Representative] (hereinafter the "Merger Agreement") at Section 6.7.

The Indemnification Agreement was a condition of Debtor's sale of Otto to Uber and his related employment by Uber. Debtor was concerned about possible litigation by Google and therefore insisted upon—and would not have joined Uber as an employee or sold Otto to Uber without—Uber assuming the obligations set forth in on the Indemnification Agreement. The Debtor considered this agreement to be a "critical" part of the deal and "wouldn't have done [the deal] without" the agreement. Decl. Ex. B (hereinafter "Award") at 52.

The Indemnification Agreement provided that in the possible event that any of the Debtor's "Former Employers" (*e.g.*, Google) brought certain types of claims against the Debtor, Otto or certain other key employees (the "Diligenced Employees"), then Uber would indemnify them by paying for certain "Expenses" (including, for example, expenses, liability, or loss (with associated legal fees), and judgments, fines, bonds, penalties, damages, awards, or amounts to be paid in settlement) for those claims. The Former Employer claims covered by the indemnity included claims for breach of fiduciary duty, breach of duty of loyalty, breach of non-solicitation, non-competition, and confidentiality obligations, infringement, and misappropriation of intellectual property.

Uber closed the acquisition of Otto in August 2016. Two months later, on October 28, 2016, Google commenced two arbitrations against the Debtor that were later consolidated into one arbitration. In the arbitration, Google sought damages, restitution and disgorgement related to, *inter alia*, to the Debtor's alleged breach of contracts and his duty of loyalty to Google. Google contended that the Debtor formed and ran a competing company for four years while employed by Google, took steps to form Otto during his employment at Google, and also recruited Google employees to join Otto (for the benefit of Uber) while he was still working for Google. According to Google, this activity caused the Debtor to breach his obligations and duties owed to Google by helping Google's competitor, Uber. On December 23, 2019, the arbitration panel (the "Panel") issued a unanimous final Award in Google's favor.

The Panel ordered the Debtor to disgorge his salary and regular compensation (determined to be $767,051.95) and the Debtor's special "Chauffeur" bonus (determined to be $126,544,500.00). The Panel also awarded interest on the disgorged sums, attorney fees, and costs.

On March 4, 2020, the California Superior Court confirmed the award and entered a $179,047,998.64 judgment in favor of Google against the Debtor.

**B.    The Chapter 11 Case and the Uber AVP.**

On March 4, 2020, shortly after entry of Google's judgment, the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code, thereby initiating this

Chapter 11 Case. The Bankruptcy Court fixed July 6, 2020, as the date by which creditors had to file Proofs of Claim in this Chapter 11 Case. Ten claimants filed Proofs of Claim in the Chapter 11 Case. Of those, two were from taxing authorities and asserted liquidated Claims of $10,000 (Internal Revenue Service ("IRS")) and $16,996.47 (California Franchise Tax Board ("FTB")). In addition, each of the claims of the IRS and the FTB (together, the "Taxing Authorities") reserves the right to a "setoff or counterclaim" from the Debtor's estate (IRS Claim 1) or to amend for modifications to assert "an administrative expense" or "a secured claim" (FTB Claim 10). The Motion seeks an order limiting the scope of the claims the Taxing Authorities allegedly reserved in their filings.

On July 16, 2020, the Debtor filed an adversary proceeding against Uber, *Levandowski v. Uber Techs. Inc.*, No. 20−03050 (the "Uber AVP"). Google intervened in the Uber AVP thereafter.

After commencement of the Uber AVP, the parties (including Google as intervenor) engaged in extended discovery, including expert discovery, and brought numerous procedural and substantive motions. None of those resolved the case and the matter was set for a ten-day trial scheduled to commence on February 14, 2022.

### C. The Global Settlement.

The Debtor, Uber, and Google participated in a mediation in January 2022, and subsequently reached an agreement in principle to resolve all disputes among the parties. A motion to approve the settlement was filed on February 10, 2022. Docket No. 831.

The "Global Settlement" described therein has three components: (a) the Plan Term Sheet and the Settlement Agreement dated February 10, 2022, between the Debtor, individually and on behalf of his estate, Uber, and Google (the "Uber Settlement Agreement"); (b) the concurrent resolution of the creditors' claims of fraudulent transfer against the Anthony Levandowski Charitable Lead Annuity Trust dated December 18, 2016; and (c) a plan support agreement between Google and the Debtor with provisions regarding filing of, and support for, a combined plan and disclosure statement that is substantially consistent with the Combined Plan and Disclosure Statement dated March 18, 2022 (as context requires, the "Plan" or the "Plan and

Disclosure Statement").

As part of the Global Settlement, the parties agreed to specified mutual releases. For example, Google agreed to release claims against Uber, and Uber agreed to release claims against Google.

Also, the Uber Settlement Agreement provides for two concurrent payments to be made by Uber on the Settlement Effective Date: (i) a payment to Google in the amount specified in the Uber Settlement Agreement (the "Uber Settlement Payment"); and (ii) a payment to the Debtor in the amount of $2,000,000.00, which is to be used only to pay claims pursuant to the Plan. The Uber Settlement Payment is perhaps the most critical component of the Global Settlement that makes possible the resolution of this case, and it does so by satisfying the creditor with the largest claim by far of all of the Debtor's creditors—Google.

### D. Proceedings Giving Rise to the Motion.

A hearing on the Global Settlement was initially scheduled for March 3, 2022. Before that hearing, the Debtor filed supplemental disclosures (Docket No. 867) which, among other things, identified the tax issues more specifically discussed in this Motion. The Court thereafter considered whether the Global Settlement could be approved without a determination of those issues. The Court, in continued hearings held on March 10 and 11, 2022, directed the Debtor to file this Motion no later than March 18, 2022.

## II. ARGUMENT.

### A. The Court Has Authority to Grant the Relief Requested.

"[A] federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *United States v. Mine Workers of Am.*, 330 U.S. 258, 291 (1947)); *see also United States v. Robertson*, 980 F.3d 672, 675 (9th Cir. 2020) (citing same). Once its determination on jurisdiction becomes final, that determination cannot be collaterally challenged. *City of S. Pasadena v. Mineta*, 284 F.3d 1154, 1157 (9th Cir. 2002).

This Court has authority to determine the issues presented in this Motion because they are relevant to a determination regarding the feasibility of the Plan. Further, under Section 505(a)(1) of the Bankruptcy Code, "the court may determine the amount or legality of any tax, any fine or

penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." 11 U.S.C. §505(a)(1). The plain language of the statute and the relevant authorities make it clear that this Court has the authority to consider the issues raised by this Motion because they relate to feasibility. *See Schwartz v. Gardiner (In re Schwartz)*, 192 B.R. 90, 94 (Bankr. N.J. 1996) (court exercises authority where "the viability of their Chapter 11 plan of reorganization depends upon a determination of [the debtor's] liability to the IRS and the N.J. Div. of Tax"); *Kilen v. United States (In re Kilen),* 129 B.R. 538, 548 (Bankr. N.D. Ill. 1991) (tax claim can be determined under Section 505 even where "it is contingent and unliquidated at this point" because the potential liability is "exactly the kind of obligation Congress wanted to have resolved within the bankruptcy process"); *see also* Oei, *Rethinking the Jurisdiction of Bankruptcy Courts Over Post-Confirmation Federal Tax Liabilities: Towards a New Jurisprudence of 11 U.S.C. 505*, 19 AKRON TAX J. 49, 64 (2004) ("In cases where the federal tax consequences of the plan may not be certain, allowing a 505(a) determination by the bankruptcy court would facilitate a more accurate and binding determination of the tax consequences of the plan."); Jacobs, *The Bankruptcy Court's Emergence as Tax Dispute Arbiter of Choice*, 45 TAX LAW. 971, 977 and 1013-1016 (1992) ("When the efficacy of the POR depends on the resolution of tax issues, these issues should be resolved by the Bankruptcy Courts charged with the responsibility of determining whether the Plan is feasible").

It is within this Court's authority to make a determination essential to the confirmation of the Plan, *i.e.*, whether the Plan is feasible under the standard established under Section 1129(a)(11) of the Bankruptcy Code. *See* 28 U.S.C. §157(b)(2)(L). The Plan does not propose to reserve for (and, by the terms of the Global Settlement, the Debtor will not have reserves sufficient for) any material taxes in connection with the Uber Settlement Payment. If material tax claims are payable on the Uber Settlement Payment, the Plan would not be feasible.

With this Motion, the Debtor is presenting evidence to support the relief requested herein. The evidence will be sufficient to support findings that will allow the Court to find the Plan is feasible under Section 1129(a)(11). If that evidence is accepted, the Court's evidentiary findings

will be sufficient to allow it to determine that the Plan does not require a reserve for the Taxing Authorities under Ninth Circuit precedent:

> To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success. *Acequia*, 787 F.2d at 1364. The Code does not require the debtor to prove that success is inevitable, *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002), and a relatively low threshold of proof will satisfy § 1129(a)(11), *In re Sagewood Manor Assocs. Ltd*., 223 B.R. 756, 762 (Bankr. D. Nev. 1998), so long as adequate evidence supports a finding of feasibility. *See In re Pizza of Hawaii, Inc*., 761 F.2d at 1382 (reversing where feasibility determination excluded consideration of major claim).

*Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191-92 (9th Cir. BAP 2003). Thus, even if this Court is unwilling or unable to determine the ultimate tax consequence of the Uber Settlement Payment, it could still make evidentiary findings that would allow it to conclude that the Debtor and his estate's risk of tax liability is low and, on that basis, confirm the Plan and determine that no reserve need be maintained. 11 U.S.C. §1129(a)(11); 11 U.S.C §105 (providing supplemental jurisdiction to issue an order "that is necessary or appropriate to carry out the provisions of this title.")

Finally, the relief sought in this Motion constitutes a determination that the contingent claims filed by the Taxing Authorities are not valid with respect to any alleged liability of the Debtor arising from the Uber Settlement Payment. In this Chapter 11 Case, without asserting more, the IRS attempts to reserve right of "setoff" against the assets of the Debtor or the estate, as asserted in IRS Claim No. 1 and the FTB reserves the right to assert an administrative expense or secured claim, as asserted in FTB Claim No. 10. Fed. R. Bankr. P. 3012. Having raised the contingent nature of their continuing claims against estate assets, the Taxing Authorities have consented to this Court's determination of the extent of their reservations. *See* 28 U.S.C. §157(b)(2); Fed. R. Bankr. P. 3012.

### B. The Uber Settlement Payment Is Either Not Taxable, Or The Plan's Omission Of Tax Reserves Does Not Impact The Feasibility Of The Plan.

Given the foregoing, the Debtor requests the Court determine either (1) the Uber Settlement Payment does not give rise to gross income for the Debtor, or, (2) based on specific proposed evidentiary rulings requested below, the risk of tax liability to the Debtor or his estate is so small that the Plan's omission of tax reserves does not detract from the Plan's feasibility.

Simply put, the Uber Settlement Payment to Google is a payment from *Uber* to ***Google.*** In other words, following the payment, Debtor will have no net increase in wealth, and therefore it should not count as gross income. Accordingly, the Uber Settlement Payment should not be taxable.[1]

There are several justifications under the tax law and statutes that make this conclusion the obvious result. First, the Uber Settlement Payment is akin to an insurance payment from the insurer (Uber) to a third party (Google) for the benefit of the insured (the Debtor), and that payment is not taxable. Second, the Uber Settlement Payment cannot be taxable to the Debtor because he cannot benefit from it from a tax perspective under the "tax benefit rule." Third, the Uber indemnity is a working condition fringe under the tax code and so any payment under that indemnity, like the Uber Settlement Payment, is not taxable. Fourth, the Uber Settlement Payment is a deductible reimbursement for services the Debtor provided Uber. All of these arguments support a finding that the Uber Settlement Payment does not result in taxable income for the Debtor.[2]

### 1. The Indemnification Agreement And The Uber Settlement Payment Is Analogous To A Non-Taxable Insurance Payment.

*First*, the contingent nature of the Indemnification Agreement is nearly identical to an insurance agreement, and the Uber Settlement Payment is therefore analogous to an insurance payment by an insurance company on behalf of an insurance policy holder to a third-party in satisfaction of an alleged tort.[3] The primary purpose of the Uber Settlement Payment is to satisfy

---

[1] An increase is required in order for there to be tax consequences because Congress taxes *income*, not gross receipts. The Supreme Court explains this by defining taxable income as all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *C.I.R. v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955)

[2] In addition to these arguments demonstrating that the Uber Settlement Payment results in no gross income to Debtor, if the Uber Settlement Payment were to result in gross income, the taxes would be reduced under the "claim of right" doctrine. Debtor's debt to Google arose because Google successfully won an arbitral award clawing back Debtor's salary, compensation, and bonuses. Award at 89-90. Debtor previously paid taxes on that salary, compensation, and bonuses, and the award was not adjusted to account for that tax payment. Award at 121-122. Accordingly, Debtor has already satisfied his tax obligations with regard to the portion of the Uber Settlement Payment satisfying the award for the disgorged salary, compensation, and bonuses. Debtor will be permitted to offset any taxes owed for the Uber Settlement Payment by what he already paid.

[3] Given their similarities, indemnity agreements are generally interpreted in the same way

Google's claim against the estate pursuant to the Award. And the reason Uber is satisfying

Google's claim is because Uber agreed in the Indemnification Agreement to indemnify the

Debtor in the possible event that the Debtor was sued by Google and subsequently ordered to pay

Google a judgment arising from indemnified claims.

Insurance payments by insurance companies to third parties on behalf of policyholders in

satisfaction of a judgment are not counted as gross income. For example, when an insured driver

negligently hits a pedestrian, if the driver's insurance pays the hospital bills for the pedestrian,

the driver is not required to pay a tax on those payments. *See* Bittker & Lokken, Federal

Taxation of Income, Estates, and Gifts ¶ 5.8.1. (Thomson Reuters/Tax & Accounting, 2d/3d

ed. 1993-2019, updated March 2022 and visited on March 17, 2022) ("when damages resulting

from a taxpayer's tortious behavior are paid by an insurance company, as in the case of an

automobile accident caused by the taxpayer's negligence, the payment is not taxed, even though

the taxpayer's liability to the victim is thereby discharged"). And even if the insurance company

were to resist paying the driver (*e.g.* for an alleged policy violation), but were to ultimately settle

with the driver and pay the pedestrian's bills (all without admitting to the validity of the

underlying agreement), that payment would still not be taxable. The circumstances here are

similar and the result should be the same—that the Uber Settlement Payment to Google should

not be considered gross income to the Debtor that is taxable.

Although there is no statutory definition of insurance in the Code, courts have developed

a definition to distinguish insurance transactions from other types of transactions. In *Amerco &*

*Subsidiaries v. Commissioner*, 96 TC 18 (1991), the Court held that if there is no statute directly

addressing whether a type of transaction is insurance, courts are to apply commonly accepted

notions of insurance. There are two defining characteristics of insurance transactions: (1) the

---

insurance agreements are. *See Centex Homes v. R-Help Constr. Co.*, 32 Cal. App. 5th 1230, 1238 (Cal. Ct. App. 2019), *reh'g denied* (Apr. 3, 2019), *review denied* (June 19, 2019) ("We recognize that Scottsdale Insurance Co. is an insurance case, and that there are some differences in treatment between insurance policies and other indemnity agreements. But R-Help cites no authority for a difference in treatment as it relates to the prospective application of the extinguishing of the duty to defend.") (*citing Crawford v. Weather Shield Mfg., Inc.*, 44 Cal. 4th 541, 552, 187 P.3d 424, 430 (2008)).

existence of "insurance risk" and (2) risk shifting and distributing. Both apply here. *Id.* at 38.

### a.     Insurance Risk.

"Insurance risk" means that the agreement must address some form of contingent hazard above and beyond regular investment risk. Here, Uber agreed to indemnify the Debtor and the other Diligenced Employees with respect to uncertain risks facing them. These risks included the risk that they might get sued by their previous employer. The risks were not quantifiable at the time Uber entered into the Indemnification Agreement, but Uber essentially acted as an insurance underwriter when it diligenced the key employees, and made a determination about the level of risk it was willing to assume in connection with the hiring of the Diligenced Employees and acquisition of Otto. Thus, Uber was agreeing to take on the insurance risk of unknown and contingent liabilities, rather than agreeing to pay for known and fixed liabilities when it entered into the Indemnification Agreement. And when the potentially covered claim actually arose in the form of the Google arbitrations filed against the Debtor in October 2016, Uber sent people to interview the Debtor regarding the claim before deciding to accept the Debtor's tender of the claim. *See* Decl. Ex. C [Nov. 3, 2016 Notes by Eric Tate].

The "insurance risk" here is similar to insurance policies that provide coverage for potential employment-related litigation. Like any traditional "D&O" insurance policy offered to directors and officers, the sponsoring corporation protects them from having to pay their own litigation expenses in exchange for the services they provide to the corporation and as part of its ordinary and necessary business activities. The law recognizes that corporations may indemnify "officers, directors, employees and agents" and that corporations are permitted to purchase and maintain insurance on behalf of those people to satisfy their indemnification obligations. *See*, *e.g.*, *DGCL* § 145(g). The purpose of allowing indemnification and insurance is to incentivize individuals to serve in roles where they would otherwise be exposed to extensive (and expensive) lawsuits. If indemnified officers, directors, employees, and agents were required to pay taxes on indemnification payments, it would undermine that purpose. *See RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 900 (Del. 2021) (Delaware recognizes "that minimizing the downside risks of serving as a director or officer through D&O insurance will enhance the ability of Delaware

corporations to attract talented people to fill those roles"); CHRISTOPHER FRENCH, THE INSURABILITY OF CLAIMS FOR RESTITUTION, 18 U. Pa. J. Bus. L. 599, 614–15 (2016) ("The most common explanation for why D&O insurance is allowed and considered desirable is that companies would not be able to attract talented people to run companies if corporate managers had to risk their own personal assets in order to do so."); *id.* (noting many "passed statutes that allow companies to indemnify corporate managers for many types of misconduct and to purchase insurance to cover the losses they are allowed to indemnify as well as the ones they are unable to indemnify").

Similarly, when the Debtor agreed to sell Otto to Uber and work for Uber, he knew it was a prominent move, and it would expose him, Otto and Otto's employees to potentially significant litigation. So the Debtor sought an indemnity from Uber for any potential future litigation-related costs for the Diligenced Employees, whose employment with Uber was a condition to Uber's acquisition of Otto. Uber understood and accepted this risk. In fact, the Uber employee in charge of "quarterbacking" the Otto acquisition himself analogized the indemnification of "super duper litigation" in the Indemnification Agreement as similar to him purchasing fire insurance for his house. *See* Decl. Ex. D (hereinafter "6/19/2017 Poetzcher Tr.") at 310:20-311:13. *See also* 6/19/2017 Poetzcher Tr. 229:6-24 (Uber was acting as an insurance company). The insurance goal of protecting Debtor from "super duper litigation" would be completely frustrated if—after Uber indemnified Debtor's litigation costs—Debtor (like any insured) faced an enormous tax bill on Uber's indemnification payment.

### b. Risk Shifting and Distributing.

The second characteristic is that the claimed insurance transaction involves (a) "risk shifting" and (b) "risk distributing."

"Risk shifting" describes the feature of a claimed insurance transaction whereby one party shifts risk to another. Here, the Indemnification Agreement shifted the burden of bearing the risk of certain potential litigation from the Debtor, Otto and others, to Uber, and thus the agreement involved "risk shifting." Both Uber and the Debtor understood this to be the primary purpose of the Indemnification Agreement. 6/19/2017 Poetzcher Tr. at 230:7-232:16 (describing

litigation risks communicated by the Debtor, and Uber's conclusion that in connection with the hiring of the Diligenced Employees as part of the Otto transaction, taking on that litigation risk for the Debtor and other Otto employees was "very reasonable").

"Risk distributing" describes how the transaction, along with other related transactions, allows the party assuming the risk to distribute the potential liability, in part, among others. Uber distributed the risk here by shifting the risks of Debtor, Otto and four other employees to Uber. Specifically, Uber undertook different evaluations of risk of employing Andrew Levandowski, Lior Ron, Don Burnette, Soren Juelsgaard, and Colin Sebern. *See, e.g.*, Indemnification Agreement at 1 (regarding Diligenced Employees). Uber determined that, taken as a whole, the risk associated with indemnifying these Diligenced Employees was acceptable in light of the value it expected to receive from having them join Uber. *See, e.g.*, 6/19/2017 Poetzcher Tr. at 232:5-232:16 (Uber took on litigation risk after concluding it was "very reasonable"); Decl. Ex. F (hereinafter "1/26/2021 Poetzcher Tr.") at 89:2-90:7 (describing that Uber conducted due diligence on the Debtor, Otto and other employees of Otto and concluded that it was not taking "undue risk of litigation").

Because the Indemnification Agreement is analogous to an insurance policy, the Uber Settlement Payment falls squarely within the category of what tax courts would consider an insurance payment, not gross income. BITTKER & LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶ 3.08(1)(c) (describing universally accepted "exclusion by a taxpayer-tortfeasor of liability insurance proceeds paid to a claimant plaintiff by the insurance company on the taxpayer's behalf").

Accordingly, for the foregoing reasons, the Court should find that the Uber Settlement Payment to Google does not constitute gross income for the Debtor. In the event the Court wishes to make evidentiary determinations instead, the Debtor requests the Court find the following to support the feasibility of the Plan:

- The Indemnification Agreement was entered into by Uber in connection with Uber's

acquisition of Otto and Uber's hiring of Debtor and other employees.[4]

- The Debtor would not agree to become an Uber employee unless Uber provided him with the indemnity memorialized in the Indemnification Agreement.[5]

- The Indemnification Agreement addressed a form of insurance risk above and beyond mere investment risk.[6]

- The Indemnification Agreement shifted the burden of bearing the risk of defined types of potential litigation from the Debtor, Otto and others to Uber.[7]

- The Indemnification Agreement pooled the risk faced by all of the indemnitees, including the Debtor, and Uber evaluated that risk and determined that, taken as a whole, the group of risks was acceptable in connection with the transaction.[8]

## 2. The Deemed Payment By The Debtor to Google Provides The Debtor No Tax Benefit And The Deemed Payment By Uber to Debtor Is Non-Taxable.

*Second*, because the Debtor does not receive any tax benefit from his deemed payment to Google, the Uber Settlement Payment to Google is merely a recovery of an expense or loss and should be excluded from the Debtor's gross income. This is encapsulated in the well-known concept in tax law called the "tax benefit rule." The purpose of the tax benefit rule is to provide

---

[4] *See* Merger Agreement at Section 6.7 ("6.7 Employees. No less than twenty-five (25) Employees (including the Company Founders and not less than two of the Select Key Employees) shall have accepted employment offers from Parent. . . ."); Page A-4 (defining Company Founders to include the Debtor); Decl. Ex. G (hereinafter "Indemnification Agreement") at 1 (recitals describing that Uber indemnified Debtor as a condition to the purchase of Otto pursuant to the Merger Agreement). *See also* 6/19/2017 Poetzcher Tr. 227:14-25 (indemnification was an important part of the deal, and the Debtor insisted upon it); 228:17-21 (indemnification important to the deal); 229:6-24 (Uber was acting as an insurance company); 230:7-231:9 (indemnification was critical, and the Debtor would not do the deal without it; it was essential to acquiring Debtor's talent).

[5] *Supra* fn.4.

[6] *See generally*, Indemnification Agreement.

[7] *See generally*, Indemnification Agreement.

[8] *See, e.g.* 6/19/2017 Poetzcher Tr. at 232:5-232:16 (Uber took on litigation risk after concluding it was "very reasonable"); 1/26/2021 Poetzcher Tr. at 89:2-90:7 (describing that Uber conducted due diligence on Debtor and other employees and concluded that it was not taking "undue risk of litigation").

an equitable mechanism to avoid absurd tax consequences that may result from a mechanical interpretation of tax laws.

In simple terms, the tax benefit rule provides that if a taxpayer makes a payment or suffers a loss that does not reduce his taxes, the recoupment of the loss (here, the Uber Settlement Payment) is not included in gross income and is not taxable. It would not be appropriate to tax a person on a payment that merely reverts him to the *status quo ante*. Stated another way, as the loss did not allow the person to reduce his tax exposure, the reversal of that loss should not artificially increase his tax exposure.

Section 111 of the Internal Revenue Code of 1986, as amended (the "Tax Code")[9] partially codifies[10] the tax benefit rule, and provides a helpful guide to understanding the operation of the rule. Generally, the tax benefit rule provides that the amount of an expense recovered shall be included in income in the year of recovery to the extent the expense resulted in a tax benefit to the taxpayer (*e.g.*, a reduction in the taxpayer's liability for taxes or taxes paid). Conversely, if the taxpayer did not receive a tax benefit when the expense was paid, then the taxpayer does not have to include an amount in income when the expense is later recovered. *See*, *e.g.*, *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370 (1983); *Estate of Backemeyer v. Commissioner*, 147 T.C. No. 17 (2016); *Elbaz v. Commissioner*, 109 T.C.M. 1229 (2015).

Here, the Uber Settlement Payment is a recoupment of, and directly attributable to, the expense incurred by the Debtor to Google in settlement of the judgment secured against him in the arbitration. Had the Debtor made the payment to Google himself, that payment would ordinarily be deductible under either Section 162 (as a business expense of the taxpayer in

---

[9] All references to "Sections" herein are references to the Sections of 26 U.S.C. (I.R.C.) unless otherwise specified. For example, Section 111 of the Tax Code is 26 U.S.C. § 111.

[10] Despite the fact that Section 111 of the Tax Code partially codifies the tax benefit rule, Section 111 does not set the limits to the rule. Rather, the tax benefit rule is judicially created, and the Court need not apply only the rule as set out in Section 111. *See Hillsboro Nat. Bk. v. Commissioner*, 460 US 370 (1983) ("[T]his Court has held, *Dobson v. Commissioner*, 320 U.S. 489, 505-506 (1943), and it has always been accepted since, that §111 does not *limit* the application of the exclusionary aspect of the tax benefit rule. On the contrary, it lists a few applications and represents a general endorsement of the exclusionary aspect of the tax benefit rule to other situations within the inclusionary part of the rule."). Rather the principles of the rule control.

carrying on his trade or business of being an employee) or Section 165 as a loss (either incurred in a trade or business or in a transaction entered into for profit, though not connected with a trade or business), except that deductions under Section 162 or Section 165 that are attributable to a trade or business consisting of the performance of services by a taxpayer as an employee are presently (years 2018-2025) disallowed. *See* Section 67(g). Because of this, the Debtor receives no tax benefit (*e.g.* there would have been no reduction in taxes) from his deemed payment to Google in settlement of the arbitration award (despite the fact that the money returned was already taxed to Debtor when received from Google). Without the application of the tax benefit rule here, Debtor could theoretically be required to include in his gross income Uber's discharge of a part of his liability to Google but would not be entitled to an offsetting deduction for his deemed payment to Google. The tax benefit rule essentially backstops the tax law's general concepts of what constitutes taxable gross income. In the present case, in the absence of the application of the tax benefit rule to exclude the Uber Settlement Payment from gross income, Debtor would be unjustly taxed despite having no corresponding increase in wealth. The tax benefit rule therefore applies since the Uber Settlement Payment merely recoups a nondeductible loss, returns the Debtor to the status quo ante, the Debtor has no corresponding increase in wealth, and therefore has no gross income as a result of the Uber Settlement Payment.

In the event the Court wishes to make evidentiary determinations instead of a finding of no gross income based on application of the tax benefit rule discussed above, the Debtor requests the Court find the following to support the feasibility of the Plan:

- The Uber Settlement Payment is a recovery of the payment treated as made to Google by the Debtor.[11]

- The Debtor receives no taxable benefit from the Uber Settlement Payment.

- The Debtor's wealth does not increase as a result of the Uber Settlement Payment.

### 3. The Uber Settlement Payment Is A Working Condition Fringe Of The Debtor's Employment With Uber.

*Third*, the Court should consider the Uber Settlement Payment to be a working condition

---

[11] *See generally* Award.

fringe under Section 132(a)(3) of the Tax Code, and excludable such that the Debtor has no gross income from the Uber Settlement Payment. Alternatively, the Uber Settlement Payment can also be excluded from the Debtor's gross income because it should be considered an employee expense of the Debtor that he incurred on Uber's behalf, and that Uber is reimbursing.

Section 132(a)(3) excludes from gross income any fringe benefit that qualifies as a working condition fringe. *See*, *e.g.*, Treasury Regulation 1.132-5(r)(4) Example (applying working condition fringe treatment to provision of liability insurance (and payments made under the policy to or for the benefit of A the manager) to cover actions taken by A as an employee of P to an employee.). Section 132(d) defines a "working condition fringe" as "any property or services provided to an employee of the employer to the extent that, if the employee paid for such property or services, such payment would be allowable as a deduction under Section 162 or 167."[12] To qualify as a working condition fringe, the benefit must be provided to an employee of the employer.[13] The Indemnification Agreement meets this criteria. Uber agreed to provide indemnity in order to convince the Debtor to join Uber as an employee and, after the Google claim arose, Uber accepted the Debtor's tender under the Indemnification Agreement while the Debtor was employed by Uber.

Further, if so treated, the Uber Settlement Payment would meet the requirements to qualify as a working condition fringe for cash payments. In order to qualify as a working condition fringe, employers must require the employee to (A) use the payment for expenses in connection with a specific or pre-arranged activity or undertaking for which a deduction is

---

[12] In general, Section 67(g) denies deductions for miscellaneous itemized deductions, including Section 162 deductions for employees (for the relevant taxable years here), Congress's intent—as revealed by the legislative history—was that this provision would not prevent employees from excluding working condition fringes from gross income. *See* Joint Comm. on Taxation, General Explanation of P.L. 115-97, Part V.F. n. 310. *See also* IRS Publication 15-B (2022) (Published after enactment of Section 67(g), this IRS publication does not limit application of the working condition fringe by reason of Section 67(g)).

[13] Although Debtor is not presently employed by Uber, employment benefits can be provided post-termination for a prior employee. *See* Rev. Rul. 92-69, 1992-2 C.B. 51. The Uber Settlement Payment still also qualifies as a working condition fringe because the Uber Settlement Payment is made pursuant to the Indemnification Agreement, and is therefore a continuing service such that Debtor is considered employed for the purposes of Section 132(d).

allowable under section 162 or 167, (B) verify that the payment is actually used for such expenses, and (C) return to the employer any part of the payment not so used. Treasury Regulation 1.132-5(a)(1)(v).[14] Here, (a) as described below, the indemnification Uber Settlement Payment is made in connection with a specific undertaking for which a deduction is allowable under Section 162 (had Debtor made the payment directly himself); (b) Uber will make the payment and verify that the payment is used for the expense covered by the Indemnification Agreement; and (c) there will be no excess money for the Debtor to return to Uber because Uber will make the payment directly to Google.

An additional requirement for qualifying as a working condition fringe is that the hypothetical payment for a property or service is not deductible with respect to a trade or business of an employee *other than* the employee's trade or business of being an employee of the employer. Treas. Reg. 1.132-5(a)(2)(i). For this requirement to be met, the employer must derive a substantial benefit from the payment that is distinct from the benefit that it would derive from the mere payment of additional compensation. Rev. Rul. 92-69. Here, Uber derived a substantial business benefit from providing the indemnity to the Debtor beyond what it could have merely included in the Debtor's compensation.

First, but for the Indemnification Agreement, Debtor would not have sold Otto to Uber and would not have joined Uber as an employee and would not have sold Otto to Uber. Indeed, the benefit of the Indemnification Agreement was to allow Debtor and the other Diligenced Employees to focus on the Otto business for Uber with the knowledge that they had retained a large public company to quarterback any potential "super duper litigation." Uber could not have obtained that level of focus merely by providing additional compensation to Debtor. As a result of Debtor's employment as part of the Otto transaction, Uber obtained a team of autonomous vehicle engineers,[15] Uber was able to later sell that part of that team to Aurora Innovation, Inc. for a 26% ownership interest in Aurora on a fully diluted basis (the transaction valued Aurora at

---

[14] All references to "Treasury Regulations" herein are references to Section 26 of the Code of Federal Regulations. For example, Treasury Regulation 1.132-5(a)(1)(v) is 26 CFR § 1.132-5.

[15] *Supra* fn.4.

$10 billion),[16] and Uber was able to build Uber Freight (the Uber business unit based on Uber's acquisition of Mr. Levandowski's Otto Trucking company, which is now valued at $3.5 billion).[17]

Second, certain of the activities that the Debtor undertook that gave rise to the Award were done in anticipation of his employment at Uber. Specifically, the Panel found that the Debtor solicited *other* employees to join Otto, then Uber, while he was still employed at Google. Award at 48-51. It was this solicitation that the Panel found violated the Debtor's contractual obligations and duty of loyalty to Google, resulting in the Award. Award at 53.

Third, by indemnifying the Debtor, Uber helped to more quickly close the Otto transaction, and get Otto employees for Uber.

Further, the Uber Settlement Payment is payment of the judgment that was entered based on the Award, and would be deductible under Section 162 if the Debtor had paid it himself and the miscellaneous itemized deduction rule did not apply. To determine whether a judgment or settlement is deductible, courts look to the "origin and character" of the claim. *U.S. v. Gilmore*, 372 U.S. 39 (1963). Section 162 broadly covers expenses incurred in connection with a trade or business, and courts have held that such expenses include expenses for claims of fraud, breach of contract, breach of loyalty, and breach of fiduciary duty, including when those claims arise out of conduct connected with a person's duties as an officer or employee. For example, in *Scofield v. Commissioner*, the Tax Court determined that a taxpayer could deduct a payment to settle claims against him that originated in his conduct of his duties as an officer or employee. T.C.M. (RIA) 1997-547. Further, in Revenue Ruling 80-211, 1980-2 C.B. 57, the taxpayer was sued civilly for breach of contract and fraud relating to the ordinary conduct of its trade or business. The ruling allowed the taxpayer to deduct amounts paid as punitive damages under section 162(a) as an

---

[16] Krystal Hu *et. al.*, Uber sells ATG self-driving business to Aurora at $4 billion, REUTERS (Dec. 8, 2020 1:13 PM) https://www.reuters.com/article/us-uber-atg/uber-sells-atg-self-drivingbusiness-to-aurora-at-4-billion-idUSKBN28H2RX.

[17] Wall Street Analysis Puts Value Of Uber Freight At $3.5B, YAHOO! (Sep. 9, 2021) https://www.yahoo.com/now/wall-street-analysis-puts-value-200729764.html#:~:text=A%20report%20from%20Morgan%20Stanley's,parts%22%20at%20%2472%20per%20share.

ordinary and necessary business expense because the acts that gave rise to the civil suit were performed in the ordinary course of the taxpayer's business. Similarly, in Revenue Ruling, 79-208, 1972-2 C.B. 79, a taxpayer was permitted to deduct payments to settle a lawsuit and obtain a release from contract claims under a franchise agreement.

Here, based on the foregoing, the Court should find the Uber Settlement Payment to be a working condition fringe benefit under Section 132(a)(3) of the Tax Code excluded from the Debtor's gross income.

In the event the Court wishes to make evidentiary determinations instead, the Debtor requests the Court find the following to support the feasibility of the Plan:

- The Uber Settlement Payment is made in connection with Uber's acquisition of Otto and the Debtor's employment at Uber.[18]

- The Indemnification Agreement was entered into by Uber to induce Debtor to join Uber.[19]

- The Debtor would not agree to become an Uber employee unless Uber provided him with the indemnity memorialized in the Indemnification Agreement. In other words, but for the Indemnification Agreement, Debtor would not have agreed to sell Otto to Uber and would not have joined Uber as an employee.[20]

- The Uber Settlement Payment is made in connection with a specific undertaking for which a deduction is allowable under Section 162—specifically the solicitation activity the Debtor undertook that formed a basis for the Award.[21]

- Uber, by making the payment directly to Google, implicitly verifies that the payment is used for an expense covered by the Indemnification Agreement.

- There will be no excess of the payment for the Debtor to return to Uber.

---

[18] *Supra* fn.4.

[19] *Id.*

[20] *Id.*

[21] Award at 48-51 (finding breach of duty of loyalty due to soliciting Google employees to join Uber).

- Uber derived a substantial business benefit from the Indemnification Agreement that is distinct from merely paying the Debtor additional compensation.

- The Uber Settlement Payment is payment of the arbitral award, which in claim's "origin and character" is linked to Uber's acquisition and operation of Otto and the Debtor's role as an employee of Uber.[22]

### 4. The Uber Settlement Payment Is A Deductible Reimbursement For the Debtor's Activity That The Panel Found Was On Behalf Of Uber.

*Fourth*, the Uber payment can also be excluded from the Debtor's gross income because it should be considered an employee expense of the Debtor that he incurred on Uber's behalf, and that Uber is reimbursing. Because, for the reasons described above, *supra* Section II.B.3, the satisfaction of the Award is made in connection with Debtor's performance of services as an employee of Uber, and the indemnification payment by Uber is a reimbursement under a reimbursement or other expense arrangement, the Debtor should be permitted to deduct his payment "above-the-line" (*i.e.* reduce his gross income), rather than as an itemized deduction. Further, because the indemnification payment was paid pursuant to an "accountable plan," the amount of the indemnification payment is excludable from wages and is not subject to withholding and payment of employment taxes.

Under Section 62(a)(2)(A), deductions for expenses paid or incurred by the taxpayer in connection with the performance by him of services as an employee under a reimbursement or other expense allowance arrangement with his employer are not itemized and may be deducted "above-the-line." Section 62(c) provides that an arrangement that (i) does not require the employee to substantiate the expenses covered by the arrangement to the person providing the reimbursement or (ii) provides the employee the right to retain any amount in excess of the substantiated expenses covered under the arrangement is not a "reimbursement or other expense allowance arrangement" for the purposes of Section 62(a)(2)(A).

---

[22] *See* Merger Agreement at Section 6.7 (conditioning merger on employing Otto "Company Founders"); Page A-4 ("Company Founders" includes the Debtor); Indemnification Agreement at 1 (Uber indemnified Debtor as a condition to the purchase of Otto pursuant to Merger Agreement); Award at 48-51 (soliciting Google employees breached duty).

In order to qualify as a reimbursement or other expense allowance arrangement, the arrangement must meet three requirements. In particular, if the reimbursement arrangement meets the requirements of Treasury Regulation Section 1.62-2(d), (e), and (f), the arrangement is treated as an accountable plan and amounts paid pursuant to the arrangement (not in excess of substantiated expenses) are excluded from wages and are not subject to withholding and payment of employment taxes. Treas. Reg. Section 1.62-2(h)(1). All three requirements are met by the Indemnification Agreement and Uber Settlement Payment.

*First*, the arrangement must provide reimbursements only for business expenses allowable as deductions by part VI, subchapter B, chapter 1 of the Code (Section 161 and following) and that are paid for or incurred by the employee in connection with the performance of services as an employee of the employer. Treas. Reg. Section 1.62-2(d). Such deductions include the deduction for ordinary and necessary trade or business expenses under Section 162, and the deduction for losses under Section 165. The Indemnification Agreement and Uber Settlement Payment meet this "business connection" requirement. As explained above, *supra* Section II.B.3, the business expenses were incurred as part of Uber's acquisition of Otto and Debtor's role in assisting Uber—Google's competitor. Award at 48-51 (finding breach of duty of loyalty because the Debtor helped Uber by soliciting Google employees to join Uber). Further, the Indemnification Agreement was crucial to Uber's efforts to build its self-driving car business by acquiring Otto and its key personnel, including the Debtor. But for the indemnity, the Debtor would never have agreed to become an Uber employee or solicit Google employees to join Uber for Uber's benefit. *Supra* Section II.B.3.

*Second*, the arrangement must require each business expense to be substantiated to the payor. Information must be submitted to the payor sufficient to enable the payor to identify the specific nature of each expense and to conclude that the expense is attributable to the payor's business activities. Treas. Reg. Section 1.62-2(e). The Uber Settlement Payment easily satisfies the these requirement. Uber is clearly aware of the nature of the indemnification payment by virtue of its multiple years of litigating the issues in this case and involvement in the settlement.

*Third*, the arrangement must require the employee to return to the payor within a

reasonable period of time any amount paid under the arrangement in excess of substantiated expenses. Treas. Reg. Section 1.62-2(f). Because Uber will make the payment directly to Google, there will be no "excess" for Levandowski to return. Thus, this requirement is also met.

Here, for the reasons explained above, the Uber Settlement Payment should be found to be reimbursement of an expense incurred in connection with the purchase of Otto and Debtor's activities on behalf of Uber, such that the Debtor would be permitted to deduct "above-the-line" without increasing gross income.

In the event the Court wishes to make evidentiary determinations instead, the Debtor requests the Court find the following to support the feasibility of the Plan:

- The deemed payment of the Award is a business expense.
- The Debtor incurred the expense of the Arbitral award expense in connection with the his performance of services for Uber.[23]
- The Debtor incurred this expense in his role of assisting Uber, Google's competitor, by joining Uber as an employee and soliciting Google employees to join Uber while he was considered an employee of Uber.
- But for the indemnity, the Debtor would not have agreed to become an Uber employee or solicit Google employees to join Uber for Uber's benefit.[24]
- Debtor has substantiated that expense as Uber is aware of the nature of the Uber Settlement Payment due to its involvement in the present litigation.
- There will be no excess payment for the Debtor to return once the Uber Settlement Payment is made to Google.

**NOTICE**

In accordance with Bankruptcy Rule 7004(b)(4), notice of this Motion[25] will be provided to the Taxing Authorities as follows: (i) the IRS at its normal notice address; (ii) the IRS at the

---

[23] *Supra* fn.22.

[24] *Supra* fn.22.

[25] Because Cal. Rev. & Tax. Code § 17024.5(a)(1)(P) provides for conformity to the Internal Revenue Code as of January 1, 2015 for taxable years beginning on or after January 1, 2015, the

address on its Proof of Claim; (iii) the FTB at its normal notice address; (iv) the FTB at the address on its Proof of Claim; (v) the office of the United States Attorney for the Northern District of California; (vi) the Attorney General of the United States at Washington, District of Columbia. Concurrently with notice of this Motion and the hearing thereon, the Debtor will provide the Taxing Authorities copies of the Court's March 11, 2022 Scheduling Order [Docket No. 885].

In addition, notice of the Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Trevor Fehr, Esq.); (ii) the Debtor's twenty largest unsecured creditors; and (iii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Debtor respectfully submits that no further notice is required. No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

**WHEREFORE**, the Debtor respectfully requests entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: March 18, 2022

By: /s/ *Brett Schuman*
Brett Schuman

**GOODWIN PROCTER LLP**

*Attorneys for Anthony S. Levandowski, Debtor and Debtor in Possession*

---

Motion is identical for both the IRS and FTB.