# Exhibit B

# REDACTED VERSION OF EXHIBIT B

**JAMS ARBITRATION**
**CASE REFERENCE NO 1100086069**

GOOGLE, LLC,

     Claimant

        and

ANTHONY SCOTT LEVANDOWSKI        **CORRECTED FINAL AWARD**

And

LIOR RON,

     Respondents

_____

| **Counsel for Claimant** | **Counsel for Respondents** |
|---|---|
| Keker & Van Nest LLP<br>633 Battery Street<br>San Francisco, CA 94111<br><br>Robert A. Van Nest<br>Rachael E. Meny<br>Jennifer A. Huber<br>Thomas R. Gorman<br>W. Hamilton Jordan<br>Jo W. Golub<br>Ben Berkowitz<br>Reid Mullen<br>Molly Caldwell Villagra | ***Attorneys for Respondent Anthony Levandowski***<br><br>Goodwin Procter LLP<br>135 Commonwealth Drive<br>Menlo Park, CA 94025<br><br>Neel Chatterjee<br>Brett M. Schuman<br>Rachel M. Walsh<br>Andrew Ong<br><br>***Attorneys for Respondent Lior Ron***<br><br>Taylor & Patchen LLP<br>One Ferry Building, Suite 355<br>San Francisco, CA 94111<br><br>Stephen E. Taylor<br>Jonathan A. Patchen<br>Cheryl A. Cauley<br>Karan S. Dhadialla<br>Daniel P. Martin |

| Arbitrators | | |
|---|---|---|
| Hon. James Ware (Ret.), Chair<br>2 Embarcadero Center<br>Suite 1500<br>San Francisco, CA 94111 | Hon. Read Ambler (Ret.)<br>160 W. Santa Clara Street,<br>Suite 1600<br>San Jose, CA 95113 | Alexander L. Brainerd, Esq.<br>2 Embarcadero Center,<br>Suite 1500<br>San Francisco, CA 94111 |
| **Place of Arbitration** | JAMS Dispute Resolution Center<br>2 Embarcadero Center<br>San Francisco, California 94111 | |
| **Date of Arbitration Hearing** | April 30, 2018 and May 1-4, 7-11, 2018 | |
| **Case Manager** | Josephine Care | |
| **Date of Interim Award** | March 26, 2019 | |
| **Date of Final Award** | December 6, 2019 | |
| **Date of Corrected Final Award** | December 23, 2019, *nunc pro tunc* as of December 6, 2019 | |

Case: 20-30242    Doc# 947    Filed: 03/31/22    Entered: 03/31/22 11:52:24    Page 3 of 22

formation, the principal business pursuit of the company was to develop LiDAR technology for autonomous trucking and passenger cars, the latter of which was developed for sale to Uber. In the Fall of 2015, Uber was Google's primary competitor in the self-driving automobile technology space. Levandowski and Ron negotiated to become Uber's sole supplier of LiDAR technology for its use in competition with Google.[43] The Panel finds that Respondents' conduct was competitive with Google and breached their duty of loyalty.

### c.    Soliciting of Google Employees

In the creation of Otto, Respondents had various conversations and meetings with key Google employees. Respondents contend that their conduct did not amount to soliciting.

Soliciting is a general term. In <u>Aetna Bldg. Maint. Co. v. West</u>, 39 Cal. 2d 198 (1952), albeit in the context of soliciting customers, the California Supreme Court defined "solicit" as follows:

> "Solicit" is defined as: "to ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite," <u>Black's Law Dictionary</u>, 3rd ed., p. 1639. "It implies personal petition and importunity addressed to a particular individual to do some particular thing. * * * <u>Golden & Co. v. Justice's Court</u>, 23 Cal. App. 778, 789. It means: "to appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain." [Citation omitted.]
>
> Merely informing customers of one's former employer of a change of employment, without more is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. [Citation omitted.] <u>Id.</u> at 203-204.

---

[43] Exh. 476.

The duty would not be breached if an employee, who had decided to leave his or her employment, merely informs co-workers of that decision, or if, when asked by a co-worker to do so, describes the new venture. Levandowski's and Ron's conduct far exceeded that limit. Respondents approached fellow employees on and off-campus about joining Otto. They invited their fellow employees to attend meetings at Levandowski's home for the purpose of convincing them to join the new company. The Panel reviews the following individual cases to exemplify the solicitous nature of Respondents activities:

Don Burnette became a software engineer at Google on Project Chauffeur in August 2010. In December 2015, in a conversation on the Google campus, Levandowski told Burnette he was creating a self-driving company and he invited Burnette to join his new company. Afterward, Burnette had four or five more conversations with Levandowski about the new company. Levandowski told Burnette he wished to have as many people as he could get from Project Chauffeur. He wanted the Chauffeur group to quit Google all on the same day. On January 21, 2016, Burnette wrote a check for $1 million to invest in Levandowski's company. Burnette terminated his employment at Google on February 9, 2016.

In December 2015, Levandowski told Google employee ███████████ that he was planning to start a new company to bring self-driving trucking technology to the market and he wanted ███████ to join him.

Also in December 2015, Levandowski interviewed, and in January 2016 hired Rhian Morgan as the Director of Human Resources for Otto. In that capacity, Morgan conducted an organized effort that assisted Levandowski and Ron to solicit Google employees and employees of other companies to join Otto. Morgan attended the January 2016 recruitment meetings at Levandowski's home, sought and obtained Levandowski's approval for offer

49

letters[44] and tracked whether individuals had signed non-disclosure agreements ("NDAs").[45]

In January 2016, Levandowski and Ron approached ██████████ about Otto. ███████ was and is a Google electrical engineer who had joined Google when ██████████ Earlier, in the summer of 2015, Levandowski had discussed his new company with ████ At that time, ████ told Levandowski that he was not interested. After the January 2016 conversation, ████ was invited to attend a recruitment meeting at Levandowski's home. At the meeting, ████ stated that he would join Otto.

In January 2016, Levandowski told ██████████ that he was considering leaving Google to start a new company that would be in the business of self-driving trucks. ████ had begun work at Google in ██████████. In March 2015 ████ had begun reporting to Levandowski as a ████████████████████████████████████████████ ████ was contemplating ████████████████████████ In January 2016 Levandowski told ████ that he was not soliciting ████ but that ████ could join Otto and potentially work remotely. On January 8, 2016, Ron texted ████ inviting ████ to meet with him. They met on January 10. ████ also attended the January meetings at Levandowski's home. Levandowski offered ████ a salary at Otto that was close to ████ Google salary. Levandowski and ████ discussed that, in order to prevent ████ resignation from being cited by Google as a cause for ████████████████████████ ████████████████████████ could delay the termination of ████ Google employment and the commencement of ████ employment at Otto until after the ██████████ ██████. Christopher Urmson, the head of engineering for Project Chauffeur ████████

---

[44] Exhs. 770; 800.
[45] Exh. 1006.

████████████████████████████ and ██ decided to remain a Google employee. Again, although ██ decided to remain a Google, employee, both Levandowski and Ron solicited ██.

The conversations and meetings that Levandowski and Ron had with their fellow Google employees about joining Otto constituted soliciting Google employees to leave their employment. The Panel finds that since these solicitations were done while they were Google employees, they breached the duty of loyalty.

### d. Negotiations to Sell Otto to Uber

Beginning in late 2015, while they remained Google employees, Levandowski and Ron negotiated to sell Otto to Uber. The breach of loyalty claim is based on their proposal not only to sell the company to Uber but to do so in a way that would harm Google.

Respondents were fully aware and intended that the sale of Otto's technology to Uber would give Uber a significant competitive advantage over Google. As confirmed by Ron's notes from January 1, 2016, Respondents' vision for Otto was to "help Uber win the self-driving race," by "reduc[ing] capital cost to compete with G[oogle]."[46] Levandowski told Uber that taking a team of Google employees to Uber would damage Google because they were going right across the street to the competitor. Respondents believed that the loss of this Google team to Uber could have a "distressing hit on the valuation" and that Chauffeur's "valuation would be much lower." Indeed, Respondents wanted their plan to have added effectiveness by having the solicited employees stage a mass walk-out. The mass action was planned around Levandowski's departure. The plan was communicated

---

[46] Exh. 609.

orally and was reflected in offer letters. The letters committed the employees to resign from Google on January 26 and to start work at Otto the next day.[47]

To keep Google from knowing about their plans and possibly taking steps to avoid its impact, Respondents had each Google employee sign a non-disclosure agreement. Respondents instructed some of their Google recruits to avoid communicating in writing and to destroy communications with Respondents. Further, in anticipation of the devastating damages that their plan was expected to inflict on Google, and the consequent risk that Google would seek to recoup those damages from them, Respondents sought and obtained an agreement from Uber to indemnify them for their "Bad Acts," defined as follows:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosure in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any employee and such Employee's Former Employer. (Exh. 1093.)

This indemnification was of critical importance to Levandowski and Ron, who proposed, and "insisted on," the concept. According to Poetzsher, "They wouldn't have done [the deal] without it."[48]

---

[47] See, e.g., Exhs. 782, 840, 832, 837, 836.
[48] Tr. 1783.

In making its determination that Respondents' conduct breached the duty of loyalty, the Panel gives great weight to the fact that Respondents negotiated to sell Otto and its LiDAR technology to Uber, known by Respondents to be Google's primary competitor in the self-driving space. An essential element of Respondents' pitch to Uber was that prior to the sale, they would populate Otto with a team of Chauffeur employees who had experience working together on self-driving vehicle technology. And the financials of the sale were tied to the number of Chauffeur employees Levandowski and Ron were able to bring out of Google.

In summary, the Panel finds that from August 2012 until his resignation in January 2016, while he was a Goggle employee, Levandowski engaged in competitive conduct that breached his duty of loyalty. And beginning in 2015 until his resignation in January 2016, by joining with Levandowski, Ron individually and jointly engaged in competitive conduct that breached his duty of loyalty.

### 3. Defenses

As in civil cases, in an arbitration a respondent might allege that the claimant has not proved an essential element of a claim. Although raised by a respondent, the burden of proof of an essential element of a claim remains with the claimant. In their closing brief, Respondents contend that Google failed to prove an essential element of its claim. Respondents also contend that they have proved affirmative defenses. We consider these defenses in turn.

### a. Synthetic Equity Defense

In their closing brief, Respondents contend that Google is not entitled to recover any Chauffeur Bonus Plan payments because, *inter alia*, "Mr. Levandowski's initial allocation was 'synthetic equity' in Chauffeur given for the sale of 510 and AR, and is not recoverable

Case: 20-30242   Doc# 947   Filed: 03/31/22   Entered: 03/31/22 11:52:24   Page 9 of
22

duty of loyalty[90] by a group of employees who had formed a competing union. The appellate court characterized disgorgement as damages or restitution for a tortious act that had been committed against the employer.[91] The Colcord case was cited as authority for requiring a disloyal employee to disgorgement his compensation in Global Medical Solutions, Ltd. V. Simon, 2013 WL 12065418 (C.D. Cal. 2013). In the Global Medical case, full disgorgement of salary and benefits starting from the time period in which the employee was disloyal was awarded, even though the company was profitable and having success during that time period. The Panel finds and concludes that disgorgement of compensation paid during the period of disloyalty is an appropriate remedy in this case.

### b. Retention Bonuses

Google also seeks to recover from Respondents retention bonuses that Google paid to retain a group of employees who had been solicited by Respondents and who expressed an intention to resign to join Respondents' new company. The issue becomes whether under California law such damages are recoverable for breach of the duty of loyalty. Again, the Panel finds Colcord instructive on that issue.

In Colcord, in addition to disgorgement of compensation, the trial court had awarded damages to the union for expenses it claimed to have incurred in opposing defendants' competitive union in a decertification election. The appellate court denied

---

[90] The defendant employees in Colcord were field representatives. Their job was to represent the union in the workplace location where Local 250 was the authorized bargaining unit and for keeping the union leadership apprised of what was going on in the field, and especially of any raid effort by a rival union. While still employed by Local 250, the defendants organized a rival union and spearheaded a decertification campaign to oust Local 250 as the bargaining agent. Because they represented the union, they were held to have a fiduciary duty to Local 250. See also, Neighborhood Assistance Corp. of Am. v. Johnson, 2012 WL 13008418 (C.D. Cal. 2012).
[91] Colcord, 160 Cal. App. 4th at 371.

89

recovery of those expenses, not because those types of expenses were not recoverable, but because it found that the union had not proved that the decertification campaign expenses were proximately caused by the defendants' choosing to remain employees while secretly competing. The Panel interprets <u>Colcord</u> as authority that the decertification campaign expenses would have been upheld if the union had proved that the decertification campaign expenses had been proximately caused by defendants' conduct. Thus, applying that authority here, Google is entitled to recover for its payment of retention bonuses during the period of disloyalty under its breach of duty of loyalty theory so long as it has proven that those payments were proximately cause by Respondents' choosing to remain employees while they were secretly competing.

### c.    Competitive Harm Damages

The third category of damages Google seeks to recover it calls "competitive harm" damages, which, according to Google, Project Chauffeur suffered when a group of employees and contractors left Google to join Otto.[92] Google has not provided the Panel with any definitive California authority that states that competitive harm damages are recoverable for breach of the duty of loyalty. Moreover, in its Reply Brief, Google discusses the harm it suffered when the employees and contractors left as "expectation damages."[93] Unlike contract damages where foreseeable expectancy damages are recoverable, damages for tortious injuries are intended to place an injured plaintiff in the position in which the

---

[92] "As quantified in the report and testimony of Yale School of Management Professor Andrew Metrick, Respondents' wrongful acts also deprived Google of the value of a team of employees and contractors working on autonomous-vehicles and related technologies. Respondents' then sold that valuable team to a competitor, harming Google's relative advantage in the emerging market for autonomous vehicle." (Google's Post-Hrg. Brief at 55.)

[93] Google's Post-Hrg. Reply Brief at 29.

Case: 20-30242    Doc# 947    Filed: 03/31/22    Entered: 03/31/22 11:52:24    Page 11 of 22

### 3. Costs

"The prevailing party is entitled to all of his costs unless another statute provides otherwise. Absent such statutory authority, the court has no discretion to deny costs to the prevailing party." <u>Baker-Hoey v. Lockheed Martin Corp.</u>, 111 Cal. App. 4th 592, 597 (2003).

Google is entitled to costs as requested in the amount of ███████. We treat costs similarly to attorney fees. From the total costs of ███████, we disallow 10%, leaving the taxable costs as ███████. As between Levandowski and Ron, we apply the 20% allocation discussed above. The Panel deducts ███████ from the ███████ in costs and awards that amount against Levandowski separately, leaving ███████ to be awarded against Levandowski and Ron jointly and severally.

### 4. Taxes

Levandowski is asking the Panel to reduce the award against him to account for his payment of income taxes and contributions toward his health-insurance and 401(k) premiums. According to Levandowski, he should receive a credit for these withholdings against any damages set forth in the Final Award "because he never received the benefit of the withheld monies."

Levandowski cites only one case to support his position – <u>American Master Lease LLC v. Idanta Partners</u>, 225 Cal.App.4th 1451(2014). <u>American Master Lease</u> is completely inapt. In <u>American Master Lease</u>, the court did not give any defendant a credit for taxes paid, and in fact, the case did not involve taxes at all. Rather, after the trial court there erroneously ordered the defendants to disgorge the "full contract price" of a stock transaction without first allowing those defendants to show that they had later agreed to accept (and had actually received) millions less, the Court of Appeal ordered a new trial on

121

damages where (among other things) the parties could present evidence and argument on the amount the defendants "actually received" for the stock sale. Id. at 1489-1493. These facts, and the legal analysis surrounding them, are not at all on point with the facts and legal issues here.

Second, as Levandowski appears to concede in his Reply brief, Levandowski did receive the benefit of these withheld monies. See Levandowski Reply, p.13 ["Levandowski concedes that certain deductions (401(k), health insurance, dental insurance, etc.) should not be credited"]. Some of these monies were used for his contributions to his 401(k) and various insurance accounts, from which he certainly benefitted. And other monies were used to satisfy his individual tax liability.

Third, the Restatement (3d) Restitution, §51 only allows "a credit for money expended in acquiring or preserving the property or in carrying on the business that is the source of the profit subject to disgorgement," which is not the type of credit that Levandowski is seeking here. Rest. (3d) of Restitution and Unjust Enrichment §51 (2007). "A wrongdoer will ordinarily be denied any credit for direct contributions in the form of services, or for expenditures incurred directly in the commission of a wrong to the claimant." Id. "The defendant is normally denied a credit for income taxes paid. The reason is not to punish wrongdoers (as is sometimes stated), but to avoid a distortion resulting from the effect of the judgment on the defendant's future tax liability." Id.

Levandowski's credit request is denied.

# Exhibit C

*PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT*

<u>Gotto - EAT notes re 11/3/16, 10 a.m., 1st Meeting/Interview with Anthony Levandowski</u>

Attendees:  Adam Bentley, Nicole Bartow, Anthony Levandowski, Justin Suhr, EAT
Location:  Conference room at Otto's offices, 737 Harrison Street in San Francisco

This summary includes my observations, recollections, and legal thoughts and conclusions regarding the topics about which we questioned Levandowski, his responses, and the extent to which they tend to relate to the claims in the lawsuit.

1. **Introductions** (covered topics)
    a. JS/NB introduce Eric. NB covered attorney-client privilege and EAT reiterated.
    b. Thanks for taking the time.  All on the same side, in this together, goal to defend you and LR and get the suits out of the way so you guys can create.
    c. Spoke with John Gardener a couple times this week, he confirmed that you are invoking the indemnification agreement, were glad and want Uber/MoFo to defend you in the Google arbitration actions.  Have AL confirm he indeed is asking for this now.
    d. We will get provide you with an engagement letter shortly to document the joint representation, it will say Uber pays for our fees subject to the terms of the Indemnification Agreement, if there is a conflict that arises, which we do not anticipate at this point based on the earlier diligence process, we would continue to represent the company, not you, and that you would not DQ.
        i. AL confirmed the above as no problem, but just asked about his ability to get copies of materials we prepared regarding information he provided so he would not have to go through everything again in the remote event it was necessary to switch counsel.
    e. If you have any questions though, about the process, anything, feel free to ask them before we get started.  Understand you all have had discussions already about the matter generally, so we can get right to questions about the substance of the arbitration demands.
    f. There may be some details to explore, but at a high level, it seems that much of the factual areas in the demands were covered in the earlier diligence process, so what we would like to focus on today is:  (1) your thoughts on any claims you or Lior might have to assert against Aspen; (2) areas that were not referenced in the Stroz final diligence report, like Odin Wave, Tyto Lidar, the Robots and 510 Agreements; and (3) the extent to which Aspen may have done any of the things they are complaining about in the arbitration demands.
2. **Potential counterclaims against Aspen?**
    a. AL:  Contract that we have, ▇▇▇▇▇▇▇thing, was supposed to happen▇▇▇▇▇▇▇▇▇▇▇  They eventually did pay but ▇▇▇▇▇▇▇▇▇▇▇  Think it was intentional.  Did not ▇▇▇▇▇▇▇▇▇  When we agreed on the number, and then it

1

was ███████ They changed the person who was supposed to ███████ ended up deciding but it ████████████████ We never went through ████████████ it was opaque. AL had no say in determining the ██████ In selling 510 and Robots, Aspen agreed that selling Robots would be ██████████████████ But then Aspen forced AL to sell Robots for ██████ then gave a ███████

**b.** Weird ways of how the ████████ was done to get to the ██████████ ██████ They maybe did not do it right. I could not see how we ███ ████████ during the time we were there.

**c.** ████████████ Employees allocated ████████████████ AL had ██████ coming in. ██████ convinced Aspen to ████████████ was interpreted. As we added to the team, ██████████████ and AL got ███████████████████ without ██████ the company. Also only supposed to have ███████████ but had ██████ which was not ████████████████

**d.** There were certain things we were ████████████████████ The ██████ ████████████████████ that we had contracted for was not what he ultimately were afforded.

**e.** Should have been ████████ not ██████████ Biggest beef is that how the ████████████████████████

**f.** Also how the ████████ was supposed to ██████████ After Sebastian left, Chris took over, then Krafcik took over, ████████████████ Sebastian promised something originally ████████████

**g.** Since leaving, we had a relationship with ██████ parts vendor, assembly for laser), we saw them at a trade show, had them quote some work for us, they accepted a P.O. This is after we hired Samir from Aspen. Then we got a call from ██████ saying they would not do any work for us. Wink wink yes it's ██████ at Aspen. Then the acquisition happened, ██████ called back and said yes, we will do the PO.

    **i.** We lost a month of work because of ██████ dropping us. We now are doing a different laser so not an issue, but that month was scary.

**3. Odin Wave/Tyto Lidar and Robots, 510**

    **a.** Walk through paragraphs 10-21 in the first demand that names AL and LR and paragraphs 8-11 of the second demand.

        **i.** 10-11. AL did not own shares or get paid, but had meetings with OW. Managed by AL's friend. AL owned the building at Dwight Way.

        **ii.** 12. Yes, a vendor contacted Pierre (3rd co-Founder of Otto who backed out after we started). Yes OW was the company at the time, but the part was different, but with similar specs. Part is a piece of ████████████████ The CAD is different, nothing fancy. They are similar because there is a standard ██████ you can buy from ██████ but they made a ██████████ They are ██████████ parts. The vendor had



made the part for ▮▮▮▮▮▮▮▮▮▮▮ It is not unique and proprietary for self-driving vehicles. Originally a ▮▮▮▮▮▮▮▮▮▮▮ The part was made for ▮▮▮▮▮▮ before Aspen acquired ▮▮▮▮▮▮▮

    1. ▮▮▮▮▮▮▮▮ for Aspen would have been proprietary, but not our ▮▮▮▮▮▮▮▮▮▮ Then vendor breached the NDA to give Aspen the part.

b. 13. Pierre and Gaetan (head of Optics at Otto). Yes, they were in AL's building, run by AL's friend. True AL denied any ownership. AL did not give them IP, but helped OW like other companies, including some who are owned by Larry Page.

c. 14. Not sure, assume yes. Yes they are friends. Ognen went to call together. Ognen works at Otto.

d. 15. False. OW was working on a laser for 2D mobile mapping, and that laser could not be used on an car.

e. 16. True. But AL never disclosed any Aspen IP. The OW folks worked at Velodyne. ▮▮▮▮▮▮ learned about ▮▮▮▮▮▮▮▮▮▮ was going to ▮▮▮▮

    i. I would love to assert that we have ▮▮▮▮▮▮▮▮▮ with Aspen IP. Then do the same with existing vendor stuff. If Aspen claiming we have Aspen laser technology. The things we have in common with Aspen will ▮▮▮▮▮▮▮▮▮▮ other companies.

f. 17. False.

g. 18. They looked at ▮▮▮▮▮▮▮▮ but ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Aspen maybe thought about ▮▮▮▮▮▮▮

h. 19. Yes, investigated ▮▮▮▮▮▮▮▮▮▮ And AL did visit once HQ. I was there as laser lead to see if they had any interesting stuff. ▮▮▮▮▮▮ independently find out about the Tyto laser and ▮▮▮▮▮▮▮▮▮ AL goes with ▮▮▮▮▮▮▮▮▮▮ Tyto laser is any good. AL did not disclose his relationship with Tyto. I did not own any stock, not an employee, did not disclose info.

i. 20. Maybe, don't know.

j. 21. True.

k. How you came to by Tyto. Left Aspen, but needed a laser, now what we needed, but could use it for our purposes. Understood that Aspen was interested in ▮▮▮▮▮▮▮▮▮▮▮ and Chauffer team would ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ When AL left Aspen, there had been enough time since the ▮▮▮▮▮▮▮▮▮▮ There was ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ was not that good. AL helped ▮▮▮▮▮▮▮▮

l. What work, if any, did you do for or in furtherance of non-Aspen companies while employed by Aspen?

    i. Helped OW

---

[1] AL started 510 Systems while at Google with Pierre and Andrew. AL's Robot's got dropped out, AL owned all the laser technology. Any ▮▮▮▮▮▮▮▮ would be limited to ▮▮▮▮▮▮▮

3

      ii.  Future Game, Jesse Levinson (Zoox), AL invested
     iii.  Charity Happens, Jesse Levinson AL invested
     iv.  Blam, started from Aspen ex-lawyer left AL invested
      v.  ████████████████████ owned by ██████████
        AL lead the █████ project. No investment, no employment.
        ████████████████
     vi.  Nemo Building Systems, Modular home manufacturing facility AL invested
    vii.  Nautilus not investor, not getting paid (No permission). There was a specific project at Aspen to do the same business.
   viii.  Date Night, invested $10K, no work

  m.  What did Aspen know about those activities?
      i.  None of these were formally approved or signed off on. Did not get formal permission to do Robot's or 510 Systems
     ii.  Common at Aspen for employees to do other side projects

**4.  Unclean hands**
  a.  Are you aware of Aspen asking you or anyone else to solicit employees from competitors in violation of restrictive covenants?
  b.  Are you aware of Aspen asking or otherwise receiving confidential, proprietary information of other companies? Related to self-driving cars, mapping, otherwise?
  c.  Any other potentially illegal, unethical, otherwise problematic acts by Aspen of which you are aware?
  d.  AL:



**5.  Aspen's knowledge of AL and LR activities[3]**
  a.  What did you discuss with Aspen about Zing and specifically that you had been asked to "transfer a group of people" to a competing company? Paragraph 26.
  b.  What if anything did you know about Google's consideration of firing you in Summer 2015. See paragraph 27.

---

[2] Follow-up with AL later.
[3] Did not have sufficient time in first meeting to explore these questions.

    c. What is your response to the claim that you misled and hid your activities until after you received a final payout of your incentive payment? See paragraph 25, 28.

    d. Assuming Aspen has combed through your Aspen devices and data sources and those of folks you used to work with, and is talking to other folks who stayed at Aspen after you left, is there else they may have learned or may learn that would not have been referenced in the Stroz final report?

**6.** ==**Solicitation** (Limited time, generally address in next interview)[4]==

    a. Tell us what happened regarding the group meetings you had with Aspen employees? See paragraph 33.

    b. What instructions were given to Aspen employees with regard to the timing of the start of their Zing employment? Did you intentionally stagger or otherwise plan or assign exit dates?

    c. Aspen allegation that you demanded that new Zing hires commit to starting work immediately? See paragraph 35.

    d. Aspen allegation that you planned to have the ███████████ ███████████ See paragraph 36.

    e. Review exit from Aspen including interview. See paragraph 38-42

    f. [TRY TO FIT IN 1st INTERVIEW]Why recontact Aspen exit interviewer and inform about employees contacting you about your departure? See paragraph 44.

        i. AL: Think this is Chelsea. AL did not quit, he was fired. They thought he was quitting but fired him. AL sent an email that I was tired of this, but did not actually quit. Clear process at Aspen about how to quit. AL did none of them. AL asked Chelsea if he needed to do anything she said no we are clear. True about what AL told her. Post-departure AL was super clean. People who are still at Aspen would confirm he did not solicit. AL's representations were true. AL had several agreements with Aspen, understood last one superseded. No recontact. We were going back and forth about insurance issues already. In the midst of those, AL gave Chelsea the heads up.

        ii. <u>AL's understanding was that he did not have a non-solicit of employees during employment</u>. ███████is one person with whom AL discussed this rule. Also, one month before leaving AL had a talk with his boss, ███████AL's boss. ███████was sitting AL down and saying ███████████████████ Went to dinner and talked about it. ***[AL described this as "extra special juice" that should not be disclosed yet as it could harm*** ████████████████came to a meeting at Uber negotiating the terms of the Zing transaction. ███was trying to sell███████████ to Uber. ███was talking to John Bares. ███told AL I know you are talking to Uber. AL thinks███used this information to

---

[4] Other than as noted, did not have sufficient time in first meeting to explore these questions. Much should be covered in Stroz report.

negotiate a ███████████ AL had dinner with ███ a month ago and asked if AL had gotten papers from Aspen. ███ left Aspen three weeks ago.



  iii. Before signing with Unicorn, ██████ told AL that he wanted to ████████████████████ Do we still 510 and AR to Aspen or someone else.

  iv. AL specifically discussed doing ████████████████ ███ We left Aspen to do robot trucks. ████████████ ████████████

  v. There was a meeting where AL's boss told ██████████ ████████████████████ AL's boss was there.

  vi. Had you in fact initiated discussions with any Aspen employees about leaving Aspen by then? Afterwards?

g. [TRY TO FIT IN 1st INTERVIEW]Aspen claims that you could not have been in a position to be acquired by Unicorn, or at least not at the valuation, were it not for all of the Aspen employees you were able to hire away? See paragraph 49-51. What do you say about that?

  i. Explore "head start" theory counterarguments

  ii. AL disagrees. Deal based on ability to bring cars to market, but not conditioned on bringing any one. No consequence to not bringing people.

  iii. Deal would have been done.

  iv. Valuation of the deal came from introspective from Unicorn knowing ATC not working well and Zing knowing what the market would bear.

  v. The team affected the timing maybe.

h. [TRY TO FIT IN 1st INTERVIEW]What is your understanding or belief about how your departure and that of the Aspen folks you hired did or did not harm Aspen?

  i. We did not solicit ██████████ most of their team is still there. Bunch of folks interested. Did not take all of one team. We have pieces from all so we can do our own. Maybe an email from ███ to ███ saying can't believe you paid $680M for that.

i. [Only to the extent not explained to Stroz], who are the Aspen employees that Zing recruited/initiated discussions with? Who are the Aspen employees that initiated discussions with Zing?

**7. IP development and strategy**[5]

a. [TRY TO FIT IN 1st INTERVIEW]In simple layman's terms, to what extent and how is what you are doing at Zing completely different and in no way reliant upon anything you learned or did at Aspen?

  i. Originally left to do self-driving trucks. Tech we did for the Beer demo. Car at Aspen is ██████████ ATC's tech is laser heavy ██ ███ At Zing we use cameras, retrofit vehicles, but ███████████

---

[5] Other than as noted, did not have sufficient time in first meeting to explore these questions. Confirm what was addressed in Stroz report.

sf-3710526
Case: 20-30242    Doc# 947    Filed: 03/31/22    Entered: 03/31/22 11:52:24    Page 20 of 22

███████ At ATC, we are ██████████ Underlying technology. The software is different, no overlap. Have a full trace of how we started the project, every line of code. We have records of all the bugs to show how we independently created our software.
    ii. Laser perception is all ATC.
    iii. Zing IP we took the planner, how to classify objects in path, we adopted that from Zing. Yur main guy went from Aspen to Apple to Otto. **Everything is written from scratch.**
    iv. How does Zing not compete with Aspen?
  b. Aspen acquiring Zing ever a possibility?
    i. Assume no because Zing employees did not want to work at Aspen or other big company.
  c. How much time and effort did you spend on Zing during your Aspen employment?
  d. Any idea what Aspen knew about Zing and when?
  e. [TRY TO FIT IN 1st INTERVIEW]Apart from the provision in your employment agreement prohibiting competitive activities during Aspen employment, did Aspen ever tell you not to work on competing ventures? How do you know Aspen was aware that you were working on other companies? Who specifically at Aspen was aware of them? How did Aspen express to you that it approved of your external side projects?
    i. Had Aspen declined to pursue the freight, and after-market products that Zing is pursuing.
    ii. John Krafcik almost taking a ride in a Zing truck?

**8. Other**[6]
  a. [TRY TO FIT IN 1st INTERVIEW]One of the sources of data identified in the earlier diligence process was your personal DropBox account. We know/assume John told you not to do anything with the files, but just to confirm, when is the last time that you so much as clicked on any Aspen files in your personal DropBox account?
    i. AL used DB for a week or two or month after Stroz took a copy of it but did not touch any folders that were off limits. Deleted the DropBox account before the transaction closed. Did not transfer anything.
  b. [TRY TO FIT IN 1st INTERVIEW]Other than what we've discussed, what are your reactions to the allegations in the arbitration demand? Anything else that might be relevant or we should know?
    i. [Good, bad, ugly]
  c. Zing recruitment and hiring process as to Aspen employees, protocols implemented to mitigate risk of claims like the ones in the arbitration demands, to mitigate risk of misappropriation, infringement claims, what and when?
  d. [Based on how far we get.] We went through some of the factual allegations today, but what we will want is to get your reaction to each of

---

[6] Other than as noted, did not have sufficient time in first meeting to explore these questions.

the Factual Allegations, which are paragraphs 5- 51 in the first demand. For you, what would be the easiest way for us to do that?

    e.  Best contact for AL is through Mason.

9.  Technical or industry experts?