# Exhibit D

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                   ---oOo---

5

6    WAYMO LLC,

7           Plaintiff,

8    vs.                        No. 3:17-cv-00939-WHA

9    UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING,

10   INC.,

11          Defendants.

     _____/

12

13      WAYMO & UBER CONFIDENTIAL ATTORNEYS' EYES ONLY

14

15      VIDEOTAPED DEPOSITION OF CAMERON POETZSCHER

16            SAN FRANCISCO, CALIFORNIA

17             MONDAY, JUNE 19, 2017

18

19

20   BY:  ANDREA M. IGNACIO,

21   CSR, RPR, CRR, CCRR, CLR

22   CSR LICENSE NO. 9830

23   JOB NO. 2642012

24

25   Pages 1 - 374

                                        Page 1

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 2 of
28

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                   ---oOo---

5    WAYMO LLC,

6         Plaintiff,

7    vs.                          No. 3:17-cv-00939-WHA

8    UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING,

9    INC.,

10        Defendants.

     _____/

11

12

13         Videotaped Deposition of Cameron Poetzscher,

14    taken on behalf of the Plaintiffs, on June 19,

15    2017, at Quinn, Emanuel, Urquhart & Sullivan, LLP,

16    50 California Street, 22nd Floor, San Francisco,

17    California 94111, beginning 8:59 a.m., and

18    commencing at 5:17 p.m., Pursuant to Notice, and

19    before me, ANDREA M. IGNACIO, CSR, RPR, CRR,

20    CLR ~ License No. 9830.

21

22

23

24

25

                                           Page  2

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 3 of
28

```
 1   A P P E A R A N C E S:

 2

 3

 4      FOR THE PLAINTIFFS:

 5          QUINN EMANUEL URQUHART & SULLIVAN LLP

 6          By:  ANDREA ROBERTS, Esq.

 7              JORDAN R. JAFFE, Esq.

 8          50 California Street, Suite 2200

 9          San Francisco, California 94111

10          Phone:  415.875.6600

11          andrearoberts@quinnemanuel.com

12

13

14      THE DEFENDANTS UBER TECHNOLOGIES INC.:

15          MORRISON & FOERSTER LLP

16          By:  MICHAEL A. JACOBS, Esq.

17          425 Market Street

18          San Francisco, California 94105

19          Phone:  415.268.7455

20          mjacobs@mofo.com

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 4 of 28

1    A P P E A R A N C E S:  (Cont.)

2

3

4        THE DEFENDANTS OTTO TRUCKING, INC.:

5             GOODWIN & PROCTER LLP

6             By: HAYES HYDE, Esq.

7             Three Embarcadero Center, 28th Floor

8             San Francisco, California 941111

9             Phone:  415.733.6000

10            hhyde@goodwinlaw.com

11

12

13       ALSO PRESENT:  Cyril Suszckiewicz, Videographer

14                       Justin Suhr, Uber

15

16

17

18

19

20

21

22

23

24

25

                                        Page  4

Case: 20-30242    Doc# 948    Filed: 03/31/22    Entered: 03/31/22 11:54:43    Page 5 of 28

| | | |
|---|---|---|
| 1 | to think about it a little bit harder. I don't recall | 14:09 |
| 2 | this particular e-mail. | 14:09 |
| 3 | Q So, separate and apart from this e-mail, do | 14:09 |
| 4 | you recall thinking it was a strange move on Google's | 14:09 |
| 5 | part to have Levandowski tell the entire team that he | 14:09 |
| 6 | was planning to leave? | 14:09 |
| 7 | A I mean, I only recall that now having this | 14:09 |
| 8 | e-mail in front of me. I don't -- didn't recall it | 14:09 |
| 9 | independently of that. | 14:09 |
| 10 | Q Does this e-mail refresh your recollection | 14:09 |
| 11 | that that was -- you thought that was strange? | 14:09 |
| 12 | A Vaguely. I mean, it does seem strange that | 14:09 |
| 13 | they would let Anthony tell the whole team that he was | 14:09 |
| 14 | leaving; right? | 14:10 |
| 15 | Typically, companies -- if someone is leaving | 14:10 |
| 16 | to form, you know, what could be a competitive | 14:10 |
| 17 | enterprise, they kind of march you out of the | 14:10 |
| 18 | building. | 14:10 |
| 19 | Q So, what's strange about it is that they | 14:10 |
| 20 | allowed him to tell the team? | 14:10 |
| 21 | A Correct. | 14:10 |
| 22 | Q Okay. | 14:10 |
| 23 | A Right. | 14:10 |
| 24 | If you're retiring, you know, they give you a | 14:10 |
| 25 | retirement party. If you leave Goldman Sachs and go | 14:10 |

Page 224

```
1    to Morgan Stanley, it's, like, Pack your bags and get      14:10
2    out of here; right?                                        14:10
3         So, if he was leaving to form a competitive           14:10
4    enterprise in NewCo, right, I was surprised that they      14:10
5    would let him sit there and address his whole team and     14:10
6    so on.                                                     14:10
7         That's my recollection reading this e-mail.           14:10
8    I can't say for sure what I thought at the time.           14:10
9    Q    Okay.  And then there is the sentence there           14:10
10   that says:                                                14:10
11        "I worry about what tactics they might have           14:10
12   up their sleeve."                                          14:10
13        Do you recall what you were referring to              14:10
14   there?                                                    14:10
15   A    Again, from this e-mail refreshing my memory          14:10
16   is that I imagine, if they're doing such a strange         14:10
17   move, then maybe they have some super clever motive        14:10
18   behind it; right?  Like, Google is not stupid.  So why     14:10
19   would they do something apparently stupid unless they      14:10
20   have a tactic up their sleeve?                             14:10
21   Q    So, you thought it was stupid for Google to           14:10
22   allow Anthony Levandowski to tell his team he was          14:11
23   leaving?                                                  14:11
24   A    I mean, perhaps I shouldn't use the word              14:11
25   "stupid."  It's certainly, as I said, unusual in the       14:11
```

Page 225

| | | |
|---|---|---|
| 1 | corporate setting for companies to allow departing | 14:11 |
| 2 | employees, who are forming potentially competitive | 14:11 |
| 3 | enterprises or going to a competitor, to sort of | 14:11 |
| 4 | remain on the premises addressing employees. | 14:11 |
| 5 | Q   And did you have in mind what tactics you | 14:11 |
| 6 | thought Google might have up its sleeve? | 14:11 |
| 7 | A   Not that I can recall. | 14:11 |
| 8 | Q   You were just nervous about them? | 14:11 |
| 9 | A   Uh-huh.  Google makes us very nervous.  It | 14:11 |
| 10 | makes a lot of people nervous, as you know. | 14:11 |
| 11 | MS. ROBERTS:  I'm going to hand you what we | 14:11 |
| 12 | will mark as Exhibit 277, which begins with Bates | 14:11 |
| 13 | No. UBER00063617. | 14:11 |
| 14 | (Document marked Exhibit 277 | 14:11 |
| 15 | for identification.) | 14:12 |
| 16 | MS. ROBERTS:  Q.  And this is an e-mail from | 14:12 |
| 17 | you to Travis and Emil, dated January 28th, 2016; | 14:12 |
| 18 | correct? | 14:12 |
| 19 | A   Correct. | 14:12 |
| 20 | Q   And this is the shortest e-mail we've seen, I | 14:12 |
| 21 | think. | 14:12 |
| 22 | "TK" refers to Travis Kalanick? | 14:12 |
| 23 | A   Correct. | 14:12 |
| 24 | Q   Okay.  And you asked: | 14:12 |
| 25 | "Did you tell Anthony that you would | 14:12 |

Page 226

| | | |
|---|---|---|
| 1 | indemnify them if they get sued by G as part of or | 14:12 |
| 2 | after the deal?  They're under that impression." | 14:12 |
| 3 | Correct? | 14:12 |
| 4 | A   That's what it says. | 14:12 |
| 5 | Q   Okay.  Why is it that you asked Mr. Kalanick | 14:12 |
| 6 | and Mr. Michael if Goo- -- if Anthony was told he | 14:12 |
| 7 | would be indemnified? | 14:12 |
| 8 | A   Again, I don't recall this.  But, it seems to | 14:12 |
| 9 | imply that they, meaning Anthony and Lior, are under | 14:12 |
| 10 | the impression that Travis had told them that.  And I | 14:12 |
| 11 | wanted to confirm with Travis that that was his | 14:13 |
| 12 | understanding.  I don't recall this e-mail, but that's | 14:13 |
| 13 | what it would suggest. | 14:13 |
| 14 | Q   Do you recall having conversations with | 14:13 |
| 15 | Mr. Levandowski and Mr. Ron about their impression | 14:13 |
| 16 | that they would be indemnified if they were sued by | 14:13 |
| 17 | Google? | 14:13 |
| 18 | A   I mean, ultimately, the indemnification was | 14:13 |
| 19 | an important part of the deal.  It wasn't just against | 14:13 |
| 20 | Google.  It was against anyone; right?  So I -- I knew | 14:13 |
| 21 | at some point -- I can't say if it was here -- that | 14:13 |
| 22 | that was an important part of the deal for them. | 14:13 |
| 23 | Q   Is that something that Mr. Levandowski and | 14:13 |
| 24 | Mr. Ron insisted on including in the agreement? | 14:13 |
| 25 | A   Yes. | 14:13 |

Page 227

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 9 of 28

1      Q   Okay.  So, Mr. Levandowski and Mr. Ron      14:13

2  insisted that, in the agreement in which Uber acquired  14:13

3  Otto, that they be indemnified by Uber if they were   14:13

4  sued by Google as part of or after the deal?      14:13

5      A   If they were sued by anyone or any former    14:13

6  employer or anyone alleging trade secret, you know,   14:13

7  infringements, among other things, I believe.     14:13

8      Q   And so, do you recall -- this is an e-mail   14:13

9  from you to Travis Kalanick.              14:13

10         Do you remember what discussions you had with  14:14

11  Anthony or Mr. Ron, prior to this, that led to this   14:14

12  e-mail?                          14:14

13     A   I don't recall, no.               14:14

14     Q   And did you receive a response to this      14:14

15  e-mail?                          14:14

16     A   I don't recall.                 14:14

17     Q   Did you have any conversations with Travis   14:14

18  about indemnifying Mr. Levandowski and Mr. Ron?    14:14

19     A   Yes, we had, because there was obviously    14:14

20  important deal point.  We had to get clearance at some  14:14

21  point for us to do that.                14:14

22         I believe all of the conversations that I   14:14

23  recall involved -- other than this e-mail, involved   14:14

24  attorneys.  I know Salle Yoo, our general counsel, was  14:14

25  present at all the discussions I recall with Travis or  14:14

Page 228

1    others regarding the topic of indemnity.                14:14

2        Q    But indemnity was an issue that was raised by  14:14

3    Mr. Levandowski and Mr. Ron as something they wanted    14:14

4    included in the agreement?                              14:14

5        A    As I recall.                                   14:14

6        Q    Was there any resistance from Uber, at least   14:14

7    initially, to including that in the agreement?          14:14

8            MR. JACOBS:  You can answer that to the          14:14

9    extent there was resistance expressed -- first of all,  14:15

10   you can answer if resistance was expressed to Anthony   14:15

11   or Lior.  And you can also answer to the extent          14:15

12   resistance was articulated internally, separate from     14:15

13   discussions with counsel.                                14:15

14           THE WITNESS:  Okay.  I believe we did            14:15

15   articulate some resistance to Anthony and Lior           14:15

16   generally.                                               14:15

17           Obviously, an indemnity is a liability,          14:15

18   essentially; right?  You're acting as an insurance       14:15

19   company.  And we didn't want to take on any              14:15

20   liabilities that we didn't have to.  So, our             14:15

21   preference, like any other company's preference, would   14:15

22   be to not indemnify someone; right?                      14:15

23           So we -- I believe we conveyed something         14:15

24   along those lines to them.                               14:15

25           MS. ROBERTS:  Q.  So, at some point after        14:15

```
 1    Mr. Levandowski and Mr. Ron requested that        14:15
 2    indemnification be included as a term of the      14:15
 3    agreement, Uber informed them that the preference --  14:15
 4    Uber's preference would be to not include indemnity   14:15
 5    provisions; is that correct?                       14:15
 6        A    Something along those lines, yes.         14:15
 7        Q    And then how -- how did Uber and          14:15
 8    Mr. Levandowski and Mr. Ron get to the point where    14:16
 9    there was an agreement on including indemnification   14:16
10    provisions?                                        14:16
11        A    I mean, it was negotiated.  They told us it  14:16
12    was a critical part of the deal.  They wouldn't do the  14:16
13    deal without indemnity.  So, we negotiated an      14:16
14    indemnity that we were comfortable with, with a lot of  14:16
15    safeguards for us.                                 14:16
16        Q    Did they say why they wouldn't do a deal  14:16
17    without an indemnity?                              14:16
18        A    They were worried that the, you know, risk of  14:16
19    them getting sued in the deal if we were acquired --   14:16
20    if we -- sorry -- if we acquired them was going to --  14:16
21    was going to increase; right?                      14:16
22             Because they felt that Google viewed Uber as  14:16
23    a key competitor in the race for autonomous vehicles.  14:16
24    And it would be one thing if they were to do       14:16
25    autonomous trucking independently.  They would be much  14:16
```

Page 230

| | | |
|---|---|---|
| 1 | less of a threat to Google. | 14:16 |
| 2 | But, if we were to acquire their talent, | 14:16 |
| 3 | right, that would bolster our team. As I said, we | 14:16 |
| 4 | already thought we had the best team, but this would | 14:16 |
| 5 | bolster it further. | 14:16 |
| 6 | They were worried that out of, you know, | 14:16 |
| 7 | anger or whatever, Google would sue us, and they felt | 14:16 |
| 8 | the risk to them of getting sued increased. And, | 14:17 |
| 9 | therefore, they wanted to have us indemnify them. | 14:17 |
| 10 | Q   Did Mr. Levandowski or Mr. Ron convey to you | 14:17 |
| 11 | any indication that there would be merit to any claims | 14:17 |
| 12 | by Google against them following the deal? | 14:17 |
| 13 | A   No, none whatsoever; in fact, quite the | 14:17 |
| 14 | opposite. As I told you, all of our discussions -- | 14:17 |
| 15 | well, not all of our discussions -- but on several | 14:17 |
| 16 | occasions, we discussed with them, Don't bring | 14:17 |
| 17 | anything. We don't want anything. | 14:17 |
| 18 | And they assured us they had no interest in | 14:17 |
| 19 | doing so because they had new approaches. So, neither | 14:17 |
| 20 | of us had any worry that it would be a substantive | 14:17 |
| 21 | concern. | 14:17 |
| 22 | At the same time, anyone can bring a lawsuit. | 14:17 |
| 23 | There are legal fees and other expenses. And they | 14:17 |
| 24 | wanted to be indemnified for all of that indemnity to | 14:17 |
| 25 | cover, as I recall, legal fees, not just damages. | 14:17 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | Q   And, when you first heard from | 14:17 |
| 2 | Mr. Levandowski that he had been told by Travis that | 14:17 |
| 3 | Uber would indemnify them, did that surprise you? | 14:17 |
| 4 | A   I don't recall. | 14:17 |
| 5 | Q   Did you have any impressions as to whether | 14:17 |
| 6 | Uber should indemnify Mr. Levandowski and Mr. Ron? | 14:18 |
| 7 | A   I mean, as I said, obviously, I'd prefer not | 14:18 |
| 8 | to indemnify.  It's a liability for us.  But it seemed | 14:18 |
| 9 | like a reasonable risk, because we knew that we | 14:18 |
| 10 | weren't going to be taking anything.  We were assured | 14:18 |
| 11 | by them they wouldn't take anything.  So, we felt like | 14:18 |
| 12 | the risk of anyone successfully suing us was low. | 14:18 |
| 13 | As I said, anyone can bring a lawsuit, but | 14:18 |
| 14 | winning is a different story.  So, we felt like this | 14:18 |
| 15 | was a very reasonable risk to take on, at least as I | 14:18 |
| 16 | recall. | 14:18 |
| 17 | Q   And, was agreeing to the indemnity provision | 14:18 |
| 18 | that Mr. Levandowski and Mr. Ron requested, dependent | 14:18 |
| 19 | on the results of the due diligence report by Stroz? | 14:18 |
| 20 | MR. JACOBS:  So, you can answer that | 14:18 |
| 21 | sequentially, i.e., whether the final agreement was to | 14:18 |
| 22 | be triggered after whatever was done in the Stroz | 14:18 |
| 23 | diligence effort. | 14:18 |
| 24 | You can answer as to sequence, and you can | 14:18 |
| 25 | answer as to what your impression was of -- your | 14:19 |

Page 232

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 14 of
28

| | | |
|---|---|---|
| 1 | understanding was of how that sequence would work | 14:19 |
| 2 | without revealing the contents of the Stroz report. | 14:19 |
| 3 | THE WITNESS:  Okay.  Can you break the | 14:19 |
| 4 | question down into smaller pieces so I can go through | 14:19 |
| 5 | it as my attorney suggested? | 14:19 |
| 6 | MS. ROBERTS:  Yes.  Let me try. | 14:19 |
| 7 | Q   Did Uber receive the final due diligence | 14:19 |
| 8 | report from Stroz before deciding whether it would | 14:19 |
| 9 | agree to the indemnity provision that Mr. Levandowski | 14:19 |
| 10 | and Mr. Ron were requesting? | 14:19 |
| 11 | A   I don't know for sure.  I never received a | 14:19 |
| 12 | copy of any of the reports. | 14:19 |
| 13 | Q   So, you have never seen the Stroz report? | 14:19 |
| 14 | A   Not that I recall. | 14:19 |
| 15 | Q   Okay.  Was there -- I understand there was a | 14:19 |
| 16 | data room in the context of this acquisition, where | 14:19 |
| 17 | documents were -- were put in for due diligence | 14:20 |
| 18 | purposes? | 14:20 |
| 19 | Are you aware of that? | 14:20 |
| 20 | A   Vaguely.  I mean, it's very typical in an M&A | 14:20 |
| 21 | deal to have a data room. | 14:20 |
| 22 | Q   In your role, do you review the due diligence | 14:20 |
| 23 | documents that are shared in the data room? | 14:20 |
| 24 | A   I very rarely review them.  I rely on either | 14:20 |
| 25 | people on my team or the attorneys, as the case may | 14:20 |

Page 233

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 15 of 28

| 1 | number of conditions, including a $100 million | 15:59 |
| 2 | potential litigation, something to that effect. | 15:59 |
| 3 | At this point in the term sheet, we just | 15:59 |
| 4 | merely put a placeholder and called it super duper. | 15:59 |
| 5 | Q   So, super duper litigation at the time of the | 15:59 |
| 6 | term sheet was intended to refer to litigation against | 15:59 |
| 7 | Otto or -- yeah, against Otto that was more than a | 15:59 |
| 8 | minor litigation? | 15:59 |
| 9 | A   I'm not sure whether it was against Otto or | 15:59 |
| 10 | against us.  I would have to read the documents | 15:59 |
| 11 | carefully and -- | 15:59 |
| 12 | Q   Okay. | 15:59 |
| 13 | A   -- refresh my memory.  But it's certainly | 15:59 |
| 14 | referring to litigation in general that was more than | 15:59 |
| 15 | minor. | 15:59 |
| 16 | Q   Okay.  And so you said that Otto was | 15:59 |
| 17 | concerned.  It didn't want Uber to be able to back out | 15:59 |
| 18 | of the deal based on litigation that was not, quote, | 16:00 |
| 19 | super duper litigation? | 16:00 |
| 20 | A   I mean, both sides in any transaction are | 16:00 |
| 21 | concerned to make sure that once they have a signed | 16:00 |
| 22 | deal, the other side has little possibility of walking | 16:00 |
| 23 | away, and we -- and -- and your side has as much | 16:00 |
| 24 | possibility; right?  It's just retaining flexibility. | 16:00 |
| 25 | They didn't want us to be able to walk away based on, | 16:00 |

Page 309

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 16 of 28

| | | |
|---|---|---|
| 1 | you know, minor litigation. | 16:00 |
| 2 | Q   And so the -- the portion that I just read to | 16:00 |
| 3 | you, where it says super duper litigation, it says: | 16:00 |
| 4 | "To be defined in definitive documentation." | 16:00 |
| 5 | Was super duper litigation ever defined in | 16:00 |
| 6 | documentation? | 16:00 |
| 7 | A   I don't know whether we retained that defined | 16:00 |
| 8 | term, but we certainly retained the concept.  And, in | 16:00 |
| 9 | the definitive documentation, as I just referenced, | 16:00 |
| 10 | there are a set of conditions that would allow us to | 16:00 |
| 11 | walk away from the deal. | 16:00 |
| 12 | Q   And, would that be in the merger and | 16:00 |
| 13 | acquisition agreement? | 16:00 |
| 14 | A   Yeah, the merger and acquisition agreement; | 16:01 |
| 15 | correct. | 16:01 |
| 16 | Q   But, it may not be referred to as super duper | 16:01 |
| 17 | litigation in that document? | 16:01 |
| 18 | A   I don't recall what we referred to it as.  I | 16:01 |
| 19 | think that term may have gone away. | 16:01 |
| 20 | Q   At the time of the term sheet, was Uber | 16:01 |
| 21 | concerned about super duper litigation as a result of | 16:01 |
| 22 | its transaction with Otto? | 16:01 |
| 23 | MR. JACOBS:  Again, you can answer that -- | 16:01 |
| 24 | the question to the extent you personally had some | 16:01 |
| 25 | understanding of litigation risks, but not in -- but | 16:01 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | you really can't answer on behalf of the company. | 16:01 |
| 2 | THE WITNESS: Right. | 16:01 |
| 3 | Yeah, I mean, me personally, I wouldn't say I | 16:01 |
| 4 | was concerned. Concern implies worry. But obviously, | 16:01 |
| 5 | there were many things we wanted to do to protect | 16:01 |
| 6 | Uber; right? Which is why we put various conditions | 16:01 |
| 7 | in. | 16:01 |
| 8 | Just having a condition there doesn't mean | 16:01 |
| 9 | you were worried something is going to happen. I have | 16:01 |
| 10 | fire insurance on my home, but I'm not concerned that | 16:01 |
| 11 | it's going to burn down. I just want to make sure | 16:01 |
| 12 | that, if something happens, I'm protected. It was | 16:01 |
| 13 | similar here. | 16:02 |
| 14 | MS. ROBERTS: Q. If you'd turn to page 4. | 16:02 |
| 15 | A (Witness complies.) | 16:02 |
| 16 | Uh-huh. | 16:02 |
| 17 | Q And we're still on the "Put Call Closing | 16:02 |
| 18 | Condition" section. In the second-to-last bullet | 16:02 |
| 19 | point on the page, can you take a minute to review | 16:02 |
| 20 | that. | 16:02 |
| 21 | A Is that the one beginning "unless mutually | 16:02 |
| 22 | agreed by the parties"? That one? | 16:02 |
| 23 | Q Yes. | 16:02 |
| 24 | A Okay. | 16:02 |
| 25 | (Witness reading document.) | 16:02 |

Page 311

Case: 20-30242    Doc# 948    Filed: 03/31/22    Entered: 03/31/22 11:54:43    Page 18 of 28

1           Okay.                                           16:02

2      Q    What was the purpose of this provision?        16:02

3      A    This goes back to what we've been talking      16:02

4  about all along, which is we -- it was a talent deal.   16:02

5  We wanted to get more talent rather than less.  As      16:03

6  much as we loved Anthony and Lior, we didn't want to    16:03

7  just hire two people.  We wanted to get at least 25.    16:03

8          So, this is ensuring that they have 25, but    16:03

9  the 25 includes key employees, and that those           16:03

10 employees all sign our standard form, the CIAA or        16:03

11 whatever we call it, to make sure they're not bringing   16:03

12 any, you know, third-party or proprietary information    16:03

13 to Uber.                                                 16:03

14     Q    Who were the key employees?                     16:03

15     A    They've not been defined as of this date.       16:03

16 I'm not even sure -- I don't recall whether they were    16:03

17 defined as of the date of signing the definitives.      16:03

18          But, it was a group of, I believe, up to       16:03

19 five employees that were alongside Anthony and Lior,     16:03

20 like, the -- you know, the most significant employees    16:03

21 in the company in Otto.                                  16:03

22     Q    So, as of the term sheet that we're looking    16:03

23 at that's Exhibit 81, we're still not talking about --   16:03

24 at least from Uber's point of view, not talking about    16:03

25 specific individuals?                                    16:03

Veritext Legal Solutions
866 299-5127

# Exhibit F

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3             SAN FRANCISCO DIVISION
 4
 5   In re:                      ) Bankruptcy Case No.
                                 ) 20-30242 (HLB)
 6   ANTHONY SCOTT LEVANDOWSKI,   ) Chapter 11
                                 )
 7   Debtor.                     )
     _____)
 8                               ) Adv. Pro. No.
     ANTHONY LEVANDOWSKI, an      ) 20-03050 (HLB)
 9   individual,                 )
                                 )
10              Plaintiff,       )
                                 )
11              vs.              )
                                 )
12   UBER TECHNOLOGIES, INC.,     )
                                 )
13              Defendant.       )
     _____)
14
15
16        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
17   UBER TECHNOLOGIES, INC. THROUGH ITS 30(B)(6) WITNESS
18                CAMERON POETZSCHER
19            Tuesday, January 26, 2021
20                  Volume I
21          *** ATTORNEYS' EYES ONLY ***
22   Reported by:
     CARLA SOARES
23   CSR No. 5908
24   Job No. 4429738
25   Pages 1 - 225

                                        Page 1
```

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5   In re:                        )  Bankruptcy Case No.
                                   )  20-30242 (HLB)
 6   ANTHONY SCOTT LEVANDOWSKI,    )  Chapter 11
                                   )
 7   Debtor.                       )
     _____ )
 8                                 )  Adv. Pro. No.
     ANTHONY LEVANDOWSKI, an       )  20-03050 (HLB)
 9   individual,                   )
                                   )
10              Plaintiff,         )
                                   )
11                 vs.             )
                                   )
12   UBER TECHNOLOGIES, INC.,      )
                                   )
13              Defendant.         )
     _____ )
14
15
16          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
17   UBER TECHNOLOGIES, INC. THROUGH ITS 30(B)(6) WITNESS
18   CAMERON POETZSCHER, Volume I, taken on behalf of
19   Plaintiff, beginning at 9:12 a.m., and ending at
20   4:21 p.m., on Tuesday, January 26, 2021, before
21   CARLA SOARES, Certified Shorthand Reporter No. 5908.
22
23
24
25
                                            Page  2
```

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 22 of 28

1   APPEARANCES VIA VIDEOCONFERENCE:

2

3   For the Plaintiff:

4           GOODWIN PROCTER LLP

5           BY:  RACHEL M. WALSH, Attorney at Law

6           BY:  THERESA ANN SUTTON, Attorney at Law

7           Three Embarcadero Center

8           San Francisco, California 94111

9           415.733.6000

10          rwalsh@goodwinlaw.com

11          tsutton@goodwinlaw.com

12

13

14  For the Defendant:

15          JENNER & BLOCK, LLP

16          BY:  DAVID J. BRADFORD, Attorney at Law

17          BY:  CHRISTIAN PLUMMER, Attorney at Law

18          353 N. Clark Street

19          Chicago, Illinois 60654

20          312.222.9350

21          dbradford@jenner.com

22          cplummer@jenner.com

23

24

25

                                          Page  3

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 23 of 28

1    APPEARANCES VIA VIDEOCONFERENCE (Continued):

2

3    For the Intervenor Google, LLC:

4              KEKER, VAN NEST & PETERS LLP

5              BY:  REID MULLEN, Attorney at Law

6              BY:  W. HAMILTON JORDAN, Attorney at Law

7              633 Battery Street

8              San Francisco, California 94111

9              415.391.5400

10             rmullen@keker.com

11             wjordan@keker.com

12

13

14   ALSO PRESENT:  Anthony Levandowski, Plaintiff

15                  Randall Haimovici, Uber In-House

16                  Counsel

17                  Ann O'Regan, Uber In-House Counsel

18                  Carlos Velasquez, Video Operator

19                  Stephen Hilton, Replacement Video

20                  Operator

21

22                      --o0o--

23

24

25

                                        Page  4

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 24 of
28

1    waited, you know, the more risk there was we          11:56:40

2    wouldn't get to do the deal, number one; number two,

3    obviously the longer we had to wait to get the

4    benefit of their talent to contribute to our

5    autonomous efforts.                                    11:56:49

6            So we certainly wanted to move fast.  And

7    I remember discussing it with both of them, you

8    know, on various occasions.  I don't know about this

9    particular date.

10       Q   And then the second sentence in Ms. Qi's       11:57:03

11   e-mail says, "All diligence and documentation need

12   to be completed and finalized by the week of 3-21."

13           Do you see that?

14       A   Yes.

15       Q   Was that a deadline that was set by Uber?      11:57:23

16           MR. BRADFORD:  Objection.  Foundation.

17           THE WITNESS:  Yeah.  I mean, again, I

18   don't know if it's a deadline.  I think it was more

19   of an aspiration.

20           I don't know who it came from necessarily,     11:57:38

21   but if Nina is e-mailing Lior, it may have come from

22   us.

23           We certainly understood she shared our

24   objective to want to move quickly, so I don't know

25   for sure, but it may have come from us.                11:57:51

Page 88

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 25 of
28

```
 1    BY MS. WALSH:                                    11:57:53

 2        Q    And as part of the due diligence process,

 3    Uber and the parties retained Stroz Friedberg,

 4    correct?

 5        A    Yes.                                      11:58:19

 6        Q    And they were to perform essentially

 7    forensic due diligence on Mr. Levandowski and the

 8    other employees, correct?

 9        A    Forensic and more general diligence, yes.

10        Q    And did Uber intend that the due diligence   11:58:46

11    performed by Stroz be completed by this March 21st

12    date in this e-mail?

13             MR. BRADFORD:  Objection.  Foundation,

14    scope.

15             THE WITNESS:  Yeah.  I mean, again, I        11:59:02

16    didn't send the e-mail, and I can't recall five

17    years later exactly what we had in mind.

18             I do know that in general, you know, as I

19    said, first of all, we wanted to move as fast as

20    possible.                                            11:59:11

21             But second of all, we didn't want to sign

22    a deal or commit ourselves to a deal until we were,

23    you know, 100 percent comfortable the deal made

24    sense for us generally, and also that we had, you

25    know, sufficient assurance that we weren't taking    11:59:21
```

1    undue risk of litigation from either Google or          11:59:24

2    from -- you know, directly against us or against

3    Anthony that we'd have to indemnify them for, right?

4         As I said, you can never be 100 percent

5    protected that you won't even get sued, but we          11:59:37

6    wanted to make sure that if we did get sued, we felt

7    comfortable we would win.

8    BY MS. WALSH:

9         Q    And was Stroz's investigation completed by

10   the time the deal was finalized?                         12:00:22

11        MR. BRADFORD:  Object to form.

12   Foundation.

13        Have we with switched topics at this

14   point?

15        MS. WALSH:  I mean, this is relevant to             12:00:36

16   Topic 1.  It may also be relevant to Stroz's

17   investigation.

18        MR. BRADFORD:  Thank you.

19        THE WITNESS:  When you say -- can you

20   repeat the question, please, actually, Rachel?          12:00:56

21        Sorry.  Can you repeat the question,

22   please?

23   BY MS. WALSH:

24        Q    Sure.

25        Was Stroz's investigation completed by the         12:01:13

Page 90

```
 1   time the deal to acquire Otto was finalized?        12:01:15

 2            MR. BRADFORD:  Object to form.

 3            THE WITNESS:  I'm not sure what you mean

 4   by "finalized."  Do you mean by -- signed?

 5   BY MS. WALSH:                                        12:01:28

 6        Q   Signed.  Yes.

 7        A   Right.  So that would be April 11th when

 8   we signed the definitive docs.  So no, it wasn't

 9   100 percent complete.

10            They had collected all of Anthony's         12:01:41

11   devices, or what he purported to be all of his

12   devices, and they had done the same for the other

13   diligenced employees, and also completed their

14   preliminary -- completed their interviews of those

15   people, and then completed some preliminary forensic  12:01:55

16   analysis using, you know, some of the keywords that

17   they got either from us or from Anthony's

18   interviews.  But the process wasn't 100 percent

19   complete.

20        Q   What information did Stroz provide to Uber   12:02:19

21   prior to the closing of the deal?

22            MR. BRADFORD:  Object to form.

23   Foundation.

24            THE WITNESS:  They didn't provide the

25   final report because that didn't come until later.    12:02:31
```

Page 91