**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (SBN 151445)
*TKeller@kbkllp.com*
DARA L. SILVEIRA (SBN 274923)
*DSilveira@kbkllp.com*
650 California Street, Suite 1900
San Francisco, California 94108
Tel.: (415) 496-6723
Fax: (650) 636-9251

BRETT SCHUMAN (SBN 189247)
*BSchuman@goodwinlaw.com*
JENNIFER BRIGGS FISHER (SBN 241321)
*JFisher@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero
San Francisco, California 94111
Tel.: (415) 733-6000
Fax.: (415) 677-9041

*Attorneys for Anthony S. Levandowski Debtor and Debtor in Possession*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>Debtor. | Bankruptcy Case<br>No. 20-30242 (HLB)<br>Chapter 11<br><br>**REPLY IN SUPPORT OF MOTION TO (I) DETERMINE TAX EFFECT OF SETTLEMENT PAYMENT OR, IN THE ALTERNATIVE, (II) FIND THE DEBTOR'S PLAN FEASIBLE WITHOUT RESERVING FOR TAXES THEREON (IRS/FTB)**<br><br>Date: April 21, 2022<br>Time: 11:00 a.m. (Pacific Time)<br>Place: (Tele/Video Appearances Only)<br>United States Bankruptcy Court<br>Courtroom 19, 16th Floor<br>San Francisco, CA 94102 |

# TABLE OF CONTENTS

Page

I.  THIS COURT HAS JURISDICTION TO GRANT THE RELIEF SOUGHT BY DEBTOR AND NEITHER TAXING AUTHORITY PRESENTS A COMPELLING ARGUMENT OTHERWISE. ............................................................ 2

II. IRS'S FAILURE TO REBUT DEBTOR'S MOTION IS WITHOUT EXCUSE. ............ 5

III. THE FTB'S ATTEMPTS TO CHARACTERIZE THE UBER SETTLEMENT PAYMENT AS TAXABLE GROSS INCOME MUST FAIL. ........................................ 6

    A.  THE FTB FAILS TO REBUT DEBTOR'S DEMONSTRATION THAT THE UBER SETTLEMENT PAYMENT IS NOT GROSS INCOME. ................. 7

        1.  THE UBER SETTLEMENT PAYMENT IS ANALOGOUS TO AN INSURANCE PAYMENT .................................................................. 7

            A.  INSURANCE RISK ............................................................ 8

            B.  RISK-DISTRIBUTING ...................................................... 9

        2.  THE TAX BENEFIT RULE APPLIES. ........................................ 11

        3.  DEDUCTIBLE REIMBURSEMENT ALSO APPLIES. ................ 11

        4.  WORKING CONDITION FRINGE ALSO APPLIES............................. 12

    B.  FTB'S CHARACTERIZATIONS PURPORTEDLY GIVING RISE TO GROSS INCOME FAIL. ...................................................................... 14

        1.  THE FTB IDENTIFIES NO AUTHORITY THAT THE PAYMENT IS TAXABLE COMPENSATION. ..................................... 14

        2.  NOT ALL CONSIDERATION IS TAXABLE. ................................. 14

        3.  THE FTB TAKES NO POSITION ON CONTINGENT LIABILITY. ..................................................................................... 15

IV. CONCLUSION. ..................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allis-Chalmers Corp. v. Goldberg (In re Hartman Material Handling Sys.)*,
 141 B.R. 802 (Bankr. S.D.N.Y. 1992) ...................................................................... 3

*Almont Ambulatory Surgery Ctr., LLC v. Int'l Longshore*,
 No. CV-14-02177, 2016 WL 10518905 (C.D. Cal. July 29, 2016) ........................... 6

*In re Amoskeag Bank Shares, Inc.*,
 215 B.R. 1 (Bankr. D.N.H. 1997), *rev'd on other grounds*, 239 B.R. 653
 (D.N.H. 1998) ............................................................................................................ 3

*Avrahami v. Comm'r*,
 149 T.C. 144 (2017) ................................................................................................... 9

*Bayley v. Comm'r*,
 69 T.C. 234 (1977) ................................................................................................... 13

*C.I.R. v. Glenshaw Glass Co.*,
 348 U.S. 426 (1955) ................................................................................................. 15

*Caylor Land & Dev., Inc. v. Comm'r*,
 121 T.C.M. (CCH) 1205 (T.C. 2021) ..................................................................... 10

*Colautti v. Franklin*,
 439 U.S. 379 (1979) ................................................................................................... 2

*Cook v. Comm'r*,
 269 F.3d 854 (7th Cir. 2001) ................................................................................... 13

*Epmeier v. U.S.*,
 199 F.2d 508 (7th Cir 1952) ...................................................................................... 8

*Hillsboro Nat. Bank v. Commissioner*,
 460 U.S. 370 (1983) ................................................................................................. 11

*Huff v Comm'r*,
 80 T.C. 804 (1983) ................................................................................................... 15

*Humana Inc. v. Comm'r*,
 881 F.2d 247 (6th Cir. 1989) ..................................................................................... 9

*Internal Revenue Service v. Sulmeyer (In re Grand Chevrolet, Inc.)*,
 153 B.R. 296 (C.D. Cal 1995) ................................................................................ 2, 3

*Kilen v. United States (In re Kilen),*
    129 B.R. 538 (Bankr. N.D. Ill. 1991) ................................................................. 3

*In re Moonlight Basin Ranch LP,*
    No. 09-62327-11, 2012 WL 168239 (Bkrtcy. D.Mont. Jan. 09, 2012) ................... 6

*Old Colony Tr. Co. v. Comm'r,*
    279 U.S. 716 (1929) ..................................................................................... 14, 15

*R.V.I. Guar. Co. & Subsidiaries v. Comm'r,*
    145 T.C. 209 (2015) ......................................................................................... 10

*Schwartz v. Gardiner (In re Schwartz),*
    192 B.R. 90 (Bankr. N.J. 1996) ........................................................................ 3

*Scofield v. Comm'r,*
    T.C.M. (RIA) 1997-547 ...................................................................................... 13

*Solar-Doherty v. Foott,*
    No. 15-CV-01395-MEJ, 2015 WL 4606517 (N.D. Cal. July 15, 2015) ................... 6

*United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.),*
    261 B.R. 800 (1st Cir. BAP 2001) ..................................................................... 4

*Zurich Am. Ins. Co. v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.),*
    371 B.R. 210 (E.D. Ky. 2007) ........................................................................... 4

**Statutes**

11 U.S.C. 505 ....................................................................................................... 3

11 U.S.C. § 505(a) ............................................................................................. 2, 4

11 U.S.C. § 505(b) ............................................................................................. 2, 4

26 U.S.C. § 62 ...................................................................................................... 7

26 U.S.C. § 83 ...................................................................................................... 7

26 U.S.C. § 162(a) .......................................................................................... 12, 15

26 U.S.C. § 162(f) ............................................................................................... 15

28 U.S.C. § 157(b)(2) ........................................................................................... 5

45 TAX LAW. 971, 977 and 1013-1016 (1992) ....................................................... 3

**Other Authorities**

I.R.S. P.L.R. 201101029 (Jan. 7, 2011) ................................................................. 8

Oei, *Rethinking the Jurisdiction of Bankruptcy Courts Over Post-Confirmation Federal Tax Liabilities: Towards a New Jurisprudence of 11 U.S.C. 505*, 19 AKRON TAX J. 49 (2004) ........................................................................................ 3

Haber, *Federal Tax Issues in Bankruptcy Reorganizations: What Role Should Bankruptcy Courts Have in Declaring the Federal Income Tax Liability of Debtors and the Federal Income Tax Consequences of Chapter 11 Plans of Reorganization*, 3 ABI L.J. 407 (Winter 1995) ......................................................... 3

Jacobs, *The Bankruptcy Court's Emergence as Tax Dispute Arbiter of Choice*, 45 TAX LAW. 971 (1992) .................................................................................................. 3

Revenue Ruling, 79-208, 1972-2 C.B. 79 ...................................................................... 13

Revenue Ruling 80-211, 1980-2 C.B. 57 ...................................................................... 13

Treasury Regulation 1.132-5(r)(4) ................................................................................. 13

Anthony Scott Levandowski, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), files this Reply in support of Debtor's Motion To (I) Determine Tax Effect Of Settlement Payment Or, In The Alternative, (II) Find The Debtor's Plan Feasible Without Reserving For Taxes Thereon (the "Motion").[1] Following Debtor's service of the Motion on the Internal Revenue Service (the "IRS") and the California Franchise Tax Board (the "FTB"), the United States Tax Division (on behalf of the IRS) and FTB filed their oppositions to the Motion (Dkt. No. 952 (the "IRS Opposition") and Dkt. No. 953 (the "FTB Opposition") respectively) on April 1, 2022. The IRS and FTB have presented no justification to deny the relief sought in Debtor's Motion.

The Debtor's motion should be granted. Neither opposition provides any basis to deny the requested relief. The IRS Opposition relies primarily on the argument that the Court does not have jurisdiction to decide the Motion, in part because there is purportedly "no actual controversy to adjudicate." *Id.* at 5. The IRS also argues that it would be premature for the Court to make a feasibility determination, yet then asserts that the Plan is not feasible without a tax reserve. *Id.* at 8-9. Despite the IRS's claim that the Plan is not feasible, the IRS does not raise any substantive disagreement with Debtor's position that the Uber Settlement Payment is not taxable gross income.

The FTB Opposition also argues that the tax dispute here is too premature for the Court to decide. But in a tacit acknowledgment that the controversy is ripe and that the Court can make the determinations requested in the Motion, the FTB argues that it should be allowed to investigate and take discovery of the issue presented by the Motion, and that the Motion insufficiently demonstrates that Uber Settlement Payment is not gross income. Unlike the IRS, the FTB engages on the merits of the tax arguments presented in Debtor's Motion. As demonstrated below, the FTB's arguments are unavailing and should be rejected.

The controversy here is sufficiently ripe, and the Court should find either (1) that the Uber Settlement Payment is not taxable as gross income under the United States Tax Code or the California Tax Code, or (2) the Plan is feasible without reserving for Federal or California taxes.

---

[1] Unless otherwise specified, capitalized terms have the meaning ascribed to them in the Motion.

**I.      THIS COURT HAS JURISDICTION TO GRANT THE RELIEF SOUGHT BY DEBTOR AND NEITHER TAXING AUTHORITY PRESENTS A COMPELLING ARGUMENT OTHERWISE.**

The IRS and FTB both argue that no authority exists for the Court to consider the Motion: "because no tax return has been filed, there is no actual controversy to adjudicate."   IRS Opp. at 5; *see also* FTB Opp. at 8-9.  This is an extreme and unprecedented interpretation of 11 U.S.C. § 505(a) that, if accepted, would hinder this Court's authority to finalize a reorganization plan, would prevent bankruptcy courts from confirming a plan before a tax return is filed without potentially imposing a large tax reserve, and finds no support in the statute, case law or in logic.

Section 505(a) is broadly drafted, allowing a bankruptcy court to determine both "the amount *or* legality" of a "*any* tax . . . or *addition to tax* . . . whether or not previously assessed." *Id.* (emphasis added).  There is no reference to a tax return or requirement that a tax return be filed before a bankruptcy court can make a section 505(a) determination.  In contrast, the very next subsection, section 505(b), provides a specific procedure for comprehensive tax determinations *after* the submission "of a tax return."  11 U.S.C. § 505(b).  Had Congress intended that both subsections of 505 be limited to circumstances in which a tax return already has been filed, much of the language in section 505(b) would be redundant and superfluous.  *See Colautti v. Franklin,* 439 U.S. 379, 392 (1979) ("Appellants' argument . . . would make either the first or the second condition redundant or largely superfluous, in violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."); *see also Goldblatt Bros., Inc.*, 106 B.R. 522, 533 (Bankr. N.D. Ill. 1989) ("there is simply no firm authority to support the argument that failure to invoke § 505(b) precludes this Court from hearing a dispute which is within its jurisdiction under § 505(a)(1)").  Indeed, the very treatise that the IRS cites for the proposition that section 505(a) motions may only be based upon a filed tax return flatly contradicts the IRS, explaining specifically that "[i]t is unclear whether a tax return must be filed before the bankruptcy court may hear a section 505(a) motion to determine tax liability."  11 *Collier on Bankruptcy* PTX 5.04 at 2[b] (16th ed. 2022); *see also Internal Revenue Service v. Sulmeyer (In re Grand Chevrolet, Inc.),* 153 B.R. 296, 300 (C.D. Cal 1995) ("this preliminary dispute may develop into a tax liability controversy and, at that point,

2

*even if the Trustee has yet to file a tax return*, section 505 will vest the Bankruptcy Court with jurisdiction over it") (emphasis added); *In re Amoskeag Bank Shares, Inc.*, 215 B.R. 1, 3 (Bankr. D.N.H. 1997), *rev'd on other grounds*, 239 B.R. 653 (D.N.H. 1998) (directly rejecting argument by IRS "that there is no tax to determine until and unless a tax return is filed").

In fact, the *Collier's* treatise focuses not on the existence of a filed tax return but, instead, on the core question of whether an actual controversy exists. 11 *Collier on Bankruptcy* PTX 5.04 at 2[b] (discussing *Grant Chevrolet* and the absence of an actual controversy). While there are cases in which a court has found that there was no justiciable issue,[2] including those cited by the IRS, commentators contrast such cases against the precise circumstance presented here—a Plan for which feasibility turns on a tax determination. *See generally* Mot. at 5 (citing *Schwartz v. Gardiner (In re Schwartz)*, 192 B.R. 90, 94 (Bankr. N.J. 1996); *Kilen v. United States (In re Kilen)*, 129 B.R. 538, 548 (Bankr. N.D. Ill. 1991)); Oei, *Rethinking the Jurisdiction of Bankruptcy Courts Over Post-Confirmation Federal Tax Liabilities: Towards a New Jurisprudence of 11 U.S.C. 505*, 19 AKRON TAX J. 49, 64 (2004); Jacobs, *The Bankruptcy Court's Emergence as Tax Dispute Arbiter of Choice*, 45 TAX LAW. 971, 977 and 1013-1016 (1992)); *see also* Haber, *Federal Tax Issues in Bankruptcy Reorganizations: What Role Should Bankruptcy Courts Have in Declaring the Federal Income Tax Liability of Debtors and the Federal Income Tax Consequences of Chapter 11 Plans of Reorganization*, 3 ABI L.J. 407, 430-331 (Winter 1995) ("[T]he impact of the federal income tax consequences of the proposed reorganization plan is one of the 'related matters' that the bankruptcy court must consider in finding that confirmation of the plan will not likely be followed by the need for further financial reorganization. . . . [T]he bankruptcy court must inherently make a determination under section 1129(a)(11) that any adverse tax consequences resulting from confirmation of the plan or events beyond confirmation are not so great as to jeopardize the success of the postconfirmation company.").

Here, both the IRS and FTB concede there is an actual controversy. The IRS demands a

---

[2] *See Grand Chevrolet*, 153 B.R. at 300 (court lacks authority to resolve "preliminary dispute" over filing consolidated returns until a "tax liability controversy" arises); *Allis-Chalmers Corp. v. Goldberg (In re Hartman Material Handling Sys.)*, 141 B.R. 802, 813 (Bankr. S.D.N.Y. 1992) (declining to make a "general ruling on . . . post-confirmation tax effects" under section 505 where the debtor did "not request a specific ruling on a particular transaction").

tax reserve; the FTB similarly asks that the Court "estimate the amount of taxes owing to FTB for the 2022 year is no less than $21,984,739.06." *See* IRS Opp. at 8 ("The Plan Is Not Feasible Without a Tax Reserve"); FTB Opp. at 7-8. Indeed, while suggesting discovery, the FTB does not identify what investigation is needed or what discovery it must have to address these issues. Given the simple factual predicate and the undisputed nature of the findings proposed by Debtor, that is not surprising. And as for the IRS, rather than address the substance of the Motion, it instead suggests that the Debtor must first file a tax return or returns on Form 1040 or 1041. But this only underscores why Congress enacted section 505 and why the Court can, and should address the Motion now—if the IRS's construction of section 505(a) was correct, which it is not, the substantive feasibility of the Plan could not be considered by this Court unless, and until, the Debtor (1) first filed his tax return, then (2) ran up administrative expenses from two to six months while awaiting the IRS's decision whether to examine the return under section 505(b), and thereafter (3) litigated with the IRS if it disagreed with the Debtor's position. Such a regime would excessively and repeatedly delay bankruptcy courts from confirming plans anytime those plans have any sizable amount of potential tax. The Debtor has not located a single case limiting section 505(a) in this manner, nor has the IRS or the FTB cited one.

As for the FTB, the thrust of its argument is that it does not wish to be bound by "prejudicial *res judicata*." FTB Opp. at 8:15. Thus, in lieu of resolving the Motion's request to definitively determine either whether the Uber Settlement Payment gives rise to gross income or find the Plan feasible, the FTB asks the Court to "estimate" the Debtor's liability at nearly $22 million using section 502(c). FTB Opp. at 7-8. By asking the Court to estimate its tax claim, the FTB impliedly concedes that the Court has jurisdiction over the tax question. Yet, section 502(c) estimation is unavailable to resolve postpetition tax claims as a matter of law. *United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.)*, 261 B.R. 800, 810 (1st Cir. BAP 2001) (section 505(a), not section 502(c), is the appropriate section to invoke in determining postpetition tax claims); *see also Zurich Am. Ins. Co. v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 371 B.R. 210, 233-34 (E.D. Ky. 2007) (§ 502(c) cannot be used to determine administrative claims under section 503). Section 505(a) is the proper statutory authority upon

which the Court should base its ruling. Indeed, even if this Court were able to estimate the claim under section 502(c), it would need to make a determination about the amount and validity of tax claims arising out of the Uber Settlement Payment. FTB's request for estimation, then, is less about the procedural vehicle than its desire that its rights be preserved by a $22 million reserve, which far surpasses the Debtor's liability to the State of California in any circumstance.

Finally, both the IRS and the FTB argue that setoff rights are preserved under section 553 of the Bankruptcy Code and cannot therefore be challenged. IRS Opp. at 9; FTB Opp. at 20. This argument ignores section 553(a)(1), which provides that setoff rights—like the "counterclaim" rights the IRS seeks to preserve—are *not* preserved if "the claim of such creditor against the debtor is disallowed." Thus, sections 502(b), 503, and 506 all provide an additional basis for this Court's jurisdiction: consideration of rights that the Taxing Authorities attempt to reserve in their claims. *See* 28 U.S.C. § 157(b)(2).

## II. IRS'S FAILURE TO REBUT DEBTOR'S MOTION IS WITHOUT EXCUSE.

Other than summarily contesting the Plan's feasibility (IRS Opp. at 8-9), the IRS fails to substantively respond to Debtor's arguments in the Motion (*id.* at 4 (noting the IRS Opp. is "of necessity incomplete")), including all of the ways Debtor has demonstrated why the Uber Settlement Payment should not result in gross income. The IRS appears to excuse its failure as "necess[ary]" and, in an attempt to justify its failure to respond, lists several facts about when the IRS received versions of the Motion to demonstrate why its failure to respond was necessary. *Id.* In doing so, it acknowledges that the agency did not even assign staff to address the Motion until twelve days after it was served. *See id.* In any event, the IRS's excuses are inadequate.

*First*, the IRS had notice of the this matter as of February 10, 2022 when the motion proposing settlement was filed. Dkt. No. 838 (certificate of service for Global Settlement).

*Second*, the March 18, 2022 version of the Motion that was more than sufficient for the IRS to begin working on its opposition. The Motion redacted only a handful of lines of the brief; none of which included Debtor's substantive arguments. *See* Dkt. Nos. 920 and 924.

*Third*, the IRS's apparent complaint that it lacked Exhibit A is also unpersuasive. Debtor served Exhibit A at the IRS's mail notice address on March 21. *See* Dkt. No. 924.

5

*Fourth*, the fact that the IRS's attorneys were only assigned to the case on March 30 is not a good reason for ignoring the scheduling order. Debtor was in contact with numerous IRS and DOJ attorneys between the IRS's receipt of the motion on March 18, and the purported March 30 assignment. Keller Decl. at ¶¶ 3-11 (reflecting records of communications between numerous IRS and government representatives and Debtor's attorneys about the Motion, including Aixa Kassim, a bankruptcy specialist in the IRS's Insolvency Group, on the 21st and 24th of March 2022; and Assistant U.S. Attorney Shining Hsu on March 29, 2022). The IRS provides no explanation for the twelve-day delay between receipt of the motion and final assignment of the case. The IRS also provides no explanation for why the Court, the Debtor, and the creditors desiring the conclusion of this matter should bear the burden of the IRS's failure to assign the case for so long. *See Almont Ambulatory Surgery Ctr., LLC v. Int'l Longshore*, No. CV-14-02177, 2016 WL 10518905, at *4 (C.D. Cal. July 29, 2016) (finding that plaintiff had "no excuse" for waiting to seek new counsel when it caused the exigency in the first place).

*Fifth*, the IRS's excuse that it lacked adequate opportunity to respond is subverted by the fact that the FTB filed the FTB Opposition engaging on the merits of the Motion.

*Finally*, even if the IRS had valid excuses (it does not), the correct approach is not to simply ignore the scheduling order. When the Department of Justice tax attorneys received this assignment on March 30, counsel could have requested more time from the Court to respond. *Solar-Doherty v. Foott*, No. 15-CV-01395-MEJ, 2015 WL 4606517, at *2 (N.D. Cal. July 15, 2015), report and recommendation adopted, No. 15-CV-01395-JD, 2015 WL 4606539 (N.D. Cal. July 31, 2015) (finding that plaintiffs' failure to respond to the order to file a voluntary dismissal by the deadline followed by their failure to respond to the court's show cause order supported an order of dismissal); *see also In re Moonlight Basin Ranch LP*, No. 09-62327-11, 2012 WL 168239 at *1 (Bkrtcy. D.Mont. Jan. 09, 2012) (granting motion after failure to respond).

### III. THE FTB'S ATTEMPTS TO CHARACTERIZE THE UBER SETTLEMENT PAYMENT AS TAXABLE GROSS INCOME MUST FAIL.

In addressing the four characterizations of the Uber Settlement Payment presented in Debtor's Motion, the FTB tacitly acknowledges that if the payment falls under one of them, then

it is not gross income.[3] *See* FTB Opp. at 15-17 (not disputing that insurance payments are not taxable), 17 (a taxpayer need not include amounts recovered for loss under the tax benefit rule), 17 ("a working condition fringe is excluded from gross income"), 19 (not disputing that 26 U.S.C. § 62 payments are deductible). As explained below, the FTB fails to provide sufficient grounds to reject any of Debtor's characterizations or to deny the relief sought by Debtor.[4]

However, the FTB also presents characterizations of its own to advance its unsupported conclusion that the Indemnification Agreement and Uber Settlement Payment "appear[s] to be taxable as gross income." FTB Opp. at 9. To support that conclusion, the FTB claims that the payment is so taxable under three alternative characterizations: (1) compensation, (2) consideration, or (3) contingent liability. *Id.* at 12-14. If the Court were to entertain any of these characterizations, as demonstrated below, they all fail.

The Court should find that the Uber Settlement Payment does not give rise to gross income or make the necessary factual findings to deem the Plan feasible.

### A. The FTB Fails To Rebut Debtor's Demonstration That The Uber Settlement Payment Is Not Gross Income.

Given that both Debtor and the FTB agree[5] that there is no directly applicable guidance as to whether the Uber Settlement Payment can be considered gross income, the Court can reach a decision using analogy. As explained in Debtor's Motion, there are four characterizations similar enough to the Uber Settlement Payment for the Court to conclude that the payment does not result in gross income or for the Court conclude that the Plan is feasible.

### 1. The Uber Settlement Payment Is Analogous To An Insurance Payment.

The Motion demonstrated how the Indemnification Agreement and resulting Uber

---

[3] The FTB also admits that (1) Congress intended to tax all gains "except those specifically exempted" (FTB Opp. at 10), and (2) that there is no statute directly applicable to the Indemnification Agreement transaction (*id.* ("the analysis goes beyond 26 U.S.C. § 83")). These four characterizations are examples of types of gains "specifically exempted."

[4] Notably, this is also why the FTB's attempt to delay the Court's decision should also be rejected. The FTB never asserts that the Court requires further evidence to evaluate Debtor's Motion. *See* FTB Opp. at 14-19. Rather the Court has everything it needs to determine whether the Uber Settlement Payment is either (1) an insurance payment, (2) not gross income under the tax benefit rule, (3) a working condition fringe, or (4) a deductible reimbursement.

[5] FTB Opp. at 10 (noting that the California tax code specifies certain items as included in gross income, but conceding that one of the examples in the code appears inapplicable).

1  Settlement Payment is akin to insurance. Mot. at 8-12. Similar to directors and officers insurance

2  ("D&O Insurance"), Uber agreed in the Indemnification Agreement that in the uncertain event

3  that Google filed suit against Debtor or any of the other indemnified individuals, Uber would bear

4  the risk and pay litigation costs and any judgment. Mot. at 1-2 and 7-8. The FTB's attempts to

5  undermine this analogy fail.

6  ### a.    Insurance Risk

7  The Motion demonstrated how the Indemnification Agreement contemplated insurance-

8  type risk because Uber indemnified Debtor and the other Diligenced Employees with respect to

9  the risks associated with a lawsuit brought by their previous employer and such risks were

10  unknown and contingent liabilities. Mot. at 9. Indeed, the FTB does not dispute Debtor's

11  analogy to tradition D&O insurance, whereby a company induces an employee to work for them

12  by insuring them against lawsuits, and does not dispute the Motion's assertion that the

13  Indemnification Agreement operates nearly identically to D&O insurance.

14  The FTB's attempt to escape this analogy by arguing that the Indemnification Agreement

15  did not entail insurance risk because "it was anticipated that Google would file a claim" (FTB

16  Opp. at 15) is demonstrably wrong. At the time Debtor and Uber signed the Indemnification

17  Agreement on April 16, 2016 (Mot. Ex. G), Google had not sued or threatened to sue, and neither

18  Uber nor Debtor could be certain it would. The Indemnification Agreement itself is phrased

19  conditionally to indemnify Debtor for future events where Google either brings a claim or

20  threatens in writing to bring a claim (*id.* at ¶ 2.1)—which at the time could not be predicted.

21  Indeed, on April 16, 2016, it was not even certain that Uber would necessarily acquire Otto.

22  Notably, the FTB cites no authority for its position, and for good reason. The very reason

23  parties insure against risk is because they anticipate the risk—as the IRS explains in its Private

24  Letter Ruling, insurance is "security against possible anticipated loss." I.R.S. P.L.R. 201101029

25  (Jan. 7, 2011) (*quoting Epmeier v. U.S.*, 199 F.2d 508, 509-10 (7th Cir 1952)). For example,

26  earthquake insurance exists to protect homeowners against the anticipated risk their home will be

27  damaged from an earthquake. Here, it was not certain if or when Google would sue Debtor, or

28  whether that litigation would be successful, and what damages Goggle might obtain (if any). The

1    Indemnification Agreement protected Debtor from all of those different risks (occurrence, timing,

2    and magnitude) by shifting them to Uber.  Uber's corporate 30(b)(6) witness testified:

3              It's a liability for us. But it seemed like a reasonable risk, because we knew that we
           weren't going to be taking anything. We were assured by them they wouldn't take
4          anything. So, we felt like the risk of anyone successfully suing us was low. As I
           said, anyone can bring a lawsuit, but winning is a different story. So, we felt like
5          this was a very reasonable risk to take on, at least as I recall.

6    Mot. Ex. D at 232:8-16.  *See also* Mot. Ex. F at 89:2-90:7 (Uber conducted due diligence on the

7    Debtor, Otto, and other employees and concluded there was not "undue risk of litigation").  Thus,

8    contrary to the FTB's argument, the Indemnification Agreement did not protect Debtor and the

9    other four Diligenced Employees from bearing the costs for a lawsuit *certain* to happen, but

10   protected Debtor and the other four Diligenced Employees against the *uncertain risk* that

11   litigation *could* occur and, if it did, insured they would not bear the uncertain risk of loss.

12                              **b.      Risk-Distributing[6]**

13         The FTB argues that the risks of the indemnified individuals were not sufficiently

14   different to allow risk shifting since "[a]ny action against one of them would likely be an action

15   against all of them at the same time."  FTB Opp. at 16.  But even though Uber indemnified *five*

16   people (Mot. Ex. G at 1), Google only sued only two (the Debtor and Lior Ron).  *See, e.g.*, Mot.

17   Ex. B.  Three of the five Diligenced Employees were never sued, demonstrating that the risks and

18   resulting damages of indemnifying the two employees sued by Google was successfully

19   distributed by the gains from the other three employees not being sued..

20         The FTB cites *Humana Inc. v. Comm'r*, 881 F.2d 247 (6th Cir. 1989) purportedly at page

21   183 for the proposition that there must be at least seven policyholders for risk distribution to exist.

22   FTB Opp. at 16.  *Humana* does not have a page 183.  *See generally Humana Inc. v. Comm'r*, 881

23   F.2d 247.  To the extent the FTB intended to cite page 183 of *Avrahami v. Comm'r*, 149 T.C. 144

24   (2017) that is a case about captive insurance companies.  The FTB provides no explanation for

25   why a case about captive insurance companies is relevant, and counsel is aware of no cases that

26   specifies a minimum number of  policyholders required in a typical insurance arrangement to

27   sufficiently distribute risk to be considered insurance for tax purposes.

28   _____
     [6] The FTB does not challenge Debtor's assertion in the Motion that the Indemnification
     Agreement entails risk-shifting.

The FTB also suggests that to meet commonly accepted notions of insurance, an insured must "generally" pay the insurer a financial premium and tries to fault Debtor for not doing so. FTB Opp. at 17. But premiums are not required for insurance arrangements to exist. Take, for example, director and officer indemnification. No premiums are required for this form of insurance. Instead, most directors and officers "pay" by providing their services to the company. But no one can question that this is a form of insurance.

Finally, the FTB argues that Uber is not an insurer and was not acting in a manner ascribed to insurers. FTB Opp. at 7. This is wrong. *First*, Uber *was* acting as an insurer. Uber considered itself so. Mot. Ex. D at 229:6-24 (Uber 30(b)(6) witness testifying that Uber was acting as an insurance company). And like an insurance company would do using an underwriter, Uber conducted diligence on the people it was considering indemnifying to try to understand the risks it was undertaking. *See*, *e.g.*, Indemnification Agreement at 1 (regarding Diligenced Employees); Mot. Ex. D at 232:5-232:16; Mot. Ex. F at 89:2-90:7 (describing that Uber conducted due diligence on the Debtor, Otto and other employees of Otto and concluded that it was not taking "undue risk of litigation"). And like an insurer, Uber had the right to control the defense of any claim arising under the agreement. Mot. Ex. G at ¶ 2.2(b).

*Second*, one does not have to be in the business of offering insurance to be an insurer. *See Caylor Land & Dev., Inc. v. Comm'r*, 121 T.C.M. (CCH) 1205 (T.C. 2021) (looking at whether something is insurance in the commonly accepted sense is "simply a command to engage in analogical reasoning—there is an ordinary public meaning of the word 'insurance' widespread in society that people ascribe to contracts without much thought. A court can then look at novel arrangements that might or might not look like those contracts in various ways and pronounce whether their differences with commonly held notions of insurance are important in any particular case."). Companies self-insure all the time, including indemnifying their directors and officers. Moreover, tax courts have considered various factors to identify whether an insurance arrangement exists, and none of them include a requirement that the party offering the insurance be a "licensed insurer. *See R.V.I. Guar. Co. & Subsidiaries v. Comm'r*, 145 T.C. 209, 231 (2015).

## 2. The Tax Benefit Rule Applies.

The Motion demonstrated that because Debtor does not receive any tax benefit from the payment to Google, and the Uber Settlement Payment to Google is merely a recovery of an expense or loss and should not give rise to gross income for the Debtor. Mot. at 12.

The FTB's sole argument that the tax benefit rule does not apply here focuses on the purported timing of when the Debtor's loss must have given rise to an exclusion, deduction, or credit. Specifically, the FTB asserts that a taxpayer hoping to benefit from the rule must show that the loss and the recovery "straddle" two tax years, by showing the tax payer "received a tax benefit—such as an exclusion, deduction, or credit—in a prior year." FTB Opp. at 17. However, straddling two tax years—as the FTB asserts—is not necessary. The Supreme Court responded to Justice Stevens partial dissent regarding the application of the rule in *Hillsboro* stating:

> JUSTICE STEVENS apparently disagrees with this rule,[7] for, although he concurs in the result in Hillsboro, he asserts that the events there would have resulted in denial of the deduction had they all occurred in one year. . . . *We find it difficult to believe that Congress placed such a premium on having a transaction straddle two tax years.*

*Hillsboro Nat. Bank v. Comm'r*, 460 U.S. 370, n.16 (1983) (emphasis added). Clearly, the Court is not required to find that the transaction straddles two tax years to apply the tax benefit rule.

The correct application of the tax benefit rule—which the FTB did not dispute (*see* FTB Opp. at 17)—simply provides "that if a taxpayer makes a payment or suffers a loss that does not reduce his taxes, the recoupment of the loss (here, the Uber Settlement Payment) is not included in gross income and is not taxable." Mot. at 13. If one considers the Uber Settlement Payment to pass through Debtor's hands to Google (which the FTB implicitly does in its argument that it is Debtor's gross income), the non-reducing loss is Debtor's deemed payment from Debtor to Google, and the recovery is the deemed payment from Uber to Debtor. Mot. at 13-14.

## 3. Deductible Reimbursement Also Applies.

The FTB's sole objection to characterizing the Uber Settlement Payment as a deductible reimbursement is that the Motion purportedly fails to identify how the payment acts as a

---

[7] The Supreme Court's response came as it was explaining the tax benefit rule: "if [a] later event is indeed fundamentally inconsistent with the premise on which the [earlier] deduction was initially based," and "if that event had occurred within the same taxable year, it would have foreclosed the deduction[.]" *Hillsboro Nat. Bank v. Commissioner*, 460 U.S. 370, 383-84 (1983).

reimbursed "expense" from Uber as opposed to "compensation or consideration." FTB Opp. at 7. This is a fictional dispute to avoid the clear result that deducible reimbursement applies.

When the totality of the transaction is considered, the transaction is properly characterized as reimbursement. The Uber Settlement Payment goes directly to Google to satisfy Google's award and judgment, and Google obtained that award and judgment because of the actions Debtor took on behalf of Uber. *See* Mot. at 17; Mot. Ex. B at 48-51, 53. Indeed, logic dictates that the Uber Settlement Payment is neither compensation nor consideration. The Indemnification Agreement requires Uber to reimburse Debtor for his "expenses" when Debtor is sued, and to pay any judgment against him if he loses the lawsuit. *See* Mot. Ex. G at 1, 2, ¶ 2.1(a), ¶ 2.3(a). If the Indemnification Agreement were compensation intended to increase Debtor's wealth, then it would lead to the absurd result that Debtor's compensation increases as his liability increases. Instead, the Indemnification Agreement is more appropriately characterized as a conditional reimbursement. Uber and Debtor agreed "if you (Debtor) are required to pay Google, I (Uber) will pay what you are required to pay Google." *See* Mot. Ex. G at ¶ 2.3(a) (describing Uber's responsibility to pay for Expenses incurred by Debtor upon presentation of reasonable documentation evidencing such Expenses), 2 (defining Expenses to include judgments, damages, awards, and amounts paid or to be paid in settlement). Thus, Uber and Debtor's agreement was designed not to increase Debtor's wealth, but to return him to the status quo.

### 4.   Working Condition Fringe Also Applies.

The Motion identifies numerous reasons why the Uber Settlement Payment constitutes a working condition fringe and is not gross income. Mot. at 17-19. Acknowledging Debtor's theoretical basis that "Section 162(a) [of the Tax Code] allows for a deduction for the 'ordinary and necessary expenses' paid or incurred during a taxable year" (FTB Opp. at 18), the FTB incorrectly asserts that the Motion fails to provide "any facts or legal argument" to explain how the payment constitutes "ordinary and necessary expenses" of the Debtor's business." *Id.*

But the Motion does just that. Mot. at 17-18. It explains that the "Uber Settlement Payment is payment of the judgment that was entered based on the Award, and would be deductible under Section 162 [of the Tax Code] if the Debtor had paid it himself." *Id.*

1     Addressing the fact that indemnification payments are ordinary and necessary, the Motion states,

2 "Courts have held that such expenses include expenses for claims of fraud, breach of contract,

3 breach of loyalty, and breach of fiduciary duty, including when those claims arise out of conduct

4 connected with a person's duties as an officer or employee" (*id.*) and goes on to identify three

5 analogous cases and rulings to Debtor's case that demonstrate the ordinary and necessary nature

6 of the Uber Settlement Payment (*id.* (citing *Scofield v. Comm'r*, T.C.M. (RIA) 1997-547;

7 Revenue Ruling 80-211, 1980-2 C.B. 57; and Revenue Ruling, 79-208, 1972-2 C.B. 79).  Further,

8 the Motion demonstrated that the origin and character of the activities for which Uber

9 indemnified Debtor included Debtor's "solicitation of *other* Google employees to join Otto, then

10 Uber" (Mot. at 17), and demonstrated that Debtor and Uber executed the Indemnification

11 Agreement to enable Debtor to recruit and bring those solicited Google employees to Uber (Mot.

12 at 16-17).  The FTB makes no argument to contradict these facts.

13        Finally, the FTB's attempt to distinguish Treasury Regulation 1.132-5(r)(4) because it

14 concerns tax-exempt entities misses the point.  The Motion did not cite the example in Treasury

15 Regulation 1.132-5(r)(4) to say that Uber is a not-for-profit organization or that Debtor was a

16 volunteer.  Rather the value of and payments made under a liability insurance policy of an

17 employee is similar to what the law would consider a working condition fringe.  Treasury

18 Regulation 1.132-5(r)(4) illustrates this point because courts have held that examples in Treasury

19 Regulations are persuasive authority.  *See Cook v. Comm'r*, 269 F.3d 854, 858 (7th Cir. 2001)

20 ("examples set forth in regulations remain persuasive authority so long as they do not conflict

21 with the regulations themselves").  Further, some courts have found that examples should be

22 given the same weight as the regulations of which they are a part.  *See Bayley v. Comm'r*, 69 T.C.

23 234 (1977) (stating that an example was "controlling" in that case).  Thus, Treasury Regulation

24 1.132-5(r)(4) simply demonstrates that because the Indemnification Agreement covers employees

25 for liabilities incurred in connection with employment with Uber, and it should similarly should

26 be treated as a working condition fringe.

27

28

**B.    FTB'S Characterizations Purportedly Giving Rise To Gross Income Fail.[8]**

While the Court can find any one of the four above characterizations apply to the Indemnification Agreement and Uber Settlement Payment and stop there, the FTB's further attempts to characterize the transaction as gross income are wrong or inconclusive.

**1.    The FTB Identifies No Authority That The Payment Is Taxable Compensation.**

The FTB's attempt to argue that the Uber Settlement Payment gives rise to gross income for Debtor is devoid of any legal authority or factual support. *See* FTB Opp. at 10. The FTB fails to cite any authority that the facts it identifies surrounding the Indemnification Agreement and resulting Uber Settlement Payment are analogous to any circumstances where a finding was made that such transactions are taxable compensation. Instead, the FTB's argument that the Uber Settlement Payment is compensation taxable as gross income is entirely *ipse dixit*.

**2.    Not All Consideration Is Taxable.**

The FTB's attempt (FTB Opp. at 10-12) to characterize the Indemnification Agreement and Uber Settlement Payment as consideration to demonstrate the transaction is taxable is flawed. The FTB argues, without any evidence, that the Indemnification Agreement "was consideration for the sale of Otto." *Id.* at 10. In doing so, it relies on *Old Colony Tr. Co. v. Comm'r*, 279 U.S. 716, 729 (1929) for the proposition that "[w]here a taxpayer performs services to a third party, and the third party issues *payment* as consideration for the taxpayer's services, that *payment* is the taxpayer's taxable income" (emphasis added). By applying *Old Colony* to *any* payment regardless of the circumstances of the transaction, the FTB takes *Old Colony* far beyond its intent.

*Old Colony* addressed a simple circumstance unlike the one presented to the Court here. An employee provided services to an employer and the employer paid the employee's taxes for him in exchange for that service. *Old Colony Tr. Co.*, 279 U.S. at 729. All the Court found is that when the employer paid the employee's taxes, that payment was taxable to the taxpayer "as

---

[8] The FTB's sole justification for its request to delay the Court's decision and for it to conduct an administrative investigation is based on its apparent need further information "to determine whether the" Uber Settlement Payment constitutes compensation, consideration, or a contingent liability. FTB Opp. at 7. No additional time or information is needed. The Indemnity Agreement, the resulting Uber Settlement Agreement and the Plan provide sufficient information to decide Debtor's motion. The FTB has made no assertion that the Court is deprived of sufficient information to decide whether Debtor's four characterizations are correct.

14

part of the compensation" for "the services rendered by the employee."  *See id.*  Here, Uber is not paying Debtor's taxes.  And the FTB identifies no authority that the specific facts here say that the Indemnification Agreement or the Uber Settlement Payment, is in the nature of additional consideration for Otto.  FTB does rely on *Huff v Comm'r*, 80 T.C. 804 (1983), which is inapposite.  The penalties at issue in *Huff* are civil penalties paid to a governmental entity (*id.* at 811), which are not deductible under 26 U.S.C. § 162(a).  26 U.S.C. § 162(f).

The FTB also argues the Uber Settlement Payment must be taxable consideration because it has "value" that the Debtor "bargained for."  FTB Opp. at 11-12.  But it leaves unrebutted Debtor's point that taxable income includes only "accession to wealth, clearly realized, and over which the taxpayers have complete dominion."  *C.I.R. v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955).  The Uber Settlement Payment is not that.  As the Motion explains, Debtor's debt to Google is due to the claw back of Debtor's salary, compensation, and bonuses.  Mot. at n.2; Mot. Ex. B at 89-90.  Debtor previously paid taxes on that salary, that compensation, and those bonuses, and he was not permitted to offset for taxes previously paid.  Mot. at n.2; Mot. Ex. B at 121-22.  The Uber Settlement Payment merely satisfies the reversal of the compensation Debtor previously received.  Debtor does not realize a penny of the "value" of the Uber Settlement Payment.  Nor did he have dominion over it.  More to the point, the transactions fall within four characterizations above that are not gross income.

### 3.  The FTB Takes No Position On Contingent Liability.

The FTB concedes that the transaction here might be a type of contingent liability subject to taxation, but takes no position on whether it is or is not.  FTB Opp. at 14.  Furthermore, the FTB is incorrect that Uber assumed the contingent liability Debtor owed Google.  And there is no basis for the assumption that Uber indirectly assumed the contingent liability because Otto assumed the contingent liability Debtor owed Google.  As demonstrated above, the transaction is one of four types of transactions that do not result in gross income.

## IV.  CONCLUSION.

The Debtor respectfully requests entry of an order granting the relief requested in the Motion and such other and further relief as the Court may deem just and proper.

Dated: April 8, 2022

By: /s/ *Brett Schuman*

Brett Schuman
*bschuman@goodwinlaw.com*
Jennifer Briggs Fisher
*JFisher@goodwinlaw.com*
**GOODWIN PROCTER** LLP

Tobias S. Keller
*tkeller@kbkllp.com*
Dara L. Silveira
*dsilveira@kbkllp.com*
**KELLER BENVENUTTI KIM LLP**

*Attorneys for Anthony S. Levandowski,
Debtor and Debtor in Possession*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28