# EXHIBIT A

1  **KELLER BENVENUTTI KIM LLP**
   TOBIAS S. KELLER (Cal. Bar No. 151445)
2  (tkeller@kbkllp.com)
   DARA L. SILVEIRA (Cal. Bar No. 274923)
3  (dsilveira@kbkllp.com)
   650 California Street, Suite 1900
4  San Francisco, California 94108
   Telephone: (415) 364-6793
5  Facsimile: (650) 636-9251

6  BRETT M. SCHUMAN (SBN 189247)
   *bschuman@goodwinlaw.com*
7  RACHEL M. WALSH (SBN 250568)
   *rwalsh@goodwinlaw.com*
8  **GOODWIN PROCTER LLP**
   Three Embarcadero Center
9  San Francisco, California 94111
   Tel.: +1 415 733 6000
10 Fax.: +1 415 677 9041

11 HONG-AN VU (SBN 266268)
   *hvu@goodwinlaw.com*
12 **GOODWIN PROCTER LLP**
   601 S. Figueroa Street, 41st Flr.
13 Los Angeles, California 90017
   Tel.: +1 213 426 2500
14 Fax: +1 213 623 1673

15 Attorneys for Plaintiff and Debtor and
   Debtor in Possession Anthony S. Levandowski
16

17              **UNITED STATES BANKRUPTCY COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19                  **SAN FRANCISCO DIVISION**

20 | In re: | Bankruptcy Case No. 20-30242 (HLB) |

21 | ANTHONY SCOTT LEVANDOWSKI, | Chapter 11 |

22 |                        Debtor. | **Adv. Pro. No. 19-_____(HLB)** |

23 | ANTHONY LEVANDOWSKI, an individual, | **DEBTOR'S COMPLAINT FOR DECLARATORY RELIEF, SPECIFIC** |

24 |                        Plaintiff, | **PERFORMANCE, AND DAMAGES; AND OBJECTION TO CLAIM** |

25 |            v. |

26 | UBER TECHNOLOGIES, INC. |

27 |                        Defendant. |

28

Anthony Levandowski, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and as plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), alleges in this Complaint upon knowledge of his own acts and upon information and belief as to other matters, as follows:

## NATURE OF CLAIM

1. This is an objection to the allegations made by Uber Technologies, Inc. ("Uber") in its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") and an action to enforce the promises Uber made to Mr. Levandowski to induce him to sell to Uber his self-driving companies and technology and to lead its autonomous vehicle program.

2. Mr. Levandowski is one of the world's leading experts in autonomous vehicle technology. Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks. He was a founding member of Google's autonomous car initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

3. Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up.

4. Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr. Levandowski worked for a competitor on self-driving technology, he would face very negative consequences. Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and Travis Kalanick, Uber's then-CEO. In addition, Mr. Levandowski was aware that Mr. Page and other executives at Google viewed Uber as a very significant competitor.

5. In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto") a self-driving trucking company.

6. Uber expressed an interest in acquiring Otto. Because of Mr. Page's threats and known hostility towards Uber, Mr. Levandowski insisted that Uber indemnify him against claims that may be brought by Google as a condition to entering into any relationship with Uber.

7. In fact, Mr. Levandowski explained to Uber multiple times that he believed

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

Google would likely sue him if he joined Uber.  Mr. Levandowski was particularly concerned because he did not have the ability to defend himself if one of the largest companies in the world, with essentially unlimited resources, came after him.

8. In addition, because Mr. Levandowski left Google to work on autonomous trucking, Mr. Levandowski conditioned the sale of Otto on Uber supporting his self-driving trucking business.

9. As part of the transaction for the acquisition of Otto, Uber agreed to indemnify Mr. Levandowski for claims Google might raise against him.  These claims included claims Google might assert for breach of fiduciary duty, breach of the duty of loyalty, breaches of various restrictive covenants, and trade secret misappropriation.  **Exhibit A** is a redacted copy of the Indemnification Agreement dated April 11, 2016 between Uber and Mr. Levandowski.

10. Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of any claim brought by Google, as well as any award or judgment in Google's favor. *See* Ex. A at 3, § 2.3.

11. As part of the acquisition of Otto, Uber also agreed to support Mr. Levandowski's trucking business objectives by either creating a new business unit within Uber (wherein Mr. Levandowski would have a leadership role) or allowing Mr. Levandowski to create a trucking business outside of Uber.

12. After Uber acquired Otto, Mr. Page followed through on his threats against Mr. Levandowski.  In October, 2016, Google initiated two arbitration proceedings against Mr. Levandowski.  Mr. Levandowski timely requested indemnity from Uber under the Indemnification Agreement, and Uber accepted its obligations.  Consequently, Uber paid for and controlled the defense of Mr. Levandowski for nearly three years.  Initially, Mr. Levandowski was represented by the same counsel that represented Uber.  During the course of a separate litigation, a trade secrets dispute with Waymo LLC, a Google affiliate, Uber's then-counsel determined it could not jointly represent Mr. Levandowski (or his company, Otto Trucking) and Uber.  Uber subsequently selected and hired separate counsel for Mr. Levandowski.  Uber

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

3

COMPLAINT

continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected. Uber also exercised its right to direct and control Mr. Levandowski's defense of the arbitration proceeding through the final award and including all settlement discussions with Google.

13. After Mr. Levandowski relied on Uber's control and direction for years and after an unfavorable Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

14. In addition, while in control of Mr. Levandowski's defense and settlement prospects with Google, Uber worked out its own settlement with Google's subsidiary, Waymo LLC ("Waymo") to resolve a trade secret dispute between them relating to the same underlying events. Upon information and belief, the terms of that settlement included an agreement that Uber would never hire or work with Mr. Levandowski again, which resulted in Uber also reneging on its promises to support Mr. Levandowski's trucking business.

15. Uber's recently filed Proof of Claim has made the Indemnification Agreement, and Uber's actions related to its acquisition of Otto, central to this Chapter 11 Case.

16. In particular, the Proof of Claim alleges that because Uber purportedly rescinded the Indemnification Agreement, not only does Uber not have any obligation to indemnify Mr. Levandowski but it also is a creditor of Mr. Levandowski. Uber seeks payment for legal fees and costs it provided under the Indemnification Agreement and contribution for the settlements it has negotiated for its own benefit and the benefit of Mr. Levandowski's cofounder, the current lead of Uber's trucking business.

17. However, Uber asserts claims that, upon information and belief, Uber released as part of the settlement with Waymo.

18. Uber also has no basis to rescind the Indemnity Agreement. Uber has set forth numerous theories to back out of the deal it struck, but two issues appear to be core: (1) a claim that Mr. Levandowski engaged in fraud and (2) a claim that Mr. Levandowski has pled to one count of trade secret misappropriation in a criminal indictment filed by the United States

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Attorney.

19. First, there was no fraud. Uber was aware of Mr. Levandowski's conduct through the extensive investigation it conducted prior to and after entering into the indemnity agreement with him, and long before it purported to rescind. To the extent Uber claims it was unaware of certain facts, those facts were not material and were fully available to Uber had they cared to look more carefully at the materials it was provided by Mr. Levandowski. In fact, Mr. Levandowski repeatedly told Uber to search those devices for the most accurate information.

20. Second, Mr. Levandowski did not make any misrepresentations regarding any theft of trade secrets. Mr. Levandowski has plead guilty to trade secret misappropriation with respect to one file he accessed after leaving Google. As for that one file, Uber knew the file's name, that Mr. Levandowski kept that file, that he accessed it after he left Google, the date he accessed it, and through its due diligence firm, the contents of that file.

21. Mr. Levandowski therefore commences the Adversary Proceeding to obtain declaratory relief as to the impact of Uber's purported rescission on the parties' respective rights and obligations, to enforce Uber's obligations arising from the Otto transaction, and to disallow the Proof of Claim.

## JURISDICTION AND VENUE

22. The Adversary Proceeding arises in and relates to the Chapter 11 Case. The Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Mr. Levandowski against Uber herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California.

23. This is a core proceeding under 28 U.S.C. § 157(b) including, without limitation, under subsections (b)(2)(A), (B), (C), (K), and (O). Mr. Levandowski consents to the entry of a final order by the Court in connection with this Adversary Proceeding.

24. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

5

# FACTS

**A.  MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY**

25.  Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

26.  He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

27.  In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles. He was 24 years old at the time.

28.  The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas.  Mr. Levandowski and a team of engineers from U.C. Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations—submitted a self-driving, self-balancing, two-wheeled motorcycle.  This motorcycle, Ghostrider, competed against well-funded submissions from Stanford University, Carnegie Mellon, and established companies.  After performing well in several qualifying rounds, Ghostrider was selected as a contender for the DARPA Grand Challenge.

29.  Ghostrider now sits in the Smithsonian Museum as one of America's great innovations.

30.  Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr. Sebastian Thrun, a former Stanford computer science professor who was also a participant in the DARPA Grand Challenge.

31.  Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool. VuTool was subsequently acquired by Google.

**B.  MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM**

32.  Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping with Dr. Thrun.  Mr. Levandowski helped develop the technology for the Google service now known as Street View.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

33.     In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-driving car program at Google.  The program was named "Project Chauffeur."

34.     Project Chauffeur catapulted Google into the lead in autonomous driving when, in 2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of 100 miles.  By 2012, Google had logged over 300,000 miles of autonomous driving.  Mr. Levandowski was a key contributor in helping Google achieve these milestones.  For his past contributions and to incentivize him going forward, Google invited Mr. Levandowski to participate in the Chauffeur Bonus Plan—an incentive plan that would pay members a percentage of the valuation of Project Chauffeur starting at the end of 2015—and gave him the highest initial allocation or individual earnout percentage of any member of the plan.

35.     Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016.

36.     Mr. Levandowski would ultimately be paid over $127 million by Google for his work on Project Chauffeur.  The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google.

## C.     MR. LEVANDOWSKI CONSIDERS LEAVING GOOGLE

37.     For years, Google enjoyed its position as the leader in the self-driving space with no significant challengers.  In 2015, Uber announced the launch of its own self-driving car initiative after acquiring a team of engineers from Carnegie Mellon University.

38.     After Uber's announcement, there were many discussions within Google about how to compete with Uber.  In those discussions, executives within Google expressed distaste and animosity towards Uber.  Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

39.     Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Mr. Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very

7

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

40.     Over time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making after its initial successes. In 2015, Mr. Levandowski began to think about other self-driving opportunities.

41.     After learning about Mr. Levandowski's discontentment at Google, Dr. Thrun introduced Mr. Levandowski to Mr. Kalanick at Uber. Upon meeting Mr. Levandowski, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership where he could supply self-driving technology to Uber as an outside technology vendor.

42.     Mr. Levandowski's Google colleagues, and more than one of his superiors, were aware that Mr. Levandowski was having discussions with Uber as he considered his future.

43.     Simultaneously, in 2015, Lior Ron rejoined Google in a business role. Mr. Levandowski and Mr. Ron, who had met while working on Google Maps, began to discuss the problems with Project Chauffeur and ways in which the Project could be improved.

44.     During those conversations, they also discussed new product markets, including self-driving trucks. As they explored this concept and brainstormed further, both became passionate about self-driving trucking. They were convinced that the trucking business could be disrupted by the addition of self-driving technology and that self-driving trucking technology could go to market much more quickly than passenger car technology. Mr. Levandowski began to include Mr. Ron in his discussions with Uber and others. Mr. Levandowski and Mr. Ron considered establishing a commercial vendor relationship with Uber to obtain funding for the trucking business.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

45. Toward the end of his time at Google, Mr. Levandowski also had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur. During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving start-up outside of Google.

46. Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences. Because Google had bought several of Mr. Levandowski's outside businesses previously and because others had left Google to start new companies without objection from Google, Mr. Levandowski understood Mr. Page's threat to be about a large, well-funded competitor and not a startup.

**D.  MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE**

47. Mr. Levandowski left Google on January 27, 2016. He joined Otto, a self-driving trucking company and was credited as a co-founder.

48. Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

49. As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber on consumer self-driving technology (instead of trucking) as a competitive act that would convert him from a friendly, start-up competitor to an enemy. Mr. Levandowski also told Uber that he feared that Google would sue him and seek recovery of the substantial amounts of money that had been paid to him or were owed to him.

50. In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Mr. Kalanick. In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick. In response, Mr. Kalanick stated that Uber was prepared to protect Mr. Levandowski from an aggressive assault by Google.

51. As a key part of the transaction to sell Otto and have Mr. Levandowski join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google might assert against him. *See* Ex. A. The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and

others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April11, 2016:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

> "Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

*Id*. at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

52.     Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

> (a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses incurred by such Diligenced Employee*** or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id*. at § 2.1(a) (emphasis added).

53.     "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

"Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id.* at 3.

54.     The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii).  That section reads:

(b) Notwithstanding anything herein to the contrary, ***an Indemnified Claim shall not, regardless of whether the Closing occurs, include***, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

(ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id.* at § 2.1(b)(ii) (emphasis added).

55.     The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski.  Mr. Levandowski would not have entered into the transaction without Uber's indemnity promise.

56.     The Indemnification Agreement was structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded.  Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

**2.3.  Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

11

an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request.

*Id.* at § 2.3.

57.     If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration proceedings to enforce Uber's obligations.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request. **If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person with such [redacted], such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e).** In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.

Ex. A at §2.3(a) (emphasis added).

(e) . . . An Indemnified Person [Mr. Levandowski *may* elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a). . . . Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS") and [Uber], on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.

*Id.* at § 2.2(e) (emphasis added).

58.     The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses, including proceedings in San Francisco state or federal courts where both parties submitted to jurisdiction.

**3.11 Specific Performance**. Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative). Each of the Parties agrees that ***this Agreement is intended to be legally binding and specifically enforceable*** pursuant to its terms and that Purchaser and the ***Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms*** and that monetary damages would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, ***a non-breaching Party shall be entitled to seek injunctive relief to prevent***

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

12

***breaches of this Agreement and to specifically enforce the terms and provisions hereof.***

*Id.* at § 3.11 (emphasis added); *see also id.* at § 3.5.

59.     In an arbitration concerning Uber's failure to advance Expenses, the agreement expressly prohibited Uber from litigating any issues concerning whether any claims or Expenses are covered by the Indemnification Agreement if the claims brought by Google were not fully resolved either through settlement or a final, non-appealable judgment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request. If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within [redacted] period, such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e). ***In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.***

*Id.* at § 2.3(a) (emphasis added).

60.     Instead, Uber agreed that it could challenge coverage and seek ***reimbursement*** of payment for Expenses it advanced ***only after*** the final resolution of Google's claims.  Section 2.2(d) of the Indemnification Agreement stated:

In the event that Purchaser believes all or a portion of a Former Employer Claim  is an Excluded Claim hereunder, Purchaser shall have the right (in its sole discretion), ***within 60 days following the settlement or final non-appealable adjudication of such Former Employer Claim***, to initiate arbitration under Section 2.2(e) with the Indemnified Person(s) party to such Former Employer Claim in order to determine whether all or a portion of such Former Employer Claim is an Excluded Claim under the terms of this Agreement.

*Id.* at § 2.2(d) (emphasis added).

61.     It was only after final resolution of any arbitration between Mr. Levandowski and Uber wherein the arbitrators determined that a Former Employer Claim was not covered by the Indemnification Agreement would Uber receive reimbursement for Expenses it advanced.

Following such arbitration, if the arbitrator(s) determines in a Final Judgment that all or a portion of such Former Employer Claim is an Excluded Claim hereunder, then Purchaser shall be entitled to receive reimbursement for, and the Indemnified Person(s) party to such Former Employer Claim shall be required to pay to

13

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

Purchaser, the amount of all Expenses paid or incurred by or on behalf of Purchaser and/or its Affiliates with respect to such Excluded Claim

*Id.*

62.     In the meantime, Uber was required to advance Expenses to indemnify Mr. Levandowski for claims brought against him by Google.

For the avoidance of doubt, ***Purchaser shall advance all Expenses*** incurred by the Indemnified Person(s) pursuant to Section 2.3(a) ***through the later to occur of the final settlement or final adjudication*** of such Former Employer Claim, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d).

*Id.* at § 2.2(d)  (emphasis added).

## E.     UBER ACQUIRES OTTO

63.     As part of the indemnification process, Mr. Levandowski agreed to be interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz").  He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination.  To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

64.     The Stroz /Uber investigation of Mr. Levandowski uncovered a great number of facts related to potential claims that might be brought by Google but was, by Stroz' own admission, incomplete.  In early April 2016, while Stroz' was conducting its investigation, Uber executed the Indemnification Agreement.

65.     As Stroz summarized, Uber requested preliminary information regarding the investigation "in the lead-up to Uber's signing of an agreement to purchase Otto and "long before the investigation was completed."  Stroz had provided Uber with preliminary information that included Stroz's draft memo from Mr. Levandowski's interviews and access reports showing that Mr. Levandowski retained, and in some instances, accessed Google confidential information after he left Google.  The interview memo remained in draft form and Mr. Levandowski's counsel reserved his rights as to the accuracy of the information in the memo.

66.     Uber pushed for the entire transaction to proceed knowing that Stroz had not completed its investigation.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

14

67.     On April 11, 2016, Uber executed several documents to complete this transaction, including the Indemnification Agreement, the Otto Agreement and Plan of Merger (the "Otto Agreement"), and the Otto Trucking LLC Agreement and Plan of Merger (the "Otto Trucking Agreement"), which gave Uber an option to acquire a second company created by Mr. Levandowski and Mr. Ron.

68.     Stroz did not issue a report until August 5, 2016, almost four months after it signed the Otto acquisition documents.

69.     The Stroz report disclosed numerous facts, including the following:

During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

70.     Stroz reported that Mr. Levandowski's devices demonstrated that during his time at Google, he downloaded documents and files relating to Project Chauffeur.

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016. An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

71.     It also reported that Mr. Levandowski downloaded Chauffeur files shortly before his departure from Google and had accessed them following his departure from Google.

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

72.     Stroz reported facts regarding hiring of Google employees.

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took place at Levandowski's house in approximately December 2015 and January 2016. These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

73. Stroz included as an exhibit to its report the draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects for which he had an ownership interest, but did not include any discussion of this memo in its main report. In addition, Mr. Levandowski's devices and accounts also contained extensive information about a company named Odin Wave/Tyto, Mr. Levandowski's estate planning, and various investments.

74. Stroz noted discrepancies in what Mr. Levandowski recalled and what Stroz discovered on Mr. Levandowski's devices.

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

75. Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text messages, as well as its decision not to investigate these deletions further.

Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

76. Despite Stroz's findings, on August 18, 2016, Uber closed the acquisition of Otto

16
COMPLAINT

Case 20-03050   Doc# 129   Filed: 07/06/20   Entered: 07/06/20 16:57:14   Page 16 of 47
Case 3:17-cv-00939-WHA   Document 1   Filed 02/23/17   Page 17 of 114

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

and publicly announced that it was acquiring the company and working with Mr. Levandowski.

77.     In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

### F.     GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI

78.     On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

79.     Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

80.     The two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before Otto was acquired by Uber.

81.     Google alleged that Mr. Levandowski violated his duties to Google through his relationship with Tyto. Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential information regarding compensation to recruit Google employees.

82.     The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement.

### G.     UBER ACCEPTS THE INDEMNITY OBLIGATIONS

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

83. On November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

84. On November 3, 2016, Uber's in-house counsel and as its outside counsel from Morrison & Foerster LLP ("MoFo") interviewed Mr. Levandowski about the allegations asserted in Google's arbitration demands.

85. After receipt of the notice and interviewing Mr. Levandowski, Uber accepted Mr. Levandowski's tender of the indemnity and assumed control of Mr. Levandowski's defense without any reservation of rights.

86. Uber hired MoFo to initially represent Mr. Levandowski. Through its counsel, Uber determined the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration.

87. In February 2017, Waymo LLC ("Waymo")—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action"). That action alleged, among other things, that Mr. Levandowski had downloaded 14,000 files from a Google server, that those files contained trade secrets, and that he had used those files at Otto, which was acquired by Uber in 2016. These were the same files that Stroz had noted in its report, except that because of duplication in the files, Stroz had identified 24,000 files from that server.

88. Based on Waymo's allegations, MoFo notified Google that Mr. Levandowski was invoking his Fifth Amendment rights and would not make disclosures in the arbitration.

89. Several weeks after, MoFo determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski. As a result, MoFo sought to withdraw from representation of Mr. Levandowski and continue with its representation of Uber.

90. Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

91. For the next year, Uber continued to pay for Mr. Levandowski's legal defense as

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

COMPLAINT

required by the Indemnification Agreement.  Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings, approval over experts, discussion about who would be arguing motions, pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions.  Mr. Levandowski complied with Uber's requirements and cooperated with his defense.  Mr. Levandowski and his counsel met with Uber whenever it requested.

92.     Mr. Levandowski provided information and guidance that led to the discovery of evidence that was helpful to his defense in the arbitration as well as the Waymo action.  This included guidance that led to the discovery of statements by the administrator of the server that housed the 14,000 files at issue that the files were "low value" and that "checking out" or downloading the entire repository of 14,000 files did not "ring the alarm bells" for him.  This was because when a user accessed the server where the so-called 14,000 files were located,  the system automatically downloaded the entire repository onto his or her laptop even if the user only wanted to access one or two files.    Ultimately, this discovery, driven by Mr. Levandowski's contributions, became a centerpiece of Uber's defense in the Waymo case.

93.     In addition to providing this critical information, Mr. Levandowski also provided additional information to support Uber's defense. This included obtaining from a former Chauffeur team member the earrings she received as a parting gift that contained the alleged trade secrets at issue in the Waymo Action.  Mr. Levandowski also identified numerous events and witnesses who aided Uber in its defense of the Waymo action as well as the arbitration with Google.

94.     Mr. Levandowski also complied with Uber's requirement that Uber control all settlement discussions with Google.  Mr. Levandowski made several proposals regarding possible settlement structures to Uber hoping that a global settlement could be reached with Google.  But because Uber controlled settlement prospects with Google, Mr. Levandowski did not know whether any of his settlement proposals were made to Google.

**H.     UBER SETTLES THE WAYMO ACTION**

95.     In February 2018, while controlling Mr. Levandowski's defense, Uber settled the

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Waymo Action with Waymo/Google. The existence of a settlement between Uber and Waymo was publicly announced, but limited information regarding the exact terms of the settlement is publicly available.

96.     Upon information and belief, that settlement agreement contained broad releases by both parties releasing claims as to the other's past and present employees.

97.     Upon information and belief, Uber agreed to a broad release as to Mr. Levandowski, a past employee of Google.

98.     In addition, upon information and belief based on publicly available information, in the Waymo Settlement, Uber agreed to never hire or do business with Mr. Levandowski ever again.

99.     Upon information and belief, because of the Waymo settlement terms, Uber refused to close on its acquisition of Otto Trucking or support Mr. Levandowski's trucking business.

100.     Upon information and belief, Uber traded Mr. Levandowski's rights in Otto Trucking and his ability to practice his profession in exchange for a settlement with Waymo.

**I.     UBER REQUESTS THAT MR. LEVANDOWSKI TESTIFY SHORTLY BEFORE THE ARBITRATION HEARING**

101.     On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the Expenses it advanced for Mr. Levandowski to defend himself in the arbitration. **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

102.     One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"— which Mr. Levandowski had exercised over a year before with full knowledge of Uber.

103.     Nevertheless, in its April 2, 2018 letter, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the *Waymo* court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

104. Uber then demanded that Mr. Levandowski waive his Fifth Amendment rights and testifying during the arbitration.

105. In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

106. Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

107. Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

108. In addition, for the first time, Uber also stated that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

109. Uber's claims were false. Uber accepted Mr. Levandowski's tender of indemnity *only after* Google's commencement of the arbitration proceeding alleging claims relating to Tyto and *only after* Mr. Levandowski had been interviewed by Uber extensively about Google's allegations relating to Tyto. In addition, Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them. And Stroz had specifically identified other materials on Mr. Levandowski's devices that he had not disclosed during interviews.

110. In fact, Uber had considered acquiring Tyto in 2015 but declined to do so at that time. Tyto was ultimately acquired by Otto with Uber's consent and at Uber's request prior to Uber closing on its acquisition of Otto to secure a lower price for Tyto than what Tyto would have requested had it known that Uber was the acquirer.

111. Moreover, prior to April 2018, Uber received extensive documents and information about Tyto in the Waymo Action and had actively participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started. Indeed, Tyto's founder, Brent Schwarz, its

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

COMPLAINT

technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto. Uber had counsel present at the meetings with these witnesses and during most, if not all, of their testimony. These individuals were also central witnesses in the two arbitrations with Google with respect to the Tyto-related allegations.

112.    Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that invested funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and would visit Tyto and his friends at that company to talk about technical and business matters from time to time. Uber was also aware of Pierre Droz' (a Google employee) allegations that Mr. Levandowski was involved with Tyto and even deposed him extensively on that very topic during the Waymo litigation.

113.    Armed with this knowledge, Uber paid for and controlled Mr. Levandowski's defense of the arbitration. In fact, Uber did not raise any issues regarding coverage until April 2018.

**J.    UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

114.    On March 28, 2019, the arbitration panel issued an interim award in favor of Google. The arbitration panel found violation of the exact claims covered by the Indemnification Agreement and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google. The panel also awarded prejudgment interest and attorneys' fees, as it determined Google was the prevailing party.

115.    On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was going to abide by its indemnity obligations and pay for any adverse award in light of the interim award. **Exhibit F** is a redacted copy of Mr. Levandowski's May 13, 2019 letter.

116.    In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence. Mr. Levandowski identified numerous documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well and pointed out that documents from his devices were

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

1  shown to witnesses at the arbitration hearing.

2      117.   Mr. Levandowski sent Uber a follow up letter on June 27, 2019.  **Exhibit G** is a

3  true and correct copy of that follow-up letter.

4      118.   On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters

5  stating that Mr. Levandowski had breached the Indemnification Agreement, that a majority of

6  the interim award was "attributable to an Excluded Claim," and that "Uber has no contractual

7  obligation to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's

8  behalf."  **Exhibit H** is a true and correct copy of Uber's July 3, 2019 letter.

9      119.   On August 15, 2019, Mr. Levandowski was indicted for thirty-three counts of

10  trade secret misappropriation.  The alleged trade secrets at issue in the indictment were some of

11  the same ones that were at issue in the Waymo Action. Mr. Levandowski ultimately agreed to

12  plead guilty to one count of trade secret misappropriation based on his access of one Google

13  document containing trade secret information on one occasion after he left Google and has

14  accepted restitutionary obligations in the amount of $756,499.22. This one file was the same file

15  that Stroz expressly identified in its report to Uber, and in fact, the Stroz report was the basis for

16  the indictment and the plea.  The government agreed to dismiss the remaining thirty-two counts

17  against Mr. Levandowski.

18      120.   On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had

19  fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for

20  which was rescission of the agreement.  **Exhibit I** is a true and correct copy of Uber's August 30,

21  2019 letter.

22      121.   At this point in time, Uber did not clearly state that the Indemnification Agreement

23  was rescinded (and instead said it had a remedy of rescission should it choose to exercise it),

24  make any offer to restore the consideration it received under the agreement, or cede control of

25  Mr. Levandowski's defense.

26      122.   Uber continued to advance payment for expenses incurred through September 25,

27  2019.

28      123.   On September 27, 2019, Uber exercised its control over Mr. Levandowski to

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

23

terminate its engagement of Goodwin Procter as counsel for Mr. Levandowski. Following this termination, Mr. Levandowski separately engaged Goodwin Procter to represent him.

124. In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission. In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims. Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **Exhibit J** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

125. On December 6, 2019, the arbitration panel issued a final arbitration award.

126. On December 10, 2019, Mr. Levandowski informed Uber of the final award. **Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter. Because of the lack of clarity in Uber's previous statements, Mr. Levandowski asked Uber, as the Indemnitor in control of the defense of the case, how it would like to proceed. Specifically, Mr. Levandowski inquired whether Uber intended to resolve the matter by paying the judgment or whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal and posting a bond to stay the judgment pending appeal.

127. On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019 letter and stated that it rescinded the Indemnification Agreement. **Exhibit L** is a true and correct copy of Uber's December 31, 2019 letter. The stated basis for rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement for Expenses paid relating to the claims based on Tyto.

128. Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

129. In addition, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

24

subsequent appeals."

130.    On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019. Uber did not provide payment for any Expenses incurred after that date.

131.    On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,047,998.64. **Exhibit M** is a true and correct copy of the judgment in Google's favor.

132.    On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a chapter 11 petition in the United States Bankruptcy Court for the Northern District of California commencing the Chapter 11 Case.

133.    On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement. In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020. **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without exhibits.

134.    On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay Google's judgment or any other Expenses. **Exhibit O** is a copy of Uber's March 27, 2020 letter.

135.    As a result, Mr. Levandowski filed an arbitration demand with JAMS San Francisco.

136.    Uber filed an answer on April 13, 2020 in which it alleged, among other defenses that it had rescinded the Indemnification Agreement based on Mr. Levandowski's purported fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.

137.    The parties have not selected arbitrators or taken any other substantive actions in the arbitration.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

## K. UBER FILES A PROOF OF CLAIM

138. On July 6, 2020, Uber filed the Proof of Claim, through which it brought into the Chapter 11 Case issues from the arbitration to support its purported position as a creditor of Mr. Levandowski. **Exhibit P** is a true and correct copy of Uber's Proof of Claim, ECF No. 8-1.

139. In its Proof of Claim, Uber asserts that Mr. Levandowski is liable for the amounts that Uber paid to settle the joint and several portion of the Final Award as part of Google's settlement with Lior Ron.

140. Uber also claims that the Indemnification Agreement has been rescinded and that it is a creditor of Mr. Levandowski because it was "fraudulently induced to acquire Levandowski's company Otto[] and indemnify Levandowski in connection with that acquisition." Based on this purported rescission, Uber seeks repayment of any Expenses advanced by Uber for Mr. Levandowski's defense. It also seeks contribution from Mr. Levandowski for the amount Uber paid to settle the Waymo Action and the legal fees incurred by Uber in defending that action.

141. Uber also claims that Mr. Levandowski has no right to demand in the arbitration payment for at least 75% of Google's judgment as those amounts purportedly relate to Excluded Claims. It contends that Uber is either allowed to recoup payment for Excluded Claims or is entitled to a set off.

142. Uber also asked the Court to require that any payment by Uber for a Gross Indemnified Claim, be held subject to Uber's rights to recoup advances relating to Excluded Claims.

## <u>COUNT I</u>

### (Declaratory Judgment - Waymo Settlement Release)

143. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

144. On February 8, 2018, Waymo and Uber executed a settlement agreement to resolve Waymo's dispute with Uber.

145. Upon information and belief, the Waymo Settlement contained broad releases in

26

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

which Google and Uber released known and unknown claims that have or could be asserted against the other's past and former employees.

146.    Upon information and belief, Mr. Levandowski is a beneficiary of the releases in the Waymo Settlement as he is a former employee of Google.

147.    Upon information and belief, Google excluded from its release the arbitration claims against Mr. Levandowski and Uber did not exclude any claims against Mr. Levandowski in its release.

148.    Upon information and belief, all of the claims in the Proof of Claim, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, were released by Uber in the Waymo Settlement.

149.    As a result of the Proof of Claim and Mr. Levandowski's objection thereto, a live controversy exists as to whether Uber released Mr. Levandowski in the Waymo Settlement and, if so, what claims Uber released.

150.    This issue is ripe for determination and requires a declaration as to Mr. Levandowski's rights in the Waymo Settlement.

151.    Mr. Levandowski seeks a declaration that the claims in the Proof of Claim, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, are barred by the Waymo Settlement.

//

//

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

27

<u>**COUNT II**</u>

**(Specific Performance to Pay Current Expenses)**

152.  Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

153.  On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2.

154.  Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer. Ex. A at § 2.1(a).

155.  As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id.* at 3.

156.  Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within a set period following a request for advancement.

157.  On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

158.  Uber has refused to advance payment for the Expenses requested in the March 6 Request.

159.  Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

160.  In the Indemnification Agreement, Uber agreed that Mr. Levandowski would be

28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id.* at § 3.11. Uber also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

161. Moreover, Mr. Levandowski will be irreparably harmed by Uber's continued breach of the Indemnification Agreement as he may no longer be able to pay for his defense and pursue his appeal against Google. As the parties agreed, no dispute with Uber regarding reimbursement of payments made under the Indemnification Agreement could occur until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred. Uber's breach has materially altered Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

162. Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id.* § 3.5.

163. The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

164. A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

165. The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

166. Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber advance payment for the Expenses requested on March 6, 2020 as well as payment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far.

//

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

# COUNT III

## (Specific Performance to Continue to Pay Expenses)

167. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

168. On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2.

169. Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer. Ex. A at § 2.1(a).

170. As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id*. at 3.

171. Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within fifteen Business Days of a request for advancement.

172. On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

173. Uber has refused to advance payment for the Expenses requested in the March 6 Request.

174. Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

175. The Parties agreed that Mr. Levandowski would be irreparably harmed by Uber's

GOODWIN PROCTER LLP<br>ATTORNEYS AT LAW<br>SILICON VALLEY

failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id.* at § 3.11. The parties also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

176. Moreover, Mr. Levandowski will be irreparably harmed by Uber's continued breach of the Indemnification Agreement as he may no longer be able to pay for his defense and pursue his appeal against Google. As the parties agreed, no dispute with Uber regarding reimbursement of payments made under the Indemnification Agreement could occur until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred. Uber's breach has materially altered Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

177. Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id.* § 3.5.

178. The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

179. A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

180. The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

181. Google's claims are not yet resolved as Mr. Levandowski intends to appeal the judgment and there has been no settlement of Google's claims.

182. Therefore, Mr. Levandowski seeks to enforce by this action precisely the terms Uber agreed to in the Indemnification Agreement—that Uber advance any Expenses incurred by Mr. Levandowski within fifteen Business Days of a request for advancement under Section 2.3

31

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

until Google's claims are resolved either by binding judgment or settlement.

## COUNT IV

### (Declaratory Judgment – Uber's Rescission Claim)

183.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

184.    In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.

185.    In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

186.    Mr. Levandowski contends that Uber's rescission claim is barred by its unreasonable delay in rescinding the Indemnification Agreement, failure to return consideration provided, and actions by Uber that are inconsistent with a claim for rescission as described hereinabove.

187.    Uber has not returned any consideration it received under the Indemnity Agreement, including Mr. Levandowski's devices, which it continues to retain through Stroz, as well as the consideration received under the full transaction for the Otto acquisition.  Such failure is fatal to any rescission claim, especially where, as here, Uber's refusal or inability to return the consideration it received is due to its delay in exercising any purported right to rescission.

188.    To the extent that Uber's ability to return the consideration received is impossible, this impossibility is due to Uber's delay in exercising the purported rescission after it controlled Mr. Levandowski's defense and settlement ability for years and benefited from Mr. Levandowski's cooperation with his defense and Uber's defense in the Waymo action.

189.    Uber has also ratified any purported fraud and acted in ways inconsistent with rescission, including by affirming its obligations under the Indemnification Agreement in its public filings.

190.    Uber's performance under the Indemnification Agreement for years and belated rescission of that agreement has substantially prejudiced Mr. Levandowski.

191.    As a result of the acts described herein, a live controversy exists as to whether

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

32

Uber has a right to rescind and whether its purported rescission is effective.

192.    This issue is ripe for determination and requires a declaration as to Uber's right to rescind the Indemnification Agreement and whether Uber is a proper creditor in the Chapter 11 Case.

193.    Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement.

<u>**COUNT V**</u>

**(Breach of Otto Trucking Agreement)**

194.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

195.    In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business. Uber agreed to this condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

196.    Under the Otto Trucking Agreement,  Uber received an option to acquire Otto Trucking.

197.    Uber closed on its acquisition of Otto on August 18, 2016.  The effect of the acquisition of Otto obligated Uber to support Mr. Levandowski's trucking business as the only scenario where Uber could walk away from Otto Trucking was if Uber did not acquire Otto.

198.    In late November 2017, at the close of the Call Option Period, Uber exercised its right to acquire Otto Trucking by providing notice of its decision.

199.    Following exercise of its option, Uber was obligated to use "commercially reasonable efforts" to close on the Otto Trucking merger, which the parties contemplated would take forty-five days.

200.    At closing of the Otto Trucking acquisition, Otto Trucking was supposed to merge with Uber and the interests of the members of Otto Trucking would be converted to interest in an Uber earnout plan that gave the Otto Trucking members a percent interest of billions in profit for Uber's new trucking business.

GOODWIN PROCTER LLP

ATTORNEYS AT LAW

SILICON VALLEY

33

COMPLAINT

201.    Mr. Levandowski and Mr. Ron were also supposed to lead the trucking business with Mr. Levandowski appointed as "non-executive Chairman" who could only be removed for Cause.  Uber also promised that Mr. Levandowski and Mr. Ron would be the top executives of the trucking business.

202.    If Uber chose not to acquire Otto Trucking after its acquisition of Otto, Mr. Levandowski was allowed to form a trucking business outside of Uber.  Uber was then obligated to provide a license to self-driving technology that Mr. Levandowski could use in the field of trucking in exchange for ownership in the new trucking business (the "IP License").

203.    The parties had agreed on a form of the IP License that would give Mr. Levandowski an exclusive license to use Uber's technology in trucking.

204.    As an exclusive license for use in trucking, Uber was not permitted to use any of its own self-driving technology for trucking.

205.    In addition, Uber was also prevented from competing with Mr. Levandowski's trucking business as the parties' agreement required Mr. Levandowski to make Uber a member of the LLC he formed for the outside trucking business with no waiver of any statutory fiduciary duties applicable to members.

206.    After exercising its option to acquire Otto Trucking, Uber did not close the acquisition in the required 45-days.  It delayed and stalled the closing for nearly nine months.

207.    During that time, based on publicly available information, Uber agreed as part of the Waymo Settlement to never re-hire or work with Mr. Levandowski again.

208.    Given Uber's delay, Mr. Levandowski asked that the Otto Trucking Agreement be terminated and that he be allowed to start his outside trucking business with the IP License Uber was obligated to provided.  Uber refused to give Mr. Levandowski the IP License.

209.    Upon information and belief, because of the Waymo Settlement, Uber stalled the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP License.

210.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

COMPLAINT

211.     Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount to mitigate the damage caused by Uber's breach.

212.     Mr. Levandowski is a party to certain provisions of the Otto Trucking Agreement and a beneficiary of other provisions and has the right to enforce that agreement and has no obligations under the Otto Trucking Agreement.  To the extent that he has any obligations under that agreement, he has satisfied them.

213.     Uber breached the Otto Trucking Agreement by failing to exercise commercially reasonable efforts to close the Otto Trucking acquisition.

214.     It also breached the Otto Trucking Agreement by failing to appoint Mr. Levandowski non-executive Chairman of the trucking business.

215.     It further breached the Otto Trucking Agreement by refusing to terminate the agreement and give Mr. Levandowski the IP License contemplated by the parties or, in the alternative, to name him a "non-Executive Chairman" and pay him up to approximately, $4.128 billion in earnouts associated with the profits of Uber Freight (the new name of Otto Trucking).

216.     Uber's performance under the Otto Trucking Agreement has not been excused.

217.     As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

## COUNT VI

### (Breach of Covenant of Good Faith and Fair Dealing)

218.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

219.     In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business.  Uber agreed to that condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

220.     The Otto Trucking Agreement includes an implied covenant of good faith and fair dealing. The implied covenant ensures that neither party may engage in arbitrary or unreasonable conduct and thereby prevent the other party from receiving the fruits of the bargain.

221.     The intent of the parties for Mr. Levandowski to be able to continue to pursue the trucking business he left Google to start with Uber's support in exchange for Mr. Levandowski selling Otto to Uber.

222.     This intent is reflected in the Otto Trucking Agreement as the only scenario where Uber could walk away from Otto Trucking and not support Mr. Levandowski's trucking business was if Uber did not acquire Otto.

223.     After acquiring Otto, Uber had two options for supporting the trucking business.  It could acquire Otto Trucking and appoint Mr. Levandowski as the non-executive chairman of that business.

224.     In the alternative, Uber could terminate the acquisition of Otto Trucking, but support an outside trucking venture started by Mr. Levandowski as an investor.  Uber was obligated to provide an exclusive license to its self-driving technology for Mr. Levandowski to use in the field of trucking in exchange for membership in Mr. Levandowski's new company. The IP License was an exclusive license for trucking, which barred Uber from competing with Mr. Levandowski's trucking business.  Uber's membership interest in Mr. Levandowski's new company also prevented Uber from competing with that business based on the statutory duties owed by members of an LLC.

225.     Uber did neither.

226.     Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was in control of Mr. Levandowski's defense and settlement prospects, and had barred Mr. Levandowski from participating in the settlement discussion or discussing settlement directly with Google.

227.     Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto

36

Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

228.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

229.    Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

230.    Mr. Levandowski is a beneficiary of the Otto Trucking Agreement and has the right to enforce that agreement and has no obligations under the Otto Trucking Agreement. To the extent that he has any obligations under that agreement, he has satisfied them.

231.    Uber's actions described herein have deprived Mr. Levandowski of the fruits of the bargain, including the agreed-to benefit of running a trucking business with Uber's support.

232.    By preventing Mr. Levandowski from obtaining the benefits of the Otto Trucking Agreement, Uber has violated the implied covenant of good faith and fair dealing.

233.    After Mr. Levandowski's forced divestment, Uber acquired Otto Trucking, which became Uber Freight.  Uber Freight has reported hundreds of millions in revenue since its creation and Mr. Ron, who heads Uber Freight, stated that he and Uber "think there is a very clear path to profitability."

234.    As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

## COUNT VII

### (Declaratory Judgment and Damages: Rescission of Otto Transaction)

235.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

236.    In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.  In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

237.     Mr. Levandowski denies that Uber has any right to rescission.

238.     Alternatively, if the Court determines that Uber has not waived its right to rescission and has in fact rescinded the Indemnification Agreement, the entirety of the Otto transaction must also be rescinded and all consideration Uber received from the Otto transaction must be returned to Mr. Levandowski.

239.     In agreeing to sell Otto to Uber and lead Uber's self-driving car program, Mr. Levandowski conveyed repeatedly to Uber's representatives that he was concerned that Google would sue him.  Because of these concerns, Uber agreed to provided indemnity as key part of the Otto transaction and as an inducement to Mr. Levandowski to sell Otto to Uber. Mr. Levandowski would not have entered into the Otto transaction without the Indemnity Agreement because of his well-founded fear of Google.

240.     For this reason, on April 11, 2016, executed documents for the acquisition of Otto, including the Indemnification Agreement.   All of the agreements executed on April 11, 2016 are one contract that cannot be severed.

241.     Uber's rescission of the Indemnification Agreement necessarily requires rescission of the entire Otto transaction, including returning all consideration related to the transaction, including the intellectual property Uber received from its acquisition of Otto.

242.     As a result of the acts described herein, should the Court determine that Uber may rescind the Indemnification Agreement, a live controversy exists as to whether Uber's rescission, if effective, also rescinds the Otto transaction and requires return of all consideration Uber received from that transaction.

243.     To the extent Uber has effectively rescinded the Indemnification Agreement, this issue is ripe for determination and requires a declaration as to the effect of Uber's purported rescission on the Otto transaction of which it was a necessary and integral part.

244.     Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement without also rescinding the Otto transaction and returning all consideration received from that deal.

245.     In addition, Mr. Levandowski seeks damages, including any consequential

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

COMPLAINT

damages, arising out of Uber's rescission of the Otto transaction.

## COUNT VIII

### (Objection to Claim)

246. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

247. For the reasons set forth above, the Indemnity Agreement is not subject to rescission and, if it had been, Uber waived its right to assert such remedy.

248. For the reasons set forth above, Uber is liable under the Indemnity Agreement to advance his Expenses (as defined in the Indemnification Agreement).

249. For the reasons set forth above, Mr. Levandowski generally denies the evidentiary bases upon which the Proof of Claim is based and specifically denies that (a) Uber was fraudulently induced to enter into the Indemnity Agreement, (b) Mr. Levandowski failed to comply with his obligations under the Indemnity Agreement, and (c) Uber's obligations under the Indemnity Agreement are subject to allocation as asserted in the Proof of Claim, which in any event, cannot be adjudicated until after Uber satisfies its obligations under the Indemnification Agreement.

250. For the reasons set forth above, any claim for offset or contribution is also undermined by its active participation in the conduct at issue in the Waymo Action and the Google arbitration as it (a) encouraged, if not directed, Mr. Levandowski to recruit Google employees to join Otto and Uber, and (b) knew about Mr. Levandowski's retention of Google information and access of the one file at issue in the plea agreement after he left Google.

251. For the reasons set forth above, Mr. Levandowski denies that Uber has any right to contribution from Mr. Levandowski for the Waymo settlement. Waymo did not prove that Mr. Levandowski misappropriated any trade secrets in that case. As for the one file that Mr. Levandowski accessed after he left Google, Uber was well aware of that conduct and proceeded to acquire Mr. Levandowski's company and work with him anyway. Moreover, Mr. Levandowski's guilty plea that resulted in a total restitution amount of approximately $750,000 further demonstrates the unreasonableness of Uber's decision to settle with Waymo for

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

$245,000,000 in stock, among other consideration. In addition, to the extent that any trade secrets were taken and used at Uber, those trade secrets did not come from Mr. Levandowski, but rather a different former Google employee. Indeed, as admitted in Uber's public statements, Uber's self-driving software—an area that Mr. Levandowski did not work on at Google or Uber—contained problematic functions that will require it to enter into a license agreement with Waymo for use of Waymo's intellectual property. Upon information and belief, the Waymo Settlement, entered into after discovery of possible misconduct relating to Uber's source code, settled issues relating to theft of trade secrets by individuals who are not Mr. Levandowski.

252. Mr. Levandowski therefore seeks disallowance in full of the Proof of Claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Levandowski prays for the following relief:

1. A declaration that Uber has released all claims against Mr. Levandowski alleged in the Proof of Claim;

2. A declaration that Uber's purported rescission of the Indemnification Agreement is barred and ineffective;

3. An order enforcing the obligation in the Indemnification Agreement that Uber advance payment for the Expenses in the March 6 Request;

4. An order from the Court enforcing the obligation in the Indemnification Agreement that Uber continue to advance payment for Expenses pursuant to Section 2.3 until Google's claims are resolved by either a binding judgment or settlement;

5. A declaration that if Uber's rescission of the Indemnification Agreement is effective, Uber must also rescind the entire Otto transaction and return all consideration received from that transaction;

6. Damages in an amount to be proven at trial for Uber's breach of the express and implied terms of the Otto Trucking Agreement;

7. Prejudgment and post-judgment interest;

8. Attorneys' fees and costs incurred by Mr. Levandowski pursuant to Section 3.2 of

COMPLAINT

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

1    the Indemnification Agreement and Section 8(n) of the Otto Trucking Agreement,

2    including fees incurred in the Bankruptcy proceeding due to Uber's failure to

3    advance expenses; and

4        9.       All other relief that is equitable and just.

5    Dated: July 17, 2020                          Respectfully submitted,

6

7                                                  By:/s/ *Brett M. Schuman*
                                                       Brett M. Schuman (SBN 189247)
8                                                      *bschuman@goodwinlaw.com*
                                                       Rachel M. Walsh (SBN 250568)
9                                                      *rwalsh@goodwinlaw.com*
                                                       **GOODWIN PROCTER LLP**
10                                                     Three Embarcadero Center
                                                       San Francisco, California 94111
11                                                     Tel.: +1 415 733 6000
                                                       Fax.: +1 415 677 9041
12
                                                       Hong-An Vu
13                                                     *HVu@goodwinlaw.com*
                                                       **GOODWIN PROCTER LLP**
14                                                     601 S. Figueroa Street, 41st Flr.
                                                       Los Angeles, California  90017
15                                                     Tel.: +1 213 426 2500
                                                       Fax: +1 213 623 1673
16
                                                       Attorneys for Plaintiff and Debtor and Debtor
17                                                     In Possession Anthony Levandowski

18

19

20

21

22

23

24

25

26

27

28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

41

COMPLAINT

# EXHIBIT B

# EXHIBIT A

## JAMS ARBITRATION
## CASE REFERENCE NO 1100086069

GOOGLE, LLC,

      Claimant

        and

ANTHONY SCOTT LEVANDOWSKI        **CORRECTED FINAL AWARD**

And

LIOR RON,

      Respondents

| **Counsel for Claimant** | **Counsel for Respondents** |
|---|---|
| Keker & Van Nest LLP<br>633 Battery Street<br>San Francisco, CA 94111<br><br>Robert A. Van Nest<br>Rachael E. Meny<br>Jennifer A. Huber<br>Thomas R. Gorman<br>W. Hamilton Jordan<br>Jo W. Golub<br>Ben Berkowitz<br>Reid Mullen<br>Molly Caldwell Villagra | *Attorneys for Respondent Anthony Levandowski*<br><br>Goodwin Procter LLP<br>135 Commonwealth Drive<br>Menlo Park, CA 94025<br><br>Neel Chatterjee<br>Brett M. Schuman<br>Rachel M. Walsh<br>Andrew Ong<br><br>*Attorneys for Respondent Lior Ron*<br><br>Taylor & Patchen LLP<br>One Ferry Building, Suite 355<br>San Francisco, CA 94111<br><br>Stephen E. Taylor<br>Jonathan A. Patchen<br>Cheryl A. Cauley<br>Karan S. Dhadialla<br>Daniel P. Martin |

| Arbitrators | | |
|---|---|---|
| Hon. James Ware (Ret.), Chair<br>2 Embarcadero Center<br>Suite 1500<br>San Francisco, CA 94111 | Hon. Read Ambler (Ret.)<br>160 W. Santa Clara Street,<br>Suite 1600<br>San Jose, CA 95113 | Alexander L. Brainerd, Esq.<br>2 Embarcadero Center,<br>Suite 1500<br>San Francisco, CA 94111 |
| **Place of Arbitration** | JAMS Dispute Resolution Center<br>2 Embarcadero Center<br>San Francisco, California 94111 | |
| **Date of Arbitration Hearing** | April 30, 2018 and May 1-4, 7-11, 2018 | |
| **Case Manager** | Josephine Care | |
| **Date of Interim Award** | March 26, 2019 | |
| **Date of Final Award** | December 6, 2019 | |
| **Date of Corrected Final Award** | December 23, 2019, *nunc pro tunc* as of December 6, 2019 | |

Case: 20-30242   Doc# 1298-1   Filed: 07/31/2023   Entered: 07/31/2023 18:47:47   Page 46 of 114

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION | ........................................................ | 1 |
| II. | PROCEDURAL HISTORY | ........................................................ | 2 |
| | A. | Arbitration Agreements and Demands for Arbitration | 3 |
| | B. | Definitive Statement of Claims and Defenses | 5 |
| | C. | Pre-hearing Motions | 6 |
| | | 1. Disclosure and Discovery Motions | 7 |
| | | 2. Fifth Amendment Privilege Issues | 7 |
| | | 3. Stroz Materials | 8 |
| | | 4. Evidentiary Stipulations | 10 |
| | | 5. Request for Adverse Presumption | 10 |
| | D. | The Arbitration Hearing | 10 |
| | E. | Post-Hearing Proceedings | 12 |
| | | 1. Disposition of Unaddressed Claims | 12 |
| | | 2. Disposition of Unaddressed Counterclaims | 15 |
| | | 3. Disposition of Unaddressed Affirmative Defenses | 16 |
| | | 4. Reopening of Hearing | 17 |
| | | 5. Disposition of Motion for Evidentiary Sanctions | 18 |
| | | 6. Supplemental Submissions | 19 |
| | | 7. Interim Award | 19 |
| III. | FACTS | ........................................................ | 20 |
| | A. | Respondents' Employment with Google | 20 |
| | B. | Employment Agreements | 21 |
| | | 1. Non-competition Provision | 21 |
| | | 2. Non-solicitation Provision | 22 |
| | | 3. Confidential Information Provision | 22 |
| | | 4. Code of Conduct | 22 |

Case: 20-302050   Doc#: 1298-1   Filed: 07/20/2023   Entered: 07/20/2023 18:47:47   Page: 4 of 7
of 114

| | | | | |
|---|---|---|---|---|
| C. | Project Chauffeur | | | 25 |
| D. | Google's Acquisition of 510 Systems and Anthony's Robots | | | 26 |
| E. | The Chauffeur Bonus Plan | | | 30 |
| F. | Odin Wave/Tyto LiDAR | | | 31 |
| G. | 280 Systems/Otto | | | 34 |
| H. | Solicitation of Google Employees | | | 38 |
| I. | Resignations from Google | | | 40 |
| J. | Uber's Acquisition of Otto | | | 41 |
| K. | Second Bonus Payment and Announcement of Uber Acquisition | | | 41 |
| IV. | ANALYSIS OF LIABILITY ISSUES | | | 42 |
| | A. | First Claim: Breach of Duty of Loyalty | | 42 |
| | | 1. | Essential Elements of the Claim | 42 |
| | | 2. | Actions by Respondents | 44 |
| | | | a. | Tyto LiDAR, LLC | 45 |
| | | | b. | Otto | 47 |
| | | | c. | Soliciting of Google Employees | 48 |
| | | | d. | Negotiations to Sell Otto to Uber | 51 |
| | | 3. | Defenses | 53 |
| | | | a. | Synthetic Equity Defense | 53 |
| | | | b. | Affirmative Defenses | 56 |
| | | | | 1. | Statute of Limitations | 57 |
| | | | | 2. | No Proof Google Would Have Terminated | 59 |
| | | | | 3. | Voluntary Payment | 60 |
| | | | | 4. | Waiver | 62 |
| | B. | Second Claim: Breach of Fiduciary Duty | | 64 |
| | | 1. | Essential Elements of the Claim | 64 |
| | | 2. | Levandowski's Status | 65 |

iv

C.    Third Claim: Breach of Contract ............................................. 66

    1.    2011 Acquisition Agreements ....................................... 66

        a.    Relevant Provisions of Agreements ............................ 67

        b.    Actions by Levandowski ....................................... 67

        c.    Affirmative Defenses .......................................... 68

            1.    Invalidity of Non-competition Provision ............... 68

            2.    Invalidity of Non-solicitation Provision ............... 75

    2.    Employment Agreements ........................................... 81

        a.    Provisions of the Agreements .................................. 81

        b.    Actions by Levandowski and Ron ............................. 82

        c.    Affirmative Defenses .......................................... 84

            1.    Invalidity ........................................... 84

            2.    Consent Decree ..................................... 85

D.    Fourth Claim: Unfair Competition ........................................ 86

    1.    Essential Elements of the Claim ..................................... 86

    2.    Actions by Levandowski and Ron ................................... 87

V.    ANALYSIS OF REMEDIES ...................................................... 87

A.    The Available Remedies .................................................. 87

    1.    Breach of Duty of Loyalty .......................................... 88

        a.    Disgorgement of Compensation ............................... 88

        b.    Retention Bonuses ............................................ 89

        c.    Competitive Harm Damages ................................... 90

    2.    Breach of Contract ................................................. 91

    3.    Unfair Competition ................................................ 91

B.    Respondent Levandowski ................................................ 92

    1.    Monetary Compensation ........................................... 93

    2.    Stock and Stock Options ........................................... 93

Case: 20-30050   Doc# 1198-1   Filed 07/12/23   Entered 07/12/23 18:47:47   Page 6 49
of 114

|   | 3. | Retention Bonuses | 94 |
|   | 4. | Competitive Harm Damages | 95 |
|   | 5. | Mitigation of Damages | 99 |
| C. | | Respondent Ron | 100 |
| D. | | Principal Amounts Awardable | 101 |
| VII. | | RESOLUTION OF REMAINING ISSUES | 102 |
| A. | | Interest | 102 |
|   | 1. | Legal Standard | 102 |
|   | 2. | Interest on Disgorgement Damages | 102 |
|   | 3. | Interest on Retention Bonus Damages | 105 |
| B. | | Attorney Fees | 106 |
|   | 1. | Prevailing Party | 106 |
|   |   | a. Google v. Levandowski | 107 |
|   |   | b. Google v. Levandowski and Ron | 112 |
|   |   | c. 998 Offer | 117 |
|   | 2. | Attorney Fees Awardable | 117 |
|   |   | a. Adjustment | 119 |
|   |   | b. Allocation | 120 |
|   | 3. | Costs | 121 |
|   | 4. | Taxes | 121 |
| VIII. | | FINAL AWARD | 123 |

THE UNDERSIGNED ARBITRATORS (the "Panel"), having been designated in accordance with the arbitration agreements between and among the parties, as modified by the Stipulation and Order dated April 14, 2017, and having examined the allegations, submissions and proof of the parties, find, conclude and issue this Final Award. The Panel confirms that in reaching its decision in this arbitration, the Panel has fully taken into consideration all the written and oral submissions of the parties, as well as the entirety of the evidence (whether documentary, testimonial, expert or otherwise) that has been presented by the parties, whether or not expressly referred to in this Final Award.

## I.    INTRODUCTION

In this arbitration, Claimant Google LLC ("Google") seeks disgorgement of salary and bonuses, damages and other relief from two of its former employees, Respondent Anthony Scott Levandowski ("Levandowski") and Respondent Lior Ron ("Ron"). Google claims that Levandowski and Ron breached their duty of loyalty, committed other tortious conduct and breached various contracts they had with Google. Google's claims arise from acts allegedly committed by Levandowski and Ron that harmed Google's self-driving vehicle program, known as Project Chauffeur, in which Google sought to be first-to-market with technology that would allow a vehicle to operate without a driver or human intervention.

Google started Project Chauffeur in 2009. It heavily invested money for facilities, research and engineering. Project Chauffeur eventually grew into an independent subsidiary, Waymo LLC, employing over 600 employees. Google alleges that while Respondent Levandowski was its employee working on autonomous vehicle control technology for Project Chauffeur, he secretly formed, funded and directed an outside competitive company to develop the same or similar technology. Google alleges that Respondent Ron joined Levandowski in competing against Google and that together they

1

solicited other Google employees to join their newly formed company and secretly
negotiated to sell critical autonomous vehicle technology to Uber Technologies
Inc.,("Uber"), Google's primary competitor. Uber came to believe that acquiring
Levandowski and Ron's company, populated as it was by a team of ex-Chauffeur employees,
would give Uber a competitive leap in the competition with Google. Uber proposed that
Levandowski and Ron sell their company to Uber, and they agreed. They resigned their
employment with Google and sold their company to Uber for consideration arguably worth
$680 million if certain milestones are met.

As an incentive to the founding employees, Google created a bonus plan. During the
course of their employment, Google paid Levandowski over          in salary and
bonuses                              . As relief for Respondents' conduct, Google seeks
disgorgement of a portion of Respondents' salary and bonuses, and over          in
damages for retention bonuses and for competitive harm, plus attorney fees and costs.

Levandowski and Ron deny that their conduct was improper, disloyal, or unlawful.
They allege that as "at-will" employees they were free to leave Google and to use their
knowledge and skills to pursue autonomous vehicle development elsewhere. They assert
that all of their conduct complied with California law as well as their contractual
obligations to Google.

## II.     PROCEDURAL HISTORY

At the commencement of these proceedings the parties elected to use the JAMS
CaseAnywhere Docketing System. The System compiles, records and serves notice of all
submissions. The System and all submissions are accessible to the parties and provides a
chronological record of these proceedings. Below, the Panel summarizes some of the
procedural history.

2

## A.     Arbitration Agreements and Demand for Arbitration

On October 28, 2016, Google, Inc., now renamed Google LLC ("Google"), submitted to JAMS a "Demand for Arbitration" naming Anthony Scott Levandowski as the sole Respondent. (JAMS Ref. No. 1100086032.) On the same day, Google submitted a second "Demand for Arbitration" jointly naming Levandowski and Ron as Respondents. (JAMS Ref. No. 1100086069.) Attached to Google's Demands were contracts between Google and Levandowski and between Google and Ron in which they agreed to arbitrate any dispute arising out of their contractual relationships.

After the Demands were submitted and the cases were opened by JAMS, counsel for the parties notified the JAMS Case Administrator that the parties wished to have the proceedings conducted by a panel of three arbitrators. In due course, and in accordance with the procedure agreed to by the parties, the following neutrals were designated by JAMS to serve as the Panel: The late Honorable Steven A. Brick (Ret.), Chair,[1] the Honorable Edward Panelli (Ret.); and the Honorable James Ware (Ret.) The composition of the Panel was approved by the parties.

On March 10, 2017, with Judge Brick presiding, the Panel conducted the first in a series of in-person case management conferences with counsel for the parties. The Panel noted the submission of the two arbitration Demands; that Respondents had submitted initial responses to the Demands;[2] and that Respondent Levandowski had submitted a

---

[1] The Panel remains saddened by Judge Brick's untimely death. The care, attention and leadership that he contributed to this matter set the cooperative tone and clear direction that the Panel continued to follow.

[2] As discussed below, during the course of the proceedings, the parties submitted amended claims and affirmative defenses.

3

counterclaim. The Panel determined and the parties stipulated that all of the issue raised by the claims, counterclaims and defenses were arbitrable.

The attention of the Panel was drawn to the fact that attached to the two Demands were five written contracts in which the parties to the contracts had agreed to binding arbitration of all disputes arising out of each contract. However, the arbitration agreements differed in the procedures to be applied. The parties advised the Panel that they were preparing a stipulation to consolidate the two arbitration cases into a single proceeding and to use a single set of procedural rules to govern the consolidated proceedings.

On April 13, 2017, counsel for the parties entered into a stipulation to consolidate the two cases and to a single set of procedures. The stipulation was also signed by each party. Pursuant to the stipulation, on April 14, 2017, the Panel issued Scheduling Order Number 2 that, *inter alia*, ordered: (1) that the two cases be consolidated for all purposes; (2) that to the extent the terms of the stipulation differed from or conflicted with the provisions of the arbitration agreements, that the stipulation operated as an amendment or modification of any such conflicting provision; (3) that the JAMS Employment Arbitration Rules shall apply to the consolidated proceedings; (4) that the JAMS Minimum Standards of Procedural Fairness would apply to the arbitration, except for the following three specifically enumerated situations: (a) Google would bear all JAMS costs, case management fees and professional fees for the arbitrators' services for the consolidated proceedings; (b) the parties retained all rights and obligations regarding prevailing party and attorney fees for any issues related to the Google v. Levandowski arbitration; and (c) the parties have the same post-arbitration review rights as are stated in the respective underlying agreements and applicable law. Paragraph 8 of Scheduling Order No. 2 also provided that the Panel

4

would issue an interim award pursuant to JAMS Rule 24, and that the question of attorneys' fees and costs would be addressed in a Final Award. The parties also stipulated that the Panel should apply the substantive law of California to the consolidated proceedings.

### B. Definitive Statement of Claims and Defenses

Google's Demand against Respondent Levandowski, alone, alleged a single cause of action for breach of contract related to Google's purchase of 510 Systems and Anthony's Robots. Google's initial and amended Demands for Arbitration against Levandowski and Ron, jointly, alleged seven claims styled as "causes of action."[3] In their initial response, Respondents denied the substantive claims, jointly asserted eight affirmative defenses[4] and alleged three counterclaims.[5]

At the direction of the Panel, on November 6, 2017, Google submitted a Definitive Statement of Claims and Defenses for the now consolidated case. Google's Definitive Statement of Claims alleged the same individual claim against Levandowski, and the same joint claims against Levandowski and Ron that were contained in its initial and in its amended Demands.

Respondents' Definitive Statement of Responses did not include counterclaims. Respondents incorporated by reference their original Response. In addition to the eight

---

[3] First Cause of Action - Breach of Contract; Second Cause of Action - Breach of Fiduciary Duties and /or Duties of Loyalty; Third Cause of Action - Fraud-Deceit; Fourth Cause of Action - Tortious Interference with Contract; Fifth Cause of Action - Tortious Interference with Prospective Economic Advantage; Sixth Cause of Action - Unlawful Conduct and Unfair Competition; Seventh Cause of Action - Unjust Enrichment.

[4] First Affirmative Defense - Failure to State a Claim; Second Affirmative Defense - Improper Restraint of Competition and Employee Freedom; Third Affirmative Defense - Waiver; Fourth Affirmative Defense - Estoppel; Fifth Affirmative Defense - Unclear Hands; Sixth Affirmative Defense - Statute of Limitations; Seventh Affirmative Defense - Laches; and Eighth Affirmative Defense - Mitigation.

[5] Violation of the California Labor Code, Breach of Contract and Unfair Competition in Violation of California Business and Professions Code.

Case 20-30242 Doc#128-1 Filed 07/30/23 Entered 07/30/23 18:23:47 Page 55 of 114

affirmative defenses originally alleged, Respondents alleged an additional fourteen affirmative defenses for a total of twenty-two affirmative defenses.[6]

When a seat on the Panel became vacant due to the untimely and unfortunate death of Judge Brick, the JAMS administrative process was initiated to fill the vacancy. On June 23, 2017, in Scheduling Order Number 4, the Panel acknowledged that Alexander L. Brainerd, Esq. was chosen to fill the vacancy. The parties stipulated to the appointment by JAMS of Justice Panelli as Panel Chair.

On March 9, 2018, for personal reasons unrelated to the case, Justice Panelli voluntarily stepped down from the Panel. On March 12, 2018, under the JAMS administrative process, the parties stipulated to the appointment by JAMS of the Honorable Read Ambler (Ret.) to the Panel. With the stipulation of the parties, Judge Ware was appointed by JAMS as the Panel Chair.

### C. Pre-hearing Motions

During the course of pre-hearing proceedings, the parties submitted multiple motions. The index of "Motions" in the CaseAnywhere System, lists over 170 entries. Some

---

[6] First Affirmative Defense - Failure to State a Claim; Second Affirmative Defense - Improper Restraint of Competition and Employee Freedom; Third Affirmative Defense - Waiver; Fourth Affirmative Defense - Estoppel; Fifth Affirmative Defense - Unclean Hands; Sixth Affirmative Defense - Statute of Limitations; Seventh Affirmative Defense - Laches; Eighth Affirmative Defense - Mitigation; Ninth Affirmative Defense - CUTSA Preemption; Tenth Affirmative Defense - Economic Loss Doctrine; Eleventh Affirmative Defense - Voluntary Payment Doctrine; Twelfth Affirmative Defense - Lack of Standing; Thirteenth Affirmative Defense - Failure to Exercise Due Diligence; Fourteenth Affirmative Defense - Accord and Satisfaction; Fifteenth Affirmative Defense - Misrepresentation; Sixteenth Affirmative Defense - Unconstitutionality of Punitive Damages; Seventeenth Affirmative Defense - Offset; Eighteenth Affirmative Defense - Parol Evidence and Integration; Nineteenth Affirmative Defense - Assumption of Risk; Twentieth Affirmative Defense - No Actual Injury; Twenty-First Affirmative Defense - Lack of Causation; and Twenty-Second Affirmative Defense -Res Judicata/Collateral Estoppel.

Case 20-03020 Doc#12081 Filed 07/04/23 Entered 07/04/23 18:23:07 Page 56 of 114

of the motions implicated third parties. With the consent of the parties, the Panel permitted third parties to address those motions.

For all noticed motions, the Panel provided the parties with written orders explaining its reasoning. Below, the Panel briefly summarizes some of the pre-hearing motions and Orders.

### 1. Disclosure and Discovery Motions

Numerous motions were filed asking the Panel to enforce JAMS Rule 17 regarding the disclosure of information:

May 12, 2017 – Order granting Google's motion to compel Levandowski to comply with disclosure obligations under Rule 17;

May 13, 2017 – Order granting Google's motion to compel Ron to comply with Rule 17 disclosure obligations;

July 13, 2017 – Order denying Levandowski's motion for order prohibiting Google from introducing evidence at the hearing relating to Google's trade secrets;

August 21, 2017 – Order granting Ron's motion to compel production of performance-related information under Rule 17;

January 9, 2018 – Order granting Google's request to take certain depositions;

January 19, 2018 – Order granting Levandowski's request to take certain depositions.

### 2. Fifth Amendment Privilege Issues

During pre-hearing proceedings, Levandowski refused to respond to some disclosure and discovery requests on the ground that he was privileged to refuse to respond under the attorney-client and self-incrimination privilege provided by the Fifth

Case 20-30080 Doc# 1081 Filed 01/30/23 Entered 01/30/23 18:23:17 Page 57 of 114

Amendment to the United States Constitution.[7] Various motions were filed that involved Levandowski's assertion of his Fifth Amendment privilege against self-incrimination. The Panel sustained Levandowski's privilege assertion as to testimonial responses.

On April 13, 2018, after pre-hearing discovery had closed, Google submitted a motion for evidentiary sanctions against Levandowski for his invocation of the Fifth Amendment. Levandowski filed a cross-motion to bifurcate the arbitration hearing and to allow him to make a limited waiver of his Fifth Amendment privilege. Levandowski also offered to reopen discovery to allow him to submit to a deposition on questions congruent with his proposed limited waiver. On April 24, 2018, the Panel denied Levandowski's motion to testify as to any subject matter as to which a Fifth Amendment privilege was asserted during pre-hearing discovery. In light of that ruling, Levandowski's motions to bifurcate and to reopen discovery were denied as unnecessary.

### 3. Stroz Materials

During pre-hearing proceedings, Google proffered evidence that on February 22, 2016, after Respondents had resigned their employment with Google, Respondents had executed a final term sheet with Uber under which Uber would buy Respondents' equity in Otto and would indemnify Respondents for "bad acts" committed by Respondents. The

---

[7] During a portion of the time of these proceedings a civil action was pending in the United States District Court for the Northern District of California entitled, Waymo LLC v. Uber Technologies, Inc., Ottomotto LLC; and Otto Trucking LLC. No. C 17-00939 WHA. In that action Waymo alleged, *inter alia*, misappropriation of trade secrets. Waymo alleged that to start Ottomotto ("Otto") and Otto Trucking, Levandowski had downloaded over 14,000 confidential files concerning the same autonomous vehicle technology that is involved in these arbitration proceedings. During the proceedings in the U.S. District Court, the trial judge referred Levandowski's conduct to the U.S. Attorney. Thereafter, in both the federal proceedings and in this arbitration, Levandowski consistently asserted a Fifth Amendment privilege.

Case 20-03020 Doc#1 2081-1 Filed 07/30/23 Entered 07/30/23 18:23:57 Page 58 of 114

term sheet provided that prior to signing final acquisition and indemnity documents, Uber would conduct due diligence. As part of its due diligence, Uber retained a firm named Stroz Friedberg to conduct an investigation that involved attestations by certain employee of Otto about his or her conduct. In doing so, Stroz Friedberg had obtained statements from Levandowski and others and produced a report (for convenience referred to as the "Stroz Materials"). Google further proffered that in the Waymo Litigation,[8] Google had made a motion to compel Uber to produce a copy of the Stroz Materials and Uber had objected to production on the grounds that the materials were privileged materials and were protected as work-product. The District Judge ultimately found against Uber and the Stroz Materials were produced in the federal case, a copy of which was filed in the public docket.

On September 22, 2017, Google moved the Panel to compel Uber to produce the Stroz Materials for this arbitration. On October 24, 2017, the Chair of the Panel granted Google's motion. On appeal to the full Panel, a majority of the Panel affirmed that ruling. Uber appealed the Panel's Order to the Superior Court, Judge Kahn, presiding.

On January 16, 2018, Judge Kahn issued an Order vacating the Panel's discovery order, ruling that the Stroz Materials were privileged, and that Google could not compel production of them from Uber. Google appealed Judge Kahn's order to the California Court of Appeals. Pending a decision on the appeal, the parties stipulated to wall-off the Stroz Materials from these proceedings.

Concurrently, some of the Stroz Materials had been disclosed to Google by Levandowski. On January 23, 2018, Levandowski sought to claw back an unredacted version of his Stroz interview memorandum that he had voluntarily produced. When

---

[8] See fn. 7.

Case 20-30242 Doc# 1281 Filed 07/30/23 Entered 07/30/23 18:23:47 Page 59 of 114

Google refused to agree to the clawback, Levandowski made a motion to allow the clawback. On March 18, 2018, the Panel granted Levandowski's motion and ordered the clawback. Levandowski later realized that he had produced other Stroz Materials that had not been the subject of the clawback motion; those materials had been listed on Google's list of proposed exhibits. A motion *in limine* to exclude those materials was granted by the Panel.

Google's appeal of Judge Kahn's order was still pending when the arbitration hearing commenced and concluded. Based on the pending appeal, the Stroz Materials were not received in evidence during the hearing. Although some of the Stroz Materials were on the public docket, none of the members of the Panel accessed or read the material.

### 4. Evidentiary Stipulations

During pre-hearing proceedings, during and after the merits hearing, and in post-hearing submissions, the parties submitted evidentiary stipulations. All of these stipulations were accepted by the Panel.

### 5. Request for Adverse Presumption

In pre-hearing motions, Google argued that Respondents failed to retain relevant information and documents and engaged in spoliation. Google requested the Panel to sanction Respondents by applying an adverse inference. The matter was taken under submission and reserved for decision after hearing all evidence.[9]

### D. The Arbitration Hearing

In pre-arbitration conferences the parties requested the Panel to schedule 10 days for the hearing. They stipulated to the division of the scheduled-time between and among

---

[9] See discussion at section II(E)5 *infra*.

them. During the hearing the parties kept track of how each used the time and coordinated the presentation of witnesses to maximize their time. The Panel commends the parties for their diligent use of the allotted time.

Prior to the hearing, the parties submitted pre-hearing briefs. The arbitration hearing commenced on April 30, 2018 and continued on May 1-4 and May 7-11, 2018 at the JAMS Resolution Center in San Francisco. As arranged by the parties, a stenographer recorded the proceedings.

At each hearing, the parties were represented by their counsel of record. During the hearing, third-party witnesses were called. Occasionally, counsel for a third-party witness attended the hearing during a client's testimony. Documentary and demonstrative exhibits were accepted into evidence at the hearing.

The following witnesses testified at the hearing:

| Witnesses Who Testified In-Person | |
|---|---|
| 1.  DMITRI DOLGOV | 16.  ALEX COOPER |
| 2.  DON HARRISON | 17.  CHRIS URMSON |
| 3.  IONUT IORDACHE | 18.  MICHIELE RODERICK |
| 4.  SEBASTIAN THRUN, PhD | 19.  JOHN KRAFCIK |
| 5.  STACY SULLIVAN | 20.  MICHAEL XING |
| 6.  LAILA MATTOS, PhD | 21.  CAMERON POETZSCHER |
| 7.  CHELSEA BAILEY | 22.  LIOR RON |
| 8.  PIERRE-YVEZ DROZ | 23.  COLIN SEBERN |
| 9.  DON BURNETTE | 24.  TRAVIS KALANICK |
| 10. RHIAN MORGAN | 25.  CLAIRE DELAUNAY |
| 11. NINA QI | 26.  GAETAN PENNECOT |
| 12. DREW ULRICH | 27.  SCOTT RYVOLA |
| 13. BRENT SCHWARZ | 28.  ZACHARY MORRISS |
| 14. JAMES HASLIM | 29.  AARON CRUM |
| 15. OGNEN STOJANOVSKI | 30.  SOREN JUELSGARRD |
| | 31.  NATHANIEL FAIRFIELD |
| Witnesses Who Testified via Video Conference | |
| 32. BRYAN SALESKY | |
| Witnesses Who Were Tendered and Accepted as Experts | |
| 33. JOHN MONTEGUDO | |
| 34. MATTHEW MARX, PHD | |

Case 2:20-cv-03040 Doc #:12-1 Filed 01/30/23 Entered 01/30/23 18:23:47 Page 181 of 1714

| | |
|---|---|
| 35. ERIK LAYKIN | |
| 36. BRIAN DURRELL | |
| 37. JOHN HARTOG | |
| 38. DOUGLAS KIDDER | |
| 39. ANDREW METRICK, PhD | |
| 40. JOSEPH SHAW | |
| 41. JAMES MALACKOWSKI | |
| **Witnesses Whose Deposition Testimony Was Submitted Into the Record[10]** | |
| 42. MATTHEW BLATTMACHR | |
| 43. SASHA ZBROZEK | |
| 44. TODD STEINER | |
| 45. ANDREW BARTON-SWEENEY | |
| 46. JOHN BARES | |
| 47. LARRY PAGE | |
| 49. DAVID LAWEE | |

### E.    Post-Hearing Proceedings

Following the hearing, the parties submitted opening post-hearing briefs. In the post-hearing briefs, an issue arose with respect to whether one or more of Google's claims that had not been specifically addressed had been withdrawn and, if so, the implication of any withdrawal. During its consideration of that issue, the Panel noted that it had not ruled on the status of withdrawn counterclaims and that there were affirmative defenses that had not been specifically addressed. The Panel now states its dispositions regarding all unaddressed claims, counterclaims and affirmative defenses.

### 1.    Disposition of Unaddressed Claims

On April 26, 2018, Google submitted a Pre-hearing Brief. In a section entitled "Preview of Claims," Google did not discuss four of its originally filed causes of actions against Levandowski and Ron (grouped together for reference as the "subject tort claims"):

---

[10] In the deposition transcripts the parties highlighted the offered testimony. In some instances, there were objections to deposition testimony. All objections to deposition testimony were resolved during deliberations of the Panel.

Case 20-03020 Doc# 1081 Filed 07/30/23 Entered 07/30/23 18:23:47 Page 102 of 114

(1) fraud; (2) tortious interference with contract; (3) tortious interference with prospective economic advantage; and (4) the Second Cause of Action of the Amended Joint Demand for breach of fiduciary duty against Respondent Ron.[11]  During the hearing, Google did not present evidence or argument on the subject tort claims.

In its post-hearing brief, Respondents argued that Google had waived the subject tort claims.  Respondents requested a partial award in their favor with respect to the subject tort claims.[12]  In an August 7, 2018, letter to the Panel, Google contended that the four claims had not been waived but had been withdrawn.  In an August 10, 2018, letter to the Panel, Respondents contended that Google's failure to address the subject tort claims should not be regarded as a "withdrawal" because Google failed to comply with the notice requirement of JAMS Rule 13(b).  Respondents reiterated their request for a partial award in their favor on the claims that Google was no longer pursuing.  Respondents also requested that Google be estopped from relying on these claims to support its damages theories.  On August 14, 2018, Google submitted a letter to the Panel objecting to Respondents' request for a partial award on the ground that because the Panel had not heard evidence on the withdrawn claims, no award was appropriate.  In addition, Google pointed out that no partial award was rendered when Respondent Levandowski withdrew

---

[11] The subject tort claims were the Third, Fourth, and Fifth Causes of Action of the Amended Joint Demand and a part of the Second Cause of Action of the Amended Joint Demand as to Respondent Ron.  The Second Cause of Action contains allegations that Respondent Ron breached Fiduciary Duties and/or Duties of Loyalty.  Google's reference to withdrawing its breach of fiduciary duty claim against Respondent Ron leads the Panel to conclude that Google did not withdraw its allegations in the Second Cause of Action for breach of loyalty against Levandowski and Ron.

[12] "Google's brief no longer alleges fraud, tortious interference with contract, or tortious interference with prospective economic advantage against either Respondent, nor does it allege breach of fiduciary duty against Ron.  Those claims have been waived, and Respondents should be issued a partial award in their favor as to those claims." (Resp. Post-Hrg. Brief at 3, n.1.)

Case 2:20-03020  Doc #:1281  Filed 01/30/23  Entered 01/30/23 18:23:47  Page 63 of 114

his counterclaims. As to the effect of the withdrawn claims on damages, Google argued that the withdrawn claims should have no impact on the remaining tort claims for breach of duty of loyalty and breach of fiduciary duty or on contract damages.

The Panel noted that the letters regarding the subject tort claims were outside of the post-hearing briefing schedule that the Panel had ordered. However, the Panel determined to take up the dispute. On August 14, 2018, the Panel directed the parties to submit formal briefs on the issue of "whether Rule 13(b) applies, whether it was 'effectively' complied with and the effect of the procedural history on the disposition of the subject claims." On August 24, 2018, formal briefs were submitted, and the Panel took the matter under submission for decision. The Panel now states its disposition.

JAMS Rule 13(b) provides a party with a conditional unilateral right to withdraw a claim without prejudice:

> A Party that asserts a claim or counterclaim may unilaterally withdraw that claim or counterclaim without prejudice by serving written notice on the other Parties and the Arbitrator. However, the opposing Parties may, within seven (7) calendar days of service of such notice, request that the Arbitrator condition the withdrawal upon such terms as he or she may direct.

Google's pre-hearing brief did not expressly state that the subject tort claims were being withdrawn without prejudice. Indeed, the subject tort claims were not discussed at all. Thus, the Panel finds that the pre-hearing brief did not satisfy Rule 13(b) as notice of withdrawal without prejudice. However, the Panel proceeds to determine if the four claims should be dismissed as withdrawn *with* prejudice.

In his opening statement, Google's counsel stated:

> And the bad acts included all the types of claims that we're presenting here: breach of fiduciary, breach of the duty of loyalty, breach of the obligation not to solicit breach of the obligation not to compete. These were all the things that they demanded Uber indemnify them for.
> * * *

14

So, as a result, we're asking for three forms of relief. First, the compensation paid to those two while they were disloyal; second damages for the valuable team of engineers that were taken without compensation from Google; and, third, damages for the cost of retaining people. (Tr. 15-16.)[13]

In its August 24, 2018 brief, Google stated that it is "willing to agree that it will not" pursue the withdrawn tort claims in the future. Although the JAMS Employment Rules apply to this case, by analogy, Section 581(d) of the California Code of Civil Procedure provides:

> Except as otherwise provided in subdivision (e), the court shall dismiss the complaint, or any cause of action asserted in it, in its entirety or as to any defendant, with prejudice when upon the trial and before the final submission of the case, the plaintiff abandons it. Cal. Code Civ. Proc. § 581(d).

Accordingly, the Panel finds that the subject tort claims were abandoned by Google and accordingly, dismisses them with prejudice.

### 2. Disposition of Unaddressed Counterclaims

On May 12, 2017, Levandowski submitted a "Notice of Dismissal of Counterclaims without Prejudice."[14] Respondent Ron took the position that he had not submitted any counterclaims. At a hearing on June 9, 2017, "to remove any doubt," Ron's counsel agreed to dismiss any counterclaims without prejudice.[15]

Section 581(d) of Cal. Code Civ. Proc. also applies by analogy to Levandowski's counterclaims that were dismissed without prejudice on May 12, 2017. The Panel now orders those counterclaims dismissed with prejudice *nunc pro tunc*.

---

[13] "Tr." refers to the reporter's transcript of the hearing.

[14] Google requested that the Panel impose conditions for acceptance of Levandowski's dismissal of his Counterclaims. On June 27, 2017, the Panel denied the conditions requested by Google. The Panel set a deadline for Levandowski to decide whether to allege counterclaims. Levendowski did not submit counterclaims before the expiration of the Panel's deadline.

[15] See June 27, 2017 Order.

Case 20-03030 Doc# 1081 Filed 07/30/23 Entered 07/30/23 18:23:47 Page 65 of 114

### 3.  Disposition of Unaddressed Affirmative Defenses

During the hearing and in their post-hearing brief, Respondents did not address

some of their affirmative defenses.  Therefore, the Panel summarily dismisses the following

affirmative defenses as not having been addressed or proved by Respondents:

| As Listed in Definitive Response | Name of Defense |
| --- | --- |
| Fifth Affirmative Defense | Unclean Hands |
| Seventh Affirmative Defense | Laches |
| Ninth Affirmative Defense | CUTSA Preemption |
| Tenth Affirmative Defense | Economic Loss Doctrine |
| Twelfth Affirmative Defense | Lack of Standing[16] |
| Thirteenth Affirmative Defense | Failure to Exercise Due Diligence[17] |
| Fourteenth Affirmative Defense | Accord and Satisfaction[18] |
| Fifteenth Affirmative Defense | Misrepresentation |
| Sixteenth Affirmative Defense | Unconstitutionality of Punitive Damages |
| Seventeenth Affirmative Defense | Offset |
| Eighteenth Affirmative Defense | Parole Evidence and Integration |
| Nineteenth Affirmative Defense | Assumption of Risk |
| Twentieth Affirmative Defense | No Actual Injury[19] |
| Twenty-First Affirmative Defense | Lack of Causation[20] |
| Twenty-Second Affirmative Defense | Res Judicata/Collateral Estoppel |

With respect to the remaining affirmative defenses, as the Panel discusses each of

Google's remaining claims, the Panel will address any applicable defenses that apply to

each of them.

---

[16] This was alleged as an affirmative defense.  The Panel regards it as a negating defense, meaning an allegation that Google cannot prove an essential element of a claim.  It was not advanced as a separate defense in post-hearing briefing.  To the extent is was subsumed in another defense, it was considered by the Panel when the Panel addressed said defense.
[17] As an affirmative defense, Respondents prosecuted a claim that Google was not entitled to disgorgement of salary or bonus payments on the grounds that they were voluntary payments or constituted waiver.  This unaddressed affirmative defense has elements in common with one or more affirmative defenses that were addressed.  The dismissal of this affirmative defense has no effect on affirmative defenses that were prosecuted or addressed.
[18] See fn. 17.
[19] See fn. 16.
[20] Id.

### 4.   Reopening of Hearing

On August 14, 2018, the Panel issued an Order that stated, "[o]n August 25, 2018, all the briefs on outstanding issues will have been submitted. Thus, the Panel will declare the hearing closed as of that date; the 90-day clock for the Panel to render a Partial Final Award commences on August 25, 2018." As noted above, the parties had stipulated to issuance of an interim award. The JAMS Rules do not set a fixed deadline for issuance of an interim award. Thus, this declaration of timing was an error. On September 26, 2018, the Panel re-opened the hearing, *sua sponte,* to correct this Order and to confirm that the Panel would issue an Interim Award.

During the reopened proceedings, Google asked the Panel to extend the scope of the re-opened hearing to allow submission of Stroz-related evidence. While that request was taken under submission, the California Supreme Court denied Uber's request to review the Court of Appeal's decision reversing the Superior Court's reversal of the Panel's prior decision finding the Stroz-related materials not privileged and therefore admissible in these proceedings. Because that decision was now final, Google suggested that the Panel might wish to review the Stroz Materials as part of its consideration of Google's request.

In a December 19, 2018 Notice of Intended Decision Regarding the Stroz Materials, on behalf of the Panel, Judge Ware explained that, while the Stroz Materials were highly relevant to the subject of the arbitration proceedings, the "Panel is not disposed to receive submission of the Stroz Materials without reopening the evidentiary hearing. If the Panel were to admit the materials, fairness dictates that Respondents be allowed to present rebuttal evidence. Currently, there is not a motion by either party to reopen the evidentiary hearing before the Panel. Accordingly, the tentative decision of the Panel is to deny

17

Google's request to submit the Stroz Materials into evidence." The Panel thereafter invited the parties to comment on its Tentative Decision.

On December 27, 2018, the parties submitted their comments. Specifically, the parties explained that they agreed, based on the Panel's tentative decision, that there was no need to reopen the evidentiary hearing. Google therefore withdrew its request to submit the Stroz Materials into evidence. In essence, this meant that Levandowski withdrew his request to testify at any subsequent hearing about the Stroz-related materials.

### 5.    Disposition of Motion for Evidentiary Sanctions

In its post-hearing brief, Google repeated its motion that the Panel apply an evidentiary sanction against Respondents for destruction of evidence. We now address and dispose of that motion.

The Panel received testimony and documents that Respondents instructed individuals to destroy correspondence, cell phone texts and call records.[21] All of the instructions were given before Google initiated these arbitration proceedings.

Google's request is based on a general presumption that Respondents' practices resulted in the destruction of information that is now unavailable. Improper pre-arbitration conduct can be the basis of sanctions when it is done in anticipation of litigation. See Williams v. Russ, 167 Cal. App. 4th 1215, 1223 (2008). Levandowski's instructions on the destruction of communications was received in evidence. We have weighed that evidence, along with all of the other evidence in the case. The Panel declines

---

[21] See e.g., Exhs. 589, 1023, 1043.

to apply an adverse evidentiary inference as a sanction. Therefore, Google's motion is denied.

### 6.    **Supplemental Submissions**

During the deliberations of the Panel, the parties have submitted to the Panel letter briefs discussing "new authority" in support of their positions. Those material were considered by the Panel in making an Interim Award.

### 7.    **Interim Award**

On March 26, 2019, pursuant to JAMS Rule 24(d), and the stipulation of the parties, the Panel made the following Interim Award:

> 1. As relief under its First Claim for Breach of the Duty of Loyalty, its Third Claim for Breach of Contract and its Fourth Claim for Unfair Competition, Claimant Google LLC is awarded the following:
>     a.    From Respondent Anthony Scott Levandowski, separately, the principal sum of ▮▮▮▮▮▮ as disgorgement of compensation; and
>     b.    From Respondent Lior Ron, separately, the principal sum of ▮▮▮▮ for disgorgement of compensation.
>     c.    From Respondent Anthony Scott Levandowski and Respondent Lior Ron, jointly and severally, the additional principal sum of ▮▮▮▮ for retention bonus damages.
>
> 2. As relief under its Second Claim for Breach of Fiduciary Duty, Claimant Google LLC is not awarded any money damages against Respondent Anthony Scott Levandowski.

In Section VI(3) of the Interim Award the Panel reserved for subsequent proceedings considerations of whether to adopt the Interim Award as the Final Award, liability for and the award of pre-award interest, attorney fees, costs, professional fees and JAMS administrative fees. In post-Interim Award briefs, the parties addressed these and other issues.

Google submitted a Declaration by Douglas Kidder. Among other matters, Kidder declared that the amount the Panel awarded to Google for disgorgement of compensation

did not conform to the actual compensation Respondents received.[22]  There was no objection to Kidder's calculation.  On December 6, 2019, the Panel issued a Final Award.  In the Final Award, the Panel modified its findings of compensation paid by Google to Respondents to conform to Kidder's calculations.  In addition, the Final Award incorporated non-substantive changes requested by the parties.

On December 12, 2019, pursuant to JAMS Rule 24(j), Google moved the Panel to correct the Final Award on the grounds that the Panel made computation errors.  On December 17, 2019, Respondents submitted separate Responses.

**III.    FACTS**

The following is a statement of the facts found by the Panel to be true and necessary to this Final Award.  To the extent that these facts, and all other facts recited in this Final Award, differ from any party's position, that is the result of determinations by the Panel as to credibility, relevance, burden of proof considerations, and the weighing of evidence, both oral and documentary.

**A.    Respondents' Employment with Google**

Levandowski and Ron were both employees of Google.  Levandowski joined Google in 2007 and remained continuously employed by the company until he resigned on January 27, 2016.  From 2009 until his departure from the company, Levandowski was part of Chauffeur, Google's project to develop and bring to market a self-driving vehicle.  For much of his time with Chauffeur, Levandowski was in charge of an engineering team that was developing laser technology known as LiDAR that was critical to the success of the project.

Ron was first employed at Google between 2007 and 2011. In 2011, he left Google
and went to work for Motorola. Ron returned to Google in the fall of 2014 and worked as a
project manager on projects unrelated to Chauffeur until he resigned on January 13, 2016.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

### B.    Employment Agreements

Levandowski and Ron each signed employment contracts that defined the terms and

conditions of their employment with Google. During the course of his employment,

Levandowski signed superseding employment contracts.[25] The provisions of each of the

employment contracts were substantively identical. The following were the pertinent

provisions of the employment agreements:

#### 1.    Non-competition Provision

##### a.    Levandowski

I agree that other than as set forth in Sections 2 and 3 of the Side Agreement,
I will not engage in any other employment, occupation, or consulting directly
related to the business in which the Company is now involved or becomes
involved during the term of my employment, nor will I engage in any other
activities, including, but not limited to, employment outside of the Company,
membership on Boards of Directors or Advisory Boards other than the
Company's, personal investments or establishing, maintaining or servicing
business relationships with family or friends that conflict with my
obligations to the Company. (Exh. 120.)

##### b.    Ron

---

[23] Through Douglas Kidder, Google presented a summary chart of Levandowski's
compensation. (Kidder Expert Report, Feb. 16, 2018 at 7.) His compensation records were
also received in evidence.

[24] Kidder Expert Report, Feb. 16, 2018 at 11.

[25] See e.g., Exh. 38.

Case 3:17-cv-00939-WHA   Document 2481   Filed 01/30/23   Entered 01/30/23 18:23:47   Page 281
of 114

During my employment with Google, I will not engage in any other employment or other activities or services directly related to the business in which Google is now involved, becomes involved, or has plans to become involved or that conflict with my obligations to Google without seeking and receiving permission in advance from Google's Ethics and Compliance team. (Exh. 325.)

## 2. Non-solicitation Provision

### a. Levandowski

I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, whether for myself or for any other person or entity. (Exh. 120.)

### b. Ron

To the fullest extent permitted under applicable law, during my employment with Google and for twelve months immediately following its termination for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of Google's employees to leave their employment. (Exh. 352.)

## 3. Confidential Information Provision

### a. Levandowski

I understand that, as a result of my employment with the Company, I will obtain extensive and valuable Confidential Information belonging to the Company. I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use, except for the benefit of the Company, or to disclose ... without written authorization ... any Company Confidential Information except under a non-disclosure agreement.... (Exh. 120.)

### b. Ron

During and after my employment with Google, I will hold in strictest confidence and take all reasonable precautions to prevent any unauthorized use or disclosure of google Confidential Information (whether disclosed to me in anticipation of or during my employment by Google), and I will not (i)

22

use Google Confidential Information for any purpose other than for the benefit of Google in the scope of my employment, or (ii) disclose Google Confidential Information to any third party without the prior written authorization. (Exh. 352.)

### 4. Code of Conduct

In their employment contracts, Respondents agreed to adhere to the terms of

Google's Code of Conduct:

I acknowledge that I have read the Company's Code of Conduct, which is available on the Company's public website and can be found by clicking "About Google" and looking on the 'Investor Relations' page of the site. I agree to adhere to the terms of the Code of Conduct and to report any violations of the Code. (See Exhs. 120, 352.)[26]

Multiple versions of the Code of Conduct were received in evidence,[27] along with a

document entitled "Employee Communications Guidelines."[28]  In substance, the Code of

Conduct contained ethical guidelines and a requirement that an employee must disclose

and obtain approval for potential conflicts of interest from his or her manager and from the

Ethics and Compliance Office of Google: [29]

When you are in a situation in which competing loyalties could cause you to pursue a personal benefit for you, your friends or your family at the expense of Google or our users, you may be faced with a conflict of interest.  All of us should avoid conflicts of interest and circumstances that reasonably present the appearance of a conflict.

When faced with a potential conflict of interest, ask yourself:

Would this activity create an incentive for me, or be perceived by others to create an incentive for me, to benefit myself, my friends or my family, or an associated business at the expense of Google?

Would this activity harm my reputation, negatively impact my ability

---

[26] The quoted language is from Levandowski's employment contract.  There is a no substantive difference from this wording in Ron's employment contract.

[27] See Exhs. 13, 125.

[28] Exh. 322.

[29] We refer to this provision as the "Disclosure and Approval Provision."  See section IV(C)(2)(b) *infra*.

to do my job at Google, or potentially harm Google?

Would this activity embarrass Google or me if it showed up on the front pages of a newspaper or a blog?

If the answer to any of these questions is "yes," the relationship or situation is likely to create a conflict of interest, and you should avoid it.

If you are considering entering into a situation that creates a conflict of interest, don't. If you are in a situation that may create a conflict of interest, or the appearance of a conflict of interest, review the situation with your manager and Ethics & Compliance.

Avoid making personal investments in companies that are Google competitors or business partners when the investment might cause, or appear to cause, you to act in a way that could harm Google.

Finally, do not start your own business if it will compete with Google.

Company information that leaks prematurely into the press or to competitors can hurt our product launches, eliminate our competitive advantage and prove costly in other ways. Our responsibilities extend beyond not revealing confidential Google material – we must also:

properly secure, label and (when appropriate) dispose of confidential Google material;

safeguard confidential information that Google receives from others under non-disclosure agreements; and

take steps to keep our trade secrets and other confidential intellectual property secret.

The Code of Conduct contained a prohibition against disclosure of confidential

information:

Google's "confidential information" includes financial, product and user information. Make sure that confidential company material stays that way; don't disclose it outside of Google without authorization.

We collect and store personal information from employees around the world. Access this data only in line with local law and Google internal policies, and keep it secure according to those standards. (Exh. 13.)

24

Levandowski and Ron were aware of their obligations to comply with these contractual provisions, including Google's conflict of interest policies. Google provided training on conflict of interest issues, and during his employment with Google, Levandowski disclosed several potential conflict issues to Google's management and sought management's guidance and approval.[30]

### C.    Project Chauffeur

In 2009, Google launched a project to develop hardware and software for self-driving vehicles that it called Project Chauffeur. Because it was considered to be unique, revolutionary, and if successful, would introduce world-wide structural change, Project Chauffeur was considered a "moonshot" project.

Dr. Sebastian Thrun was the original Director of Project Chauffeur. He, together with a few other members of Google's Street View Project were designated as founding members of Chauffeur. Levandowski was one of the founding members. The project eventually grew into an independent subsidiary, Waymo LLC, with over 675 employees.

Levandowski was eventually placed in charge of an engineering team that was developing LiDAR sensors, a vital component of self-driving technology. Google had determined that it needed to develop a proprietary sensor and the success of that effort was critical to the overall success of Chauffeur.

LiDAR stands for light detection and ranging. A LiDAR sensor sends out a beam of light into the surrounding environment. When the light hits an object, it will bounce back and the sensor, together with related technology, will measure the qualities of the return signal to determine the size, shape and distance of the object. In operation, the LiDAR

---

[30] See e.g., Exh. 1541.127.

sensor beams or pulses at a rate of up to millions of pulses per second and by using a mirror the light may be disbursed in a 360 degree pattern around the vehicle. Through the storage and processing of the return signals, the vehicle obtains a comprehensive understanding of the world around it.

In implementing self-driving technology, a LiDAR sensor can perform two critical functions: mapping and perception. First, a sensor can be used to create a comprehensive base map of the static environment in which the vehicle will operate. For example, a LiDAR sensor, together with related technology, can be used to create a map of every street, building and fixed object in San Francisco. The second application of a LiDAR sensor, sometimes referred to as perception, is to become the eyes and ears of the vehicle by dynamically detecting what is going on around the vehicle while it is moving through a previously mapped environment. In this application, the sensor in concert with other technology will detect on a real time basis the presence of other vehicles, pedestrians, temporary obstacles and any other danger or impediment so that the vehicle may drive safely to its destination.

Google uses the same LiDAR sensor for both mapping and perception. Accordingly, Google invested significant time, energy and resources to assemble the LiDAR sensor team that Levandowski led. The LiDAR team was of vital importance to Project Chauffeur and to its ability to compete with Uber and other companies trying to develop self-driving technology.

### D.     Google's Acquisition of 510 Systems and Anthony's Robots

At or shortly after the time he joined Google, Levandowski formed two companies, 510 Systems LLC ("510"), formed on May 11, 2007, and Anthony's Robots LLC ("AR"),

26

formed on June 12, 2008.[31]  Pursuant to Google's requirement that employees disclose their outside business activities so as to avoid conflicts, Levandowski disclosed these outside interests to Google officials.[32]  Levandowski represented to Google officials that upon joining the Google Street View Project, he retained his ownership interest in 510 but had "left" active involvement in 510.[33]

Because a significant part of 510's business was the development of LiDAR technology, when he joined Project Chauffeur, Levandowski's ownership of 510 and AR continued to be a contentious issue between him and Google's management.  Levandowski licensed the AR technology to Google and signed a side agreement confirming that he would not engage in any outside activities that competed with Google.  However, in addition, Google decided that it wanted to develop a proprietary LiDAR sensor and also determined that 510's technology and engineering team would significantly advance that effort.  Accordingly, in 2010, Google decided to buy the two companies and entered into extensive negotiations with Levandowski for their acquisition.

After a lengthy period of negotiations, on July 28, 2011, Google signed binding merger and acquisition agreements with 510 and AR.  The two agreements contained integration clauses and cited "Aggregate Acquisition Consideration" of ▮▮▮▮▮ for 510

---

[31] Exh. 374.

[32] Exh. 5.

[33] "510 Systems is a robot and software engineering firm that has done business with ▮▮▮▮ since 2004.  In 2005 ▮▮▮▮ and 510 Systems bulid [sic] a ▮▮▮▮▮▮▮ which now operate [sic] around the world. ▮▮▮▮▮▮ Darpa Grand Challenge that is now at the [S]mithsonian. ... 510 [S]ystems builds software for ▮▮▮▮ that provides the synchronization of the GPS, encoder, lasers and IMU signals. Upon joining [Google], I left 510 [S]ystems and disclosed this to Sebastian, my manager. 510 Systems receives revenue from ▮▮▮▮ for a variety of work, including work relating to the ▮▮▮▮▮▮ that [G]oogle buys from ▮▮▮▮" (Exh. 1.)

Case 2:08-cv-02020 Doc #120-1 Filed 07/30/23 Entered 07/30/23 18:23:47 Page 347 of 1714

and ███████ for AR. The transactions closed in October of 2011.

As a result of the acquisition, Google acquired all of 510's and AR's technology, business, and "business promise," including the LiDAR technology developed by 510. That technology included ████████████████████████████████████████ ████████████████ known as ████████████ ███ ████████. After the acquisition, Google ████████████████████████ including the development and sale of the ████████████████. While it ████████ any effort to develop the ████████ system, Google did ████████████████████ for about a year and still ████████████████████████. The ████████ sensor developed by 510 and still employed by Google is ████████████████████████

As part of the acquisition and merger agreements with both 510 and AR, Levandowski and Google entered into Non-Competition and a Non-Solicitation Agreements (the "2011 NCNS Agreements"). As the managing member of the two LLCs, Levandowski personally agreed:

> During the Non-Competition Period (as defined below), Member [Levandowski] shall not (other than in connection with his or her provision of services as an employee or consultant to any Parent Entity (as defined below), without prior written consent of Parent [Google], directly or indirectly: (a) Engage, anywhere in the Restricted Territory (as defined below), in any Competing Business Purpose (as defined below); (b) be or become an officer, director, member, stockholder, owner, affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of any Person or business that engages or participates in a Competing Business Purpose in the Restricted Territory; or (c) contact, solicit or communicate with any Person known to Member to be a customer of any Parent Entity or any former customer of the Company in connection with a Competing Business Purpose (whether or not such Member has had personal contact

28

with such Person). (Exhs. 107, 108.)

The 2011 NCNS Agreements defined the following relevant terms:

"Competing Business Purpose" means any business or enterprise (including research and development), operations, activities or services that (i) are related to the design, development, manufacture or commercialization or positioning, navigation, sensor, high-speed data acquisition, 3D data analysis, machine control, or robotics technologies, or (ii) provides the products and services of the Company as such exist or are contemplated as of the Closing Date.

"Non-Competition Period" means the period commencing on the Closing Date and ending on the two (2) year anniversary of the Closing Date.

Term and Severability of Covenants: If Member breaches any covenant set forth in Section 2 or Section 3 hereof, the term of such covenant shall be extended by the period of the duration of such breach . . . . (Exhs. 107, 108.)

In the 2011 NCNS Agreements, Levandowski agreed to the following non-

solicitation provision:

Member further agrees that Member shall not during the period commencing on the Closing Date and ending of the later of the two (2) year anniversary of the Closing Date or the termination of Member's employment with or provision of consulting services to any Parent Entity (the "Non-Solicitation Period"), directly or indirectly, without the prior written consent of Parent: (a) personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage, any Former Company Employee (as described below) or any other employee or consultant of any Parent Entity, to leave his or her employment or service with any Parent Entity or take away employees or consultants; or (b) personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage any Former Company Employee or any other employee or consultant of any Parent Entity to engage in any activity in which Member would, under the provisions of Section 2 hereof, be prohibited from engaging. "Former Company Employee" means any current employee or consultant of the Company who accepts an offer of employment with any Parent Entity. (Exhs. 107, 108.)

29

### E.    Chauffeur Bonus Plan

In 2012, Google created a bonus plan that it called the Project Chauffeur Bonus Program (the "Chauffeur Bonus Plan" or the "Plan") and made it available to certain senior members of Project Chauffeur.  The Chauffeur Bonus Plan had two primary purposes:  to retain critical members of the Project Chauffeur team and to incentivize their efforts to increase the value of the Chauffeur project.

During the development of the Chauffeur Bonus Plan, Google's management discussed ███████████████████████████████████████ ████████. At one point, consideration was given to ███████████████ ████████████████████████████████████████████████ However, the final 510 and AR acquisition documents and the final Chauffeur Bonus Plan documents do not recite or confirm that any part of Levandowski's allocation in the Chauffeur Bonus Plan was given as consideration for the sale of 510 and AR.

On January 1, 2012, Levandowski received a letter from Google giving him the option of continuing under Google's regular bonus program or becoming a participant in the Chauffeur Bonus Plan.  Levandowski was advised that if he elected to participate in the Chauffeur Bonus Plan, he would be eligible to receive an initial allocation of ██████████, which was ████ of the original valuation of the Plan.  The January 1, 2012 letter also recited that the existence of the Chauffeur Bonus Plan, the terms set forth in the letter and the Project Chauffeur technology were all confidential and could not be disclosed to any third party.  Levandowski was also advised that if he elected to become a participant in the Plan, he would have to sign a new employment agreement with the company.

On February 24, 2012, Levandowski elected to participate in the Plan, and on the

30

same day, he signed a new at-will Employment, Confidential Information, Invention Assignment and Arbitration Agreement. The new employment agreement contained provisions regarding confidentiality, conflicting activities, non-solicitation and Google's Code of Conduct that were substantially identical to those in his earlier employment contracts.

Each participant in the Chauffeur Bonus Plan received an initial allocation upon election to participate in the plan. As noted above, Levandowski's allocation was ████████, or ████ of the Plan. However, the Plan has a vesting schedule which provides that each participant's interest vests in ████████████████████████████ ████████. Accordingly, Levandowski's interest in the Plan did not fully ████ until ████████ ████████. If for any reason a participant in the Chauffeur Bonus Plan ████████ Google, the participant ████████████████████████████████████ ████████████████████. Under the Plan, if a participant leaves Google, any final payment due under the Plan would not be paid until six months after the date of departure.

While the Chauffeur Bonus Plan had an original valuation of ████████, Google was required to ████████████████████████. At the time of Levandowski's departure from Google in January 2016, the Chauffeur Bonus Plan was valued at ████ ████. The payouts under the Chauffeur Bonus Plan were scheduled to occur in ████████ ████████. Levandowski received his first payment of ████████ on December 31, 2015.

### F.    Odin Wave/Tyto LiDAR

Without disclosing it to Google, beginning in the spring of 2012, Levandowski took steps to create a LiDAR company that initially he called Odin Wave. The company's name was later changed to Tyto LiDAR. For ease of reference in this Final Award, the company,

31

both before and after its name change, will be referred to as Tyto LiDAR or Tyto.

On April 1, 2012, Levandowski reached out to James Haslim ("Haslim"), a prior acquaintance and engineer with significant experience in LiDAR technology, regarding the possibility of joining a startup company dedicated to the development of a LIDAR sensor. After an initial meeting in early April, Haslim expressed great interest in joining what he understood to be Levandowski's company.

Sometime during the same month of April 2012, █████████████████ who was interested in creating a startup company to develop a low-cost LiDAR sensor for high definition mapping and other applications, met with Levandowski to explore his idea with him. On May 29, 2012, █████████████████████████████



The original business plan for

the company █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

████████████████████ To the extent that the loans were paid off, the money used to

retire those loans was received from a holding company known as █████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████

Tyto LiDAR was created to develop a high-accuracy mapping LiDAR sensor that

would cost significantly less than competing sensors already on the market. After several

years of development, Tyto LiDAR eventually produced its Owl sensor, which was a high-

accuracy mapping sensor that Tyto LiDAR intended for various non-self-driving

applications, including transportation infrastructure mapping, linear assets mapping and

historical preservation. However, by 2015, Tyto LiDAR was attempting to market its

technology to self-driving companies including Uber and Zoox. By that time, ████████

believed there was a huge opportunity for Tyto LiDAR's technology to be used in creating

the base maps necessary to implement self-driving technology. In April of 2016, Tyto LiDAR was sold to Otto, which as discussed below, was a self-driving company that had been formed by Levandowski and Ron.

At no time before he left Google did Levandowski ever advise Google of his involvement with Tyto LiDAR. To the contrary, when asked whether he had any financial interest in the company, Levandowski denied that did and he did not offer any information concerning his participation in Tyto LiDAR. In May of 2015, Google evaluated Tyto's LiDAR sensors for possible purchase and even gave some consideration to buying the company. That evaluation was led by one of Google's engineers, Alex Cooper ("Cooper"). Cooper became aware of Levandowski's expertise in the field of LiDAR sensors and sought his assistance in evaluating Tyto LiDAR's technology and products. As part of that evaluation, Levandowski attended a meeting between the Google team and Tyto LiDAR. At no time during the Tyto LiDAR evaluation, including Google's meeting with Tyto LiDAR, did Levandowski disclose to Cooper or any other Google employee his involvement with Tyto LiDAR.

### G. 280 Systems/Otto

In May of 2015, Levandowski reached out to Uber CEO Travis Kalanick ("Kalanick") to ostensibly discuss their common interest in robots, which was Levandowski's catch-all phrase for a wide range of technology, including self-driving cars. At that time, Uber was heavily investing in, and aggressively pursuing, a self-driving technology program. In fact, Kalanick had declared that self-driving or autonomous vehicle technology was existential for Uber. That initial contact evolved into a series of contacts between Levandowski and various Uber employees, and in mid-July of 2015, Levandowski advised Uber that he was considering leaving Google and taking most of his team with him. This possibility was of

extreme interest to Uber because Kalanick believed that Google was ahead of Uber in the development of self-driving technology and that most of the talented engineers and scientists dedicated to that technology worked for Google.

In September of 2015, Levandowski and Ron, who were both dissatisfied with their roles at Google, began to brainstorm various alternatives to their situations. Those alternatives included trying to convince Google to implement an aggressive to market strategy for Project Chauffeur, to set up a new company within the Google system, or to start a new company outside of Google. The alternative of establishing a new company outside of Google became the primary focus of their activities in the fall of 2015, as they started to implement a plan to form a new company, 280 Systems ("280"), which would focus on self-driving technology, initially applied to trucks. 280 later changed its name to Ottomotto LLC ("Otto").[34] In furtherance of their plan, Levandowski and Ron started to look for financing and hired the law firm of Fenwick & West to assist in the formation of the company. They also created a preliminary business plan that identified certain key Google employees that would be part of the original team and that also included a list of Google employees to recruit.

In the fall of 2015, Levandowski and Ron entered into extensive negotiations with Uber, Google's primary competitor in the self-driving space, regarding a commercial relationship with Otto. They met with Uber's senior management in corporate development, including Cameron Poetzscher ("Poetzscher"), Nina Qi ("Qi") and Brian

---

[34] Levandowski and Ron considered several names for their company. Initially, they referred to the company as Full Throttle. However, at the time it was incorporated on January 13, 2016, the company was known as 280 Systems LLC. The company name was later changed to Ottomotto LLC. The Company was generally referred to by the parties as "Otto" during these proceedings.

Case 2:03:03:020 Doc #120811 Filed 07/30/203 Entered 07/30/203 18:23:047 Page 485 of 114

McClendon ("McClendon"). At times, they also met with John Bares ("Bares"), who was in charge of developing Uber's self-driving technology. By September 30, 2015, Uber had circulated a proposed term sheet that provided that Uber would become a significant investor in and commercial partner of Otto, which was referred to as "NewCo" during the negotiations, and that Otto would provide Uber with a low-cost laser designed for high resolution, fully autonomous usage in self-driving cars.

Negotiations continued during October of 2015. On October 22, 2015, a new term sheet was circulated that provided that Uber would become a major commercial partner in Otto and that Otto would build LiDAR sensors for self-driving or autonomous usage and provide them to Uber on an exclusive basis. Concurrent with these negotiations were discussions between Uber and Levandowski and Ron concerning how Otto would be staffed. Uber was told that Otto would be comprised of a team of approximately 25 individuals from Google. Levandowski also told Uber that he was recruiting from the most experienced, founding members of Project Chauffeur.



On                  , as Levandowski and Ron continued their secret negotiations with Uber, the                  of Levandowski's Initial Allocation under the Chauffeur Bonus Plan        . At that time, the value of the Chauffeur Bonus Plan was set at                  . On November 20, 2015, the valuation of the Chauffeur Bonus Plan

                      . On December 31, 2015, not knowing of Levandowski's formation of Otto and his negotiations with Uber, Google made the first Chauffeur Bonus Plan payment to Levandowski in the amount of                  .

In late December 2015 or early January of 2016, Uber's senior management determined that instead of concluding the pending commercial deal to purchase LiDAR sensors from Otto, it was in Uber's best interest to acquire the company. Accordingly, at

36

that time the negotiations between Levandowski and Ron and Uber shifted to the acquisition of Otto. Those negotiations intensified in January of 2016 with numerous conversations and meetings between the parties. The basic structure of the deal being negotiated was that Uber would acquire Otto and the owners of Otto would receive a payment primarily in Uber RSUs (restricted stock units) that would be paid pursuant to a schedule of milestones that related to the progress being made in the development of the self-driving technology. Accordingly, two of the principal deal points under negotiation were the milestones and the number of RSUs that Otto would receive when it was sold to Uber.

On January 8, 2016, Ron personally delivered to Uber a revised set of proposed milestones. By January 12, Poetzscher believed that the parties were very close to signing a term sheet. On January 13, Ron resigned from Google and Otto was formally incorporated. On January 14, the Uber team met with Levandowski and provided him with detailed milestones and a detailed compensation structure. On January 27, 2017, Levandowski resigned from Google, and his employment terminated on that day.

On February 22, 2016, a term sheet was executed by Uber, Levandowski and Ron for the sale of Otto to Uber. The term sheet provided that Uber would acquire 100% of Otto in exchange for $592 million in Uber RSUs, to be paid out pursuant to established milestones. The term sheet also required Otto to provide Uber with at least 25 employees before the transaction would close. This was a critical term for Uber, as it always saw the value of the transaction to be the team of scientists and engineers skilled in self-driving technology that it would acquire. Bares, Uber's engineer in charge of its autonomous driving program, wrote to Uber's senior management:

Wanted to weigh in on the value of the team to Uber AV. The nexus of this

Case 3:17-cv-00939 Document 2361-1 Filed 01/30/2018 Entered 01/30/2018 23:04:57 Page 87 of 114

group represents a couple of very significant things to our AV efforts. First Anthony and his close team have developed several generations of mid- and long range laser(s) that we now believe critical to AV's autonomy (day and night). Not only do they have several generations of experience but also know how to improve on next-gen devices that they would build for us. We have yet to find anyone else in the world with this know how. Our next best choice is to build a team internally and we can do that but probably with a 2-4 year lag on what these guys can do. Second, just rubbing shoulders with them and having them advise us all over AV has a decent chance of saving Uber at least a year off the race to large-scale AV deployment. (Exhibit 730.)

Bares also believed that in the market for a talented group of self-driving engineers, its "per head price" was increasing dramatically and there was a premium to be paid to acquire a team of engineers.

Consistent with Bares's assessment of the value of Levandowski's team, the primary method used by Uber to value the Otto transaction was to establish a per-member value for the team. At the time of the February term sheet, that value was being calculated in terms of Uber basis points and the average value for each member of the team was determined to be at least $5 million. Uber at one time proposed to offer Levandowski a full basis point for each Google employee he successfully recruited, while it would only pay half as much for a non-Google recruit.

### H. Solicitation of Google Employees

As part of their plan to use Otto to compete with Google, in the fall of 2015, Levandowski and Ron began a targeted campaign to recruit certain Google employees working in Project Chauffeur and other Google projects to join their new company. Levandowski and Ron created a list of Google employees to recruit, ranked according to their criticality and commitment to their new company. Levandowski, and sometimes Ron, conducted a series of secret meetings with other Google employees to discuss the plans for Otto and to encourage them to join the company. Some were one-on-one meetings on the

Google campus during working hours.  Other meetings took place off campus.

After Respondents' negotiations to sell Otto to Uber had begun, they began to focus their efforts on obtaining firm commitments from the Google employees they were recruiting to form the new company.  On January 12, 2016 and again on January 25, two recruitment meetings were held at Levandowski's home.  During their meetings, Respondents outlined their plans for Otto and encouraged the attendees, many of whom were Google employees, to join their company.  In addition to Levandowski and Ron, the following Project Chauffeur employees[35] and others attended one or both meetings:



| 1. | Don Burnette, Trajectory Optimizer (planner) |
| 2. | Brian Cullinane |
| 3. | Claire Delaunay, Software Engineer |
| 4. | ████████████████████ |
| 5. | ███████████ |
| 6. | ███████████████ |
| 7. | ████████████ |
| 8. | |
| 9. | ██████ |
| 10. | ██████████████████████ |
| 11. | Gaetan Pennecot, Laser Designer (optics and manufacturing) |
| 12. | ████ |
| 13. | Brian Torcellini, Lead Testing Operations Manager |
| 14. | ██████, Mechanical Engineer ████ |
| 15. | David Weikersdorfer |
| 16. | ██████████████ |
| 17. | Michael Tocce |
| 18. | ██████████████████████ |
| 19. | █████████, Hardware Engineer |
| 20. | █████████, Software Engineer |
| 21. | ███████████, Sweeney, Software Engineer |

---

[35] A job description or duty is included if the Panel received evidence in which it was disclosed.

Case 2:08-cv-04020  Doc #: 12081  Filed 01/30/23  Entered 01/30/23 18:23:47  Page 489 of 114

At the second meeting on January 25, 2016, all of the attendees were required to declare whether they were "in or out" in terms of leaving Google and joining the new company. Attendees were asked to sign non-disclosure agreements so that if asked they would be contractually bound not to disclose the solicitation. Within a day of that meeting, Otto employment agreements were circulated to the Google employees for signatures. This timing was consistent with Respondents' strategy to have all the Google employees resign and walk out of Google together with Levandowski on January 27, 2016.

In an attempt to allay any fears the Google employees might have regarding leaving Google, Levandowski and Ron falsely told them that Otto was going to focus on self-driving technology for trucks and that Google's top management, including its CEO, Larry Page, was aware of their new company and was not concerned. Levandowski and Ron never told the departing Google employees, who thought they were joining a self-driving startup company, that they were in the final stages of selling Otto to Uber.

### I. Resignations from Google

On January 13, 2016, Ron resigned his employment at Google. Levandowski resigned from Google on January 27, 2016. On that same day, Poetzscher reported internally that Uber believed it had a tentative deal with Levandowski and Ron for the acquisition of Otto in which the owners of Otto would receive 100 basis points of Uber Restricted Stock Units ("RSUs") to be paid out pursuant to agreed upon milestones. As of that date, the value of the RSUs was $680 million.

Google was not aware of Respondents' negotiations with Uber. During his January 27, 2016 exit interview, Levandowski told Google's HR employee, Chelsea Bailey ("Bailey")

that he might possibly start a new company involving self-driving trucks.[36]  During that interview, Levandowski also falsely denied that he had made any attempt to recruit Google employees.  In a follow-up meeting with Bailey and another Google employee, Stacy Sullivan, Levandowski denied soliciting any Google employee and stated that he was not sure what he was going to do next.  However, in the seven months between Levandowski's resignation from Google and the close of the Uber acquisition of Otto, approximately 29 Google employees and contractors left Google to join Otto.

### J.    Uber's Acquisition of Otto

On April 11, 2016, the final and binding merger agreement for Uber's acquisition of Otto was signed.  On that same day, Uber acquired an option to purchase Otto's related company, Otto Trucking.  Pursuant to the terms of the final agreement, Levandowski and Ron were required to bring a team of at least 25 engineers and other technical individuals to Uber.  In return, Uber agreed to pay up to $542 million in Uber RSUs, which were to be paid out pursuant to agreed-upon milestones.

Another important provision of the agreement required Uber to indemnify Levandowski and Ron for their "Bad Acts."  This provision was proposed by Levandowski and Ron and they required the indemnity in order to close the transaction.  Under the terms of the indemnity, Uber was required to indemnify Levandowski and Ron under defined circumstances for liability arising from breaches of their employment contracts with Google and breaches of their fiduciary duties and duties of loyalty.  Qi and Poetzscher, who both had extensive experience with mergers and acquisitions, testified that they had never encountered such an indemnity provision in any other deal they had negotiated.

### K.    Second Bonus Payment and Announcement of Otto Acquisition

[36] Exh. 3452.

Case 2:03-cv-02020   Doc #: 1281   Filed: 01/30/23   Entered: 01/30/23 18:23:47   Page 91 of 114

The closing of the acquisition was kept secret for a period of time because

Levandowski expected a second payment from the Chauffeur Bonus Plan. The Plan

provided that upon termination of employment, a participant had to wait six months plus

one day before any outstanding vested allocation would be paid. In Levandowski's case,

that date would be July 28, 2016. Levandowski wanted the acquisition kept secret to

minimize the prospect that Google would withhold payment based on the transaction. In

accordance with Levandowski's wishes, Uber waited to announce its acquisition until after

Levandowski received his final Chauffeur Bonus Plan payout.

On July 28, 2016, Google paid Levandowski ███████ under the Chauffeur Bonus

Plan.[37] On August 18, 2016, Uber issued a public announcement of its acquisition of Otto

for a reported $680 million.[38]

On October 28, 2016, Google initiated this arbitration.

## IV. ANALYSIS OF LIABILITY

This Final Award resolves all of the substantive claims and affirmative defenses

submitted for determination. The Panel organizes its analysis of Google's claims into four

claims: breach of duty of loyalty; breach of fiduciary duty; breach of contract; and unfair

competition. In resolving each claim, we also resolve all related defenses and affirmative

defenses associated with them.

### A. FIRST CLAIM: BREACH OF THE DUTY OF LOYALTY

Google claims that Levandowski and Ron, individually and jointly, breached the duty

of loyalty each owed to Google.

---

[37] Exh. 604.
[38] Exh. 1236.

### 1. Essential Elements of the Claim

An employee, while employed, owes undivided loyalty to his employer. Fowler v. Varian Assoc., Inc., 196 Cal. App. 3d 34, 41(1987). In general, an employee breaches the duty of loyalty when the employee's actions are "inimical to the best interests of the employer." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 414 (2007) (quoting Stokes v. Dole Nut Co, 41 Cal. App. 4th 285 (1995)). Whether an employee's actions are "inimical to the best interests of the employer" is more of a factual, rather than legal question. To state a claim for breach of duty of loyalty, a claimant must plead: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach. Id. at 410.

California courts apply principles of agency and hold that, just as an agent must refrain from competing with the principal during the employment, an employee must refrain from competing with the employer and from taking action on behalf of or otherwise assisting the employer's competitors. See e.g., Rest.3d, Agency, § 8.04. Agents may "not . . . acquire a material benefit from a third party in connection with . . . actions taken . . . through the agent's use of the agent's position" Id. § 8.02. Further, agents have a duty "not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." Id. § 8.05(2); Huong Que, Inc., 150 Cal. App. 4th at 413. The duty of loyalty is not breached solely because an employee transacts business on the employee's own account. However, by statute, "[a]n employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer." Cal. Lab. Code § 2863.

An employee may conduct "a business enterprise independent from, though similar to, that conducted by" his or her employer, so long as the employee acts in good faith and

Case 20-03020 Doc#128-1 Filed 07/30/23 Entered 07/30/23 18:23:47 Page 93 of 114

does not "seize ... business opportunities in the company's line of activities which the company has an interest and prior claim to obtain ...." Thomas Petroleum, LLC v. Lloyd, 1:11-CV-00902-LJO, 2012 WL 4511369 at *6–7 (E.D. Cal. October 2, 2012) (quoting Industrial Indem. Co. v. Golden State Co., 17 Cal. App. 2d 519, 533(1953)). An employee may also conduct legitimate business activities to capture opportunities of which the employer was either unwilling or unable to take advantage. Id. at *7. Thus, California law permits an employee to seek other employment and even to make some "preparations to compete" before resigning. It also permits an employee to set up a competing organization through which business might be conducted. See Mamou v. Trendwest Resorts, Inc., 165 Cal. App. 4th 686, 719–20 (2008).

There are "[n]o ironclad rules as to the type of conduct which is permissible ... since the spectrum of activities [of an employee seeking to leave a company] is as broad as the ingenuity of man itself." Bancroft Whitney Co. v. Glen, 64 Cal. 2d 327, 346 (1966). But it can be said with certainty that where an employee is doing nothing more than preparing for his or her future employment, the duty of loyalty has not been breached. See Mintz v. Mark Bartelstein & Assocs, Inc., 906 F. Supp. 2d 1017, 1037-38 (C.D. Cal. 2012).

Thus, to establish liability for breach of the duty of loyalty, Google must prove the following elements: (1) that Levandowski or Ron or both were employees of Google; (2) that while employed, beyond merely seeking or preparing for alternative employment, each or both of them engaged in conduct inimical to the best interest of Google; and (3) that Google suffered damages as the result of Levandowski and Ron's breach.

### 2. Actions by Respondents

Case 3:17-cv-00939 Doc #1281 Filed 07/30/23 Entered 07/30/23 18:23:47 Page 594 of 714

It is undisputed that Respondents were employees of Google and as employees each owed a duty of loyalty to Google. In its post-hearing opening brief, Google summarizes the evidence upon which it bases its breach of the duty of loyalty claim as follows:

> Here, Levandowski and Ron breached their duty of loyalty to Google in multiple ways: … Beginning in 2012, Levandowski formed, funded, assisted and supported Tyto – a company that developed LiDAR technology – at the same time he was head of the Laser team developing LiDAR technology at Google for Chauffeur. ***
> In 2015, Levandowski and Ron launched efforts to create and sell to Uber a company staffed by solicited Google employees, first to sell laser to Uber for its self-driving cars, and later to sell the employees themselves to Uber. ***
> Respondents also violated their duty of loyalty to Google by forming 280 Systems to develop technology for self-driving cars and trucks, the same technology Google was working on at Chauffeur.***
>
> By mid-September 2015, Levandowski and Ron had resolved to recruit dozens of Google employees to join their new company. (Google Post-Hrg. Opening Brief at 38-40.)

Respondents contend that the evidence proves that Respondents engaged in conduct that was permissible for employees under California law. The issue therefore becomes whether the conduct of Respondents exceeded that allowed for employees, because it was inimical to the best interests of Google, and breached Respondents' respective duty of loyalty to Google.

With respect to the duty of loyalty, the Panel evaluates the evidence of Respondents' conduct with respect to three interrelated events: (a) Tyto LiDAR; (b) formation of Otto and negotiations of a commercial transaction with Uber; and (c) soliciting Google employees and negotiation of a sale of Otto to Uber.

### a. Tyto LiDAR

With respect to the first set of events, Google contends:

> Beginning in 2012, Levandowski formed, funded, assisted and supported Tyto – a company that developed LiDAR technology – at the same time he

Case 2:20-cv-03040 Doc #: 1-81 Filed: 07/30/20 Entered: 07/30/20 18:23:47 Page 95 of 114

was head of the Laser team developing LiDAR technology at Google for Chauffeur. \*\*\*. (Google Post-Hrg. Opening Brief at 38.)

This event seeks to impose liability for breach of the duty of loyalty only on Levandowski.

In his post-hearing brief, Levandowski contends that his conduct with respect to Tyto LiDAR did not breach his duty of loyalty to Google because he merely helped others set up the company and that his conduct was not competitive:

> Mr. Levandowski merely helped his friends set up Tyto; his subsequent involvement with the company was well within the bounds of the California duty of loyalty. Second, Ognen Stojanovski, Brent Schwarz, and James Haslim had full autonomy in all aspects of Tyto's decision making, operations, and business and technical directions. Third Tyto was not competitive with anything at Google. Fourth, Google was presented with the Tyto opportunity and did not want it. (Resp. Post-Hrg. Brief at 19.)

Based on the facts as recited above, the Panel finds that beginning as early as May 2012, and at least by August 2012, while he was a Google employee working on self-driving technology, Respondent Levandowski created, financed and provided technical support to Tyto LiDAR. The Panel rejects Levandowski's assertion that his conduct with respect to Tyto LiDAR was mere assistance of other people who had full autonomy of Tyto LiDAR. The evidence shows that Levandowski provided financial, logistical and technical support to Tyto LiDAR while he was still an employee of Google. Although he did not take an official title with the company, the Panel finds that Levandowski was its control person.

Moreover, the Panel finds that Levandowski's conduct with respect to Tyto LiDAR was competitive. ██████████████████████████████

██████████████████████████████████████████

███████████ The evidence that Google's principal "product" development was for internal

---

[39] Exhs. 166, 172.

use and that Tyto LiDAR's principal "product" development was for sale to others does not eliminate the competitive nature of Levandowski's conduct. In 2012, Google and other companies were competing for which company would win the race to develop reliable and safe autonomous vehicle technology. LiDAR sensors were a critical part of that technology.

During this same period of time, Levandowski was the head of the LiDAR team at Google. His duty of loyalty precluded him from creating, financing and providing technical support to Tyto LiDAR. Thus, the Panel finds and concludes that Google proved that, commencing in May 2012 and continuing to August 2015, Levandowski's conduct with respect to Tyto LiDAR was competitive with Google and that this conduct breached his duty of loyalty.

### b. Otto

As recited in the facts section above, beginning in August 2015, while they were Google employees, Levandowski and Ron created what eventually became Otto. During its

---

[40] Exhs. 166, 172, 1205.
[41] Exh. 1541.096.
[42] Exh. 1541.164.

formation, the principal business pursuit of the company was to develop LiDAR technology for autonomous trucking and passenger cars, the latter of which was developed for sale to Uber. In the Fall of 2015, Uber was Google's primary competitor in the self-driving automobile technology space. Levandowski and Ron negotiated to become Uber's sole supplier of LiDAR technology for its use in competition with Google.[43] The Panel finds that Respondents' conduct was competitive with Google and breached their duty of loyalty.

### c.    Soliciting of Google Employees

In the creation of Otto, Respondents had various conversations and meetings with key Google employees. Respondents contend that their conduct did not amount to soliciting.

Soliciting is a general term. In Aetna Bldg. Maint. Co. v. West, 39 Cal. 2d 198 (1952), albeit in the context of soliciting customers, the California Supreme Court defined "solicit" as follows:

> "Solicit" is defined as: "to ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite," Black's Law Dictionary, 3rd ed., p. 1639. "It implies personal petition and importunity addressed to a particular individual to do some particular thing. * * * Golden & Co. v. Justice's Court, 23 Cal. App. 778, 789. It means: "to appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain." [Citation omitted.]

> Merely informing customers of one's former employer of a change of employment, without more is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. [Citation omitted.] Id. at 203-204.

---

[43] Exh. 476.

The duty would not be breached if an employee, who had decided to leave his or her employment, merely informs co-workers of that decision, or if, when asked by a co-worker to do so, describes the new venture. Levandowski's and Ron's conduct far exceeded that limit. Respondents approached fellow employees on and off-campus about joining Otto. They invited their fellow employees to attend meetings at Levandowski's home for the purpose of convincing them to join the new company. The Panel reviews the following individual cases to exemplify the solicitous nature of Respondents activities:

Don Burnette became a software engineer at Google on Project Chauffeur in August 2010. In December 2015, in a conversation on the Google campus, Levandowski told Burnette he was creating a self-driving company and he invited Burnette to join his new company. Afterward, Burnette had four or five more conversations with Levandowski about the new company. Levandowski told Burnette he wished to have as many people as he could get from Project Chauffeur. He wanted the Chauffeur group to quit Google all on the same day. On January 21, 2016, Burnette wrote a check for $1 million to invest in Levandowski's company. Burnette terminated his employment at Google on February 9, 2016.

In December 2015, Levandowski told Google employee ███████ that he was planning to start a new company to bring self-driving trucking technology to the market and he wanted ████ to join him.

Also in December 2015, Levandowski interviewed, and in January 2016 hired Rhian Morgan as the Director of Human Resources for Otto. In that capacity, Morgan conducted an organized effort that assisted Levandowski and Ron to solicit Google employees and employees of other companies to join Otto. Morgan attended the January 2016 recruitment meetings at Levandowski's home, sought and obtained Levandowski's approval for offer

49

letters[44] and tracked whether individuals had signed non-disclosure agreements ("NDAs").[45]

In January 2016, Levandowski and Ron approached ▆▆▆▆ about Otto. ▆▆▆ was and is a Google electrical engineer who had joined Google when ▆▆▆▆▆. Earlier, in the summer of 2015, Levandowski had discussed his new company with ▆▆▆. At that time, ▆▆ told Levandowski that he was not interested. After the January 2016 conversation, ▆▆ was invited to attend a recruitment meeting at Levandowski's home. At the meeting, ▆▆ stated that he would join Otto.

In January 2016, Levandowski told ▆▆▆▆ that he was considering leaving Google to start a new company that would be in the business of self-driving trucks. ▆▆▆ had begun work at Google in ▆▆▆▆. In March 2015 ▆▆ had begun reporting to Levandowski as a ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. ▆▆▆ was contemplating ▆▆▆▆▆▆▆▆▆▆▆▆▆. In January 2016 Levandowski told ▆▆▆ that he was not soliciting ▆▆ but that ▆▆ could join Otto and potentially work remotely. On January 8, 2016, Ron texted ▆▆▆, inviting ▆▆ to meet with him. They met on January 10. ▆▆▆ also attended the January meetings at Levandowski's home. Levandowski offered ▆▆▆ a salary at Otto that was close to ▆▆ Google salary. Levandowski and ▆▆▆ discussed that, in order to prevent ▆▆ resignation from being cited by Google as a cause for ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ could delay the termination of ▆▆ Google employment and the commencement of ▆▆ employment at Otto until after the ▆▆▆▆▆▆. Christopher Urmson, the head of engineering for Project Chauffeur ▆▆▆▆

44 Exhs. 770; 800.
45 Exh. 1006.

▮▮▮▮ and ▮ decided to remain a Google employee. Again, although ▮ decided to remain a Google, employee, both Levandowski and Ron solicited ▮.

The conversations and meetings that Levandowski and Ron had with their fellow Google employees about joining Otto constituted soliciting Google employees to leave their employment. The Panel finds that since these solicitations were done while they were Google employees, they breached the duty of loyalty.

### d. Negotiations to Sell Otto to Uber

Beginning in late 2015, while they remained Google employees, Levandowski and Ron negotiated to sell Otto to Uber. The breach of loyalty claim is based on their proposal not only to sell the company to Uber but to do so in a way that would harm Google.

Respondents were fully aware and intended that the sale of Otto's technology to Uber would give Uber a significant competitive advantage over Google. As confirmed by Ron's notes from January 1, 2016, Respondents' vision for Otto was to "help Uber win the self-driving race," by "reduc[ing] capital cost to compete with G[oogle]."[46] Levandowski told Uber that taking a team of Google employees to Uber would damage Google because they were going right across the street to the competitor. Respondents believed that the loss of this Google team to Uber could have a "distressing hit on the valuation" and that Chauffeur's "valuation would be much lower." Indeed, Respondents wanted their plan to have added effectiveness by having the solicited employees stage a mass walk-out. The mass action was planned around Levandowski's departure. The plan was communicated

---

[46] Exh. 609.

orally and was reflected in offer letters. The letters committed the employees to resign from Google on January 26 and to start work at Otto the next day.[47]

To keep Google from knowing about their plans and possibly taking steps to avoid its impact, Respondents had each Google employee sign a non-disclosure agreement. Respondents instructed some of their Google recruits to avoid communicating in writing and to destroy communications with Respondents. Further, in anticipation of the devastating damages that their plan was expected to inflict on Google, and the consequent risk that Google would seek to recoup those damages from them, Respondents sought and obtained an agreement from Uber to indemnify them for their "Bad Acts," defined as follows:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosure in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any employee and such Employee's Former Employer. (Exh. 1093.)

This indemnification was of critical importance to Levandowski and Ron, who proposed, and "insisted on," the concept. According to Poetzsher, "They wouldn't have done [the deal] without it."[48]

---

[47] *See, e.g.,* Exhs. 782, 840, 832, 837, 836.
[48] Tr. 1783.

Case: 20-36322   Doc# 1298-1   Filed: 07/31/24   Entered: 07/31/24 13:47:35   Page 59
102 of 114

In making its determination that Respondents' conduct breached the duty of loyalty, the Panel gives great weight to the fact that Respondents negotiated to sell Otto and its LiDAR technology to Uber, known by Respondents to be Google's primary competitor in the self-driving space. An essential element of Respondents' pitch to Uber was that prior to the sale, they would populate Otto with a team of Chauffeur employees who had experience working together on self-driving vehicle technology. And the financials of the sale were tied to the number of Chauffeur employees Levandowski and Ron were able to bring out of Google.

In summary, the Panel finds that from August 2012 until his resignation in January 2016, while he was a Goggle employee, Levandowski engaged in competitive conduct that breached his duty of loyalty. And beginning in 2015 until his resignation in January 2016, by joining with Levandowski, Ron individually and jointly engaged in competitive conduct that breached his duty of loyalty.

### 3.     Defenses

As in civil cases, in an arbitration a respondent might allege that the claimant has not proved an essential element of a claim. Although raised by a respondent, the burden of proof of an essential element of a claim remains with the claimant. In their closing brief, Respondents contend that Google failed to prove an essential element of its claim. Respondents also contend that they have proved affirmative defenses. We consider these defenses in turn.

#### a.     Synthetic Equity Defense

In their closing brief, Respondents contend that Google is not entitled to recover any Chauffeur Bonus Plan payments because, *inter alia*, "Mr. Levandowski's initial allocation was 'synthetic equity' in Chauffeur given for the sale of 510 and AR, and is not recoverable

compensation." (Resp. Post-Hrg. Brief at 71.) The Panel treats this as an argument that the Chauffeur Bonus was not "compensation" subject to disgorgement. It was Google's burden to prove that the bonus payments were compensation and not consideration for its purchase of the LLCs.[49]

As recited in our factual findings, in 2010, Google began discussions with Levandowski about acquiring 510 and AR.[50] During the discussions, various acquisition proposals were exchanged, including ████████████████████████████

██████████████████.[51] The acquisition closed on July 28, 2011.[52] The consideration for the acquisitions was recited in the closing documents.[53]

In interpreting the contracts, the Panel applies well-established standards. If contractual language is clear and explicit it governs. See Cal. Civ. Code § 1639. The clear and explicit meaning of contract language, interpreted in its ordinary and popular sense, controls, unless used by the parties in a technical sense or with a special meaning is given to it by usage. See Cal. Civ. Code § 1644; Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18 (1995).

The percentage allotted to Levandowski for his participation in the Chauffeur Bonus Plan was not recited as consideration in the contracts for the sale of his interests in 510 or AR. The lack of any recital of a bonus allocation as consideration for the July 2011

---

[49] The Panel heard expert opinion testimony from James Malackowski regarding whether the Chauffeur bonus was compensation or consideration for a sale of Levandowski's LLCs. The Panel finds this to be governed by interpretation of contracts, a matter of law for the Panel to decide. Accordingly, no weight was given to the opinion testimony.
[50] Exhs. 55, 77.
[51] See e.g., Exh. 75.
[52] Exhs. 105, 106.
[53] Under the agreements, Google acquired AR for an "Aggregate Acquisition Consideration" of ████████, and 510 for an "Aggregate Merger Consideration" of ████████. (Exhs. 106, 105.)

acquisitions is significant because the formation of the Chauffeur Bonus Plan in 2012 and the allocations that were made in February 2012 were made retroactively effective back to ███████████. If the parties had intended to treat Levandowski's allocation as consideration for his 2011 sales of his interests in 510 and AR, it would have been easy to do so retroactively in the Chauffeur Bonus Plan documents.

There was evidence of some overlap in the period of time when Levandowski and Google officials were discussing the purchase of 510 and AR and when the discussions about the Chauffeur Bonus Program commenced. Aaron Crum, the Google corporate development employee who served as lead employee on the acquisition, testified that at one point, Levandowski proposed that his Chauffeur Bonus allocation be given to him in exchange for his sale of his interest in 510 and AR. However, the acquisitions closed before the Chauffeur Bonus Plan was finalized. And even after the acquisition had closed, during formation and implementation of the Chauffeur Bonus Plan, Google officials ███████████ ██████████████████████████████████████████████████████████. At one point, a Google official stated that Levandowski's ███████████████████████████ ███████████. However, as noted, *supra*, the finalized Bonus Plan documents did not recite that Levandowski's sale of his companies was consideration for the allocation.

Further, on January 1, 2012, Levandowski received a letter giving him the option of continuing under Google's regular bonus program or becoming a participant in the Project Chauffeur Bonus Plan. The letter stated that if he elected to participate in the Bonus Plan he would be eligible to receive ███████████████████████████ that would be converted into a bonus in accordance with the terms of the Plan. In addition, he would be required to sign a new "At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement." There was no recitation in any of these

55

documents that his Chauffeur allocation would be related to the consideration he had received for Google's acquisitions of AR or 510. Significantly, under the Plan, if Levandowski were to leave the Chauffeur Project for any reason, he would "not be entitled to receive any further" vesting or allocations, and would "have no further rights under" the Chauffeur Bonus Plan.[54] This further militates against finding that Levandowski's Chauffeur Bonus was at all tied to the companies' acquisition.

Levandowski argues that the phrase "Related Agreements . . . constitute the entire agreement among the parties" in the 2011 NCNS Agreements and thus should be interpreted to incorporate a term sheet and two May 10, 2018 letter submissions from Levandowski. (Resp. Post-Hrg. Brief at 8.) California law recognizes that several contracts relating to the same matter, between the same parties, and made as parts of substantially one transaction, are to be taken together. Cal. Civ. Codes § 1642; Fillpoint, LLC v. Maas, 208 Cal. App. 4th 1170, 1178 (2012). Here, the Panel received evidence where, by reference and by attachment, the parties incorporated multiple agreements into a single transaction. However, it is clear that the acquisitions and bonus allocation did not close as one transaction. By definition, a "term sheet" that is superseded by a finalized agreement does not qualify as an "agreement."

We interpret the contracts in accordance with their clear language. The acquisition agreements recite that the consideration for the sale of the LLCs was money. Based on the language of the contracts, the Panel finds that Levandowski's allocation of an interest in the Chauffeur Bonus Plan was not equity, synthetic or otherwise; his Chauffeur allocation and bonus payments were compensation.

---

[54] Exh. 120; Tr. 1669:10–20.

### b. Affirmative Defenses

An affirmative defense if proved will negate civil liability. Respondents have the burden to prove an affirmative defense. In their closing brief, Respondents contend that they have proved the following affirmative defenses: (1) statute of limitations; (2) no proof of termination; (3) voluntary payment; and (4) waiver. The Panel discusses each of these in turn.

### 1. Statute of Limitations

As an affirmative defense, Respondents allege that Google's breach of loyalty claim against Respondent Levandowski was not timely submitted. (Resp. Post-Hrg. Brief at 19.) Here, Google's Demands for Arbitration were submitted to JAMS on October 28, 2016. The parties dispute the applicable statute of limitations. The California Code of Civil Procedure does not have a provision that explicitly prescribes the limitations period for a claim for an employee's breach of the duty of loyalty.

Respondents contend that the claim for breach of the duty of loyalty has a three-year statute of limitations. (Resp. Post-Hrg. Brief at 19.) Respondents contend that a three-year limitations period applies because Google's breach of loyalty claim and its fraud claim are based on the same facts. The Panel considers this argument despite its dismissal of the fraud claim.[55] The statute of limitations for fraud under California law is three years, starting from the time that the aggrieved party discovers the facts constituting fraud. Cal. Code Civ. Proc. § 338(d). Discovering the facts constituting fraud occurs with either actual knowledge or when "[a claimant] has notice or information of circumstances to put a

---

[55] See Procedural History at II(E)(1).

Case: 20-30242   Doc# 1298-1   Filed: 07/31/24   Entered: 07/31/24 13:47:35   Page 64
107 of 114

reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation. . ." General Bedding Corp. v. Echevarria, 9476 F.2d 1395, 1397 (9th Cir. 1991); see also Kline v. Turner, 87 Cal. App. 4th 1369, 1374 (2001).

Although a fraud claim and a breach of loyalty claim share elements in common, the gravamen of the two actions are different. To sustain a claim for breach of loyalty, Google must have proved that while they were employees, Respondents engaged in conduct that was inimical to the best interests of their employer. This conduct need not have been fraudulent. Thus, the claims are not based on facts that are mutually exclusive. See In re Brocade Commc'ns Sys., Inc. Derivative Litig, 615 F. Supp. 2d 1018, 1037 (N.D. Cal. 2009). Therefore, the Panel rejects Respondents' argument that the same three-year statute of limitations that applies to a claim for fraud also applies to the claim for breach of the duty of loyalty.

California Code of Civil Procedure section 343 provides that an action for relief not explicitly otherwise provided for must be commenced within four years after the cause of action shall have accrued. A breach of loyalty claim accrues when the employer discovered, or in the exercise of reasonable diligence could have discovered the facts giving rise to the breach of duty of loyalty claim. In re Brocade at 1036-37; General Bedding Corp. at 1397. Thus, the Panel applies the four-year statute of limitations to Google's breach of loyalty claim. The arbitration demand was submitted on October 28, 2016. Section 343 requires commencement "within" four years. Therefore, the demand was timely if Google discovered or could have discovered the facts giving rise to its breach of the duty of loyalty claim on or after October 28, 2012. Stated differently, if Google discovered or could have discovered the breach on or before October 27, 2012, the demand was tardy. Therefore, to prove its limitations affirmative defense, Respondents must have proved that Google

Case: 20-08292   Doc# 1298-1 Filed: 07/31/24 23 Entered: 07/31/24 23 14:35:47 Page 65
108 of 114

discovered or could have discovered the facts giving rise to its breach of the duty of loyalty claim on or before October 27, 2012.

Respondents do not contend that they proved knowledge or inquiry notice on or before October 27, 2012. Contending that a three-year limitations period applied, in their post-hearing brief, Respondents contend, "Google, through at least three of its employees, had knowledge of Mr. Levandowski's involvement in Odin Wave [Tyto LiDAR] no later than July 2013." (Resp. Post-Hrg. Brief at 26.) Moreover, while there might have been some at Google who had some knowledge of Levandowski's association with Tyto LiDAR, the preponderance of evidence is that Levandowski took affirmative actions to conceal the nature and extent of his involvement from his supervisors and officers of Google. The Panel finds and concludes that Respondents failed to prove that Google's demand for arbitration of its claim for breach of the duty of loyalty was time-barred.

### 2. No Proof Google Would have Terminated

Respondents argue that Google is not entitled to disgorgement of his Chauffeur bonuses because there is no evidence that Google would have fired Levandowski for his alleged breaches:

> In California, an employer may recover compensation paid during an employee's period of disloyalty. Such recovery is based on the assumption that, had the employer known of the disloyalty, it would have terminated the employee or cease to pay him. [Citation] Contrary to that assumption, there was significant undisputed evidence at the hearing that, despite his actions, Google did not fire and would not have fired Mr. Levandowski. (Resp. Post-Hrg. Brief at 74.)

Given the secrecy with which Respondents shrouded their conduct, whether or not they would have been terminated for their disloyalty is irrelevant to Google's entitlement to disgorgement. Thus, the Panel rejects Respondents' argument that disgorgement should

be denied based on speculation about what Google would have done had it known the full extent of Respondents' conduct.

### 3. Voluntary Payment

Respondents contend that Google cannot recover the Chauffeur bonus payments that it made to Levandowski because it voluntarily made those payments after it knew *or should have known* all material facts relating to what it now alleges to be breaches by Levandowski. (Resp. Post-Hrg. Brief at 75.)

Under California law, the voluntary payment doctrine is an affirmative defense that bars the recovery of money that was voluntarily paid with knowledge of the facts. See W. Gulf Oil Co. v. Title Ins. & Tr. Co, 92 Cal. App. 2d 257, 266 (1949); Steinman v. Malamed, 185 Cal. App. 4th 1550, 1557 (2010). To sustain this affirmative defense, Respondents must have proved that (1) Google knew the facts upon which it now relies to request disgorgement of the payments; and (2) after knowing those facts, Google voluntarily paid money for which it now seeks disgorgement.

The knowledge used to test whether a payment was voluntary must be knowledge of facts upon which Google bases its claim for disgorgement. Since Google is an entity, Respondents must prove that the knowledge was that of a high-ranking official who could act for and on behalf of Google. See Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton, LLP, 133 Cal. App. 4th 658, 679 (2005) ("an officer's knowledge is not imputed to the corporation when he has no authority to bind the corporation relative to the fact or matter within his knowledge"). As discussed above, Levandowski and Ron kept secret the activities and communications between Otto and Uber, claiming that they were legitimately operating in stealth mode. Their secrecy and stealth-mode conduct are inconsistent with

their claim that Google had full knowledge or should have had full knowledge of the requisite facts. See Rodman v. Safeway, Inc., 694 Fed. Appx. 612, 614 (9th Cir. 2017).

Respondents cite evidence that in August 2015, Chelsea Bailey, a Google Human Resources employee, received an email from Levandowski's supervisor, Chris Urmson, that Google should fire Levandowski. Urmson wrote that he had heard from "two different sources" that Levandowski is approaching Chauffeur employees to set up "a package deal of people that he could sell en mass to Uber."[56] Bailey testified that she investigated the matter, including personal interviews with members of the Chauffeur team. Individuals on the Chauffeur team denied that they had been approached. Bailey testified that she was unable to substantiate Urmson's allegations.

Respondents also cite evidence that in 2016 Bailey investigated information that Chauffeur employees had received offers to join a startup company. Bailey confirmed that some employees had received offers, but the employees said that they had signed a non-disclosure agreement that forbid them from identifying the company. As part of the investigation, in January 2016, Bailey attended a Chauffeur team meeting where Levandowski stated that he intended to stay with Google. After Levandowski resigned, on January 27, 2016, Bailey conducted his exit interview. Levandowski stated that he was undecided about what he would next do. He said that he was considering joining a company called Kitty Hawk or starting a self-driving semi-truck company. Employment counsel Jade Wagner joined the conversation. Levandowski acknowledged his intent to abide by Google's confidentiality and non-solicitation policies. Bailey's notes taken during the meeting were received in evidence.[57] The Panel also received in evidence an email

---

[56] Exh. 428.
[57] Exh. 845.

written by Bailey to John Krafcik and others that summarized her exit interview with Levandowski.[58] Based on the totality of evidence, the Panel finds that Respondents have failed to prove that before the bonus payments were made a sufficiently high-ranking Google official had full knowledge of the facts upon which Google relies for disgorgement.

Moreover, to substantiate their voluntary payment defense, Respondents must also show that the payment was voluntary. Legally obligated payments fall outside the voluntary payment doctrine. The bonus payments made to Levandowski were "earned" on ▮▮▮▮▮▮▮▮ and on ▮▮▮▮▮▮▮▮▮ when they ▮▮ (although subject to divestment upon proof of breach of the duty of loyalty). Thus, although Google did not pay the bonus on the dates they vested, upon vesting, Google had a contractual obligation to pay them. As such, Respondents failed to prove that the payments were voluntary.

### 4. Waiver

In their post-hearing brief, Respondents contend that Google should be deemed to have waived each of its claims. (Resp. Post-Hrg. Brief at 63-65.)

In California, waiver is the intentional relinquishment of a known right after knowledge of the facts, or a waiver can occur as the result of an act which, according to its natural import, is so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished. See Chase v. National Indemnity Co., 129 Cal. App. 2d 853, 858 (1954); Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d 1551, 1559 (9th Cir. 1991) (discussing and citing California cases.) The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not

---

[58] Exh. 880.

leave the matter to speculation, and doubtful cases will be decided against a waiver. <u>Waller</u> 11 Cal. 4th 1 at 31.

While Google clearly had knowledge of its rights concerning employee conduct, Respondents must prove that a high ranking individual at Google had actual knowledge of Respondents' conduct that was a breach of those rights and took an action or took no action with the intent of relinquishing the breach on behalf of Google. <u>See</u> <u>Peregrine</u> <u>Funding, Inc.</u>, 133 Cal. App. 4th at 679. The individuals cited in Respondents' brief appear, at most, to have received inconclusive, piecemeal information about some of Respondents' actions. Moreover, it does not appear that Respondents have proven that any high ranking individuals at Google engaged in acts "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." Indeed, evidence was introduced to show that Google did, in fact, instruct Levandowski about his legal obligations. Thus, Google did not act inconsistently. Based on the totality of the evidence, the Panel finds that Respondents did not prove that Google had full knowledge of their actions. Therefore, the affirmative defense of waiver was not proved.[59]

In the alternative, Respondents contend that they should be excused from liability for their disloyal acts because such competitive acts were known to Google and Google did not care about them because that was standard behavior at Google. (Resp. Post-Hrg. Brief at 1.) The Panel regards this argument as within the ambit of Respondents' affirmative

---

[59] In their pre-hearing brief, Respondents' contend that, based on its inconsistent words and actions, Google is estopped from asserting any claims based on the Odin Wave/Tyto LiDAR facts. (<u>See</u> Resp. Pre-Hrg. Brief at 22-23.) This affirmative defense was not raised in the post-hearing brief. And even if it were, because estoppel is based on knowledge of actions that induce detrimental reliance by another party, our finding that Google lacked full knowledge of Respondents' conduct leads us to find that Respondents did not prove the affirmative defense of estoppel.

Case: 20-08292   Doc# 1298-1   Filed: 07/31/24   Entered: 07/31/24 13:47:35   Page 70
113 of 114

defense of waiver. While the Panel did receive evidence that various Google officials initiated outside ventures, none of the outside ventures shown by the evidence rose to the level of competition against Google practiced by Respondents. Thus, the Panel finds no waiver by Google of its claims based on outside ventures pursued by other Google employee.

The Panel finds that Google has proved that Levandowski was in breach of his duty of loyalty beginning with his actions with respect to Tyto LiDAR in May 2012, and continuing together with Ron with respect to Otto and Uber, up to his resignation of his employment. Similarly, Ron was in breach of his duty of loyalty beginning with his conduct with respect to Otto up to his resignation. The Respondents failed to prove that their respective conduct was excused by any affirmative defense.

In Section IV below the Panel analyzes to what relief Google is entitled based on this finding of liability. We now turn to Google's claim for breach of fiduciary duty.

## B.  SECOND CLAIM: BREACH OF FIDUCIARY DUTY

Google claims that Levandowski was a fiduciary while he was employed at Google and that "all of the misconduct identified above for Levandowski's breaches of the duty of loyalty also constitutes breaches of Levandowski's fiduciary duty to Google." (Google Post-Hrg. Opening Brief at 40-41.) Before analyzing Levandowski's conduct, the Panel determines whether Google proved a fiduciary relationship between itself and Levandowski.

### 1.  Essential Elements of Claim

In California, while corporate directors and officers typically are deemed to owe fiduciary duties to their employer, non-officers have also been found to owe fiduciary duties if they participate in management. See Les Fields/C.C.H.I. Ins. Servs. v. Hines, No. 15-

Case: 20-03232   Doc# 1298-1 Filed: 07/31/24 Entered: 07/31/24 13:47:35 Page 74 of 114