# EXHIBIT C

Debra I. Grassgreen (CA Bar No. 169978)
Miriam Manning (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:     (415) 263-7000
Facsimile:      (415) 263-7010
E-mail:          dgrassgreen@pszjlaw.com
                mmanning@pszjlaw.com

David J. Bradford (admitted *pro hac vice*)
Catherine Steege (admitted *pro hac vice*)
Terri L. Mascherin (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Telephone: (312) 222-9350
E-mail: dbradford@jenner.com
        csteege@jenner.com
        tmscherin@jenner.com

*Counsel for Uber Technologies, Inc.*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>Debtor. | Bankruptcy Case<br>No. 20-30242 (HLB)<br>Chapter 11<br><br>Hon. Hannah L. Blumenstiel |
| ANTHONY LEVANDOWSKI, an individual,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.<br><br>Defendant. | Adv. Pro. No. 20-03050 (HLB)<br><br>**ANSWER TO DEBTOR'S COMPLAINT FOR DECLARATORY RELIEF, SPECIFIC PERFORMANCE, AND DAMAGES; AFFIRMATIVE DEFENSES; AND COUNTERCLAIMS** |

Defendant Uber Technologies, Inc. ("Uber") asserts the following answers, affirmative defenses, and counterclaims to the complaint of Plaintiff Anthony S. Levandowski ("Levandowski"), as debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and as plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and states as follows:

## NATURE OF CLAIM[1]

1. This is an objection to the allegations made by Uber Technologies, Inc. ("Uber") in its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") and an action to enforce the promises Uber made to Mr. Levandowski to induce him to sell to Uber his self-driving companies and technology and to lead its autonomous vehicle program.

**ANSWER:** Uber admits that Levandowski purports to object to allegations Uber made in its Proof of Claim (8-1) on July 6, 2020. Uber further admits that Levandowski purports to bring an action to enforce alleged promises he claims Uber made to Levandowski. Uber denies the remaining allegations in paragraph 1.

2. Mr. Levandowski is one of the world's leading experts in autonomous vehicle technology. Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks. He was a founding member of Google's autonomous car initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

**ANSWER:** Uber admits that Levandowski is an engineer who has participated in projects related to the construction of self-driving vehicles. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2 and therefore denies the allegations.

3. Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies the allegation.

---

[1] Due to confidentiality concerns and volume, Uber has not attached all of the referenced documents to its Answer, Affirmative Defenses, and Counterclaims. Uber will make these documents available and/or file them with the Court (including under seal as appropriate) upon request from the Court or Mr. Levandowski that it do so.

4. Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr. Levandowski worked for a competitor on self-driving technology, he would face very negative consequences. Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and Travis Kalanick, Uber's then-CEO. In addition, Mr. Levandowski was aware that Mr. Page and other executives at Google viewed Uber as a very significant competitor.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 and therefore denies the allegations.

5. In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto") a self-driving trucking company.

**ANSWER:** Uber admits that Levandowski left Google in early 2016. Uber further admits that Levandowski helped start Ottomotto LLC ("Otto") and that Otto was a self-driving vehicle company. Uber denies the remaining allegations in paragraph 5.

6. Uber expressed an interest in acquiring Otto. Because of Mr. Page's threats and known hostility towards Uber, Mr. Levandowski insisted that Uber indemnify him against claims that may be brought by Google as a condition to entering into any relationship with Uber.

**ANSWER:** Uber admits that it was interested in acquiring Otto. Uber admits that Levandowski sought to have Uber indemnify him against certain potential claims. Uber further admits that Levandowski expressed concern that Google could sue him even if he did nothing wrong. Uber denies that Levandowski is entitled to indemnification. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 6 and therefore denies the allegations.

7. In fact, Mr. Levandowski explained to Uber multiple times that he believed Google would likely sue him if he joined Uber. Mr. Levandowski was particularly concerned because he did not have the ability to defend himself if one of the largest companies in the world, with essentially unlimited resources, came after him.

**ANSWER:** Uber admits that, prior to executing the Indemnification Agreement, Levandowski and Uber discussed the prospect that Google may bring litigation against Levandowski. Uber further admits that Levandowski expressed concern that Google could sue him even if he did nothing wrong. Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

in the second sentence of paragraph 7 and therefore denies the allegations. Uber denies the remaining allegations in paragraph 7.

8. In addition, because Mr. Levandowski left Google to work on autonomous trucking, Mr. Levandowski conditioned the sale of Otto on Uber supporting his self-driving trucking business.

**ANSWER:** Uber admits that on April 11, 2016, the Ottomotto Merger Agreement ("Otto Agreement") and the Otto Trucking Merger Agreement ("Otto Trucking Agreement") were each executed. Uber respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 8.

9. As part of the transaction for the acquisition of Otto, Uber agreed to indemnify Mr. Levandowski for claims Google might raise against him. These claims included claims Google might assert for breach of fiduciary duty, breach of the duty of loyalty, breaches of various restrictive covenants, and trade secret misappropriation. Exhibit A is a redacted copy of the Indemnification Agreement dated April 11, 2016 between Uber and Mr. Levandowski.

**ANSWER:** Uber admits that it entered into an Indemnification Agreement on April 11, 2016 with Levandowski, and that Exhibit A to the Adversary Complaint is a redacted copy of that Agreement. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 9. Answering further, Uber entered into the Indemnification Agreement based on, among other things, Levandowski's unequivocal representations that he had not breached any obligations to Google, that he had not taken any confidential information or documents from Google, and that no Google documents or information would be brought to Uber.

10. Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of any claim brought by Google, as well as any award or judgment in Google's favor. See Ex. A at 3, § 2.3.

**ANSWER:** Uber admits that the Indemnification Agreement includes at page 3 and § 2.3 language related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 10.

11. As part of the acquisition of Otto, Uber also agreed to support Mr. Levandowski's trucking business objectives by either creating a new business unit within Uber (wherein Mr. Levandowski would have a leadership role) or allowing Mr. Levandowski to create a trucking business outside of Uber.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

4

**ANSWER:** Uber admits that on April 11, 2016, the Otto Agreement and the Otto Trucking Agreement were each executed. Uber respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 11. Answering further, Uber states that the Otto Trucking Agreement was terminated pursuant to its terms, that Levandowski voluntarily sold his interest in Otto Trucking LLC ("Otto Trucking") to a third party, and that Levandowski has no legal right to enforce the terminated Agreement.

12. After Uber acquired Otto, Mr. Page followed through on his threats against Mr. Levandowski. In October, 2016, Google initiated two arbitration proceedings against Mr. Levandowski. Mr. Levandowski timely requested indemnity from Uber under the Indemnification Agreement, and Uber accepted its obligations. Consequently, Uber paid for and controlled the defense of Mr. Levandowski for nearly three years. Initially, Mr. Levandowski was represented by the same counsel that represented Uber. During the course of a separate litigation, a trade secrets dispute with Waymo LLC, a Google affiliate, Uber's then-counsel determined it could not jointly represent Mr. Levandowski (or his company, Otto Trucking) and Uber. Uber subsequently selected and hired separate counsel for Mr. Levandowski. Uber continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected. Uber also exercised its right to direct and control Mr. Levandowski's defense of the arbitration proceeding through the final award and including all settlement discussions with Google.

**ANSWER:** Uber admits that in October 2016, Google initiated two arbitration proceedings against Levandowski (together, the "Google Arbitration"). Uber further admits that Levandowski thereafter requested indemnity from Uber pursuant to the April 11, 2016 Indemnification Agreement. Uber admits that it paid the legal expenses in connection with the two arbitration proceedings through September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber admits that Levandowski was represented in the arbitration proceedings by Morrison & Foerster LLP, and that Morrison & Foerster initially represented both Levandowski and Uber. Uber admits that after Google initiated *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation"), Uber determined that Levandowski should have separate counsel. Uber denies that it directed and controlled Levandowski's defense of the arbitration proceeding through the final award, including all settlement discussions with Google. Uber denies the remaining allegations in paragraph 12.

13. After Mr. Levandowski relied on Uber's control and direction for years and after an unfavorable Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

333 Answer, Affirmative Defenses, and Counterclaims No. 20-03050

**ANSWER:** Uber admits that it notified Levandowski through counsel that the Indemnification Agreement was rescinded and that it would not make additional payments after September 25, 2019. Uber respectfully refers the Court to the August 30, 2019 and September 27, 2019 letters from Uber's counsel to Levandowski's counsel for their complete and accurate contents. Uber denies the remaining allegations in paragraph 13.

14. In addition, while in control of Mr. Levandowski's defense and settlement prospects with Google, Uber worked out its own settlement with Google's subsidiary, Waymo LLC ("Waymo") to resolve a trade secret dispute between them relating to the same underlying events. Upon information and belief, the terms of that settlement included an agreement that Uber would never hire or work with Mr. Levandowski again, which resulted in Uber also reneging on its promises to support Mr. Levandowski's trucking business.

**ANSWER:** Uber admits that in February 2018 it, along with Otto, entered into a Settlement Agreement with Waymo LLC, Google LLC, and Alphabet, Inc. in connection with a civil action that Waymo filed against Uber, Otto, and Otto Trucking asserting claims for violations of the Trade Secrets Act, violations of the California Uniform Trade Secrets Act, patent infringement, and violations of Section 17200 of the California Business and Professions Code. Uber respectfully refers the Court to the Settlement Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 14.

15. Uber's recently filed Proof of Claim has made the Indemnification Agreement, and Uber's actions related to its acquisition of Otto, central to this Chapter 11 Case.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber denies the remaining allegations in paragraph 15.

16. In particular, the Proof of Claim alleges that because Uber purportedly rescinded the Indemnification Agreement, not only does Uber not have any obligation to indemnify Mr. Levandowski but it also is a creditor of Mr. Levandowski. Uber seeks payment for legal fees and costs it provided under the Indemnification Agreement and contribution for the settlements it has negotiated for its own benefit and the benefit of Mr. Levandowski's cofounder, the current lead of Uber's trucking business.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 16.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

17. However, Uber asserts claims that, upon information and belief, Uber released as part of the settlement with Waymo.

**ANSWER:** Uber denies the allegations in paragraph 17.

18. Uber also has no basis to rescind the Indemnity Agreement. Uber has set forth numerous theories to back out of the deal it struck, but two issues appear to be core: (1) a claim that Mr. Levandowski engaged in fraud and (2) a claim that Mr. Levandowski has pled to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney.

**ANSWER:** Uber admits that it has asserted, among other things, that Levandowski engaged in fraud, and that Levandowski has pled guilty to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney. Uber denies the remaining allegations in paragraph 18.

19. First, there was no fraud. Uber was aware of Mr. Levandowski's conduct through the extensive investigation it conducted prior to and after entering into the indemnity agreement with him, and long before it purported to rescind. To the extent Uber claims it was unaware of certain facts, those facts were not material and were fully available to Uber had they cared to look more carefully at the materials it was provided by Mr. Levandowski. In fact, Mr. Levandowski repeatedly told Uber to search those devices for the most accurate information.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz Friedberg, LLC ("Stroz") to conduct an independent investigation of Otto employees, including Levandowski. Uber denies the remaining allegations in paragraph 19.

20. Second, Mr. Levandowski did not make any misrepresentations regarding any theft of trade secrets. Mr. Levandowski has plead guilty to trade secret misappropriation with respect to one file he accessed after leaving Google. As for that one file, Uber knew the file's name, that Mr. Levandowski kept that file, that he accessed it after he left Google, the date he accessed it, and through its due diligence firm, the contents of that file.

**ANSWER:** Uber admits that Mr. Levandowski has pled guilty to Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA. Uber denies the remaining allegations in paragraph 20.

21. Mr. Levandowski therefore commences the Adversary Proceeding to obtain declaratory relief as to the impact of Uber's purported rescission on the parties' respective rights and obligations, to enforce Uber's obligations arising from the Otto transaction, and to disallow the Proof of Claim.

**ANSWER:** Paragraph 21 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 21.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

## JURISDICTION AND VENUE

22. The Adversary Proceeding arises in and relates to the Chapter 11 Case. The Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Mr. Levandowski against Uber herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges,* General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California.

**ANSWER:** Uber admits that the Adversary Proceeding relates to the Chapter 11 Case and that the Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Levandowski pursuant to 28 U.S.C. §1334(b). Uber denies the remaining allegations of paragraph 22.

23. This is a core proceeding under 28 U.S.C. § 157(b) including, without limitation, under subsections (b)(2)(A), (B), (C), (K), and (O). Mr. Levandowski consents to the entry of a final order by the Court in connection with this Adversary Proceeding.

**ANSWER:** Uber admits that Levandowski's objection to Uber's Proof of Claim is denominated as a core proceeding under 28 U.S.C. § 157(b)(2)(B). Uber denies that the remaining claims set forth in this Adversary Proceeding are denominated as core proceedings pursuant to any of the subparts of 28 U.S.C. § 157(b)(2). Pursuant to Local Bankruptcy Rule 7012-1, Uber does not consent to the entry of final orders or judgments by the Bankruptcy Court.

24. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:** Uber admits that venue is proper before this Court pursuant to 28 U.S.C. § 1409(a) and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court. (*See* Case No. 20-03050, Dkt. 13.) Pursuant to that Stipulation, Uber does not contest that venue is proper before this Court with respect to Levandowski's Adversary Complaint. Uber denies the remaining allegations in paragraph 24.

## FACTS

### A. MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY

25. Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 and therefore denies the allegations.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

8

26.     He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and therefore denies the allegations.

27.     In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles. He was 24 years old at the time.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies the allegations.

28.     The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas. Mr. Levandowski and a team of engineers from U.C. Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations—submitted a self-driving, self-balancing, two-wheeled motorcycle. This motorcycle, Ghostrider, competed against well-funded submissions from Stanford University, Carnegie Mellon, and established companies. After performing well in several qualifying rounds, Ghostrider was selected as a contender for the DARPA Grand Challenge.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies the allegations.

29.     Ghostrider now sits in the Smithsonian Museum as one of America's great innovations.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies the allegations.

30.     Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr. Sebastian Thrun, a former Stanford computer science professor who was also a participant in the DARPA Grand Challenge.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies the allegations.

31.     Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool. VuTool was subsequently acquired by Google.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies the allegations.

Case 20-03050    Doc# 298-2    Filed 08/31/23    Entered 08/31/23 14:34:47    Page 9 of 10 of 555

## B. MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM

32.     Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping with Dr. Thrun. Mr. Levandowski helped develop the technology for the Google service now known as Street View.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 and therefore denies the allegations.

33.     In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-driving car program at Google. The program was named "Project Chauffeur."

**ANSWER:**     Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 33 and therefore denies the allegations.

34.     Project Chauffeur catapulted Google into the lead in autonomous driving when, in 2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of 100 miles. By 2012, Google had logged over 300,000 miles of autonomous driving. Mr. Levandowski was a key contributor in helping Google achieve these milestones. For his past contributions and to incentivize him going forward, Google invited Mr. Levandowski to participate in the Chauffeur Bonus Plan—an incentive plan that would pay members a percentage of the valuation of Project Chauffeur starting at the end of 2015—and gave him the highest initial allocation or individual earnout percentage of any member of the plan.

**ANSWER:**     Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google and that he participated in the Chauffeur Bonus Plan. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34 and therefore denies the allegations.

35.     Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016.

**ANSWER:**     Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google and that he left Google in 2016. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies the allegations.

36.     Mr. Levandowski would ultimately be paid over $127 million by Google for his work on Project Chauffeur. The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google.

**ANSWER:**     Uber admits that the Arbitration Award in favor of Google and against Levandowski ("Arbitration Award") recounts that Levandowski was paid approximately $127 million by Google and that Levandowski had no right to receive that payment and was required to disgorge the same. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 and therefore denies the allegations.

## C.     MR. LEVANDOWSKI CONSIDERS LEAVING GOOGLE

37.     For years, Google enjoyed its position as the leader in the self-driving space with no significant challengers. In 2015, Uber announced the launch of its own self-driving car initiative after acquiring a team of engineers from Carnegie Mellon University.

**ANSWER:**     Uber admits that in 2015, Uber formed a partnership with Carnegie Mellon University ("CMU") that resulted in Uber hiring certain faculty members, researchers, and technicians from CMU. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 and therefore denies the allegations.

38.     After Uber's announcement, there were many discussions within Google about how to compete with Uber. In those discussions, executives within Google expressed distaste and animosity towards Uber. Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 and therefore denies the allegations.

39.     Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Mr. Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

11

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

**ANSWER:** Uber admits that the language quoted in paragraph 39 is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* and respectfully refers the Court to the trial transcript for its complete and accurate contents. Uber denies the remaining allegations in paragraph 39.

40. Over time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making after its initial successes. In 2015, Mr. Levandowski began to think about other self-driving opportunities.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 and therefore denies the allegations.

41. After learning about Mr. Levandowski's discontentment at Google, Dr. Thrun introduced Mr. Levandowski to Mr. Kalanick at Uber. Upon meeting Mr. Levandowski, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership where he could supply self-driving technology to Uber as an outside technology vendor.

**ANSWER:** Uber admits that Dr. Thrun introduced Levandowski to Mr. Kalanick. Uber denies the allegations in the second sentence of paragraph 41. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 41 and therefore denies the allegations.

42. Mr. Levandowski's Google colleagues, and more than one of his superiors, were aware that Mr. Levandowski was having discussions with Uber as he considered his future.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 42 and therefore denies the allegations.

43. Simultaneously, in 2015, Lior Ron rejoined Google in a business role. Mr. Levandowski and Mr. Ron, who had met while working on Google Maps, began to discuss the problems with Project Chauffeur and ways in which the Project could be improved.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 43 and therefore denies the allegations.

44. During those conversations, they also discussed new product markets, including self-driving trucks. As they explored this concept and brainstormed further, both became passionate about self-driving trucking. They were convinced that the trucking business could be disrupted by the addition of self-driving technology and that self-driving trucking technology could go to market much more quickly than passenger car technology. Mr. Levandowski began to include Mr. Ron in his discussions with Uber and others. Mr. Levandowski and Mr. Ron considered establishing a commercial vendor relationship with Uber to obtain funding for the trucking business.

**ANSWER:** Uber admits that Mr. Ron participated in discussions with Uber and Levandowski. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 44 and therefore denies the allegations.

45. Toward the end of his time at Google, Mr. Levandowski also had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur. During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving startup outside of Google.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 45 and therefore denies the allegations.

46. Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences. Because Google had bought several of Mr. Levandowski's outside businesses previously and because others had left Google to start new companies without objection from Google, Mr. Levandowski understood Mr. Page's threat to be about a large, well-funded competitor and not a startup.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 46 and therefore denies the allegations.

### D. MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE

47. Mr. Levandowski left Google on January 27, 2016. He joined Otto, a self-driving trucking company and was credited as a co-founder.

**ANSWER:** Uber admits that Levandowski left Google on January 27, 2016. Uber admits that Levandowski joined Otto and that he was credited as a co-founder. Uber denies the remaining allegations in paragraph 47.

48. Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

**ANSWER:** Uber admits that it discussed acquiring Otto with Levandowski. Uber denies the remaining allegations in paragraph 48.

49. As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber on consumer self-driving technology (instead of trucking) as a competitive act that would convert him from a friendly, start-up competitor to an enemy. Mr. Levandowski also told Uber that he feared that Google would sue him and seek recovery of the substantial amounts of money that had been paid to him or were owed to him.

**ANSWER:** Uber admits that in early 2016, Levandowski and Uber discussed the prospect that Google may bring litigation against Levandowski. Uber further admits that Levandowski expressed

concern that Google could sue him even if he did nothing wrong. Uber denies the remaining allegations in paragraph 49.

50.     In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Mr. Kalanick. In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick. In response, Mr. Kalanick stated that Uber was prepared to protect Mr. Levandowski from an aggressive assault by Google.

**ANSWER:**     Uber admits that in early 2016, Levandowski and Uber discussed concerns related to Levandowski's former employer, Google, and the prospect that Google may bring litigation against Levandowski. Uber denies the remaining allegations in paragraph 50.

51.     As a key part of the transaction to sell Otto and have Mr. Levandowski join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google might assert against him. *See* Ex. A. The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

> "Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date. *Id.* at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

**ANSWER:**     Uber admits that the language quoted in paragraph 51 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 51. Answering further, Uber states that Levandowski is not entitled to indemnification.

52.     Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

> (a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses***

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

14

*incurred by such Diligenced Employee* or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id.* at § 2.1(a) (emphasis added).

**ANSWER:**    Uber admits that the language quoted in paragraph 52 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 52. Answering further, Uber states that Levandowski is not entitled to indemnification.

53.    "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

"Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id.* at 3.

**ANSWER:**    Uber admits that the language quoted in paragraph 53 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 53. Answering further, Uber states that the scope of permissible indemnification is limited by applicable law.

54.    The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii)). That section reads:

(b) Notwithstanding anything herein to the contrary, *an Indemnified Claim shall not, regardless of whether the Closing occurs, include,* and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

15

(ii) *claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts* committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that *either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries* in connection with the due diligence performed by the Outside Expert *or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees* to the Outside Expert.

*Id.* at § 2.1(b)(ii) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 54 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies that the language quoted in paragraph 54 constitutes the "only limitations" on Uber's indemnification obligations. Uber denies the remaining allegations in paragraph 54.

55. The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski. Mr. Levandowski would not have entered into the transaction without Uber's indemnity promise.

**ANSWER:** Uber admits that Levandowski expressed concern about Google's use of virtually inexhaustible resources to attack him without basis, but denies the remaining allegations in the first sentence of paragraph 55. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 55 and therefore denies the allegations.

56. The Indemnification Agreement was structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded. Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request.

*Id.* at § 2.3.

**ANSWER:** Uber admits that the language quoted in paragraph 56 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 56. Answering further, Uber denies that Levandowski is entitled to indemnification.

57. If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration proceedings to enforce Uber's obligations.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request. **If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within such [redacted], such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e).** In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.

Ex. A at §2.3(a) (emphasis added).

(e) . . . An Indemnified Person [Mr. Levandowski] ***may*** elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a). . . . Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS") and [Uber], on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.

*Id.* at § 2.2(e) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 57 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 57.

58. The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses, including proceedings in San Francisco state or federal courts where both parties submitted to jurisdiction.

**3.11 Specific Performance.** Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative). Each of the Parties agrees that ***this Agreement is intended to be legally binding and specifically enforceable*** pursuant to its terms and that Purchaser and the ***Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms*** and that monetary damages would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, ***a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.***

*Id.* at § 3.11 (emphasis added); *see also id.* at § 3.5.

**ANSWER:** Uber admits that the language quoted in paragraph 58 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 58.

59. In an arbitration concerning Uber's failure to advance Expenses, the agreement expressly prohibited Uber from litigating any issues concerning whether any claims or Expenses are covered by the Indemnification Agreement if the claims brought by Google were not fully resolved either through settlement or a final, non-appealable judgment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request. If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within [redacted] period, such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e). ***In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.***

*Id.* at § 2.3(a) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 59 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 59. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11 Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

60. Instead, Uber agreed that it could challenge coverage and seek ***reimbursement*** of payment for Expenses it advanced ***only after*** the final resolution of Google's claims. Section 2.2(d) of the Indemnification Agreement stated:

Case 23-03050 Doc 1348-1 Filed 06/12/24 Entered 06/12/24 12:05:47 Page 19 of 555

In the event that Purchaser believes all or a portion of a Former Employer Claim is an Excluded Claim hereunder, Purchaser shall have the right (in its sole discretion), ***within 60 days following the settlement or final non-appealable adjudication of such Former Employer Claim,*** to initiate arbitration under Section 2.2(e) with the Indemnified Person(s) party to such Former Employer Claim in order to determine whether all or a portion of such Former Employer Claim is an Excluded Claim under the terms of this Agreement.

*Id.* at § 2.2(d) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 60 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 60. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11 Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

61. It was only after final resolution of any arbitration between Mr. Levandowski and Uber wherein the arbitrators determined that a Former Employer Claim was not covered by the Indemnification Agreement would Uber receive reimbursement for Expenses it advanced.

Following such arbitration, if the arbitrator(s) determines in a Final Judgment that all or a portion of such Former Employer Claim is an Excluded Claim hereunder, then Purchaser shall be entitled to receive reimbursement for, and the Indemnified Person(s) party to such Former Employer Claim shall be required to pay to Purchaser, the amount of all Expenses paid or incurred by or on behalf of Purchaser and/or its Affiliates with respect to such Excluded Claim

*Id*.

**ANSWER:** Uber admits that the language quoted in paragraph 61 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 61. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

19

between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his

Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11

Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute

under the Indemnification Agreement will be presented and resolved as part of the Adversary

Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on

any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of

the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

      62.    In the meantime, Uber was required to advance Expenses to indemnify Mr. Levandowski for claims brought against him by Google.

> For the avoidance of doubt, ***Purchaser shall advance all Expenses*** incurred by the Indemnified Person(s) pursuant to Section 2.3(a) ***through the later to occur of the final settlement or final adjudication*** of such Former Employer Claim, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d).

*Id.* at § 2.2(d) (emphasis added).

     **ANSWER:**    Uber admits that the language quoted in paragraph 62 appears in the April 11,

2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and

accurate contents. Uber denies the remaining allegations in paragraph 62. Answering further, on July 29,

2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes

between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his

Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11

Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute

under the Indemnification Agreement will be presented and resolved as part of the Adversary

Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on

any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of

the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

### E.    UBER ACQUIRES OTTO

     63.    As part of the indemnification process, Mr. Levandowski agreed to be interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz"). He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination. To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that Stroz collected a number of devices from Levandowski and that Levandowski gave Stroz access to a number of accounts. Upon information and belief, Uber admits that Stroz is still in possession of most of those devices and maintains static images of those accounts. Uber denies that it is in possession of Levandowski's devices and images of his accounts. Uber denies the remaining allegations in paragraph 63.

64. The Stroz /Uber investigation of Mr. Levandowski uncovered a great number of facts related to potential claims that might be brought by Google but was, by Stroz' own admission, incomplete. In early April 2016, while Stroz' was conducting its investigation, Uber executed the Indemnification Agreement.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that the Indemnification Agreement was executed on April 11, 2016, and that the final Stroz written summary report had not been completed at that point. Uber denies the remaining allegations in paragraph 64. Answering further, Uber received preliminary findings from Stroz prior to April 11, 2016.

65. As Stroz summarized, Uber requested preliminary information regarding the investigation "in the lead-up to Uber's signing of an agreement to purchase Otto and "long before the investigation was completed." Stroz had provided Uber with preliminary information that included Stroz's draft memo from Mr. Levandowski's interviews and access reports showing that Mr. Levandowski retained, and in some instances, accessed Google confidential information after he left Google. The interview memo remained in draft form and Mr. Levandowski's counsel reserved his rights as to the accuracy of the information in the memo.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that Stroz provided a draft memo to Uber dated April 2, 2016 that discussed its interviews of Levandowski. Uber admits that the final Stroz report states that counsel reserved their clients' rights with respect to accuracy in the drafts of the interview memos. Uber denies the remaining allegations in paragraph 65. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

66. Uber pushed for the entire transaction to proceed knowing that Stroz had not completed its investigation.

**ANSWER:** Uber admits that it signed the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement before receiving Stroz's final written summary report. Uber denies the remaining allegations in paragraph 66. Answering further, Uber received preliminary findings from Stroz prior to April 11, 2016.

67. On April 11, 2016, Uber executed several documents to complete this transaction, including the Indemnification Agreement, the Otto Agreement and Plan of Merger (the "Otto Agreement"), and the Otto Trucking LLC Agreement and Plan of Merger (the "Otto Trucking Agreement"), which gave Uber an option to acquire a second company created by Mr. Levandowski and Mr. Ron.

**ANSWER:** Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed. Uber refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 67.

68. Stroz did not issue a report until August 5, 2016, almost four months after it signed the Otto acquisition documents.

**ANSWER:** Uber admits that Stroz provided Uber with a final written summary report on August 5, 2016 ("Stroz Report"). Uber denies the remaining allegations in paragraph 68.

69. The Stroz report disclosed numerous facts, including the following:

During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

**ANSWER**: Uber admits that the language quoted in paragraph 69 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 69. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

70.     Stroz reported that Mr. Levandowski's devices demonstrated that during his time at Google, he downloaded documents and files relating to Project Chauffeur.

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016. An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

**ANSWER:**     Uber admits that the language quoted in paragraph 70 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 70. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

71.     It also reported that Mr. Levandowski downloaded Chauffeur files shortly before his departure from Google and had accessed them following his departure from Google.

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2016 — Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

**ANSWER:**     Uber admits that the language quoted in paragraph 71 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 71. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

72.     Stroz reported facts regarding hiring of Google employees.

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffeur employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took

place at Levandowski's house in approximately December 2015 and January 2016. These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

**ANSWER:** Uber admits that the language quoted in paragraph 72 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 72.

73. Stroz included as an exhibit to its report the draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects for which he had an ownership interest, but did not include any discussion of this memo in its main report. In addition, Mr. Levandowski's devices and accounts also contained extensive information about a company named Odin Wave/Tyto, Mr. Levandowski's estate planning, and various investments.

**ANSWER:** Uber admits that a redacted interview memorandum of Levandowski was attached to the Stroz Report that was provided to Uber. Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of paragraph 73 and therefore denies those allegations. Uber denies the remaining allegations in paragraph 73. Answering further, Uber states that Levandowski's counsel controlled what information Stroz could share with Uber from Stroz's interviews of the Otto employees and reviews of data provided to Stroz. Stroz did not provide Uber copies of all of the exhibits to its summary report, and Uber did not have access to Levandowski's devices and accounts. To the extent that any of Levandowski's devices contained information related to Tyto, Uber did not have access to and was not told about that material, and Levandowski did not disclose that information to Stroz. To the contrary, when asked by Stroz what "side projects" he had done while at Google, he did not identify Tyto.

74. Stroz noted discrepancies in what Mr. Levandowski recalled and what Stroz discovered on Mr. Levandowski's devices.

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

24

**ANSWER:** Uber admits that the language quoted in paragraph 74 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 74.

75. Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text messages, as well as its decision not to investigate these deletions further.

> Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

**ANSWER:** Uber admits that the language quoted in paragraph 75 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 75.

76. Despite Stroz's findings, on August 18, 2016, Uber closed the acquisition of Otto and publicly announced that it was acquiring the company and working with Mr. Levandowski.

**ANSWER:** Uber admits that in August 2016 it closed the acquisition of Otto and that a press release was issued on August 18, 2016 by Uber stating that it had acquired Otto. Uber admits that Levandowski would be working with Uber. Uber denies the remaining allegations in paragraph 76.

77. In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

**ANSWER:** Uber admits that it issued a press release on August 18, 2016 and that the language quoted in paragraph 77 appears in the press release. Uber respectfully refers the Court to the press release for its complete and accurate contents. Uber denies the remaining allegations in paragraph 77.

## F. GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI

78. On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements

relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 78.

79. Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 79. Answering further, Uber refers the Court to the Arbitration Award as setting forth the complete and accurate account of any determinations made by the Arbitration Panel.

80. The two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before Otto was acquired by Uber

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 80.

81. Google alleged that Mr. Levandowski violated his duties to Google through his relationship with Tyto. Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential information regarding compensation to recruit Google employees.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 81.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

82. The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement.

**ANSWER:** Uber denies that the claims asserted by Google in arbitration are covered by the Indemnification Agreement. Uber denies the remaining allegations in paragraph 82.

### G. UBER ACCEPTS THE INDEMNITY OBLIGATIONS

83. On November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

**ANSWER:** Uber admits that on November 3, 2016, Uber received notice of the Former Employer Claims under the Indemnification Agreement. Uber denies the remaining allegations in paragraph 83.

84. On November 3, 2016, Uber's in-house counsel and as its outside counsel from Morrison & Foerster LLP ("MoFo") interviewed Mr. Levandowski about the allegations asserted in Google's arbitration demands.

**ANSWER:** Uber admits that Uber's counsel interviewed Levandowski on November 3, 2016 in connection with Google's arbitration demands. Uber denies the remaining allegations in paragraph 84.

85. After receipt of the notice and interviewing Mr. Levandowski, Uber accepted Mr. Levandowski's tender of the indemnity and assumed control of Mr. Levandowski's defense without any reservation of rights.

**ANSWER:** Uber admits that on November 3, 2016, it received notice of Google's arbitration demands and that Uber's counsel interviewed Levandowski. Uber denies that Levandowski is entitled to indemnification. Uber denies the remaining allegations in paragraph 85.

86. Uber hired MoFo to initially represent Mr. Levandowski. Through its counsel, Uber determined the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration.

**ANSWER:** Uber admits that Morrison & Foerster represented Levandowski. Uber denies that it unilaterally determined the strategy for Levandowski's defense, including the issues identified in paragraph 86. Uber denies the remaining allegations in paragraph 86.

87. In February 2017, Waymo LLC ("Waymo")—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action"). That action alleged, among other things, that Mr. Levandowski had downloaded 14,000 files from a Google server, that those files

Case 22-03050   Doc#13-1   Filed 06/12/24   Entered 06/12/24 11:35:47   Page 27 of 555

contained trade secrets, and that he had used those files at Otto, which was acquired by Uber in 2016. These were the same files that Stroz had noted in its report, except that because of duplication in the files, Stroz had identified 24,000 files from that server.

       **ANSWER:**    Uber admits that in February 2017, Waymo initiated an action in the United States District Court for the Northern District of California, alleging misappropriation of trade secrets and patent infringement against Uber. Uber respectfully refers the Court to the amended complaint for its complete and accurate contents and allegations. Uber denies the remaining allegations in paragraph 87.

       88.    Based on Waymo's allegations, MoFo notified Google that Mr. Levandowski was invoking his Fifth Amendment rights and would not make disclosures in the arbitration.

       **ANSWER:**    Uber admits that Morrison & Foerster notified counsel for Waymo that Levandowski was invoking his Fifth Amendment privilege. Uber denies the remaining allegations in paragraph 88.

       89.    Several weeks after, MoFo determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski. As a result, MoFo sought to withdraw from representation of Mr. Levandowski and continue with its representation of Uber.

       **ANSWER:**    Uber admits that Morrison & Foerster terminated its representation of Levandowski in connection with the Google Arbitration. Uber lacks knowledge or information sufficient to admit or deny whether Morrison & Foerster determined it had a conflict of interest, and denies the remaining allegations in paragraph 89.

       90.    Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

       **ANSWER:**    Uber admits that Goodwin Procter represented Levandowski in the Google Arbitration. Uber denies the remaining allegations in paragraph 90. Answering further, Uber states that it was prohibited from seeing most of the discovery materials, was excluded from most of the arbitration hearing, was prohibited from seeing most of the legal briefing and expert reports, and exercised no control over either Levandowski's arguments or defenses.

       91.    For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement. Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings, approval over experts, discussion about who would be arguing motions, pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions. Mr. Levandowski complied with Uber's requirements and cooperated with his defense. Mr. Levandowski and his counsel met with Uber whenever it requested.

Case 22-03050   Doc#1248-1 Filed 06/12/24 Entered 06/12/24 12:04:47 Page 29 of 555

**ANSWER:** Uber admits that it has paid some of Levandowski's legal expenses in connection with the Google Arbitration. Uber admits that it received periodic updates on proceedings in the arbitration. Uber denies the remaining allegations in paragraph 91.

92.    Mr. Levandowski provided information and guidance that led to the discovery of evidence that was helpful to his defense in the arbitration as well as the Waymo action. This included guidance that led to the discovery of statements by the administrator of the server that housed the 14,000 files at issue that the files were "low value" and that "checking out" or downloading the entire repository of 14,000 files did not "ring the alarm bells" for him. This was because when a user accessed the server where the so-called 14,000 files were located, the system automatically downloaded the entire repository onto his or her laptop even if the user only wanted to access one or two files. Ultimately, this discovery, driven by Mr. Levandowski's contributions, became a centerpiece of Uber's defense in the Waymo case.

**ANSWER:** Uber admits that Levandowski provided information to his counsel in connection with the Waymo litigation and the Google Arbitration. Uber denies that Levandowski cooperated with Uber in the defense of the Google Arbitration as contemplated and required by the Indemnification Agreement. Uber denies the remaining allegations in paragraph 92.

93.    In addition to providing this critical information, Mr. Levandowski also provided additional information to support Uber's defense. This included obtaining from a former Chauffeur team member the earrings she received as a parting gift that contained the alleged trade secrets at issue in the Waymo Action. Mr. Levandowski also identified numerous events and witnesses who aided Uber in its defense of the Waymo action as well as the arbitration with Google.

**ANSWER:** Uber admits that Levandowski provided information to his counsel in connection with the Waymo litigation and the Google Arbitration. Uber denies the remaining allegations in paragraph 93.

94.    Mr. Levandowski also complied with Uber's requirement that Uber control all settlement discussions with Google. Mr. Levandowski made several proposals regarding possible settlement structures to Uber hoping that a global settlement could be reached with Google. But because Uber controlled settlement prospects with Google, Mr. Levandowski did not know whether any of his settlement proposals were made to Google.

**ANSWER:** Uber denies the allegations in paragraph 94.

**H.    UBER SETTLES THE WAYMO ACTION**

95.    In February 2018, while controlling Mr. Levandowski's defense, Uber settled the Waymo Action with Waymo/Google. The existence of a settlement between Uber and Waymo was publicly announced, but limited information regarding the exact terms of the settlement is publicly available.

Case 3:20-03050   Doc#1348-1   Filed 06/12/24/23   Entered 06/12/24/23 12:04:47   Page 30 of 1665

**ANSWER:** Uber admits that a settlement was reached in the Waymo litigation, that the existence of the settlement was publicly announced in a press release on February 9, 2018, and that the terms of the settlement are confidential. *See* https://www.uber.com/newsroom/uber-waymo-settlement/. Uber denies the remaining allegations in paragraph 95.

96. Upon information and belief, that settlement agreement contained broad releases by both parties releasing claims as to the other's past and present employees.

**ANSWER:** Uber denies the allegations in paragraph 96.

97. Upon information and belief, Uber agreed to a broad release as to Mr. Levandowski, a past employee of Google.

**ANSWER:** Uber denies the allegations in paragraph 97. Answering further, Uber states that no release contained in the Waymo settlement agreement released or was intended to release any of Uber's claims or defenses against Levandowski. Uber further states that Levandowski does not have any right to enforce any term of the Waymo settlement agreement; Levandowski was neither a party nor an intended third party beneficiary of the Waymo settlement agreement. And, even if Levandowski could enforce the agreement against Uber, the agreement would not bar Uber from asserting the claims and defenses that it asserts here.

98. In addition, upon information and belief based on publicly available information, in the Waymo Settlement, Uber agreed to never hire or do business with Mr. Levandowski ever again.

**ANSWER:** Uber respectfully refers the Court to the Waymo settlement agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 98.

99. Upon information and belief, because of the Waymo settlement terms, Uber refused to close on its acquisition of Otto Trucking or support Mr. Levandowski's trucking business.

**ANSWER:** Uber denies the allegations in paragraph 99.

100. Upon information and belief, Uber traded Mr. Levandowski's rights in Otto Trucking and his ability to practice his profession in exchange for a settlement with Waymo.

**ANSWER:** Uber denies the allegations in paragraph 100.

## I. UBER REQUESTS THAT MR. LEVANDOWSKI TESTIFY SHORTLY BEFORE THE ARBITRATION HEARING

101.     On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the Expenses it advanced for Mr. Levandowski to defend himself in the arbitration. **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

**ANSWER:**     Uber admits that on April 2, 2018, counsel for Uber sent a letter to Levandowski's counsel. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 101.

102.     One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"—which Mr. Levandowski had exercised over a year before with full knowledge of Uber.

**ANSWER:**     Uber admits that the language quoted in paragraph 102 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that Levandowski had previously exercised his Fifth Amendment rights in a separate matter. Uber denies the remaining allegations in paragraph 102.

103.     Nevertheless, in its April 2, 2018 letter, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the *Waymo* court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

**ANSWER:**     Uber admits that the April 2, 2018 letter to Levandowski's counsel discusses Levandowski's obligations under the Indemnification Agreement and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 103.

104.     Uber then demanded that Mr. Levandowski waive his Fifth Amendment rights and testifying during the arbitration.

**ANSWER:**     Uber admits that on April 2, 2018, its counsel sent Levandowski's counsel a letter that requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 104.

105.     In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

**ANSWER:** Uber admits that after receiving the April 2, 2018 letter, Levandowski's counsel communicated with Google and the Arbitration Panel about potentially testifying to certain topics and Uber refers to those communications for their content. Uber denies the remaining allegations in paragraph 105.

106. Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

**ANSWER:** Uber admits that Levandowski submitted a proffer to the Arbitration Panel and that it was denied. Uber respectfully refers the Court to the Arbitration Panel's Order for its complete and accurate contents. Uber denies the remaining allegations in paragraph 106.

107. Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

**ANSWER:** Uber admits that Levandowski's offer to testify, after previously asserting the Fifth Amendment during his deposition, was denied by the Arbitration Panel. Uber admits that it paid Levandowski's legal fees until September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber denies the remaining allegations in paragraph 107.

108. In addition, for the first time, Uber also stated that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

**ANSWER:** Uber admits that the language quoted in paragraph 108 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in its April 2, 2018 letter it asserted that Google's claims relating to Tyto Misconduct by Levandowski are Excluded Claims as defined in the Indemnification Agreement. Uber denies the remaining allegations in paragraph 108.

109. Uber's claims were false. Uber accepted Mr. Levandowski's tender of indemnity ***only after*** Google's commencement of the arbitration proceeding alleging claims relating to Tyto and ***only after*** Mr. Levandowski had been interviewed by Uber extensively about Google's allegations relating to Tyto. In addition, Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them. And Stroz had specifically identified other materials on Mr. Levandowski's devices that he had not disclosed during interviews.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

32

**ANSWER:** Uber admits that on November 3, 2016, Levandowski notified Uber that he was requesting indemnity in connection with the Google Arbitration. Uber admits that the Google Arbitration alleges claims related to Tyto. Uber admits that Stroz identified some materials on Levandowski's devices that he had not disclosed in his interviews. Uber denies that on November 3, 2016 it had knowledge of any Tyto information on devices given to Stroz. Uber denies the remaining allegations in paragraph 109. Answering further, Uber states that Levandowski intentionally did not disclose his involvement with Tyto in response to questions posed to him by Stroz prior to entry of the Indemnification Agreement, and that Uber learned that Levandowski had engaged in wrongful conduct in establishing and developing the Tyto business only later, through the allegations in the Google Arbitration and discovery in the Waymo litigation.

110.    In fact, Uber had considered acquiring Tyto in 2015 but declined to do so at that time. Tyto was ultimately acquired by Otto with Uber's consent and at Uber's request prior to Uber closing on its acquisition of Otto to secure a lower price for Tyto than what Tyto would have requested had it known that Uber was the acquirer.

**ANSWER:** Uber admits that Tyto was acquired by Otto with Uber's consent prior to Uber's acquisition of Otto. Uber denies the remaining allegations in paragraph 110. Answering further, at the time that Uber acquired Otto and at the time that Uber consented to Otto's acquisition of Tyto, Uber did not know that Levandowski had been involved with Tyto and did not know that Levandowski engaged in wrongful conduct in establishing and developing the Tyto business.

111.    Moreover, prior to April 2018, Uber received extensive documents and information about Tyto in the Waymo Action and had actively participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started. Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto. Uber had counsel present at the meetings with these witnesses and during most, if not all, of their testimony. These individuals were also central witnesses in the two arbitrations with Google with respect to the Tyto-related allegations.

**ANSWER:** Uber admits that Brent Schwarz, James Haslim, and Ognen Stojanovski testified in either the Waymo litigation or the Google Arbitration, and that they each worked for Uber at some point. Uber refers to the transcripts of their testimony to establish who was present and for what duration. Uber admits that discovery related to Tyto was provided in the Waymo action. Uber admits that it

learned certain information through the Waymo litigation that indicated that Levandowski had engaged

in misconduct related to Tyto. Uber denies the remaining allegations in paragraph 111. Answering

further, Uber states that Levandowski failed to disclose to Stroz or to Uber his role and his misconduct in

connection with Tyto, and that Uber learned that information only later, through the Waymo litigation

and through Google's allegations against Levandowski in the Google Arbitration.

112.    Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that invested funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and would visit Tyto and his friends at that company to talk about technical and business matters from time to time. Uber was also aware of Pierre Droz' (a Google employee) allegations that Mr. Levandowski was involved with Tyto and even deposed him extensively on that very topic during the Waymo litigation.

**ANSWER:**    Uber admits that through testimony in the Waymo litigation in 2017–2018 it

learned certain information about Levandowski's involvement with Tyto, and that Uber learned of Peter

Droz's allegations during the Waymo litigation in 2017–2018. Uber refers to the testimony of Droz and

Stojanovski as setting forth the information that they provided through their testimony. Uber denies the

remaining allegations in paragraph 112.

113.    Armed with this knowledge, Uber paid for and controlled Mr. Levandowski's defense of the arbitration. In fact, Uber did not raise any issues regarding coverage until April 2018.

**ANSWER:**    Uber admits that it paid for Levandowski's legal expenses in connection with the

defense of the Google Arbitration through September 25, 2019. Uber denies the remaining allegations in

paragraph 113.

**J.    UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

114.    On March 28, 2019, the arbitration panel issued an interim award in favor of Google. The arbitration panel found violation of the exact claims covered by the Indemnification Agreement and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google. The panel also awarded prejudgment interest and attorneys' fees, as it determined Google was the prevailing party.

**ANSWER:**    Uber admits that on March 26, 2019, the Arbitration Panel issued an interim award

and respectfully refers the Court to it for its complete and accurate contents. Uber denies the remaining

allegations in paragraph 114.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

34

115. On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was going to abide by its indemnity obligations and pay for any adverse award in light of the interim award. **Exhibit F** is a redacted copy of Mr. Levandowski's May 13, 2019 letter.

**ANSWER:** Uber admits that on May 13, 2019, its counsel received a letter from Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 115.

116. In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence. Mr. Levandowski identified numerous documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well as pointed out that documents from his devices were shown to witnesses at the arbitration hearing.

**ANSWER:** Uber admits that on May 13, 2019, its counsel received a letter from Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 116.

117. Mr. Levandowski sent Uber a follow up letter on June 27, 2019. **Exhibit G** is a true and correct copy of that follow-up letter.

**ANSWER:** Uber admits the allegations in paragraph 117.

118. On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters stating that Mr. Levandowski had breached the Indemnification Agreement, that a majority of the interim award was "attributable to an Excluded Claim," and that "Uber has no contractual obligation to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's behalf." **Exhibit H** is a true and correct copy of Uber's July 3, 2019 letter.

**ANSWER:** Uber admits that on July 3, 2019, its counsel responded to Levandowski's counsel's letter of June 27, 2019, and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 118.

119. On August 15, 2019, Mr. Levandowski was indicted for thirty-three counts of trade secret misappropriation. The alleged trade secrets at issue in the indictment were some of the same ones that were at issue in the Waymo Action. Mr. Levandowski ultimately agreed to plead guilty to one count of trade secret misappropriation based on his access of one Google document containing trade secret information on one occasion after he left Google and has accepted restitutionary obligations in the amount of $756,499.22. This one file was the same file that Stroz expressly identified in its report to Uber, and in fact, the Stroz report was the basis for the indictment and the plea. The government agreed to dismiss the remaining thirty-two counts against Mr. Levandowski.

**ANSWER:** Uber admits that on August 15, 2019, Levandowski was indicted pursuant to 18 U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843 and 2323, Criminal Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-

cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019). Uber admits that trade secret misappropriation, among other things, was at issue in the Waymo litigation, and respectfully refers the Court to the amended complaint filed in the Waymo litigation for its complete and accurate contents. Uber admits that Mr. Levandowski has pled guilty to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). Uber further admits that as part of Levandowski's sentence he has been ordered to pay $756,499.22 in restitution to Waymo LLC. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case"). Uber admits that counts one through thirty-two of the indictment were dismissed on the motion of the United States. *Id.* Uber admits that a file identified in Levandowski's indictment was also identified in the Stroz report. Uber denies the remaining allegations in paragraph 119. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

120.　　On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for which was rescission of the agreement. **Exhibit I** is a true and correct copy of Uber's August 30, 2019 letter.

**ANSWER:**　　Uber admits that on August 30, 2019, its counsel corresponded with counsel for Levandowski, and respectfully refers the Court to the letter for its complete and accurate contents. Uber further admits that in its August 30, 2019 letter it informed counsel that it is Uber's view that Levandowski fraudulently induced Uber to enter into the Indemnification Agreement. Uber further admits that its counsel stated in the August 30, 2019 letter that rescission of the Indemnification Agreement was a proper remedy. Uber denies the remaining allegations in paragraph 120.

121.　　At this point in time, Uber did not clearly state that the Indemnification Agreement was rescinded (and instead said it had a remedy of rescission should it choose to exercise it), make any offer to restore the consideration it received under the agreement, or cede control of Mr. Levandowski's defense.

**ANSWER:**　　Uber denies Levandowski's characterization of the letter, and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 121.

122. Uber continued to advance payment for expenses incurred through September 25, 2019.

**ANSWER:** Uber admits that it advanced payment for expenses incurred through September 25, 2019. Uber denies the remaining allegations in paragraph 122. Answering further, Uber states that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that "[i]n the spirit of compromise and good will," Uber would pay Levandowski's counsel through September 25, 2019, the date on which the Arbitration Panel declared the hearing closed. Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents.

123. On September 27, 2019, Uber exercised its control over Mr. Levandowski to terminate its engagement of Goodwin Procter as counsel for Mr. Levandowski. Following this termination, Mr. Levandowski separately engaged Goodwin Procter to represent him.

**ANSWER:** Uber admits that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that Uber's engagement with Goodwin Procter "in connection with the defense of the arbitration brought by Google . . . is terminated." Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents. Uber admits that Levandowski subsequently engaged Goodwin Procter. Uber denies the remaining allegations in paragraph 123.

124. In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission. In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims. Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **Exhibit J** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

**ANSWER:** Uber admits that on November 5, 2019, it filed a Form 10-Q with the Securities and Exchange Commission. Uber further admits that the language quoted in paragraph 124 appears in the filed Form 10-Q and respectfully refers the Court to the filed Form 10-Q for its complete and accurate contents. Uber denies the remaining allegations in paragraph 124.

125. On December 6, 2019, the arbitration panel issued a final arbitration award.

**ANSWER:** Uber admits the allegations in paragraph 125. Answering further, Uber states that on December 23, 2019, the Arbitration Panel issued a Corrected Final Award that was *nunc pro tunc* as of December 6, 2019.

126.     On December 10, 2019, Mr. Levandowski informed Uber of the final award. **Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter. Because of the lack of clarity in Uber's previous statements, Mr. Levandowski asked Uber, as the Indemnitor in control of the defense of the case, how it would like to proceed. Specifically, Mr. Levandowski inquired whether Uber intended to resolve the matter by paying the judgment or whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal and posting a bond to stay the judgment pending appeal.

**ANSWER:**     Uber admits that on December 10, 2019, Levandowski's counsel informed Uber that the Arbitration Panel issued its final award in *Google v. Levandowski and Ron* on December 6, 2019. Uber respectfully refers the Court to the December 10, 2019 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 126.

127.     On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019 letter and stated that it rescinded the Indemnification Agreement. **Exhibit L** is a true and correct copy of Uber's December 31, 2019 letter. The stated basis for rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement for Expenses paid relating to the claims based on Tyto.

**ANSWER:**     Uber admits that on December 31, 2019, Uber's counsel responded to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in the December 31, 2019 letter, counsel for Uber stated that Uber rescinded the Indemnification Agreement, but denies that Uber had not previously rescinded the Indemnification Agreement.  Uber denies the remaining allegations in paragraph 127.

128.     Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

**ANSWER:**     Uber admits that in the December 31, 2019 letter, Uber's counsel stated that Uber has no obligations to advance expenses and that Uber "will not pay any part of the Final Award."  Uber denies the remaining allegations in paragraph 128.

129.     In addition, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals."

**ANSWER:**     Uber admits that on December 31, 2019, Uber's counsel sent Levandowski's counsel a letter and that the language quoted in paragraph 129 appears in the letter. Uber respectfully

refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 129.

130.    On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019. Uber did not provide payment for any Expenses incurred after that date.

**ANSWER:**    Uber admits that it provided payment to Levandowski through September 25, 2019. Uber denies the remaining allegations in paragraph 130.

131.    On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,047,998.64. **Exhibit M** is a true and correct copy of the judgment in Google's favor.

**ANSWER:**    Uber admits the allegations in paragraph 131.

132.    On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a chapter 11 petition in the United States Bankruptcy Court for the Northern District of California commencing the Chapter 11 Case.

**ANSWER:**    Uber admits the allegations in paragraph 132.

133.    On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement. In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020. **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without exhibits.

**ANSWER:**    Uber admits that on March 6, 2020, counsel for Levandowski provided notice of the March 4, 2020 judgment and a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel. Uber respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 133.

134.    On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay Google's judgment or any other Expenses. **Exhibit O** is a copy of Uber's March 27, 2020 letter.

**ANSWER:**    Uber admits that its counsel responded to Levandowski's counsel on March 27, 2020 and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 134.

135.    As a result, Mr. Levandowski filed an arbitration demand with JAMS San Francisco.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

Case 3:20-03050   Doc#1348-1   Filed 08/12/24   Entered 08/12/24 12:15:47   Page 40
of 555

**ANSWER:** Uber admits that Levandowski filed an arbitration demand with JAMS in San Francisco, California. Uber denies the remaining allegations in paragraph 135.

136. Uber filed an answer on April 13, 2020 in which it alleged, among other defenses that it had rescinded the Indemnification Agreement based on Mr. Levandowski's purported fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.

**ANSWER:** Uber admits that it filed an answer to Levandowski's arbitration demand on April 13, 2020, and respectfully refers the Court to the answer for its complete and accurate contents. Uber denies the remaining allegations in paragraph 136.

137. The parties have not selected arbitrators or taken any other substantive actions in the arbitration.

**ANSWER:** Uber admits the allegations in paragraph 137. Answering further, the parties have since agreed not to pursue this dispute in arbitration, and instead to resolve it before the Bankruptcy Court, pursuant to the terms of this Court's Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court. (Case No. 20-03050, Dkt. 13, July 29, 2020).

## K. UBER FILES A PROOF OF CLAIM

138. On July 6, 2020, Uber filed the Proof of Claim, through which it brought into the Chapter 11 Case issues from the arbitration to support its purported position as a creditor of Mr. Levandowski. **Exhibit P** is a true and correct copy of Uber's Proof of Claim, ECF No. 8-1.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 138.

139. In its Proof of Claim, Uber asserts that Mr. Levandowski is liable for the amounts that Uber paid to settle the joint and several portion of the Final Award as part of Google's settlement with Lior Ron.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 139.

140. Uber also claims that the Indemnification Agreement has been rescinded and that it is a creditor of Mr. Levandowski because it was "fraudulently induced to acquire Levandowski's company Otto[] and indemnify Levandowski in connection with that acquisition." Based on this purported

rescission, Uber seeks repayment of any Expenses advanced by Uber for Mr. Levandowski's defense. It also seeks contribution from Mr. Levandowski for the amount Uber paid to settle the Waymo Action and the legal fees incurred by Uber in defending that action.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 140.

141. Uber also claims that Mr. Levandowski has no right to demand in the arbitration payment for at least 75% of Google's judgment as those amounts purportedly relate to Excluded Claims. It contends that Uber is either allowed to recoup payment for Excluded Claims or is entitled to a set off.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 141. Answering further, Uber asserts that 100% of the award is allocable to Excluded Claims, and in no event less than 75% of the award. The Arbitration Award is not indemnifiable for multiple other reasons, including, but not limited to, that it was based upon felonious conduct in violation of California Penal Code Section 502, that the Indemnification Agreement is nullified by Levandowski's commission of a Post-Signing Specified Bad Act, and that the award itself relates to monies to which Levandowski was not entitled and is not indemnifiable as a matter of policy and contract.

142. Uber also asked the Court to require that any payment by Uber for a Gross Indemnified Claim, be held subject to Uber's rights to recoup advances relating to Excluded Claims.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber admits that it states in its Proof of Claim that "to the extent that Uber is required to pay any gross Indemnified Claim to Levandowski (without deduction for Uber's Excluded Claim), Levandowski will hold said funds subject to all of Uber's rights, remedies and interests in said funds, to the extent of the Excluded Claim." Uber denies the remaining allegations in paragraph 142.

## COUNT I

### (Declaratory Judgment - Waymo Settlement Release)

143.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

144.    On February 8, 2018, Waymo and Uber executed a settlement agreement to resolve Waymo's dispute with Uber.

**ANSWER:**    Uber admits that it entered into a Settlement Agreement as part of the Waymo litigation on February 8, 2018, and respectfully refers the Court to the agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 144.

145.    Upon information and belief, the Waymo Settlement contained broad releases in which Google and Uber released known and unknown claims that have or could be asserted against the other's past and former employees.

**ANSWER:**    Uber denies the allegations in paragraph 145.

146.    Upon information and belief, Mr. Levandowski is a beneficiary of the releases in the Waymo Settlement as he is a former employee of Google.

**ANSWER:**    Uber denies the allegations of paragraph 146.

147.    Upon information and belief, Google excluded from its release the arbitration claims against Mr. Levandowski and Uber did not exclude any claims against Mr. Levandowski in its release.

**ANSWER:**    Uber denies the allegations in paragraph 147.

148.    Upon information and belief, all of the claims in the Proof of Claim, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, were released by Uber in the Waymo Settlement.

**ANSWER:**    Uber denies the allegations in paragraph 148.

149.    As a result of the Proof of Claim and Mr. Levandowski's objection thereto, a live controversy exists as to whether Uber released Mr. Levandowski in the Waymo Settlement and, if so, what claims Uber released.

**ANSWER:** Uber denies the allegations in paragraph 149.

150. This issue is ripe for determination and requires a declaration as to Mr. Levandowski's rights in the Waymo Settlement.

**ANSWER:** Uber denies the allegations in paragraph 150.

151. Mr. Levandowski seeks a declaration that the claims in the Proof of Claim, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, are barred by the Waymo Settlement.

**ANSWER:** Paragraph 151 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 151.

## COUNT II

### (Specific Performance to Pay Current Expenses)

152. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

153. On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2.

**ANSWER:** Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016, and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 153.

154. Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer. Ex. A at § 2.1(a).

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

43

**ANSWER:** Uber admits that the language quoted in paragraph 154 appears in Section 2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 154. Answering further, the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's affirmative defenses and counterclaims, including, but not limited to, that the award was based upon felonious conduct, including conduct in violation of California Penal Code Section 502, that the award arises out of one or more Excluded Claims, that the award is not indemnifiable as a matter of policy and contract because it orders the disgorgement of monies to which Levandowski was not entitled, that the Indemnification Agreement was rescinded, and that Uber has no indemnification obligations due to Levandowski's commission of a Post-Signing Specified Bad Act.

155. As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id.* at 3.

**ANSWER:** Uber admits that page 3 of the Indemnification Agreement contains an Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 155.

156. Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within a set period following a request for advancement.

**ANSWER:** Uber admits that Section 2.3 of the Indemnification Agreement provides provisions related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 156.

157. On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

**ANSWER:** Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 157.

158. Uber has refused to advance payment for the Expenses requested in the March 6 Request

**ANSWER:** Uber admits that it has not advanced payment to Levandowski pursuant to Levandowski's March 6, 2020 request for advancement of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies that Levandowski is entitled to indemnification or any payment of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies the remaining allegations in paragraph 158.

159. Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 159.

160. In the Indemnification Agreement, Uber agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id.* at § 3.11. Uber also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

**ANSWER:** Uber denies the characterization that Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy and respectfully refers the Court to the Indemnification Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 160.

161. Moreover, Mr. Levandowski will be irreparably harmed by Uber's continued breach of the Indemnification Agreement as he may no longer be able to pay for his defense and pursue his appeal against Google. As the parties agreed, no dispute with Uber regarding reimbursement of payments made under the Indemnification Agreement could occur until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred. Uber's breach has materially altered Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

**ANSWER:** Uber denies the allegations in paragraph 161.

162. Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id.* § 3.5.

**ANSWER:** Uber admits that the Indemnification Agreement contains a provision called "Applicable Law" at Section 3.5 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 162.

163. The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

**ANSWER:** Uber denies the allegations in paragraph 163.

164. A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

**ANSWER:** Paragraph 164 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 164. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

165. The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

**ANSWER:** Uber denies the allegations in paragraph 165.

166. Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber advance payment for the Expenses requested on March 6, 2020 as well as payment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far.

**ANSWER:** Uber denies the allegations in paragraph 166.

### COUNT III

### (Specific Performance to Continue to Pay Expenses)

167. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

168. On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

46

resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2

**ANSWER:** Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 168. Answering further, the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's affirmative defenses and counterclaims, including, but not limited to, that the award was based upon felonious conduct, including conduct in violation of California Penal Code Section 502, that the award arises out of one or more Excluded Claims, that the award is not indemnifiable as a matter of policy and contract because it orders the disgorgement of monies to which Levandowski was not entitled, that the Indemnification Agreement was rescinded, and that Uber has no indemnification obligations due to Levandowski's commission of a Post-Signing Specified Bad Act.

169. Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer. Ex. A at § 2.1(a).

**ANSWER:** Uber admits that the language quoted in paragraph 169 appears in Section 2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 169.

170. As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id.* at 3.

**ANSWER:** Uber admits that page 3 of the Indemnification Agreement contains an Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 170.

171. Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within fifteen Business Days of a request for advancement.

**ANSWER:** Uber admits that Section 2.3 of the Indemnification Agreement provides provisions related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 171.

172. On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

**ANSWER:** Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 172.

173. Uber has refused to advance payment for the Expenses requested in the March 6 Request.

**ANSWER:** Uber admits that it has not advanced payment to Levandowski pursuant to Levandowski's March 6, 2020 request for advancement of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies that Levandowski is entitled to indemnification or any payment of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies the remaining allegations in paragraph 173.

174. Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 174.

175. The Parties agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id.* at § 3.11. The parties also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

**ANSWER:** Uber denies the characterization that Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy and respectfully refers the Court to the Indemnification Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 175.

176. Moreover, Mr. Levandowski will be irreparably harmed by Uber's continued breach of the Indemnification Agreement as he may no longer be able to pay for his defense and pursue his appeal against Google. As the parties agreed, no dispute with Uber regarding reimbursement of payments made

under the Indemnification Agreement could occur until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred. Uber's breach has materially altered Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

**ANSWER:**      Uber denies the allegations in paragraph 176.

177.    Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id.* § 3.5.

**ANSWER:**      Uber admits that the Indemnification Agreement contains a provision called "Applicable Law" at Section 3.5 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 177.

178.    The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

**ANSWER:**      Uber denies the allegations in paragraph 178.

179.    A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

**ANSWER:**      Paragraph 179 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 179. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

180.    The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

**ANSWER:**      Uber denies the allegations in paragraph 180.

181.    Google's claims are not yet resolved as Mr. Levandowski intends to appeal the judgment and there has been no settlement of Google's claims.

**ANSWER:** Paragraph 181 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 181. Answering further, Uber states that on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

182.   Therefore, Mr. Levandowski seeks to enforce by this action precisely the terms Uber agreed to in the Indemnification Agreement—that Uber advance any Expenses incurred by Mr. Levandowski within fifteen Business Days of a request for advancement under Section 2.3 until Google's claims are resolved either by binding judgment or settlement.

**ANSWER:** Uber denies the allegations in paragraph 182.

## COUNT IV

### (Declaratory Judgment — Uber's Rescission Claim)

183.   Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

184.   In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242 and that Levandowski named Uber as a creditor. Uber admits that the Indemnification Agreement has been rescinded. Uber denies the remaining allegations in paragraph 184.

185.   In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

**ANSWER:** Uber admits that the Indemnification Agreement has been rescinded. Uber admits it has not made payments to Levandowski since September 25, 2019, but denies the characterization that

the Expenses are due. Uber denies that Levandowski is entitled to any indemnification or the payment of any Expenses for multiple reasons, including, but not limited to, the rescission of the Indemnification Agreement. Uber denies the remaining allegations in paragraph 185.

186.    Mr. Levandowski contends that Uber's rescission claim is barred by its unreasonable delay in rescinding the Indemnification Agreement, failure to return consideration provided, and actions by Uber that are inconsistent with a claim for rescission as described hereinabove.

**ANSWER:**    Uber denies the allegations in paragraph 186.

187.    Uber has not returned any consideration it received under the Indemnity Agreement, including Mr. Levandowski's devices, which it continues to retain through Stroz, as well as the consideration received under the full transaction for the Otto acquisition. Such failure is fatal to any rescission claim, especially where, as here, Uber's refusal or inability to return the consideration it received is due to its delay in exercising any purported right to rescission.

**ANSWER:**    Uber admits that Levandowski provided a number of devices to Stroz. Upon information and belief, Uber admits that Stroz is still in possession of some or all of those devices. Uber denies that it was or is in possession of Levandowski's devices. Uber denies that it received any consideration under the Indemnification Agreement. Uber denies the remaining allegations in paragraph 187.

188.    To the extent that Uber's ability to return the consideration received is impossible, this impossibility is due to Uber's delay in exercising the purported rescission after it controlled Mr. Levandowski's defense and settlement ability for years and benefited from Mr. Levandowski's cooperation with his defense and Uber's defense in the Waymo action.

**ANSWER:**    Uber denies the allegations in paragraph 188.

189.    Uber has also ratified any purported fraud and acted in ways inconsistent with rescission, including by affirming its obligations under the Indemnification Agreement in its public filings.

**ANSWER:**    Uber denies the allegations in paragraph 189.

190.    Uber's performance under the Indemnification Agreement for years and belated rescission of that agreement has substantially prejudiced Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 190.

191.    As a result of the acts described herein, a live controversy exists as to whether Uber has a right to rescind and whether its purported rescission is effective.

Case 20-03050   Doc#1348-1   Filed 06/12/23   Entered 06/12/23 12:05:47   Page 52 of 555

**ANSWER:** Uber denies the allegations in paragraph 191.

192. This issue is ripe for determination and requires a declaration as to Uber's right to rescind the Indemnification Agreement and whether Uber is a proper creditor in the Chapter 11 Case.

**ANSWER:** Uber denies the allegations in paragraph 192.

193. Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 193.

## COUNT V

### (Breach of Otto Trucking Agreement)

194. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

195. In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business. Uber agreed to this condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

**ANSWER:** Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed and respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 195. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and that the Otto Trucking Agreement was terminated on August 5, 2018.

196. Under the Otto Trucking Agreement, Uber received an option to acquire Otto Trucking.

**ANSWER:** Uber admits that the Otto Trucking Agreement contained a provision for a Call Option Period granting Uber a "right, but in no circumstances the obligation" to acquire Otto Trucking. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 196.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

197.     Uber closed on its acquisition of Otto on August 18, 2016. The effect of the acquisition of Otto obligated Uber to support Mr. Levandowski's trucking business as the only scenario where Uber could walk away from Otto Trucking was if Uber did not acquire Otto.

**ANSWER:**     Uber admits that it closed on the acquisition of Otto in August 2016. Uber denies the remaining allegations in paragraph 197. Answering further, Uber states that the conditions precedent to Uber's obligation to support a separate trucking business were not met.

198.     In late November 2017, at the close of the Call Option Period, Uber exercised its right to acquire Otto Trucking by providing notice of its decision.

**ANSWER:**     Uber admits that in November 2017, it provided notice to Otto Trucking that it would exercise its option under the Otto Trucking Agreement. Uber denies the remaining allegations in paragraph 198.

199.     Following exercise of its option, Uber was obligated to use "commercially reasonable efforts" to close on the Otto Trucking merger, which the parties contemplated would take forty-five days.

**ANSWER:**     Uber admits that the language quoted in paragraph 199 appeared in the Otto Trucking Agreement. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 199.

200.     At closing of the Otto Trucking acquisition, Otto Trucking was supposed to merge with Uber and the interests of the members of Otto Trucking would be converted to interest in an Uber earnout plan that gave the Otto Trucking members a percent interest of billions in profit for Uber's new trucking business.

**ANSWER:**     Uber admits that the Otto Trucking Agreement contemplated a merger with Uber. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 200.  Answering further, Uber states that the conditions precedent to Uber's obligation to perform were not met, and that the Otto Trucking Agreement was terminated and replaced with a  new Otto Trucking Merger Agreement ("New Otto Trucking Agreement") dated August 5, 2018.  Uber further states that Levandowski was not a member of Otto Trucking at the time that the Otto Trucking acquisition closed.

201.     Mr. Levandowski and Mr. Ron were also supposed to lead the trucking business with Mr. Levandowski appointed as "non-executive Chairman" who could only be removed for Cause. Uber also promised that Mr. Levandowski and Mr. Ron would be the top executives of the trucking business.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

**ANSWER:** Uber admits that the Otto Trucking Agreement included a provision related to Post-Closing Operational Covenants of the Parties which discussed the possible roles of Levandowski and Lior Ron, and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 201. Answering further, Uber states that the Otto Trucking Agreement was terminated and replaced with the New Otto Trucking Agreement dated August 5, 2018, which did not contemplate any role for Levandowski, and further states that Levandowski had been terminated for Cause and had sold his interest in Otto Trucking prior to the termination of the Otto Trucking Agreement.

202. If Uber chose not to acquire Otto Trucking after its acquisition of Otto, Mr. Levandowski was allowed to form a trucking business outside of Uber. Uber was then obligated to provide a license to self-driving technology that Mr. Levandowski could use in the field of trucking in exchange for ownership in the new trucking business (the "IP License").

**ANSWER:** Uber admits that the Otto Trucking Agreement provided that Levandowski could start a new trucking company if the Otto Trucking Agreement were terminated. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 202. Answering further, the Otto Trucking Agreement was terminated and replaced with the New Otto Trucking Agreement dated August 5, 2018, and that the New Otto Trucking Agreement did not provide for an IP License to Levandowski. Uber further states that Levandowski had sold his interest in Otto Trucking prior to the termination of the Otto Trucking Agreement.

203. The parties had agreed on a form of the IP License that would give Mr. Levandowski an exclusive license to use Uber's technology in trucking.

**ANSWER:** Uber admits that the Otto Trucking Agreement contained a provision called "New Trucking Company License" and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 203.

204. As an exclusive license for use in trucking, Uber was not permitted to use any of its own self-driving technology for trucking.

**ANSWER:** Uber denies the allegations in paragraph 204.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

54

1  205.    In addition, Uber was also prevented from competing with Mr. Levandowski's trucking
2  business as the parties' agreement required Mr. Levandowski to make Uber a member of the LLC he
   formed for the outside trucking business with no waiver of any statutory fiduciary duties applicable to
3  members.

4       **ANSWER:**    Uber denies the allegations in paragraph 205.

5       206.    After exercising its option to acquire Otto Trucking, Uber did not close the acquisition in
6  the required 45-days. It delayed and stalled the closing for nearly nine months.

7       **ANSWER:**    Uber admits that the acquisition of Otto Trucking, as contemplated by the Otto

8  Trucking Agreement, did not close within 45 days, but denies the characterization that it was obligated to

9  do so. Uber denies the remaining allegations in paragraph 206.

10      207.    During that time, based on publicly available information, Uber agreed as part of the
   Waymo Settlement to never re-hire or work with Mr. Levandowski again.

11
12      **ANSWER:**    Uber admits that it entered into a Settlement Agreement as part of the Waymo

13  litigation on February 8, 2018, and respectfully refers the Court to the Agreement for its complete and

14  accurate contents. Uber denies the remaining allegations in paragraph 207.

15      208.    Given Uber's delay, Mr. Levandowski asked that the Otto Trucking Agreement be
   terminated and that he be allowed to start his outside trucking business with the IP License Uber was
16  obligated to provided. Uber refused to give Mr. Levandowski the IP License.

17      **ANSWER:**    Uber denies the allegations in paragraph 208. Answering further, Uber states that

18  Levandowski failed to satisfy the conditions precedent to any obligation by Uber to provide

19  Levandowski the IP License, and further states that the Otto Trucking Agreement was terminated and

20  replaced with the New Otto Trucking Agreement dated August 5, 2018, and that the New Otto Trucking

21  Agreement did not provide for an IP License to Levandowski..

22      209**.**    Upon information and belief, because of the Waymo Settlement, Uber stalled the Otto
23  Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of
   the company and would not in any event give him the IP License.

24
25      **ANSWER:**    Uber admits that it expressed concerns to Levandowski with respect to closing a

26  transaction pursuant to the original Otto Trucking Agreement. Uber denies the remaining allegations in

27  paragraph 209. Answering further, Uber states that it used commercially reasonable efforts to close the

28  Answer, Affirmative Defenses, and Counterclaims No. 20-03050

Otto Trucking transaction and that the parties to the Otto Trucking Agreement had authority to and did agree to the termination of that Agreement.

210.     Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

**ANSWER:**     Uber denies the allegations in paragraph 210.

211.     Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount to mitigate the damage caused by Uber's breach.

**ANSWER:**     Uber admits that Levandowski resigned from Otto Trucking and sold his interest in Otto Trucking. Uber denies the remaining allegations in paragraph 211.

212.     Mr. Levandowski is a party to certain provisions of the Otto Trucking Agreement and a beneficiary of other provisions and has the right to enforce that agreement and has no obligations under the Otto Trucking Agreement. To the extent that he has any obligations under that agreement, he has satisfied them.

**ANSWER:**     Uber denies the allegations in paragraph 212.

213.     Uber breached the Otto Trucking Agreement by failing to exercise commercially reasonable efforts to close the Otto Trucking acquisition.

**ANSWER:**     Uber denies the allegations in paragraph 213.

214.     It also breached the Otto Trucking Agreement by failing to appoint Mr. Levandowski non-executive Chairman of the trucking business.

**ANSWER:**     Uber denies the allegations in paragraph 214.

215.     It further breached the Otto Trucking Agreement by refusing to terminate the agreement and give Mr. Levandowski the IP License contemplated by the parties or, in the alternative, to name him a "non-Executive Chairman" and pay him up to approximately, $4.128 billion in earnouts associated with the profits of Uber Freight (the new name of Otto Trucking).

**ANSWER:**     Uber denies the allegations in paragraph 215.

216.     Uber's performance under the Otto Trucking Agreement has not been excused.

**ANSWER:**     Uber denies the allegations in paragraph 216.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

56

217.     As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

**ANSWER:**     Uber denies the allegations in paragraph 217.

## <u>COUNT VI</u>

### (Breach of Covenant of Good Faith and Fair Dealing)

218.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**     Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

219.     In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business. Uber agreed to that condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

**ANSWER:**     Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed and respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 219. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking Agreement was terminated on August 5, 2018.

220.     The Otto Trucking Agreement includes an implied covenant of good faith and fair dealing. The implied covenant ensures that neither party may engage in arbitrary or unreasonable conduct and thereby prevent the other party from receiving the fruits of the bargain.

**ANSWER:**     Paragraph 220 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 220.

221.     The intent of the parties for Mr. Levandowski to be able to continue to pursue the trucking business he left Google to start with Uber's support in exchange for Mr. Levandowski selling Otto to Uber.

**ANSWER:**     Uber denies the allegations in paragraph 221.

222.     This intent is reflected in the Otto Trucking Agreement as the only scenario where Uber could walk away from Otto Trucking and not support Mr. Levandowski's trucking business was if Uber did not acquire Otto.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

**ANSWER:** Uber denies the allegations in paragraph 222. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking Agreement was terminated on August 5, 2018.

223. After acquiring Otto, Uber had two options for supporting the trucking business. It could acquire Otto Trucking and appoint Mr. Levandowski as the non-executive chairman of that business.

**ANSWER:** Uber denies the allegations in paragraph 223

224. In the alternative, Uber could terminate the acquisition of Otto Trucking, but support an outside trucking venture started by Mr. Levandowski as an investor. Uber was obligated to provide an exclusive license to its self-driving technology for Mr. Levandowski to use in the field of trucking in exchange for membership in Mr. Levandowski's new company. The IP License was an exclusive license for trucking, which barred Uber from competing with Mr. Levandowski's trucking business. Uber's membership interest in Mr. Levandowski's new company also prevented Uber from competing with that business based on the statutory duties owed by members of an LLC.

**ANSWER:** Uber denies the allegations in paragraph 224. Answering further, Uber states that Levandowski failed to satisfy the conditions precedent to Uber's obligation to provide Levandowski the IP License

225. Uber did neither.

**ANSWER:** Uber denies the allegations in paragraph 225.

226. Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was in control of Mr. Levandowski's defense and settlement prospects, and had barred Mr. Levandowski from participating in the settlement discussion or discussing settlement directly with Google.

**ANSWER:** Uber denies the allegations in paragraph 226.

227. Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

**ANSWER:** Uber denies the allegations in paragraph 227. Answering further, Uber states that it used commercially reasonable efforts to close the Otto Trucking transaction and that it expressed concerns with continuing a business relationship with Levandowski because, among other things, Levandowski was terminated from Uber for Cause.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

58

228.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

**ANSWER:**    Uber denies the allegations in paragraph 228.

229.    Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

**ANSWER:**    Uber admits that Levandowski resigned from Otto Trucking and sold his interest in Otto Trucking. Uber denies the remaining allegations in paragraph 229.

230.    Mr. Levandowski is a beneficiary of the Otto Trucking Agreement and has the right to enforce that agreement and has no obligations under the Otto Trucking Agreement. To the extent that he has any obligations under that agreement, he has satisfied them.

**ANSWER:**    Uber denies the allegations in paragraph 230.

231.    Uber's actions described herein have deprived Mr. Levandowski of the fruits of the bargain, including the agreed-to benefit of running a trucking business with Uber's support.

**ANSWER:**    Uber denies the allegations in paragraph 231.

232.    By preventing Mr. Levandowski from obtaining the benefits of the Otto Trucking Agreement, Uber has violated the implied covenant of good faith and fair dealing.

**ANSWER:**    Uber denies the allegations in paragraph 232.

233.    After Mr. Levandowski's forced divestment, Uber acquired Otto Trucking, which became Uber Freight. Uber Freight has reported hundreds of millions in revenue since its creation and Mr. Ron, who heads Uber Freight, stated that he and Uber "think there is a very clear path to profitability."

**ANSWER:**    Uber admits that it acquired Otto Trucking and further states that it acquired Otto Trucking pursuant to the New Otto Trucking Agreement dated August 5, 2018. Uber admits that Mr. Ron is head of Uber Freight. Uber admits that in a public statement, Mr. Ron said: "We think there is a very clear path to profitability, but it's important to understand that we are in investment mode." https://finance.yahoo.com/news/uber-freight-to-investors-theres-a-very-clear-path-to-profitability-232536480.html. Uber denies the remaining allegations in paragraph 233.

234.    As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

59

**ANSWER:** Uber denies the allegations in paragraph 234.

**COUNT VII**

**(Declaratory Judgment and Damages: Rescission of Otto Transaction)**

235. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

236. In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement. In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242 in response to Levandowski's March 4, 2020 Chapter 11 bankruptcy petition in which Levandowski named Uber as a creditor. Uber further admits that the Indemnification Agreement has been rescinded. Uber respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 236.

237. Mr. Levandowski denies that Uber has any right to rescission.

**ANSWER:** Uber denies the allegations in paragraph 237. Answering further, Uber states that Levandowski made fraudulent misrepresentations to Uber prior to entering into the Indemnification Agreement regarding whether he had taken any trade secret information from Google and fraudulently concealed facts from Uber such as his involvement in "side projects" including Tyto. Levandowski made these fraudulent representations and engaged in these fraudulent concealments with the intent of deceiving Uber and to induce Uber to enter into the Indemnification Agreement. Levandowski's claims are barred because he fraudulently induced Uber to enter into the Indemnification Agreement, and the Indemnification Agreement is rescinded as a result of that fraudulent inducement.

238. Alternatively, if the Court determines that Uber has not waived its right to rescission and has in fact rescinded the Indemnification Agreement, the entirety of the Otto transaction must also be rescinded and all consideration Uber received from the Otto transaction must be returned to Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 238.

239.    In agreeing to sell Otto to Uber and lead Uber's self-driving car program, Mr. Levandowski conveyed repeatedly to Uber's representatives that he was concerned that Google would sue him. Because of these concerns, Uber agreed to provided indemnity as key part of the Otto transaction and as an inducement to Mr. Levandowski to sell Otto to Uber. Mr. Levandowski would not have entered into the Otto transaction without the Indemnity Agreement because of his well-founded fear of Google.

**ANSWER:**    Uber admits that, prior to executing the Indemnification Agreement and Otto Agreement, Levandowski and Uber discussed concerns related to Levandowski's former employer, Google, and the prospect that Google may bring litigation against Levandowski. Uber denies the remaining allegations in paragraph 239.

240.    For this reason, on April 11, 2016, executed documents for the acquisition of Otto, including the Indemnification Agreement. All of the agreements executed on April 11, 2016 are one contract that cannot be severed.

**ANSWER:**    Uber denies the allegations in paragraph 240.

241.    Uber's rescission of the Indemnification Agreement necessarily requires rescission of the entire Otto transaction, including returning all consideration related to the transaction, including the intellectual property Uber received from its acquisition of Otto.

**ANSWER:**    Uber denies the allegations in paragraph 241.

242.    As a result of the acts described herein, should the Court determine that Uber may rescind the Indemnification Agreement, a live controversy exists as to whether Uber's rescission, if effective, also rescinds the Otto transaction and requires return of all consideration Uber received from that transaction.

**ANSWER:**    Uber denies the allegations in paragraph 242.

243.    To the extent Uber has effectively rescinded the Indemnification Agreement, this issue is ripe for determination and requires a declaration as to the effect of Uber's purported rescission on the Otto transaction of which it was a necessary and integral part.

**ANSWER:**    Uber denies the allegations in paragraph 243.

244.    Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement without also rescinding the Otto transaction and returning all consideration received from that deal.

**ANSWER:**    Uber denies the allegations in paragraph 244.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

245. In addition, Mr. Levandowski seeks damages, including any consequential damages, arising out of Uber's rescission of the Otto transaction.

**ANSWER:** Uber denies the allegations in paragraph 245.

## COUNT VIII

### (Objection to Claim)

246. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

247. For the reasons set forth above, the Indemnity Agreement is not subject to rescission and, if it had been, Uber waived its right to assert such remedy.

**ANSWER:** Uber denies the allegations in paragraph 247.

248. For the reasons set forth above, Uber is liable under the Indemnity Agreement to advance his Expenses (as defined in the Indemnification Agreement).

**ANSWER:** Uber denies the allegations in paragraph 248.

249. For the reasons set forth above, Mr. Levandowski generally denies the evidentiary bases upon which the Proof of Claim is based and specifically denies that (a) Uber was fraudulently induced to enter into the Indemnity Agreement, (b) Mr. Levandowski failed to comply with his obligations under the Indemnity Agreement, and (c) Uber's obligations under the Indemnity Agreement are subject to allocation as asserted in the Proof of Claim, which in any event, cannot be adjudicated until after Uber satisfies its obligations under the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 249.

250. For the reasons set forth above, any claim for offset or contribution is also undermined by its active participation in the conduct at issue in the Waymo Action and the Google arbitration as it (a) encouraged, if not directed, Mr. Levandowski to recruit Google employees to join Otto and Uber, and (b) knew about Mr. Levandowski's retention of Google information and access of the one file at issue in the plea agreement after he left Google.

**ANSWER:** Uber denies the allegations in paragraph 250.

251. For the reasons set forth above, Mr. Levandowski denies that Uber has any right to contribution from Mr. Levandowski for the Waymo settlement. Waymo did not prove that Mr. Levandowski misappropriated any trade secrets in that case. As for the one file that Mr. Levandowski accessed after he left Google, Uber was well aware of that conduct and proceeded to acquire Mr. Levandowski's company and work with him anyway. Moreover, Mr. Levandowski's guilty plea that

resulted in a total restitution amount of approximately $750,000 further demonstrates the unreasonableness of Uber's decision to settle with Waymo for $245,000,000 in stock, among other consideration. In addition, to the extent that any trade secrets were taken and used at Uber, those trade secrets did not come from Mr. Levandowski, but rather a different former Google employee. Indeed, as admitted in Uber's public statements, Uber's self-driving software—an area that Mr. Levandowski did not work on at Google or Uber—contained problematic functions that will require it to enter into a license agreement with Waymo for use of Waymo's intellectual property. Upon information and belief, the Waymo Settlement, entered into after discovery of possible misconduct relating to Uber's source code, settled issues relating to theft of trade secrets by individuals who are not Mr. Levandowski.

**ANSWER:** Uber denies the allegations in paragraph 251.

252.    Mr. Levandowski therefore seeks disallowance in full of the Proof of Claim.

**ANSWER:** Uber denies the allegations in paragraph 252.

## AFFIRMATIVE AND OTHER DEFENSES

In addition to its answers to the allegations set forth above, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that would otherwise rest with Levandowski, Uber asserts the following affirmative and other defenses to all claims asserted against Uber.

1.    **Indemnification For Disgorgement Is Barred By Public Policy**.  Levandowski's claim for indemnification of the Salary and Regular Compensation ("Related Compensation"), Chauffeur Bonus, and prejudgment interest associated with the same fails because indemnification for disgorgement is impermissible in California as a matter of public policy. The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, order Levandowski to disgorge payments wrongfully obtained from Google. As a matter of law, the Related Compensation and Chauffeur Bonus never belonged to Levandowski. Under California law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement of monies that did not belong to him, it is void and unenforceable as contrary to public policy and the law. Any amount awarded for prejudgment interest related to an award of disgorgement is likewise unenforceable.

2.    **Expenses Reduced By Amounts Paid By Third Party**. Levandowski's claim for indemnification for the Related Compensation, Chauffeur Bonus, and prejudgment interest related to it fails because Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses." The $127 million payment to Levandowski, related to the Related Compensation and Chauffeur Bonus, was a payment by a third party, Google, to Levandowski, an Indemnified Person, upon which Levandowski's claim for indemnification is based. Levandowski is not entitled to indemnification for that amount, or for prejudgment interest related to that amount.

3.    **Indemnification For Felonious Activity Is Barred**. Each of Levandowski's claims against Uber under the Indemnification Agreement fails, in whole or in part, because an agreement to indemnify a person against conduct is invalid and void pursuant to California Civil Code § 2774 if the conduct

constitutes a felony. Levandowski engaged in felonious activity in connection with the events that led to the Arbitration Award. Levandowski pled guilty to the felony of Theft and Attempted Theft of Trade Secrets for stealing Google trade secrets related to self-driving car technology for use in competing with Google. The indictment recites a course of conduct that substantially overlaps with the conduct that formed the basis of the Arbitration Award. Upon information and belief, Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation information regarding the employees he was soliciting to come to Otto, in violation of California Penal Code Section 502. This conduct also formed the basis of the Arbitration Award. The foregoing may not be an exhaustive list of Levandowski's felonious activity. Levandowski's felonious conduct was an essential part of the conduct that led to the Arbitration Award. As a matter of law and contract, Uber is not required or permitted to indemnify Levandowski for any Expense resulting from or associated with his felonious activity.

4. **Indemnification Agreement Is Null And Void Due To A Post-Signing Specified Bad Act**. Each of Levandowski's claims against Uber under the Indemnification Agreement fails, in whole or in part, because the Agreement is void based upon Levandowski's commission of a Post-Signing Specified Bad Act, as provided in Section 2.1(a) of the Indemnification Agreement. Under Section 2.1(a) of the Indemnification Agreement, the Agreement is null and void as to any employee who commits a Post-Signing Specified Bad Act that was the subject of a Former Employer Claim. The definition of "Post-Signing Specified Bad Act" includes any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer." The definition of Post-Signing Specified Bad Acts also includes the solicitation of employees of a Former Employer without that Former Employer's express written consent. And it includes knowingly permitting others to commit a Post-Signing Specified Bad Act.

Case 3:20-03050 Doc#1348-1 Filed 03/12/24 Entered 03/12/24 12:05:47 Page 66 of 555

Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Google, Waymo, and Tyto were all Former Employers of Levandowski. The amended complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. The Google Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. Both the Google Arbitration and the Waymo litigation were Former Employer Claims within the meaning of the Indemnification Agreement. Levandowski received indemnification of certain legal fees in conjunction with the Google Arbitration. Otto Trucking was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation. Levandowski committed Post-Signing Specified Bad Acts with respect to Google or Waymo as well as with respect to Tyto. To the extent Levandowski retained and/or accessed and/or knowingly permitted others to retain or access confidential documents, confidential information, and trade secrets belonging to Google or Waymo after April 2016, he committed Post-Signing Specified Bad Acts.

In May 2016, Levandowski arranged for Otto, and thus upon closing for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google and Waymo had a claim, without disclosing his involvement in Tyto. Levandowski's fraudulent concealment of his own involvement in Tyto as well as his misconduct between April 11, 2016 and August 2016 caused Uber to acquire patents, trade secrets, and confidential information related to Tyto's LiDAR technology that were purportedly owned by Tyto but as to which, based upon Levandowski's breach of his duty of loyalty, Google and Waymo had a potential claim. Through this Tyto acquisition and Levandowski's concealment of his role in Tyto, after April 11, 2016, Levandowski also solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. On information and belief, Levandowski also permitted others to solicit Google or Waymo employees to join Otto during July 2016, and neither Google nor Waymo provided express written consent for Levandowski to engage in any of this misconduct. Levandowski's misconduct was the subject of multiple Former Employer Claims, including certain claims asserted in the Waymo litigation and claims asserted in the Google Arbitration. The Waymo amended

complaint makes allegations at paragraphs 51-54 of Post-Signing Specified Bad Acts, including the hiring of Employees who were not Diligenced Employees, in which Levandowski knowingly participated.

Uber seeks a Final Judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim

5.     **Excluded Claims**. Each of Levandowski's claims against Uber under the Indemnification Agreement fails because the Arbitration Award is attributable, in whole or in part, to an Excluded Claim. Section 2.1(b)(ii) of the Indemnification Agreement provides that Uber shall have no obligation to indemnify Levandowski for claims arising from any Pre-Signing Bad Acts that "were not truthfully disclosed by [Levandowski] to the Outside Expert in response to relevant inquiries," or "were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]." The entire Arbitration Award is attributable to Pre-Signing Bad Acts that were not truthfully disclosed by Levandowski to the Outside Expert—including Levandowski's misconduct with respect to Tyto ("Tyto Misconduct"). Among other concealment, when asked about side projects while employed at Google, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list and failed to disclose his involvement with and role in forming Odin Wave/Tyto. Levandowski concealed material and relevant information about Tyto to Stroz in the due diligence materials. Accordingly, the Google claim associated with the Tyto Misconduct is an Excluded Claim.

The Tyto Misconduct occurred throughout the entire period that the Chauffeur Bonus was vesting and was the predominant cause of Levandowski receiving the Related Compensation and the Chauffeur Bonus to which he was not entitled. The Tyto Misconduct was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Related Compensation and Chauffeur Bonus.

Additionally, Levandowski did not disclose truthfully to Uber the other Pre-Signing Bad Acts that formed the basis of the Arbitration Award, including the full extent of the Otto Misconduct. Thus, the entire Arbitration Award is attributable to an Excluded Claim, and Uber has no obligation to indemnify Levandowski for that Award. In the alternative, at least 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring.

6. **Material Breach Of Contract By Levandowski**. Each of Levandowski's claims under the Indemnification Agreement fails, in whole or in part, because Levandowski materially breached the Indemnification Agreement, thereby relieving Uber from its obligation to perform thereunder, and/or entitling Uber to a setoff and/or recoupment for the amounts paid or advanced to Levandowski for Expenses. Section 2.2(c) of the Indemnification Agreement provided that Uber had the right to direct and control the defense of any Former Employer Claims (including Google's arbitration claims), required Levandowski to cooperate in that defense, and required Levandowski to appear and give testimony at Uber's reasonable request. Levandowski refused to cooperate, did not permit Uber to control the defense, and refused to appear and testify at deposition despite Uber's reasonable request, instead broadly invoking the Fifth Amendment in response to all questions posed. This had the effect of also precluding any testimony by Levandowski at the arbitration hearing. Levandowski's failure to testify denied Uber its primary bargained-for-consideration under that agreement. If Levandowski's contention that his testimony would have made a difference is correct, then Levandowski materially breached the terms of the Indemnification Agreement by reason of his refusal to testify. In light of Levandowski's material breach of the Indemnification Agreement, Uber is not obligated to perform under the Indemnification Agreement.

7. **Fraudulent Inducement**. Each of Levandowski's claims against Uber, including for specific performance and indemnification, fails because Levandowski fraudulently induced Uber to sign the Indemnification Agreement by, among other misrepresentations and omissions, concealing from Uber and Stroz his involvement in Tyto and misrepresenting to Uber that he had not taken confidential information or trade secrets from Google when, in fact, he had stolen at least one Google trade secret with the intention of using it at Uber. On April 11, 2016, Levandowski signed a written attestation stating that,

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

68

"subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list.

Levandowski also represented during the Stroz interview that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession were there unintentionally, including tools, Drobo 5D disks and company emails on his personal laptop, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski thus represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

All of these representations were false. Contrary to his attestation and his representations during the Stroz interview, Google was not aware of and did not approve of Levandowski's involvement in the Odin Wave/Tyto side project, and Levandowski did not comply with his agreements with Google—as determined by the award in the Google Arbitration. Contrary to his attestations and his statements during the Stroz interviews, Levandowski did intentionally take Google confidential information with the intention of using it at Uber—as determined by his guilty plea to the crime of Theft and Attempted Theft of Trade Secrets. This is not an exhaustive list of Levandowski's misrepresentations and omissions; Uber's investigation continues.

Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement. Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending the Waymo litigation and advancing Levandowski's defense costs in the Google Arbitration. Due to his fraudulent inducement, Levandowski is not entitled to enforce the Indemnification Agreement.

8. **Unclean Hands**. Each of Levandowski's claims against Uber is barred by the doctrine of unclean hands. Levandowski engaged in wrongful conduct including but not limited to the following: fraudulently inducing Uber to indemnify Levandowski without disclosing that he had stolen one or more trade secrets from Google with the intent to use them at Uber; fraudulently misrepresenting to Uber that he had not intentionally taken any Google confidential information and did not intend to use any Google confidential information at Uber; fraudulently misrepresenting to Uber that he had not violated any of his agreements with or obligations to Uber; fraudulently concealing from Uber his involvement in Odin Wave/Tyto; committing one or more felonies by stealing one or more trade secrets from Google and wrongfully accessing and taking compensation information from Google in order to solicit Google employees; and wrongfully obtaining a bonus of over $100 million from Google. Because of this and other wrongful conduct, Levandowski is barred by the doctrine of unclean hands from seeking any indemnification or damages of any kind, or seeking to hold Uber liable in any manner, in connection with any of the events at issue in this action, the Waymo litigation, the Google Arbitration, or the criminal action.

9. **Reimbursement For Amounts Paid Into Estate For Excluded Claims**. To the extent that Uber is required to pay into Levandowski's estate any indemnification amounts that are attributable to any Excluded Claim, Uber is entitled to reimbursement of those amounts. In addition, Uber is entitled to reimbursement for all defense costs already advanced that are allocable to any Excluded Claim.

10. **Setoff and Recoupment**. To the extent Uber is determined to have any indemnification obligation to Levandowski or to bear any other liability to Levandowski, which Uber expressly denies, Uber is entitled to an offset, reduction, or credit, and/or recoupment, for each of the following:

a. Compensatory and consequential damages for Levandowski's fraudulent conduct including but not limited to fraudulent inducement. Levandowski fraudulently induced Uber to indemnify Levandowski. As a result of that agreement, Uber was required to defend against, and ultimately settle, litigation brought by Google's subsidiary Waymo, premised on Uber's alleged infringement of Google trade secrets and concealed involvement with Tyto and the development of its LiDAR technology. But for Levandowski's fraud, Uber would not have hired him and would not have been sued by Waymo, and relatedly would not have been required to provide hundreds of millions of dollars of value to settle the Waymo litigation. Accordingly, and as more fully set forth in Uber's counterclaims, Uber is entitled to compensatory and consequential damages in the amount of the defense costs and settlement value it provided in the Waymo litigation.

b. Contribution from Levandowski for the value provided by Uber to settle the Waymo litigation based upon Levandowski's fault in causing Uber to incur potential liability to Waymo in connection with those claims.

c. Compensatory and/or rescissory damages in the amounts advanced to Levandowski to cover defense costs in the Google Arbitration. Levandowski materially breached the Indemnification Agreement by refusing to testify in the Google Arbitration. Levandowski also fraudulently induced Uber to enter into the Indemnification Agreement. Whether under a rescission or breach of contract theory, Uber is entitled to damages in the amount it paid under the Indemnification Agreement for Levandowski's defense of the Google Arbitration.

d. Contribution for at least 50% of the approximately $9.5 million that Uber paid to indemnify Lior Ron for the portion of the Arbitration Award that was "joint and several" as between Levandowski and Ron.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

71

e. The amount of the Arbitration Award that is allocable to Excluded Claims.

f. Reimbursement for all attorneys' fees and other costs allocable to Excluded Claims.

11. **Contract Termination**. Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because the agreement on which these claims are based was properly terminated, along with any rights, if any, Levandowski had thereunder. Levandowski's Otto Trucking claims stem from an April 11, 2016 Otto Trucking Agreement. The Otto Trucking Agreement was executed between Uber and Otto Trucking, and Levandowski was a party only to sections 5.4 and 5.11 of the agreement. The Agreement was terminated in its entirety, and with specific reference to sections 5.4 and 5.11. Levandowski's assent was not required to effectuate this termination. *See* April 11, 2016 Otto Trucking Agreement § 8.1 ("Notwithstanding anything to the contrary herein, this Agreement may be terminated, and the Merger may be abandoned, prior to the Effective Time . . . by mutual written consent of Purchaser [Uber] and the Company [Otto Trucking] . . . ."). Accordingly, Levandowski has no rights to enforce that Agreement.

12. **Excused Performance/Conditions Precedent Not Satisfied.**

Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because two conditions precedent to Uber's obligation were not satisfied.

Section 6 of the Otto Trucking Agreement provided that: "[t]he obligations of Parent, Purchaser and Merger Sub to effect the Merger and otherwise consummate the transactions contemplated by this Agreement are subject to the satisfaction (or, to the extent permitted, waiver by Purchaser), at or prior to the Closing, of each of the following conditions." *See* April 11, 2016 Otto Trucking Agreement. The Otto Trucking Agreement then listed, among the conditions:

**6.6 No Litigation.** There shall not be pending or threatened in writing before any court of competent jurisdiction or other Governmental Body . . . (b) any material Proceeding that relates to or arises out of any Company Intellectual Property (including the claims of infringement or misappropriation of any Intellectual Property of any third party or any claims seeking to prohibit or otherwise limit the use of any Company Intellectual Property by the Company)[.]

**6.8 No Post-Signing Specified Bad Acts**. No Post-Signing Specified Bad Act of a Diligenced Employee shall have been committed by or on behalf of the Company by a

Diligenced Employee and/or shall have been committed by a Diligenced Employee. The determination of whether any such Post-Signing Specified Bad Act has been committed shall be determined solely by either (i) the mutual written agreement of the Company and Purchaser or (ii) a Final Judgment.

*Id.*

The Waymo litigation and the Google Arbitration proceedings were both a material Proceeding related to the Company's intellectual property within the meaning of Section 6.6(b). In addition, Levandowski committed one or more Post-Signing Specified Bad Acts within the meaning of Section 6.8. Accordingly, two conditions precedent to Uber's obligation to perform were not satisfied and therefore Uber was not obligated to perform under the Agreement.

13. **Prevention of Performance.** Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because Uber was prevented, or in the alternative, discharged, from any contractual obligations it had to Levandowski in connection with these claims. Levandowski's rights, if any, under the Otto Trucking Agreement, were based on the interest he owned in Otto Trucking. *See* April 11, 2016 Otto Trucking Agreement §§ 5.4, 5.11. Levandowski sold his interest in Otto Trucking on August 1, 2018. Levandowski's act of selling his interest in Otto Trucking prevented, or in the alternative, discharged, any obligation on the part of Uber to Levandowski in connection with the Otto Trucking Agreement.

14. **Equitable Estoppel**. Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because Levandowski is equitably estopped from asserting any rights he had, if any, pursuant to the Otto Trucking Agreement. Levandowski's rights, if any, under the Otto Trucking Agreement were based on the interest he owned in Otto Trucking. *See* April 11, 2016 Otto Trucking Agreement §§ 5.4, 5.11. Levandowski sold his interest in Otto Trucking on August 1, 2018. Levandowski's sale of his interest in Otto Trucking was an act inconsistent with any intention to assert any rights Levandowski may have had under the Otto Trucking Agreement. Uber justifiably relied on this conduct to its detriment. Accordingly, Levandowski is equitably estopped from now asserting any rights, if any, under the Otto Trucking Agreement.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

73

## **PRAYER FOR RELIEF**

WHEREFORE, Uber requests that this Court enter judgment in its favor and against Levandowski on each Count of the Adversary Complaint, and that the Court award Uber its costs, including attorneys' fees, for defending this action.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

74

**COUNTERCLAIMS**

Uber Technologies, Inc. ("Uber"), by and through its attorneys, alleges as follows in connection with its counterclaims against Anthony Levandowski:

**THE PARTIES**

1.    Defendant Uber is a Delaware corporation with its principal place of business in San Francisco, California.

2.    Plaintiff Anthony Levandowski is an individual who resides in Sausalito, California.

**JURISDICTION AND VENUE**

3.    The Court has jurisdiction over Uber's Counterclaims, pursuant to 28 U.S.C. § 1334(b), because the Counterclaims arise in and relate to the Chapter 11 bankruptcy case that Levandowski filed on March 4, 2020, in the United States Bankruptcy Court for the Northern District of California, Bankruptcy Petition No. 20-30242.

4.    Uber's Counterclaims seeking a declaration that its claims are non-dischargeable are denominated as core proceedings under 28 U.S.C. § 157(b)(2)(B) and (I). Pursuant to Local Bankruptcy Rule 7012-1, Uber does not consent to the entry of final orders or judgments by the Bankruptcy Court.

5.    Venue is proper before the Court pursuant to 28 U.S.C. § 1409(a), and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court.

**FACTS**

6.    Uber incorporates paragraphs 1–252 of its Answer and Affirmative Defenses 1-14 as though fully set forth herein.

7.    Prior to January 27, 2016, Levandowski was an employee at Google, working on Google's self-driving car project. While Levandowski was at Google, that project was operated as a division within Google called "Project Chauffeur." In 2016, this project was referred to and established under the name of Waymo.

8.    By February 22, 2016, Uber and Levandowski had entered into a non-binding term sheet for Uber's acquisition of Ottomotto LLC ("Otto"). Prior to agreeing to the transaction, Uber and Otto,

through their outside lawyers, hired a third-party forensic investigator, Stroz Friedberg ("Stroz") to gather facts and documents to confirm and ensure that Levandowski and others did not bring any proprietary or confidential Google material to Otto, and would not bring any such information to Uber.

9. In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

10. During his interview with Stroz on March 22 and 23, 2016, Stroz asked Levandowski if he had been involved in any "side projects" during his employment at Google. Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but did not disclose a side business called Tyto LiDAR ("Tyto), which was a company that Levandowski created beginning in 2012, while working at Google, that was originally called Odin Wave. Levandowski had been the owner, investor, and adviser of Tyto and was the "control person" at Tyto.

11. Levandowski actively concealed from Uber that he had any role at Tyto. Levandowski arranged for Uber to acquire the assets of Tyto through a sale of those assets in May 2016 to Otto, which Uber had agreed to acquire. Unknown to Uber, Google and Waymo had claims to Tyto's LiDAR technology including because Levandowski was concurrently employed by Google and Waymo to develop the same type of LiDAR technology and because Levandowski concealed his involvement in Tyto from Google and Waymo. By arranging for Uber to acquire the Tyto assets and employ persons employed by Tyto, Levandowski fraudulently exposed Uber to substantial claims by Google and Waymo.

12. Levandowski also represented during the Stroz interview that the Google information that was found on his devices and accounts "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession were there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

13. As part of Stroz's due diligence, on April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or other obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

14. Levandowski did not disclose to Stroz that since 2012, and while working at Google, he was the control person of Tyto and did not disclose Google's potential claim to ownership of Tyto trade secrets and patents related to LiDAR technology.

15. Additionally, contrary to his attestations, his statements during the Stroz interviews and his multiple representations to Uber, Levandowski had intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets after leaving Google. Levandowski never disclosed this fact to Uber. To the contrary, Levandowski consistently assured Uber that he would not bring any confidential Google information to Uber.

16. Uber relied on Levandowski's assurances when it entered into an Indemnification Agreement with him on April 11, 2016.

17. Levandowski fraudulently induced Uber into executing the Indemnification Agreement. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

18. At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google, other than as expressly and fully disclosed to Stroz.

19.     If Uber had known Levandowski had been involved with the Tyto business, had misappropriated Google trade secrets, had breached his fiduciary duties to Google, had committed felonious misconduct, or had lied to Stroz, Uber would not have executed the Indemnification Agreement in April 2016 and it would not have completed the Otto acquisition in August 2016.

20.     Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, and owed fiduciary duties to Uber.

21.     Levandowski committed fraud on Uber while acting in his fiduciary capacity.

22.     In October 2016, Google initiated two arbitration proceedings against Levandowski, which were subsequently consolidated. *Google LLC v. Anthony Scott Levandowski and Lior Ron*, JAMS Arbitration Case Reference No. 1100086069 (Consolidated) (the "Google Arbitration"). Levandowski thereafter requested indemnity from Uber pursuant to the Indemnification Agreement.

23.     Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending subsequent litigation brought by Google against Uber and Levandowski and advancing Levandowski's defense costs in the Google Arbitration.

24.     On August 15, 2019, a grand jury indicted Levandowski on 33 counts of theft and attempted theft of trade secrets. Levandowski was indicted pursuant to 18 U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843 and 2323, Criminal Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019).

25.     The indictment and each count incorporates a course of alleged misconduct that includes Levandowski's involvement with: (a) Project Chauffeur/Waymo; (b) Odin Wave/Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets through at least January 2016.

26.     The indictment was not publicly announced until August 27, 2019.

27.     Three days after the indictment was made public, Uber notified Levandowski in a letter dated August 30, 2019, that the Indemnification Agreement was rescinded based on Levandowski's fraudulent inducement. Uber's August 30, 2019 letter also explained that even if the Indemnification Agreement were not rescinded, Levandowski would have no right to enforce it because (a) he had committed a "Post-Signing Specified Bad Act," which was defined in the Agreement to include "retaining,

not returning . . . or possessing" confidential information from a former employer, and which rendered any indemnification obligation to Levandowski "null and void" under the Agreement's plain terms, and (b) Levandowski had materially breached the Agreement by refusing to testify and failing to cooperate in the Google Arbitration. Uber also explained that Google's claims related to Levandowski's Tyto conduct were Excluded Claims.

28.     Uber reiterated its rescission of the Indemnification Agreement in letters dated September 11, 2019, September 27, 2019, December 31, 2019, and March 27, 2020.

29.     On December 6, 2019, the Google Arbitration Panel issued a final award against Levandowski. The amount of the award solely against Levandowski was over $174 million, not including amounts for which he was held jointly and severally liable with co-respondent Lior Ron. As discussed below, a primary component of that award was that Levandowski was obligated to disgorge to Google payments for a $126,544,500.00 bonus tied to Google's Project Chauffeur program ("Chauffeur Bonus") and $767,051.95 in salary and regular compensation ("Related Compensation"), to which he was not entitled, as well as to pay prejudgment interest on the same.

30.     On March 4, 2020, the California Superior Court confirmed Google's Final Award against Levandowski, and issued judgment against Levandowski in the amount of $179,047,998.64. The primary component of the judgment was disgorgement of the Chauffeur Bonus and Related Compensation, which were payments that Levandowski was not entitled to receive, together with prejudgment interest on that amount.

31.     On March 4, 2020, Levandowski filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

32.     On March 19, 2020, federal prosecutors announced that Levandowski had agreed to plead guilty to taking Google trade secret information with the intention of using it for his economic benefit, including at Uber. Levandowski fraudulently concealed that he had taken trade secret information when he negotiated the Indemnification Agreement.

33.     On August 6, 2020, Levandowski was sentenced to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case").

34.     At the time Uber agreed to indemnify Levandowski, it did not know about Levandowski's involvement and misconduct in forming the Tyto business, that he had stolen trade secrets from and breached his fiduciary duties to Google, that he had lied to Stroz, or that he had committed felonious conduct. Levandowski actively concealed those facts from Uber.

35.     On July 6, 2020, Uber filed a Proof of Claim (Claim 8-1) in Bankruptcy Petition No. 20-30242.

A.   **The Google Arbitration Award**

36.     As set forth in the Google Arbitration Award, "Google s[ought] an award that would constitute a disgorgement of compensation that was paid to Respondents during the period of time that they were disloyal."

37.     The Google Arbitration Panel ruled that "Google is entitled to an award that orders Levandowski to disgorge and restore to Google the principal sum of $127,311,551.95" in compensation.

38.     The Google Arbitration Panel also awarded Google "the sum of $45,547,474.64 from Levandowski as pre-award interest on disgorgement damages."

39.     The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge payments wrongfully obtained from Google.

40.     By law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

41.     Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person

from any third-party insurer or from any other third parties in connection with such Expenses." The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person. Any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

### B. The Indemnification Agreement's Post-Signing Specified Bad Acts Provision

42.     The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

43.     Section 2.1(a) of the Indemnification Agreement provides that if Levandowski committed "a Post-Signing Specified Bad Act" after April 11, 2016, the date the Indemnification Agreement was executed, but before the closing of the Otto acquisition in August 2016, then Uber's indemnification obligation to Levandowski would "become null and void and of no further force and effect and there shall be no liability on the part of" Uber or any of its affiliates to indemnify Levandowski.

44.     The definition of "Post-Signing Specified Bad Act" includes, among other things, any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer."  It also includes solicitation of employees of a Former Employer without express written consent of the Former Employer.

45.     Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski.

46.     The amended complaint in *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation") alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. To the extent that Levandowski retained confidential documents, information, and trade secrets belonging to Google or Waymo after April 2016, and/or retained and/or accessed confidential documents, information, and trade secrets that were the subject of the Waymo litigation and that belonged to Tyto after April 2016 without Tyto's express written agreement, or to the extent that he knowingly permitted others to do so, his doing so was a Post-Signing Specified Bad Act.

47.     In May 2016, Levandowski arranged for Otto and thus Uber to acquire Tyto without disclosing his interest in it, and thereby caused Otto and Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that belonged to Tyto and as to which, based upon Levandowski's breach of his duty of loyalty, Waymo or Google had a claim. Through this acquisition and his concealment of his role in Tyto, Levandowski solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this conduct.

48.     With respect to Tyto, Levandowski concealed from Uber his role in Tyto and did not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of Levandowski's misconduct that was the subject of a Former Employer Claim, including claims asserted in the Waymo litigation. Upon information and belief, Levandowski committed other Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, including the Google Arbitration.

49.     As but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

## C. **The Indemnification Agreement's Excluded Claims Provision**

50.     Section 2.1(b)(ii) of the Indemnification Agreement provides that an Indemnified Claim shall not include, and that Uber shall not have "any obligation" to indemnity for, an "Excluded Claim." An Excluded Claim is any claim arising out of actions that "either (A) were not truthfully disclosed by [Levandowski] to [Stroz] in response to relevant inquiries in connection with the due diligence performed by [Stroz] or (B) were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]."

51.     In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

52.     Levandowski did not disclose his work on Tyto to Stroz. During those interviews, Stroz expressly asked Levandowski to identify all of the side projects he had worked on while employed at Google. Levandowski concealed from Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, and that he had been the owner, investor, and adviser of the company.

53.     Stroz's report to Uber lists all of the side projects that Levandowski disclosed to Stroz. The list does not include any reference to Tyto or to any entity involved in the development of LiDAR technology.

54.     Levandowski failed to disclose to Stroz his involvement with Tyto. Uber was not aware that Levandowski had any involvement with Tyto or had worked on Tyto as a side project while at Google at the time the Indemnification Agreement was signed.

55.     The Google Arbitration Panel found that Google's claims against Levandowski included misconduct attributed to Tyto and Otto.

56.     The Google Arbitration Panel found that, during his employment at Google, Levandowski was secretly setting up a series of trusts and LLCs that resulted in him owning and controlling the company that was ultimately known as Tyto. The Google Arbitration Panel found that Levandowski breached his duty of loyalty to Google by setting up Tyto to develop technology that was competitive with Google's

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

self-driving car efforts. Levandowski's misconduct related to Tyto began prior to October 2012 and continued through January 2016 when Levandowski left Google (the "Tyto Misconduct"). Thereafter, on information and belief, Levandowski committed additional Post-Signing Specified Bad Acts related to Tyto by accessing and transferring Tyto trade secrets, patents, and confidential information, as well as by soliciting Tyto employees, without Tyto's express consent.

57. The Google Arbitration Panel also found that Levandowski engaged in misconduct by setting up an entity that later became known as Otto. Levandowski's misconduct related to Otto began in August 2015 at the earliest, and continued until January 2016 when Levandowski left Google (the "Otto Misconduct").

58. Levandowski was part of the program known as Project Chauffeur while employed by Google. Levandowski participated in the Chauffeur Bonus Plan. He also received Related Compensation.

59. The Google Arbitration Panel entered an award against Levandowski requiring disgorgement of the compensation he earned during the period of disloyalty when he was engaged in conduct related to Tyto and Otto. The largest portion of the award was $126,544,000.00 in Chauffeur Bonus payments and $751,051.95 in Related Compensation, as well as prejudgment interest on those amounts of $45,547,474.64.

60. As part of the Chauffeur Bonus Plan, Levandowski's interest vested in 25% annual increments each year from October 2012 to October 2015. By the time Levandowski began his Otto Misconduct in 2015, he had already accrued a right to at least 75% of his Chauffeur Bonus. Levandowski's Tyto Misconduct continued from October 2012 through the termination of his employment.

61. The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation. Had Levandowski not been paid a bonus for the period of the Tyto Misconduct, he would not have received even a penny of the Chauffeur Bonus. Levandowski's concealment of the Tyto Misconduct is the primary cause of his receipt of the bonus and the primary reason for the disgorgement of that bonus and obligation to pay prejudgment interest on the same.

Case 22-03050   Doc#1348-1   Filed 06/12/24   Entered 06/12/24 12:35:47   Page 84 of 555

62. The Tyto Misconduct is an Excluded Claim. During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

63. The Otto Misconduct is also an Excluded Claim because Levandowski failed to disclose fully the extent or nature of that misconduct.

64. Levandowski's claims are barred because the predominant cause of the misconduct is based on Excluded Claims under the plain terms of the Indemnification Agreement.

65. In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring. Therefore, at a minimum, 75% or more of the Chauffeur Bonus and Related Compensation (and prejudgment interest thereon) is allocable to Excluded Claims for which Uber has no obligation to indemnify Levandowski under any circumstances.

### D. **Levandowski's Refusal to Testify in the Google Arbitration was a Material Breach of the Indemnification Agreement**

66. The Indemnification Agreement provides that in the event that a claim is brought against Levandowksi by a former employer, Uber "shall direct and control the defense or settlement of the Former Employer Claim."

67. Section 2.2(c) of the Indemnification Agreement further states:

The Indemnified Person(s) party to such Former Employer Claim (i) shall furnish Purchaser and its Representatives with such information as such Indemnified Person(s) may have with respect to such Former Employer Claim . . . , (ii) shall provide to Purchaser and its Representatives any documents or other materials . . . that may be necessary or useful to the defense of such Former Employer Claim . . . , (iii) shall make himself or herself available to Purchaser upon reasonable notice for interviews and factual investigations and to appear at Purchaser's reasonable request to give testimony (including deposition and trial testimony) with respect to the defense of such Former Employer Claim . . . and (iv) shall otherwise

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

85

reasonably cooperate with and assist Purchaser and its Representatives in the defense of such Former Employer Claim.

68. Google sought Levandowski's deposition as part of the Google Arbitration.

69. In January 2018, Uber learned that Levandowski intended to invoke the Fifth Amendment at his deposition in the Google Arbitration rather than testify at the deposition that was scheduled for later that month.

70. On January 15, 2018, Uber's counsel emailed Levandowski's attorneys and stated: "It is Uber's view that it would be better for the defense of the claims in the Zing arbitration if Mr. Levandowski would testify to the issues raised in the arbitration, rather than invoke the 5th Amendment." Counsel for Uber also requested a meeting with Levandowski prior to his deposition.

71. On January 15, 2018, Levandowski's counsel rejected Uber's request that Levandowski testify regarding the issues in the arbitration, stating, "[A]fter extraordinary consideration and discussion, Anthony has decided he needs to continue to broadly assert his Fifth Amendment rights."

72. Contrary to the terms of the Indemnification Agreement providing that Uber be permitted to direct and control the litigation, Levandowski's counsel refused to meet with Uber's counsel prior to Levandowski's deposition.

73. On January 18, 2018, Levandowski sat for his deposition in the Google Arbitration and invoked the Fifth Amendment in response to each and every substantive question posed to him.

74. On April 2, 2018, counsel for Uber sent Levandowski's counsel a letter that explained, among other things, that Levandowski was in material breach of the Indemnification Agreement because he refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment, and requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing.

75. The April 2, 2018 letter from Uber's counsel also provided notice to Levandowski that Uber intended to exercise all of its rights to disclaim or avoid liability under the Indemnification Agreement based on (1) Levandowski's material breach by refusing to testify based on an unjustifiably broad invocation of the Fifth Amendment, (2) Levandowski's breach of the Indemnification Agreement by

refusing to reasonably cooperate with the defense, and (3) the fact that certain of Google's claims were Excluded Claims.

76. On April 20, 2018, Levandowski submitted a proffer to the Google Arbitration Panel as to issues he would testify to at the arbitration hearing.

77. On April 24, 2018, the Google Arbitration Panel denied Levandowski's request to testify as to the subject matter that he did not testify to during fact discovery, which were the essential facts that Uber had requested that Levandowski testify to in the Google Arbitration.

78. Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at the hearing due entirely to Levandowski's refusal to testify during his deposition.

79. Levandowski failed to perform under and materially breached the Indemnification Agreement. In particular, Levandowski refused to testify in the Google Arbitration upon Uber's reasonable request, and failed to cooperate with Uber in the defense of the Google Arbitration claims, thereby denying Uber the entire consideration it bargained for under the Indemnification Agreement.

80. Uber's inability to cause Levandowski to testify evidences that at no point was Uber in control of Levandowski's defense in the Google Arbitration.

81. Uber never directed Levandowski's counsel to assert any arguments or defenses that they did not independently want to assert, or to refrain from asserting any arguments or defenses that they did want to assert. Uber was prohibited from participating in the dispute and denied access to and information about most of the arbitration hearing, and from presenting an argument on the allocation of Google's damages.

82. Uber was not permitted to submit evidence of the proper allocation of damages at the Google Arbitration hearing. The Google Arbitration Panel issued its decision without any reasoned consideration or arguments presented on the issue. Both Levandowski and Google had an incentive to reach a damages award that was incorrect as a matter of law and adverse to Uber.

83. During the Google Arbitration, Levandowski refused to cooperate, refused to testify, and refused to make it possible for rational settlement discussions to take place.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

84.     Levandowski's failure to comply with his obligations under the Indemnification Agreement deprived Uber of the benefit it would have derived from the Indemnification Agreement, namely, the right to control any litigation for which it was agreeing to provide indemnification. Uber cannot be adequately compensated for the breach. Levandowski's offer to testify at the hearing came too late and therefore Levandowski did not cure his breach.

85.     Uber expects Levandowski to assert on appeal that his testimony, if allowed, would have changed the outcome of the arbitration. If it is determined that the outcome of the arbitration would have been different if Levandowski testified, then Levandowski's failure to testify was a material breach of the Indemnification Agreement, which excuses Uber's obligation to perform under the Indemnification Agreement, including payment of any Expenses in connection with the Arbitration Award.

### COUNT I
### Declaratory Judgment – No Indemnification
### Based On Disgorgement and Prejudgment Interest

86.     Uber incorporates all of the above paragraphs as though fully set forth herein.

87.     The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge the Chauffer Bonus of $126,544,500.00 and Related Compensation of $767,051.95 for a total disgorgement of $127,311,551.95 in payments that Levandowski wrongfully obtained from Google.

88.     As a matter of law, those payments never belonged to Levandowski. Levandowski's claims against Uber under the Indemnification Agreement related to the Chauffeur Bonus and Related Compensation, along with prejudgment interest on the same, fail because indemnification for disgorgement is impermissible in California as a matter of public policy.

89.     Uber is not required or permitted to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and prejudgment interest on the same, as ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

90. The amounts awarded for prejudgment interest related to the award of disgorgement is likewise not indemnifiable as a matter of law and policy.

91. Independent of the prohibition on indemnification for disgorgement, any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

92. The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person.

93. Uber is not obligated to pay any amount that is attributable to the Chauffeur Bonus and Related Compensation under Section 2.4(b) of the Indemnification Agreement, including any prejudgment interest or post-judgment interest on that award.

94. As a result of the acts described herein, a live controversy exists as to (a) whether Levandowski is entitled to indemnification for the disgorgement of the Chauffeur Bonus and Related Compensation as well as prejudgment interest related to this disgorgement; and (b) whether Levandowski is entitled to indemnification for his obligation to return or repay to Google payments that he received from Google, a third party.

95. These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, for the obligation to repay any monies paid to him by Google and any prejudgment interest related to the same.

96. Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and for the obligation to repay any monies paid to him by Google and any prejudgment interest related to the same.

### COUNT II
### Declaratory Judgment - Levandowski's Claims Are Barred
### By California Civil Code § 2774

97. Uber incorporates all of the above paragraphs as though fully set forth herein.

98.     California Civil Code § 2774 states: "[a]n agreement to indemnify a person against an act already done, is valid, even though the act was known to be wrongful, unless it was a felony." Cal. Civil Code § 2774 precludes indemnification for losses and damages caused by felonious conduct, without regard to whether the party seeking indemnification is convicted for that crime or not.

99.     Levandowski engaged in felonious acts and those acts were the basis for the Arbitration Award. Any indemnification of Levandowski for the Arbitration Award or any resulting judgment is precluded by Cal. Civil Code § 2774.

100.    Levandowski was charged with 33 felony counts of theft and attempted theft of trade secrets. *See* 18 U.S.C. §§ 1832(a)(1), (2), (3), & (4). The indictment and each count incorporates a course of alleged misconduct that included Levandowski's involvement with: (a) Project Chauffeur; (b) Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets through at least January 2016. The indictment reflects a course of felonious conduct that substantially overlaps with the conduct that formed the basis of the Arbitration Award.

101.    Levandowski pled guilty to the felony of Theft and Attempted Theft of Trade Secrets for stealing Google trade secrets related to self-driving car technology for use in competing with Google.

102.    Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation and benefits information regarding the employees he was soliciting to come to Otto, in violation of California Penal Code Section 502. The Google Arbitration Panel found that Levandowski breached his duties to Google by improperly accessing Google employees' salary and performance information and then using that information to attempt to solicit those employees to Otto. This conduct was not only a breach of Levandowski's duties to Google, but it was felonious conduct within the meaning of Cal. Civil Code § 2774 and Cal. Penal Code § 502(c)(1) and (2).

103.    Uber is not required or permitted to indemnify Levandowski for any Expense resulting from or associated with his felonious activity.

104.    As a result of the acts described herein, a live controversy exists as to whether Levandowski is entitled to indemnification for the Arbitration Award and subsequent judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

105.     These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and Judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

106.     Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and subsequent judgment, including any part of the Award or Judgment that is based upon felonious conduct.

## COUNT III
### Declaratory Judgment - No Indemnification Due To Post-Signing Specified Bad Acts

107.     Uber incorporates all of the above paragraphs as though fully set forth herein.

108.     The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

109.     Levandowski committed one or more Post-Signing Specified Bad Acts, rendering the Agreement null and void as to him, and unenforceable by him.

110.     The definition of Post-Signing Specified Bad Acts includes retaining or using any confidential Google information after the execution of the Indemnification Agreement, as well as solicitation of employees. The expansive definition is set forth more fully in Exhibit A to the Indemnification Agreement and provides that an "Act" may include "knowingly permit[ing] someone else to take" an action.

111.     Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Indemnification Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski. The amended complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. Both the Google Arbitration and the Waymo litigation were Former Employer Claims within the meaning of the Indemnification Agreement.  Levandowski received indemnification of certain legal fees in conjunction

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

with the Google Arbitration. Otto Trucking LLC was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation.

112.     Levandowski retained and/or accessed confidential documents, confidential information, patents, and trade secrets belonging to Google, Waymo, and Tyto after April 2016. In May 2016, Levandowski arranged for Otto, and thus upon closing for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google or Waymo had a claim, without disclosing his involvement in Tyto

113.     Levandowski's fraudulent concealment of his own involvement in Tyto, as well as his misconduct between April 11, 2016 and August 2016, caused Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that were purportedly owned by Tyto but in which, based upon Levandowski's breach of his duty of loyalty, Google or Waymo had a claim.

114.     Through this Tyto acquisition and Levandowski's concealment of his role in Tyto after April 11, 2016, Levandowski also solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this misconduct.

115.     With respect to Tyto, Levandowski concealed from Uber his role in Tyto and thus could not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of these. Levandowski's misconduct was the subject of multiple Former Employer Claims, including the claims asserted in the Waymo litigation and claims asserted in the Google Arbitration. The acquisition of Tyto's LiDAR technology, which was arranged for in May 2016 by Levandowski, was at the heart of the Waymo litigation.

116.     Additionally, as but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

Case 2:20-03050   Doc #1348-1  Filed 08/12/24/23  Entered 08/12/24/23 12:05:47  Page 92 93 of 555

117.    Uber seeks a final judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim.

118.    As a result of the acts described herein, a live controversy exists as to whether the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

119.    This controversy is ripe for determination and requires a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

120.    Uber therefore seeks a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

## COUNT IV
### Declaratory Judgment - No Indemnification And/Or Setoff Due To Excluded Claims

121.    Uber incorporates all of the above paragraphs as though fully set forth herein.

122.    During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

123.    Levandowski's claims are barred because the predominant cause of the Arbitration Award was misconduct that constitutes one or more Excluded Claims under the plain terms of the Indemnification Agreement.

Case 20-03050   Doc#1248-1   Filed 06/12/24   Entered 06/12/24 12:45:47   Page 94 of 555

124. The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation.

125. Levandowski also failed to disclose the full scope of the misconduct he committed in relation to Otto; thus, any undisclosed misconduct related to Otto also constitutes an Excluded Claim. To the extent that the Arbitration Award was based on the Otto Misconduct, Levandowski's claims are barred because that conduct also constituted an Excluded Claim.

126. In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct was occurring.

127. As a result of the acts described herein, a live controversy exists as to whether the Arbitration Award and any judgment based on it is an Excluded Claim.

128. This controversy is ripe for determination and requires a declaration that the Arbitration Award and any judgment based on it is an Excluded Claim.

129. Uber therefore seeks a declaration that the Arbitration Award, and any judgment based on it, and/or any portion of that Award and judgment related to the Tyto Misconduct are Excluded Claims and not subject to indemnification. In the alternative, Uber seeks a declaration that any indemnification to which Levandowski may otherwise be entitled must be subject to setoff and/or recoupment in the amount of any award or judgment attributable to an Excluded Claim.

## COUNT V
### Breach of Indemnification Agreement

130. Uber incorporates all of the above paragraphs as though fully set forth herein.

131. Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at his deposition or the arbitration hearing.

132. Levandowski materially breached the Indemnification Agreement by failing to testify at his deposition and the Google Arbitration hearing, and by his other failures to cooperate with the defense. Levandowski failed to perform his obligations under the Indemnification Agreement by failing to comply

with Uber's request that he provide relevant testimony at his deposition and at the Google Arbitration hearing and by impeding Uber's ability to have access to the information necessary for Uber to effectively oversee and direct the defense of the dispute. By broadly invoking the Fifth Amendment and declining to meet with Uber's counsel, Levandowski materially breached Sections 2.2(b) and 2.2(c) of the Indemnification Agreement and denied Uber its bargained-for consideration.

133.     Levandowski is expected to assert that the outcome of the Google Arbitration would have been different had he testified at the arbitration hearing.

134.     Levandowski admitted through his last-ditch effort to reverse course in order to try to testify in the Google Arbitration that he believes his testimony and cooperation would have changed the outcome of the arbitration against Google.

135.     If Levandowski's contention that his testimony would have made a difference is correct, then he has materially breached the terms of the Indemnification Agreement so as to excuse Uber's performance of the Indemnification Agreement. At minimum, Levandowski's breach injured Uber by depriving it of the benefits for which it bargained in the Indemnification Agreement.

136.     Uber is entitled to a declaration that Levandowski's breach of the Indemnification Agreement excuses any obligation that Uber may otherwise have to perform under the Indemnification Agreement. Uber is also entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Levandowski's breach of contract.

### COUNT VI
### Damages Based On Fraud And Fraudulent Inducement
### And For A Declaration That Such Damages Are Non-Dischargeable
### Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)

137.     Uber incorporates all of the above paragraphs as though fully set forth herein.

138.     Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

95

139.    In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

140.    During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted Tyto from the list.

141.    Levandowski concealed from Stroz and Uber that since 2012 he had been secretly operating a business that competed with Google called Tyto. Levandowski had been the owner, investor, and adviser of Tyto and, as the Arbitration Panel found, he was secretly the control person of Tyto. Levandowski arranged for Otto to purchase Tyto, so as to transfer Tyto's trade secrets and confidential information related to the LiDAR technology to Uber, without Uber ever knowing that Levandowski was involved with Tyto and without Uber ever knowing that Levandowski had used Tyto as a means for secretly establishing a competing business with Google and that Google would have a claim to the very LiDAR technology that Uber was acquiring.

142.    Levandowski also represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

143.    Levandowski represented to Stroz during the interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally. Levandowski also represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

144.    At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

145.    On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

146.     In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

147.     Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

148.     Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

149.     If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

150.     After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

151.     Uber is entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud.

152.     Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

97

153.    If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, including through his secret control of Tyto, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

154.    But for Levandowski's fraud, Uber would not have acquired any LiDAR technology in which Google or Waymo had a claim, and would not have been subject to the claims asserted against it by Waymo.  Levandowski's fraud, including his concealment of his involvement as the control person in Tyto, was a substantial factor in the Google Arbitration Award and also a substantial factor in causing Uber to provide Waymo consideration valued at approximately $245 million to resolve claims asserted in the Waymo litigation. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Google Arbitration and the Waymo claims.

155.    The sole basis for Uber's inclusion in the Waymo litigation was Uber's acquisition of Otto and agreement to acquire Otto Trucking LLC. Uber would not have closed that transaction or entered into the Indemnification Agreement had it known of Levandowski's fraudulent and other wrongful conduct, and Waymo would not have sued Uber but for that misconduct. The Waymo litigation was a direct consequence of Levandowski's fraudulent conduct.

156.    Uber is entitled to consequential damages caused by Levandowski's fraud committed upon Uber, including but not limited to the value of the consideration that Uber has been required to provide Waymo in the Waymo litigation to resolve claims arising out of and caused by Levandowski's fraud, including claims for violations of the Trade Secret Act, violations of the California Uniform Trade Secret Act, patent infringements, and violation of the California Business and Professional Code.

157.    Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber against any amounts Uber is found to owe to Levandowski based upon Levandowski's fraud.

158.    Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's claims for recovery of benefits conferred upon Levandowski under the Indemnification Agreement and for all damages incurred as a result of Levandowski's fraud, including recovery of the value of the consideration

that Uber provided Waymo in connection with the Waymo litigation. The Court should therefore declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

159.    Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

160.    Levandowski's actual fraud and fraudulent misrepresentations were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## COUNT VII
### Contribution Of The Value Of The Consideration Provided To Settle The Waymo Litigation And For A Declaration That Such Right Of Contribution Is Non-Dischargeable Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)

161.    Uber incorporates all of the above paragraphs as though fully set forth herein.

162.    Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

163.    If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

164.    But for Levandowski's fraud, Uber would not have been subject to the claims asserted against it by Waymo and it would not have been necessary for Uber to provide consideration valued at approximately $245 million to resolve those claims. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Waymo claims.

165. Levandowski is jointly and severally liable to Waymo for the losses that Waymo claimed in its claims against Uber.

166. Uber is entitled to contribution from Levandowski in the amount equal to the consideration it provided Waymo to settle the Waymo litigation.

167. Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

168. Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

169. Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

170. Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## COUNT VIII
### Declaratory Judgment For Rescission Based On Fraudulent Inducement

171. Uber incorporates all of the above paragraphs as though fully set forth herein.

172. Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

173. In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

174. During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

100

Case 20-03050   Doc# 34   Filed: 08/11/20   Entered: 08/11/20 13:14:35   Page 100 of
101

Case 20-03050   Doc# 34   Filed: 08/11/20   Entered: 08/11/20 14:22:35   Page 100 of
106555

nine side projects that he participated in while employed by Google, but omitted the Tyto project from the list.

175.    Levandowski fraudulently concealed from Stroz and Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, which was a company that Levandowski created beginning in 2012. Levandowski had been the owner, investor, and adviser of Tyto.

176.    Levandowski fraudulently represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

177.    Levandowski fraudulently represented during the Stroz interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

178.    At the time of the Indemnification Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

179.    On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

180.    In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

181.    Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential

Case 2:20-03002   Doc# 3429   Filed: 08/01/2004   Entered: 08/01/2004 21:04:35   Page 101 of
102 of 555

information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

182.     Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

183.     If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

184.     After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

185.     As a result of the acts described herein, a live controversy exists as to whether Uber has effectively rescinded the Indemnification Agreement.

186.     The issue of whether Uber has effectively rescinded the Indemnification Agreement is ripe for determination.

187.     Uber therefore seeks a declaration that it has effectively rescinded the Indemnification Agreement.

### COUNT IX
### Contribution Of The Amounts Paid For Lior Ron And
### For A Declaration That Such Amounts Are Non-Dischargeable
### Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)

188.     Uber incorporates all of the above paragraphs as though fully set forth herein.

189.     The Corrected Final Award and subsequent judgment awarded Google $9,573,096.60 from Lior Ron, individually and jointly and severally with Levandowski.

190.     On February 5, 2020, Uber paid Google, on Ron's behalf, $9,453,135.87 to settle this portion of the award, as well as the much smaller amount awarded solely against Ron.

Case 20-03050   Doc# 34  Filed 08/11/20   Entered 08/11/20 14:35  Page 102 of 103

191.    Ron assigned to Uber his right to seek contribution from Levandowski in the amount proportionate to Levandowski's comparative fault. Levandowski is solely or primarily at fault with respect to that award.

192.    Uber is entitled to contribution from Levandowski in the amount of the joint and several portion of the Google Award that Uber paid on behalf of Lior Ron.

193.    Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

194.    Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

195.    Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity making, Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

196.    Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

**COUNT X**
**Incorporation Of Proof Of Claim**

197.    Uber incorporates all of the above paragraphs as though fully set forth herein.

198.    Uber incorporates by reference as though fully set forth herein its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") in Bankruptcy Petition No. 20-30242 pending in the United States Bankruptcy Court for the Northern District of California and reasserts those claims herein.

Case 2003050  Doc# 34  Filed 08/11/20  Entered 08/11/20 21:04:35  Page 108 of
104105555

199.    On March 4, 2020, Levandowski filed a voluntary Chapter 11 individual bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

200.    On July 6, 2020, Uber filed a Proof of Claim alleging various claims against Levandowski and to the extent not otherwise asserted in these counterclaims, Uber incorporates and reasserts those claims herein, including but not limited to: (1) contribution for the amount of the joint and several portion of the Corrected Final Award in the Google Arbitration that Uber paid on behalf of Lior Ron; (2) restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud; (3) consequential damages arising out of Levandowski's fraud committed upon Uber; and  (4) a defense against indemnification based upon the Excluded Claims provision of the Indemnification Agreement and/or a claim for reimbursement, recoupment and/or setoff as to all amounts subject to the Excluded Claims provision.

201.    To the extent not otherwise alleged in these counterclaims, Uber incorporates by reference all claims in its July 6, 2020 Proof of Claim.

### **PRAYER FOR RELIEF**

WHEREFORE, Uber prays for the following relief:

202.    That the Complaint filed by Levandowski be dismissed in its entirety with prejudice, that judgment be entered in favor of Uber and against Levandowski, and that Levandowski be denied all relief requested in his Complaint;

203.    A declaration that Uber has valid claims against Levandowski as alleged in the July 6, 2020 Proof of Claim;

204.    A declaration that Levandowski is not subject to a release from claims;

205.    A declaration that the Indemnification Agreement has been rescinded or is null and void;

206.    A final judgment that Levandowski is not entitled to indemnification under the Indemnification Agreement because Levandowski fraudulently induced Uber to enter into that agreement;

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

207.    A declaration that Levandowski is not entitled to indemnification for disgorgement of the Chauffeur Bonus and Related Compensation or any prejudgment interest related to the same;

208.    A declaration that Levandowski is not entitled to indemnification for any amounts paid to him by a third party, Google, including the Chauffeur Bonus and Related Compensation, as well as any prejudgment interest associated with the same;

209.    A declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award or any resulting judgment because Cal. Civil Code § 2774 precludes indemnification due to Levandowski's felonious conduct;

210.    A final judgment determining that Levandowski committed Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, and an order from the Court that the Indemnification Agreement is null and void, including because Levandowski committed Post-Signing Specified Bad Acts;

211.    An final judgment that Levandowski materially breached the Indemnification Agreement and that the agreement is not enforceable against Uber on account of that breach;

212.    An award of consequential damages arising out and caused by Levandowski's fraud committed upon Uber; including but not limited to the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

213.    An award of contribution for the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

214.    An award of consequential damages arising out of and caused by Levandowski's breach of the Indemnification Agreement;

215.    Setoff and/or recoupment of any amounts Levandowski owes to Uber against any amounts Uber is otherwise found to owe to Levandowski;

216.    An award of contribution for the portion of the joint and several part of the Corrected Final Award in *Google, LLC v. Anthony Scott Levandowski and Lior Ron* that Uber paid on behalf of Lior Ron;

217.    An final judgment providing restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement based on Uber's rescission of the Indemnification Agreement;

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

Case 20-03050   Doc# 429   Filed: 08/11/20   Entered: 08/11/20 12:14:35   Page 105 of 106

218. An Order from the Court that the amounts that Levandowski seeks to recover under the Indemnification Agreement may not be recovered because they are based upon Excluded Claims, or in the alternative that at least over 75% of the amounts Levandowski seeks to compel Uber to pay, plus attorneys' fees and costs, are Excluded Claims related to the Tyto Misconduct and not subject to indemnification;

219. A declaration that Uber's claims and the damages sought herein are not subject to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6);

220. Prejudgment and post judgment interest on any amounts awarded to Uber;

221. Attorneys' fees and costs incurred by Uber in defending this action, including fees incurred in the Bankruptcy proceeding; and

222. Such other and further relief as is just and proper.

Dated: August 31, 2020

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Debra I. Grassgreen*
Debra I. Grassgreen
Miriam Manning

-and-

David J. Bradford (admitted *pro hac vice*)
Catherine Steege (admitted *pro hac vice*)
Terri L. Mascherin (admitted *pro hac vice*)
JENNER & BLOCK LLP

*Counsel for Uber Technologies, Inc.*

# EXHIBIT D

Debra I. Grassgreen (CA Bar No. 169978)
Miriam Manning (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:     (415) 263-7000
Facsimile:     (415) 263-7010
E-mail:     dgrassgreen@pszjlaw.com
            mmanning@pszjlaw.com

David J. Bradford (admitted *pro hac vice*)
Catherine Steege (admitted *pro hac vice*)
Terri L. Mascherin (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Telephone: (312) 222-9350
E-mail: dbradford@jenner.com
        csteege@jenner.com
        tmscherin@jenner.com

*Counsel for Uber Technologies, Inc.*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 20-30242 (HLB) |
| ANTHONY SCOTT LEVANDOWSKI, | Chapter 11 |
| Debtor. | |
| ANTHONY LEVANDOWSKI, an individual, | Adv. Pro. No. 20-03050 (HLB) |
| Plaintiff, | **[REDACTED]** **AMENDED ANSWER TO DEBTOR'S COMPLAINT FOR DECLARATORY RELIEF, SPECIFIC PERFORMANCE, AND DAMAGES; AFFIRMATIVE DEFENSES; AND COUNTERCLAIMS** |
| v. | |
| UBER TECHNOLOGIES, INC. | |
| Defendant. | |

Defendant Uber Technologies, Inc. ("Uber") asserts the following answers, affirmative defenses, and counterclaims to the complaint of Plaintiff Anthony S. Levandowski ("Levandowski"), as debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and as plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and states as follows:

## NATURE OF CLAIM[1]

1. This is an objection to the allegations made by Uber Technologies, Inc. ("Uber") in its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") and an action to enforce the promises Uber made to Mr. Levandowski to induce him to sell to Uber his self-driving companies and technology and to lead its autonomous vehicle program.

**ANSWER:** Uber admits that Levandowski purports to object to allegations Uber made in its Proof of Claim (8-1) on July 6, 2020. Uber further admits that Levandowski purports to bring an action to enforce alleged promises he claims Uber made to Levandowski. Uber denies the remaining allegations in paragraph 1.

2. Mr. Levandowski is one of the world's leading experts in autonomous vehicle technology. Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks. He was a founding member of Google's autonomous car initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

**ANSWER:** Uber admits that Levandowski is an engineer who has participated in projects related to the construction of self-driving vehicles. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2 and therefore denies the allegations.

3. Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies the allegation.

---

[1] Due to confidentiality concerns and volume, Uber has not attached all of the referenced documents to its Answer, Affirmative Defenses, and Counterclaims. Uber will make these documents available and/or file them with the Court (including under seal as appropriate) upon request from the Court or Mr. Levandowski that it do so.

1  4.  Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr.
2  Levandowski worked for a competitor on self-driving technology, he would face very negative
3  consequences. Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and
   Travis Kalanick, Uber's then-CEO. In addition, Mr. Levandowski was aware that Mr. Page and other
   executives at Google viewed Uber as a very significant competitor.

**ANSWER:**  Uber lacks knowledge or information sufficient to form a belief as to the truth of
the allegations in paragraph 4 and therefore denies the allegations.

5.  In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto") a
self-driving trucking company.

**ANSWER:**  Uber admits that Levandowski left Google in early 2016. Uber further admits that
Levandowski helped start Ottomotto LLC ("Otto") and that Otto was a self-driving vehicle company.
Uber denies the remaining allegations in paragraph 5.

6.  Uber expressed an interest in acquiring Otto. Because of Mr. Page's threats and known
hostility towards Uber, Mr. Levandowski insisted that Uber indemnify him against claims that may be
brought by Google as a condition to entering into any relationship with Uber.

**ANSWER:**  Uber admits that it was interested in acquiring Otto. Uber admits that Levandowski
sought to have Uber indemnify him against certain potential claims. Uber further admits that
Levandowski expressed concern that Google could sue him even if he did nothing wrong. Uber denies
that Levandowski is entitled to indemnification. Uber lacks knowledge or information sufficient to form
a belief as to the truth of the remaining allegations set forth in paragraph 6 and therefore denies the
allegations.

7.  In fact, Mr. Levandowski explained to Uber multiple times that he believed Google would
likely sue him if he joined Uber. Mr. Levandowski was particularly concerned because he did not have
the ability to defend himself if one of the largest companies in the world, with essentially unlimited
resources, came after him.

**ANSWER:**  Uber admits that, prior to executing the Indemnification Agreement, Levandowski
and Uber discussed the prospect that Google may bring litigation against Levandowski. Uber further
admits that Levandowski expressed concern that Google could sue him even if he did nothing wrong.
Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

in the second sentence of paragraph 7 and therefore denies the allegations. Uber denies the remaining allegations in paragraph 7.

8.      In addition, because Mr. Levandowski left Google to work on autonomous trucking, Mr. Levandowski conditioned the sale of Otto on Uber supporting his self-driving trucking business.

**ANSWER:**    Uber admits that on April 11, 2016, the Ottomotto Merger Agreement ("Otto Agreement") and the Otto Trucking Merger Agreement ("Otto Trucking Agreement") were each executed. Uber respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 8.

9.      As part of the transaction for the acquisition of Otto, Uber agreed to indemnify Mr. Levandowski for claims Google might raise against him. These claims included claims Google might assert for breach of fiduciary duty, breach of the duty of loyalty, breaches of various restrictive covenants, and trade secret misappropriation. Exhibit A is a redacted copy of the Indemnification Agreement dated April 11, 2016 between Uber and Mr. Levandowski.

**ANSWER:**    Uber admits that it entered into an Indemnification Agreement on April 11, 2016 with Levandowski, and that Exhibit A to the Adversary Complaint is a redacted copy of that Agreement. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 9. Answering further, Uber entered into the Indemnification Agreement based on, among other things, Levandowski's unequivocal representations that he had not breached any obligations to Google, that he had not taken any confidential information or documents from Google, and that no Google documents or information would be brought to Uber.

10.      Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of any claim brought by Google, as well as any award or judgment in Google's favor. See Ex. A at 3, § 2.3.

**ANSWER:**    Uber admits that the Indemnification Agreement includes at page 3 and § 2.3 language related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 10.

11.      As part of the acquisition of Otto, Uber also agreed to support Mr. Levandowski's trucking business objectives by either creating a new business unit within Uber (wherein Mr. Levandowski would have a leadership role) or allowing Mr. Levandowski to create a trucking business outside of Uber.

Case: 20-03050    Doc# 4398  Filed: 09/21/23  Entered: 09/21/23 16:40:47  Page 4 of
112 of 555

**ANSWER:** Uber admits that on April 11, 2016, the Otto Agreement and the Otto Trucking Agreement were each executed. Uber respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 11. Answering further, Uber states that the Otto Trucking Agreement was terminated pursuant to its terms, that Levandowski voluntarily sold his interest in Otto Trucking LLC ("Otto Trucking") to a third party, and that Levandowski has no legal right to enforce the terminated Agreement.

12. After Uber acquired Otto, Mr. Page followed through on his threats against Mr. Levandowski. In October, 2016, Google initiated two arbitration proceedings against Mr. Levandowski. Mr. Levandowski timely requested indemnity from Uber under the Indemnification Agreement, and Uber accepted its obligations. Consequently, Uber paid for and controlled the defense of Mr. Levandowski for nearly three years. Initially, Mr. Levandowski was represented by the same counsel that represented Uber. During the course of a separate litigation, a trade secrets dispute with Waymo LLC, a Google affiliate, Uber's then-counsel determined it could not jointly represent Mr. Levandowski (or his company, Otto Trucking) and Uber. Uber subsequently selected and hired separate counsel for Mr. Levandowski. Uber continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected. Uber also exercised its right to direct and control Mr. Levandowski's defense of the arbitration proceeding through the final award and including all settlement discussions with Google.

**ANSWER:** Uber admits that in October 2016, Google initiated two arbitration proceedings against Levandowski (together, the "Google Arbitration"). Uber further admits that Levandowski thereafter requested indemnity from Uber pursuant to the April 11, 2016 Indemnification Agreement. Uber admits that it paid the legal expenses in connection with the two arbitration proceedings through September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber admits that Levandowski was represented in the arbitration proceedings by Morrison & Foerster LLP, and that Morrison & Foerster initially represented both Levandowski and Uber. Uber admits that after Google initiated *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation"), Uber determined that Levandowski should have separate counsel. Uber denies that it directed and controlled Levandowski's defense of the arbitration proceeding through the final award, including all settlement discussions with Google. Uber denies the remaining allegations in paragraph 12.

13. After Mr. Levandowski relied on Uber's control and direction for years and after an unfavorable Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

**ANSWER:** Uber admits that it notified Levandowski through counsel that the Indemnification Agreement was rescinded and that it would not make additional payments after September 25, 2019. Uber respectfully refers the Court to the August 30, 2019 and September 27, 2019 letters from Uber's counsel to Levandowski's counsel for their complete and accurate contents. Uber denies the remaining allegations in paragraph 13.

14. In addition, while in control of Mr. Levandowski's defense and settlement prospects with Google, Uber worked out its own settlement with Google's subsidiary, Waymo LLC ("Waymo") to resolve a trade secret dispute between them relating to the same underlying events. Upon information and belief, the terms of that settlement included an agreement that Uber would never hire or work with Mr. Levandowski again, which resulted in Uber also reneging on its promises to support Mr. Levandowski's trucking business.

**ANSWER:** Uber admits that in February 2018 it, along with Otto, entered into a Settlement Agreement with Waymo LLC, Google LLC, and Alphabet, Inc. in connection with a civil action that Waymo filed against Uber, Otto, and Otto Trucking asserting claims for violations of the Trade Secrets Act, violations of the California Uniform Trade Secrets Act, patent infringement, and violations of Section 17200 of the California Business and Professions Code. Uber respectfully refers the Court to the Settlement Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 14.

15. Uber's recently filed Proof of Claim has made the Indemnification Agreement, and Uber's actions related to its acquisition of Otto, central to this Chapter 11 Case.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber denies the remaining allegations in paragraph 15.

16. In particular, the Proof of Claim alleges that because Uber purportedly rescinded the Indemnification Agreement, not only does Uber not have any obligation to indemnify Mr. Levandowski but it also is a creditor of Mr. Levandowski. Uber seeks payment for legal fees and costs it provided under the Indemnification Agreement and contribution for the settlements it has negotiated for its own benefit and the benefit of Mr. Levandowski's cofounder, the current lead of Uber's trucking business.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 16.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

6

17. However, Uber asserts claims that, upon information and belief, Uber released as part of the settlement with Waymo.

**ANSWER:** Uber denies the allegations in paragraph 17.

18. Uber also has no basis to rescind the Indemnity Agreement. Uber has set forth numerous theories to back out of the deal it struck, but two issues appear to be core: (1) a claim that Mr. Levandowski engaged in fraud and (2) a claim that Mr. Levandowski has pled to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney.

**ANSWER:** Uber admits that it has asserted, among other things, that Levandowski engaged in fraud, and that Levandowski has pled guilty to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney. Uber denies the remaining allegations in paragraph 18.

19. First, there was no fraud. Uber was aware of Mr. Levandowski's conduct through the extensive investigation it conducted prior to and after entering into the indemnity agreement with him, and long before it purported to rescind. To the extent Uber claims it was unaware of certain facts, those facts were not material and were fully available to Uber had they cared to look more carefully at the materials it was provided by Mr. Levandowski. In fact, Mr. Levandowski repeatedly told Uber to search those devices for the most accurate information.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz Friedberg, LLC ("Stroz") to conduct an independent investigation of Otto employees, including Levandowski. Uber denies the remaining allegations in paragraph 19.

20. Second, Mr. Levandowski did not make any misrepresentations regarding any theft of trade secrets. Mr. Levandowski has plead guilty to trade secret misappropriation with respect to one file he accessed after leaving Google. As for that one file, Uber knew the file's name, that Mr. Levandowski kept that file, that he accessed it after he left Google, the date he accessed it, and through its due diligence firm, the contents of that file.

**ANSWER:** Uber admits that Mr. Levandowski has pled guilty to Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA. Uber denies the remaining allegations in paragraph 20.

21. Mr. Levandowski therefore commences the Adversary Proceeding to obtain declaratory relief as to the impact of Uber's purported rescission on the parties' respective rights and obligations, to enforce Uber's obligations arising from the Otto transaction, and to disallow the Proof of Claim.

**ANSWER:** Paragraph 21 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 21.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

7

## JURISDICTION AND VENUE

22.    The Adversary Proceeding arises in and relates to the Chapter 11 Case. The Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Mr. Levandowski against Uber herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges,* General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California.

**ANSWER:**    Uber admits that the Adversary Proceeding relates to the Chapter 11 Case and that the Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Levandowski pursuant to 28 U.S.C. §1334(b). Uber denies the remaining allegations of paragraph 22.

23.    This is a core proceeding under 28 U.S.C. § 157(b) including, without limitation, under subsections (b)(2)(A), (B), (C), (K), and (O). Mr. Levandowski consents to the entry of a final order by the Court in connection with this Adversary Proceeding.

**ANSWER:**    Uber admits that Levandowski's objection to Uber's Proof of Claim is denominated as a core proceeding under 28 U.S.C. § 157(b)(2)(B). Uber denies that the remaining claims set forth in this Adversary Proceeding are denominated as core proceedings pursuant to any of the subparts of 28 U.S.C. § 157(b)(2). Pursuant to Local Bankruptcy Rule 7012-1, Uber consents to the entry of final orders or judgments by the Bankruptcy Court.

24.    Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:**    Uber admits that venue is proper before this Court pursuant to 28 U.S.C. § 1409(a) and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court. (*See* Case No. 20-03050, Dkt. 13.) Pursuant to that Stipulation, Uber does not contest that venue is proper before this Court with respect to Levandowski's Adversary Complaint. Uber denies the remaining allegations in paragraph 24.

## FACTS

**A.    MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY**

25.    Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

**ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 and therefore denies the allegations.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

8

26.     He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and therefore denies the allegations.

27.     In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles. He was 24 years old at the time.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies the allegations.

28.     The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas. Mr. Levandowski and a team of engineers from U.C. Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations—submitted a self-driving, self-balancing, two-wheeled motorcycle. This motorcycle, Ghostrider, competed against well-funded submissions from Stanford University, Carnegie Mellon, and established companies. After performing well in several qualifying rounds, Ghostrider was selected as a contender for the DARPA Grand Challenge.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies the allegations.

29.     Ghostrider now sits in the Smithsonian Museum as one of America's great innovations.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies the allegations.

30.     Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr. Sebastian Thrun, a former Stanford computer science professor who was also a participant in the DARPA Grand Challenge.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies the allegations.

31.     Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool. VuTool was subsequently acquired by Google.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies the allegations.

Case: 20-30242   Doc# 4898   Filed: 09/21/23   Entered: 09/21/23 16:05:47   Page 8 of
117 of 555

**B. MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM**

32.    Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping with Dr. Thrun. Mr. Levandowski helped develop the technology for the Google service now known as Street View.

**ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 and therefore denies the allegations.

33.    In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-driving car program at Google. The program was named "Project Chauffeur."

**ANSWER:**    Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 33 and therefore denies the allegations.

34.    Project Chauffeur catapulted Google into the lead in autonomous driving when, in 2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of 100 miles. By 2012, Google had logged over 300,000 miles of autonomous driving. Mr. Levandowski was a key contributor in helping Google achieve these milestones. For his past contributions and to incentivize him going forward, Google invited Mr. Levandowski to participate in the Chauffeur Bonus Plan—an incentive plan that would pay members a percentage of the valuation of Project Chauffeur starting at the end of 2015—and gave him the highest initial allocation or individual earnout percentage of any member of the plan.

**ANSWER:**    Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google and that he participated in the Chauffeur Bonus Plan. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34 and therefore denies the allegations.

35.    Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016.

**ANSWER:**    Uber admits that Levandowski was part of a program called Project Chauffeur while employed by Google and that he left Google in 2016. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies the allegations.

36.      Mr. Levandowski would ultimately be paid over $127 million by Google for his work on Project Chauffeur. The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google.

**ANSWER:**      Uber admits that the Arbitration Award in favor of Google and against Levandowski ("Arbitration Award") recounts that Levandowski was paid approximately $127 million by Google and that Levandowski had no right to receive that payment and was required to disgorge the same. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 and therefore denies the allegations.

## C.      MR. LEVANDOWSKI CONSIDERS LEAVING GOOGLE

37.      For years, Google enjoyed its position as the leader in the self-driving space with no significant challengers. In 2015, Uber announced the launch of its own self-driving car initiative after acquiring a team of engineers from Carnegie Mellon University.

**ANSWER:**      Uber admits that in 2015, Uber formed a partnership with Carnegie Mellon University ("CMU") that resulted in Uber hiring certain faculty members, researchers, and technicians from CMU. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 and therefore denies the allegations.

38.      After Uber's announcement, there were many discussions within Google about how to compete with Uber. In those discussions, executives within Google expressed distaste and animosity towards Uber. Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

**ANSWER:**      Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 and therefore denies the allegations.

39.      Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Mr. Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

11

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

**ANSWER:** Uber admits that the language quoted in paragraph 39 is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* and respectfully refers the Court to the trial transcript for its complete and accurate contents. Uber denies the remaining allegations in paragraph 39.

40. Over time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making after its initial successes. In 2015, Mr. Levandowski began to think about other self-driving opportunities.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 and therefore denies the allegations.

41. After learning about Mr. Levandowski's discontentment at Google, Dr. Thrun introduced Mr. Levandowski to Mr. Kalanick at Uber. Upon meeting Mr. Levandowski, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership where he could supply self-driving technology to Uber as an outside technology vendor.

**ANSWER:** Uber admits that Dr. Thrun introduced Levandowski to Mr. Kalanick. Uber denies the allegations in the second sentence of paragraph 41. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 41 and therefore denies the allegations.

42. Mr. Levandowski's Google colleagues, and more than one of his superiors, were aware that Mr. Levandowski was having discussions with Uber as he considered his future.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 42 and therefore denies the allegations.

43. Simultaneously, in 2015, Lior Ron rejoined Google in a business role. Mr. Levandowski and Mr. Ron, who had met while working on Google Maps, began to discuss the problems with Project Chauffeur and ways in which the Project could be improved.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 43 and therefore denies the allegations.

44. During those conversations, they also discussed new product markets, including self-driving trucks. As they explored this concept and brainstormed further, both became passionate about self-driving trucking. They were convinced that the trucking business could be disrupted by the addition of self-driving technology and that self-driving trucking technology could go to market much more quickly than passenger car technology. Mr. Levandowski began to include Mr. Ron in his discussions with Uber and others. Mr. Levandowski and Mr. Ron considered establishing a commercial vendor relationship with Uber to obtain funding for the trucking business.

**ANSWER:** Uber admits that Mr. Ron participated in discussions with Uber and Levandowski. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 44 and therefore denies the allegations.

45. Toward the end of his time at Google, Mr. Levandowski also had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur. During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving startup outside of Google.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 45 and therefore denies the allegations.

46. Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences. Because Google had bought several of Mr. Levandowski's outside businesses previously and because others had left Google to start new companies without objection from Google, Mr. Levandowski understood Mr. Page's threat to be about a large, well-funded competitor and not a startup.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 46 and therefore denies the allegations.

### D. MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE

47. Mr. Levandowski left Google on January 27, 2016. He joined Otto, a self-driving trucking company and was credited as a co-founder.

**ANSWER:** Uber admits that Levandowski left Google on January 27, 2016. Uber admits that Levandowski joined Otto and that he was credited as a co-founder. Uber denies the remaining allegations in paragraph 47.

48. Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

**ANSWER:** Uber admits that it discussed acquiring Otto with Levandowski. Uber denies the remaining allegations in paragraph 48.

49. As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber on consumer self-driving technology (instead of trucking) as a competitive act that would convert him from a friendly, start-up competitor to an enemy. Mr. Levandowski also told Uber that he feared that Google would sue him and seek recovery of the substantial amounts of money that had been paid to him or were owed to him.

**ANSWER:** Uber admits that in early 2016, Levandowski and Uber discussed the prospect that Google may bring litigation against Levandowski. Uber further admits that Levandowski expressed

concern that Google could sue him even if he did nothing wrong. Uber denies the remaining allegations in paragraph 49.

50.     In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Mr. Kalanick. In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick. In response, Mr. Kalanick stated that Uber was prepared to protect Mr. Levandowski from an aggressive assault by Google.

**ANSWER:**     Uber admits that in early 2016, Levandowski and Uber discussed concerns related to Levandowski's former employer, Google, and the prospect that Google may bring litigation against Levandowski. Uber denies the remaining allegations in paragraph 50.

51.     As a key part of the transaction to sell Otto and have Mr. Levandowski join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google might assert against him. *See* Ex. A. The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

> "Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date. *Id.* at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

**ANSWER:**     Uber admits that the language quoted in paragraph 51 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 51. Answering further, Uber states that Levandowski is not entitled to indemnification.

52.     Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

> (a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses***

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

14

*incurred by such Diligenced Employee* or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id.* at § 2.1(a) (emphasis added).

**ANSWER:**    Uber admits that the language quoted in paragraph 52 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 52. Answering further, Uber states that Levandowski is not entitled to indemnification.

53.    "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

"Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id.* at 3.

**ANSWER:**    Uber admits that the language quoted in paragraph 53 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 53. Answering further, Uber states that the scope of permissible indemnification is limited by applicable law.

54.    The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii)). That section reads:

(b) Notwithstanding anything herein to the contrary, *an Indemnified Claim shall not, regardless of whether the Closing occurs, include,* and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

15

(ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id.* at § 2.1(b)(ii) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 54 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies that the language quoted in paragraph 54 constitutes the "only limitations" on Uber's indemnification obligations. Uber denies the remaining allegations in paragraph 54.

55. The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski. Mr. Levandowski would not have entered into the transaction without Uber's indemnity promise.

**ANSWER:** Uber admits that Levandowski expressed concern about Google's use of virtually inexhaustible resources to attack him without basis, but denies the remaining allegations in the first sentence of paragraph 55. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 55 and therefore denies the allegations.

56. The Indemnification Agreement was structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded. Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request.

*Id.* at § 2.3.

**ANSWER:** Uber admits that the language quoted in paragraph 56 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 56. Answering further, Uber denies that Levandowski is entitled to indemnification.

57.     If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration proceedings to enforce Uber's obligations.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request. **If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within such [redacted], such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e).** In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.

Ex. A at §2.3(a) (emphasis added).

(e) . . . An Indemnified Person [Mr. Levandowski] ***may*** elect (in its sole discretion) to arbitrate whether such Indemnified Person is entitled to the advancement of Expenses under Section 2.3(a). . . . Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS") and [Uber], on the one hand, and the Indemnified Person, on the other, agree to appear at such arbitration Proceeding.

*Id.* at § 2.2(e) (emphasis added).

**ANSWER:**     Uber admits that the language quoted in paragraph 57 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 57.

58.     The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses, including proceedings in San Francisco state or federal courts where both parties submitted to jurisdiction.

**3.11 Specific Performance.** Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative). Each of the Parties agrees that ***this Agreement is intended to be legally binding and specifically enforceable*** pursuant to its terms and that Purchaser and the ***Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms*** and that monetary damages would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, ***a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.***

*Id.* at § 3.11 (emphasis added); *see also id.* at § 3.5.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

17

**ANSWER:** Uber admits that the language quoted in paragraph 58 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 58.

59. In an arbitration concerning Uber's failure to advance Expenses, the agreement expressly prohibited Uber from litigating any issues concerning whether any claims or Expenses are covered by the Indemnification Agreement if the claims brought by Google were not fully resolved either through settlement or a final, non-appealable judgment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request. If Purchaser denies any such request or otherwise fails to advance such Expenses to such Indemnified Person within [redacted] period, such Indemnified Person shall have the right to enforce its right to receive such Expenses by commencing arbitration under Section 2.2(e). *In the event of any such arbitration described in this Section 2.3(a), Purchaser shall not be permitted to arbitrate in such Proceeding whether the Indemnified Claim giving rise to such Expenses is an Excluded Claim until such time as such Indemnified Claim has been settled or subject to a final, non-appealable judgment in accordance with this Agreement.*

*Id.* at § 2.3(a) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 59 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 59. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11 Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

60. Instead, Uber agreed that it could challenge coverage and seek *reimbursement* of payment for Expenses it advanced *only after* the final resolution of Google's claims. Section 2.2(d) of the Indemnification Agreement stated:

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

18

In the event that Purchaser believes all or a portion of a Former Employer Claim is an Excluded Claim hereunder, Purchaser shall have the right (in its sole discretion), ***within 60 days following the settlement or final non-appealable adjudication of such Former Employer Claim,*** to initiate arbitration under Section 2.2(e) with the Indemnified Person(s) party to such Former Employer Claim in order to determine whether all or a portion of such Former Employer Claim is an Excluded Claim under the terms of this Agreement.

*Id.* at § 2.2(d) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 60 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 60. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11 Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

61. It was only after final resolution of any arbitration between Mr. Levandowski and Uber wherein the arbitrators determined that a Former Employer Claim was not covered by the Indemnification Agreement would Uber receive reimbursement for Expenses it advanced.

Following such arbitration, if the arbitrator(s) determines in a Final Judgment that all or a portion of such Former Employer Claim is an Excluded Claim hereunder, then Purchaser shall be entitled to receive reimbursement for, and the Indemnified Person(s) party to such Former Employer Claim shall be required to pay to Purchaser, the amount of all Expenses paid or incurred by or on behalf of Purchaser and/or its Affiliates with respect to such Excluded Claim

*Id.*

**ANSWER:** Uber admits that the language quoted in paragraph 61 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 61. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes

between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his

Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11

Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute

under the Indemnification Agreement will be presented and resolved as part of the Adversary

Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on

any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of

the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

      62. In the meantime, Uber was required to advance Expenses to indemnify Mr. Levandowski for claims brought against him by Google.

> For the avoidance of doubt, ***Purchaser shall advance all Expenses*** incurred by the Indemnified Person(s) pursuant to Section 2.3(a) ***through the later to occur of the final settlement or final adjudication*** of such Former Employer Claim, which Expenses may be subject to reimbursement pursuant to this Section 2.2(d).

*Id.* at § 2.2(d) (emphasis added).

     **ANSWER:** Uber admits that the language quoted in paragraph 62 appears in the April 11,

2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and

accurate contents. Uber denies the remaining allegations in paragraph 62. Answering further, on July 29,

2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all disputes

between them, including all disputes raised in Mr. Levandowski's demand in the arbitration and his

Complaint in the Adversary Proceeding and those raised in Uber's Proof of Claim in the Chapter 11

Case, will be resolved before this Court [and] agree that all issues relating to the Excluded Claim dispute

under the Indemnification Agreement will be presented and resolved as part of the Adversary

Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on

any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of

the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

    **E.    UBER ACQUIRES OTTO**

     63. As part of the indemnification process, Mr. Levandowski agreed to be interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz"). He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination. To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that Stroz collected a number of devices from Levandowski and that Levandowski gave Stroz access to a number of accounts. Upon information and belief, Uber admits that Stroz is still in possession of most of those devices and maintains static images of those accounts. Uber denies that it is in possession of Levandowski's devices and images of his accounts. Uber denies the remaining allegations in paragraph 63.

64. The Stroz /Uber investigation of Mr. Levandowski uncovered a great number of facts related to potential claims that might be brought by Google but was, by Stroz' own admission, incomplete. In early April 2016, while Stroz' was conducting its investigation, Uber executed the Indemnification Agreement.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that the Indemnification Agreement was executed on April 11, 2016, and that the final Stroz written summary report had not been completed at that point. Uber denies the remaining allegations in paragraph 64. Answering further, Uber received preliminary findings from Stroz prior to April 11, 2016.

65. As Stroz summarized, Uber requested preliminary information regarding the investigation "in the lead-up to Uber's signing of an agreement to purchase Otto and "long before the investigation was completed." Stroz had provided Uber with preliminary information that included Stroz's draft memo from Mr. Levandowski's interviews and access reports showing that Mr. Levandowski retained, and in some instances, accessed Google confidential information after he left Google. The interview memo remained in draft form and Mr. Levandowski's counsel reserved his rights as to the accuracy of the information in the memo.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that Stroz provided a draft memo to Uber dated April 2, 2016 that discussed its interviews of Levandowski. Uber admits that the final Stroz report states that counsel reserved their clients' rights with respect to accuracy in the drafts of the interview memos. Uber denies the remaining allegations in paragraph 65. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

Case: 20-03050    Doc #: 298-2 Filed: 09/21/20 Entered: 09/21/20 14:36:35    Page 21 of
129 of 555

66. Uber pushed for the entire transaction to proceed knowing that Stroz had not completed its investigation.

**ANSWER:** Uber admits that it signed the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement before receiving Stroz's final written summary report. Uber denies the remaining allegations in paragraph 66. Answering further, Uber received preliminary findings from Stroz prior to April 11, 2016.

67. On April 11, 2016, Uber executed several documents to complete this transaction, including the Indemnification Agreement, the Otto Agreement and Plan of Merger (the "Otto Agreement"), and the Otto Trucking LLC Agreement and Plan of Merger (the "Otto Trucking Agreement"), which gave Uber an option to acquire a second company created by Mr. Levandowski and Mr. Ron.

**ANSWER:** Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed. Uber refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 67.

68. Stroz did not issue a report until August 5, 2016, almost four months after it signed the Otto acquisition documents.

**ANSWER:** Uber admits that Stroz provided Uber with a final written summary report on August 5, 2016 ("Stroz Report"). Uber denies the remaining allegations in paragraph 68.

69. The Stroz report disclosed numerous facts, including the following:

During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

**ANSWER**: Uber admits that the language quoted in paragraph 69 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 69. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

70.     Stroz reported that Mr. Levandowski's devices demonstrated that during his time at Google, he downloaded documents and files relating to Project Chauffeur.

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016. An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

**ANSWER:**     Uber admits that the language quoted in paragraph 70 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 70. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

71.     It also reported that Mr. Levandowski downloaded Chauffeur files shortly before his departure from Google and had accessed them following his departure from Google.

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2015 — Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

**ANSWER:**     Uber admits that the language quoted in paragraph 71 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 71. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

72.     Stroz reported facts regarding hiring of Google employees.

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took

Case: 20-03050   Doc #: 4298-1   Filed: 08/21/2004/23   Entered: 08/21/2004 22:36:10:35   Page 23 of 131 of 555

place at Levandowski's house in approximately December 2015 and January 2016. These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

**ANSWER:** Uber admits that the language quoted in paragraph 72 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 72.

73. Stroz included as an exhibit to its report the draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects for which he had an ownership interest, but did not include any discussion of this memo in its main report. In addition, Mr. Levandowski's devices and accounts also contained extensive information about a company named Odin Wave/Tyto, Mr. Levandowski's estate planning, and various investments.

**ANSWER:** Uber admits that a redacted interview memorandum of Levandowski was attached to the Stroz Report that was provided to Uber. Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of paragraph 73 and therefore denies those allegations. Uber denies the remaining allegations in paragraph 73. Answering further, Uber states that Levandowski's counsel controlled what information Stroz could share with Uber from Stroz's interviews of the Otto employees and reviews of data provided to Stroz. Stroz did not provide Uber copies of all of the exhibits to its summary report, and Uber did not have access to Levandowski's devices and accounts. To the extent that any of Levandowski's devices contained information related to Tyto, Uber did not have access to and was not told about that material, and Levandowski did not disclose that information to Stroz. To the contrary, when asked by Stroz what "side projects" he had done while at Google, he did not identify Tyto.

74. Stroz noted discrepancies in what Mr. Levandowski recalled and what Stroz discovered on Mr. Levandowski's devices.

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

**ANSWER:** Uber admits that the language quoted in paragraph 74 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 74.

75. Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text messages, as well as its decision not to investigate these deletions further.

Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

**ANSWER:** Uber admits that the language quoted in paragraph 75 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 75.

76. Despite Stroz's findings, on August 18, 2016, Uber closed the acquisition of Otto and publicly announced that it was acquiring the company and working with Mr. Levandowski.

**ANSWER:** Uber admits that in August 2016 it closed the acquisition of Otto and that a press release was issued on August 18, 2016 by Uber stating that it had acquired Otto. Uber admits that Levandowski would be working with Uber. Uber denies the remaining allegations in paragraph 76.

77. In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

**ANSWER:** Uber admits that it issued a press release on August 18, 2016 and that the language quoted in paragraph 77 appears in the press release. Uber respectfully refers the Court to the press release for its complete and accurate contents. Uber denies the remaining allegations in paragraph 77.

### F.    GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI

78. On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 78.

79.     Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 79. Answering further, Uber refers the Court to the Arbitration Award as setting forth the complete and accurate account of any determinations made by the Arbitration Panel.

80.     The two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before Otto was acquired by Uber

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 80.

81.     Google alleged that Mr. Levandowski violated his duties to Google through his relationship with Tyto. Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential information regarding compensation to recruit Google employees.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 81.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

82. The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement.

**ANSWER:** Uber denies that the claims asserted by Google in arbitration are covered by the Indemnification Agreement. Uber denies the remaining allegations in paragraph 82.

### G. UBER ACCEPTS THE INDEMNITY OBLIGATIONS

83. On November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

**ANSWER:** Uber admits that on November 3, 2016, Uber received notice of the Former Employer Claims under the Indemnification Agreement. Uber denies the remaining allegations in paragraph 83.

84. On November 3, 2016, Uber's in-house counsel and as its outside counsel from Morrison & Foerster LLP ("MoFo") interviewed Mr. Levandowski about the allegations asserted in Google's arbitration demands.

**ANSWER:** Uber admits that Uber's counsel interviewed Levandowski on November 3, 2016 in connection with Google's arbitration demands. Uber denies the remaining allegations in paragraph 84.

85. After receipt of the notice and interviewing Mr. Levandowski, Uber accepted Mr. Levandowski's tender of the indemnity and assumed control of Mr. Levandowski's defense without any reservation of rights.

**ANSWER:** Uber admits that on November 3, 2016, it received notice of Google's arbitration demands and that Uber's counsel interviewed Levandowski. Uber denies that Levandowski is entitled to indemnification. Uber denies the remaining allegations in paragraph 85.

86. Uber hired MoFo to initially represent Mr. Levandowski. Through its counsel, Uber determined the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration.

**ANSWER:** Uber admits that Morrison & Foerster represented Levandowski. Uber denies that it unilaterally determined the strategy for Levandowski's defense, including the issues identified in paragraph 86. Uber denies the remaining allegations in paragraph 86.

87. In February 2017, Waymo LLC ("Waymo")—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action"). That action alleged, among other things, that Mr. Levandowski had downloaded 14,000 files from a Google server, that those files

contained trade secrets, and that he had used those files at Otto, which was acquired by Uber in 2016. These were the same files that Stroz had noted in its report, except that because of duplication in the files, Stroz had identified 24,000 files from that server.

**ANSWER:** Uber admits that in February 2017, Waymo initiated an action in the United States District Court for the Northern District of California, alleging misappropriation of trade secrets and patent infringement against Uber. Uber respectfully refers the Court to the amended complaint for its complete and accurate contents and allegations. Uber denies the remaining allegations in paragraph 87.

88. Based on Waymo's allegations, MoFo notified Google that Mr. Levandowski was invoking his Fifth Amendment rights and would not make disclosures in the arbitration.

**ANSWER:** Uber admits that Morrison & Foerster notified counsel for Waymo that Levandowski was invoking his Fifth Amendment privilege. Uber denies the remaining allegations in paragraph 88.

89. Several weeks after, MoFo determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski. As a result, MoFo sought to withdraw from representation of Mr. Levandowski and continue with its representation of Uber.

**ANSWER:** Uber admits that Morrison & Foerster terminated its representation of Levandowski in connection with the Google Arbitration. Uber lacks knowledge or information sufficient to admit or deny whether Morrison & Foerster determined it had a conflict of interest, and denies the remaining allegations in paragraph 89.

90. Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

**ANSWER:** Uber admits that Goodwin Procter represented Levandowski in the Google Arbitration. Uber denies the remaining allegations in paragraph 90. Answering further, Uber states that it was prohibited from seeing most of the discovery materials, was excluded from most of the arbitration hearing, was prohibited from seeing most of the legal briefing and expert reports, and exercised no control over either Levandowski's arguments or defenses.

91. For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement. Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings, approval over experts, discussion about who would be arguing motions, pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions. Mr. Levandowski complied with Uber's requirements and cooperated with his defense. Mr. Levandowski and his counsel met with Uber whenever it requested.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

28

**ANSWER:** Uber admits that it has paid some of Levandowski's legal expenses in connection with the Google Arbitration. Uber admits that it received periodic updates on proceedings in the arbitration. Uber denies the remaining allegations in paragraph 91.

92. Mr. Levandowski provided information and guidance that led to the discovery of evidence that was helpful to his defense in the arbitration as well as the Waymo action. This included guidance that led to the discovery of statements by the administrator of the server that housed the 14,000 files at issue that the files were "low value" and that "checking out" or downloading the entire repository of 14,000 files did not "ring the alarm bells" for him. This was because when a user accessed the server where the so-called 14,000 files were located, the system automatically downloaded the entire repository onto his or her laptop even if the user only wanted to access one or two files. Ultimately, this discovery, driven by Mr. Levandowski's contributions, became a centerpiece of Uber's defense in the Waymo case.

**ANSWER:** Uber admits that Levandowski provided information to his counsel in connection with the Waymo litigation and the Google Arbitration. Uber denies that Levandowski cooperated with Uber in the defense of the Google Arbitration as contemplated and required by the Indemnification Agreement. Uber denies the remaining allegations in paragraph 92.

93. In addition to providing this critical information, Mr. Levandowski also provided additional information to support Uber's defense. This included obtaining from a former Chauffeur team member the earrings she received as a parting gift that contained the alleged trade secrets at issue in the Waymo Action. Mr. Levandowski also identified numerous events and witnesses who aided Uber in its defense of the Waymo action as well as the arbitration with Google.

**ANSWER:** Uber admits that Levandowski provided information to his counsel in connection with the Waymo litigation and the Google Arbitration. Uber denies the remaining allegations in paragraph 93.

94. Mr. Levandowski also complied with Uber's requirement that Uber control all settlement discussions with Google. Mr. Levandowski made several proposals regarding possible settlement structures to Uber hoping that a global settlement could be reached with Google. But because Uber controlled settlement prospects with Google, Mr. Levandowski did not know whether any of his settlement proposals were made to Google.

**ANSWER:** Uber denies the allegations in paragraph 94.

### H. UBER SETTLES THE WAYMO ACTION

95. In February 2018, while controlling Mr. Levandowski's defense, Uber settled the Waymo Action with Waymo/Google. The existence of a settlement between Uber and Waymo was publicly announced, but limited information regarding the exact terms of the settlement is publicly available.

Case: 20-03050   Doc #: 45-2   Filed: 06/11/20   Entered: 06/11/20 14:36:05   Page 28 of
137 of 555

**ANSWER:** Uber admits that a settlement was reached in the Waymo litigation, that the existence of the settlement was publicly announced in a press release on February 9, 2018, and that the terms of the settlement are confidential. *See* https://www.uber.com/newsroom/uber-waymo-settlement/. Uber denies the remaining allegations in paragraph 95.

96.     Upon information and belief, that settlement agreement contained broad releases by both parties releasing claims as to the other's past and present employees.

**ANSWER:** Uber denies the allegations in paragraph 96.

97.     Upon information and belief, Uber agreed to a broad release as to Mr. Levandowski, a past employee of Google.

**ANSWER:** Uber denies the allegations in paragraph 97. Answering further, Uber states that no release contained in the Waymo settlement agreement released or was intended to release any of Uber's claims or defenses against Levandowski. Uber further states that Levandowski does not have any right to enforce any term of the Waymo settlement agreement; Levandowski was neither a party nor an intended third party beneficiary of the Waymo settlement agreement. And, even if Levandowski could enforce the agreement against Uber, the agreement would not bar Uber from asserting the claims and defenses that it asserts here.

98.     In addition, upon information and belief based on publicly available information, in the Waymo Settlement, Uber agreed to never hire or do business with Mr. Levandowski ever again.

**ANSWER:** Uber respectfully refers the Court to the Waymo settlement agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 98.

99.     Upon information and belief, because of the Waymo settlement terms, Uber refused to close on its acquisition of Otto Trucking or support Mr. Levandowski's trucking business.

**ANSWER:** Uber denies the allegations in paragraph 99.

100.     Upon information and belief, Uber traded Mr. Levandowski's rights in Otto Trucking and his ability to practice his profession in exchange for a settlement with Waymo.

**ANSWER:** Uber denies the allegations in paragraph 100.

## I. UBER REQUESTS THAT MR. LEVANDOWSKI TESTIFY SHORTLY BEFORE THE ARBITRATION HEARING

101.    On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the Expenses it advanced for Mr. Levandowski to defend himself in the arbitration. **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

**ANSWER:**    Uber admits that on April 2, 2018, counsel for Uber sent a letter to Levandowski's counsel. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 101.

102.    One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"—which Mr. Levandowski had exercised over a year before with full knowledge of Uber.

**ANSWER:**    Uber admits that the language quoted in paragraph 102 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that Levandowski had previously exercised his Fifth Amendment rights in a separate matter. Uber denies the remaining allegations in paragraph 102.

103.    Nevertheless, in its April 2, 2018 letter, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the *Waymo* court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

**ANSWER:**    Uber admits that the April 2, 2018 letter to Levandowski's counsel discusses Levandowski's obligations under the Indemnification Agreement and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 103.

104.    Uber then demanded that Mr. Levandowski waive his Fifth Amendment rights and testifying during the arbitration.

**ANSWER:**    Uber admits that on April 2, 2018, its counsel sent Levandowski's counsel a letter that requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 104.

105.    In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

**ANSWER:** Uber admits that after receiving the April 2, 2018 letter, Levandowski's counsel communicated with Google and the Arbitration Panel about potentially testifying to certain topics and Uber refers to those communications for their content. Uber denies the remaining allegations in paragraph 105.

106. Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

**ANSWER:** Uber admits that Levandowski submitted a proffer to the Arbitration Panel and that it was denied. Uber respectfully refers the Court to the Arbitration Panel's Order for its complete and accurate contents. Uber denies the remaining allegations in paragraph 106.

107. Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

**ANSWER:** Uber admits that Levandowski's offer to testify, after previously asserting the Fifth Amendment during his deposition, was denied by the Arbitration Panel. Uber admits that it paid Levandowski's legal fees until September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber denies the remaining allegations in paragraph 107.

108. In addition, for the first time, Uber also stated that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

**ANSWER:** Uber admits that the language quoted in paragraph 108 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in its April 2, 2018 letter it asserted that Google's claims relating to Tyto Misconduct by Levandowski are Excluded Claims as defined in the Indemnification Agreement. Uber denies the remaining allegations in paragraph 108.

109. Uber's claims were false. Uber accepted Mr. Levandowski's tender of indemnity *only after* Google's commencement of the arbitration proceeding alleging claims relating to Tyto and *only after* Mr. Levandowski had been interviewed by Uber extensively about Google's allegations relating to Tyto. In addition, Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them. And Stroz had specifically identified other materials on Mr. Levandowski's devices that he had not disclosed during interviews.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

**ANSWER:** Uber admits that on November 3, 2016, Levandowski notified Uber that he was requesting indemnity in connection with the Google Arbitration. Uber admits that the Google Arbitration alleges claims related to Tyto. Uber admits that Stroz identified some materials on Levandowski's devices that he had not disclosed in his interviews. Uber denies that on November 3, 2016 it had knowledge of any Tyto information on devices given to Stroz. Uber denies the remaining allegations in paragraph 109. Answering further, Uber states that Levandowski intentionally did not disclose his involvement with Tyto in response to questions posed to him by Stroz prior to entry of the Indemnification Agreement, and that Uber learned that Levandowski had engaged in wrongful conduct in establishing and developing the Tyto business only later, through the allegations in the Google Arbitration and discovery in the Waymo litigation.

110. In fact, Uber had considered acquiring Tyto in 2015 but declined to do so at that time. Tyto was ultimately acquired by Otto with Uber's consent and at Uber's request prior to Uber closing on its acquisition of Otto to secure a lower price for Tyto than what Tyto would have requested had it known that Uber was the acquirer.

**ANSWER:** Uber admits that Tyto was acquired by Otto with Uber's consent prior to Uber's acquisition of Otto. Uber denies the remaining allegations in paragraph 110. Answering further, at the time that Uber acquired Otto and at the time that Uber consented to Otto's acquisition of Tyto, Uber did not know that Levandowski had been involved with Tyto and did not know that Levandowski engaged in wrongful conduct in establishing and developing the Tyto business.

111. Moreover, prior to April 2018, Uber received extensive documents and information about Tyto in the Waymo Action and had actively participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started. Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto. Uber had counsel present at the meetings with these witnesses and during most, if not all, of their testimony. These individuals were also central witnesses in the two arbitrations with Google with respect to the Tyto-related allegations.

**ANSWER:** Uber admits that Brent Schwarz, James Haslim, and Ognen Stojanovski testified in either the Waymo litigation or the Google Arbitration, and that they each worked for Uber at some point. Uber refers to the transcripts of their testimony to establish who was present and for what duration. Uber admits that discovery related to Tyto was provided in the Waymo action. Uber admits that it

learned certain information through the Waymo litigation that indicated that Levandowski had engaged

in misconduct related to Tyto. Uber denies the remaining allegations in paragraph 111. Answering

further, Uber states that Levandowski failed to disclose to Stroz or to Uber his role and his misconduct in

connection with Tyto, and that Uber learned that information only later, through the Waymo litigation

and through Google's allegations against Levandowski in the Google Arbitration.

112.    Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship
between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that invested
funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and
would visit Tyto and his friends at that company to talk about technical and business matters from time to
time. Uber was also aware of Pierre Droz' (a Google employee) allegations that Mr. Levandowski was
involved with Tyto and even deposed him extensively on that very topic during the Waymo litigation.

**ANSWER:**    Uber admits that through testimony in the Waymo litigation in 2017–2018 it

learned certain information about Levandowski's involvement with Tyto, and that Uber learned of Peter

Droz's allegations during the Waymo litigation in 2017–2018. Uber refers to the testimony of Droz and

Stojanovski as setting forth the information that they provided through their testimony. Uber denies the

remaining allegations in paragraph 112.

113.    Armed with this knowledge, Uber paid for and controlled Mr. Levandowski's defense of
the arbitration. In fact, Uber did not raise any issues regarding coverage until April 2018.

**ANSWER:**    Uber admits that it paid for Levandowski's legal expenses in connection with the

defense of the Google Arbitration through September 25, 2019. Uber denies the remaining allegations in

paragraph 113.

**J.    UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

114.    On March 28, 2019, the arbitration panel issued an interim award in favor of Google. The
arbitration panel found violation of the exact claims covered by the Indemnification Agreement and
found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google. The
panel also awarded prejudgment interest and attorneys' fees, as it determined Google was the prevailing
party.

**ANSWER:**    Uber admits that on March 26, 2019, the Arbitration Panel issued an interim award

and respectfully refers the Court to it for its complete and accurate contents. Uber denies the remaining

allegations in paragraph 114.

115.     On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was going to abide by its indemnity obligations and pay for any adverse award in light of the interim award. **Exhibit F** is a redacted copy of Mr. Levandowski's May 13, 2019 letter.

**ANSWER:**     Uber admits that on May 13, 2019, its counsel received a letter from

Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate

contents. Uber denies the remaining allegations in paragraph 115.

116.     In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence. Mr. Levandowski identified numerous documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well and pointed out that documents from his devices were shown to witnesses at the arbitration hearing.

**ANSWER:**     Uber admits that on May 13, 2019, its counsel received a letter from

Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate

contents. Uber denies the remaining allegations in paragraph 116.

117.     Mr. Levandowski sent Uber a follow up letter on June 27, 2019. **Exhibit G** is a true and correct copy of that follow-up letter.

**ANSWER:**     Uber admits the allegations in paragraph 117.

118.     On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters stating that Mr. Levandowski had breached the Indemnification Agreement, that a majority of the interim award was "attributable to an Excluded Claim," and that "Uber has no contractual obligation to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's behalf." **Exhibit H** is a true and correct copy of Uber's July 3, 2019 letter.

**ANSWER:**     Uber admits that on July 3, 2019, its counsel responded to Levandowski's

counsel's letter of June 27, 2019, and respectfully refers the Court to the letter for its complete and

accurate contents. Uber denies the remaining allegations in paragraph 118.

119.     On August 15, 2019, Mr. Levandowski was indicted for thirty-three counts of trade secret misappropriation. The alleged trade secrets at issue in the indictment were some of the same ones that were at issue in the Waymo Action. Mr. Levandowski ultimately agreed to plead guilty to one count of trade secret misappropriation based on his access of one Google document containing trade secret information on one occasion after he left Google and has accepted restitutionary obligations in the amount of $756,499.22. This one file was the same file that Stroz expressly identified in its report to Uber, and in fact, the Stroz report was the basis for the indictment and the plea. The government agreed to dismiss the remaining thirty-two counts against Mr. Levandowski.

**ANSWER:**     Uber admits that on August 15, 2019, Levandowski was indicted pursuant to 18

U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843

and 2323, Criminal Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

35

cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019). Uber admits that trade secret misappropriation, among other things, was at issue in the Waymo litigation, and respectfully refers the Court to the amended complaint filed in the Waymo litigation for its complete and accurate contents. Uber admits that Mr. Levandowski has pled guilty to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). Uber further admits that as part of Levandowski's sentence he has been ordered to pay $756,499.22 in restitution to Waymo LLC. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case"). Uber admits that counts one through thirty-two of the indictment were dismissed on the motion of the United States. *Id.* Uber admits that a file identified in Levandowski's indictment was also identified in the Stroz report. Uber denies the remaining allegations in paragraph 119. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

120.    On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for which was rescission of the agreement. **Exhibit I** is a true and correct copy of Uber's August 30, 2019 letter.

**ANSWER:**    Uber admits that on August 30, 2019, its counsel corresponded with counsel for Levandowski, and respectfully refers the Court to the letter for its complete and accurate contents. Uber further admits that in its August 30, 2019 letter it informed counsel that it is Uber's view that Levandowski fraudulently induced Uber to enter into the Indemnification Agreement. Uber further admits that its counsel stated in the August 30, 2019 letter that rescission of the Indemnification Agreement was a proper remedy. Uber denies the remaining allegations in paragraph 120.

121.    At this point in time, Uber did not clearly state that the Indemnification Agreement was rescinded (and instead said it had a remedy of rescission should it choose to exercise it), make any offer to restore the consideration it received under the agreement, or cede control of Mr. Levandowski's defense.

**ANSWER:**    Uber denies Levandowski's characterization of the letter, and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 121.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

122.     Uber continued to advance payment for expenses incurred through September 25, 2019.

**ANSWER:**     Uber admits that it advanced payment for expenses incurred through September 25, 2019. Uber denies the remaining allegations in paragraph 122. Answering further, Uber states that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that "[i]n the spirit of compromise and good will," Uber would pay Levandowski's counsel through September 25, 2019, the date on which the Arbitration Panel declared the hearing closed. Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents.

123.     On September 27, 2019, Uber exercised its control over Mr. Levandowski to terminate its engagement of Goodwin Procter as counsel for Mr. Levandowski. Following this termination, Mr. Levandowski separately engaged Goodwin Procter to represent him.

**ANSWER:**     Uber admits that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that Uber's engagement with Goodwin Procter "in connection with the defense of the arbitration brought by Google . . . is terminated." Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents. Uber admits that Levandowski subsequently engaged Goodwin Procter. Uber denies the remaining allegations in paragraph 123.

124.     In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission. In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims. Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **Exhibit J** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

**ANSWER:**     Uber admits that on November 5, 2019, it filed a Form 10-Q with the Securities and Exchange Commission. Uber further admits that the language quoted in paragraph 124 appears in the filed Form 10-Q and respectfully refers the Court to the filed Form 10-Q for its complete and accurate contents. Uber denies the remaining allegations in paragraph 124.

125.     On December 6, 2019, the arbitration panel issued a final arbitration award.

**ANSWER:**     Uber admits the allegations in paragraph 125. Answering further, Uber states that on December 23, 2019, the Arbitration Panel issued a Corrected Final Award that was *nunc pro tunc* as of December 6, 2019.

126.     On December 10, 2019, Mr. Levandowski informed Uber of the final award. **Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter. Because of the lack of clarity in Uber's previous statements, Mr. Levandowski asked Uber, as the Indemnitor in control of the defense of the case, how it would like to proceed. Specifically, Mr. Levandowski inquired whether Uber intended to resolve the matter by paying the judgment or whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal and posting a bond to stay the judgment pending appeal.

**ANSWER:**     Uber admits that on December 10, 2019, Levandowski's counsel informed Uber that the Arbitration Panel issued its final award in *Google v. Levandowski and Ron* on December 6, 2019. Uber respectfully refers the Court to the December 10, 2019 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 126.

127.     On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019 letter and stated that it rescinded the Indemnification Agreement. **Exhibit L** is a true and correct copy of Uber's December 31, 2019 letter. The stated basis for rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement for Expenses paid relating to the claims based on Tyto.

**ANSWER:**     Uber admits that on December 31, 2019, Uber's counsel responded to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in the December 31, 2019 letter, counsel for Uber stated that Uber rescinded the Indemnification Agreement, but denies that Uber had not previously rescinded the Indemnification Agreement.  Uber denies the remaining allegations in paragraph 127.

128.     Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

**ANSWER:**     Uber admits that in the December 31, 2019 letter, Uber's counsel stated that Uber has no obligations to advance expenses and that Uber "will not pay any part of the Final Award."  Uber denies the remaining allegations in paragraph 128.

129.     In addition, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals."

**ANSWER:**     Uber admits that on December 31, 2019, Uber's counsel sent Levandowski's counsel a letter and that the language quoted in paragraph 129 appears in the letter. Uber respectfully

Answer, Affirmative Defenses, and Counterclaims No. 20-03050
38

refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 129.

130.     On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019. Uber did not provide payment for any Expenses incurred after that date.

**ANSWER:**     Uber admits that it provided payment to Levandowski through September 25, 2019. Uber denies the remaining allegations in paragraph 130.

131.     On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,047,998.64. **Exhibit M** is a true and correct copy of the judgment in Google's favor.

**ANSWER:**     Uber admits the allegations in paragraph 131.

132.     On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a chapter 11 petition in the United States Bankruptcy Court for the Northern District of California commencing the Chapter 11 Case.

**ANSWER:**     Uber admits the allegations in paragraph 132.

133.     On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement. In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020. **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without exhibits.

**ANSWER:**     Uber admits that on March 6, 2020, counsel for Levandowski provided notice of the March 4, 2020 judgment and a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel. Uber respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 133.

134.     On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay Google's judgment or any other Expenses. **Exhibit O** is a copy of Uber's March 27, 2020 letter.

**ANSWER:**     Uber admits that its counsel responded to Levandowski's counsel on March 27, 2020 and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 134.

135.     As a result, Mr. Levandowski filed an arbitration demand with JAMS San Francisco.

**ANSWER:** Uber admits that Levandowski filed an arbitration demand with JAMS in San Francisco, California. Uber denies the remaining allegations in paragraph 135.

136. Uber filed an answer on April 13, 2020 in which it alleged, among other defenses that it had rescinded the Indemnification Agreement based on Mr. Levandowski's purported fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.

**ANSWER:** Uber admits that it filed an answer to Levandowski's arbitration demand on April 13, 2020, and respectfully refers the Court to the answer for its complete and accurate contents. Uber denies the remaining allegations in paragraph 136.

137. The parties have not selected arbitrators or taken any other substantive actions in the arbitration.

**ANSWER:** Uber admits the allegations in paragraph 137. Answering further, the parties have since agreed not to pursue this dispute in arbitration, and instead to resolve it before the Bankruptcy Court, pursuant to the terms of this Court's Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court. (Case No. 20-03050, Dkt. 13, July 29, 2020).

### K. UBER FILES A PROOF OF CLAIM

138. On July 6, 2020, Uber filed the Proof of Claim, through which it brought into the Chapter 11 Case issues from the arbitration to support its purported position as a creditor of Mr. Levandowski. **Exhibit P** is a true and correct copy of Uber's Proof of Claim, ECF No. 8-1.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 138.

139. In its Proof of Claim, Uber asserts that Mr. Levandowski is liable for the amounts that Uber paid to settle the joint and several portion of the Final Award as part of Google's settlement with Lior Ron.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 139.

140. Uber also claims that the Indemnification Agreement has been rescinded and that it is a creditor of Mr. Levandowski because it was "fraudulently induced to acquire Levandowski's company Otto[] and indemnify Levandowski in connection with that acquisition." Based on this purported

rescission, Uber seeks repayment of any Expenses advanced by Uber for Mr. Levandowski's defense. It also seeks contribution from Mr. Levandowski for the amount Uber paid to settle the Waymo Action and the legal fees incurred by Uber in defending that action.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 140.

141. Uber also claims that Mr. Levandowski has no right to demand in the arbitration payment for at least 75% of Google's judgment as those amounts purportedly relate to Excluded Claims. It contends that Uber is either allowed to recoup payment for Excluded Claims or is entitled to a set off.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 141. Answering further, Uber asserts that 100% of the award is allocable to Excluded Claims, and in no event less than 75% of the award. The Arbitration Award is not indemnifiable for multiple other reasons, including, but not limited to, that it was based upon felonious conduct in violation of California Penal Code Section 502, that the Indemnification Agreement is nullified by Levandowski's commission of a Post-Signing Specified Bad Act, and that the award itself relates to monies to which Levandowski was not entitled and is not indemnifiable as a matter of policy and contract.

142. Uber also asked the Court to require that any payment by Uber for a Gross Indemnified Claim, be held subject to Uber's rights to recoup advances relating to Excluded Claims.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber admits that it states in its Proof of Claim that "to the extent that Uber is required to pay any gross Indemnified Claim to Levandowski (without deduction for Uber's Excluded Claim), Levandowski will hold said funds subject to all of Uber's rights, remedies and interests in said funds, to the extent of the Excluded Claim." Uber denies the remaining allegations in paragraph 142.

## COUNT I

### (Declaratory Judgment - Waymo Settlement Release)

143.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

144.    On February 8, 2018, Waymo and Uber executed a settlement agreement to resolve Waymo's dispute with Uber.

**ANSWER:**    Uber admits that it entered into a Settlement Agreement as part of the Waymo litigation on February 8, 2018, and respectfully refers the Court to the agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 144.

145.    Upon information and belief, the Waymo Settlement contained broad releases in which Google and Uber released known and unknown claims that have or could be asserted against the other's past and former employees.

**ANSWER:**    Uber denies the allegations in paragraph 145.

146.    Upon information and belief, Mr. Levandowski is a beneficiary of the releases in the Waymo Settlement as he is a former employee of Google.

**ANSWER:**    Uber denies the allegations of paragraph 146.

147.    Upon information and belief, Google excluded from its release the arbitration claims against Mr. Levandowski and Uber did not exclude any claims against Mr. Levandowski in its release.

**ANSWER:**    Uber denies the allegations in paragraph 147.

148.    Upon information and belief, all of the claims in the Proof of Claim, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, were released by Uber in the Waymo Settlement.

**ANSWER:**    Uber denies the allegations in paragraph 148.

149.    As a result of the Proof of Claim and Mr. Levandowski's objection thereto, a live controversy exists as to whether Uber released Mr. Levandowski in the Waymo Settlement and, if so, what claims Uber released.

**ANSWER:** Uber denies the allegations in paragraph 149.

150. This issue is ripe for determination and requires a declaration as to Mr. Levandowski's rights in the Waymo Settlement.

**ANSWER:** Uber denies the allegations in paragraph 150.

151. Mr. Levandowski seeks a declaration that the claims in the Proof of Claim, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, are barred by the Waymo Settlement.

**ANSWER:** Paragraph 151 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 151.

## COUNT II

### (Specific Performance to Pay Current Expenses)

152. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

153. On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2.

**ANSWER:** Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016, and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 153.

154. Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer. Ex. A at § 2.1(a).

**ANSWER:** Uber admits that the language quoted in paragraph 154 appears in Section 2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 154. Answering further, the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's affirmative defenses and counterclaims, including, but not limited to, that the award was based upon felonious conduct, including conduct in violation of California Penal Code Section 502, that the award arises out of one or more Excluded Claims, that the award is not indemnifiable as a matter of policy and contract because it orders the disgorgement of monies to which Levandowski was not entitled, that the Indemnification Agreement was rescinded, and that Uber has no indemnification obligations due to Levandowski's commission of a Post-Signing Specified Bad Act.

155. As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id.* at 3.

**ANSWER:** Uber admits that page 3 of the Indemnification Agreement contains an Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 155.

156. Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within a set period following a request for advancement.

**ANSWER:** Uber admits that Section 2.3 of the Indemnification Agreement provides provisions related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 156.

157. On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

**ANSWER:** Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 157.

158. Uber has refused to advance payment for the Expenses requested in the March 6 Request

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

**ANSWER:** Uber admits that it has not advanced payment to Levandowski pursuant to Levandowski's March 6, 2020 request for advancement of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies that Levandowski is entitled to indemnification or any payment of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies the remaining allegations in paragraph 158.

159.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 159.

160.    In the Indemnification Agreement, Uber agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id.* at § 3.11. Uber also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

**ANSWER:** Uber denies the characterization that Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy and respectfully refers the Court to the Indemnification Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 160.

161.    Moreover, Mr. Levandowski will be irreparably harmed by Uber's continued breach of the Indemnification Agreement as he may no longer be able to pay for his defense and pursue his appeal against Google. As the parties agreed, no dispute with Uber regarding reimbursement of payments made under the Indemnification Agreement could occur until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred. Uber's breach has materially altered Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

**ANSWER:** Uber denies the allegations in paragraph 161.

162.    Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id.* § 3.5.

**ANSWER:** Uber admits that the Indemnification Agreement contains a provision called "Applicable Law" at Section 3.5 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 162.

163.    The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

Case: 20-03050    Doc# 4298-2    Filed 09/21/23    Entered 09/21/23 16:10:35    Page 45 of
153 of 555

**ANSWER:**    Uber denies the allegations in paragraph 163.

164.    A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

**ANSWER:**    Paragraph 164 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 164. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

165.    The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

**ANSWER:**    Uber denies the allegations in paragraph 165.

166.    Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber advance payment for the Expenses requested on March 6, 2020 as well as payment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far.

**ANSWER:**    Uber denies the allegations in paragraph 166.

## COUNT III

### (Specific Performance to Continue to Pay Expenses)

167.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

168.    On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

46

resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2

**ANSWER:** Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 168. Answering further, the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's affirmative defenses and counterclaims, including, but not limited to, that the award was based upon felonious conduct, including conduct in violation of California Penal Code Section 502, that the award arises out of one or more Excluded Claims, that the award is not indemnifiable as a matter of policy and contract because it orders the disgorgement of monies to which Levandowski was not entitled, that the Indemnification Agreement was rescinded, and that Uber has no indemnification obligations due to Levandowski's commission of a Post-Signing Specified Bad Act.

169. Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer. Ex. A at § 2.1(a).

**ANSWER:** Uber admits that the language quoted in paragraph 169 appears in Section 2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 169.

170. As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id.* at 3.

**ANSWER:** Uber admits that page 3 of the Indemnification Agreement contains an Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 170.

171. Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within fifteen Business Days of a request for advancement.

**ANSWER:** Uber admits that Section 2.3 of the Indemnification Agreement provides provisions related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 171.

172. On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

**ANSWER:** Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 172.

173. Uber has refused to advance payment for the Expenses requested in the March 6 Request.

**ANSWER:** Uber admits that it has not advanced payment to Levandowski pursuant to Levandowski's March 6, 2020 request for advancement of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies that Levandowski is entitled to indemnification or any payment of Expenses pursuant to Section 2.3 of the Indemnification Agreement. Uber denies the remaining allegations in paragraph 173.

174. Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 174.

175. The Parties agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id.* at § 3.11. The parties also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

**ANSWER:** Uber denies the characterization that Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy and respectfully refers the Court to the Indemnification Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 175.

176. Moreover, Mr. Levandowski will be irreparably harmed by Uber's continued breach of the Indemnification Agreement as he may no longer be able to pay for his defense and pursue his appeal against Google. As the parties agreed, no dispute with Uber regarding reimbursement of payments made

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

under the Indemnification Agreement could occur until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred. Uber's breach has materially altered Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

**ANSWER:** Uber denies the allegations in paragraph 176.

177. Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id. § 3.5.*

**ANSWER:** Uber admits that the Indemnification Agreement contains a provision called "Applicable Law" at Section 3.5 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 177.

178. The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

**ANSWER:** Uber denies the allegations in paragraph 178.

179. A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim in arbitration following final resolution of the Google matter.

**ANSWER:** Paragraph 179 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 179. Answering further, on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

180. The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

**ANSWER:** Uber denies the allegations in paragraph 180.

181. Google's claims are not yet resolved as Mr. Levandowski intends to appeal the judgment and there has been no settlement of Google's claims.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

49

**ANSWER:** Paragraph 181 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 181. Answering further, Uber states that on July 29, 2020, this Court entered a stipulation whereby "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the *Google v. Levandowski* arbitration award." (Case No. 20-03050, Dkt. 13.)

182. Therefore, Mr. Levandowski seeks to enforce by this action precisely the terms Uber agreed to in the Indemnification Agreement—that Uber advance any Expenses incurred by Mr. Levandowski within fifteen Business Days of a request for advancement under Section 2.3 until Google's claims are resolved either by binding judgment or settlement.

**ANSWER:** Uber denies the allegations in paragraph 182.

### COUNT IV

### (Declaratory Judgment — Uber's Rescission Claim)

183. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

184. In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242 and that Levandowski named Uber as a creditor. Uber admits that the Indemnification Agreement has been rescinded. Uber denies the remaining allegations in paragraph 184.

185. In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

**ANSWER:** Uber admits that the Indemnification Agreement has been rescinded. Uber admits it has not made payments to Levandowski since September 25, 2019, but denies the characterization that

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

50

the Expenses are due. Uber denies that Levandowski is entitled to any indemnification or the payment of any Expenses for multiple reasons, including, but not limited to, the rescission of the Indemnification Agreement. Uber denies the remaining allegations in paragraph 185.

186.    Mr. Levandowski contends that Uber's rescission claim is barred by its unreasonable delay in rescinding the Indemnification Agreement, failure to return consideration provided, and actions by Uber that are inconsistent with a claim for rescission as described hereinabove.

**ANSWER:**    Uber denies the allegations in paragraph 186.

187.    Uber has not returned any consideration it received under the Indemnity Agreement, including Mr. Levandowski's devices, which it continues to retain through Stroz, as well as the consideration received under the full transaction for the Otto acquisition. Such failure is fatal to any rescission claim, especially where, as here, Uber's refusal or inability to return the consideration it received is due to its delay in exercising any purported right to rescission.

**ANSWER:**    Uber admits that Levandowski provided a number of devices to Stroz. Upon information and belief, Uber admits that Stroz is still in possession of some or all of those devices. Uber denies that it was or is in possession of Levandowski's devices. Uber denies that it received any consideration under the Indemnification Agreement. Uber denies the remaining allegations in paragraph 187.

188.    To the extent that Uber's ability to return the consideration received is impossible, this impossibility is due to Uber's delay in exercising the purported rescission after it controlled Mr. Levandowski's defense and settlement ability for years and benefited from Mr. Levandowski's cooperation with his defense and Uber's defense in the Waymo action.

**ANSWER:**    Uber denies the allegations in paragraph 188.

189.    Uber has also ratified any purported fraud and acted in ways inconsistent with rescission, including by affirming its obligations under the Indemnification Agreement in its public filings.

**ANSWER:**    Uber denies the allegations in paragraph 189.

190.    Uber's performance under the Indemnification Agreement for years and belated rescission of that agreement has substantially prejudiced Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 190.

191.    As a result of the acts described herein, a live controversy exists as to whether Uber has a right to rescind and whether its purported rescission is effective.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

51

**ANSWER:** Uber denies the allegations in paragraph 191.

192. This issue is ripe for determination and requires a declaration as to Uber's right to rescind the Indemnification Agreement and whether Uber is a proper creditor in the Chapter 11 Case.

**ANSWER:** Uber denies the allegations in paragraph 192.

193. Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 193.

## <u>COUNT V</u>

### (Breach of Otto Trucking Agreement)

194. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

195. In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business. Uber agreed to this condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

**ANSWER:** Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed and respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 195. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and that the Otto Trucking Agreement was terminated on August 5, 2018.

196. Under the Otto Trucking Agreement, Uber received an option to acquire Otto Trucking.

**ANSWER:** Uber admits that the Otto Trucking Agreement contained a provision for a Call Option Period granting Uber a "right, but in no circumstances the obligation" to acquire Otto Trucking. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 196.

Case: 20-03050    Doc# 45    Filed 08/21/20    Entered 08/21/20 12:36:05    Page 52 of
160

197.    Uber closed on its acquisition of Otto on August 18, 2016. The effect of the acquisition of Otto obligated Uber to support Mr. Levandowski's trucking business as the only scenario where Uber could walk away from Otto Trucking was if Uber did not acquire Otto.

**ANSWER:**    Uber admits that it closed on the acquisition of Otto in August 2016. Uber denies the remaining allegations in paragraph 197. Answering further, Uber states that the conditions precedent to Uber's obligation to support a separate trucking business were not met.

198.    In late November 2017, at the close of the Call Option Period, Uber exercised its right to acquire Otto Trucking by providing notice of its decision.

**ANSWER:**    Uber admits that in November 2017, it provided notice to Otto Trucking that it would exercise its option under the Otto Trucking Agreement. Uber denies the remaining allegations in paragraph 198.

199.    Following exercise of its option, Uber was obligated to use "commercially reasonable efforts" to close on the Otto Trucking merger, which the parties contemplated would take forty-five days.

**ANSWER:**    Uber admits that the language quoted in paragraph 199 appeared in the Otto Trucking Agreement. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 199.

200.    At closing of the Otto Trucking acquisition, Otto Trucking was supposed to merge with Uber and the interests of the members of Otto Trucking would be converted to interest in an Uber earnout plan that gave the Otto Trucking members a percent interest of billions in profit for Uber's new trucking business.

**ANSWER:**    Uber admits that the Otto Trucking Agreement contemplated a merger with Uber. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 200.  Answering further, Uber states that the conditions precedent to Uber's obligation to perform were not met, and that the Otto Trucking Agreement was terminated and replaced with a  new Otto Trucking Merger Agreement ("New Otto Trucking Agreement") dated August 5, 2018.  Uber further states that Levandowski was not a member of Otto Trucking at the time that the Otto Trucking acquisition closed.

201.    Mr. Levandowski and Mr. Ron were also supposed to lead the trucking business with Mr. Levandowski appointed as "non-executive Chairman" who could only be removed for Cause. Uber also promised that Mr. Levandowski and Mr. Ron would be the top executives of the trucking business.

**ANSWER:**     Uber admits that the Otto Trucking Agreement included a provision related to Post-Closing Operational Covenants of the Parties which discussed the possible roles of Levandowski and Lior Ron, and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 201. Answering further, Uber states that the Otto Trucking Agreement was terminated and replaced with the New Otto Trucking Agreement dated August 5, 2018, which did not contemplate any role for Levandowski, and further states that Levandowski had been terminated for Cause and had sold his interest in Otto Trucking prior to the termination of the Otto Trucking Agreement.

202.    If Uber chose not to acquire Otto Trucking after its acquisition of Otto, Mr. Levandowski was allowed to form a trucking business outside of Uber. Uber was then obligated to provide a license to self-driving technology that Mr. Levandowski could use in the field of trucking in exchange for ownership in the new trucking business (the "IP License").

**ANSWER:**     Uber admits that the Otto Trucking Agreement provided that Levandowski could start a new trucking company if the Otto Trucking Agreement were terminated. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 202. Answering further, the Otto Trucking Agreement was terminated and replaced with the New Otto Trucking Agreement dated August 5, 2018, and that the New Otto Trucking Agreement did not provide for an IP License to Levandowski. Uber further states that Levandowski had sold his interest in Otto Trucking prior to the termination of the Otto Trucking Agreement.

203.    The parties had agreed on a form of the IP License that would give Mr. Levandowski an exclusive license to use Uber's technology in trucking.

**ANSWER:**     Uber admits that the Otto Trucking Agreement contained a provision called "New Trucking Company License" and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 203.

204.    As an exclusive license for use in trucking, Uber was not permitted to use any of its own self-driving technology for trucking.

**ANSWER:**     Uber denies the allegations in paragraph 204.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

205.    In addition, Uber was also prevented from competing with Mr. Levandowski's trucking business as the parties' agreement required Mr. Levandowski to make Uber a member of the LLC he formed for the outside trucking business with no waiver of any statutory fiduciary duties applicable to members.

**ANSWER:**    Uber denies the allegations in paragraph 205.

206.    After exercising its option to acquire Otto Trucking, Uber did not close the acquisition in the required 45-days. It delayed and stalled the closing for nearly nine months.

**ANSWER:**    Uber admits that the acquisition of Otto Trucking, as contemplated by the Otto Trucking Agreement, did not close within 45 days, but denies the characterization that it was obligated to do so. Uber denies the remaining allegations in paragraph 206.

207.    During that time, based on publicly available information, Uber agreed as part of the Waymo Settlement to never re-hire or work with Mr. Levandowski again.

**ANSWER:**    Uber admits that it entered into a Settlement Agreement as part of the Waymo litigation on February 8, 2018, and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 207.

208.    Given Uber's delay, Mr. Levandowski asked that the Otto Trucking Agreement be terminated and that he be allowed to start his outside trucking business with the IP License Uber was obligated to provided. Uber refused to give Mr. Levandowski the IP License.

**ANSWER:**    Uber denies the allegations in paragraph 208. Answering further, Uber states that Levandowski failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski the IP License, and further states that the Otto Trucking Agreement was terminated and replaced with the New Otto Trucking Agreement dated August 5, 2018, and that the New Otto Trucking Agreement did not provide for an IP License to Levandowski..

209**.**    Upon information and belief, because of the Waymo Settlement, Uber stalled the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP License.

**ANSWER:**    Uber admits that it expressed concerns to Levandowski with respect to closing a transaction pursuant to the original Otto Trucking Agreement. Uber denies the remaining allegations in paragraph 209. Answering further, Uber states that it used commercially reasonable efforts to close the

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

Case: 20-03050    Doc# 45-2    Filed: 08/21/20    Entered: 08/21/20 22:36:05    Page 55 of
Case: 20-03042    Doc# 298-2    Filed: 06/11/24    Entered: 06/11/24 14:34:03    Page 55 of
163
106555

Otto Trucking transaction and that the parties to the Otto Trucking Agreement had authority to and did agree to the termination of that Agreement.

210.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

**ANSWER:**    Uber denies the allegations in paragraph 210.

211.    Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount to mitigate the damage caused by Uber's breach.

**ANSWER:**    Uber admits that Levandowski resigned from Otto Trucking and sold his interest in Otto Trucking. Uber denies the remaining allegations in paragraph 211.

212.    Mr. Levandowski is a party to certain provisions of the Otto Trucking Agreement and a beneficiary of other provisions and has the right to enforce that agreement and has no obligations under the Otto Trucking Agreement. To the extent that he has any obligations under that agreement, he has satisfied them.

**ANSWER:**    Uber denies the allegations in paragraph 212.

213.    Uber breached the Otto Trucking Agreement by failing to exercise commercially reasonable efforts to close the Otto Trucking acquisition.

**ANSWER:**    Uber denies the allegations in paragraph 213.

214.    It also breached the Otto Trucking Agreement by failing to appoint Mr. Levandowski non-executive Chairman of the trucking business.

**ANSWER:**    Uber denies the allegations in paragraph 214.

215.    It further breached the Otto Trucking Agreement by refusing to terminate the agreement and give Mr. Levandowski the IP License contemplated by the parties or, in the alternative, to name him a "non-Executive Chairman" and pay him up to approximately, $4.128 billion in earnouts associated with the profits of Uber Freight (the new name of Otto Trucking).

**ANSWER:**    Uber denies the allegations in paragraph 215.

216.    Uber's performance under the Otto Trucking Agreement has not been excused.

**ANSWER:**    Uber denies the allegations in paragraph 216.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

56

217.     As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

**ANSWER:**     Uber denies the allegations in paragraph 217.

## <u>COUNT VI</u>

### (Breach of Covenant of Good Faith and Fair Dealing)

218.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**     Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

219.     In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business. Uber agreed to that condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

**ANSWER:**     Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed and respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 219. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking Agreement was terminated on August 5, 2018.

220.     The Otto Trucking Agreement includes an implied covenant of good faith and fair dealing. The implied covenant ensures that neither party may engage in arbitrary or unreasonable conduct and thereby prevent the other party from receiving the fruits of the bargain.

**ANSWER:**     Paragraph 220 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 220.

221.     The intent of the parties for Mr. Levandowski to be able to continue to pursue the trucking business he left Google to start with Uber's support in exchange for Mr. Levandowski selling Otto to Uber.

**ANSWER:**     Uber denies the allegations in paragraph 221.

222.     This intent is reflected in the Otto Trucking Agreement as the only scenario where Uber could walk away from Otto Trucking and not support Mr. Levandowski's trucking business was if Uber did not acquire Otto.

Case: 20-03050   Doc# 4529-2   Filed: 08/21/24   Entered: 08/21/24 12:36:10   Page 57 of
165

**ANSWER:** Uber denies the allegations in paragraph 222. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking Agreement was terminated on August 5, 2018.

223. After acquiring Otto, Uber had two options for supporting the trucking business. It could acquire Otto Trucking and appoint Mr. Levandowski as the non-executive chairman of that business.

**ANSWER:** Uber denies the allegations in paragraph 223

224. In the alternative, Uber could terminate the acquisition of Otto Trucking, but support an outside trucking venture started by Mr. Levandowski as an investor. Uber was obligated to provide an exclusive license to its self-driving technology for Mr. Levandowski to use in the field of trucking in exchange for membership in Mr. Levandowski's new company. The IP License was an exclusive license for trucking, which barred Uber from competing with Mr. Levandowski's trucking business. Uber's membership interest in Mr. Levandowski's new company also prevented Uber from competing with that business based on the statutory duties owed by members of an LLC.

**ANSWER:** Uber denies the allegations in paragraph 224. Answering further, Uber states that Levandowski failed to satisfy the conditions precedent to Uber's obligation to provide Levandowski the IP License

225. Uber did neither.

**ANSWER:** Uber denies the allegations in paragraph 225.

226. Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was in control of Mr. Levandowski's defense and settlement prospects, and had barred Mr. Levandowski from participating in the settlement discussion or discussing settlement directly with Google.

**ANSWER:** Uber denies the allegations in paragraph 226.

227. Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

**ANSWER:** Uber denies the allegations in paragraph 227. Answering further, Uber states that it used commercially reasonable efforts to close the Otto Trucking transaction and that it expressed concerns with continuing a business relationship with Levandowski because, among other things, Levandowski was terminated from Uber for Cause.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

58

228. Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

**ANSWER:** Uber denies the allegations in paragraph 228.

229. Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

**ANSWER:** Uber admits that Levandowski resigned from Otto Trucking and sold his interest in Otto Trucking. Uber denies the remaining allegations in paragraph 229.

230. Mr. Levandowski is a beneficiary of the Otto Trucking Agreement and has the right to enforce that agreement and has no obligations under the Otto Trucking Agreement. To the extent that he has any obligations under that agreement, he has satisfied them.

**ANSWER:** Uber denies the allegations in paragraph 230.

231. Uber's actions described herein have deprived Mr. Levandowski of the fruits of the bargain, including the agreed-to benefit of running a trucking business with Uber's support.

**ANSWER:** Uber denies the allegations in paragraph 231.

232. By preventing Mr. Levandowski from obtaining the benefits of the Otto Trucking Agreement, Uber has violated the implied covenant of good faith and fair dealing.

**ANSWER:** Uber denies the allegations in paragraph 232.

233. After Mr. Levandowski's forced divestment, Uber acquired Otto Trucking, which became Uber Freight. Uber Freight has reported hundreds of millions in revenue since its creation and Mr. Ron, who heads Uber Freight, stated that he and Uber "think there is a very clear path to profitability."

**ANSWER:** Uber admits that it acquired Otto Trucking and further states that it acquired Otto Trucking pursuant to the New Otto Trucking Agreement dated August 5, 2018. Uber admits that Mr. Ron is head of Uber Freight. Uber admits that in a public statement, Mr. Ron said: "We think there is a very clear path to profitability, but it's important to understand that we are in investment mode." https://finance.yahoo.com/news/uber-freight-to-investors-theres-a-very-clear-path-to-profitability-232536480.html. Uber denies the remaining allegations in paragraph 233.

234. As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

**ANSWER:** Uber denies the allegations in paragraph 234.

## COUNT VII

### (Declaratory Judgment and Damages: Rescission of Otto Transaction)

235.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

236.    In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement. In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242 in response to Levandowski's March 4, 2020 Chapter 11 bankruptcy petition in which Levandowski named Uber as a creditor. Uber further admits that the Indemnification Agreement has been rescinded. Uber respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 236.

237.    Mr. Levandowski denies that Uber has any right to rescission.

**ANSWER:** Uber denies the allegations in paragraph 237. Answering further, Uber states that Levandowski made fraudulent misrepresentations to Uber prior to entering into the Indemnification Agreement regarding whether he had taken any trade secret information from Google and fraudulently concealed facts from Uber such as his involvement in "side projects" including Tyto. Levandowski made these fraudulent representations and engaged in these fraudulent concealments with the intent of deceiving Uber and to induce Uber to enter into the Indemnification Agreement. Levandowski's claims are barred because he fraudulently induced Uber to enter into the Indemnification Agreement, and the Indemnification Agreement is rescinded as a result of that fraudulent inducement.

238.    Alternatively, if the Court determines that Uber has not waived its right to rescission and has in fact rescinded the Indemnification Agreement, the entirety of the Otto transaction must also be rescinded and all consideration Uber received from the Otto transaction must be returned to Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 238.

239.    In agreeing to sell Otto to Uber and lead Uber's self-driving car program, Mr. Levandowski conveyed repeatedly to Uber's representatives that he was concerned that Google would sue him. Because of these concerns, Uber agreed to provided indemnity as key part of the Otto transaction and as an inducement to Mr. Levandowski to sell Otto to Uber. Mr. Levandowski would not have entered into the Otto transaction without the Indemnity Agreement because of his well-founded fear of Google.

**ANSWER:**    Uber admits that, prior to executing the Indemnification Agreement and Otto Agreement, Levandowski and Uber discussed concerns related to Levandowski's former employer, Google, and the prospect that Google may bring litigation against Levandowski. Uber denies the remaining allegations in paragraph 239.

240.    For this reason, on April 11, 2016, executed documents for the acquisition of Otto, including the Indemnification Agreement. All of the agreements executed on April 11, 2016 are one contract that cannot be severed.

**ANSWER:**    Uber denies the allegations in paragraph 240.

241.    Uber's rescission of the Indemnification Agreement necessarily requires rescission of the entire Otto transaction, including returning all consideration related to the transaction, including the intellectual property Uber received from its acquisition of Otto.

**ANSWER:**    Uber denies the allegations in paragraph 241.

242.    As a result of the acts described herein, should the Court determine that Uber may rescind the Indemnification Agreement, a live controversy exists as to whether Uber's rescission, if effective, also rescinds the Otto transaction and requires return of all consideration Uber received from that transaction.

**ANSWER:**    Uber denies the allegations in paragraph 242.

243.    To the extent Uber has effectively rescinded the Indemnification Agreement, this issue is ripe for determination and requires a declaration as to the effect of Uber's purported rescission on the Otto transaction of which it was a necessary and integral part.

**ANSWER:**    Uber denies the allegations in paragraph 243.

244.    Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement without also rescinding the Otto transaction and returning all consideration received from that deal.

**ANSWER:**    Uber denies the allegations in paragraph 244.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

245.     In addition, Mr. Levandowski seeks damages, including any consequential damages, arising out of Uber's rescission of the Otto transaction.

**ANSWER:**     Uber denies the allegations in paragraph 245.

## COUNT VIII

### (Objection to Claim)

246.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**     Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

247.     For the reasons set forth above, the Indemnity Agreement is not subject to rescission and, if it had been, Uber waived its right to assert such remedy.

**ANSWER:**     Uber denies the allegations in paragraph 247.

248.     For the reasons set forth above, Uber is liable under the Indemnity Agreement to advance his Expenses (as defined in the Indemnification Agreement).

**ANSWER:**     Uber denies the allegations in paragraph 248.

249.     For the reasons set forth above, Mr. Levandowski generally denies the evidentiary bases upon which the Proof of Claim is based and specifically denies that (a) Uber was fraudulently induced to enter into the Indemnity Agreement, (b) Mr. Levandowski failed to comply with his obligations under the Indemnity Agreement, and (c) Uber's obligations under the Indemnity Agreement are subject to allocation as asserted in the Proof of Claim, which in any event, cannot be adjudicated until after Uber satisfies its obligations under the Indemnification Agreement.

**ANSWER:**     Uber denies the allegations in paragraph 249.

250.     For the reasons set forth above, any claim for offset or contribution is also undermined by its active participation in the conduct at issue in the Waymo Action and the Google arbitration as it (a) encouraged, if not directed, Mr. Levandowski to recruit Google employees to join Otto and Uber, and (b) knew about Mr. Levandowski's retention of Google information and access of the one file at issue in the plea agreement after he left Google.

**ANSWER:**     Uber denies the allegations in paragraph 250.

251.     For the reasons set forth above, Mr. Levandowski denies that Uber has any right to contribution from Mr. Levandowski for the Waymo settlement. Waymo did not prove that Mr. Levandowski misappropriated any trade secrets in that case. As for the one file that Mr. Levandowski accessed after he left Google, Uber was well aware of that conduct and proceeded to acquire Mr. Levandowski's company and work with him anyway. Moreover, Mr. Levandowski's guilty plea that

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

62

resulted in a total restitution amount of approximately $750,000 further demonstrates the unreasonableness of Uber's decision to settle with Waymo for $245,000,000 in stock, among other consideration. In addition, to the extent that any trade secrets were taken and used at Uber, those trade secrets did not come from Mr. Levandowski, but rather a different former Google employee. Indeed, as admitted in Uber's public statements, Uber's self-driving software—an area that Mr. Levandowski did not work on at Google or Uber—contained problematic functions that will require it to enter into a license agreement with Waymo for use of Waymo's intellectual property. Upon information and belief, the Waymo Settlement, entered into after discovery of possible misconduct relating to Uber's source code, settled issues relating to theft of trade secrets by individuals who are not Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 251.

252.    Mr. Levandowski therefore seeks disallowance in full of the Proof of Claim.

**ANSWER:**    Uber denies the allegations in paragraph 252.

## AFFIRMATIVE AND OTHER DEFENSES

In addition to its answers to the allegations set forth above, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that would otherwise rest with Levandowski, Uber asserts the following affirmative and other defenses to all claims asserted against Uber.

1. **Indemnification For Disgorgement Is Barred By Public Policy**. Levandowski's claim for indemnification of the Salary and Regular Compensation ("Related Compensation"), Chauffeur Bonus, and prejudgment interest associated with the same fails because indemnification for disgorgement is impermissible in California as a matter of public policy. The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, order Levandowski to disgorge payments wrongfully obtained from Google. As a matter of law, the Related Compensation and Chauffeur Bonus never belonged to Levandowski. Under California law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement of monies that did not belong to him, it is void and unenforceable as contrary to public policy and the law. Any amount awarded for prejudgment interest related to an award of disgorgement is likewise unenforceable.

2. **Expenses Reduced By Amounts Paid By Third Party**. Levandowski's claim for indemnification for the Related Compensation, Chauffeur Bonus, and prejudgment interest related to it fails because Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses." The $127 million payment to Levandowski, related to the Related Compensation and Chauffeur Bonus, was a payment by a third party, Google, to Levandowski, an Indemnified Person, upon which Levandowski's claim for indemnification is based. Levandowski is not entitled to indemnification for that amount, or for prejudgment interest related to that amount.

3. **Indemnification For Felonious Activity Is Barred**. Each of Levandowski's claims against Uber under the Indemnification Agreement fails, in whole or in part, because an agreement to indemnify a person against conduct is invalid and void pursuant to California Civil Code § 2774 if the conduct

Case: 20-03050   Doc# 45-2   Filed 06/11/20   Entered 06/11/20 12:36:05   Page 64 of
172

constitutes a felony. Levandowski engaged in felonious activity in connection with the events that led to the Arbitration Award. Levandowski pled guilty to the felony of Theft and Attempted Theft of Trade Secrets for stealing Google trade secrets related to self-driving car technology for use in competing with Google. The indictment recites a course of conduct that substantially overlaps with the conduct that formed the basis of the Arbitration Award. Upon information and belief, Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation information regarding the employees he was soliciting to come to Otto, in violation of California Penal Code Section 502. This conduct also formed the basis of the Arbitration Award. The foregoing may not be an exhaustive list of Levandowski's felonious activity. Levandowski's felonious conduct was an essential part of the conduct that led to the Arbitration Award. As a matter of law and contract, Uber is not required or permitted to indemnify Levandowski for any Expense resulting from or associated with his felonious activity.

4. **Indemnification Agreement Is Null And Void Due To A Post-Signing Specified Bad Act**. Each of Levandowski's claims against Uber under the Indemnification Agreement fails, in whole or in part, because the Agreement is void based upon Levandowski's commission of a Post-Signing Specified Bad Act, as provided in Section 2.1(a) of the Indemnification Agreement. Under Section 2.1(a) of the Indemnification Agreement, the Agreement is null and void as to any employee who commits a Post-Signing Specified Bad Act that was the subject of a Former Employer Claim. The definition of "Post-Signing Specified Bad Act" includes any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer." The definition of Post-Signing Specified Bad Acts also includes the solicitation of employees of a Former Employer without that Former Employer's express written consent. And it includes knowingly permitting others to commit a Post-Signing Specified Bad Act.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

65

Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Google, Waymo, and Tyto were all Former Employers of Levandowski. The amended complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. The Google Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. Both the Google Arbitration and the Waymo litigation were Former Employer Claims within the meaning of the Indemnification Agreement. Levandowski received indemnification of certain legal fees in conjunction with the Google Arbitration. Otto Trucking was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation. Levandowski committed Post-Signing Specified Bad Acts with respect to Google or Waymo as well as with respect to Tyto. To the extent Levandowski retained and/or accessed and/or knowingly permitted others to retain or access confidential documents, confidential information, and trade secrets belonging to Google or Waymo after April 2016, he committed Post-Signing Specified Bad Acts.

In May 2016, Levandowski arranged for Otto, and thus upon closing for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google and Waymo had a claim, without disclosing his involvement in Tyto. Levandowski's fraudulent concealment of his own involvement in Tyto as well as his misconduct between April 11, 2016 and August 2016 caused Uber to acquire patents, trade secrets, and confidential information related to Tyto's LiDAR technology that were purportedly owned by Tyto but as to which, based upon Levandowski's breach of his duty of loyalty, Google and Waymo had a potential claim. Through this Tyto acquisition and Levandowski's concealment of his role in Tyto, after April 11, 2016, Levandowski also solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. On information and belief, Levandowski also permitted others to solicit Google or Waymo employees to join Otto during July 2016, and neither Google nor Waymo provided express written consent for Levandowski to engage in any of this misconduct. Levandowski's misconduct was the subject of multiple Former Employer Claims, including certain claims asserted in the Waymo litigation and claims asserted in the Google Arbitration. The Waymo amended

Case: 20-03050   Doc# 4529-2   Filed: 08/21/20   Entered: 08/21/20 22:36:05   Page 66 of
174

Case: 20-03050   Doc# 4298   Filed: 06/11/20   Entered: 06/11/20 14:34:01   Page 66 of
655

complaint makes allegations at paragraphs 51-54 of Post-Signing Specified Bad Acts, including the hiring of Employees who were not Diligenced Employees, in which Levandowski knowingly participated.

Uber seeks a Final Judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim

5. **Excluded Claims**. Each of Levandowski's claims against Uber under the Indemnification Agreement fails because the Arbitration Award is attributable, in whole or in part, to an Excluded Claim. Section 2.1(b)(ii) of the Indemnification Agreement provides that Uber shall have no obligation to indemnify Levandowski for claims arising from any Pre-Signing Bad Acts that "were not truthfully disclosed by [Levandowski] to the Outside Expert in response to relevant inquiries," or "were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]." The entire Arbitration Award is attributable to Pre-Signing Bad Acts that were not truthfully disclosed by Levandowski to the Outside Expert—including Levandowski's misconduct with respect to Tyto ("Tyto Misconduct"). Among other concealment, when asked about side projects while employed at Google, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list and failed to disclose his involvement with and role in forming Odin Wave/Tyto. Levandowski concealed material and relevant information about Tyto to Stroz in the due diligence materials. Accordingly, the Google claim associated with the Tyto Misconduct is an Excluded Claim.

The Tyto Misconduct occurred throughout the entire period that the Chauffeur Bonus was vesting and was the predominant cause of Levandowski receiving the Related Compensation and the Chauffeur Bonus to which he was not entitled. The Tyto Misconduct was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Related Compensation and Chauffeur Bonus.

Additionally, Levandowski did not disclose truthfully to Uber the other Pre-Signing Bad Acts that formed the basis of the Arbitration Award, including the full extent of the Otto Misconduct. Thus, the entire Arbitration Award is attributable to an Excluded Claim, and Uber has no obligation to indemnify Levandowski for that Award. In the alternative, at least 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring.

6.   **Material Breach Of Contract By Levandowski**. Each of Levandowski's claims under the Indemnification Agreement fails, in whole or in part, because Levandowski materially breached the Indemnification Agreement, thereby relieving Uber from its obligation to perform thereunder, and/or entitling Uber to a setoff and/or recoupment for the amounts paid or advanced to Levandowski for Expenses. Section 2.2(c) of the Indemnification Agreement provided that Uber had the right to direct and control the defense of any Former Employer Claims (including Google's arbitration claims), required Levandowski to cooperate in that defense, and required Levandowski to appear and give testimony at Uber's reasonable request. Levandowski refused to cooperate, did not permit Uber to control the defense, and refused to appear and testify at deposition despite Uber's reasonable request, instead broadly invoking the Fifth Amendment in response to all questions posed. This had the effect of also precluding any testimony by Levandowski at the arbitration hearing. Levandowski's failure to testify denied Uber its primary bargained-for-consideration under that agreement. If Levandowski's contention that his testimony would have made a difference is correct, then Levandowski materially breached the terms of the Indemnification Agreement by reason of his refusal to testify. In light of Levandowski's material breach of the Indemnification Agreement, Uber is not obligated to perform under the Indemnification Agreement.

7.   **Fraudulent Inducement**. Each of Levandowski's claims against Uber, including for specific performance and indemnification, fails because Levandowski fraudulently induced Uber to sign the Indemnification Agreement by, among other misrepresentations and omissions, concealing from Uber and Stroz his involvement in Tyto and misrepresenting to Uber that he had not taken confidential information or trade secrets from Google when, in fact, he had stolen at least one Google trade secret with the intention of using it at Uber. On April 11, 2016, Levandowski signed a written attestation stating that,

"subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list.

Levandowski also represented during the Stroz interview that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession were there unintentionally, including tools, Drobo 5D disks and company emails on his personal laptop, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski thus represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

All of these representations were false. Contrary to his attestation and his representations during the Stroz interview, Google was not aware of and did not approve of Levandowski's involvement in the Odin Wave/Tyto side project, and Levandowski did not comply with his agreements with Google—as determined by the award in the Google Arbitration. Contrary to his attestations and his statements during the Stroz interviews, Levandowski did intentionally take Google confidential information with the intention of using it at Uber—as determined by his guilty plea to the crime of Theft and Attempted Theft of Trade Secrets. This is not an exhaustive list of Levandowski's misrepresentations and omissions; Uber's investigation continues.

Case: 20-03050   Doc# 4298-2   Filed: 06/11/24   Entered: 06/11/24 14:36:05   Page 69 of
177

Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement. Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending the Waymo litigation and advancing Levandowski's defense costs in the Google Arbitration. Due to his fraudulent inducement, Levandowski is not entitled to enforce the Indemnification Agreement.

8. **Unclean Hands**. Each of Levandowski's claims against Uber is barred by the doctrine of unclean hands. Levandowski engaged in wrongful conduct including but not limited to the following: fraudulently inducing Uber to indemnify Levandowski without disclosing that he had stolen one or more trade secrets from Google with the intent to use them at Uber; fraudulently misrepresenting to Uber that he had not intentionally taken any Google confidential information and did not intend to use any Google confidential information at Uber; fraudulently misrepresenting to Uber that he had not violated any of his agreements with or obligations to Uber; fraudulently concealing from Uber his involvement in Odin Wave/Tyto; committing one or more felonies by stealing one or more trade secrets from Google and wrongfully accessing and taking compensation information from Google in order to solicit Google employees; and wrongfully obtaining a bonus of over $100 million from Google. Because of this and other wrongful conduct, Levandowski is barred by the doctrine of unclean hands from seeking any indemnification or damages of any kind, or seeking to hold Uber liable in any manner, in connection with any of the events at issue in this action, the Waymo litigation, the Google Arbitration, or the criminal action.

9. **Reimbursement For Amounts Paid Into Estate For Excluded Claims**. To the extent that Uber is required to pay into Levandowski's estate any indemnification amounts that are attributable to any Excluded Claim, Uber is entitled to reimbursement of those amounts. In addition, Uber is entitled to reimbursement for all defense costs already advanced that are allocable to any Excluded Claim.

10. **Setoff and Recoupment**. To the extent Uber is determined to have any indemnification obligation to Levandowski or to bear any other liability to Levandowski, which Uber expressly denies, Uber is entitled to an offset, reduction, or credit, and/or recoupment, for each of the following:

a. Compensatory and consequential damages for Levandowski's fraudulent conduct including but not limited to fraudulent inducement. Levandowski fraudulently induced Uber to indemnify Levandowski. As a result of that agreement, Uber was required to defend against, and ultimately settle, litigation brought by Google's subsidiary Waymo, premised on Uber's alleged infringement of Google trade secrets and concealed involvement with Tyto and the development of its LiDAR technology. But for Levandowski's fraud, Uber would not have hired him and would not have been sued by Waymo, and relatedly would not have been required to provide hundreds of millions of dollars of value to settle the Waymo litigation. Accordingly, and as more fully set forth in Uber's counterclaims, Uber is entitled to compensatory and consequential damages in the amount of the defense costs and settlement value it provided in the Waymo litigation.

b. Contribution from Levandowski for the value provided by Uber to settle the Waymo litigation based upon Levandowski's fault in causing Uber to incur potential liability to Waymo in connection with those claims.

c. Compensatory and/or rescissory damages in the amounts advanced to Levandowski to cover defense costs in the Google Arbitration. Levandowski materially breached the Indemnification Agreement by refusing to testify in the Google Arbitration. Levandowski also fraudulently induced Uber to enter into the Indemnification Agreement. Whether under a rescission or breach of contract theory, Uber is entitled to damages in the amount it paid under the Indemnification Agreement for Levandowski's defense of the Google Arbitration.

d. Contribution for at least 50% of the approximately $9.5 million that Uber paid to indemnify Lior Ron for the portion of the Arbitration Award that was "joint and several" as between Levandowski and Ron.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

71

e.   The amount of the Arbitration Award that is allocable to Excluded Claims.

f.   Reimbursement for all attorneys' fees and other costs allocable to Excluded Claims.

11.   **Contract Termination**. Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because the agreement on which these claims are based was properly terminated, along with any rights, if any, Levandowski had thereunder. Levandowski's Otto Trucking claims stem from an April 11, 2016 Otto Trucking Agreement. The Otto Trucking Agreement was executed between Uber and Otto Trucking, and Levandowski was a party only to sections 5.4 and 5.11 of the agreement. The Agreement was terminated in its entirety, and with specific reference to sections 5.4 and 5.11. Levandowski's assent was not required to effectuate this termination. *See* April 11, 2016 Otto Trucking Agreement § 8.1 ("Notwithstanding anything to the contrary herein, this Agreement may be terminated, and the Merger may be abandoned, prior to the Effective Time . . . by mutual written consent of Purchaser [Uber] and the Company [Otto Trucking] . . . ."). Accordingly, Levandowski has no rights to enforce that Agreement.

12.   **Excused Performance/Conditions Precedent Not Satisfied.**

Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because two conditions precedent to Uber's obligation were not satisfied.

Section 6 of the Otto Trucking Agreement provided that: "[t]he obligations of Parent, Purchaser and Merger Sub to effect the Merger and otherwise consummate the transactions contemplated by this Agreement are subject to the satisfaction (or, to the extent permitted, waiver by Purchaser), at or prior to the Closing, of each of the following conditions." *See* April 11, 2016 Otto Trucking Agreement. The Otto Trucking Agreement then listed, among the conditions:

**6.6 No Litigation.** There shall not be pending or threatened in writing before any court of competent jurisdiction or other Governmental Body . . . (b) any material Proceeding that relates to or arises out of any Company Intellectual Property (including the claims of infringement or misappropriation of any Intellectual Property of any third party or any claims seeking to prohibit or otherwise limit the use of any Company Intellectual Property by the Company)[.]

**6.8 No Post-Signing Specified Bad Acts**. No Post-Signing Specified Bad Act of a Diligenced Employee shall have been committed by or on behalf of the Company by a

Case: 20-03050   Doc# 452-2   Filed: 06/21/21   Entered: 06/21/21 12:36:45   Page 72 of
180

Diligenced Employee and/or shall have been committed by a Diligenced Employee. The determination of whether any such Post-Signing Specified Bad Act has been committed shall be determined solely by either (i) the mutual written agreement of the Company and Purchaser or (ii) a Final Judgment.

*Id.*

The Waymo litigation and the Google Arbitration proceedings were both a material Proceeding related to the Company's intellectual property within the meaning of Section 6.6(b). In addition, Levandowski committed one or more Post-Signing Specified Bad Acts within the meaning of Section 6.8. Accordingly, two conditions precedent to Uber's obligation to perform were not satisfied and therefore Uber was not obligated to perform under the Agreement.

13.     **Prevention of Performance.**   Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because Uber was prevented, or in the alternative, discharged, from any contractual obligations it had to Levandowski in connection with these claims. Levandowski's rights, if any, under the Otto Trucking Agreement, were based on the interest he owned in Otto Trucking. *See* April 11, 2016 Otto Trucking Agreement §§ 5.4, 5.11. Levandowski sold his interest in Otto Trucking on August 1, 2018. Levandowski's act of selling his interest in Otto Trucking prevented, or in the alternative, discharged, any obligation on the part of Uber to Levandowski in connection with the Otto Trucking Agreement.

14.     **Equitable Estoppel**. Levandowski's claims against Uber for breach of the Otto Trucking Agreement and breach of the covenant of good faith and fair dealing fail, in whole or part, because Levandowski is equitably estopped from asserting any rights he had, if any, pursuant to the Otto Trucking Agreement. Levandowski's rights, if any, under the Otto Trucking Agreement were based on the interest he owned in Otto Trucking. *See* April 11, 2016 Otto Trucking Agreement §§ 5.4, 5.11. Levandowski sold his interest in Otto Trucking on August 1, 2018. Levandowski's sale of his interest in Otto Trucking was an act inconsistent with any intention to assert any rights Levandowski may have had under the Otto Trucking Agreement. Uber justifiably relied on this conduct to its detriment. Accordingly, Levandowski is equitably estopped from now asserting any rights, if any, under the Otto Trucking Agreement.

15.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████

16. ███████████████████████████████████████████████

17. **Reservation of Additional Defenses Based Upon Full Text of Arbitration Award And Full Arbitration Record**. As of the date of this Amended Answer, Uber still has not been provided a full, un-redacted copy of the Arbitration Award for which Levandowski seeks indemnification, or the record supporting that award. Uber has requested the production of the complete, un-redacted Award and the full arbitration record from both Levandowski and Intervenor Google. Uber reserves the right to assert additional defenses and affirmative defenses based upon the content of the un-redacted Arbitration Award and the arbitration record.

## **PRAYER FOR RELIEF**

WHEREFORE, Uber requests that this Court enter judgment in its favor and against Levandowski on each Count of the Adversary Complaint, and that the Court award Uber its costs, including attorneys' fees, for defending this action.

# COUNTERCLAIMS[2]

Uber Technologies, Inc. ("Uber"), by and through its attorneys, alleges as follows in connection with its counterclaims against Anthony Levandowski:

## THE PARTIES

1.      Defendant Uber is a Delaware corporation with its principal place of business in San Francisco, California.

2.      Plaintiff Anthony Levandowski is an individual who resides in Sausalito, California.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over Uber's Counterclaims, pursuant to 28 U.S.C. § 1334(b), because the Counterclaims arise in and relate to the Chapter 11 bankruptcy case that Levandowski filed on March 4, 2020, in the United States Bankruptcy Court for the Northern District of California, Bankruptcy Petition No. 20-30242.

4.      Uber's Counterclaims seeking a declaration that its claims are non-dischargeable are denominated as core proceedings under 28 U.S.C. § 157(b)(2)(B) and (I). Pursuant to Local Bankruptcy Rule 7012-1, Uber consents to the entry of final orders or judgments by the Bankruptcy Court.

5.      Venue is proper before the Court pursuant to 28 U.S.C. § 1409(a), and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court.

## FACTS

6.      Uber incorporates paragraphs 1–252 of its Answer and Affirmative Defenses 1-14 as though fully set forth herein.

7.      Prior to January 27, 2016, Levandowski was an employee at Google, working on Google's self-driving car project. While Levandowski was at Google, that project was operated as a division within

---

[2] As of the date of this Amended Answer, Uber still has not been provided a full, un-redacted copy of the Arbitration Award for which Levandowski seeks indemnification, or the record supporting that award. Uber has requested the production of the complete, un-redacted Award and the full arbitration record from both Levandowski and Intervenor Google. Uber reserves the rights to assert additional defenses and affirmative defenses based upon the content of the un-redacted Arbitration Award and the arbitration record.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

Google called "Project Chauffeur." In 2016, this project was referred to and established under the name of Waymo.

8.     By February 22, 2016, Uber and Levandowski had entered into a non-binding term sheet for Uber's acquisition of Ottomotto LLC ("Otto"). Prior to agreeing to the transaction, Uber and Otto, through their outside lawyers, hired a third-party forensic investigator, Stroz Friedberg ("Stroz") to gather facts and documents to confirm and ensure that Levandowski and others did not bring any proprietary or confidential Google material to Otto, and would not bring any such information to Uber.

9.     In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

10.     During his interview with Stroz on March 22 and 23, 2016, Stroz asked Levandowski if he had been involved in any "side projects" during his employment at Google. Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but did not disclose a side business called Tyto LiDAR ("Tyto), which was a company that Levandowski created beginning in 2012, while working at Google, that was originally called Odin Wave. Levandowski had been the owner, investor, and adviser of Tyto and was the "control person" at Tyto.

11.     Levandowski actively concealed from Uber that he had any role at Tyto.  Levandowski arranged for Uber to acquire the assets of Tyto through a sale of those assets in May 2016 to Otto, which Uber had agreed to acquire. Unknown to Uber, Google and Waymo had claims to Tyto's LiDAR technology including because Levandowski was concurrently employed by Google and Waymo to develop the same type of LiDAR technology and because Levandowski concealed his involvement in Tyto from Google and Waymo. By arranging for Uber to acquire the Tyto assets and employ persons employed by Tyto, Levandowski fraudulently exposed Uber to substantial claims by Google and Waymo.

12.     Levandowski also represented during the Stroz interview that the Google information that was found on his devices and accounts "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his

Case: 20-03050   Doc# 4298-2   Filed: 06/21/24   Entered: 06/21/24 23:10:35   Page 76 of
184

possession were there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

13. As part of Stroz's due diligence, on April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or other obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

14. Levandowski did not disclose to Stroz that since 2012, and while working at Google, he was the control person of Tyto and did not disclose Google's potential claim to ownership of Tyto trade secrets and patents related to LiDAR technology.

15. Additionally, contrary to his attestations, his statements during the Stroz interviews and his multiple representations to Uber, Levandowski had intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets after leaving Google. Levandowski never disclosed this fact to Uber. To the contrary, Levandowski consistently assured Uber that he would not bring any confidential Google information to Uber.

16. Uber relied on Levandowski's assurances when it entered into an Indemnification Agreement with him on April 11, 2016.

17. Levandowski fraudulently induced Uber into executing the Indemnification Agreement. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

18. At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google, other than as expressly and fully disclosed to Stroz.

19. If Uber had known Levandowski had been involved with the Tyto business, had misappropriated Google trade secrets, had breached his fiduciary duties to Google, had committed felonious misconduct, or had lied to Stroz, Uber would not have executed the Indemnification Agreement in April 2016 and it would not have completed the Otto acquisition in August 2016.

20. Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, and owed fiduciary duties to Uber.

21. Levandowski committed fraud on Uber while acting in his fiduciary capacity.

22. In October 2016, Google initiated two arbitration proceedings against Levandowski, which were subsequently consolidated. *Google LLC v. Anthony Scott Levandowski and Lior Ron*, JAMS Arbitration Case Reference No. 1100086069 (Consolidated) (the "Google Arbitration"). Levandowski thereafter requested indemnity from Uber pursuant to the Indemnification Agreement.

23. Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending subsequent litigation brought by Google against Uber and Levandowski and advancing Levandowski's defense costs in the Google Arbitration.

24. On August 15, 2019, a grand jury indicted Levandowski on 33 counts of theft and attempted theft of trade secrets. Levandowski was indicted pursuant to 18 U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843 and 2323, Criminal Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019).

25. The indictment and each count incorporates a course of alleged misconduct that includes Levandowski's involvement with: (a) Project Chauffeur/Waymo; (b) Odin Wave/Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets through at least January 2016.

26. The indictment was not publicly announced until August 27, 2019.

27. Three days after the indictment was made public, Uber notified Levandowski in a letter dated August 30, 2019, that the Indemnification Agreement was rescinded based on Levandowski's

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

78

fraudulent inducement. Uber's August 30, 2019 letter also explained that even if the Indemnification Agreement were not rescinded, Levandowski would have no right to enforce it because (a) he had committed a "Post-Signing Specified Bad Act," which was defined in the Agreement to include "retaining, not returning . . . or possessing" confidential information from a former employer, and which rendered any indemnification obligation to Levandowski "null and void" under the Agreement's plain terms, and (b) Levandowski had materially breached the Agreement by refusing to testify and failing to cooperate in the Google Arbitration. Uber also explained that Google's claims related to Levandowski's Tyto conduct were Excluded Claims.

28. Uber reiterated its rescission of the Indemnification Agreement in letters dated September 11, 2019, September 27, 2019, December 31, 2019, and March 27, 2020.

29. On December 6, 2019, the Google Arbitration Panel issued a final award against Levandowski. The amount of the award solely against Levandowski was over $174 million, not including amounts for which he was held jointly and severally liable with co-respondent Lior Ron. As discussed below, a primary component of that award was that Levandowski was obligated to disgorge to Google payments for a $126,544,500.00 bonus tied to Google's Project Chauffeur program ("Chauffeur Bonus") and $767,051.95 in salary and regular compensation ("Related Compensation"), to which he was not entitled, as well as to pay prejudgment interest on the same.

30. On March 4, 2020, the California Superior Court confirmed Google's Final Award against Levandowski, and issued judgment against Levandowski in the amount of $179,047,998.64. The primary component of the judgment was disgorgement of the Chauffeur Bonus and Related Compensation, which were payments that Levandowski was not entitled to receive, together with prejudgment interest on that amount.

31. On March 4, 2020, Levandowski filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

32. On March 19, 2020, federal prosecutors announced that Levandowski had agreed to plead guilty to taking Google trade secret information with the intention of using it for his economic benefit,

including at Uber. Levandowski fraudulently concealed that he had taken trade secret information when he negotiated the Indemnification Agreement.

33.     On August 6, 2020, Levandowski was sentenced to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case").

34.     At the time Uber agreed to indemnify Levandowski, it did not know about Levandowski's involvement and misconduct in forming the Tyto business, that he had stolen trade secrets from and breached his fiduciary duties to Google, that he had lied to Stroz, or that he had committed felonious conduct. Levandowski actively concealed those facts from Uber.

35.     On July 6, 2020, Uber filed a Proof of Claim (Claim 8-1) in Bankruptcy Petition No. 20-30242.

### A.    The Google Arbitration Award

36.     As set forth in the Google Arbitration Award, "Google s[ought] an award that would constitute a disgorgement of compensation that was paid to Respondents during the period of time that they were disloyal."

37.     The Google Arbitration Panel ruled that "Google is entitled to an award that orders Levandowski to disgorge and restore to Google the principal sum of $127,311,551.95" in compensation.

38.     The Google Arbitration Panel also awarded Google "the sum of $45,547,474.64 from Levandowski as pre-award interest on disgorgement damages."

39.     The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge payments wrongfully obtained from Google.

40.     By law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

41.     Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses." The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person. Any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

**B.  The Indemnification Agreement's Post-Signing Specified Bad Acts Provision**

42.     The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

43.     Section 2.1(a) of the Indemnification Agreement provides that if Levandowski committed "a Post-Signing Specified Bad Act" after April 11, 2016, the date the Indemnification Agreement was executed, but before the closing of the Otto acquisition in August 2016, then Uber's indemnification obligation to Levandowski would "become null and void and of no further force and effect and there shall be no liability on the part of" Uber or any of its affiliates to indemnify Levandowski.

44.     The definition of "Post-Signing Specified Bad Act" includes, among other things, any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer." It also includes solicitation of employees of a Former Employer without express written consent of the Former Employer.

45.     Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski.

46.     The amended complaint in *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation") alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. To the extent that Levandowski retained confidential documents, information, and trade secrets belonging to Google or Waymo after April 2016, and/or retained and/or accessed confidential documents, information, and trade secrets that were the subject of the Waymo litigation and that belonged to Tyto after April 2016 without Tyto's express written agreement, or to the extent that he knowingly permitted others to do so, his doing so was a Post-Signing Specified Bad Act.

47.     In May 2016, Levandowski arranged for Otto and thus Uber to acquire Tyto without disclosing his interest in it, and thereby caused Otto and Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that belonged to Tyto and as to which, based upon Levandowski's breach of his duty of loyalty, Waymo or Google had a claim. Through this acquisition and his concealment of his role in Tyto, Levandowski solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this conduct.

48.     With respect to Tyto, Levandowski concealed from Uber his role in Tyto and did not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of Levandowski's misconduct that was the subject of a Former Employer Claim, including claims asserted in the Waymo litigation. Upon information and belief, Levandowski committed other Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, including the Google Arbitration.

Case: 20-03050   Doc# 4298-2   Filed: 06/21/24   Entered: 06/21/24 14:16:35   Page 82 of
190
Case: 20-03050   Doc# 4529   Filed: 00/21/24   Entered: 00/21/24 23:10:05   Page 82 of
106
555

49.     As but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

**C.  The Indemnification Agreement's Excluded Claims Provision**

50.     Section 2.1(b)(ii) of the Indemnification Agreement provides that an Indemnified Claim shall not include, and that Uber shall not have "any obligation" to indemnity for, an "Excluded Claim." An Excluded Claim is any claim arising out of actions that "either (A) were not truthfully disclosed by [Levandowski] to [Stroz] in response to relevant inquiries in connection with the due diligence performed by [Stroz] or (B) were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]."

51.     In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

52.     Levandowski did not disclose his work on Tyto to Stroz. During those interviews, Stroz expressly asked Levandowski to identify all of the side projects he had worked on while employed at Google. Levandowski concealed from Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, and that he had been the owner, investor, and adviser of the company.

53.     Stroz's report to Uber lists all of the side projects that Levandowski disclosed to Stroz. The list does not include any reference to Tyto or to any entity involved in the development of LiDAR technology.

54.     Levandowski failed to disclose to Stroz his involvement with Tyto. Uber was not aware that Levandowski had any involvement with Tyto or had worked on Tyto as a side project while at Google at the time the Indemnification Agreement was signed.

55.     The Google Arbitration Panel found that Google's claims against Levandowski included misconduct attributed to Tyto and Otto.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

56.     The Google Arbitration Panel found that, during his employment at Google, Levandowski was secretly setting up a series of trusts and LLCs that resulted in him owning and controlling the company that was ultimately known as Tyto. The Google Arbitration Panel found that Levandowski breached his duty of loyalty to Google by setting up Tyto to develop technology that was competitive with Google's self-driving car efforts. Levandowski's misconduct related to Tyto began prior to October 2012 and continued through January 2016 when Levandowski left Google (the "Tyto Misconduct"). Thereafter, on information and belief, Levandowski committed additional Post-Signing Specified Bad Acts related to Tyto by accessing and transferring Tyto trade secrets, patents, and confidential information, as well as by soliciting Tyto employees, without Tyto's express consent.

57.     The Google Arbitration Panel also found that Levandowski engaged in misconduct by setting up an entity that later became known as Otto. Levandowski's misconduct related to Otto began in August 2015 at the earliest, and continued until January 2016 when Levandowski left Google (the "Otto Misconduct").

58.     Levandowski was part of the program known as Project Chauffeur while employed by Google. Levandowski participated in the Chauffeur Bonus Plan. He also received Related Compensation.

59.     The Google Arbitration Panel entered an award against Levandowski requiring disgorgement of the compensation he earned during the period of disloyalty when he was engaged in conduct related to Tyto and Otto. The largest portion of the award was $126,544,000.00 in Chauffeur Bonus payments and $751,051.95 in Related Compensation, as well as prejudgment interest on those amounts of $45,547,474.64.

60.     As part of the Chauffeur Bonus Plan, Levandowski's interest vested in 25% annual increments each year from October 2012 to October 2015. By the time Levandowski began his Otto Misconduct in 2015, he had already accrued a right to at least 75% of his Chauffeur Bonus. Levandowski's Tyto Misconduct continued from October 2012 through the termination of his employment.

61.     The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation. Had Levandowski not been

Case: 20-03050    Doc# 4529-2   Filed 06/21/24   Entered 06/21/24 23:10:55   Page 7
of 192 of 555

paid a bonus for the period of the Tyto Misconduct, he would not have received even a penny of the Chauffeur Bonus. Levandowski's concealment of the Tyto Misconduct is the primary cause of his receipt of the bonus and the primary reason for the disgorgement of that bonus and obligation to pay prejudgment interest on the same.

62.     The Tyto Misconduct is an Excluded Claim. During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

63.     The Otto Misconduct is also an Excluded Claim because Levandowski failed to disclose fully the extent or nature of that misconduct.

64.     Levandowski's claims are barred because the predominant cause of the misconduct is based on Excluded Claims under the plain terms of the Indemnification Agreement.

65.     In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring. Therefore, at a minimum, 75% or more of the Chauffeur Bonus and Related Compensation (and prejudgment interest thereon) is allocable to Excluded Claims for which Uber has no obligation to indemnify Levandowski under any circumstances.

**D. Levandowski's Refusal to Testify in the Google Arbitration was a Material Breach of the Indemnification Agreement**

66.     The Indemnification Agreement provides that in the event that a claim is brought against Levandowksi by a former employer, Uber "shall direct and control the defense or settlement of the Former Employer Claim."

67.     Section 2.2(c) of the Indemnification Agreement further states:

> The Indemnified Person(s) party to such Former Employer Claim (i) shall furnish Purchaser and its Representatives with such information as such Indemnified Person(s) may have with respect to such Former Employer Claim . . . , (ii) shall provide to Purchaser and its Representatives any

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

85

documents or other materials . . . that may be necessary or useful to the defense of such Former Employer Claim . . . , (iii) shall make himself or herself available to Purchaser upon reasonable notice for interviews and factual investigations and to appear at Purchaser's reasonable request to give testimony (including deposition and trial testimony) with respect to the defense of such Former Employer Claim . . . and (iv) shall otherwise reasonably cooperate with and assist Purchaser and its Representatives in the defense of such Former Employer Claim.

68. Google sought Levandowski's deposition as part of the Google Arbitration.

69. In January 2018, Uber learned that Levandowski intended to invoke the Fifth Amendment at his deposition in the Google Arbitration rather than testify at the deposition that was scheduled for later that month.

70. On January 15, 2018, Uber's counsel emailed Levandowski's attorneys and stated: "It is Uber's view that it would be better for the defense of the claims in the Zing arbitration if Mr. Levandowski would testify to the issues raised in the arbitration, rather than invoke the 5th Amendment." Counsel for Uber also requested a meeting with Levandowski prior to his deposition.

71. On January 15, 2018, Levandowski's counsel rejected Uber's request that Levandowski testify regarding the issues in the arbitration, stating, "[A]fter extraordinary consideration and discussion, Anthony has decided he needs to continue to broadly assert his Fifth Amendment rights."

72. Contrary to the terms of the Indemnification Agreement providing that Uber be permitted to direct and control the litigation, Levandowski's counsel refused to meet with Uber's counsel prior to Levandowski's deposition.

73. On January 18, 2018, Levandowski sat for his deposition in the Google Arbitration and invoked the Fifth Amendment in response to each and every substantive question posed to him.

74. On April 2, 2018, counsel for Uber sent Levandowski's counsel a letter that explained, among other things, that Levandowski was in material breach of the Indemnification Agreement because he refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment, and requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing.

Case: 20-03050   Doc# 4529-2   Filed: 08/11/20   Entered: 08/11/20 14:36:35   Page 86 of
194 of 555

75.     The April 2, 2018 letter from Uber's counsel also provided notice to Levandowski that Uber intended to exercise all of its rights to disclaim or avoid liability under the Indemnification Agreement based on (1) Levandowski's material breach by refusing to testify based on an unjustifiably broad invocation of the Fifth Amendment, (2) Levandowski's breach of the Indemnification Agreement by refusing to reasonably cooperate with the defense, and (3) the fact that certain of Google's claims were Excluded Claims.

76.     On April 20, 2018, Levandowski submitted a proffer to the Google Arbitration Panel as to issues he would testify to at the arbitration hearing.

77.     On April 24, 2018, the Google Arbitration Panel denied Levandowski's request to testify as to the subject matter that he did not testify to during fact discovery, which were the essential facts that Uber had requested that Levandowski testify to in the Google Arbitration.

78.     Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at the hearing due entirely to Levandowski's refusal to testify during his deposition.

79.     Levandowski failed to perform under and materially breached the Indemnification Agreement. In particular, Levandowski refused to testify in the Google Arbitration upon Uber's reasonable request, and failed to cooperate with Uber in the defense of the Google Arbitration claims, thereby denying Uber the entire consideration it bargained for under the Indemnification Agreement.

80.     Uber's inability to cause Levandowski to testify evidences that at no point was Uber in control of Levandowski's defense in the Google Arbitration.

81.     Uber never directed Levandowski's counsel to assert any arguments or defenses that they did not independently want to assert, or to refrain from asserting any arguments or defenses that they did want to assert. Uber was prohibited from participating in the dispute and denied access to and information about most of the arbitration hearing, and from presenting an argument on the allocation of Google's damages.

82.     Uber was not permitted to submit evidence of the proper allocation of damages at the Google Arbitration hearing. The Google Arbitration Panel issued its decision without any reasoned

Case: 20-03050   Doc# 45-2   Filed 06/11/20   Entered 06/11/20 14:36:05   Page 87 of
Case: 20-03050   Doc# 45-2   Filed 06/11/20   Entered 06/11/20 14:36:05   Page 87 of
195   06555

consideration or arguments presented on the issue. Both Levandowski and Google had an incentive to reach a damages award that was incorrect as a matter of law and adverse to Uber.

83. During the Google Arbitration, Levandowski refused to cooperate, refused to testify, and refused to make it possible for rational settlement discussions to take place.

84. Levandowski's failure to comply with his obligations under the Indemnification Agreement deprived Uber of the benefit it would have derived from the Indemnification Agreement, namely, the right to control any litigation for which it was agreeing to provide indemnification. Uber cannot be adequately compensated for the breach. Levandowski's offer to testify at the hearing came too late and therefore Levandowski did not cure his breach.

85. Uber expects Levandowski to assert on appeal that his testimony, if allowed, would have changed the outcome of the arbitration. If it is determined that the outcome of the arbitration would have been different if Levandowski testified, then Levandowski's failure to testify was a material breach of the Indemnification Agreement, which excuses Uber's obligation to perform under the Indemnification Agreement, including payment of any Expenses in connection with the Arbitration Award.

**COUNT I**
**Declaratory Judgment – No Indemnification**
**Based On Disgorgement and Prejudgment Interest**

86. Uber incorporates all of the above paragraphs as though fully set forth herein.

87. The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge the Chauffer Bonus of $126,544,500.00 and Related Compensation of $767,051.95 for a total disgorgement of $127,311,551.95 in payments that Levandowski wrongfully obtained from Google.

88. As a matter of law, those payments never belonged to Levandowski. Levandowski's claims against Uber under the Indemnification Agreement related to the Chauffeur Bonus and Related Compensation, along with prejudgment interest on the same, fail because indemnification for disgorgement is impermissible in California as a matter of public policy.

89.     Uber is not required or permitted to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and prejudgment interest on the same, as ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

90.     The amounts awarded for prejudgment interest related to the award of disgorgement is likewise not indemnifiable as a matter of law and policy.

91.     Independent of the prohibition on indemnification for disgorgement, any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

92.     The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person.

93.     Uber is not obligated to pay any amount that is attributable to the Chauffeur Bonus and Related Compensation under Section 2.4(b) of the Indemnification Agreement, including any prejudgment interest or post-judgment interest on that award.

94.     As a result of the acts described herein, a live controversy exists as to (a) whether Levandowski is entitled to indemnification for the disgorgement of the Chauffeur Bonus and Related Compensation as well as prejudgment interest related to this disgorgement; and (b) whether Levandowski is entitled to indemnification for his obligation to return or repay to Google payments that he received from Google, a third party.

95.     These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, for the obligation to repay any monies paid to him by Google and any prejudgment interest related to the same.

96.     Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and for the obligation to repay any monies paid to him by Google and any prejudgment interest related to the same.

**COUNT II**
**Declaratory Judgment - Levandowski's Claims Are Barred**
**By California Civil Code § 2774**

97.     Uber incorporates all of the above paragraphs as though fully set forth herein.

98.     California Civil Code § 2774 states: "[a]n agreement to indemnify a person against an act already done, is valid, even though the act was known to be wrongful, unless it was a felony." Cal. Civil Code § 2774 precludes indemnification for losses and damages caused by felonious conduct, without regard to whether the party seeking indemnification is convicted for that crime or not.

99.     Levandowski engaged in felonious acts and those acts were the basis for the Arbitration Award. Any indemnification of Levandowski for the Arbitration Award or any resulting judgment is precluded by Cal. Civil Code § 2774.

100.     Levandowski was charged with 33 felony counts of theft and attempted theft of trade secrets. *See* 18 U.S.C. §§ 1832(a)(1), (2), (3), & (4). The indictment and each count incorporates a course of alleged misconduct that included Levandowski's involvement with: (a) Project Chauffeur; (b) Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets through at least January 2016. The indictment reflects a course of felonious conduct that substantially overlaps with the conduct that formed the basis of the Arbitration Award.

101.     Levandowski pled guilty to the felony of Theft and Attempted Theft of Trade Secrets for stealing Google trade secrets related to self-driving car technology for use in competing with Google.

102.     Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation and benefits information regarding the employees he was soliciting to come to Otto, in violation of California Penal Code Section 502. The Google Arbitration Panel found that Levandowski breached his duties to Google by improperly accessing Google employees' salary and performance information and then using that information to attempt to solicit those employees to Otto. This conduct was not only a breach of Levandowski's duties to Google, but it was felonious conduct within the meaning of Cal. Civil Code § 2774 and Cal. Penal Code § 502(c)(1) and (2).

Case: 20-03050   Doc# 45-2   Filed: 09/21/20   Entered: 09/21/20 14:36:05   Page 90 of
198 of 555

103.    Uber is not required or permitted to indemnify Levandowski for any Expense resulting from or associated with his felonious activity.

104.    As a result of the acts described herein, a live controversy exists as to whether Levandowski is entitled to indemnification for the Arbitration Award and subsequent judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

105.    These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and Judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

106.    Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and subsequent judgment, including any part of the Award or Judgment that is based upon felonious conduct.

## COUNT III
## Declaratory Judgment - No Indemnification Due To Post-Signing Specified Bad Acts

107.    Uber incorporates all of the above paragraphs as though fully set forth herein.

108.    The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

109.    Levandowski committed one or more Post-Signing Specified Bad Acts, rendering the Agreement null and void as to him, and unenforceable by him.

110.    The definition of Post-Signing Specified Bad Acts includes retaining or using any confidential Google information after the execution of the Indemnification Agreement, as well as solicitation of employees. The expansive definition is set forth more fully in Exhibit A to the Indemnification Agreement and provides that an "Act" may include "knowingly permit[ing] someone else to take" an action.

111.    Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Indemnification Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski. The amended

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

91

complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. Both the Google Arbitration and the Waymo litigation were Former Employer Claims within the meaning of the Indemnification Agreement. Levandowski received indemnification of certain legal fees in conjunction with the Google Arbitration. Otto Trucking LLC was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation.

112.    Levandowski retained and/or accessed confidential documents, confidential information, patents, and trade secrets belonging to Google, Waymo, and Tyto after April 2016. In May 2016, Levandowski arranged for Otto, and thus upon closing for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google or Waymo had a claim, without disclosing his involvement in Tyto

113.    Levandowski's fraudulent concealment of his own involvement in Tyto, as well as his misconduct between April 11, 2016 and August 2016, caused Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that were purportedly owned by Tyto but in which, based upon Levandowski's breach of his duty of loyalty, Google or Waymo had a claim.

114.    Through this Tyto acquisition and Levandowski's concealment of his role in Tyto after April 11, 2016, Levandowski also solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this misconduct.

115.    With respect to Tyto, Levandowski concealed from Uber his role in Tyto and thus could not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of these. Levandowski's misconduct was the subject of multiple Former Employer Claims, including the claims asserted in the Waymo litigation and claims asserted in the Google Arbitration. The acquisition of Tyto's LiDAR technology, which was arranged for in May 2016 by Levandowski, was at the heart of the Waymo litigation.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

Case: 20-03050   Doc# 1298-2   Filed 08/21/20   Entered 08/21/20 22:16:35   Page 92 of 200

116. Additionally, as but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

117. Uber seeks a final judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim.

118. As a result of the acts described herein, a live controversy exists as to whether the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

119. This controversy is ripe for determination and requires a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

120. Uber therefore seeks a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

**COUNT IV**
**Declaratory Judgment - No Indemnification And/Or Setoff Due To Excluded Claims**

121. Uber incorporates all of the above paragraphs as though fully set forth herein.

122. During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

123. Levandowski's claims are barred because the predominant cause of the Arbitration Award was misconduct that constitutes one or more Excluded Claims under the plain terms of the Indemnification Agreement.

124. The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation.

125. Levandowski also failed to disclose the full scope of the misconduct he committed in relation to Otto; thus, any undisclosed misconduct related to Otto also constitutes an Excluded Claim. To the extent that the Arbitration Award was based on the Otto Misconduct, Levandowski's claims are barred because that conduct also constituted an Excluded Claim.

126. In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct was occurring.

127. As a result of the acts described herein, a live controversy exists as to whether the Arbitration Award and any judgment based on it is an Excluded Claim.

128. This controversy is ripe for determination and requires a declaration that the Arbitration Award and any judgment based on it is an Excluded Claim.

129. Uber therefore seeks a declaration that the Arbitration Award, and any judgment based on it, and/or any portion of that Award and judgment related to the Tyto Misconduct are Excluded Claims and not subject to indemnification. In the alternative, Uber seeks a declaration that any indemnification to which Levandowski may otherwise be entitled must be subject to setoff and/or recoupment in the amount of any award or judgment attributable to an Excluded Claim.

### COUNT V
### Breach of Indemnification Agreement

130. Uber incorporates all of the above paragraphs as though fully set forth herein.

131. Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at his deposition or the arbitration hearing.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

94

132. Levandowski materially breached the Indemnification Agreement by failing to testify at his deposition and the Google Arbitration hearing, and by his other failures to cooperate with the defense. Levandowski failed to perform his obligations under the Indemnification Agreement by failing to comply with Uber's request that he provide relevant testimony at his deposition and at the Google Arbitration hearing and by impeding Uber's ability to have access to the information necessary for Uber to effectively oversee and direct the defense of the dispute. By broadly invoking the Fifth Amendment and declining to meet with Uber's counsel, Levandowski materially breached Sections 2.2(b) and 2.2(c) of the Indemnification Agreement and denied Uber its bargained-for consideration.

133. Levandowski is expected to assert that the outcome of the Google Arbitration would have been different had he testified at the arbitration hearing.

134. Levandowski admitted through his last-ditch effort to reverse course in order to try to testify in the Google Arbitration that he believes his testimony and cooperation would have changed the outcome of the arbitration against Google.

135. If Levandowski's contention that his testimony would have made a difference is correct, then he has materially breached the terms of the Indemnification Agreement so as to excuse Uber's performance of the Indemnification Agreement. At minimum, Levandowski's breach injured Uber by depriving it of the benefits for which it bargained in the Indemnification Agreement.

136. Uber is entitled to a declaration that Levandowski's breach of the Indemnification Agreement excuses any obligation that Uber may otherwise have to perform under the Indemnification Agreement. Uber is also entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Levandowski's breach of contract.

### COUNT VI
### Damages Based On Fraud And Fraudulent Inducement
### And For A Declaration That Such Damages Are Non-Dischargeable
### Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)

137. Uber incorporates all of the above paragraphs as though fully set forth herein.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

95

138.     Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

139.     In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

140.     During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted Tyto from the list.

141.     Levandowski concealed from Stroz and Uber that since 2012 he had been secretly operating a business that competed with Google called Tyto. Levandowski had been the owner, investor, and adviser of Tyto and, as the Arbitration Panel found, he was secretly the control person of Tyto. Levandowski arranged for Otto to purchase Tyto, so as to transfer Tyto's trade secrets and confidential information related to the LiDAR technology to Uber, without Uber ever knowing that Levandowski was involved with Tyto and without Uber ever knowing that Levandowski had used Tyto as a means for secretly establishing a competing business with Google and that Google would have a claim to the very LiDAR technology that Uber was acquiring.

142.     Levandowski also represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

143.     Levandowski represented to Stroz during the interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally. Levandowski also represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

144.     At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

145.    On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

146.    In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

147.    Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

148.    Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

149.    If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

150.    After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

151.    Uber is entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud.

Case: 20-03050    Doc# 4598-2    Filed: 08/21/20    Entered: 08/21/20 14:36:35    Page 95 of
205

152.    Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

153.    If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, including through his secret control of Tyto, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

154.    But for Levandowski's fraud, Uber would not have acquired any LiDAR technology in which Google or Waymo had a claim, and would not have been subject to the claims asserted against it by Waymo. Levandowski's fraud, including his concealment of his involvement as the control person in Tyto, was a substantial factor in the Google Arbitration Award and also a substantial factor in causing Uber to provide Waymo consideration valued at approximately $245 million to resolve claims asserted in the Waymo litigation. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Google Arbitration and the Waymo claims.

155.    The sole basis for Uber's inclusion in the Waymo litigation was Uber's acquisition of Otto and agreement to acquire Otto Trucking LLC. Uber would not have closed that transaction or entered into the Indemnification Agreement had it known of Levandowski's fraudulent and other wrongful conduct, and Waymo would not have sued Uber but for that misconduct. The Waymo litigation was a direct consequence of Levandowski's fraudulent conduct.

156.    Uber is entitled to consequential damages caused by Levandowski's fraud committed upon Uber, including but not limited to the value of the consideration that Uber has been required to provide Waymo in the Waymo litigation to resolve claims arising out of and caused by Levandowski's fraud, including claims for violations of the Trade Secret Act, violations of the California Uniform Trade Secret Act, patent infringements, and violation of the California Business and Professional Code.

157.    Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber against any amounts Uber is found to owe to Levandowski based upon Levandowski's fraud.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

158.    Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's claims for recovery of benefits conferred upon Levandowski under the Indemnification Agreement and for all damages incurred as a result of Levandowski's fraud, including recovery of the value of the consideration that Uber provided Waymo in connection with the Waymo litigation. The Court should therefore declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

159.    Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

160.    Levandowski's actual fraud and fraudulent misrepresentations were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## COUNT VII
### Contribution Of The Value Of The Consideration Provided To Settle The Waymo Litigation And For A Declaration That Such Right Of Contribution Is Non-Dischargeable Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)

161.    Uber incorporates all of the above paragraphs as though fully set forth herein.

162.    Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

163.    If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

164.    But for Levandowski's fraud, Uber would not have been subject to the claims asserted against it by Waymo and it would not have been necessary for Uber to provide consideration valued at approximately $245 million to resolve those claims. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Waymo claims.

165.    Levandowski is jointly and severally liable to Waymo for the losses that Waymo claimed in its claims against Uber.

166.    Uber is entitled to contribution from Levandowski in the amount equal to the consideration it provided Waymo to settle the Waymo litigation.

167.    Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

168.    Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

169.    Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

170.    Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## COUNT VIII
### Declaratory Judgment For Rescission Based On Fraudulent Inducement

171.    Uber incorporates all of the above paragraphs as though fully set forth herein.

172.    Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

100

173. In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

174. During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Tyto project from the list.

175. Levandowski fraudulently concealed from Stroz and Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, which was a company that Levandowski created beginning in 2012. Levandowski had been the owner, investor, and adviser of Tyto.

176. Levandowski fraudulently represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

177. Levandowski fraudulently represented during the Stroz interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

178. At the time of the Indemnification Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

179. On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

180. In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further

Case 20-03050    Doc# 452    Filed: 09/01/20    Entered: 09/01/20 21:06:35    Page 209 of
209 of 555

attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

181. Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

182. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

183. If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

184. After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

185. As a result of the acts described herein, a live controversy exists as to whether Uber has effectively rescinded the Indemnification Agreement.

186. The issue of whether Uber has effectively rescinded the Indemnification Agreement is ripe for determination.

187. Uber therefore seeks a declaration that it has effectively rescinded the Indemnification Agreement.

### COUNT IX
### Contribution Of The Amounts Paid For Lior Ron And
### For A Declaration That Such Amounts Are Non-Dischargeable
### Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)

188. Uber incorporates all of the above paragraphs as though fully set forth herein.

Answer, Affirmative Defenses, and Counterclaims No. 20-03050
102

189. The Corrected Final Award and subsequent judgment awarded Google $9,573,096.60 from Lior Ron, individually and jointly and severally with Levandowski.

190. On February 5, 2020, Uber paid Google, on Ron's behalf, $9,453,135.87 to settle this portion of the award, as well as the much smaller amount awarded solely against Ron.

191. Ron assigned to Uber his right to seek contribution from Levandowski in the amount proportionate to Levandowski's comparative fault. Levandowski is solely or primarily at fault with respect to that award.

192. Uber is entitled to contribution from Levandowski in the amount of the joint and several portion of the Google Award that Uber paid on behalf of Lior Ron.

193. Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

194. Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

195. Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity making, Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

196. Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## COUNT X
### Incorporation Of Proof Of Claim

197. Uber incorporates all of the above paragraphs as though fully set forth herein.

Case 20-03050 Doc# 45 Filed: 09/01/20 Entered: 09/01/20 16:35:47 Page 208 of 211106555

198.    Uber incorporates by reference as though fully set forth herein its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") in Bankruptcy Petition No. 20-30242 pending in the United States Bankruptcy Court for the Northern District of California and reasserts those claims herein.

199.    On March 4, 2020, Levandowski filed a voluntary Chapter 11 individual bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

200.    On July 6, 2020, Uber filed a Proof of Claim alleging various claims against Levandowski and to the extent not otherwise asserted in these counterclaims, Uber incorporates and reasserts those claims herein, including but not limited to: (1) contribution for the amount of the joint and several portion of the Corrected Final Award in the Google Arbitration that Uber paid on behalf of Lior Ron; (2) restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud; (3) consequential damages arising out of Levandowski's fraud committed upon Uber; and  (4) a defense against indemnification based upon the Excluded Claims provision of the Indemnification Agreement and/or a claim for reimbursement, recoupment and/or setoff as to all amounts subject to the Excluded Claims provision.

201.    To the extent not otherwise alleged in these counterclaims, Uber incorporates by reference all claims in its July 6, 2020 Proof of Claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Uber prays for the following relief:

202.    That the Complaint filed by Levandowski be dismissed in its entirety with prejudice, that judgment be entered in favor of Uber and against Levandowski, and that Levandowski be denied all relief requested in his Complaint;

203.    A declaration that Uber has valid claims against Levandowski as alleged in the July 6, 2020 Proof of Claim;

204.    A declaration that Levandowski is not subject to a release from claims;

Answer, Affirmative Defenses, and Counterclaims No. 20-03050

104

205. A declaration that the Indemnification Agreement has been rescinded or is null and void;

206. A final judgment that Levandowski is not entitled to indemnification under the Indemnification Agreement because Levandowski fraudulently induced Uber to enter into that agreement;

207. A declaration that Levandowski is not entitled to indemnification for disgorgement of the Chauffeur Bonus and Related Compensation or any prejudgment interest related to the same;

208. A declaration that Levandowski is not entitled to indemnification for any amounts paid to him by a third party, Google, including the Chauffeur Bonus and Related Compensation, as well as any prejudgment interest associated with the same;

209. A declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award or any resulting judgment because Cal. Civil Code § 2774 precludes indemnification due to Levandowski's felonious conduct;

210. A final judgment determining that Levandowski committed Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, and an order from the Court that the Indemnification Agreement is null and void, including because Levandowski committed Post-Signing Specified Bad Acts;

211. An final judgment that Levandowski materially breached the Indemnification Agreement and that the agreement is not enforceable against Uber on account of that breach;

212. An award of consequential damages arising out and caused by Levandowski's fraud committed upon Uber; including but not limited to the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

213. An award of contribution for the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

214. An award of consequential damages arising out of and caused by Levandowski's breach of the Indemnification Agreement;

215. Setoff and/or recoupment of any amounts Levandowski owes to Uber against any amounts Uber is otherwise found to owe to Levandowski;

216. An award of contribution for the portion of the joint and several part of the Corrected Final Award in *Google, LLC v. Anthony Scott Levandowski and Lior Ron* that Uber paid on behalf of Lior Ron;

217. An final judgment providing restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement based on Uber's rescission of the Indemnification Agreement;

218. An Order from the Court that the amounts that Levandowski seeks to recover under the Indemnification Agreement may not be recovered because they are based upon Excluded Claims, or in the alternative that at least over 75% of the amounts Levandowski seeks to compel Uber to pay, plus attorneys' fees and costs, are Excluded Claims related to the Tyto Misconduct and not subject to indemnification;

219. A declaration that Uber's claims and the damages sought herein are not subject to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6);

220. Prejudgment and post judgment interest on any amounts awarded to Uber;

221. Attorneys' fees and costs incurred by Uber in defending this action, including fees incurred in the Bankruptcy proceeding; and

222. Such other and further relief as is just and proper.

Dated: September 18, 2020

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Debra I. Grassgreen*
Debra I. Grassgreen
Miriam Manning

-and-

David J. Bradford (admitted *pro hac vice*)
Catherine Steege (admitted *pro hac vice*)
Terri L. Mascherin (admitted *pro hac vice*)
JENNER & BLOCK LLP

*Counsel for Uber Technologies, Inc.*

Answer, Affirmative Defenses, and Counterclaims No. 20-03050
106

# EXHIBIT E

1  **KELLER BENVENUTTI KIM LLP**
   TOBIAS S. KELLER (Cal. Bar No. 151445)
2  (tkeller@kbkllp.com)
   DARA L. SILVEIRA (Cal. Bar No. 274923)
3  (dsilveira@kbkllp.com)
   650 California Street, Suite 1900
4  San Francisco, California 94108
   Telephone: (415) 364-6793
5  Facsimile: (650) 636-9251

6  BRETT M. SCHUMAN (SBN 189247)
   bschuman@goodwinlaw.com
7  RACHEL M. WALSH (SBN 250568)
   rwalsh@goodwinlaw.com
8  **GOODWIN PROCTER LLP**
   Three Embarcadero Center
9  San Francisco, California 94111
   Tel.: +1 415 733 6000
10 Fax.: +1 415 677 9041

11 HONG-AN VU (SBN 266268)
   hvu@goodwinlaw.com
12 **GOODWIN PROCTER LLP**
   601 S. Figueroa Street, 41st Flr.
13 Los Angeles, California 90017
   Tel.: +1 213 426 2500
14 Fax: +1 213 623 1673

15 Attorneys for Plaintiff and Debtor and
   Debtor in Possession Anthony S. Levandowski
16

17            **UNITED STATES BANKRUPTCY COURT**

18            **NORTHERN DISTRICT OF CALIFORNIA**

19                **SAN FRANCISCO DIVISION**

20 | In re:                              | Bankruptcy Case
                                          No. 20-30242 (HLB)
21 | ANTHONY SCOTT LEVANDOWSKI,          | Chapter 11

22 |                          Debtor.    | **Adv. Pro. No. 20-03050 HLB)**

23 | ANTHONY LEVANDOWSKI, an individual, | **DEBTOR'S FIRST AMENDED
                                          COMPLAINT FOR DECLARATORY
                                          RELIEF, SPECIFIC PERFORMANCE,
24 |                          Plaintiff, | AND DAMAGES; AND OBJECTION TO
                                          CLAIM**
25 |            v.

26 | UBER TECHNOLOGIES, INC.

27 |                        Defendant.
28

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

FIRST AMENDED COMPLAINT

Anthony Levandowski, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and as plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), alleges in this First Amended Complaint upon knowledge of his own acts and upon information and belief as to other matters, as follows:

## NATURE OF CLAIM

1.      This is an objection to the allegations made by Uber Technologies, Inc. ("Uber") in its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") and an action to enforce the promises Uber made to Mr. Levandowski to induce him to sell to Uber his self-driving companies and technology and to lead its autonomous vehicle program.

2.      Mr. Levandowski is one of the world's leading experts in autonomous vehicle technology.  Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks.  He was a founding member of Google's autonomous car initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

3.      Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up.

4.      Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr. Levandowski worked for a competitor on self-driving technology, he would face very negative consequences.  Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and Travis Kalanick, Uber's then-CEO.  In addition, Mr. Levandowski was aware that Mr. Page and other executives at Google viewed Uber as a very significant competitor.

5.      In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto") a self-driving trucking company.

6.      Uber expressed an interest in acquiring Otto to accelerate its self-driving program and to compete with Google, whom Mr. Kalanick believed to be an existential threat to Uber.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

7.     Because of Mr. Page's threats and known hostility towards Uber, Mr. Levandowski insisted that Uber indemnify him against claims that may be brought by Google as a condition to entering into any relationship with Uber.

8.     In fact, Mr. Levandowski explained to Uber multiple times that he believed Google would likely sue him if he joined Uber.  Mr. Levandowski was particularly concerned because he did not have the ability to defend himself if one of the largest companies in the world, with essentially unlimited resources, came after him.

9.     In addition, because Mr. Levandowski left Google to work on autonomous trucking, Mr. Levandowski conditioned the sale of Otto on Uber supporting his self-driving trucking business.

10.     As part of the transaction for the acquisition of Otto, Uber agreed to indemnify Mr. Levandowski for claims Google might raise against him.  These claims included claims Google might assert for breach of fiduciary duty, breach of the duty of loyalty, breaches of various restrictive covenants, and trade secret misappropriation.  **Exhibit A** is a redacted copy of the Indemnification Agreement dated April 11, 2016 between Uber and Mr. Levandowski.

11.     Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of any claim brought by Google, as well as any award or judgment in Google's favor. *See* Ex. A at 3, § 2.3.

12.     As part of the acquisition of Otto, Uber also agreed to support Mr. Levandowski's trucking business objectives by either creating a new business unit within Uber (wherein Mr. Levandowski would have a leadership role) or allowing Mr. Levandowski to create a trucking business outside of Uber.

13.     After Uber acquired Otto, Mr. Page followed through on his threats against Mr. Levandowski.  In October, 2016, Google initiated two arbitration proceedings against Mr. Levandowski.  Mr. Levandowski timely requested indemnity from Uber under the Indemnification Agreement, and Uber accepted its obligations.  Consequently, Uber paid for and controlled the defense of Mr. Levandowski for nearly three years.  Initially, Mr. Levandowski

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

FIRST AMENDED COMPLAINT
Case 2:03-cv-02942   Doc #: 129   Filed: 08/25/20   Page 8 of 44
Case 2:20-mc-00242   Document 9-1   Filed 08/25/20   Page 8 of 44
218 of 555

was represented by the same counsel that represented Uber.  During the course of a separate litigation, a trade secrets dispute with Waymo LLC, a Google affiliate, Uber's then-counsel determined it could not jointly represent Mr. Levandowski (or his company, Otto Trucking) and Uber.  Uber subsequently selected and hired separate counsel for Mr. Levandowski.  Uber continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected.  Uber also exercised its right to direct and control Mr. Levandowski's defense of the arbitration proceeding through the final award and including all settlement discussions with Google.

14.    After Mr. Levandowski relied on Uber's control and direction for years and after an unfavorable Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

15.    In addition, while in control of Mr. Levandowski's defense and settlement prospects with Google, Uber worked out its own settlement with Google's subsidiary, Waymo LLC ("Waymo") to resolve a trade secret dispute between them relating to the same underlying events.  Upon information and belief, the terms of that settlement included an agreement that Uber would never hire or work with Mr. Levandowski again, which resulted in Uber also reneging on its promises to support Mr. Levandowski's trucking business.

16.    Uber's recently filed Proof of Claim has made the Indemnification Agreement, and Uber's actions related to its acquisition of Otto, central to this Chapter 11 Case.

17.    In particular, the Proof of Claim alleges that because Uber purportedly rescinded the Indemnification Agreement, not only does Uber not have any obligation to indemnify Mr. Levandowski but it also is a creditor of Mr. Levandowski.  Uber seeks payment for legal fees and costs it provided under the Indemnification Agreement and contribution for the settlements it has negotiated for its own benefit and the benefit of Mr. Levandowski's cofounder, the current lead of Uber's trucking business.

18.    However, Uber asserts claims that, upon information and belief, Uber released as part of the settlement with Waymo.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

4

Case 20-30242   Doc# 129   Filed 05/22/20   Entered 05/22/20 16:35:42   Page 4
219 of 555

19.     Uber also has no basis to rescind the Indemnity Agreement.  Uber has set forth numerous theories to back out of the deal it struck, but two issues appear to be core: (1) a claim that Mr. Levandowski engaged in fraud and (2) a claim that Mr. Levandowski has pled to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney.

20.     First, there was no fraud.  Uber was aware of Mr. Levandowski's conduct through the extensive investigation it conducted prior to and after entering into the indemnity agreement with him, and long before it purported to rescind.  To the extent Uber claims it was unaware of certain facts, those facts were not material and were fully available to Uber had they cared to look more carefully at the materials it was provided by Mr. Levandowski.  In fact, Mr. Levandowski repeatedly told Uber to search those devices for the most accurate information.

21.     Second, Mr. Levandowski did not make any misrepresentations regarding any theft of trade secrets.  Mr. Levandowski has plead guilty to trade secret misappropriation with respect to one file he accessed after leaving Google.  As for that one file, Uber knew the file's name, that Mr. Levandowski kept that file, that he accessed it after he left Google, the date he accessed it, and through its due diligence firm, the contents of that file.

22.     Mr. Levandowski therefore commenced the Adversary Proceeding to obtain declaratory relief as to the impact of Uber's purported rescission on the parties' respective rights and obligations, to enforce Uber's obligations arising from the Otto transaction, and to disallow the Proof of Claim.

## JURISDICTION AND VENUE

23.     The Adversary Proceeding arises in and relates to the Chapter 11 Case.  The Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Mr. Levandowski against Uber herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California.  The parties also stipulated to have this dispute, and any

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

others raised in Mr. Levandowski's arbitration demand and Uber's proof of claim be resolved in this Adversary Proceeding. *See* ECF No. 13.

24.     This is a core proceeding under 28 U.S.C. § 157(b) including, without limitation, under subsections (b)(2)(A), (B), (C), (K), and (O). Mr. Levandowski consents to the entry of a final order by the Court in connection with this Adversary Proceeding.

25.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

### A.     MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY

26.     Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

27.     He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

28.     In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles. He was 24 years old at the time.

29.     The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas. Mr. Levandowski and a team of engineers from U.C. Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations— submitted a self-driving, self-balancing, two-wheeled motorcycle. This motorcycle, Ghostrider, competed against well-funded submissions from Stanford University, Carnegie Mellon, and established companies. After performing well in several qualifying rounds, Ghostrider was selected as a contender for the DARPA Grand Challenge.

30.     Ghostrider now sits in the Smithsonian Museum as one of America's great innovations.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

6

31.     Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr. Sebastian Thrun, a former Stanford computer science professor who was also a participant in the DARPA Grand Challenge.

32.     Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool. VuTool was subsequently acquired by Google.

**B.     MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM**

33.     Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping with Dr. Thrun. Mr. Levandowski helped develop the technology for the Google service now known as Street View.

34.     In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-driving car program at Google. The program was named "Project Chauffeur."

35.     Project Chauffeur catapulted Google into the lead in autonomous driving when, in 2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of 100 miles. By 2012, Google had logged over 300,000 miles of autonomous driving. Mr. Levandowski was a key contributor in helping Google achieve these milestones. For his past contributions and to incentivize him going forward, Google invited Mr. Levandowski to participate in the Chauffeur Bonus Plan—an incentive plan that would pay members a percentage of the valuation of Project Chauffeur starting at the end of 2015—and gave him the highest initial allocation or individual earnout percentage of any member of the plan.

36.     Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016.

37.     Mr. Levandowski would ultimately be paid over $127 million by Google for his work on Project Chauffeur. The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google.

**C.     MR. LEVANDOWSKI CONSIDERS LEAVING GOOGLE**

38.     For years, Google enjoyed its position as the leader in the self-driving space with no significant challengers. In 2015, Uber announced the launch of its own self-driving car initiative after acquiring a team of engineers from Carnegie Mellon University.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

FIRST AMENDED COMPLAINT
Case 2:03-cv-02042 Doc #:9 Filed: 03/25/20 421 Page 2 of 04:35 PM Page 7 of 44
Case 2:03-cv-02042 Doc #:9 Filed: 03/25/20 421 Page 2 of 04:35 PM
222 of 555

39.     After Uber's announcement, there were many discussions within Google about how to compete with Uber. In those discussions, executives within Google expressed distaste and animosity towards Uber. Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

40.     Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Mr. Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

41.     Over time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making after its initial successes. In 2015, Mr. Levandowski began to think about other self-driving opportunities.

42.     After learning about Mr. Levandowski's discontentment at Google, Dr. Thrun introduced Mr. Levandowski to Mr. Kalanick at Uber. Upon meeting Mr. Levandowski, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership where he could supply self-driving technology to Uber as an outside technology vendor.

43.     Mr. Levandowski's Google colleagues, and more than one of his superiors, were aware that Mr. Levandowski was having discussions with Uber as he considered his future.

44.     Simultaneously, in 2015, Lior Ron rejoined Google in a business role. Mr. Levandowski and Mr. Ron, who had met while working on Google Maps, began to discuss the problems with Project Chauffeur and ways in which the Project could be improved.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

8

45.     During those conversations, they also discussed new product markets, including self-driving trucks.  As they explored this concept and brainstormed further, both became passionate about self-driving trucking.  They were convinced that the trucking business could be disrupted by the addition of self-driving technology and that self-driving trucking technology could go to market much more quickly than passenger car technology.  Mr. Levandowski began to include Mr. Ron in his discussions with Uber and others.  Mr. Levandowski and Mr. Ron considered establishing a commercial vendor relationship with Uber to obtain funding for the trucking business.

46.     Toward the end of his time at Google, Mr. Levandowski also had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur.  During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving start-up outside of Google.

47.     Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences.  Because Google had bought several of Mr. Levandowski's outside businesses previously and because others had left Google to start new companies without objection from Google, Mr. Levandowski understood Mr. Page's threat to be about a large, well-funded competitor and not a startup.

**D.     MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE**

48.     Mr. Levandowski left Google on January 27, 2016.  He joined Otto, a self-driving trucking company and was credited as a co-founder.

49.     Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

50.     As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber on consumer self-driving technology (instead of trucking) as a competitive act that would convert him from a friendly, start-up competitor to an enemy.  Mr. Levandowski also told Uber that he feared that Google would sue him and seek

9

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

recovery of the substantial amounts of money that had been paid to him or were owed to him, in particular, the proceeds from the Chauffeur incentive plan that Google owed him.

51.     In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Mr. Kalanick. In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick. In response, Mr. Kalanick stated that Uber was prepared to protect Mr. Levandowski from an aggressive assault by Google.

52.     As a key and indivisible part of the transaction to sell Otto to Uber and have Mr. Levandowski join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google might assert against him. *See* Ex. A. The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

> "Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

*Id*. at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

53.     Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

> (a) *Purchaser will indemnify and hold harmless each Diligenced Employee* and the Company Group, *to the maximum extent permitted by applicable Law* (subject to the limitations and exclusions set forth herein), from and against any and *all Expenses incurred by such Diligenced Employee* or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the

10

FIRST AMENDED COMPLAINT

Case: 20-03054   Doc# 298-2   Filed: 06/23/24   Entered: 06/23/24 06:46:35   Page 10 of 555
Case: 20-03054   Doc# 298-2   Filed: 06/23/24   Entered: 06/23/24 06:46:35   Page 10 of 555
225

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id*. at § 2.1(a) (emphasis added).

54.     "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

"Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id*. at 3.

55.     The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii).  That section reads:

(b) Notwithstanding anything herein to the contrary, ***an Indemnified Claim shall not, regardless of whether the Closing occurs, include***, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

(ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id*. at § 2.1(b)(ii) (emphasis added).

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

56.     The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski.  Mr. Levandowski would not have entered into the transaction to sell Otto to Uber without Uber's indemnity promise.

57.     The Indemnification Agreement was structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded.  Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

> **2.3. Expenses**
> (a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request.

*Id.* at § 2.3.

58.     If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration proceedings to enforce Uber's obligations or seek specific performance of Uber's obligations.  Ex. A at §§ 2.3, 3.11

59.     The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses, including proceedings in San Francisco state or federal courts where both parties submitted to jurisdiction.

> **3.11 Specific Performance**. Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative).  Each of the Parties agrees that ***this Agreement is intended to be legally binding and specifically enforceable*** pursuant to its terms and that Purchaser and the ***Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms*** and that monetary damages would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, ***a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.***

*Id.* at § 3.11 (emphasis added); *see also id.* at § 3.5.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

FIRST AMENDED COMPLAINT

Case: 20-03052   Doc# 4298-1   Filed: 02/28/2024   Entered: 02/28/2024 06:10:35   Page 12 of 44
Case 3:20-cv-06754-WHA   Document 298-1   Filed 09/23/24   Page 13 of 555
227

60. As part of the indemnification process, Mr. Levandowski agreed to be interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz"). He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination. To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

61. The Stroz /Uber investigation of Mr. Levandowski uncovered a great number of facts related to potential claims that might be brought by Google but was, by Stroz's own admission, incomplete. In early April 2016, while Stroz' was conducting its investigation, Uber executed the Indemnification Agreement.

62. As Stroz summarized, Uber requested preliminary information regarding the investigation "in the lead-up to Uber's signing of an agreement to purchase Otto and "long before the investigation was completed." Stroz had provided Uber with preliminary information that included Stroz's draft memo from Mr. Levandowski's interviews and access reports showing that Mr. Levandowski retained thousands of Google files, and had accessed hundreds of Google documents after he left Google, including several that were identified by Mr. Levandowski as relating to self-driving. The interview memo remained in draft form and Mr. Levandowski's counsel reserved his rights as to the accuracy of the information in the memo.

63. The Stroz draft interview memo contained nine pages of summaries of Mr. Levandowski's interactions and discussions with Google employees about his plans to start a company outside of Google, including summaries of one-on-one discussions and larger gatherings at his house.

64. Uber pushed for the entire transaction to proceed to closing knowing that Stroz had not completed its investigation.

65. On April 11, 2016, Uber executed several documents to complete this transaction, including the Indemnification Agreement, the Otto Agreement and Plan of Merger (the "Otto Agreement"), and the Otto Trucking LLC Agreement and Plan of Merger (the "Otto Trucking

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

13

Agreement"), which gave Uber an option to acquire a second company created by Mr. Levandowski and Mr. Ron.

66. Stroz did not issue a report until August 5, 2016, almost four months after it signed the Otto acquisition documents.

67. The Stroz report disclosed numerous facts, including the following:

During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

68. Stroz reported that Mr. Levandowski's devices demonstrated that during his time at Google, he downloaded documents and files relating to Project Chauffeur.

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016. An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

69. It also reported that Mr. Levandowski downloaded Chauffeur files shortly before his departure from Google and had accessed them following his departure from Google.

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

70. Stroz reported facts regarding hiring of Google employees.

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took place at Levandowski's house in

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

approximately December 2015 and January 2016. These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

71. Stroz included as an exhibit to its report the draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects for which he had an ownership interest, but did not include any discussion of this memo in its main report. In addition, Mr. Levandowski's devices and accounts also contained extensive information about a company named Odin Wave/Tyto, Mr. Levandowski's estate planning, and various investments.

72. Stroz noted discrepancies in what Mr. Levandowski recalled and what Stroz discovered on Mr. Levandowski's devices.

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

73. Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text messages, as well as its decision not to investigate these deletions further.

Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

74. Despite and with full knowledge of Stroz's findings, on August 18, 2016, Uber closed the acquisition of Otto and publicly announced that it was acquiring the company and working with Mr. Levandowski.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

75. In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

**F. GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI**

76. On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

77. Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

78. The two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before Otto was acquired by Uber.

79. Google alleged that Mr. Levandowski violated his duties to Google through his relationship with Tyto. Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential information regarding compensation to recruit Google employees.

80. The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

81.     On November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

82.     On November 3, 2016, Uber's in-house counsel and as its outside counsel from Morrison & Foerster LLP ("MoFo"), Eric Tate, interviewed Mr. Levandowski about the allegations asserted in Google's arbitration demands.

83.     After receipt of the notice and interviewing Mr. Levandowski, Uber accepted Mr. Levandowski's tender of the indemnity (even though Uber's outside counsel stated that he was concerned that not everything alleged in the arbitration demands was covered in the Stroz due diligence) and assumed control of Mr. Levandowski's defense.

84.     Uber hired MoFo to initially represent Mr. Levandowski. Through its counsel, Uber controlled the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration.

85.     In February 2017, Waymo LLC ("Waymo")—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action"). That action alleged, among other things, that Mr. Levandowski had downloaded 14,000 files from a Google server, that those files contained trade secrets, and that he had used those files at Otto, which was acquired by Uber in 2016. These were the same files that Stroz had noted in its report, except that because Mr. Levandowski had downloaded the repository multiple times over his time at Google, Stroz had identified 24,000 files from that server.

86.     Based on Waymo's allegations, MoFo notified Google that Mr. Levandowski was invoking his Fifth Amendment rights and would not make disclosures in the arbitration.

87.     Several weeks after, MoFo determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski. As a result, MoFo sought to withdraw from representation of Mr. Levandowski and continue with its representation of Uber.

Case: 20-80252   Doc# 298-1   Filed: 02/28/24   Entered: 02/28/24 16:05:47   Page 17 of
Case: 20-03052   Doc# 49   Filed: 06/23/21   Entered: 06/23/21 20:10:35   Page 17 of
232 of 555
44

88.     Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

89.     For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement.  Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings, approval over experts, discussion about who would be arguing motions, pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions.  Mr. Levandowski complied with Uber's requirements and cooperated with his defense.  Mr. Levandowski and his counsel met with Uber whenever it requested.

90.     Mr. Levandowski provided information and guidance that led to the discovery of evidence that was helpful to his defense in the arbitration as well as the Waymo action.  This included guidance that led to the discovery of statements by the administrator of the server that housed the 14,000 files at issue that the files were "low value" and that "checking out" or downloading the entire repository of 14,000 files did not "ring the alarm bells" for him.  This was because when a user accessed the server where the so-called 14,000 files were located, the system automatically downloaded the entire repository onto his or her laptop even if the user only wanted to access one or two files.  Ultimately, this discovery, driven by Mr. Levandowski's contributions, became a centerpiece of Uber's defense in the Waymo case.

91.     In addition to providing this critical information, Mr. Levandowski also provided additional information to support Uber's defense. This included obtaining from a former Chauffeur team member the earrings she received as a parting gift that contained the alleged trade secrets at issue in the Waymo Action.  Mr. Levandowski also identified numerous events and witnesses who aided Uber in its defense of the Waymo action as well as the arbitration with Google.

92.     Mr. Levandowski also complied with Uber's requirement that Uber control all settlement discussions with Google.  Mr. Levandowski made several proposals regarding possible settlement structures to Uber hoping that a global settlement could be reached with

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

18

Google.  But because Uber controlled settlement prospects with Google, Mr. Levandowski did not know whether any of his settlement proposals were made to Google.

### H.  UBER SETTLES THE WAYMO ACTION

93.     In February 2018, while controlling Mr. Levandowski's defense, Uber settled the Waymo Action with Waymo/Google.  The existence of a settlement between Uber and Waymo was publicly announced, but limited information regarding the exact terms of the settlement is publicly available.

94.     Upon information and belief, that settlement agreement contained broad releases by both parties releasing claims as to the other's past and present employees.

95.     Upon information and belief, Uber agreed to a broad release as to Mr. Levandowski, a past employee of Google.

96.     In addition, upon information and belief based on publicly available information, in the Waymo Settlement, Uber agreed to never hire or do business with Mr. Levandowski ever again.

97.     Upon information and belief, because of the Waymo settlement terms, Uber refused to close on its acquisition of Otto Trucking or support Mr. Levandowski's trucking business.

98.     Upon information and belief, Uber traded Mr. Levandowski's rights in Otto Trucking and his ability to practice his profession in exchange for a settlement with Waymo.

### I.  UBER REQUESTS THAT MR. LEVANDOWSKI TESTIFY SHORTLY BEFORE THE ARBITRATION HEARING

99.     On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the Expenses it advanced for Mr. Levandowski to defend himself in the arbitration.  **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

Case: 20-80252   Doc# 498-2   Filed: 06/28/24   Entered: 06/28/24 10:35:27   Page 12 of
234 of 555

100. One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"—which Mr. Levandowski had exercised over a year before with full knowledge of Uber.

101. Nevertheless, in its April 2, 2018 letter, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the *Waymo* court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

102. Uber then demanded that Mr. Levandowski waive his Fifth Amendment rights and testifying during the arbitration.

103. In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

104. Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

105. Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

106. In addition, for the first time, Uber also stated that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

107. Uber's claims were false. Uber accepted Mr. Levandowski's tender of indemnity *only after* Google's commencement of the arbitration proceeding alleging claims relating to Tyto and *only after* Mr. Levandowski had been interviewed by Uber extensively about Google's allegations relating to Tyto. In addition, Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them. And Stroz had specifically identified other materials on Mr. Levandowski's devices that he had not disclosed during interviews.

108. In fact, Uber had considered acquiring Tyto in 2015 but declined to do so at that time. Tyto was ultimately acquired by Otto with Uber's consent and at Uber's request prior to

20

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Uber closing on its acquisition of Otto to secure a lower price for Tyto than what Tyto would have requested had it known that Uber was the acquirer.

109.    Moreover, prior to April 2018, Uber received extensive documents and information about Tyto in the Waymo Action and had actively participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started.  Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto.  Uber had counsel present at the meetings with these witnesses and during most, if not all, of their testimony.  These individuals were also central witnesses in the two arbitrations with Google with respect to the Tyto-related allegations.

110.    Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that invested funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and would visit Tyto and his friends at that company to talk about technical and business matters from time to time.  Uber was also aware of Pierre Droz's (a Google employee) allegations that Mr. Levandowski was involved with Tyto and even deposed him extensively on that very topic during the Waymo litigation.

111.    Armed with this knowledge, Uber paid for and controlled Mr. Levandowski's defense of the arbitration.  In fact, Uber did not raise any issues regarding coverage until April 2018.

**J.    UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

112.    On March 28, 2019, the arbitration panel issued an interim award in favor of Google.  The arbitration panel found violation of the exact claims covered by the Indemnification Agreement and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

FIRST AMENDED COMPLAINT

Case: 20-03052    Doc# 4298-2    Filed: 06/28/24    Entered: 06/28/24 16:35:47    Page 21 of 236 44 555

113. On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was going to abide by its indemnity obligations and pay for any adverse award in light of the interim award. **Exhibit F** is a redacted copy of Mr. Levandowski's May 13, 2019 letter.

114. In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence. Mr. Levandowski identified numerous documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well and pointed out that documents from his devices were shown to witnesses at the arbitration hearing.

115. Mr. Levandowski sent Uber a follow up letter on June 27, 2019. **Exhibit G** is a true and correct copy of that follow-up letter.

116. On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters stating that Mr. Levandowski had breached the Indemnification Agreement, that a majority of the interim award was "attributable to an Excluded Claim," and that "Uber has no contractual obligation to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's behalf." **Exhibit H** is a true and correct copy of Uber's July 3, 2019 letter.

117. On August 15, 2019, Mr. Levandowski was indicted for thirty-three counts of trade secret misappropriation. The alleged trade secrets at issue in the indictment were some of the same ones that were at issue in the Waymo Action. Mr. Levandowski ultimately agreed to plead guilty to one count of trade secret misappropriation based on his access of one Google document containing trade secret information on one occasion after he left Google and has accepted restitutionary obligations in the amount of $756,499.22. This one file was the same file that Stroz expressly identified in its report to Uber, and in fact, the Stroz report was the basis for the indictment and the plea. The government agreed to dismiss the remaining thirty-two counts against Mr. Levandowski.

118. On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for which was rescission of the agreement. **Exhibit I** is a true and correct copy of Uber's August 30, 2019 letter.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

119.    At this point in time, Uber did not clearly state that the Indemnification Agreement was rescinded (and instead said it had a remedy of rescission should it choose to exercise it), make any offer to restore the consideration it received under the agreement, or cede control of Mr. Levandowski's defense.

120.    Uber continued to advance payment for expenses incurred through September 25, 2019.

121.    On September 27, 2019, Uber exercised its control over Mr. Levandowski to terminate its engagement of Goodwin Procter as counsel for Mr. Levandowski.  Following this termination, Mr. Levandowski separately engaged Goodwin Procter to represent him.

122.    In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission.  In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims.  Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **Exhibit J** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

123.    On December 6, 2019, the arbitration panel issued a final arbitration award.  In addition to the findings from the Interim Award, the Final Award awarded Google prejudgment interest at the 10% rate pursuant to Cal. Civ. Code § 3287, and awarded attorneys' fees and costs to Google under Cal. Civ. Code. § 1717.

124.    The Final Award was not based on any alleged trade secret misappropriation by Mr. Levandowski or others.  During the arbitration proceedings, Google had repeatedly represented that it was pursuing only claims premised on different conduct than what was at issue in the Waymo litigation.  The arbitration panel recognized this on several occasions.

125.    On December 10, 2019, Mr. Levandowski informed Uber of the final award. **Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter.  Because of the lack of clarity in Uber's previous statements, Mr. Levandowski asked Uber, as the Indemnitor in control of the defense of the case, how it would like to proceed.  Specifically,

FIRST AMENDED COMPLAINT

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Mr. Levandowski inquired whether Uber intended to resolve the matter by paying the judgment or whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal and posting a bond to stay the judgment pending appeal.

126.    On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019 letter and stated that it rescinded the Indemnification Agreement.  **Exhibit L** is a true and correct copy of Uber's December 31, 2019 letter.  The stated basis for rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement for Expenses paid relating to the claims based on Tyto.

127.    Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

128.    In addition, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals."

129.    On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019.  Uber did not provide payment for any Expenses incurred after that date.

130.    On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,047,998.64. **Exhibit M** is a true and correct copy of the judgment in Google's favor.

131.    On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a chapter 11 petition in the United States Bankruptcy Court for the Northern District of California commencing the Chapter 11 Case.

132.    On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement.  In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019

24

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

and February 29, 2020. **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without exhibits.

133. On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay Google's judgment or any other Expenses. **Exhibit O** is a copy of Uber's March 27, 2020 letter.

134. As a result, Mr. Levandowski filed an arbitration demand with JAMS San Francisco.

135. Uber filed an answer on April 13, 2020 in which it alleged, among other defenses that it had rescinded the Indemnification Agreement based on Mr. Levandowski's purported fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.

136. On July 6, 2020, Uber filed the Proof of Claim, through which it brought into the Chapter 11 Case issues from the arbitration to support its purported position as a creditor of Mr. Levandowski. **Exhibit P** is a true and correct copy of Uber's Proof of Claim, ECF No. 8-1.

137. On July 28, 2020, the parties agreed, and the Court approved, that Mr. Levandowski could withdraw his arbitration demand and that all disputes in the arbitration demand, the original complaint in this proceeding, and Uber's proof of claim would be resolved as part of this Adversary Proceeding.

## COUNT I

### (Declaratory Judgment - Waymo Settlement Release)

138. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

139. On February 8, 2018, Waymo and Uber executed a settlement agreement to resolve Waymo's dispute with Uber.

140. Upon information and belief, the Waymo Settlement contained broad releases in which Google and Uber released known and unknown claims that have or could be asserted against the other's past and former employees.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

25

FIRST AMENDED COMPLAINT

Case: 20-03052   Doc# 49-8   Filed: 06/23/21   Entered: 06/23/21 20:10:35   Page 25 of 44
240 of 555

141.     Upon information and belief, Mr. Levandowski is a beneficiary of the releases in the Waymo Settlement as he is a former employee of Google.

142.     Upon information and belief, Google excluded from its release the arbitration claims against Mr. Levandowski and Uber did not exclude any claims against Mr. Levandowski in its release.

143.     Upon information and belief, all of the claims in the Proof of Claim and Uber's Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto,  and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, were released by Uber in the Waymo Settlement.

144.     As a result of the Proof of Claim and Mr. Levandowski's objection thereto, a live controversy exists as to whether Uber released Mr. Levandowski in the Waymo Settlement and, if so, what claims Uber released.

145.     This issue is ripe for determination and requires a declaration as to Mr. Levandowski's rights in the Waymo Settlement.

146.     Mr. Levandowski seeks a declaration that the claims and defenses in the Proof of Claim and Uber's Amended Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto,  and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, are barred by the Waymo Settlement.

## <u>COUNT II</u>

### (Specific Performance to Pay Expenses)

147.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

148.	On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

149.	Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

150.	As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims.  *Id*. at 3.

151.	Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within a set period following a request for advancement.

152.	On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

153.	Uber has refused to advance payment for the Expenses requested in the March 6 Request and continues to refuse to pay for any Expenses.

154.	Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

155.	In the Indemnification Agreement, Uber agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy.  *See id*. at § 3.11.  Uber also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement.  *See id.*

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

27

156.     Moreover, Mr. Levandowski has been irreparably harmed by Uber's continued breach of the Indemnification Agreement.  By way of example only, Uber's breach of the Indemnification Agreement directly caused Mr. Levandowski to have to file this bankruptcy proceeding.  The parties to the Indemnification Agreement specifically agreed that disputes regarding reimbursement of payments made under the Indemnification Agreement would not take be resolved until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred.  Uber's breach has materially impacted Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

157.     Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id.* § 3.5.

158.     The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

159.     A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim and have agreed to seek resolution of whether any claim is an Excluded Claim in this proceeding.  .

160.     The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

161.     Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber pay for the Expenses requested on March 6, 2020 as well as payment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far, as well as any post-judgement interest which has or will accrue, and all other Expenses that Mr. Levandowski has and will incur.

//

//

//

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

28

## **(Breach of Indemnification Agreement)**

162.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

163.     On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

164.     Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

165.     As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims.  *Id*. at 3.

166.     Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within fifteen Business Days of a request for advancement.

167.     On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

168.     Uber has refused to advance payment for the Expenses requested in the March 6 Request.  Mr. Levandowski has paid many of the Expenses since Uber refused to advance payment.

169.     Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

170.     As a result of Uber's refusal to honor its obligations under the Indemnification Agreement, Mr. Levandowski has suffered damages at least in the amount of the Expenses he has paid and will be required to pay to continue funding this litigation against Uber, the cost of the chapter 11 proceedings and this adversary proceeding and having to liquidate assets in the middle of a pandemic to continue to pursue his rights under the Indemnification Agreement and in challenging Google's judgment.

## COUNT IV

### (Declaratory Judgment – Uber's Rescission Claim)

171.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

172.     In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.

173.     In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

174.     Mr. Levandowski contends that Uber waived any right to rescind because it expressly confirmed and ratified the Otto Trucking Merger Agreement, one key component of the April 11, 2016 transactions, and thereby ratified the transaction Uber claims it was fraudulently induced into entering.

175.     Mr. Levandowski also contends that Uber also impliedly waived, is estopped from asserting, and/or ratified any alleged fraudulent inducement on which Uber's purported rescission is based by entering into an amendment of the transaction Uber alleges it was fraudulently induced to enter into.

176.     Mr. Levandowski further contends that Uber's rescission claim is barred by its unreasonable delay in rescinding the Indemnification Agreement, failure to return consideration provided, and actions by Uber that are inconsistent with a claim for rescission as described hereinabove.

177.     Uber has not returned any consideration it received under the Indemnity Agreement, including Mr. Levandowski's devices, which it continues to retain through Stroz, as

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

well as the consideration received under the full transaction for the Otto acquisition. Such failure is fatal to any rescission claim, especially where, as here, Uber's refusal or inability to return the consideration it received is due to its delay in exercising any purported right to rescission.

178. To the extent that Uber's ability to return the consideration received is impossible, this impossibility is due to Uber's delay in exercising the purported rescission after it controlled Mr. Levandowski's defense and settlement ability for years and benefited from Mr. Levandowski's cooperation with his defense and Uber's defense in the Waymo action.

179. Uber has also ratified any purported fraud and acted in ways inconsistent with rescission, including by affirming its obligations under the Indemnification Agreement in its public filings.

180. Uber's performance under the Indemnification Agreement for years and belated rescission of that agreement has substantially prejudiced Mr. Levandowski.

181. Finally, upon information and belief, Uber has released any claim for rescission as part of its release in the Waymo Settlement.

182. As a result of the acts described herein, a live controversy exists as to whether Uber has a right to rescind and whether its purported rescission is effective.

183. This issue is ripe for determination and requires a declaration as to Uber's right to rescind the Indemnification Agreement and whether Uber is a proper creditor in the Chapter 11 Case.

184. Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement.

## <u>COUNT V</u>

### (Declaratory Judgment and Damages: Rescission of Otto Transaction)

185. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

186. As shown herein, Mr. Levandowski denies that Uber has any right to rescind the Indemnity Agreement and Mr. Levandowski seeks a declaratory judgment regarding Uber's rescission claim/defense.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

187.    Alternatively, if the Court determines that Uber has rescinded the Indemnification Agreement, the entirety of the Otto transaction must also be rescinded and all consideration Uber received from the Otto transaction must be returned to Mr. Levandowski.

188.    In agreeing to sell Otto to Uber and lead Uber's self-driving car program, Mr. Levandowski conveyed repeatedly to Uber's representatives that he was concerned that Google would sue him.  Because of these concerns, Uber agreed to provided indemnity as key and indivisible part of the Otto transaction and as an inducement to Mr. Levandowski to sell Otto to Uber. Mr. Levandowski would not have entered into the Otto transaction without the Indemnity Agreement because of his well-founded fear of litigation against him by Google.

189.    For this reason, on April 11, 2016, Uber and Mr. Levandowski executed documents for the acquisition of Otto, including the Indemnification Agreement.   All of the agreements executed on April 11, 2016 are part of one single transaction that can not be divided.

190.    Uber's rescission of the Indemnification Agreement necessarily requires rescission of the entire Otto transaction, including returning all consideration related to the transaction, including the intellectual property Uber received from its acquisition of Otto.

191.    Should the Court determine that Uber effectively rescinded the Indemnification Agreement, a live controversy exists as to whether Uber's rescission also rescinds the Otto transaction and requires return of all consideration Uber received from that transaction.

192.    Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement without also rescinding the Otto transaction and returning all consideration received from that deal.

193.    In addition, Mr. Levandowski seeks damages, including any consequential damages, arising out of Uber's rescission of the Otto transaction.

## <u>COUNT VI</u>

### (Declaration As to Unenforceability of Amendment and Termination of

### Otto Trucking Agreement as to Anthony Levandowski)

194.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

195.    Mr. Levandowski is a party to the Otto Trucking Agreement, including as to Section 5.4 and 5.11.

196.    Section 5.4 allowed Mr. Levandowski to form a new trucking company and to obtain the IP License from Uber if Uber failed to satisfy its funding obligations to Otto Trucking in the three years after closing on that transaction.

197.    Section 5.11 allowed Mr. Levandowski to form a new trucking company and demand that Uber provide him with the IP License for use in the new trucking company if Uber terminated the Otto Trucking Agreement after acquiring Otto.

198.    Uber closed on its acquisition of Otto on August 18, 2016.

199.    In November 2017, Uber provided notice that it was exercising its option to acquire Otto Trucking.

200.    After providing notice, Uber stalled the closing of the Otto Trucking acquisition.

201.    Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was controling Mr. Levandowski's defense, including regarding settlement.

202.    Upon information and belief, Uber agreed in the Waymo settlement to terms that gave away Mr. Levandowski's rights.

203.    Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

204.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

205.    Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

206.    Uber acquired Otto Trucking on August 5, 2018.

207.    On August 31, 2020, in response to Mr. Levandowski's complaint, Uber answered and alleged that it had terminated the Otto Trucking Agreement and had acquired Otto Trucking pursuant to a new Otto Trucking agreement dated August 5, 2018.

208.    This was the first time that Mr. Levandowski learned that Uber had terminated the Otto Trucking Agreement.

209.    On September 11, 2020, Uber produced a copy of an Amendment and Termination of the Otto Trucking Agreement dated August 5, 2018 (the "Termination Agreement") and an Agreement and Plan of Merger for Otto Trucking LLC dated August 5, 2018 (the "New Otto Trucking Agreement").

210.    Upon receipt, of the Termination Agreement, Mr. Levandowski learned for the first time that Uber and Otto Trucking had agreed to terminate the Otto Trucking Agreement.

211.    Mr. Levandowski also learned that while the agreement affirmed his status as a party as to Section 5.11, it purported to terminate his rights under that provision without his knowledge or consent.

212.    Indeed, Mr. Levandowski did not sign the Termination Agreement and has never agreed to relinquish his right to the IP License.

213.    A controversy exists as to whether Uber and Otto Trucking's purported termination of Section 5.11 is enforceable and effective as to Mr. Levandowski.

214.    Mr. Levandowski thus seeks a declaration that Uber and Otto Trucking could not and did not terminate his rights under Section 5.11 when it executed the Termination Agreement without his consent or signature on that document.

## <u>COUNT VII</u>

**(Specific Performance of Uber's Obligations to Provide Mr. Levandowski an IP License and Form an New Trucking Company Under Section 5.11 of Otto Trucking Agreement)**

215.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

Case: 20-03052    Doc# 298-1    Filed: 06/28/24    Entered: 06/28/24 16:05:47    Page 34 of
249 44 555

216.     In addition to requiring the Indemnification Agreement, Mr. Levandowski also conditioned his sale of Otto to Uber on Uber's support for his autonomous trucking business. Uber agreed to this condition in the Otto Trucking Agreement.

217.     Under the Otto Trucking Agreement, Uber received an option to acquire Otto Trucking.

218.     Uber closed on its acquisition of Otto on August 18, 2016.  The effect of the acquisition of Otto obligated Uber to support Mr. Levandowski's trucking business as the only scenario where Uber could walk away from Otto Trucking was if Uber did not acquire Otto.  For example, even if Uber terminated the Otto Trucking Agreement after acquired Otto, Uber was required to give Mr. Levandowski an exclusive license to use Uber's self-driving technology in the field of trucking to form a new trucking company outside of Uber.  The terms of the exclusive license are described at Exhibits E and F of the Otto Trucking Agreement.

219.     In late November 2017, Uber exercised its right to acquire Otto Trucking by providing notice of its decision.

220.     On August 5, 2018, Uber terminated the Otto Trucking Agreement.

221.     Uber hid its termination of the Otto Trucking Agreement from Mr. Levandowski for over two years, finally disclosing its purported termination of the Otto Trucking Agreement only recently in its answer to the Complaint.

222.     Under Section 5.11, because Uber acquired Otto and obtained the benefits of that acquisition, Uber is required to provide a license to these patents and any other patents or intellectual property related to autonomous trucking to Mr. Levandowski for use in the field of trucking.

223.     Mr. Levandowski seeks specific performance of Uber's obligation under Section 5.11.  Specifically, Mr. Levandowski seeks an order requiring Uber to provide a company formed by Mr. Levandowski the IP License in a form consistent with Exhibit E and F of the Otto Trucking Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

35

224.     A search for autonomous driving related patents yielded over hundreds of results for patents owned by Uber.  **Exhibit Q** is a copy of the patent search result for Uber's self-driving related patents.

225.     Mr. Levandowski has performed all obligations under the Otto Trucking Agreement.

226.     Although Mr. Levandowski contends that the ten business day period referenced in Section 5.11 relates to how "promptly" his right to the IP License becomes available after termination of the Otto Trucking Agreement and that there is no deadline to provide such notices, on September 21, 2020, within ten business days of receipt of the Termination Agreement, Mr. Levandowski provided Uber with written notice that he is exercising his right to form the new trucking company, and has requested that Uber provide the IP License and work together to sign and prepare organization documents for the new company.  **Exhibit R** is a copy of the letter notifying Uber of Mr. Levandowski's election of the right to obtain the IP License.

227.     Uber has refused to provide the requested license.

228.     Mr. Levandowski will be irreparably harmed by Uber's refusal to provide the IP License and to form the trucking company as agreed.

229.     Uber received adequate consideration, at least in the form of its acquisition of Otto, in exchange for agreeing to Mr. Levandowski's right to lead an autonomous trucking business within Uber or with Uber's IP License.

230.     A mutuality of remedies exists as the agreement provides for a method for adjudicating disputes, including allowing either party to sue for specific performance.

231.     The contract is sufficiently definite in requiring that Uber must provide the IP License to Mr. Levandowski on terms consistent with Exhibits E and F of the Otto Trucking Agreement if the Otto Trucking Agreement was terminated after Uber acquired Otto.

232.     Therefore, Mr. Levandowski seeks an order from the Court requiring Uber to provide the IP License as required by Section 5.11 of the Otto Trucking Agreement and to work with Mr. Levandowski to form the new trucking company.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

Case: 20-03052   Doc# 298-1   Filed: 08/28/24   Entered: 09/28/24 10:35:37   Page 36 of
251 44 555

233.     In the alternative, Mr. Levandowski seeks damages for Uber's breach of Section 5.11 of the Otto Trucking Agreement, including damages for the value of the IP License and either the value of Uber Freight, which is estimated as $4 billion once Uber closes on its latest round of financing, and/or the trucking company he should have been able to form and operate using the IP License and lost profits from that company.

## COUNT VIII

**(Declaration Regarding Uber's Fiduciary Duty To Shut Down Uber Freight)**

234.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

235.     In addition to requiring Uber to provide the IP License upon termination, Section 5.11 of the Otto Trucking Agreement also requires Uber to become a member of a new limited liability trucking company formed by Mr. Levandowski.

236.     Uber's membership interest was to be 50% of the then available shares.

237.     The material terms of Uber's membership are provided in Exhibit F to the Otto Trucking Agreement, referenced in Section 5.11.

238.     Exhibit F addressed fiduciary duties of managers during the initial development of the company, requiring that they owe the duties to the company and the holders of equity in that company the same fiduciary duties that would be owed in a corporation until the company raises at least $17,500,000 in investments.

239.     Exhibit F, however, does not contain any limitation or waiver of the statutory fiduciary duties owed by members of the company to the company and other members.

240.     As such, once formed, Uber owes the new trucking company and Mr. Levandowski statutory fiduciary duties, including the duty not to compete with the company, including by continuing to operate Uber Freight.

241.     In its answer, Uber denies that Exhibit F contemplates that Uber would owe Mr. Levandowski and the new trucking company fiduciary duties that would prevent it from competing with the company.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

37

Case: 20-03052   Doc# 4298-1   Filed: 06/28/24   Entered: 06/28/24 20:41:35   Page 37 of 555

242.    As such, a controversy exists as to what fiduciary duties Uber will owe in the new trucking company to be formed consistent with the terms of Section 5.11 and Exhibit F of the Otto Trucking Agreement and whether Uber may continue to operate Uber Freight once that company is formed.

243.    Mr. Levandowski requests a declaration as to Uber's obligations and fiduciary duties to Mr. Levandowski and the new trucking company as provided in Section 5.11 and Exhibit F of the Otto Trucking Agreement, including, Uber's obligation to shut down Uber Freight.

## COUNT IX

### (Breach of Covenant of Good Faith and Fair Dealing )

244.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

245.    In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business.  Uber agreed to that condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

246.    The Otto Trucking Agreement includes an implied covenant of good faith and fair dealing. The implied covenant ensures that neither party may engage in arbitrary or unreasonable conduct and thereby prevent the other party from receiving the fruits of the bargain.

247.    The intent of the parties for Mr. Levandowski to be able to continue to pursue the trucking business he left Google to start with Uber's support in exchange for Mr. Levandowski selling Otto to Uber.

248.    This intent is reflected in the Otto Trucking Agreement as the only scenario where Uber could walk away from Otto Trucking and not support Mr. Levandowski's trucking business was if Uber did not acquire Otto.

249.    After acquiring Otto, Uber had two options for supporting the trucking business.  It could acquire Otto Trucking and appoint Mr. Levandowski as the non-executive chairman of that business.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

38

250.     In the alternative, Uber could terminate the acquisition of Otto Trucking, but support an outside trucking venture started by Mr. Levandowski as an investor.  Uber was obligated to provide an exclusive license to its self-driving technology for Mr. Levandowski to use in the field of trucking in exchange for membership in Mr. Levandowski's new company. The IP License was an exclusive license for trucking, which barred Uber from competing with Mr. Levandowski's trucking business.  Uber's membership interest in Mr. Levandowski's new company also prevented Uber from competing with that business based on the statutory duties owed by members of an LLC.

251.     Uber did neither.

252.     Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was in control of Mr. Levandowski's defense and settlement prospects, and had barred Mr. Levandowski from participating in the settlement discussion or discussing settlement directly with Google.

253.     Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

254.     Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

255.     Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

256.     But Mr. Levandowski, as a Company Founder and in his individual capacity, remained a party to the Otto Trucking Agreement with respect to Section 5.4 and 5.11 of that agreement and a beneficiary of the remainder of the Otto Trucking Agreement independent of his prior status as a unitholder of the company.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

257.     Uber and Otto Trucking agreed between them, without Mr. Levandowski's agreement or consent, to terminate the Otto Trucking Agreement.

258.     Uber and Otto Trucking hid the termination from him for two years.

259.     Despite terminating the Otto Trucking Agreement after acquiring Otto, Uber refused to provide Mr. Levandowski with the IP License, and in fact, Uber and Otto Trucking agreed, without Mr. Levandowski's agreement or consent and without providing any consideration, to terminate Mr. Levandowski's individual rights under the Otto Trucking Agreement.[1]

260.     Uber and Otto Trucking then entered into a separate agreement whereby Uber proceeded to acquire Otto Trucking and started Uber Freight without Mr. Levandowski, the trucking business Uber had promised that Mr. Levandowski would lead.

261.     In fact, the parties agreed in the New Trucking Agreement to terms intended to keep Mr. Levandowski out of the company.

262.     As a party to section 5.4 and 5.11 and as a beneficiary to the remainder of the Otto Trucking Agreement, Mr. Levandowski has a right to enforce that agreement, including the covenant of good faith and fair dealing.

263.     To the extent that Mr. Levandowski has any obligations under that agreement, he has satisfied them.

264.     Uber's actions described herein were unreasonable, made in bad faith, and have deprived Mr. Levandowski of the fruits of the bargain, including the agreed-to benefit of running a trucking business with Uber's support.

265.     By preventing Mr. Levandowski from obtaining the benefits of the Otto Trucking Agreement, Uber has violated the implied covenant of good faith and fair dealing.

266.     After Mr. Levandowski's forced divestment, Uber's refusal to provide the IP License and for the new trucking company, and Uber's acquisition of Otto Trucking to form Uber Freight, Uber continued to operate that business.  Uber Freight has reported hundreds of

---

[1] Mr.Levandowski contends, as alleged in Count VII that such agreement to terminate Mr. Levandowski's rights was ineffective and unenforceable.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

millions in revenue since its creation and Mr. Ron, who heads Uber Freight, stated that he and Uber "think there is a very clear path to profitability."

267. As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

**COUNT X**

**(Objection to Claim)**

268. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

269. For the reasons set forth above, the Indemnity Agreement is not subject to rescission and, if it had been, Uber waived its right to assert such remedy.

270. For the reasons set forth above, Uber is liable under the Indemnity Agreement to advance his Expenses (as defined in the Indemnification Agreement).

271. For the reasons set forth above, Mr. Levandowski generally denies the evidentiary bases upon which the Proof of Claim is based and specifically denies that (a) Uber was fraudulently induced to enter into the Indemnity Agreement, (b) Mr. Levandowski failed to comply with his obligations under the Indemnity Agreement, and (c) Uber's obligations under the Indemnity Agreement are subject to allocation as asserted in the Proof of Claim, which in any event, cannot be adjudicated until after Uber satisfies its obligations under the Indemnification Agreement.

272. For the reasons set forth above, any claim for offset or contribution is also undermined by its active participation in the conduct at issue in the Waymo Action and the Google arbitration as it (a) encouraged, if not directed, Mr. Levandowski to recruit Google employees to join Otto and Uber, and (b) knew about Mr. Levandowski's retention of Google information and access of the one file at issue in the plea agreement after he left Google.

273. For the reasons set forth above, Mr. Levandowski denies that Uber has any right to contribution from Mr. Levandowski for the Waymo settlement. Waymo did not prove that Mr. Levandowski misappropriated any trade secrets in that case. As for the one file that Mr. Levandowski accessed after he left Google, Uber was well aware of that conduct and proceeded

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

41

to acquire Mr. Levandowski's company and work with him anyway. Moreover, Mr. Levandowski's guilty plea that resulted in a total restitution amount of approximately $750,000 further demonstrates the unreasonableness of Uber's decision to settle with Waymo for $245,000,000 in stock, among other consideration. In addition, to the extent that any trade secrets were taken and used at Uber, those trade secrets did not come from Mr. Levandowski, but rather a different former Google employee. Indeed, as admitted in Uber's public statements, Uber's self-driving software—an area that Mr. Levandowski did not work on at Google or Uber—contained problematic functions that will require it to enter into a license agreement with Waymo for use of Waymo's intellectual property. Upon information and belief, the Waymo Settlement, entered into after discovery of possible misconduct relating to Uber's source code, settled issues relating to theft of trade secrets by individuals who are not Mr. Levandowski.

274. Mr. Levandowski therefore seeks disallowance in full of the Proof of Claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Levandowski prays for the following relief:

1. A declaration that Uber has released all claims and defenses against Mr. Levandowski alleged in the Proof of Claim and Amended Answer and Counterclaims;

2. An order enforcing the Indemnification Agreement and requiring Uber pay all Expenses Mr. Levandowski has incurred and will incur, including Google's judgment and any interest that has accrued;

3. Damages for Uber's breach of the Indemnification Agreement;

4. A declaration that Uber's purported rescission of the Indemnification Agreement is ineffective and invalid;

5. In the alternative to paragraph 4, a declaration that if Uber's rescission of the Indemnification Agreement is effective, the entire Otto transaction is rescinded and all consideration received from that transaction must be returned;

6. A declaration that Uber's attempt to eliminate Mr. Levandowski's rights under Section 5.11 of the Otto Trucking Agreement is unenforceable;

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

7.  An order requiring Uber to specifically perform its obligations under Section 5.11 of the Otto Trucking Agreement to provide Mr. Levandowski the IP License and to form the new trucking company or, in the alternative, damages for the value of that license and the valuation of Uber Freight and/or the trucking business that would have been formed but for Uber's breaches and lost profits from that business;

8.  A declaration that Uber Freight must be shut down;

9.  Damages in an amount to be proven at trial for Uber's breach of the express and implied terms of the Otto Trucking Agreement;

10. An order disallowing in full the proof of claim;

11. Prejudgment and post-judgment interest;

12. Attorneys' fees and costs incurred by Mr. Levandowski pursuant to Section 3.2 of the Indemnification Agreement and Section 8(n) of the Otto Trucking Agreement, including fees incurred in the Bankruptcy proceeding due to Uber's failure to advance expenses; and

//

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

43

1    13.    All other relief that is equitable and just.

2    Dated: September 28, 2020                    Respectfully submitted,

3
                                                By:/s/ *Brett M. Schuman*
4                                                   Brett M. Schuman (SBN 189247)
                                                   *bschuman@goodwinlaw.com*
5                                                   Rachel M. Walsh (SBN 250568)
                                                   *rwalsh@goodwinlaw.com*
6                                                   **GOODWIN PROCTER LLP**
                                                   Three Embarcadero Center
7                                                   San Francisco, California 94111
                                                   Tel.: +1 415 733 6000
8                                                   Fax.: +1 415 677 9041

9                                                   Hong-An Vu
                                                   *HVu@goodwinlaw.com*
10                                                  **GOODWIN PROCTER LLP**
                                                   601 S. Figueroa Street, 41st Flr.
11                                                  Los Angeles, California  90017
                                                   Tel.: +1 213 426 2500
12                                                  Fax: +1 213 623 1673

13                                               Attorneys for Plaintiff and Debtor and Debtor
                                                In Possession Anthony Levandowski
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GOODWIN PROCTER LLP**
ATTORNEYS AT LAW
SILICON VALLEY

44

FIRST AMENDED COMPLAINT

Case: 20-03050   Doc# 1  Filed: 09/28/20  Entered: 09/28/20 17:36:05   Page 44 of
259

# EXHIBIT F

1   **KELLER BENVENUTTI KIM** LLP
    TOBIAS S. KELLER (SBN 151445)
2   *tkeller@kbkllp.com*
    DARA L. SILVEIRA (SBN 274923)
3   *dsilveira@kbkllp.com*
    650 California Street, Suite 1900
4   San Francisco, California 94108
    Tel.: +1 415 364 6793
5   Fax: +1 650 636 9251

6   BRETT M. SCHUMAN (SBN 189247)
    *bschuman@goodwinlaw.com*
7   RACHEL M. WALSH (SBN 250568)
    *rwalsh@goodwinlaw.com*
8   **GOODWIN PROCTER** LLP
    Three Embarcadero Center
9   San Francisco, California 94111
    Tel.: +1 415 733 6000
10  Fax.: +1 415 677 9041

11  HONG-AN VU (SBN 266268)
    *hvu@goodwinlaw.com*
12  **GOODWIN PROCTER** LLP
    601 S. Figueroa Street, 41st Flr.
13  Los Angeles, California 90017
    Tel.: +1 213 426 2500
14  Fax: +1 213 623 1673

15  *Attorneys for Plaintiff and Debtor and*
    *Debtor in Possession Anthony S. Levandowski*
16

17              **UNITED STATES BANKRUPTCY COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19                   **SAN FRANCISCO DIVISION**

20  In re:                              Bankruptcy Case
                                        No. 20-30242 (HLB)
21  ANTHONY SCOTT LEVANDOWSKI,          Chapter 11

22              Debtor.                 **Adv. Pro. No. 20-03050 (HLB)**

23  ANTHONY LEVANDOWSKI, an individual, **ANSWER TO DEFENDANT UBER**
                                        **TECHNOLOGIES, INC.'S AMENDED**
24              Plaintiff,              **COUNTERCLAIMS; AND**
                                        **AFFIRMATIVE DEFENSES**
25      v.

26  UBER TECHNOLOGIES, INC.

27              Defendant.

28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ANSWER TO AMENDED COUNTERCLAIMS; AND AFFIRMATIVE DEFENSES

Case: 20-03050   Doc# 51-2   Filed: 02/13/23   Entered: 02/13/23 15:35   Page 40
261 of 555

Anthony Scott Levandowski ("Levandowski"), as debtor and debtor in possession in the above-captioned Chapter 11 case (the "Chapter 11 Case"), and as Counterclaim Defendant in the above-captioned adversary proceeding (the "Adversary Proceeding"), by and through his attorneys, hereby states as follows:

**THE PARTIES**

1. In response to Paragraph 1, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

2. In response to Paragraph 2, Levandowski admits the allegations set forth therein.

**JURISDICTION AND VENUE**

3. In response to Paragraph 3, Levandowski admits that he filed a Chapter 11 voluntary petition on March 4, 2020 in the United States Bankruptcy Court for the Northern District of California in the matter, *In re Anthony Scott Levandowski*, Bankruptcy Petition No. 20-30242 (HLB). Levandowski further states that Paragraph 3 contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

4. In response to Paragraph 4, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

5. In response to Paragraph 5, Levandowski admits that venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court. Pursuant to that Stipulation, Levandowski does not dispute that venue is proper before this Court with respect to Uber's Counterclaims. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

**FACTS**

6. In response to Paragraph 6, Levandowski refers to his allegations in Paragraphs 1–252 of his Complaint.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

7.      In response to Paragraph 7, Levandowski admits he worked at Google in a division referred to as "Project Chauffeur." Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

8.      In response to Paragraph 8, Levandowski admits that he had entered into a term sheet with Uber by February 22, 2016. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

9.      In response to Paragraph 9, Levandowski admits that he was interviewed by Stroz employees on March 22 and 23, 2016, and also states that Stroz interviewed him on April 2, 2016 as well. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

10.     In response to Paragraph 10, Levandowski admits that Stroz interviewed him and drafted a memo that summarized his interview that stated that Stroz had asked him about "side projects" but denies that the Stroz memo from which the allegations in Paragraph 10 rely is accurate and complete. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

11.     In response to Paragraph 11, Levandowski admits that Otto had acquired Tyto with Uber's consent in May 2016. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding Uber's knowledge, and therefore denies them. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

12.     In response to Paragraph 12, Levandowski admits that Stroz interviewed him and drafted a memo that stated that he had communicated that information found on his devices was stored in the normal course of his work at Google, that he was not aware of the volume of Google information Stroz found on his devices, and that he accurately told Uber that as of the date of the

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

ANSWER TO AMENDED COUNTERCLAIMS; AND AFFIRMATIVE DEFENSES

Case 2:03-30242   Doc #: 235-12   Filed: 08/26/22   Page 8 of 40
263 of 555

interviews, he did not intend to rely on any information or data from Google in his work for Uber. However, Levandowski denies that the Stroz memo from which the allegations in Paragraph 10 rely is accurate and complete. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

13.     In response to Paragraph 13, Levandowski states that the written attestation referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

14.     In response to Paragraph 14, Levandowski denies the allegations therein.

15.     In response to Paragraph 15, Levandowski denies the allegations therein.

16.     In response to Paragraph 16, Levandowski admits that he and Uber entered into the Indemnification Agreement on April 11, 2016 as part of a transaction for Uber to acquire Ottomotto and Otto Trucking. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

17.     In response to Paragraph 17, Levandowski denies the allegations therein.

18.     In response to Paragraph 18, Levandowski states that the allegations reference a writing, and to the extent that writing exists, it speaks for itself. Levandowski therefore denies any and all allegations to the extent inconsistent with the contents therein.

19.     In response to Paragraph 19, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

20.     In response to Paragraph 20, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

21.     In response to Paragraph 21, Levandowski denies the allegations therein.

22.     In response to Paragraph 22, Levandowski admits to the allegations therein.

23.     In response to Paragraph 23, Levandowski denies the allegations therein.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

4

ANSWER TO AMENDED COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

Case 2:03-cv-30242 Doc. 50-2 Filed: Dec. 26, 2004 Entered: 05/23/10 14:35 Page # of 40
264 of 555

24. In response to Paragraph 24, Levandowski states that the indictment referenced therein pertaining to the matter, *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019), speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

25. In response to Paragraph 25, Levandowski states that the indictment referenced therein pertaining to the matter, *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019) speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

26. In response to Paragraph 26, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

27. In response to Paragraph 27, Levandowski states that the August 30, 2019 letter from Uber to Levandowski referenced therein, and the Indemnification Agreement also referenced therein speaks for themselves, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

28. In response to Paragraph 28, Levandowski admits that he received letters from Uber's counsel dated September 11, 2019, September 27, 2019, December 31, 2019, and March 27, 2020. Levandowski further states that the letters dated September 11, 2019, September 27, 2019, December 31, 2019, and March 27, 2020 referenced therein speak for themselves, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

29. In response to Paragraph 29, Levandowski states that the final award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

30. In response to Paragraph 30, Levandowski states that the judgment referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

31. In response to Paragraph 31, Levandowski admits that on March 4, 2020, he filed a Chapter 11 voluntary petition listing Uber as a potential creditor with a claim valued at $1.

Case 20-30242 Doc 502 Filed 03/23/21 Entered 03/23/21 15:35 Page 8 of 40
Case 3:20-cv-04423 Document 23 Filed 10/09/23 Page 265 of 555

Levandowski further states that the petition and attendant documents filed therewith speak for themselves, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

32.     In response to Paragraph 32, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Levandowski denies that he had fraudulently concealed any information when he negotiated the Indemnification Agreement.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

33.     In response to Paragraph 33, Levandowski states that the judgment in the matter, *United States of America v. Anthony Scott Levandowski*, Case No. 19-cr-00377-WHA (N.D. Cal.) referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

34.     In response to Paragraph 34, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

35.     In response to Paragraph 35, Levandowski admits the allegation therein.

36.     In response to Paragraph 36, Levandowski states that the Google Arbitration Award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

37.     In response to Paragraph 37, Levandowski states that the written opinion of the Google Arbitration Panel referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

38.     In response to Paragraph 38, Levandowski states that the written opinion of the Google Arbitration Panel referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

6

39. In response to Paragraph 39, Levandowski states that the Arbitration Award and judgment referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

40. In response to Paragraph 40, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

41. In response to Paragraph 41, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

42. In response to Paragraph 42, Levandowski states that the Indemnification Agreement speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

43. In response to Paragraph 43, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

44. In response to Paragraph 44, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

45. In response to Paragraph 45, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

46. In response to Paragraph 46, Levandowski states that the amended complaint in *Waymo LLC v. Uber Technologies, Inc. et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) and the finding of the Arbitration Panel speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that this Paragraph

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

47. In response to Paragraph 47, Levandowski admits that he had requested consent from Uber for Otto to acquire Tyto, and Uber provided that consent. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

48. In response to Paragraph 48, Levandowski denies the allegations therein. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

49. In response to Paragraph 49, Levandowski states that the Google Arbitration Award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

50. In response to Paragraph 50, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

51. In response to Paragraph 51, Levandowski admits that he was interviewed by Stroz employees on March 22 and 23, 2016, and also adds that he was interviewed again on April 2, 2016. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

52. In response to Paragraph 52, Levandowski denies the allegations therein.

53. In response to Paragraph 53, Levandowski states that Stroz's report referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

8

ANSWER TO AMENDED COUNTERCLAIMS; AND AFFIRMATIVE DEFENSES

Case 2:03-cv-03042 Document 529-2 Filed 03/26/2004 Entered 02/20/04 23:45:35 Page 8 of 40
268 of 555

1  with the contents therein.  Except as expressly admitted, Levandowski denies each and every

2  allegation in this Paragraph.

3      54.    In response to Paragraph 54, Levandowski denies that he failed to disclose to Stroz

4  his involvement with Tyto.  Levandowski further states that he lacks knowledge or information

5  sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each

6  and every allegation set forth therein.

7      55.    In response to Paragraph 55, Levandowski states that the findings of the Google

8  Arbitration Panel referenced therein speaks for itself, and therefore denies any and all allegations

9  to the extent inconsistent with the contents therein.

10     56.    In response to Paragraph 56, Levandowski states that the findings of the Google

11 Arbitration Panel referenced therein speaks for itself, and therefore denies any and all allegations

12 to the extent inconsistent with the contents therein.  Except as expressly admitted, Levandowski

13 denies each and every allegation in this Paragraph.

14     57.    In response to Paragraph 57, Levandowski states that the findings of the Google

15 Arbitration Panel referenced therein speaks for itself, and therefore denies any and all allegations

16 to the extent inconsistent with the contents therein.  Except as expressly admitted, Levandowski

17 denies each and every allegation in this Paragraph.

18     58.    In response to Paragraph 58, Levandowski admits he worked at Google in a

19 division referred to as "Project Chauffeur," participated in the Chauffeur Bonus Plan, and

20 received compensation for his work at Project Chauffeur.  Except as expressly admitted,

21 Levandowski denies each and every allegation in this Paragraph.

22     59.    In response to Paragraph 59, Levandowski states that the award entered by the

23 Google Arbitration Panel referenced therein speaks for itself, and therefore denies any and all

24 allegations to the extent inconsistent with the contents therein.

25     60.    In response to Paragraph 60, Levandowski states that the Chauffeur Bonus Plan

26 referenced therein speaks for itself, and therefore denies any and all allegations to the extent

27 inconsistent with the contents therein.  Except as expressly admitted, Levandowski denies each

28 and every allegation in this Paragraph.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

9

ANSWER TO AMENDED COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

Case 2:03-cv-02354 Document 128-2 Filed 12/20/04 Page 9 of 40
269 of 555

61.     In response to Paragraph 61, Levandowski states that the Arbitration Award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

62.     In response to Paragraph 62, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

63.     In response to Paragraph 63, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

64.     In response to Paragraph 64, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

65.     In response to Paragraph 65, Levandowski denies the allegations therein.

66.     In response to Paragraph 66, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

67.     In response to Paragraph 67, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

10

68.     In response to Paragraph 68, Levandowski admits that Google requested Levandowski's deposition in the Google Arbitration. Levandowski denies any and all remaining allegations of Paragraph 68.

69.     In response to Paragraph 69, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

70.     In response to Paragraph 70, Levandowski states that the January 15, 2018 email referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

71.     In response to Paragraph 71, Levandowski states that the January 15, 2018 email referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

72.     In response to Paragraph 72, Levandowski denies the allegations therein.

73.     In response to Paragraph 73, Levandowski admits that he sat for a deposition on January 18, 2018. Levandowski further states that the transcript of the deposition proceedings on January 18, 2018 referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

74.     In response to Paragraph 74, Levandowski states that the April 2, 2018 letter referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

75.     In response to Paragraph 75, Levandowski states that the April 2, 2018 email referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

76.     In response to Paragraph 76, Levandowski admits the allegations therein.

Case: 20-80252   Document: 32-3   Page: 271   Date Filed: 08/28/2024
Case 3:20-cv-04542   Document: 50-38   Filed 08/28/2024   Page 11 of 555
271   40

77.     In response to Paragraph 77, Levandowski states that the April 24, 2018 decision of the Google Arbitration Panel referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

78.     In response to Paragraph 78, Levandowski denies the allegations therein.

79.     In response to Paragraph 79, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

80.     In response to Paragraph 80, Levandowski denies the allegations therein.

81.     In response to Paragraph 81, Levandowski denies the allegations therein.

82.     In response to Paragraph 82, Levandowski admits that Uber, who was not a party to the Google Arbitration, did not present evidence on allocation of damages at the hearing. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

83.     In response to Paragraph 83, Levandowski denies the allegations therein.

84.     In response to Paragraph 84, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

85.     In response to Paragraph 85, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

## COUNT 1

86.     In response to Paragraph 86, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

12

87. In response to Paragraph 87, Levandowski states that the Arbitration Award and subsequent judgment referenced therein speak for themselves, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

88. In response to Paragraph 88, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

89. In response to Paragraph 89, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

90. In response to Paragraph 90, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

91. In response to Paragraph 91, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

92. In response to Paragraph 92, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

93. In response to Paragraph 93, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski denies all other allegations herein.

94. In response to Paragraph 94, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

13

ANSWER TO AMENDED COUNTERCLAIMS; AND AFFIRMATIVE DEFENSES

Case: 20-80052    Doc# 5098-4  Filed: 06/28/24  Entered: 06/28/24 23:14:35  Page 18 of
273                                 40                               555

95.     In response to Paragraph 95, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

96.     In response to Paragraph 96, Levandowski denies that Uber is entitled to relief. Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

## COUNT II

97.     In response to Paragraph 97, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

98.     In response to Paragraph 98, Levandowski states that California Civil Code § 2774 speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.

99.     In response to Paragraph 99, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

100.    In response to Paragraph 100, Levandowski states that the indictment and the Arbitration Award referenced therein speak for themselves, and therefore denies any and all allegations to the extent inconsistent with the contents therein.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

101.    In response to Paragraph 101, Levandowski states that the judgment in the matter, *United States of America v. Anthony Scott Levandowski*, Case No. 319-cr-00377-WHA (N.D. Cal.) referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

102.    In response to Paragraph 102, Levandowski states that the findings of the Google Arbitration Panel, and the contents of Cal. Civ. Code § 2774 and Cal. Penal Code §§ 502(c)(1)

14

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

and (2) referenced therein speak for themselves, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

103.    In response to Paragraph 103, Levandowski denies the allegations therein.

104.    In response to Paragraph 104, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

105.    In response to Paragraph 105, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

106.    In response to Paragraph 106, Levandowski denies that Uber is entitled to any relief, and denies the allegations therein.

## COUNT III

107.    In response to Paragraph 107, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

108.    In response to Paragraph 108, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

109.    In response to Paragraph 109, Levandowski denies the allegations therein.

110.    In response to Paragraph 110, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

111.    In response to Paragraph 111, Levandowski states that the Indemnification Agreement, amended complaint in the Waymo litigation, and Corrected Final Award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. Levandowski admits that he received indemnification for certain legal

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

fees in connection with Google Arbitration. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

112. In response to Paragraph 112, Levandowski denies the allegations therein.

113. In response to Paragraph 113, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

114. In response to Paragraph 114, Levandowski denies the allegations therein.

115. In response to Paragraph 115, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

116. In response to Paragraph 116, Levandowski states that the Google Arbitration Award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

117. In response to Paragraph 117, Levandowski denies that Uber is entitled to any relief. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

118. In response to Paragraph 118, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

16

119.    In response to Paragraph 119, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

120.    In response to Paragraph 120, Levandowski denies the allegations therein and denies that Uber is entitled to any relief.

## COUNT IV

121.    In response to Paragraph 121, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

122.    In response to Paragraph 122, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

123.    In response to Paragraph 123, Levandowski states that the Arbitration Award and the Indemnification Agreement referenced therein speak for themselves, and therefore denies any and all allegations to the extent inconsistent with the contents therein.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

124.    In response to Paragraph 124, Levandowski states that the Arbitration Award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

125.    In response to Paragraph 125, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

126.    In response to Paragraph 126, Levandowski denies the allegations therein.

127.    In response to Paragraph 127, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

17

128.    In response to Paragraph 128, Levandowski states that this Paragraph contains legal contentions as to which no response is required.

129.    In response to Paragraph 129, Levandowski denies that Uber is entitled to any relief.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

## COUNT V

130.    In response to Paragraph 130, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

131.    In response to Paragraph 131, Levandowski admits that he invoked his Fifth Amendment privilege and that he was not permitted by the arbitrators to testify at the arbitration hearing.  Levandowski further states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

132.    In response to Paragraph 132, Levandowski states that the Indemnification Agreement referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

133.    In response to Paragraph 133, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

134.    In response to Paragraph 134, Levandowski denies the allegations therein.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

18

135.     In response to Paragraph 135, Levandowski states that this Paragraph contains legal contentions as to which no response is required.  Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

136.     In response to Paragraph 136, Levandowski denies that Uber is entitled to any relief, and further denies the allegations therein.

## COUNT VI

137.     In response to Paragraph 137, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

138.     In response to Paragraph 138, Levandowski admits that Uber and other parties entered into the Indemnification Agreement with Levandowski on April 11, 2016 as part of the transaction for Uber to acquire Otto.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

139.     In response to Paragraph 139, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

140.     In response to Paragraph 140, Levandowski states that the document(s) reflecting Stroz's interview with Levandowski on March 22 and 23, 2016 referenced therein speaks for itself, but in any event, denies that the Stroz interview memo and notes are complete and accurate.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

141.     In response to Paragraph 141, Levandowski states that the findings of the Arbitration Panel referenced therein speaks for itself, and therefore denies any and all allegations

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

to the extent inconsistent with the contents therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

142. In response to Paragraph 142, Levandowski states that the document(s) reflecting Stroz's interview with Levandowski on March 22 and 23, 2016 referenced therein speaks for itself, and in any event, denies that the Stroz interview memo or notes are complete and accurate. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

143. In response to Paragraph 143, Levandowski states that the document(s) reflecting Stroz's interview with Levandowski on March 22 and 23, 2016 referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein. in any event, denies that the Stroz interview memo or notes are complete and accurate. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

144. In response to Paragraph 144, Levandowski states that to the extent this Paragraph refers to a written attestation, it speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

145. In response to Paragraph 145, Levandowski states that the written attestation referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

146. In response to Paragraph 146, Levandowski states that the written attestation referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

147. In response to Paragraph 147, Levandowski denies the allegations therein.

148. In response to Paragraph 148, Levandowski denies that he made fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

149. In response to Paragraph 149, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

150. In response to Paragraph 150, Levandowski denies the allegations therein.

151. In response to Paragraph 151, Levandowski denies the allegations therein.

152. In response to Paragraph 152, Levandowski denies the allegations therein.

153. In response to Paragraph 153, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

154. In response to Paragraph 154, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

155. In response to Paragraph 155, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

156. In response to Paragraph 156, Levandowski denies that Uber is entitled to any relief. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

157. In response to Paragraph 157, Levandowski denies that Uber is entitled to any relief. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

158. In response to Paragraph 158, Levandowski denies that Uber is entitled relief, and denies that any of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523

21

(a)(2)(A). Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

159. In response to Paragraph 159, Levandowski denies that he was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, and denies that any of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523 (a)(2)(A). Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

160. In response to Paragraph 160, Levandowski denies that any of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

## COUNT VII

161. In response to Paragraph 161, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

162. In response to Paragraph 162, Levandowski denies the allegations therein.

163. In response to Paragraph 163, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

164. In response to Paragraph 164, Levandowski denies that Uber is entitled to relief on its claim. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

165. In response to Paragraph 165, Levandowski denies that Uber is entitled to relief on its claim. Levandowski further states that this Paragraph contains legal contentions as to which

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

22

no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

166.    In response to Paragraph 166, Levandowski denies that Uber is entitled to relief on its claim.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

167.    In response to Paragraph 167, Levandowski denies that Uber is entitled to relief on its claim.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

168.    In response to Paragraph 168, Levandowski denies that Uber is entitled to relief on its claim.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

169.    In response to Paragraph 169, Levandowski denies that he was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, and denies that Uber is entitled to relief on its claim.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

170.    In response to Paragraph 170, Levandowski denies that Uber is entitled to relief on its claim.  Levandowski further states that this Paragraph contains legal contentions as to which no response is required.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

## <u>COUNT VIII</u>

171.    In response to Paragraph 171, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

172.     In response to Paragraph 172, Levandowski admits that Uber, Levandowski and other parties entered into the Indemnification Agreement on April 11, 2016.  Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

173.     In response to Paragraph 173, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

174.     In response to Paragraph 174, Levandowski admits that he was interviewed by Stroz employees on March 22 and 23, 2016, and adds that he was interviewed again on April 2, 2016.  Levandowski further states that the document(s) reflecting Stroz's interview with Levandowski on March 22 and 23, 2016 referenced therein speaks for itself, and in any event, denies that the Stroz interview memo or notes are complete and accurate.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

175.     In response to Paragraph 175, Levandowski denies the allegations therein.

176.     In response to Paragraph 176, Levandowski denies the allegations therein.

177.     In response to Paragraph 177, Levandowski states that the document(s) reflecting Stroz's interview with Levandowski on March 22 and 23, 2016 referenced therein speak for themselves, and in any event, denies that the Stroz interview memo or notes are complete and accurate.  Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

178.     In response to Paragraph 178, Levandowski states that the writing referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

179.     In response to Paragraph 179, Levandowski states that the written attestation referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

24

180. In response to Paragraph 180, Levandowski states that the written attestation referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

181. In response to Paragraph 181, Levandowski denies the allegations therein.

182. In response to Paragraph 182, Levandowski denies that he made fraudulent representations or omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Levandowski further states that he lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations therein, and therefore denies each and every allegation set forth therein. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

183. In response to Paragraph 183, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

184. In response to Paragraph 184, Levandowski denies the allegations therein.

185. In response to Paragraph 185, Levandowski states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

186. In response to Paragraph 186, Levandowski states that this Paragraph contains legal contentions as to which no response is required.

187. In response to Paragraph 187, Levandowski denies that Uber it entitled to relief on its claim. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

## <u>COUNT IX</u>

188. In response to Paragraph 188, Levandowski refers to its responses to the allegations in all of the above Paragraphs and incorporates by reference such responses as if set forth herein.

Goodwin Procter LLP
ATTORNEYS AT LAW
SILICON VALLEY

189. In response to Paragraph 189, Levandowski states that the Corrected Final Award referenced therein speaks for itself, and therefore denies any and all allegations to the extent inconsistent with the contents therein.

190. In response to Paragraph 190, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

191. In response to Paragraph 191, Levandowski states that he lacks knowledge or information sufficient to form a belief regarding the truth of the allegations therein, and therefore denies each and every allegation set forth therein.

192. In response to Paragraph 192, Levandowski denies the allegations therein.

193. In response to Paragraph 193, Levandowski denies the allegations therein.

194. In response to Paragraph 194, Levandowski denies that Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

195. In response to Paragraph 195, Levandowski denies that the was the lead officer responsible for Uber's self-driving car business during his tenure at Uber and denies that Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

196. In response to Paragraph 196, Levandowski denies that Uber is entitled to relief on its claim. Levandowski further states that this Paragraph contains legal contentions as to which no response is required. Except as expressly admitted, Levandowski denies each and every allegation in this Paragraph.

## **COUNT X**

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

Case: 20-03052   Doc# 32-3   Filed: 09/28/24   Entered: 09/28/24 23:14:55   Page 26 of 40
Case: 20-03052   Doc# 50-3   Filed: 09/28/24   Entered: 09/28/24 23:14:55   Page 26 of 286   of 555

1     197.    In response to Paragraph 197, Levandowski refers to its responses to the

2    allegations in all of the above Paragraphs and incorporates by reference such responses as if set

3    forth herein.

4     198.    In response to Paragraph 198, Levandowski admits that Uber served a proof of

5    claim on July 6, 2020.  The Proof of Claim contains legal conclusions that do not require a

6    response.  Except as expressly admitted, Levandowski denies the allegations in this Paragraph.

7     199.    In response to Paragraph 199, Levandowski admits that on March 4, 2020, he filed

8    a Chapter 11 voluntary petition.  Levandowski further states that the Petition and documents filed

9    therewith as referenced therein speaks for itself, and therefore denies any and all allegations to the

10    extent inconsistent with the contents therein.

11     200.    In response to Paragraph 200, Levandowski states that the Proof of Claim

12    referenced therein speaks for itself, and therefore denies any and all allegations to the extent

13    inconsistent with the contents therein.  Levandowski further states that this Paragraph contains

14    legal contentions as to which no response is required.  Levandowski further states that he lacks

15    knowledge or information sufficient to form a belief regarding the truth of the allegations therein,

16    and therefore denies each and every allegation set forth therein.  Except as expressly admitted,

17    Levandowski denies each and every allegation in this Paragraph.

18     201.    In response to Paragraph 201, Levandowski states that the Proof of Claim

19    referenced therein speaks for itself, and therefore denies any and all allegations to the extent

20    inconsistent with the contents therein.  Except as expressly admitted, Levandowski denies each

21    and every allegation in this Paragraph.

22    **<u>PRAYER FOR RELIEF</u>**

23    Levandowski denies that Uber is entitled to the requested relief or any relief.

24    **<u>AFFIRMATIVE AND ADDITIONAL DEFENSES</u>**

25    By way of further answer, Levandowski alleges and asserts the following defenses in

26    response to the allegations contained in the Counterclaims.  In this regard, Levandowski

27    undertakes the burden of proof only as to the defenses that are deemed affirmative defenses by

28    law, regardless of how such defenses are denominated in the instant Answer.  Levandowski

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

ANSWER TO AMENDED COUNTERCLAIMS; AND AFFIRMATIVE DEFENSES

Case: 20-03052   Doc# 31-38   Filed: 06/23/24   Entered: 06/23/24 21:34:35   Page 29 of

287 of 555

40

reserves the right to amend or assert other affirmative defenses as this action proceeds based on further discovery, legal research, or analysis that may supply additional facts or lend new meaning or clarification to the claims contained in the Complaint.

### FIRST AFFIRMATIVE DEFENSE

### WAIVER

202.    Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

203.    Uber's claims are barred, either in whole or in part, because it expressly or impliedly waived its claims in this action.

204.    In February 2016, Uber entered into a non-binding term sheet with Levandowski to acquire Ottomotto and Otto Trucking.  In connection with the contemplated acquisition, Uber engaged the services of a third-party forensic investigator, Stroz Friedberg.  The purpose of engaging Stroz was to confirm that Google proprietary information was excluded from the assets contemplated in the Uber-Otto transaction.

205.    As part of the Stroz investigation, Stroz requested Levandowski to provide devices to Stroz.  Levandowski fully complied.  Stroz conducted in-person interviews with Levandowski in March 2016 to further detail the information stored on Levandowski's devices and clarify assets in the proposed Uber-Otto transaction.

206.    Levandowski's devices contain the very information that Uber claims is not disclosed.  Specifically, the devices that Stroz requested, and Levandowski provided in response to that request, contained information disclosing the fact of Tyto, its assets, and its relationship to Diligenced Employees.  In fact, Levandowski repeatedly communicated to Uber during the Stroz investigation that the most accurate information pertaining to assets contemplated in the Uber-Otto transaction would be found on those devices themselves.

207.    Uber continued with the Uber-Otto transaction anyway.  Accordingly, Uber entered into the Indemnification Agreement with Levandowski in connection with the closing of the Uber-Otto transaction.  It did so knowing that the Stroz investigation had not yet been completed at that time, and in Levandowski's full disclosure of material information—including

Tyto—learned during the course of the Stroz investigation. In fact, the Stroz report was not completed until August 2016, nearly four months after the Uber-Otto transaction consummated.

208.    Uber, having full knowledge that the Stroz investigation was not complete, and further having full knowledge that information was provided to it that were located on Levandowski's devices, undertook the deliberate decision to consummate the transaction anyway. Uber has waived its claim to now object to enforcement of the Indemnification Agreement based on acts that it knew or should have known at the time of the bargained-for contract, but chose to disregard.

209.    Uber also waived its counterclaims in whole or in party by accepting Levandowski's claim for indemnity without reservation of rights, including after stating its belief that some of the information alleged by Google in the arbitration demands were not disclosed by Levandowski to Stroz.

210.    Uber further waived its counterclaims by waiting more than three years to raise any defenses to the agreement. During that three-year period, Uber performed under the Indemnification Agreement well after it was aware of any alleged basis for rescission, any now alleged Post-Signing Specified Bad Act, and by affirming the Indemnification Agreement expressly and impliedly.

211.    Uber further waived any objections as to Excluded Claims because it failed to disclaim liability and give notice of its reservation of rights at the time the indemnification obligation arose under the Indemnification Agreement, even though it had full knowledge that the Stroz investigation was not complete, and further had full knowledge that the information was provided to it that were located on Levandowski's devices.

212.    Levandowski relied on Uber's performance of its indemnity obligations for years, including by giving Uber control of his defense and settlement ability, which has ultimately proved to have been to his detriment.

213.    Uber also waived each and every counterclaim by continuing to proceed with closing the Otto Trucking transaction and acquiring that company. The Otto acquisition, Otto Trucking acquisition, and the Indemnity were one transaction documented by the agreement

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

ANSWER TO AMENDED COUNTERCLAIMS; AND AFFIRMATIVE DEFENSES

entered into on April 11, 2016. By proceeding to acquire Otto Trucking well after Uber was aware of the allegations pled in the Counterclaim, Uber waived any of its claims for avoiding its obligations under the Indemnification Agreement.

**SECOND AFFIRMATIVE DEFENSE**

**ESTOPPEL**

214.    Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

215.    Uber's claims are barred, either in whole or in part, because it is equitably estopped from pursuing its claims in this action.

216.    In February 2016, Uber entered into a non-binding term sheet with Levandowski to acquire Ottomotto and Otto Trucking. In connection with the contemplated acquisition, Uber engaged the services of a third-party forensic investigator, Stroz Friedberg. The purpose of engaging Stroz was to confirm that Google proprietary information was excluded from the assets contemplated in the Uber-Otto transaction.

217.    As part of the Stroz investigation, Stroz requested Levandowski to provide devices to Stroz. Levandowski fully complied. Stroz conducted in-person interviews with Levandowski in March 2016 to further detail the information stored on Levandowski's devices and clarify assets in the proposed Uber-Otto transaction.

218.    Levandowski's devices contain the very information that Uber claims is not disclosed. Specifically, the devices that Stroz requested, and Levandowski provided in response to that request, contained information disclosing the fact of Tyto, its assets, and its relationship to Diligenced Employees. In fact, Levandowski repeatedly communicated to Uber during the Stroz investigation that the most accurate information pertaining to assets contemplated in the Uber-Otto transaction would be found on those devices themselves.

219.    Uber continued with the Uber-Otto transaction anyway. Accordingly in April 2016, Uber entered into the Indemnification Agreement with Levandowski in connection with consummating the Uber-Otto transaction. It did so knowing that the Stroz investigation had not yet been completed at that time, and in Levandowski's full disclosure of material information—

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

30

including Tyto—learned during the course of the Stroz investigation. In fact, the Stroz report was not completed until August 2016, nearly four months after the Uber-Otto transaction consummated.

220. Uber, by its statements and conduct, intentionally and deliberately led Levandowski to believe that it was satisfied with the Stroz investigation, or was satisfied with continuing with the Uber-Otto transaction in the absence of the completion of the Stroz investigation. Accordingly, Uber caused Levandowski to reasonably rely on those statements and conduct, did not suggest at any time that further action was necessary from Levandowski to correct or further perfect any aspect of the Stroz investigation in the course of due diligence for the Uber-Otto transaction, and intended that the Uber-Otto transaction close. Uber therefore is equitably estopped from asserting claims or take legal positions in contradiction to it.

221. Uber also is estopped from asserting any of the alleged claims because it has accepted Levandowski's claim for indemnity without reservation of rights, including after stating its belief that some of the information alleged by Google in the arbitration demands were not disclosed by Levandowski to Stroz.

222. Uber is further estopped because it performed under the Indemnification Agreement for years and well after it was aware of the alleged actions by Levandowski that give rise to the counterclaims, thereby inducing Levandowski to rely on Uber's performance of the Indemnification Agreement to his detriment.

223. Uber is further estopped from raising any objections as to Excluded Claims because it failed to disclaim liability and give notice of its reservation of rights at the time the indemnification obligation arose under the Indemnification Agreement, even though it had full knowledge that the Stroz investigation was not complete, and further had full knowledge that the information was provided to it that were located on Levandowski's devices.

224. Uber also is estopped from bringing each and every counterclaim by continuing to proceed with closing the Otto Trucking transaction and acquiring that company. The Otto acquisition, Otto Trucking acquisition, and the Indemnity were one transaction documented by the agreement entered into on April 11, 2016. By proceeding to acquire Otto Trucking well after

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Uber was aware of the allegations pled in the Counterclaim, Uber waived any of its claims for avoiding its obligations under the Indemnification Agreement.

## THIRD AFFIRMATIVE DEFENSE

## STATUTE OF LIMITATIONS—FRAUD

225. Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

226. Uber's claims are barred, either in whole or in part, under the applicable statute of limitations.

227. In February 2016, Uber entered into a non-binding term sheet with Levandowski to acquire Ottomotto and Otto Trucking. In connection with the contemplated acquisition, Uber engaged the services of a third-party forensic investigator, Stroz Friedberg. The purpose of engaging Stroz was to confirm that Google proprietary information was excluded from the assets contemplated in the Uber-Otto transaction.

228. As part of the Stroz investigation, Stroz requested Levandowski to provide devices to Stroz. Levandowski fully complied. Stroz conducted in-person interviews with Levandowski in March 2016 to further detail the information stored on Levandowski's devices and clarify assets in the proposed Uber-Otto transaction.

229. Levandowski's devices contain the very information that Uber claims is not disclosed. Specifically, the devices that Stroz requested, and Levandowski provided in response to that request, contained information disclosing the fact of Tyto, its assets, and its relationship to Diligenced Employees. In fact, Levandowski repeatedly communicated to Uber during the Stroz investigation that the most accurate information pertaining to assets contemplated in the Uber-Otto transaction would be found on those devices themselves.

230. Uber continued with the Uber-Otto transaction anyway.

231. On July 16, 2020, Levandowski filed the instant complaint in the above captioned matter. Uber filed its answer and counterclaims on August 17, 2020, raising among other things fraud-based claims against Levandowski.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

32

232. Uber knew or should have known the bases for its fraud-based claims, and therefore Uber's fraud-based claims are barred, either in whole or in part, by the applicable statute of limitations.

### FOURTH AFFIRMATIVE DEFENSE

### STATUTE OF LIMITATIONS—CONTRIBUTION

233. Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

234. Uber's claims are barred, either in whole or in part, under the applicable statute of limitations.

235. On December 23, 2019, the Google Arbitration Panel issued a Corrected Final Award in the matter *Google, Inc. v. Anthony Scott Levandowski et al.* Upon information and belief, on or about February 5, 2020, Uber tendered a payment in the amount of $9,453,135.87 on behalf of Lior Ron to Google in connection with the Corrected Final Award.

236. Uber was party in the matter, *Waymo LLC v. Uber Technologies, Inc. et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.), filed on February 23, 2017.

237. Upon information and belief, on February 8, 2018, Waymo and Uber executed a settlement agreement (the "Waymo Settlement"). Further upon information and belief, Uber entered into the Waymo Settlement for just consideration, and secured the release of claims in exchange for, among other things, a $245 million equity share to Waymo.

238. On July 16, 2020, Levandowski filed the instant complaint in the above captioned matter. Uber filed its answer and counterclaims on August 17, 2020, seeking among other things contribution against Levandowski for payments it made to Google in connection with the Waymo Settlement and the Corrected Final Award.

239. Accordingly, Uber's contribution claims are barred, either in whole or in part, by the applicable statute of limitations.

### FIFTH AFFIRMATIVE DEFENSE

### UNCLEAN HANDS

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

240.    Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

241.    Uber's claims are barred, either in whole or in part, because it has unclean hands.

242.    In February 2016, Uber entered into a non-binding term sheet with Levandowski to acquire Ottomotto and Otto Trucking. The term sheet contemplated that Uber would acquire Ottomotto and Otto Trucking. The acquisition of Otto Trucking was a condition precedent for Levandowski to agree to the Uber-Otto transaction. Without this agreement, Levandowski would not have continued with the Uber-Otto transaction.

243.    Accordingly, in April 2016, Uber and Levandowski executed the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement. The Otto Trucking Agreement provided Uber an option to acquire Otto Trucking, consistent with the terms contemplated under the February 2016 term sheet. Under the Otto Trucking Agreement, Uber was obligated to use "commercially reasonable efforts" to consummate the Otto Trucking merger, which the parties intended to occur within forty-five (45) days of the exercise of the option.

244.    In fact Uber never intended to acquire Otto Trucking. It fraudulently misrepresented to Levandowski its true intentions so as to induce Levandowski to continue with the Uber-Otto transaction. Levandowski relied on Uber's misrepresentations that it would pursue in a good faith the Otto Trucking acquisition following the close of Uber's acquisition of Ottomotto.

245.    The Uber-Otto transaction closed on August 18, 2016. In November 2017, within the close of the Call Option period, Uber exercised the call option acquire Otto Trucking by providing notice of its decision.

246.    After exercising its option to acquire Otto Trucking, Uber did not close, and never intended to close, on the Otto Trucking acquisition in the required 45-day period. In fact Uber unilaterally delayed and stalled the closing for nearly nine months. Upon information and belief, during that time, Uber negotiated a settlement with Waymo whereby it agreed to an illegal no-hire scheme with respect to Mr. Levandowski and any company affiliated with him, and also agreed to divest him from Otto Trucking.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

247. Uber then coerced Levandowski out of Otto Trucking, making it a condition to acquiring that company, that Levandowski sell his shares.

248. Uber also refused to terminate the Otto Trucking merger agreement at that time as it would give Levandowski right to an exclusive license to Uber's self-driving technology for use in trucking.

249. Uber threatened to tie up Levandowski in protracted litigation unless he sold his shares.

250. Uber then terminated the original Otto Trucking Merger Agreement without disclosing this termination to Levandowski to obfuscate his right to the trucking IP license.

251. Uber's fraud in the course of the Uber-Otto transaction constitutes unclean hands, and Uber's claims are barred, either in whole or in part, therefore.

252. Uber's hands are also unclean due to its inducement of Levandowski to bring over Google employees to Uber and was fully aware and encouraged any solicitation by Levandowski of Google employees.

253. Uber's hands are further unclean in that, upon information and belief, it agreed as part of the Waymo Settlement to divest Levandowski from Otto Trucking.  Further upon information and belief, Uber also agreed with a competitor to an illegal no-hire agreement where it agreed never to work with Levandowski or anyone affiliated with him ever again.

## SIXTH AFFIRMATIVE DEFENSE

## RELEASE OF CLAIMS

254. Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

255. Uber's claims are barred, either in whole or in part, because it expressly or impliedly released its claims in this action.

256. Uber was party in the matter, *Waymo LLC v. Uber Technologies, Inc. et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.), filed on February 23, 2017.

257. Upon information and belief, on February 8, 2018, Waymo and Uber executed a settlement agreement.  Further upon information and belief, the Waymo Settlement contained

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

releases in which Google and Uber agreed to release both known and unknown claims that have or could be asserted against the other's past and former employees.

258.    Upon information and belief, Uber entered into the agreement for just consideration, and secured the release of claims in exchange for, among other things, a $245 million equity share to Waymo.

259.    Upon information and belief, the Waymo Settlement release includes Levandowski.  Further upon information and belief, Levandowski is a former employee as understood in the Waymo Settlement agreement.

**SEVENTH AFFIRMATIVE DEFENSE**

**FAILURE TO MITIGATE DAMAGES**

260.    Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

261.    Uber's claims are barred, either in whole or in part, because it failed to mitigate damages.

262.    In February 2016, Uber entered into a non-binding term sheet with Levandowski to acquire Ottomotto and Otto Trucking.  Because Levandowski anticipated litigation from his former employer, Google, upon the disclosure of the contemplated Uber-Otto transaction, the parties agreed that Uber would indemnify Levandowski in the event litigation were to occur, and in the event damages were found against Levandowski.  As a further condition of indemnification, Uber required that Levandowski agree that Uber can control his legal defense.

263.    In April 2016, Uber and Levandowski entered into the Indemnification Agreement that memorialized these terms, among other things.

264.    In February 2017, following the consummation of the Uber-Otto transaction, Google filed a demand for arbitration captioned, Google, Inc. v. Anthony Scott Levandowski et al.  That arbitration demand alleged, among other things, that Levandowski downloaded 14,000 files from a Google server, and that those files were acquired by Uber in 2016.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

36

265. Under the Indemnification Agreement, Uber had an obligation to indemnify Levandowski of legal expenses related to his defense, and further to indemnify any money judgment rendered against him.

266. In the course of the Google Arbitration, Levandowski made several proposals to Uber regarding settlement intended to facilitate a global settlement of all claims. Uber did not agree. Further, because Uber controlled Levandowski's legal defense, Levandowski could not agree, either. Uber unjustifiably and unreasonably denied Levandowski's settlement proposals to resolve the matter.

267. As a direct result of Uber's unilateral decision to deny Levandowski's interim settlement proposals, the arbitration proceeded to trial and final award.

268. On December 6, 2019, the Arbitration Panel issued a final award against Levandowski in the amount of approximately $174 million.

269. Uber at all times acted unjustifiably and unreasonably in failing to consider interim settlement proposals that could resolve the dispute before the Arbitration Panel's final award. Accordingly, Uber's claims are barred, either in whole or in part, because it unjustifiably and unreasonably failed to mitigate damages.

## EIGHTH AFFIRMATIVE DEFENSE

## RATIFICATION

270. Levandowski incorporates by reference his responses in the preceding paragraphs and the allegations made in the Complaint.

271. Uber's counterclaims are barred by in whole or in party by the doctrine of ratification.

272. In February 2016, Uber entered into a non-binding term sheet with Levandowski to acquire Ottomotto and Otto Trucking. In connection with the contemplated acquisition, Uber engaged the services of a third-party forensic investigator, Stroz Friedberg. The purpose of engaging Stroz was to confirm that Google proprietary information was excluded from the assets contemplated in the Uber-Otto transaction.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

273. As part of the Stroz investigation, Stroz requested Levandowski to provide devices to Stroz. Levandowski fully complied. Stroz conducted in-person interviews with Levandowski in March 2016 to further detail the information stored on Levandowski's devices and clarify assets in the proposed Uber-Otto transaction.

274. Levandowski's devices contain the very information that Uber claims is not disclosed. Specifically, the devices that Stroz requested, and Levandowski provided in response to that request, contained information disclosing the fact of Tyto, its assets, and its relationship to Diligenced Employees. In fact, Levandowski repeatedly communicated to Uber during the Stroz investigation that the most accurate information pertaining to assets contemplated in the Uber-Otto transaction would be found on those devices themselves.

275. Uber continued with the Uber-Otto transaction anyway. Accordingly, Uber entered into the Indemnification Agreement with Levandowski in connection with the closing of the Uber-Otto transaction. It did so knowing that the Stroz investigation had not yet been completed at that time, and in Levandowski's full disclosure of material information—including Tyto—learned during the course of the Stroz investigation. In fact, the Stroz report was not completed until August 2016, nearly four months after the Uber-Otto transaction consummated.

276. Uber, having full knowledge that the Stroz investigation was not complete, and further having full knowledge that information was provided to it that were located on Levandowski's devices, undertook the deliberate decision to consummate the transaction anyway. Uber has waived its claim to now object to enforcement of the Indemnification Agreement based on acts that it knew or should have known at the time of the bargained-for contract, but chose to disregard.

277. Uber further ratified any claim for rescission and exclusion by accepting Levandowski's claim for indemnity without reservation of rights, including after stating its belief that some of the information alleged by Google in the arbitration demands were not disclosed by Levandowski to Stroz.

278. Uber further ratified any right to rescind the Indemnification Agreement or assert any of these claims by waiting more than three years to raise any defenses to the agreement.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

279.     During that three-year period, Uber performed under the Indemnification Agreement well after it was aware of any alleged basis for rescission, any now alleged Post-Signing Specified Bad Act, and by affirming the Indemnification Agreement expressly and impliedly.

280.     Levandowski relied on Uber's performance of its indemnity obligations for years, including by giving Uber control of his defense and settlement ability, which has ultimately proved to have been to his detriment.

281.     Uber also ratified any alleged conduct by Levandowski that Uber now claims is a basis for avoiding its indemnity obligation by continuing to proceed with closing the Otto Trucking transaction and acquiring that company.  The Otto acquisition, Otto Trucking acquisition, and the Indemnity were one transaction documented by the agreement entered into on April 11, 2016.  By proceeding to acquire Otto Trucking well after Uber was aware of the allegations pled in the Counterclaim, Uber waived any of its claims for avoiding its obligations under the Indemnification Agreement.

282.      In addition, Uber impliedly and expressly ratified the alleged fraud, Post-Signing Bad Acts, and other related claims by amending the Otto Trucking Merger Agreement, which affirmed the entire transaction between Levandowski and the agreements made as part of that transaction—the Otto acquisition, Indemnity, and Otto Trucking acquisition.

//

//

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

1 │ //

2 │ Dated: September 28, 2020

Respectfully submitted,

3 │

By: */s/ Brett M. Schuman*

4 │ Brett M. Schuman (SBN 189247)
*bschuman@goodwinlaw.com*

5 │ Rachel M. Walsh (SBN 250568)
*rwalsh@goodwinlaw.com*

6 │ **GOODWIN PROCTER LLP**
Three Embarcadero Center

7 │ San Francisco, California 94111
Tel.: +1 415 733 6000

8 │ Fax.: +1 415 677 9041

9 │ Hong-An Vu (SBN 266268)
*hvu@goodwinlaw.com*

10 │ **GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Flr.

11 │ Los Angeles, California 90017
Tel.: +1 213 426 2500

12 │ Fax: +1 213 623 1673

13 │ **ATTORNEYS FOR PLAINTIFF AND
DEBTOR AND DEBTOR IN POSSESSION**

14 │ **ANTHONY LEVANDOWSKI**

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

40

ANSWER TO AMENDED COUNTERCLAIMS; AND AFFIRMATIVE DEFENSES

# EXHIBIT G

1   Debra I. Grassgreen (CA Bar No. 169978)
    Miriam Manning (CA Bar No. 178584)
2   PACHULSKI STANG ZIEHL & JONES LLP
    150 California Street, 15th Floor
3   San Francisco, CA 94111
    Telephone:    (415) 263-7000
4   Facsimile:    (415) 263-7010
    E-mail:       dgrassgreen@pszjlaw.com
5                 mmanning@pszjlaw.com

6   David J. Bradford (admitted *pro hac vice*)
    Catherine Steege (admitted *pro hac vice*)
7   Terri L. Mascherin (admitted *pro hac vice*)
    Katharine R. Ciliberti (admitted *pro hac vice*)
8   JENNER & BLOCK LLP
    353 N. Clark St.
9   Chicago, IL 60654
    Telephone: (312) 222-9350
10  E-mail: dbradford@jenner.com
            csteege@jenner.com
11          tmascherin@jenner.com
            kciliberti@jenner.com
12

13  *Counsel for Uber Technologies, Inc.*

14
            **UNITED STATES BANKRUPTCY COURT**
15          **NORTHERN DISTRICT OF CALIFORNIA**
                **SAN FRANCISCO DIVISION**
16
    In re:                                  | Case No. 20-30242 (HLB)
17
    ANTHONY SCOTT LEVANDOWSKI,               | Chapter 11
18
                    Debtor.
19

20  ANTHONY LEVANDOWSKI, an individual,      | **Adv. Pro. No. 20-03050 HLB**
                                             | **[REDACTED]**
21                  Plaintiff,               | **ANSWER TO DEBTOR'S FIRST**
                                             | **AMENDED COMPLAINT FOR**
22          v.                               | **DECLARATORY RELIEF, SPECIFIC**
                                             | **PERFORMANCE, DAMAGES, AND**
23  UBER TECHNOLOGIES, INC.                  | **OBJECTION TO CLAIM; AFFIRMATIVE**
                                             | **DEFENSES; AND COUNTERCLAIMS**
24                  Defendant.
25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Debra I. Grassgreen (CA Bar No. 169978)
     Miriam Manning (CA Bar No. 178584)
2    PACHULSKI STANG ZIEHL & JONES LLP
     150 California Street, 15th Floor
3    San Francisco, CA 94111
     Telephone:   (415) 263-7000
4    Facsimile:    (415) 263-7010
     E-mail:       dgrassgreen@pszjlaw.com
5                mmanning@pszjlaw.com

6    David J. Bradford (admitted *pro hac vice*)
     Catherine Steege (admitted *pro hac vice*)
7    Terri L. Mascherin (admitted *pro hac vice*)
     Katharine R. Ciliberti (admitted *pro hac vice*)
8    JENNER & BLOCK LLP
     353 N. Clark St.
9    Chicago, IL 60654
     Telephone: (312) 222-9350
10   E-mail: dbradford@jenner.com
            csteege@jenner.com
11           tmascherin@jenner.com
             kciliberti@jenner.com

*Counsel for Uber Technologies, Inc.*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>           Debtor. | Case No. 20-30242 (HLB)<br><br>Chapter 11 |
| ANTHONY LEVANDOWSKI, an individual,<br><br>           Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.<br><br>           Defendant. | **Adv. Pro. No. 20-03050 HLB**<br>**[REDACTED]**<br>**ANSWER TO DEBTOR'S FIRST**<br>**AMENDED COMPLAINT FOR**<br>**DECLARATORY RELIEF, SPECIFIC**<br>**PERFORMANCE, DAMAGES, AND**<br>**OBJECTION TO CLAIM; AFFIRMATIVE**<br>**DEFENSES; AND COUNTERCLAIMS** |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Dated: October 13, 2020

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Debra I. Grassgreen*
Debra I. Grassgreen
Miriam Manning

-and-

David J. Bradford
Catherine Steege
Terri L. Mascherin
Katharine R. Ciliberti
JENNER & BLOCK LLP

*Counsel for Uber Technologies, Inc.*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case 20-30242 Doc# 68 Filed 10/13/20 Entered 10/13/20 09:09:55 Page 306 of
304 of 555

Defendant Uber Technologies, Inc. ("Uber") asserts the following answers, affirmative defenses, and counterclaims to the complaint of Plaintiff Anthony S. Levandowski ("Levandowski"), as debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and as plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and states as follows:

**NATURE OF CLAIM**

1.      This is an objection to the allegations made by Uber Technologies, Inc. ("Uber") in its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") and an action to enforce the promises Uber made to Mr. Levandowski to induce him to sell to Uber his self-driving companies and technology and to lead its autonomous vehicle program.

**ANSWER:**      Uber admits that Levandowski purports to object to allegations Uber made in its Proof of Claim (8-1) on July 6, 2020. Uber further admits that Levandowski purports to bring an action to enforce alleged promises he claims Uber made to Levandowski. Uber denies the remaining allegations in paragraph 1.

2.      Mr. Levandowski is one of the world's leading experts in autonomous vehicle technology.  Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks.  He was a founding member of Google's autonomous car initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

**ANSWER:**      Uber admits that Levandowski is an engineer who has participated in projects related to the construction of self-driving vehicles. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2 and therefore denies the allegations.

3.      Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up.

**ANSWER:**      Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies the allegation.

4.      Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr. Levandowski worked for a competitor on self-driving technology, he would face very negative consequences.  Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and Travis Kalanick, Uber's then-CEO.  In addition, Mr. Levandowski was aware that Mr. Page and other executives at Google viewed Uber as a very significant competitor.

**ANSWER:**      Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 and therefore denies the allegations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    5.    In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto")
2  a self-driving trucking company.

        **ANSWER:**    Uber admits that Levandowski left Google in early 2016. Uber further admits
3
that Levandowski helped start Ottomotto LLC ("Otto") and that Otto was a self-driving vehicle
4
company. Uber denies the remaining allegations in paragraph 5.
5
6    6.    Uber expressed an interest in acquiring Otto to accelerate its self-driving program and
   to compete with Google, whom Mr. Kalanick believed to be an existential threat to Uber.
7
        **ANSWER:**    Uber admits that it was interested in acquiring Otto. Uber denies the
8
remaining allegations in paragraph 6.
9    7.    Because of Mr. Page's threats and known hostility towards Uber, Mr. Levandowski
   insisted that Uber indemnify him against claims that may be brought by Google as a condition to
10 entering into any relationship with Uber.

11      **ANSWER:**    Uber admits that Levandowski sought to have Uber indemnify him against
12 certain potential claims and that Levandowski expressed concern that Google would sue him even if
13 he did nothing wrong. Uber denies that Levandowski is entitled to indemnification. Uber lacks
14 knowledge or information sufficient to form a belief as to the truth of the remaining allegations set
15 forth in paragraph 7 and therefore denies the allegations.

16   8.    In fact, Mr. Levandowski explained to Uber multiple times that he believed Google
   would likely sue him if he joined Uber.  Mr. Levandowski was particularly concerned because he did
17 not have the ability to defend himself if one of the largest companies in the world, with essentially
   unlimited resources, came after him.
18
        **ANSWER:**    Uber admits that, prior to executing the Indemnification Agreement,
19
Levandowski and Uber discussed the prospect that Google may bring litigation against
20
Levandowski. Uber further admits that Levandowski expressed concern that Google could sue him
21
even if he did nothing wrong. Uber lacks knowledge or information sufficient to form a belief as to
22
the truth of the allegations set forth in the second sentence of paragraph 8 and therefore denies the
23
allegations. Uber denies the remaining allegations in paragraph 8.
24
25   9.    In addition, because Mr. Levandowski left Google to work on autonomous trucking,
   Mr. Levandowski conditioned the sale of Otto on Uber supporting his self-driving trucking business.

26      **ANSWER:**    Uber admits that on April 11, 2016, the Ottomotto Merger Agreement ("Otto
27 Agreement") and the Otto Trucking Merger Agreement ("Otto Trucking Agreement") were each
28 executed. Uber respectfully refers the Court to the Otto Trucking Agreement, attached as Exhibit 8,

DOCS_SF:103689.1 85641/001                    2

Case: 20-80150   Doc# 6398   Filed: 10/13/22   Entered: 10/13/22 09:41:45   Page 8 of
Case: 20-80150   Doc# 6398   Filed: 10/13/22   Entered: 10/13/22 09:41:45   Page 8 of
306 of 555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

and the August 17, 2016 amendment to that agreement, attached as Exhibit 9, for their complete and accurate contents. Uber denies the remaining allegations in paragraph 9.

10.     As part of the transaction for the acquisition of Otto, Uber agreed to indemnify Mr. Levandowski for claims Google might raise against him.  These claims included claims Google might assert for breach of fiduciary duty, the duty of loyalty, breaches of various restrictive covenants, and trade secret misappropriation.  **Exhibit A** is a redacted copy of the Indemnification Agreement dated April 11, 2016 between Uber and Mr. Levandowski.

**ANSWER:**     Uber admits that it entered into an Indemnification Agreement on April 11, 2016 with Levandowski, and that Exhibit A to the Amended Adversary Complaint is a redacted copy of that Agreement. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 10. Answering further, Uber entered into the Indemnification Agreement based on, among other things, Levandowski's unequivocal representations that he had not breached any obligations to Google, that he had not taken any confidential information or documents from Google, and that no Google documents or information would be brought to Uber.

11.     Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of any claim brought by Google, as well as any award or judgment in Google's favor.  *See* Ex. A at 3, § 2.3.

**ANSWER:**     Uber admits that the Indemnification Agreement includes at page 3 and § 2.3 language related to Expenses and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 11.

12.     As part of the acquisition of Otto, Uber also agreed to support Mr. Levandowski's trucking business objectives by either creating a new business unit within Uber (wherein Mr. Levandowski would have a leadership role) or allowing Mr. Levandowski to create a trucking business outside of Uber.

**ANSWER:**     Uber admits that on April 11, 2016, the Otto Agreement and the Otto Trucking Agreement were each executed. Uber respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 12. Answering further, Uber states that the Otto Trucking Agreement was terminated pursuant to its terms,  that prior to its termination, Levandowski voluntarily sold his interest in Otto Trucking LLC ("Otto Trucking") to a third party, and that Levandowski has no legal right to enforce the terminated Agreement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    13.    After Uber acquired Otto, Mr. Page followed through on his threats against Mr. Levandowski. In October, 2016, Google initiated two arbitration proceedings against Mr. Levandowski. Mr. Levandowski timely requested indemnity from Uber under the Indemnification Agreement, and Uber accepted its obligations. Consequently, Uber paid for and controlled the defense of Mr. Levandowski for nearly three years. Initially, Mr. Levandowski was represented by the same counsel that represented Uber. During the course of a separate litigation, a trade secrets dispute with Waymo LLC, a Google affiliate, Uber's then-counsel determined it could not jointly represent Mr. Levandowski (or his company, Otto Trucking) and Uber. Uber subsequently selected and hired separate counsel for Mr. Levandowski. Uber continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected. Uber also exercised its right to direct and control Mr. Levandowski's defense of the arbitration proceeding through the final award and including all settlement discussions with Google.

**ANSWER:** Uber admits that in October 2016, Google initiated two arbitration proceedings against Levandowski (together, the "Google Arbitration"). Uber further admits that Levandowski thereafter requested indemnity from Uber pursuant to the April 11, 2016 Indemnification Agreement. Uber admits that it paid the legal expenses in connection with the two arbitration proceedings through September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber admits that Levandowski was represented in the arbitration proceedings by Morrison & Foerster LLP, and that Morrison & Foerster initially represented both Levandowski and Uber. Uber admits that after Google initiated *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation"), Uber determined that Levandowski should have separate counsel. Uber denies that it directed and controlled Levandowski's defense of the arbitration proceeding through the final award, including all settlement discussions with Google. Uber denies the remaining allegations in paragraph 13.

14.    After Mr. Levandowski relied on Uber's control and direction for years and after an unfavorable Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

**ANSWER:** Uber admits that it notified Levandowski through counsel that the Indemnification Agreement was rescinded and that it would not make additional payments after September 25, 2019. Uber respectfully refers the Court to the August 30, 2019 and September 27, 2019 letters from Uber's counsel to Levandowski's counsel for their complete and accurate contents. Uber denies the remaining allegations in paragraph 14.

15.    In addition, while in control of Mr. Levandowski's defense and settlement prospects with Google, Uber worked out its own settlement with Google's subsidiary, Waymo LLC ("Waymo") to resolve a trade secret dispute between them relating to the same underlying events. Upon information and belief, the terms of that settlement included an agreement that Uber would

Case: 20-03050   Doc# 6398   Filed: 10/13/24   Entered: 10/13/24 09:4   Page 5 of
Case: 20-03050   Doc# 6398-3   Filed: 10/13/24   Entered: 10/13/24 09:4   Page 5 of
308   555
DOCS_SF:10...564798.1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

never hire or work with Mr. Levandowski again, which resulted in Uber also reneging on its promises to support Mr. Levandowski's trucking business.

**ANSWER:** Uber admits that in February 2018 it, along with Otto, entered into a Settlement Agreement with Waymo LLC, Google LLC, and Alphabet, Inc. ("Google Settlement Agreement") in connection with a civil action that Waymo filed against Uber, Otto, and Otto Trucking asserting claims for violations of the Trade Secrets Act, violations of the California Uniform Trade Secrets Act, patent infringement, and violations of Section 17200 of the California Business and Professions Code. Uber respectfully refers the Court to the Google Settlement Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 15.

16. Uber's recently filed Proof of Claim has made the Indemnification Agreement, and Uber's actions related to its acquisition of Otto, central to this Chapter 11 Case.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber denies the remaining allegations in paragraph 16.

17. In particular, the Proof of Claim alleges that because Uber purportedly rescinded the Indemnification Agreement, not only does Uber not have any obligation to indemnify Mr. Levandowski but it also is a creditor of Mr. Levandowski. Uber seeks payment for legal fees and costs it provided under the Indemnification Agreement and contribution for the settlements it has negotiated for its own benefit and the benefit of Mr. Levandowski's cofounder, the current lead of Uber's trucking business.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242. Uber respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 17.

18. However, Uber asserts claims that, upon information and belief, Uber released as part of the settlement with Waymo.

**ANSWER:** Uber denies the allegations in paragraph 18.

19. Uber also has no basis to rescind the Indemnity Agreement. Uber has set forth numerous theories to back out of the deal it struck, but two issues appear to be core: (1) a claim that Mr. Levandowski engaged in fraud and (2) a claim that Mr. Levandowski has pled to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney.

**ANSWER:** Uber admits that it has asserted, among other things, that Levandowski engaged in fraud, and that Levandowski has pled guilty to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney. Uber denies the remaining allegations in paragraph 19.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

20.     First, there was no fraud.  Uber was aware of Mr. Levandowski's conduct through the extensive investigation it conducted prior to and after entering into the indemnity agreement with him, and long before it purported to rescind.  To the extent Uber claims it was unaware of certain facts, those facts were not material and were fully available to Uber had they cared to look more carefully at the materials it was provided by Mr. Levandowski.  In fact, Mr. Levandowski repeatedly told Uber to search those devices for the most accurate information.

**ANSWER:**     Uber admits that in March 2016, it engaged Stroz Friedberg, LLC ("Stroz") to conduct an independent investigation of Otto employees, including Levandowski. Uber denies the remaining allegations in paragraph 20.

21.     Second, Mr. Levandowski did not make any misrepresentations regarding any theft of trade secrets.  Mr. Levandowski has plead guilty to trade secret misappropriation with respect to one file he accessed after leaving Google.  As for that one file, Uber knew the file's name, that Mr. Levandowski kept that file, that he accessed it after he left Google, the date he accessed it, and through its due diligence firm, the contents of that file.

**ANSWER:**     Uber admits that Levandowski has pled guilty to Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA. Uber denies the remaining allegations in paragraph 21.

22.     Mr. Levandowski therefore commenced the Adversary Proceeding to obtain declaratory relief as to the impact of Uber's purported rescission on the parties' respective rights and obligations, to enforce Uber's obligations arising from the Otto transaction, and to disallow the Proof of Claim.

**ANSWER:**     Paragraph 22 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 22.

## JURISDICTION AND VENUE

23.     The Adversary Proceeding arises in and relates to the Chapter 11 Case.  The Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Mr. Levandowski against Uber herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. The parties also stipulated to have this dispute, and any others raised in Mr. Levandowski's arbitration demand and Uber's proof of claim be resolved in this Adversary Proceeding.  *See* ECF No. 13.

**ANSWER:**     Uber admits that the Adversary Proceeding relates to the Chapter 11 case and that the Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Levandowski pursuant to 28 U.S.C. 1334(b). Uber admits that the parties stipulated to have "all disputes between them" resolved before this Court as part of the Adversary Proceeding, including disputes raised in Levandowski's demand in arbitration and his Complaint in the Adversary

Proceeding, and those raised in Uber's Proof of Claim in the Chapter 11 case. Uber denies the remaining allegations in paragraph 23.

24.     This is a core proceeding under 28 U.S.C. § 157(b) including, without limitation, under subsections (b)(2)(A), (B), (C), (K), and (O).  Mr. Levandowski consents to the entry of a final order by the Court in connection with this Adversary Proceeding.

**ANSWER:**     Uber admits that Levandowski's objection to Uber's Proof of Claim is denominated as a core proceeding under 28 U.S.C. § 157(b)(2)(B). Uber denies that the remaining claims set forth in this Adversary Proceeding are denominated as core proceedings pursuant to any of the subparts of 28 U.S.C. § 157(b)(2). Pursuant to Local Bankruptcy Rule 7012-1, Uber consents to the entry of final orders or judgments by the Bankruptcy Court.

25.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:**     Uber admits that venue is proper before this Court pursuant to 28 U.S.C. § 1409(a) and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court. (*See* Case No. 20-03050, Dkt. 13.) Pursuant to that Stipulation, Uber does not contest that venue is proper before this Court with respect to Levandowski's Amended Adversary Complaint. Uber denies the remaining allegations in paragraph 25.

## **FACTS**

A.     **M**R. **L**EVANDOWSKI **E**STABLISHES **H**IS **R**EPUTATION **A**S **A** **P**IONEER **I**N **S**ELF-**D**RIVING **C**AR **T**ECHNOLOGY

26.     Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and therefore denies the allegations.

27.     He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

**ANSWER:**     Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies the allegations.

28.     In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles.  He was 24 years old at the time.

P<small>ACHULSKI</small> S<small>TANG</small> Z<small>IEHL</small> & J<small>ONES</small> LLP
A<small>TTORNEYS</small> A<small>T</small> L<small>AW</small>
S<small>AN</small> F<small>RANCISCO</small>, C<small>ALIFORNIA</small>

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    **ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth

2    of the allegations in paragraph 28 and therefore denies the allegations.

3    29.    The DARPA Grand Challenge was an effort to race robotic, computer-controlled
     vehicles between Los Angeles and Las Vegas.  Mr. Levandowski and a team of engineers from U.C.

4    Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations— submitted a
     self-driving, self-balancing, two-wheeled motorcycle.  This motorcycle, Ghostrider, competed

5    against well-funded submissions from Stanford University, Carnegie Mellon, and established
     companies.  After performing well in several qualifying rounds, Ghostrider was selected as a

6    contender for the DARPA Grand Challenge.

7    **ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth

8    of the allegations in paragraph 29 and therefore denies the allegations.

9    30.    Ghostrider now sits in the Smithsonian Museum as one of America's great
     innovations.

10   **ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth

11   of the allegations in paragraph 30 and therefore denies the allegations.

12

13   31.    Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr.
     Sebastian Thrun, a former Stanford computer science professor who was also a participant in the

14   DARPA Grand Challenge.

15   **ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth

16   of the allegations in paragraph 31 and therefore denies the allegations.

17   32.    Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool.
     VuTool was subsequently acquired by Google.

18   **ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth

19   of the allegations in paragraph 32 and therefore denies the allegations.

20   **B.    MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM**

21   33.    Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping
     with Dr. Thrun.  Mr. Levandowski helped develop the technology for the Google service now known

22   as Street View.

23   **ANSWER:**    Uber lacks knowledge or information sufficient to form a belief as to the truth

24   of the allegations in paragraph 33 and therefore denies the allegations.

25   34.    In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-
     driving car program at Google.  The program was named "Project Chauffeur."

26

27

28

1     **ANSWER:**     Uber admits that Levandowski was part of a program called Project Chauffeur

2     while employed by Google. Uber lacks knowledge or information sufficient to form a belief as to the

3     truth of the remaining allegations in paragraph 34 and therefore denies the allegations.

4          35.     Project Chauffeur catapulted Google into the lead in autonomous driving when, in
5     2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of 100
      miles.  By 2012, Google had logged over 300,000 miles of autonomous driving.  Mr. Levandowski
6     was a key contributor in helping Google achieve these milestones.  For his past contributions and to
      incentivize him going forward, Google invited Mr. Levandowski to participate in the Chauffeur
7     Bonus Plan—an incentive plan that would pay members a percentage of the valuation of Project
      Chauffeur starting at the end of 2015—and gave him the highest initial allocation or individual
8     earnout percentage of any member of the plan.

9     **ANSWER:**     Uber admits that Levandowski was part of a program called Project Chauffeur

10    while employed by Google and that he participated in the Chauffeur Bonus Plan. Uber lacks

11    knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

12    paragraph 35 and therefore denies the allegations.

13         36.     Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left
      Google in early 2016.

14    **ANSWER:**     Uber admits that Levandowski was part of a program called Project Chauffeur

15    while employed by Google and that he left Google in 2016. Uber lacks knowledge or information

16    sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 and therefore

17    denies the allegations.

18         37.     Mr. Levandowski would ultimately be paid over $127 million by Google for his work
19    on Project Chauffeur.  The majority of that payment came in December 2015 and then in mid-
      August 2016, after Mr. Levandowski left Google.

20    **ANSWER:**     Uber admits that the Arbitration Award in favor of Google and against

21    Levandowski ("Arbitration Award") recounts that Levandowski was paid approximately $127

22    million by Google and that Levandowski had no right to receive that payment and was required to

23    disgorge the same. Uber respectfully refers the Court to the redacted Arbitration Award for its

24    complete and accurate contents, attached as Exhibit 1. Uber lacks knowledge or information

25    sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 and therefore

26    denies the allegations.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## C. MR. LEVANDOWSKI CONSIDERS LEAVING GOOGLE

38. For years, Google enjoyed its position as the leader in the self-driving space with no significant challengers. In 2015, Uber announced the launch of its own self-driving car initiative after acquiring a team of engineers from Carnegie Mellon University.

**ANSWER:** Uber admits that in 2015, Uber formed a partnership with Carnegie Mellon University ("CMU") that resulted in Uber hiring certain faculty members, researchers, and technicians from CMU. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and therefore denies the allegations.

39. After Uber's announcement, there were many discussions within Google about how to compete with Uber. In those discussions, executives within Google expressed distaste and animosity towards Uber. Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and therefore denies the allegations.

40. Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Mr. Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

**ANSWER:** Uber admits that the language quoted in paragraph 40 is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* and respectfully refers the Court to the trial transcript for its complete and accurate contents. Uber denies the remaining allegations in paragraph 40.

41. Over time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making after its initial successes. In 2015, Mr. Levandowski began to think about other self-driving opportunities.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 and therefore denies the allegations.

42. After learning about Mr. Levandowski's discontentment at Google, Dr. Thrun introduced Mr. Levandowski to Mr. Kalanick at Uber. Upon meeting Mr. Levandowski, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership where he could supply self-driving technology to Uber as an outside technology vendor.

**ANSWER:** Uber admits that Dr. Thrun introduced Levandowski to Mr. Kalanick. Uber denies the allegations in the second sentence of paragraph 42. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 42 and therefore denies the allegations.

43. Mr. Levandowski's Google colleagues, and more than one of his superiors, were aware that Mr. Levandowski was having discussions with Uber as he considered his future.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 43 and therefore denies the allegations.

44. Simultaneously, in 2015, Lior Ron rejoined Google in a business role. Mr. Levandowski and Mr. Ron, who had met while working on Google Maps, began to discuss the problems with Project Chauffeur and ways in which the Project could be improved.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 44 and therefore denies the allegations.

45. During those conversations, they also discussed new product markets, including self-driving trucks. As they explored this concept and brainstormed further, both became passionate about self-driving trucking. They were convinced that the trucking business could be disrupted by the addition of self-driving technology and that self-driving trucking technology could go to market much more quickly than passenger car technology. Mr. Levandowski began to include Mr. Ron in his discussions with Uber and others. Mr. Levandowski and Mr. Ron considered establishing a commercial vendor relationship with Uber to obtain funding for the trucking business.

**ANSWER:** Uber admits that Mr. Ron participated in discussions with Uber and Levandowski. Uber lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 45 and therefore denies the allegations.

46. Toward the end of his time at Google, Mr. Levandowski also had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur. During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving start-up outside of Google.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 46 and therefore denies the allegations.

47. Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences. Because Google had bought several of Mr. Levandowski's outside businesses previously and because others had left Google to start new companies without objection from Google, Mr. Levandowski understood Mr. Page's threat to be about a large, well-funded competitor and not a startup.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 47 and therefore denies the allegations.

**D. MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE**

48. Mr. Levandowski left Google on January 27, 2016. He joined Otto, a self-driving trucking company and was credited as a co-founder.

**ANSWER:** Uber admits that Levandowski left Google on January 27, 2016. Uber admits that Levandowski joined Otto and that he was credited as a co-founder. Uber denies the remaining allegations in paragraph 48.

49. Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

**ANSWER:** Uber admits that it discussed acquiring Otto with Levandowski. Uber denies the remaining allegations in paragraph 49.

50. As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber on consumer self-driving technology (instead of trucking) as a competitive act that would convert him from a friendly, start-up competitor to an enemy. Mr. Levandowski also told Uber that he feared that Google would sue him and seek recovery of the substantial amounts of money that had been paid to him or were owed to him, in particular, the proceeds from the Chauffeur incentive plan that Google owed him.

**ANSWER:** Uber admits that Levandowski raised concerns that Google would sue him without a valid basis for doing so. Uber denies the remaining allegations in paragraph 50.

51. In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Mr. Kalanick. In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick. In response, Mr. Kalanick stated that Uber was prepared to protect Mr. Levandowski from an aggressive assault by Google.

**ANSWER:** Uber admits that in early 2016, Levandowski and Uber discussed concerns related to Levandowski's former employer, Google, and the prospect that Google may bring litigation against Levandowski. Uber denies the remaining allegations in paragraph 51.

52. As a key and indivisible part of the transaction to sell Otto to Uber and have Mr. Levandowski join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google might assert against him. *See* Ex. A. The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

"Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

"Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

*Id*. at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

**ANSWER:** Uber admits that the language quoted in paragraph 52 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 52. Answering further, Uber states that Levandowski is not entitled to indemnification.

53. Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

(a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses incurred by such Diligenced Employee*** or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id*. at § 2.1(a) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 53 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 53. Answering further, Uber states that Levandowski is not entitled to indemnification.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

54. "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

> "Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id*. at 3.

**ANSWER:** Uber admits that the language quoted in paragraph 54 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 54. Answering further, Uber states that the scope of permissible indemnification is limited by applicable law.

55. The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii). That section reads:

> (b) Notwithstanding anything herein to the contrary, ***an Indemnified Claim shall not, regardless of whether the Closing occurs, include***, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:
>
> > (ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id*. at § 2.1(b)(ii) (emphasis added).

**ANSWER:** Uber admits that the language quoted in paragraph 55 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies that the language quoted in paragraph 55 constitutes the "only limitations" on Uber's indemnification obligations. Uber denies the remaining allegations in paragraph 55.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

56. The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski. Mr. Levandowski would not have entered into the transaction to sell Otto to Uber without Uber's indemnity promise.

**ANSWER:** Uber admits that Levandowski expressed concern about Google's use of virtually inexhaustible resources to attack him without basis, but denies the remaining allegations in the first sentence of paragraph 56. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56 and therefore denies the allegations.

57. The Indemnification Agreement was structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded. Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

**2.3. Expenses**
(a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request.

*Id*. at § 2.3.

**ANSWER:** Uber admits that the language quoted in paragraph 57 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 57. Answering further, Uber denies that Levandowski is entitled to indemnification.

58. If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration proceedings to enforce Uber's obligations or seek specific performance of Uber's obligations. Ex. A at §§ 2.3, 3.11

**ANSWER:** Uber admits that sections 2.3 and 3.11 appear in the Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 58.

59. The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses, including proceedings in San Francisco state or federal courts where both parties submitted to jurisdiction.

**3.11 Specific Performance**. Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative). Each of the Parties agrees that *this Agreement is intended to be legally binding and specifically enforceable* pursuant to its terms and that Purchaser and the *Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms* and that monetary damages

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, *a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.*

*Id.* at § 3.11 (emphasis added); *see also id.* at § 3.5.

**ANSWER:** Uber admits that the language quoted in paragraph 59 appears in the April 11, 2016 Indemnification Agreement and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 59.

## E. UBER ACQUIRES OTTO

60. As part of the indemnification process, Mr. Levandowski agreed to be interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz"). He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination. To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that Stroz collected a number of devices from Levandowski and that Levandowski gave Stroz access to a number of accounts. Upon information and belief, Uber admits that Stroz is still in possession of most of those devices and maintains static images of those accounts. Uber denies that it is in possession of Levandowski's devices and images of his accounts. Uber denies the remaining allegations in paragraph 60.

61. The Stroz /Uber investigation of Mr. Levandowski uncovered a great number of facts related to potential claims that might be brought by Google but was, by Stroz's own admission, incomplete. In early April 2016, while Stroz' was conducting its investigation, Uber executed the Indemnification Agreement.

**ANSWER:** Uber admits that in March 2016, it engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. Uber admits that the Indemnification Agreement was executed on April 11, 2016, and that the final Stroz written summary report had not been completed at that point. Uber denies the remaining allegations in paragraph 61. Answering further, Uber received preliminary findings from Stroz prior to April 11, 2016.

62. As Stroz summarized, Uber requested preliminary information regarding the investigation "in the lead-up to Uber's signing of an agreement to purchase Otto and "long before the investigation was completed." Stroz had provided Uber with preliminary information that included Stroz's draft memo from Mr. Levandowski's interviews and access reports showing that Mr. Levandowski retained thousands of Google files, and had accessed hundreds of Google documents after he left Google, including several that were identified by Mr. Levandowski as relating to self-driving. The interview memo remained in draft form and Mr. Levandowski's counsel reserved his rights as to the accuracy of the information in the memo.

Case: 25-80042   Doc #: 6298-2   Filed: 10/13/2009   Entered: 10/13/2014 20:10:35   Page 12 of

1      **ANSWER:**    Uber admits that it engaged Stroz to conduct an independent investigation of

2      Otto employees, including Levandowski. Uber admits that Stroz provided a draft memo to Uber

3      dated April 2, 2016 that discussed its interviews of Levandowski. Uber admits that the final Stroz

4      report states that counsel reserved their clients' rights with respect to accuracy in the drafts of the

5      interview memos. Uber denies the remaining allegations in paragraph 62. Answering further,

6      Levandowski represented to Uber that he had retained Google confidential information after he left

7      Google because he wanted to be able to demonstrate to Google the work he had done to earn a bonus

8      that he expected to receive.

9          63.    The Stroz draft interview memo contained nine pages of summaries of Mr.
       Levandowski's interactions and discussions with Google employees about his plans to start a
10     company outside of Google, including summaries of one-on-one discussions and larger gatherings at
       his house.

11     **ANSWER:**    Uber admits that Stroz prepared a draft memo of its interview of Levandowski

12     and respectfully refers the Court to the memo for its complete and accurate contents. Uber denies the

13     remaining allegations in paragraph 63.

14

15         64.    Uber pushed for the entire transaction to proceed to closing knowing that Stroz had
       not completed its investigation.

16     **ANSWER:**    Uber admits that it signed the Indemnification Agreement, the Otto

17     Agreement, and the Otto Trucking Agreement before receiving Stroz's final written summary report.

18     Uber denies the remaining allegations in paragraph 64. Answering further, Uber received

19     preliminary findings from Stroz prior to April 11, 2016.

20         65.    On April 11, 2016, Uber executed several documents to complete this transaction,
       including the Indemnification Agreement, the Otto Agreement and Plan of Merger (the "Otto
21     Agreement"), and the Otto Trucking LLC Agreement and Plan of Merger (the "Otto Trucking
       Agreement"), which gave Uber an option to acquire a second company created by Mr. Levandowski
22     and Mr. Ron.

23     **ANSWER:**    Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto

24     Agreement, and the Otto Trucking Agreement were each executed. Uber refers the Court to the

25     Agreements for their complete and accurate contents. Uber denies the remaining allegations in

26     paragraph 65.

27         66.    Stroz did not issue a report until August 5, 2016, almost four months after it signed
       the Otto acquisition documents.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that Stroz provided Uber with a final written summary report on August 5, 2016 ("Stroz Report"). Uber denies the remaining allegations in paragraph 66.

67. The Stroz report disclosed numerous facts, including the following:

During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

**ANSWER:** Uber admits that the language quoted in paragraph 67 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 67. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

68. Stroz reported that Mr. Levandowski's devices demonstrated that during his time at Google, he downloaded documents and files relating to Project Chauffeur.

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016. An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

**ANSWER:** Uber admits that the language quoted in paragraph 68 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 68. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

69. It also reported that Mr. Levandowski downloaded Chauffeur files shortly before his departure from Google and had accessed them following his departure from Google.

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

**ANSWER:** Uber admits that the language quoted in paragraph 69 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 69. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

70. Stroz reported facts regarding hiring of Google employees.

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took place at Levandowski's house in approximately December 2015 and January 2016. These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

**ANSWER:** Uber admits that the language quoted in paragraph 70 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 70.

71. Stroz included as an exhibit to its report the draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects for which he had an ownership interest, but did not include any discussion of this memo in its main report. In addition, Mr. Levandowski's devices and accounts also contained extensive information about a company named Odin Wave/Tyto, Mr. Levandowski's estate planning, and various investments.

**ANSWER:** Uber admits that a redacted interview memorandum of Levandowski was attached to the Stroz Report that was provided to Uber. Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of paragraph

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

71 and therefore denies those allegations. Uber denies the remaining allegations in paragraph 71.

Answering further, Uber states that Levandowski's counsel controlled what information Stroz could share with Uber from Stroz's interviews of the Otto employees and reviews of data provided to Stroz. Stroz did not provide Uber copies of all of the exhibits to its summary report, and Uber did not have access to Levandowski's devices and accounts. To the extent that any of Levandowski's devices contained information related to Tyto, Uber did not have access to and was not told about that material, and Levandowski did not disclose that information to Stroz. To the contrary, when asked by Stroz what "side projects" he had done while at Google, he did not identify Tyto.

72. Stroz noted discrepancies in what Mr. Levandowski recalled and what Stroz discovered on Mr. Levandowski's devices.

> Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

**ANSWER:** Uber admits that the language quoted in paragraph 72 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 72.

73. Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text messages, as well as its decision not to investigate these deletions further.

> Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

**ANSWER:** Uber admits that the language quoted in paragraph 73 appears in the Stroz Report and respectfully refers the Court to the Stroz Report for its complete and accurate contents. Uber denies the remaining allegations in paragraph 73.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

74. Despite and with full knowledge of Stroz's findings, on August 18, 2016, Uber closed the acquisition of Otto and publicly announced that it was acquiring the company and working with Mr. Levandowski.

**ANSWER:** Uber admits that in August 2016 it closed the acquisition of Otto and that a press release was issued on August 18, 2016 by Uber and respectfully refers the Court to that press release for its full contents. Uber denies the remaining allegations in paragraph 74.

75. In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency." Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh." **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

**ANSWER:** Uber admits that it issued a press release on August 18, 2016 and that the language quoted in paragraph 75 appears in the press release. Uber respectfully refers the Court to the press release for its complete and accurate contents. Uber denies the remaining allegations in paragraph 75.

## F. GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI

76. On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 76.

77. Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

**ANSWER:** Uber admits that Google filed arbitration demands against Levandowski on October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber denies the remaining allegations in paragraph 77. Answering further, Uber refers the Court to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Arbitration Award as setting forth the complete and accurate account of any determinations made by

2   the Arbitration Panel.

3       78.    The two arbitration demands involved facts concerning Mr. Levandowski's dealings
    with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of

4   Otto, which later acquired Tyto before Otto was acquired by Uber.

5       **ANSWER:**    Uber admits that Google filed arbitration demands against Levandowski on

6   October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D

7   to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber

8   denies the remaining allegations in paragraph 78.

9       79.    Google alleged that Mr. Levandowski violated his duties to Google through his
    relationship with Tyto.  Google also alleged that Mr. Levandowski breached his obligations to

10  Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using
    confidential information regarding compensation to recruit Google employees.

11
        **ANSWER:**    Uber admits that Google filed arbitration demands against Levandowski on

12  October 28, 2016 and respectfully refers the Court to the arbitration demands attached as Exhibit D

13  to Levandowski's Amended Adversary Complaint for their complete and accurate contents. Uber

14  denies the remaining allegations in paragraph 79.

15      80.    The claims asserted by Google were the precise types of claims covered by the
    Indemnification Agreement.

16
        **ANSWER:**    Uber denies that the claims asserted by Google in arbitration are covered by

17  the Indemnification Agreement. Uber denies the remaining allegations in paragraph 80.

18

19      **G.    UBER ACCEPTS THE INDEMNITY OBLIGATIONS**

20      81.    On November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these
    Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

21
        **ANSWER:**    Uber admits that on November 3, 2016, Uber received notice of the Former

22  Employer Claims under the Indemnification Agreement. Uber denies the remaining allegations in

23  paragraph 81.

24      82.    On November 3, 2016, Uber's in-house counsel and as its outside counsel from
    Morrison & Foerster LLP ("MoFo"), Eric Tate, interviewed Mr. Levandowski about the allegations

25  asserted in Google's arbitration demands.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1       **ANSWER:**    Uber admits that Uber's counsel interviewed Levandowski on November 3,

2   2016 in connection with Google's arbitration demands. Uber denies the remaining allegations in

3   paragraph 82.

4       83.    After receipt of the notice and interviewing Mr. Levandowski, Uber accepted Mr.

5   Levandowski's tender of the indemnity (even though Uber's outside counsel stated that he was
concerned that not everything alleged in the arbitration demands was covered in the Stroz due

6   diligence) and assumed control of Mr. Levandowski's defense.

      **ANSWER:**    Uber admits that on November 3, 2016, it received notice of Google's

7   arbitration demands and that Uber's counsel interviewed Levandowski. Uber denies that

8   Levandowski is entitled to indemnification. Uber denies the remaining allegations in paragraph 83.

9       84.    Uber hired MoFo to initially represent Mr. Levandowski.  Through its counsel, Uber

10   controlled the strategy for Mr. Levandowski's defense, including deciding to consolidate the two
arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative

11   defenses, and dealing with procedural matters relating to the arbitration.

12       **ANSWER:**    Uber admits that Morrison & Foerster represented Levandowski. Uber denies

13   that it controlled the strategy for Levandowski's defense, including the issues identified in paragraph

14   84. Uber denies the remaining allegations in paragraph 84.

15       85.    In February 2017, Waymo LLC ("Waymo")—the entity Project Chauffeur became

16   after a corporate restructuring—initiated an action in the Northern District of California for
misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action").  That

17   action alleged, among other things, that Mr. Levandowski had downloaded 14,000 files from a
Google server, that those files contained trade secrets, and that he had used those files at Otto, which

18   was acquired by Uber in 2016.  These were the same files that Stroz had noted in its report, except
that because Mr. Levandowski had downloaded the repository multiple times over his time at

19   Google, Stroz had identified 24,000 files from that server.

      **ANSWER:**    Uber admits that in February 2017, Waymo initiated an action in the United

20   States District Court for the Northern District of California, alleging misappropriation of trade

21   secrets and patent infringement against Uber. Uber respectfully refers the Court to the amended

22   complaint for its complete and accurate contents. Uber denies the remaining allegations in paragraph

23   85.

24       86.    Based on Waymo's allegations, MoFo notified Google that Mr. Levandowski was

25   invoking his Fifth Amendment rights and would not make disclosures in the arbitration.

26       **ANSWER:**    Uber admits that Morrison & Foerster notified counsel for Waymo that

27   Levandowski was invoking his Fifth Amendment privilege. Uber denies the remaining allegations in

28   paragraph 86.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

87.     Several weeks after, MoFo determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski.  As a result, MoFo sought to withdraw from representation of Mr. Levandowski and continue with its representation of Uber.

**ANSWER:**     Uber admits that Morrison & Foerster terminated its representation of

Levandowski in connection with the Google Arbitration. Uber lacks knowledge or information

sufficient to admit or deny whether Morrison & Foerster determined it had a conflict of interest, and

denies the remaining allegations in paragraph 87.

88.     Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

**ANSWER:**     Uber admits that Goodwin Procter represented Levandowski in the Google

Arbitration. Uber denies the remaining allegations in paragraph 88. Answering further, Uber states

that it was prohibited from seeing most of the discovery materials, was excluded from most of the

arbitration hearing, was prohibited from seeing most of the legal briefing and expert reports, and

exercised no control over either Levandowski's arguments or defenses.

89.     For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement.  Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings, approval over experts, discussion about who would be arguing motions, pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions.  Mr. Levandowski complied with Uber's requirements and cooperated with his defense.  Mr. Levandowski and his counsel met with Uber whenever it requested.

**ANSWER:**     Uber admits that it has paid some of Levandowski's legal expenses in

connection with the Google Arbitration. Uber admits that it received periodic updates on proceedings

in the arbitration. Uber denies the remaining allegations in paragraph 89.

90.     Mr. Levandowski provided information and guidance that led to the discovery of evidence that was helpful to his defense in the arbitration as well as the Waymo action.  This included guidance that led to the discovery of statements by the administrator of the server that housed the 14,000 files at issue that the files were "low value" and that "checking out" or downloading the entire repository of 14,000 files did not "ring the alarm bells" for him.  This was because when a user accessed the server where the so-called 14,000 files were located, the system automatically downloaded the entire repository onto his or her laptop even if the user only wanted to access one or two files.  Ultimately, this discovery, driven by Mr. Levandowski's contributions, became a centerpiece of Uber's defense in the Waymo case.

**ANSWER:**     Uber admits that Levandowski provided information to his counsel in

connection with the Waymo litigation and the Google Arbitration. Uber denies that Levandowski

cooperated with Uber in the defense of the Google Arbitration as contemplated and required by the

Indemnification Agreement. Uber denies the remaining allegations in paragraph 90.

DOCS_SF:103042.1 85643\003
Case: 26-080542   Doc# 6298-1   Filed: 10/13/21   Entered: 10/13/21 20:10:35   Page 28 of
328
100555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

91.     In addition to providing this critical information, Mr. Levandowski also provided additional information to support Uber's defense.  This included obtaining from a former Chauffeur team member the earrings she received as a parting gift that contained the alleged trade secrets at issue in the Waymo Action.  Mr. Levandowski also identified numerous events and witnesses who aided Uber in its defense of the Waymo action as well as the arbitration with Google.

**ANSWER:**     Uber admits that Levandowski provided information to his counsel in connection with the Waymo litigation and the Google Arbitration. Uber denies the remaining allegations in paragraph 91.

92.     Mr. Levandowski also complied with Uber's requirement that Uber control all settlement discussions with Google.  Mr. Levandowski made several proposals regarding possible settlement structures to Uber hoping that a global settlement could be reached with Google.  But because Uber controlled settlement prospects with Google, Mr. Levandowski did not know whether any of his settlement proposals were made to Google.

**ANSWER:**     Uber denies the allegations in paragraph 92.

## H.     UBER SETTLES THE WAYMO ACTION

93.     In February 2018, while controlling Mr. Levandowski's defense, Uber settled the Waymo Action with Waymo/Google.  The existence of a settlement between Uber and Waymo was publicly announced, but limited information regarding the exact terms of the settlement is publicly available.

**ANSWER:**     Uber admits that a settlement was reached in the Waymo litigation, that the existence of the settlement was publicly announced in a press release on February 9, 2018, and that the terms of the settlement are confidential. *See* https://www.uber.com/newsroom/uber-waymo-settlement/. Uber denies the remaining allegations in paragraph 93.

94.     Upon information and belief, that settlement agreement contained broad releases by both parties releasing claims as to the other's past and present employees.

**ANSWER:**     Uber denies the allegations in paragraph 94.

95.     Upon information and belief, Uber agreed to a broad release as to Mr. Levandowski, a past employee of Google.

**ANSWER:**     Uber denies the allegations in paragraph 95. Answering further, Uber states that no release contained in the Google Settlement Agreement with Uber released or was intended to release any of Uber's claims or defenses against Levandowski. Uber further states that Levandowski does not have any right to enforce any term of the Google Settlement Agreement; Levandowski was neither a party nor an intended third party beneficiary of the Google Settlement Agreement. And, even if Levandowski could enforce the agreement against Uber, the agreement would not bar Uber from asserting the claims and defenses that it asserts here.

96.     In addition, upon information and belief based on publicly available information, in the Waymo Settlement, Uber agreed to never hire or do business with Mr. Levandowski ever again.

**ANSWER:**     Uber respectfully refers the Court to the Google Settlement Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 96.

97.     Upon information and belief, because of the Waymo settlement terms, Uber refused to close on its acquisition of Otto Trucking or support Mr. Levandowski's trucking business.

**ANSWER:**     Uber denies the allegations in paragraph 97.

98.     Upon information and belief, Uber traded Mr. Levandowski's rights in Otto Trucking and his ability to practice his profession in exchange for a settlement with Waymo.

**ANSWER:**     Uber denies the allegations in paragraph 98.

**I.     UBER REQUESTS THAT MR. LEVANDOWSKI TESTIFY SHORTLY BEFORE THE ARBITRATION HEARING**

99.     On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the Expenses it advanced for Mr. Levandowski to defend himself in the arbitration.  **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

**ANSWER:**     Uber admits that on April 2, 2018, counsel for Uber sent a letter to Levandowski's counsel. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 99.

100.     One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"— which Mr. Levandowski had exercised over a year before with full knowledge of Uber.

**ANSWER:**     Uber admits that the language quoted in paragraph 100 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that Levandowski had previously exercised his Fifth Amendment rights in a separate matter. Uber denies the remaining allegations in paragraph 100.

101.     Nevertheless, in its April 2, 2018 letter, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the *Waymo* court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

**ANSWER:**     Uber admits that the April 2, 2018 letter to Levandowski's counsel discusses Levandowski's obligations under the Indemnification Agreement and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 101.

DOCS_SF:105840.1 85564/001
Case: 20-80042  Date Filed: 10/13/2018  Entered: 10/13/2018 09:35:17  Page 26 of 33
Case 3:16-md-02741  Document 6298-1  Filed 10/13/23  Page 73 of 108555

102.    Uber then demanded that Mr. Levandowski waive his Fifth Amendment rights and testifying during the arbitration.

**ANSWER:**    Uber admits that on April 2, 2018, its counsel sent Levandowski's counsel a letter that requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing. Uber respectfully refers the Court to the April 2, 2018 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 102.

103.    In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

**ANSWER:**    Uber admits that after receiving the April 2, 2018 letter, Levandowski's counsel communicated with Google and the Arbitration Panel about potentially testifying to certain topics and Uber refers to those communications for their content. Uber denies the remaining allegations in paragraph 103.

104.    Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

**ANSWER:**    Uber admits that Levandowski submitted a proffer to the Arbitration Panel and that it was denied. Uber respectfully refers the Court to the Arbitration Panel's Order for its complete and accurate contents. Uber denies the remaining allegations in paragraph 104.

105.    Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

**ANSWER:**    Uber admits that Levandowski's offer to testify, after previously asserting the Fifth Amendment during his deposition, was denied by the Arbitration Panel. Uber admits that it paid Levandowski's legal fees until September 25, 2019, the date the Arbitration Panel declared the arbitration hearing closed. Uber denies the remaining allegations in paragraph 105.

106.    In addition, for the first time, Uber also stated that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

**ANSWER:**    Uber admits that the language quoted in paragraph 106 appears in the April 2, 2018 letter to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in its April 2, 2018 letter it asserted that Google's claims

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:105240v1 85546.001
Case: 20-80242   Document: 6-3   Filed: 10/13/2020   Entered: 10/13/2020 09:35:37   Page 30 of
331

relating to Tyto Misconduct by Levandowski are Excluded Claims as defined in the Indemnification Agreement. Uber denies the remaining allegations in paragraph 106.

107.    Uber's claims were false.  Uber accepted Mr. Levandowski's tender of indemnity *only after* Google's commencement of the arbitration proceeding alleging claims relating to Tyto and *only after* Mr. Levandowski had been interviewed by Uber extensively about Google's allegations relating to Tyto.  In addition, Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them.  And Stroz had specifically identified other materials on Mr. Levandowski's devices that he had not disclosed during interviews.

**ANSWER:**    Uber admits that on November 3, 2016, Levandowski notified Uber that he was requesting indemnity in connection with the Google Arbitration. Uber admits that the Google Arbitration alleges claims related to Tyto. Uber admits that Stroz identified some materials on Levandowski's devices that he had not disclosed in his interviews. Uber denies that on November 3, 2016 it had knowledge of any Tyto information on devices given to Stroz. Uber denies the remaining allegations in paragraph 107. Answering further, Uber states that Levandowski intentionally did not disclose his involvement with Tyto in response to questions posed to him by Stroz prior to entry of the Indemnification Agreement, and that Uber learned that Levandowski had engaged in wrongful conduct in establishing and developing the Tyto business only later, through the allegations in the Google Arbitration and discovery in the Waymo litigation.

108.    In fact, Uber had considered acquiring Tyto in 2015 but declined to do so at that time. Tyto was ultimately acquired by Otto with Uber's consent and at Uber's request prior to Uber closing on its acquisition of Otto to secure a lower price for Tyto than what Tyto would have requested had it known that Uber was the acquirer.

**ANSWER:**    Uber admits that Tyto was acquired by Otto with Uber's consent prior to Uber's acquisition of Otto. Uber denies the remaining allegations in paragraph 108. Answering further, at the time that Uber acquired Otto and at the time that Uber consented to Otto's acquisition of Tyto, Uber did not know that Levandowski had been involved with Tyto and did not know that Levandowski engaged in wrongful conduct in establishing and developing the Tyto business.

109.    Moreover, prior to April 2018, Uber received extensive documents and information about Tyto in the Waymo Action and had actively participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started.  Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto.  Uber had counsel present at the meetings with these witnesses and during most, if not all, of their testimony.  These individuals were also central witnesses in the two arbitrations with Google with respect to the Tyto-related allegations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    **ANSWER:**    Uber admits that Brent Schwarz, James Haslim, and Ognen Stojanovski

2  testified in either the Waymo litigation or the Google Arbitration, and that they each worked for Uber

3  at some point. Uber refers to the transcripts of their testimony to establish who was present and for

4  what duration.  Uber admits that discovery related to Tyto was provided in the Waymo action. Uber

5  admits that it learned certain information through the Waymo litigation that indicated that

6  Levandowski had engaged in misconduct related to Tyto. Uber denies the remaining allegations in

7  paragraph 109. Answering further, Uber states that Levandowski failed to disclose to Stroz or to

8  Uber his role and his misconduct in connection with Tyto, and that Uber learned that information

9  only later, through the Waymo litigation and through Google's allegations against Levandowski in

10 the Google Arbitration.

11     110.    Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship

12 between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that
   invested funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's

13 children, and would visit Tyto and his friends at that company to talk about technical and business
   matters from time to time.  Uber was also aware of Pierre Droz's (a Google employee) allegations

14 that Mr. Levandowski was involved with Tyto and even deposed him extensively on that very topic
   during the Waymo litigation.

15     **ANSWER:**    Uber admits that through testimony in the Waymo litigation in 2017–2018 it

16 learned certain information about Levandowski's involvement with Tyto, and that Uber learned of

17 Peter Droz's allegations during the Waymo litigation in 2017–2018. Uber refers to the testimony of

18 Droz and Stojanovski as setting forth the information that they provided through their testimony.

19 Uber denies the remaining allegations in paragraph 110.

20     111.    Armed with this knowledge, Uber paid for and controlled Mr. Levandowski's defense
   of the arbitration.  In fact, Uber did not raise any issues regarding coverage until April 2018.

21     **ANSWER:**    Uber admits that it paid for Levandowski's legal expenses in connection with

22 the defense of the Google Arbitration through September 25, 2019. Uber denies the remaining

23 allegations in paragraph 111.

24     **J.    UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

25     112.    On March 28, 2019, the arbitration panel issued an interim award in favor of Google.

26 The arbitration panel found violation of the exact claims covered by the Indemnification Agreement
   and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google.

27

28

DOCS_SF:108534.1 85640/001
Case: 26-08052 Doc# 6298-1 Filed: 10/13/28 Entered: 10/13/2024 09:09:35 Page 38 of
333108555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1      **ANSWER:**    Uber admits that on March 26, 2019, the Arbitration Panel issued an interim

2  award and respectfully refers the Court to it for its complete and accurate contents. Uber denies the

3  remaining allegations in paragraph 112.

4      113.    On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was
going to abide by its indemnity obligations and pay for any adverse award in light of the interim

5  award.  **Exhibit F** is a redacted copy of Mr. Levandowski's May 13, 2019 letter.

6      **ANSWER:**    Uber admits that on May 13, 2019, its counsel received a letter from

7  Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate

8  contents. Uber denies the remaining allegations in paragraph 113.

9      114.    In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did
not disclose information relating to Tyto to Stroz during the due diligence.  Mr. Levandowski

10  identified numerous documents that the arbitration panel relied on relating to Tyto that were on the
devices he provided to Stroz as well and pointed out that documents from his devices were shown to

11  witnesses at the arbitration hearing.

12      **ANSWER:**    Uber admits that on May 13, 2019, its counsel received a letter from

13  Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate

14  contents. Uber denies the remaining allegations in paragraph 114.

15      115.    Mr. Levandowski sent Uber a follow up letter on June 27, 2019.  **Exhibit G** is a true
and correct copy of that follow-up letter.

16      **ANSWER:**    Uber admits the allegations in paragraph 115.

17

18      116.    On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters
stating that Mr. Levandowski had breached the Indemnification Agreement, that a majority of the

19  interim award was "attributable to an Excluded Claim," and that "Uber has no contractual obligation
to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's behalf." **Exhibit H**

20  is a true and correct copy of Uber's July 3, 2019 letter.

21      **ANSWER:**    Uber admits that on July 3, 2019, its counsel responded to Levandowski's

22  counsel's letter of June 27, 2019, and respectfully refers the Court to the letter for its complete and

23  accurate contents. Uber denies the remaining allegations in paragraph 116.

24      117.    On August 15, 2019, Mr. Levandowski was indicted for thirty-three counts of trade
secret misappropriation.  The alleged trade secrets at issue in the indictment were some of the same

25  ones that were at issue in the Waymo Action.  Mr. Levandowski ultimately agreed to plead guilty to
one count of trade secret misappropriation based on his access of one Google document containing

26  trade secret information on one occasion after he left Google and has accepted restitutionary
obligations in the amount of $756,499.22.  This one file was the same file that Stroz expressly

27  identified in its report to Uber, and in fact, the Stroz report was the basis for the indictment and the
plea.  The government agreed to dismiss the remaining thirty-two counts against Mr. Levandowski.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that on August 15, 2019, Levandowski was indicted pursuant to 18 U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843 and 2323, Criminal Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019). Uber admits that trade secret misappropriation, among other things, was at issue in the Waymo litigation, and respectfully refers the Court to the amended complaint filed in the Waymo litigation for its complete and accurate contents. Uber admits that Levandowski has pled guilty to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). Uber further admits that as part of Levandowski's sentence he has been ordered to pay $756,499.22 in restitution to Waymo LLC. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case"). Uber admits that counts one through thirty-two of the indictment were dismissed on the motion of the United States. *Id.* Uber admits that a file identified in Levandowski's indictment was also identified in the Stroz report. Uber denies the remaining allegations in paragraph 117. Answering further, Levandowski later represented to Uber that he had retained Google confidential information after he left Google because he was worried that Google would not pay him his bonus and wanted to demonstrate the work he had done to earn that bonus.

118. On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering into the Indemnification Agreement, the remedy for which was rescission of the agreement. **Exhibit I** is a true and correct copy of Uber's August 30, 2019 letter.

**ANSWER:** Uber admits that on August 30, 2019, its counsel corresponded with counsel for Levandowski, and respectfully refers the Court to the letter for its complete and accurate contents. Uber further admits that in its August 30, 2019 letter it informed counsel that it is Uber's view that Levandowski fraudulently induced Uber to enter into the Indemnification Agreement. Uber further admits that its counsel stated in the August 30, 2019 letter that rescission of the Indemnification Agreement was a proper remedy. Uber denies the remaining allegations in paragraph 118.

119. At this point in time, Uber did not clearly state that the Indemnification Agreement was rescinded (and instead said it had a remedy of rescission should it choose to exercise it), make

Case: 20-80092   Doc # 6298   Filed 10/13/20   Entered 10/13/20 09:35:57   Page 32 of
335   106   555

any offer to restore the consideration it received under the agreement, or cede control of Mr. Levandowski's defense.

**ANSWER:** Uber denies Levandowski's characterization of the letter, and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 119.

120. Uber continued to advance payment for expenses incurred through September 25, 2019.

**ANSWER:** Uber admits that it advanced payment for expenses incurred through September 25, 2019. Uber denies the remaining allegations in paragraph 120. Answering further, Uber states that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that "[i]n the spirit of compromise and good will," Uber would pay Levandowski's counsel through September 25, 2019, the date on which the Arbitration Panel declared the hearing closed. Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents.

121. On September 27, 2019, Uber exercised its control over Mr. Levandowski to terminate its engagement of Goodwin Procter as counsel for Mr. Levandowski. Following this termination, Mr. Levandowski separately engaged Goodwin Procter to represent him.

**ANSWER:** Uber admits that on September 27, 2019, counsel for Uber sent a letter to Levandowski's counsel stating that Uber's engagement with Goodwin Procter "in connection with the defense of the arbitration brought by Google . . . is terminated." Uber respectfully refers the Court to the September 27, 2019 letter for its complete and accurate contents. Uber admits that Levandowski subsequently engaged Goodwin Procter. Uber denies the remaining allegations in paragraph 121.

122. In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission. In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims. Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **Exhibit J** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

**ANSWER:** Uber admits that on November 5, 2019, it filed a Form 10-Q with the Securities and Exchange Commission. Uber further admits that the language quoted in paragraph

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

122 appears in the filed Form 10-Q and respectfully refers the Court to the filed Form 10-Q for its complete and accurate contents. Uber denies the remaining allegations in paragraph 122.

123.    On December 6, 2019, the arbitration panel issued a final arbitration award.  In addition to the findings from the Interim Award, the Final Award awarded Google prejudgment interest at the 10% rate pursuant to Cal. Civ. Code § 3287, and awarded attorneys' fees and costs to Google under Cal. Civ. Code. § 1717.

**ANSWER:**    Uber admits that on December 6, 2019, the Arbitration Panel issued a final arbitration award and respectfully refers the Court to it for its complete and accurate contents. Answering further, Uber states that on December 23, 2019, the Arbitration Panel issued a Corrected Final Award that was *nunc pro tunc* as of December 6, 2019. Uber denies the remaining allegations in paragraph 123.

124.    The Final Award was not based on any alleged trade secret misappropriation by Mr. Levandowski or others.  During the arbitration proceedings, Google had repeatedly represented that it was pursuing only claims premised on different conduct than what was at issue in the Waymo litigation.  The arbitration panel recognized this on several occasions.

**ANSWER:**    Uber admits that the Arbitration Panel entered a corrected final award on December 23, 2019, *nunc pro tunc* as of December 6, 2019, and respectfully refers the Court to it for its complete and accurate contents. Uber denies the remaining allegations in paragraph 124.

125.    On December 10, 2019, Mr. Levandowski informed Uber of the final award. **Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter.  Because of the lack of clarity in Uber's previous statements, Mr. Levandowski asked Uber, as the Indemnitor in control of the defense of the case, how it would like to proceed.  Specifically, Mr. Levandowski inquired whether Uber intended to resolve the matter by paying the judgment or whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal and posting a bond to stay the judgment pending appeal.

**ANSWER:**    Uber admits that on December 10, 2019, Levandowski's counsel informed Uber that the Arbitration Panel issued its final award in *Google v. Levandowski and Ron* on December 6, 2019. Uber respectfully refers the Court to the December 10, 2019 letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 125.

126.    On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019 letter and stated that it rescinded the Indemnification Agreement.  **Exhibit L** is a true and correct copy of Uber's December 31, 2019 letter.  The stated basis for rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement for Expenses paid relating to the claims based on Tyto.

DOCS_SF:105942.1 85641/001
Case 2:20-cv-00541 Doc #6298-2 Filed 10/13/23 Entered 10/13/2023 09:35:17 Page 36 of
337 106555

1
2
3
4
5

**ANSWER:** Uber admits that on December 31, 2019, Uber's counsel responded to Levandowski's counsel and respectfully refers the Court to the letter for its complete and accurate contents. Uber admits that in the December 31, 2019 letter, counsel for Uber stated that Uber rescinded the Indemnification Agreement, but denies that Uber had not previously rescinded the Indemnification Agreement. Uber denies the remaining allegations in paragraph 126.

6
7

127. Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

8
9

**ANSWER:** Uber admits that in the December 31, 2019 letter, Uber's counsel stated that Uber has no obligations to advance expenses and that Uber "will not pay any part of the Final Award." Uber denies the remaining allegations in paragraph 127.

10
11
12

128. In addition, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals."

13
14
15
16

**ANSWER:** Uber admits that on December 31, 2019, Uber's counsel sent Levandowski's counsel a letter and that the language quoted in paragraph 128 appears in the letter. Uber respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 128.

17
18

129. On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019. Uber did not provide payment for any Expenses incurred after that date.

19
20

**ANSWER:** Uber admits that it provided payment to Levandowski through September 25, 2019. Uber denies the remaining allegations in paragraph 129.

21
22

130. On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,047,998.64. **Exhibit M** is a true and correct copy of the judgment in Google's favor.

23

**ANSWER:** Uber admits the allegations in paragraph 130.

24
25

131. On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a chapter 11 petition in the United States Bankruptcy Court for the Northern District of California commencing the Chapter 11 Case.

26

**ANSWER:** Uber admits the allegations in paragraph 131.

27
28

132. On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement. In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020. **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without exhibits.

**ANSWER:** Uber admits that on March 6, 2020, counsel for Levandowski provided notice of the March 4, 2020 judgment and a "Request for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's counsel. Uber respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 132.

133. On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay Google's judgment or any other Expenses. **Exhibit O** is a copy of Uber's March 27, 2020 letter.

**ANSWER:** Uber admits that its counsel responded to Levandowski's counsel on March 27, 2020 and respectfully refers the Court to the letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 133.

134. As a result, Mr. Levandowski filed an arbitration demand with JAMS San Francisco.

**ANSWER:** Uber admits that Levandowski filed an arbitration demand with JAMS in San Francisco, California. Uber denies the remaining allegations in paragraph 134.

135. Uber filed an answer on April 13, 2020 in which it alleged, among other defenses that it had rescinded the Indemnification Agreement based on Mr. Levandowski's purported fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.

**ANSWER:** Uber filed an answer on April 13, 2020 in which it alleged, among other defenses, that it had rescinded the Indemnification Agreement based on Levandowski's purported fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.

136. On July 6, 2020, Uber filed the Proof of Claim, through which it brought into the Chapter 11 Case issues from the arbitration to support its purported position as a creditor of Mr. Levandowski. **Exhibit P** is a true and correct copy of Uber's Proof of Claim, ECF No. 8-1.

**ANSWER:** Uber admits that it filed a Proof of Claim on July 6, 2020 and respectfully refers the Court to the Proof of Claim for its complete and accurate contents. Uber denies the remaining allegations in paragraph 136.

137. On July 28, 2020, the parties agreed, and the Court approved, that Mr. Levandowski could withdraw his arbitration demand and that all disputes in the arbitration demand, the original complaint in this proceeding, and Uber's proof of claim would be resolved as part of this Adversary Proceeding.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1      **ANSWER:**    Uber admits that on July 29, 2020, the Court entered a stipulation whereby the

2  parties agreed that Levandowski could withdraw his arbitration demand and that "all disputes"

3  between Uber and Levandowski would be resolved before this Court as part of the Adversary

4  Proceeding, including disputes raised in Levandowski's demand in arbitration, his Complaint in the

5  Adversary Proceeding (including claims related to the Otto Trucking Agreement), and Uber's Proof

6  of Claim in the Chapter 11 case. Uber denies the remaining allegations in paragraph 137.

7  **<u>COUNT I</u>**

8  **(Declaratory Judgment - Waymo Settlement Release)**

9      138.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated

10 herein.

    **ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its

11 answers to each of the allegations above.

12

13     139.    On February 8, 2018, Waymo and Uber executed a settlement agreement to resolve
Waymo's dispute with Uber.

14     **ANSWER:**    Uber admits that it entered into a Settlement Agreement as part of the Waymo

15 litigation on February 8, 2018, and respectfully refers the Court to the agreement for its complete

16 and accurate contents. Uber denies the remaining allegations in paragraph 139.

17     140.    Upon information and belief, the Waymo Settlement contained broad releases in
which Google and Uber released known and unknown claims that have or could be asserted against

18 the other's past and former employees.

19     **ANSWER:**    Uber denies the allegations in paragraph 140.

20     141.    Upon information and belief, Mr. Levandowski is a beneficiary of the releases in the
Waymo Settlement as he is a former employee of Google.

21     **ANSWER:**    Uber denies the allegations of paragraph 141.

22

23     142.    Upon information and belief, Google excluded from its release the arbitration claims
against Mr. Levandowski and Uber did not exclude any claims against Mr. Levandowski in its

24 release.

    **ANSWER:**    Uber denies the allegations in paragraph 142.

25

26     143.    Upon information and belief, all of the claims in the Proof of Claim and Uber's
Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided

27 under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's
alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's

28 assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on

Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, were released by Uber in the Waymo Settlement.

**ANSWER:**   Uber denies the allegations in paragraph 143.

143. As a result of the Proof of Claim and Mr. Levandowski's objection thereto, a live controversy exists as to whether Uber released Mr. Levandowski in the Waymo Settlement and, if so, what claims Uber released.

**ANSWER:**   Uber denies the allegations in paragraph 144.

145. This issue is ripe for determination and requires a declaration as to Mr. Levandowski's rights in the Waymo Settlement.

**ANSWER:**   Uber denies the allegations in paragraph 145.

146. Mr. Levandowski seeks a declaration that the claims and defenses in the Proof of Claim and Uber's Amended Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto, and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, are barred by the Waymo Settlement.

**ANSWER:**   Uber denies the allegations in paragraph 146.

## COUNT II

### (Specific Performance to Pay Expenses)

147. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**   Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

148. On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

**ANSWER:**   Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016, and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 148.

149. Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 20-03050   Doc# 63-28   Filed: 10/13/20   Entered: 10/13/20 21:09:35   Page 36 of
108

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    **ANSWER:**    Uber admits that the language quoted in paragraph 149 appears in Section

2    2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its

3    complete and accurate contents. Uber denies the remaining allegations in paragraph 149. Answering

4    further, the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's

5    affirmative defenses and counterclaims, including, but not limited to, that the award was based upon

6    felonious conduct, including conduct in violation of California Penal Code Section 502, that the

7    award arises out of one or more Excluded Claims, that the award is not indemnifiable as a matter of

8    policy and contract because it orders the disgorgement of monies to which Levandowski was not

9    entitled, that the Indemnification Agreement was rescinded, and that Uber has no indemnification

10   obligations due to Levandowski's commission of a Post-Signing Specified Bad Act.

11   150.    As defined in the Indemnification Agreement, "Expenses" includes reasonable
     attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards,
12   judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id.* at 3.

13   **ANSWER:**    Uber admits that page 3 of the Indemnification Agreement contains an

14   Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate

15   contents. Uber denies the remaining allegations in paragraph 150.

16   151.    Under Section 2.3 of the Indemnification Agreement, Uber is required to advance
     payment for Expenses within a set period following a request for advancement.
17
     **ANSWER:**    Uber admits that Section 2.3 of the Indemnification Agreement provides
18
     provisions related to Expenses and respectfully refers the Court to the Agreement for its complete
19
     and accurate contents. Uber denies the remaining allegations in paragraph 151.
20
21   152.    On March 6, 2020, Mr. Levandowski requested that Uber advance payment for
     Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between
     September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.
22
     **ANSWER:**    Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request
23
24   for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's

25   counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber

26   denies the remaining allegations in paragraph 152.

27   153.    Uber has refused to advance payment for the Expenses requested in the March 6
     Request and continues to refuse to pay for any Expenses.
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1        **ANSWER:**    Uber admits that it has not advanced payment to Levandowski pursuant to

2    Levandowski's March 6, 2020 request for advancement of Expenses. Uber denies that Levandowski

3    is entitled to indemnification or any payment of Expenses pursuant to the Indemnification

4    Agreement. Uber denies the remaining allegations in paragraph 153.

5        154.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

6        **ANSWER:**    Uber denies the allegations in paragraph 154.

7

8        155.    In the Indemnification Agreement, Uber agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy.  *See id*. at § 3.11.  Uber also agreed that Mr. Levandowski

9    may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id*.

10        **ANSWER:**    Uber denies the characterization that Levandowski would be irreparably

11    harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages

12    would be an inadequate remedy and respectfully refers the Court to the Indemnification Agreement

13    for its complete and accurate contents. Uber denies the remaining allegations in paragraph 155.

14

15        156.    Moreover, Mr. Levandowski has been irreparably harmed by Uber's continued breach of the Indemnification Agreement.  By way of example only, Uber's breach of the Indemnification

16    Agreement directly caused Mr. Levandowski to have to file this bankruptcy proceeding.  The parties to the Indemnification Agreement specifically agreed that disputes regarding reimbursement of

17    payments made under the Indemnification Agreement would not take be resolved until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred.

18    Uber's breach has materially impacted Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

19        **ANSWER:**    Uber denies the allegations in paragraph 156.

20        157.    Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco.  *See id*. § 3.5.

21

22        **ANSWER:**    Uber admits that the Indemnification Agreement contains a provision called

23    "Applicable Law" at Section 3.5 and respectfully refers the Court to the Agreement for its complete

24    and accurate contents. Uber denies the remaining allegations in paragraph 157.

25        158.    The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to

26    acquire Otto.

27        **ANSWER:**    Uber denies the allegations in paragraph 158.

28

DOCS_SF:106024.2 85564/001
Case: 20-30242   Doc# 6298   Filed: 10/13/20   Entered: 10/13/20 10:35:27   Page 40 of
343106555

159.     A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim and have agreed to seek resolution of whether any claim is an Excluded Claim in this proceeding.

**ANSWER:**     Paragraph 159 contains legal conclusions to which no response is required. To the extent a response is required, Uber admits that on July 29, 2020, this Court entered a stipulation whereby, among other things, "Uber and Mr. Levandowski agree that all issues relating to the Excluded Claim dispute under the Indemnification Agreement will be presented and resolved as part of the Adversary Proceeding, without any claim or defense relating to the Excluded Claim dispute being delayed based on any alleged need for a final non-appealable judgment in Mr. Levandowski's pending state-court appeal of the Google v. Levandowski arbitration award." (Case No. 20-03050, Dkt. 13.) Uber denies the remaining allegations in paragraph 159.

160.     The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

**ANSWER:**     Uber denies the allegations in paragraph 160.

161.     Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber pay for the Expenses requested on March 6, 2020 as well as payment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far, as well as any post-judgement interest which has or will accrue, and all other Expenses that Mr. Levandowski has and will incur.

**ANSWER:**     Uber denies the allegations in paragraph 161.

## COUNT III

### (Breach of Indemnification Agreement)

162.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**     Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

163.     On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2.

**ANSWER:**     Uber admits that Levandowski and Uber entered into an Indemnification Agreement dated April 11, 2016 and respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 163. Answering further,

the Arbitration Award is not indemnifiable for multiple reasons as set forth in Uber's affirmative

defenses and counterclaims, including, but not limited to, that the award was based upon felonious

conduct, including conduct in violation of California Penal Code Section 502, that the award arises

out of one or more Excluded Claims, that the award is not indemnifiable as a matter of policy and

contract because it orders the disgorgement of monies to which Levandowski was not entitled, that

the Indemnification Agreement was rescinded, and that Uber has no indemnification obligations due

to Levandowski's commission of a Post-Signing Specified Bad Act.

164.     Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

**ANSWER:**     Uber admits that the language quoted in paragraph 164 appears in Section

2.1(a) of the Indemnification Agreement and respectfully refers the Court to the Agreement for its

complete and accurate contents. Uber denies the remaining allegations in paragraph 164.

165.     As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims.  *Id*. at 3.

**ANSWER:**     Uber admits that page 3 of the Indemnification Agreement contains an

Expenses definition and respectfully refers the Court to the Agreement for its complete and accurate

contents. Uber denies the remaining allegations in paragraph 165.

166.     Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within fifteen Business Days of a request for advancement.

**ANSWER:**     Uber admits that Section 2.3 of the Indemnification Agreement provides

provisions related to Expenses and respectfully refers the Court to the Agreement for its complete

and accurate contents. Uber denies the remaining allegations in paragraph 166.

167.     On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

**ANSWER:**     Uber admits that on March 6, 2020, counsel for Levandowski sent a "Request

for Advancement of Expenses Pursuant to Section 2.3 of the Indemnification Agreement" to Uber's

counsel and respectfully refers the Court to that letter for its complete and accurate contents. Uber denies the remaining allegations in paragraph 167.

168.    Uber has refused to advance payment for the Expenses requested in the March 6 Request. Mr. Levandowski has paid many of the Expenses since Uber refused to advance payment.

**ANSWER:**    Uber admits that it has not advanced payment to Levandowski pursuant to Levandowski's March 6, 2020 request for advancement of Expenses. Uber denies that Levandowski is entitled to indemnification or any payment of Expenses. Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 168 and therefore denies the remaining allegations in paragraph 168.

169.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

**ANSWER:**    Uber denies the allegations in paragraph 169.

170.    As a result of Uber's refusal to honor its obligations under the Indemnification Agreement, Mr. Levandowski has suffered damages at least in the amount of the Expenses he has paid and will be required to pay to continue funding this litigation against Uber, the cost of the chapter 11 proceedings and this adversary proceeding and having to liquidate assets in the middle of a pandemic to continue to pursue his rights under the Indemnification Agreement and in challenging Google's judgment.

**ANSWER:**    Uber denies the allegations in paragraph 170.

<u>**COUNT IV**</u>

**(Declaratory Judgment – Uber's Rescission Claim)**

171.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

172.    In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.

**ANSWER:**    Uber admits that it filed a Proof of Claim on July 6, 2020 in Bankruptcy Petition No. 20-30242 and that Levandowski named Uber as a creditor. Uber admits that the Indemnification Agreement has been rescinded. Uber denies the remaining allegations in paragraph 172.

173.    In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber admits that the Indemnification Agreement has been rescinded. Uber denies the remaining allegations in paragraph 173, and further states that it ceased paying Expenses for multiple reasons, including that it had no obligation to do so.

174. Mr. Levandowski contends that Uber waived any right to rescind because it expressly confirmed and ratified the Otto Trucking Merger Agreement, one key component of the April 11, 2016 transactions, and thereby ratified the transaction Uber claims it was fraudulently induced into entering.

**ANSWER:** Uber denies the allegations in paragraph 174.

175. Mr. Levandowski also contends that Uber also impliedly waived, is estopped from asserting, and/or ratified any alleged fraudulent inducement on which Uber's purported rescission is based by entering into an amendment of the transaction Uber alleges it was fraudulently induced to enter into.

**ANSWER:** Uber denies the allegations in paragraph 175.

176. Mr. Levandowski further contends that Uber's rescission claim is barred by its unreasonable delay in rescinding the Indemnification Agreement, failure to return consideration provided, and actions by Uber that are inconsistent with a claim for rescission as described hereinabove.

**ANSWER:** Uber denies the allegations in paragraph 176.

177. Uber has not returned any consideration it received under the Indemnity Agreement, including Mr. Levandowski's devices, which it continues to retain through Stroz, as well as the consideration received under the full transaction for the Otto acquisition. Such failure is fatal to any rescission claim, especially where, as here, Uber's refusal or inability to return the consideration it received is due to its delay in exercising any purported right to rescission.

**ANSWER:** Uber admits that Levandowski provided a number of devices to Stroz. Upon information and belief, Uber admits that Stroz is still in possession of some or all of those devices. Uber denies that it was or is in possession of Levandowski's devices. Uber denies that it received any consideration under the Indemnification Agreement. Uber denies the remaining allegations in paragraph 177.

178. To the extent that Uber's ability to return the consideration received is impossible, this impossibility is due to Uber's delay in exercising the purported rescission after it controlled Mr. Levandowski's defense and settlement ability for years and benefited from Mr. Levandowski's cooperation with his defense and Uber's defense in the Waymo action.

**ANSWER:** Uber denies the allegations in paragraph 178.

179. Uber has also ratified any purported fraud and acted in ways inconsistent with rescission, including by affirming its obligations under the Indemnification Agreement in its public filings.

**ANSWER:** Uber denies the allegations in paragraph 179.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

180. Uber's performance under the Indemnification Agreement for years and belated rescission of that agreement has substantially prejudiced Mr. Levandowski.

**ANSWER:** Uber denies the allegations in paragraph 180.

181. Finally, upon information and belief, Uber has released any claim for rescission as part of its release in the Waymo Settlement.

**ANSWER:** Uber denies the allegations in paragraph 181.

182. As a result of the acts described herein, a live controversy exists as to whether Uber has a right to rescind and whether its purported rescission is effective.

**ANSWER:** Uber denies the allegations in paragraph 182.

183. This issue is ripe for determination and requires a declaration as to Uber's right to rescind the Indemnification Agreement and whether Uber is a proper creditor in the Chapter 11 Case.

**ANSWER:** Uber denies the allegations in paragraph 183.

184. Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement.

**ANSWER:** Uber denies the allegations in paragraph 184.

## COUNT V

**(Declaratory Judgment and Damages: Rescission of Otto Transaction)**

185. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

186. As shown herein, Mr. Levandowski denies that Uber has any right to rescind the Indemnity Agreement and Mr. Levandowski seeks a declaratory judgment regarding Uber's rescission claim/defense.

**ANSWER:** Uber denies the allegations in paragraph 186.

187. Alternatively, if the Court determines that Uber has rescinded the Indemnification Agreement, the entirety of the Otto transaction must also be rescinded and all consideration Uber received from the Otto transaction must be returned to Mr. Levandowski.

**ANSWER:** Uber denies the allegations in paragraph 187.

188. In agreeing to sell Otto to Uber and lead Uber's self-driving car program, Mr. Levandowski conveyed repeatedly to Uber's representatives that he was concerned that Google would sue him. Because of these concerns, Uber agreed to provided indemnity as key and indivisible part of the Otto transaction and as an inducement to Mr. Levandowski to sell Otto to Uber. Mr. Levandowski would not have entered into the Otto transaction without the Indemnity Agreement because of his well-founded fear of litigation against him by Google.

Case: 20-03050 Doc# 63-2 Filed: 10/13/20 Entered: 10/13/20 09:35:27 Page 45 of
348 of 555

**ANSWER:**     Uber admits that, prior to executing the Indemnification Agreement and Otto Agreement, Levandowski raised concerns that Google may bring litigation against him without a valid basis for doing so. Uber denies the remaining allegations in paragraph 188.

189.     For this reason, on April 11, 2016, Uber and Mr. Levandowski executed documents for the acquisition of Otto, including the Indemnification Agreement. All of the agreements executed on April 11, 2016 are part of one single transaction that can not be divided.

**ANSWER:**     Uber admits that on April 11, 2016, Uber and Levandowski executed certain documents, including the Indemnification Agreement. Uber denies the remaining allegations of paragraph 189.

**ANSWER:**

190.     Uber's rescission of the Indemnification Agreement necessarily requires rescission of the entire Otto transaction, including returning all consideration related to the transaction, including the intellectual property Uber received from its acquisition of Otto.

**ANSWER:**     Uber denies the allegations in paragraph 190.

191.     Should the Court determine that Uber effectively rescinded the Indemnification Agreement, a live controversy exists as to whether Uber's rescission also rescinds the Otto transaction and requires return of all consideration Uber received from that transaction.

**ANSWER:**     Uber denies the allegations in paragraph 191.

192.     Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement without also rescinding the Otto transaction and returning all consideration received from that deal.

**ANSWER:**     Uber denies the allegations in paragraph 192.

193.     In addition, Mr. Levandowski seeks damages, including any consequential damages, arising out of Uber's rescission of the Otto transaction.

**ANSWER:**     Uber denies the allegations in paragraph 193.

## <u>COUNT VI</u>

### (Declaration As to Unenforceability of Amendment and Termination of

### Otto Trucking Agreement as to Anthony Levandowski)

194.     Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**     Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

195. Mr. Levandowski is a party to the Otto Trucking Agreement, including as to Section 5.4 and 5.11.

**ANSWER:** Uber denies the allegations in paragraph 195. Answering further, the April 11, 2016 Otto Trucking Agreement defines "parties" as the Company Unitholder Representative, Parent, Purchaser, Merger Sub, and the Company.

196. Section 5.4 allowed Mr. Levandowski to form a new trucking company and to obtain the IP License from Uber if Uber failed to satisfy its funding obligations to Otto Trucking in the three years after closing on that transaction.

**ANSWER:** Uber respectfully refers the Court to the Otto Trucking Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 196. Answering further, Uber states that the conditions precedent for Levandowski to obtain an IP License were not met, that the Otto Trucking Agreement was amended and terminated according to its terms, and that the New Otto Trucking Merger Agreement ("New Otto Trucking Agreement") did not provide Levandowski with any right to an IP License. Uber refers the Court to the New Otto Trucking Agreement, attached as Exhibit 2, for its complete and accurate contents.

197. Section 5.11 allowed Mr. Levandowski to form a new trucking company and demand that Uber provide him with the IP License for use in the new trucking company if Uber terminated the Otto Trucking Agreement after acquiring Otto.

**ANSWER:** Uber respectfully refers the Court to the Otto Trucking Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 197. Answering further, Uber states that the conditions precedent for Levandowski to obtain an IP license and for Uber to support a new trucking company were not met, that the Otto Trucking Agreement, including Section 5.11, was terminated, and that the New Otto Trucking Agreement did not provide for an IP License to Levandowski.

198. Uber closed on its acquisition of Otto on August 18, 2016.

**ANSWER:** Uber denies the allegations in paragraph 198. Answering further, Uber closed on its acquisition of Otto pursuant to the New Otto Trucking Agreement on August 23, 2016.

199. In November 2017, Uber provided notice that it was exercising its option to acquire Otto Trucking.

**ANSWER:** Uber admits the allegations in paragraph 199.

200. After providing notice, Uber stalled the closing of the Otto Trucking acquisition.

1    **ANSWER:**    Uber denies the allegations in paragraph 200.

2    201.    Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition
     so that it could work out a settlement with Waymo/Google in the trade secrets action. During that
3    time, Uber was controling Mr. Levandowski's defense, including regarding settlement.

4    **ANSWER:**    Uber denies the allegations in paragraph 201.

5    202.    Upon information and belief, Uber agreed in the Waymo settlement to terms that gave
     away Mr. Levandowski's rights.
6    **ANSWER:**    Uber denies the allegations in paragraph 202.

7    203.    Upon information and belief, because of its agreement in the Waymo Settlement to
8    never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking
     closing and told Mr. Levandowski that it would not close the transaction if he was still part of the
9    company and would not in any event give him the IP license.

10   **ANSWER:**    Uber admits that, after it terminated Levandowski for cause, it expressed

11   concerns to Levandowski about continuing a relationship with him. Uber denies the remaining

12   allegations in paragraph 203. Answering further, Uber states that Levandowski sold his interest in

13   Otto Trucking and Uber refers the Court to the Unit Purchase Agreements, attached as Exhibits 3 and

14   4, for their complete and accurate contents. Following Levandowski's sale of his interests in Otto

15   Trucking, the Otto Trucking Agreement was amended and terminated.

16   204.    Uber threatened to leave the transaction in limbo and force Mr. Levandowski to
17   engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

     **ANSWER:**    Uber denies the allegations in paragraph 204.
18
19   205.    Faced with the prospect of litigating immediately with a multi-billion dollar company
     in the midst of other active litigation—the defense of which was under Uber's control—and a
     criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to
20   sell his interest in the company at a significant discount.

21   **ANSWER:**    Uber admits that Levandowski resigned from Otto Trucking and sold his

22   interest in Otto Trucking. Uber denies the remaining allegations in paragraph 205.

23   206.    Uber acquired Otto Trucking on August 5, 2018.

24   **ANSWER:**    Uber admits that it entered into an Agreement and Plan of Merger with Otto

25   Trucking pursuant to the New Otto Trucking Agreement on August 5, 2018. Uber denies the

26   remaining allegations in paragraph 206.

27   207.    On August 31, 2020, in response to Mr. Levandowski's complaint, Uber answered
     and alleged that it had terminated the Otto Trucking Agreement and had acquired Otto Trucking
28   pursuant to a new Otto Trucking agreement dated August 5, 2018.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:105842.1 85864/001
Case: 20-80042   Doc# 6298-2   Filed: 10/13/21   Entered: 10/13/21 20:10:35   Page 80 of
351   106555

**ANSWER:** Uber admits that it filed its Answer to Levandowski's complaint on August 31, 2020, and respectfully refers the Court to the Answer for its complete and accurate contents. Uber further admits that the Otto Trucking Agreement was terminated and that Otto Trucking was acquired pursuant to the New Otto Trucking Merger Agreement dated August 5, 2018. Uber denies the remaining allegations in paragraph 207.

208. This was the first time that Mr. Levandowski learned that Uber had terminated the Otto Trucking Agreement.

**ANSWER:** Uber denies the allegations in paragraph 208.

209. On September 11, 2020, Uber produced a copy of an Amendment and Termination of the Otto Trucking Agreement dated August 5, 2018 (the "Termination Agreement") and an Agreement and Plan of Merger for Otto Trucking LLC dated August 5, 2018 (the "New Otto Trucking Agreement").

**ANSWER:** Uber admits the allegations in paragraph 209.

210. Upon receipt, of the Termination Agreement, Mr. Levandowski learned for the first time that Uber and Otto Trucking had agreed to terminate the Otto Trucking Agreement.

**ANSWER:** Uber denies the allegations in paragraph 210.

211. Mr. Levandowski also learned that while the agreement affirmed his status as a party as to Section 5.11, it purported to terminate his rights under that provision without his knowledge or consent.

**ANSWER:** Uber denies the allegations in paragraph 211. Answering further, Levandowski was not a Party to the Otto Trucking Agreement as defined in the Agreement, and Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber further states that neither Levandowski's knowledge nor his consent was required to terminate the Otto Trucking Agreement or any term thereof, and in any event, Levandowski had knowledge that the Otto Trucking Agreement was terminated.

212. Indeed, Mr. Levandowski did not sign the Termination Agreement and has never agreed to relinquish his right to the IP License.

**ANSWER:** Uber admits that Levandowski did not sign the Termination Agreement. Uber refers the Court to the Amendment and Termination Agreement, attached as Exhibit 5, for its complete and accurate contents. Uber denies the remaining allegations in paragraph 212. Answering further, Uber states that neither Levandowski's signature, knowledge, agreement, nor his consent was required to terminate the Otto Trucking Agreement or any term thereof.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

213.    A controversy exists as to whether Uber and Otto Trucking's purported termination of Section 5.11 is enforceable and effective as to Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 213.

214.    Mr. Levandowski thus seeks a declaration that Uber and Otto Trucking could not and did not terminate his rights under Section 5.11 when it executed the Termination Agreement without his consent or signature on that document.

**ANSWER:**    Uber denies the allegations in paragraph 214.

## COUNT VII

### (Specific Performance of Uber's Obligations to Provide Mr. Levandowski an IP License and Form an New Trucking Company Under Section 5.11 of Otto Trucking Agreement)

215.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

216.    In addition to requiring the Indemnification Agreement, Mr. Levandowski also conditioned his sale of Otto to Uber on Uber's support for his autonomous trucking business. Uber agreed to this condition in the Otto Trucking Agreement.

**ANSWER:**    Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed, and Uber respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 216.

217.    Under the Otto Trucking Agreement, Uber received an option to acquire Otto Trucking.

**ANSWER:**    Uber admits that the Otto Trucking Agreement contained a provision for a Call Option Period granting Uber a "right, but in no circumstances the obligation" to acquire Otto Trucking. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Uber denies the remaining allegations in paragraph 217.

218.    Uber closed on its acquisition of Otto on August 18, 2016. The effect of the acquisition of Otto obligated Uber to support Mr. Levandowski's trucking business as the only scenario where Uber could walk away from Otto Trucking was if Uber did not acquire Otto. For example, even if Uber terminated the Otto Trucking Agreement after acquired Otto, Uber was required to give Mr. Levandowski an exclusive license to use Uber's self-driving technology in the field of trucking to form a new trucking company outside of Uber. The terms of the exclusive license are described at Exhibits E and F of the Otto Trucking Agreement.

DOCS_SF:103242.1 85864/001
Case: 20-80042   Doc# 6298   Filed 10/13/20   Entered 10/13/20 09:35:37   Page 52 of
353   of   555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1      **ANSWER:**    Uber admits that it closed on the acquisition of Otto in August 2016. Uber

2  denies the remaining allegations in paragraph 218.

3      219.    In late November 2017, Uber exercised its right to acquire Otto Trucking by
providing notice of its decision.

4      **ANSWER:**    Uber admits that in November 2017, it provided notice to Otto Trucking that it

5  would exercise its option under the Otto Trucking Agreement. Uber denies the remaining allegations

6  in paragraph 219.

7      220.    On August 5, 2018, Uber terminated the Otto Trucking Agreement.

8      **ANSWER:**    Uber admits the allegations in paragraph 220.

9      221.    Uber hid its termination of the Otto Trucking Agreement from Mr. Levandowski for

10  over two years, finally disclosing its purported termination of the Otto Trucking Agreement only
recently in its answer to the Complaint.

11      **ANSWER:**    Uber denies the allegations in paragraph 221.  Answering further,

12  Levandowski was aware of the forthcoming termination of the Otto Trucking Agreement and the

13  New Otto Trucking Merger Agreement as of August 1, 2018 at the latest.

14      222.    Under Section 5.11, because Uber acquired Otto and obtained the benefits of that

15  acquisition, Uber is required to provide a license to these patents and any other patents or intellectual
property related to autonomous trucking to Mr. Levandowski for use in the field of trucking.

16      **ANSWER:**    Uber denies the allegations in paragraph 222. Answering further,

17  Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto

18  Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New

19  Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking

20  Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the

21  conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

22      223.    Mr. Levandowski seeks specific performance of Uber's obligation under Section 5.11.

23  Specifically, Mr. Levandowski seeks an order requiring Uber to provide a company formed by Mr.
Levandowski the IP License in a form consistent with Exhibit E and F of the Otto Trucking

24  Agreement.

25      **ANSWER:**    Uber denies the allegations in paragraph 223. Answering further,

26  Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto

27  Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New

28  Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking

Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

224. A search for autonomous driving related patents yielded over hundreds of results for patents owned by Uber. **Exhibit Q** is a copy of the patent search result for Uber's self-driving related patents.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 224 and therefore denies the allegations.

225. Mr. Levandowski has performed all obligations under the Otto Trucking Agreement.

**ANSWER:** Uber denies the allegations in paragraph 225.

226. Although Mr. Levandowski contends that the ten business day period referenced in Section 5.11 relates to how "promptly" his right to the IP License becomes available after termination of the Otto Trucking Agreement and that there is no deadline to provide such notices, on September 21, 2020, within ten business days of receipt of the Termination Agreement, Mr. Levandowski provided Uber with written notice that he is exercising his right to form the new trucking company, and has requested that Uber provide the IP License and work together to sign and prepare organization documents for the new company. **Exhibit R** is a copy of the letter notifying Uber of Mr. Levandowski's election of the right to obtain the IP License.

**ANSWER:** Uber denies the allegations in paragraph 226. Answering further, Section 5.11 of the Otto Trucking Agreement required that the Company Founders provide written notice "no more than 10 Business Days" from the date of termination of the Agreement of any election to form a new trucking company. Uber respectfully refers the Court to the Agreement for its complete and accurate contents. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

227. Uber has refused to provide the requested license.

**ANSWER:** Uber admits that it has not provided an IP License to Levandowski related to a new trucking company. Uber denies the remaining allegations in paragraph 227. Answering further, Uber denies that it has any obligations to provide any such IP License to Levandowski.

228. Mr. Levandowski will be irreparably harmed by Uber's refusal to provide the IP License and to form the trucking company as agreed.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ANSWER:** Uber denies the allegations in paragraph 228.

229. Uber received adequate consideration, at least in the form of its acquisition of Otto, in exchange for agreeing to Mr. Levandowski's right to lead an autonomous trucking business within Uber or with Uber's IP License.

**ANSWER:** Uber denies the allegations in paragraph 229.

230. A mutuality of remedies exists as the agreement provides for a method for adjudicating disputes, including allowing either party to sue for specific performance.

**ANSWER:** Uber denies the allegations in paragraph 230.

231. The contract is sufficiently definite in requiring that Uber must provide the IP License to Mr. Levandowski on terms consistent with Exhibits E and F of the Otto Trucking Agreement if the Otto Trucking Agreement was terminated after Uber acquired Otto.

**ANSWER:** Uber denies the allegations in paragraph 231. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

232. Therefore, Mr. Levandowski seeks an order from the Court requiring Uber to provide the IP License as required by Section 5.11 of the Otto Trucking Agreement and to work with Mr. Levandowski to form the new trucking company.

**ANSWER:** Uber denies the allegations in paragraph 232.

233. In the alternative, Mr. Levandowski seeks damages for Uber's breach of Section 5.11 of the Otto Trucking Agreement, including damages for the value of the IP License and either the value of Uber Freight, which is estimated as $4 billion once Uber closes on its latest round of financing, and/or the trucking company he should have been able to form and operate using the IP License and lost profits from that company.

**ANSWER:** Uber denies the allegations in paragraph 233.

## COUNT VIII

### (Declaration Regarding Uber's Fiduciary Duty To Shut Down Uber Freight)

234. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:** Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

235. In addition to requiring Uber to provide the IP License upon termination, Section 5.11 of the Otto Trucking Agreement also requires Uber to become a member of a new limited liability trucking company formed by Mr. Levandowski.

**ANSWER:** Uber denies the allegations in paragraph 235. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

236. Uber's membership interest was to be 50% of the then available shares.

**ANSWER:** Uber denies the allegations in paragraph 236. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

237. The material terms of Uber's membership are provided in Exhibit F to the Otto Trucking Agreement, referenced in Section 5.11.

**ANSWER:** Uber denies the allegations in paragraph 237. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

238. Exhibit F addressed fiduciary duties of managers during the initial development of the company, requiring that they owe the duties to the company and the holders of equity in that company the same fiduciary duties that would be owed in a corporation until the company raises at least $17,500,000 in investments.

**ANSWER:** Uber denies the allegations in paragraph 238. Answering further, Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking

2    Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the

3    conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

4        239.    Exhibit F, however, does not contain any limitation or waiver of the statutory
     fiduciary duties owed by members of the company to the company and other members.

5        **ANSWER:**    Uber denies the allegations in paragraph 239. Answering further,

6    Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto

7    Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New

8    Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking

9    Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the

10   conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

11       240.    As such, once formed, Uber owes the new trucking company and Mr. Levandowski
     statutory fiduciary duties, including the duty not to compete with the company, including by
12   continuing to operate Uber Freight.

13       **ANSWER:**    Uber denies the allegations in paragraph 240. Answering further,

14   Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto

15   Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New

16   Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking

17   Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the

18   conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

19       241.    In its answer, Uber denies that Exhibit F contemplates that Uber would owe Mr.
     Levandowski and the new trucking company fiduciary duties that would prevent it from competing
20   with the company.

21       **ANSWER:**    Uber denies that it owes fiduciary duties to a company that does not exist and

22   denies the remaining allegations in paragraph 241. Answering further, Levandowski sold his interest

23   in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended

24   and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and

25   Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had

26   rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any

27   obligation by Uber to provide Levandowski with an IP License.

28

DOCS_SF:103542v1 85614/001
Case: 26-08042    Doc# 6298-1    Filed: 10/13/24    Entered: 10/13/24 20:09:35    Page 55 of
358106555

242.    As such, a controversy exists as to what fiduciary duties Uber will owe in the new trucking company to be formed consistent with the terms of Section 5.11 and Exhibit F of the Otto Trucking Agreement and whether Uber may continue to operate Uber Freight once that company is formed.

**ANSWER:**    Uber denies the allegations in paragraph 242.

243.    Mr. Levandowski requests a declaration as to Uber's obligations and fiduciary duties to Mr. Levandowski and the new trucking company as provided in Section 5.11 and Exhibit F of the Otto Trucking Agreement, including, Uber's obligation to shut down Uber Freight.

**ANSWER:**    Uber denies the allegations in paragraph 243.

## COUNT IX

### (Breach of Covenant of Good Faith and Fair Dealing )

244.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

**ANSWER:**    Uber restates and incorporates by reference as though fully set forth herein its answers to each of the allegations above.

245.    In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business.  Uber agreed to that condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

**ANSWER:**    Uber admits that on April 11, 2016, the Indemnification Agreement, the Otto Agreement, and the Otto Trucking Agreement were each executed and respectfully refers the Court to the Agreements for their complete and accurate contents. Uber denies the remaining allegations in paragraph 245. Answering further, Uber states that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking Agreement was amended and terminated on August 5, 2018.

246.    The Otto Trucking Agreement includes an implied covenant of good faith and fair dealing.  The implied covenant ensures that neither party may engage in arbitrary or unreasonable conduct and thereby prevent the other party from receiving the fruits of the bargain.

**ANSWER:**    Paragraph 246 asserts legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in paragraph 246.

247.    The intent of the parties for Mr. Levandowski to be able to continue to pursue the trucking business he left Google to start with Uber's support in exchange for Mr. Levandowski selling Otto to Uber.

**ANSWER:**    Uber denies the allegations in paragraph 247.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

248.     This intent is reflected in the Otto Trucking Agreement as the only scenario where Uber could walk away from Otto Trucking and not support Mr. Levandowski's trucking business was if Uber did not acquire Otto.

**ANSWER:**     Uber denies the allegations in paragraph 248. Answering further, Uber states

that Levandowski sold his interest in Otto Trucking on August 1, 2018, and the Otto Trucking

Agreement was amended and terminated on August 5, 2018.

249.     After acquiring Otto, Uber had two options for supporting the trucking business. It could acquire Otto Trucking and appoint Mr. Levandowski as the non-executive chairman of that business.

**ANSWER:**     Uber denies the allegations in paragraph 249.

250.     In the alternative, Uber could terminate the acquisition of Otto Trucking, but support an outside trucking venture started by Mr. Levandowski as an investor. Uber was obligated to provide an exclusive license to its self-driving technology for Mr. Levandowski to use in the field of trucking in exchange for membership in Mr. Levandowski's new company. The IP License was an exclusive license for trucking, which barred Uber from competing with Mr. Levandowski's trucking business. Uber's membership interest in Mr. Levandowski's new company also prevented Uber from competing with that business based on the statutory duties owed by members of an LLC.

**ANSWER:**     Uber denies the allegations in paragraph 250. Answering further, Uber states

that Levandowski failed to satisfy the conditions precedent to Uber's obligation to provide

Levandowski the IP License.

251.     Uber did neither.

**ANSWER:**     Uber denies the allegations in paragraph 251.

252.     Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was in control of Mr. Levandowski's defense and settlement prospects, and had barred Mr. Levandowski from participating in the settlement discussion or discussing settlement directly with Google.

**ANSWER:**     Uber denies the allegations in paragraph 252.

253.     Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

**ANSWER:**     Uber denies the allegations in paragraph 253. Answering further, Uber states

that it used commercially reasonable efforts to close the Otto Trucking transaction and that it

expressed concerns with continuing a business relationship with Levandowski because, among other

things, Levandowski was terminated from Uber for Cause.

Case: 20-80052    Document: 6-2    Filed: 10/13/2020    Entered: 10/13/2020 09:35:52    Page 52 of
360    105555

254. Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

**ANSWER:** Uber denies the allegations in paragraph 254.

255. Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

**ANSWER:** Uber admits that Levandowski resigned from Otto Trucking and sold his interest in Otto Trucking. Uber denies the remaining allegations in paragraph 255.

256. But Mr. Levandowski, as a Company Founder and in his individual capacity, remained a party to the Otto Trucking Agreement with respect to Section 5.4 and 5.11 of that agreement and a beneficiary of the remainder of the Otto Trucking Agreement independent of his prior status as a unitholder of the company.

**ANSWER:** Uber denies the allegations in paragraph 256.

257. Uber and Otto Trucking agreed between them, without Mr. Levandowski's agreement or consent, to terminate the Otto Trucking Agreement.

**ANSWER:** Uber admits that the Otto Trucking Agreement was terminated. Uber denies the remaining allegations in paragraph 257. Answering further, neither Levandowski's agreement nor his consent was required to terminate the Otto Trucking Agreement.

258. Uber and Otto Trucking hid the termination from him for two years.

**ANSWER:** Uber denies the allegations in paragraph 258. Answering further, Levandowski was aware of the forthcoming termination of the Otto Trucking Agreement and the New Otto Trucking Merger Agreement as of August 1, 2018 at the latest, as evidenced by two agreements he signed that reference the New Otto Trucking Agreement, which in turn reference the termination of the Otto Trucking Agreement.

259. Despite terminating the Otto Trucking Agreement after acquiring Otto, Uber refused to provide Mr. Levandowski with the IP License, and in fact, Uber and Otto Trucking agreed, without Mr. Levandowski's agreement or consent and without providing any consideration, to terminate Mr. Levandowski's individual rights under the Otto Trucking Agreement.[1]

**ANSWER:** Uber admits that the Otto Trucking Agreement was terminated after Uber acquired Otto. Uber denies the remaining allegations in paragraph 259. Answering further, neither Levandowski's agreement nor his consent was required to terminate the Otto Trucking Agreement,

---

[1] Mr. Levandowski contends, as alleged in Count VII that such agreement to terminate Levandowski's rights was ineffective and unenforceable.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

including any rights Levandowski had in his individual capacity. Levandowski sold his interest in Otto Trucking on August 1, 2018; on August 5, 2018, the Otto Trucking Agreement was amended and terminated and Uber and Otto Trucking entered into the New Otto Trucking Agreement; and Levandowski had no continuing rights under the Otto Trucking Agreement, and even if he still had rights under the Otto Trucking Agreement, he failed to satisfy the conditions precedent to any obligation by Uber to provide Levandowski with an IP License.

260. Uber and Otto Trucking then entered into a separate agreement whereby Uber proceeded to acquire Otto Trucking and started Uber Freight without Mr. Levandowski, the trucking business Uber had promised that Mr. Levandowski would lead.

**ANSWER:** Uber admits that it acquired Otto Trucking pursuant to the New Otto Trucking Agreement dated August 5, 2018. Uber denies the remaining allegations in paragraph 260.

261. In fact, the parties agreed in the New Trucking Agreement to terms intended to keep Mr. Levandowski out of the company.

**ANSWER:** Uber denies the allegations in paragraph 261.

262. As a party to section 5.4 and 5.11 and as a beneficiary to the remainder of the Otto Trucking Agreement, Mr. Levandowski has a right to enforce that agreement, including the covenant of good faith and fair dealing.

**ANSWER:** Uber denies the allegations in paragraph 262.

263. To the extent that Mr. Levandowski has any obligations under that agreement, he has satisfied them.

**ANSWER:** Uber denies the allegations in paragraph 263.

264. Uber's actions described herein were unreasonable, made in bad faith, and have deprived Mr. Levandowski of the fruits of the bargain, including the agreed-to benefit of running a trucking business with Uber's support.

**ANSWER:** Uber denies the allegations in paragraph 264.

265. By preventing Mr. Levandowski from obtaining the benefits of the Otto Trucking Agreement, Uber has violated the implied covenant of good faith and fair dealing.

**ANSWER:** Uber denies the allegations in paragraph 265.

266. After Mr. Levandowski's forced divestment, Uber's refusal to provide the IP License and for the new trucking company, and Uber's acquisition of Otto Trucking to form Uber Freight, Uber continued to operate that business. Uber Freight has reported hundreds of millions in revenue since its creation and Mr. Ron, who heads Uber Freight, stated that he and Uber "think there is a very clear path to profitability."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   **ANSWER:**   Uber admits that it acquired Otto Trucking and further states that it acquired

2   Otto Trucking pursuant to the New Otto Trucking Agreement dated August 5, 2018. Uber admits that

3   Mr. Ron is head of Uber Freight. Uber admits that Mr. Ron made a public statement that is reported

4   at https://finance.yahoo.com/news/uber-freight-to-investors-theres-a-very-clear-path-to-profitability-

5   232536480.html, and refers to that Court to the article for its complete and accurate contents. Uber

6   denies the remaining allegations in paragraph 266.

7   267.   As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount
    to be proven at trial, which amount should be at least $4.128 billion.

8   **ANSWER:**   Uber denies the allegations in paragraph 267.

9   ## COUNT X

10  ### (Objection to Claim)

11

12  268.   Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated
    herein.

13  **ANSWER:**   Uber restates and incorporates by reference as though fully set forth herein its

14  answers to each of the allegations above.

15  269.   For the reasons set forth above, the Indemnity Agreement is not subject to rescission
    and, if it had been, Uber waived its right to assert such remedy.

16  **ANSWER:**   Uber denies the allegations in paragraph 269.

17

18  270.   For the reasons set forth above, Uber is liable under the Indemnity Agreement to
    advance his Expenses (as defined in the Indemnification Agreement).

19  **ANSWER:**   Uber denies the allegations in paragraph 270.

20  271.   For the reasons set forth above, Mr. Levandowski generally denies the evidentiary
21  bases upon which the Proof of Claim is based and specifically denies that (a) Uber was fraudulently
    induced to enter into the Indemnity Agreement, (b) Mr. Levandowski failed to comply with his
    obligations under the Indemnity Agreement, and (c) Uber's obligations under the Indemnity
22  Agreement are subject to allocation as asserted in the Proof of Claim, which in any event, cannot be
    adjudicated until after Uber satisfies its obligations under the Indemnification Agreement.

23  **ANSWER:**   Uber denies the allegations in paragraph 271.

24

25  272.   For the reasons set forth above, any claim for offset or contribution is also
    undermined by its active participation in the conduct at issue in the Waymo Action and the Google
26  arbitration as it (a) encouraged, if not directed, Mr. Levandowski to recruit Google employees to join
    Otto and Uber, and (b) knew about Mr. Levandowski's retention of Google information and access
27  of the one file at issue in the plea agreement after he left Google.

28  **ANSWER:**   Uber denies the allegations in paragraph 272.

273.    For the reasons set forth above, Mr. Levandowski denies that Uber has any right to contribution from Mr. Levandowski for the Waymo settlement.  Waymo did not prove that Mr. Levandowski misappropriated any trade secrets in that case.  As for the one file that Mr. Levandowski accessed after he left Google, Uber was well aware of that conduct and proceeded to acquire Mr. Levandowski's company and work with him anyway.  Moreover, Mr. Levandowski's guilty plea that resulted in a total restitution amount of approximately $750,000 further demonstrates the unreasonableness of Uber's decision to settle with Waymo for $245,000,000 in stock, among other consideration.  In addition, to the extent that any trade secrets were taken and used at Uber, those trade secrets did not come from Mr. Levandowski, but rather a different former Google employee.  Indeed, as admitted in Uber's public statements, Uber's self-driving software—an area that Mr. Levandowski did not work on at Google or Uber—contained problematic functions that will require it to enter into a license agreement with Waymo for use of Waymo's intellectual property.  Upon information and belief, the Waymo Settlement, entered into after discovery of possible misconduct relating to Uber's source code, settled issues relating to theft of trade secrets by individuals who are not Mr. Levandowski.

**ANSWER:**    Uber denies the allegations in paragraph 273.

274.    Mr. Levandowski therefore seeks disallowance in full of the Proof of Claim.

**ANSWER:**    Uber denies the allegations in paragraph 274.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## AFFIRMATIVE AND OTHER DEFENSES

In addition to its answers to the allegations set forth above, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that would otherwise rest with Levandowski, Uber asserts the following affirmative and other defenses to certain of the claims asserted against Uber: with respect to Count I, Uber asserts Affirmative Defenses 15 and 16; with respect to Counts II and III, Uber asserts Affirmative Defenses 1-10; with respect to Count IV, Uber asserts only Affirmative Defense 7; with respect to Counts V-IX, Uber asserts Affirmative Defenses 7-14; and with respect to Count X, Uber asserts Affirmative Defense 10. Affirmative Defense 17 is asserted as to the fact of Google's intervention into Count IV, but not as to the substance of the claim set forth in Count IV.

1.     **Indemnification For Disgorgement Is Barred By Public Policy**.  Levandowski's claims in Counts II and III for indemnification of the Salary and Regular Compensation ("Related Compensation"), Chauffeur Bonus, and prejudgment interest associated with the same fail because indemnification for disgorgement is impermissible in California as a matter of public policy. The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, order Levandowski to disgorge payments wrongfully obtained from Google. As a matter of law, the Related Compensation and Chauffeur Bonus never belonged to Levandowski. Under California law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement of monies that did not belong to him, it is void and unenforceable as contrary to public policy and the law. Any amount awarded for prejudgment interest related to an award of disgorgement is likewise unenforceable.

2.     **Expenses Reduced By Amounts Paid By Third Party**. Levandowski's claims in Counts II and III for indemnification for the Related Compensation, Chauffeur Bonus, and prejudgment interest related to it fail because Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses." The $127 million payment to Levandowski, related to the

DOCS_SF:103542.1 85647/001

Related Compensation and Chauffeur Bonus, was a payment by a third party, Google, to Levandowski, an Indemnified Person, upon which Levandowski's claim for indemnification is based. Levandowski is not entitled to indemnification for that amount, or for prejudgment interest related to that amount.

3. **Indemnification For Wrongful, Unlawful and Felonious Activity Is Barred**. Levandowski's claims in Counts II and III are barred in whole or in part, by California Civil Code Sections 2773 and 2774. An agreement to indemnify Levandowski against wrongful conduct committed after April 11, 2016 that Levandowski knew to be wrongful is void and unenforceable pursuant to California Civil Code § 2773. Levandowski knowingly engaged in wrongful conduct after April 11, 2016, including by concealing his role in Tyto and concealing his theft of trade secrets from Google, all in order to deceive Google so as to receive the second installment of the Chauffeur Bonus from Google under false pretenses. The foregoing is not an exhaustive list of Levandowski's wrongful activity after April 11, 2016. Additionally, under California Civil Code § 2774 it is impermissible to indemnify Levandowski for conduct that was felonious in nature. Levandowski engaged in felonious activity in connection with the events that led to the Arbitration Award. As determined in the Arbitration Award, Levandowski concealed competitive and disloyal conduct over a four-year period in order to procure a bonus and other compensation from Google under false pretenses. This conduct constitutes felony grand theft under California Penal Code Section 487, and it caused the Arbitration Panel to order Levandowski to disgorge the compensation obtained under false pretenses. Levandowski also pled guilty to the felony of Theft and Attempted Theft of Trade Secrets for stealing Google trade secrets related to self-driving car technology for use in competing with Google. The indictment recites a course of conduct that substantially overlaps with the conduct that formed the basis of the Arbitration Award. The indictment and guilty plea are attached as Exhibits 6 and 7. Moreover, Levandowski also concealed his felony theft of trade secrets in order to procure a bonus and other compensation from Google under false pretenses. Upon information and belief, Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation information regarding the employees he was soliciting to join Otto, in violation of California Penal Code Section 502. This conduct also

DOCS_SF:108254.1 85641/002
Case: 25-80042   Document: 63-2   Page: 68   Date Filed: 10/13/2024
Case 20-30242   Doc# 63-2   Filed 10/13/24   Entered 10/13/24 09:35:17   Page 68 of
366
108555

formed the basis of the Arbitration Award. The foregoing may not be an exhaustive list of Levandowski's felonious activity. The Award of disgorgement was based upon Levandowski's commission of wrongful and felonious conduct. Indemnification for the Award of disgorgement is precluded as a matter of law and contract by both California Code Section 2773 and Section 2774.

    4.    **Indemnification Agreement Is Null And Void Due To A Post-Signing Specified Bad Act**. Levandowski's claims in Counts II and III fail, in whole or in part, because the Agreement is void based upon Levandowski's commission of one or more Post-Signing Specified Bad Acts, as provided in Section 2.1(a) of the Indemnification Agreement. Under Section 2.1(a) of the Indemnification Agreement, the Agreement is null and void as to any employee who commits a Post-Signing Specified Bad Act that was the subject of a Former Employer Claim. The definition of "Post-Signing Specified Bad Act" includes any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer." The definition of Post-Signing Specified Bad Acts also includes the solicitation of employees of a Former Employer without that Former Employer's express written consent. And it includes knowingly permitting others to commit a Post-Signing Specified Bad Act, as well as failing to disclose knowledge of the commission of such acts.

    Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Google, Waymo, and Tyto were all Former Employers of Levandowski. The amended complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. Levandowski also provided services to Tyto, so as to render Tyto a Former Employer. Both the Google Arbitration and the Waymo litigation were Former Employer

DOCS_SF:105042v1 85641/001

Claims within the meaning of the Indemnification Agreement. Levandowski received indemnification of certain legal fees in conjunction with the Google Arbitration. Otto Trucking was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation.

Levandowski committed Post-Signing Specified Bad Acts by, among other things, retaining access to Google confidential information and trade secrets after April 11, 2016, including through one or more online cloud storage accounts. In addition, upon information and belief, Levandowski knowingly permitted others to retain or access confidential documents, confidential information, and trade secrets belonging to Google or Waymo after April 11, 2016.

Levandowski also committed Post-Signing Specified Bad Acts by causing Ottomotto, and thus effectively Uber, to acquire Tyto and Tyto's intellectual property without disclosing his connection to Tyto. In May 2016, Levandowski arranged for Otto, and thus (upon closing of the Otto transaction) for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google and Waymo had a claim, without disclosing his involvement in Tyto. Levandowski's fraudulent concealment of his own involvement in Tyto as well as his misconduct between April 11, 2016 and August 2016 caused Uber to acquire patents, trade secrets, and confidential information related to Tyto's LiDAR technology that were purportedly owned by Tyto but as to which, based upon Levandowski's breach of his duty of loyalty, Google and Waymo had a claim to equitable ownership.

Levandowski also committed Post-Signing Specified Bad Acts by retaining access to confidential information and trade secrets of another Former Employer after April 11, 2016: Tyto. Upon information and belief, Mr. Levandowski obtained and retained Tyto's confidential information without the express written consent of Tyto after April 11, 2016.

Additionally, upon information and belief, Levandowski also committed Post-Signing Specified Bad Acts by permitting others at Otto, after April 11, 2016, to solicit Google or Waymo employees to join Otto without the express written consent of Google or Waymo. Waymo's amended complaint in the Waymo litigation makes allegations at paragraphs 51-54 that relate to these Post-Signing Specified Bad Acts.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

This is not an exhaustive account of Levandowski's Post-Signing Specified Bad Acts; Uber's investigation continues.

All of these Post-Signing Specified Bad Acts were the subject of Former Employer Claims, including certain claims asserted in the Waymo litigation and claims asserted in the Google Arbitration.

Uber seeks a Final Judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim.

5.    **Excluded Claims**. Levandowski's claims in Counts II and III fail because the Arbitration Award is attributable, in whole or in part, to an Excluded Claim. Section 2.1(b)(ii) of the Indemnification Agreement provides that Uber shall have no obligation to indemnify Levandowski for claims arising from any Pre-Signing Bad Acts that "were not truthfully disclosed by [Levandowski] to the Outside Expert in response to relevant inquiries," or "were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]." The entire Arbitration Award is attributable to Pre-Signing Bad Acts that were not truthfully disclosed by Levandowski to the Outside Expert—including Levandowski's misconduct with respect to Tyto ("Tyto Misconduct"). Among other concealment, when asked about side projects while employed at Google, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list and failed to disclose his involvement with and role in forming Odin Wave/Tyto. Levandowski concealed material and relevant information about Tyto to Stroz in the due diligence materials. Accordingly, the Google claim associated with the Tyto Misconduct is an Excluded Claim.

The Tyto Misconduct occurred throughout the entire period that the Chauffeur Bonus was vesting, and was the predominant reason that he was not entitled to receive the Related

65

Compensation and the Chauffeur Bonus. The Tyto Misconduct was also the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Related Compensation and Chauffeur Bonus. Additionally, Levandowski did not disclose truthfully to Uber the other Pre-Signing Bad Acts that formed the basis of the Arbitration Award, including the full extent of the Otto Misconduct, and his long-running course of conduct to procure compensation and a bonus under false pretenses. Thus, the entire Arbitration Award is attributable to an Excluded Claim, and Uber has no obligation to indemnify Levandowski for that Award. In the alternative, at least 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring.

6. **Material Breach Of Contract By Levandowski**. Levandowski's claims in Counts II and III fail, in whole or in part, because Levandowski materially breached the Indemnification Agreement, thereby relieving Uber from its obligation to perform thereunder, and entitling Uber to a setoff and/or recoupment for the amounts paid or advanced to Levandowski for Expenses. Section 2.2(c) of the Indemnification Agreement provided that Uber had the right to direct and control the defense of any Former Employer Claims (including Google's arbitration claims), required Levandowski to cooperate in that defense, and required Levandowski to appear and give testimony at Uber's reasonable request. Levandowski refused to cooperate, did not permit Uber to control the defense, and refused to appear and testify at deposition despite Uber's reasonable request, instead broadly invoking the Fifth Amendment in response to all questions posed. This had the effect of also precluding any testimony by Levandowski at the arbitration hearing. Levandowski's failure to testify denied Uber its primary bargained-for-consideration under that agreement. If Levandowski's contention that his testimony would have made a difference is correct, then Levandowski materially breached the terms of the Indemnification Agreement by reason of his refusal to testify. In light of Levandowski's material breach of the Indemnification Agreement, Uber is not obligated to perform under the Indemnification Agreement.

7. **Fraudulent Inducement**. Levandowski's claims in Counts II, III, and IV-IX fail because Levandowski fraudulently induced Uber to sign the Indemnification Agreement, Otto

DOCS_SF:105842v1 85641-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Agreement, and Otto Trucking Agreement by, among other misrepresentations and omissions, concealing from Uber and Stroz his involvement in Tyto and misrepresenting to Uber that he had not taken confidential information or trade secrets from Google when, in fact, he had stolen at least one Google trade secret with the intention of using it at Uber. On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved of, *all of* his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Odin Wave/Tyto LiDAR project from the list.

Levandowski also represented during the Stroz interview that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession were there unintentionally, including tools, Drobo 5D disks and company emails on his personal laptop, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski thus represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

All of these representations were false. Google was not aware of and did not approve of Levandowski's involvement in the Odin Wave/Tyto side project, and Levandowski did not comply with his agreements with or obligations to Google—as determined by the award in the Google

DOCS_SF:103542v1 56456/0001

Case: 23-60242   Doc# 6298-2   Filed: 10/13/2024   Entered: 10/13/2024 20:10:35   Page 68 of
371  106555

Arbitration. In fact, Levandowski's breach of his duties and obligations to Google was so pervasive that, as determined in the Arbitration Award, it nullified any benefit he may have conferred on Google during that time period, and warranted the disgorgement of all of the compensation that accrued to him during that time. Contrary to his attestations and his statements during the Stroz interviews, Levandowski did intentionally take Google confidential information with the intention of using it at Uber—as determined by his guilty plea to the crime of Theft and Attempted Theft of Trade Secrets. This is not an exhaustive list of Levandowski's misrepresentations and omissions; Uber's investigation continues.

Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement, Otto Agreement, and Otto Trucking Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement, Otto Agreement, and Otto Trucking Agreement. Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending the Waymo litigation and advancing Levandowski's defense costs in the Google Arbitration. Due to his fraudulent inducement, Levandowski is not entitled to enforce the Indemnification Agreement, Otto Agreement, and Otto Trucking Agreement.

8. **Unclean Hands**. Levandowski's claims in Counts II, III, and V-IX are barred by the doctrine of unclean hands. Levandowski engaged in wrongful conduct including but not limited to the following: fraudulently inducing Uber to indemnify Levandowski without disclosing that he had stolen one or more trade secrets from Google with the intent to use them at Uber; fraudulently misrepresenting to Uber that he had not intentionally taken any Google confidential information and did not intend to use any Google confidential information at Uber; fraudulently misrepresenting to Uber that he had not violated any of his agreements with or obligations to Google; fraudulently concealing from Uber his involvement in Odin Wave/Tyto; committing one or more felonies by stealing one or more trade secrets from Google and wrongfully accessing and taking compensation information from Google in order to solicit Google employees; and wrongfully obtaining a bonus of over $100 million from Google under false pretenses. Because of this and other wrongful conduct,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Levandowski is barred by the doctrine of unclean hands from seeking any indemnification or

2   damages of any kind, or seeking to hold Uber liable in any manner, in connection with any of the

3   events at issue in this action, the Waymo litigation, the Google Arbitration, or the criminal action.

4         9.     **Reimbursement For Amounts Paid Into Estate For Excluded Claims**. To the

5   extent that Uber has paid or is otherwise required to pay into Levandowski's estate any

6   indemnification amounts that are attributable to any Excluded Claim, Uber is entitled to

7   reimbursement of those amounts. In addition, Uber is entitled to reimbursement for all defense costs

8   already advanced that are allocable to any Excluded Claim.

9         10.    **Setoff and Recoupment**. To the extent Uber is determined to have any

10  indemnification obligation to Levandowski or to bear any other liability to Levandowski, which

11  Uber expressly denies, Uber is entitled to an offset, reduction, or credit, and/or recoupment, for each

12  of the following:

13        a.   Compensatory and consequential damages for Levandowski's fraudulent conduct

14           including but not limited to fraudulent inducement. Levandowski fraudulently

15           induced Uber to indemnify Levandowski. As a result of that agreement, Uber was

16           required to defend against, and ultimately settle, litigation brought by Google's

17           subsidiary Waymo, premised on Uber's alleged infringement of Google trade secrets

18           and concealed involvement with Tyto and the development of its LiDAR technology.

19           But for Levandowski's fraud, Uber would not have hired him and would not have

20           been sued by Waymo, and relatedly would not have been required to provide

21           hundreds of millions of dollars of value to settle the Waymo litigation. Accordingly,

22           and as more fully set forth in Uber's counterclaims, Uber is entitled to compensatory

23           and consequential damages in the amount of the defense costs and settlement value it

24           provided in the Waymo litigation.

25        b.   Contribution from Levandowski for the value provided by Uber to settle the Waymo

26           litigation based upon Levandowski's fault in causing Uber to incur potential liability

27           to Waymo in connection with those claims.

28

c.  Compensatory and/or rescissory damages in the amounts advanced to Levandowski to cover defense costs in the Google Arbitration. Levandowski materially breached the Indemnification Agreement by refusing to testify in the Google Arbitration. Levandowski also fraudulently induced Uber to enter into the Indemnification Agreement. Whether under a rescission or breach of contract theory, Uber is entitled to damages in the amount it paid under the Indemnification Agreement for Levandowski's defense of the Google Arbitration.

d.  Contribution for at least 50% of the approximately $9.5 million that Uber paid to indemnify Lior Ron for the portion of the Arbitration Award that was "joint and several" as between Levandowski and Ron.

e.  The amount of the Arbitration Award that is allocable to Excluded Claims.

f.  Reimbursement for all attorneys' fees and other costs allocable to Excluded Claims.

11.



12.

Case: 20-80042   Doc #: 6298   Filed: 10/13/20   Entered: 10/13/20 10:35:17   Page 73 of

70

374 of 555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

b.

13.

14.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

15.

16.

DOCS_SF:108994.1 08564/001
Case: 26-03052   Doc# 6298   Filed: 10/13/24   Entered: 10/13/24 09:35:27   Page 73 of
377 of 555

17.

18. **Reservation of Additional Defenses Based Upon Full Text of Arbitration Award And Full Arbitration Record**. As of the date of this Amended Answer, Uber still has not been provided a full, un-redacted copy of the Arbitration Award for which Levandowski seeks indemnification, or the record supporting that award. Uber has requested the production of the complete, un-redacted Award and the full arbitration record from both Levandowski and Intervenor Google. Uber reserves the right to assert additional defenses and affirmative defenses based upon the content of the un-redacted Arbitration Award and the arbitration record.

## **PRAYER FOR RELIEF**

WHEREFORE, Uber requests that this Court enter judgment in its favor and against Levandowski on each Count of the Amended Adversary Complaint, and that the Court award Uber its costs, including attorneys' fees, for defending this action.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## COUNTERCLAIMS[2]

Uber Technologies, Inc. ("Uber"), by and through its attorneys, alleges as follows in connection with its counterclaims against Anthony Levandowski:

### THE PARTIES

1.  Defendant Uber is a Delaware corporation with its principal place of business in San Francisco, California.

2.  Plaintiff Anthony Levandowski is an individual who resides in Sausalito, California.

### JURISDICTION AND VENUE

3.  The Court has jurisdiction over Uber's Counterclaims, pursuant to 28 U.S.C. § 1334(b), because the Counterclaims arise in and relate to the Chapter 11 bankruptcy case that Levandowski filed on March 4, 2020, in the United States Bankruptcy Court for the Northern District of California, Bankruptcy Petition No. 20-30242.

4.  Uber's Counterclaims seeking a declaration that its claims are non-dischargeable are denominated as core proceedings under 28 U.S.C. § 157(b)(2)(B) and (I). Pursuant to Local Bankruptcy Rule 7012-1, Uber consents to the entry of final orders or judgments by the Bankruptcy Court.

5.  Venue is proper before the Court pursuant to 28 U.S.C. § 1409(a), and this Court's July 29, 2020 Order Granting Stipulation to Withdraw Arbitration and Litigate Indemnity Dispute in Bankruptcy Court.

### FACTS

6.  Uber incorporates paragraphs 1–274 of its Answer and Affirmative Defenses 1-18 as though fully set forth herein.

7.  Prior to January 27, 2016, Levandowski was an employee at Google, working on Google's self-driving car project. While Levandowski was at Google, that project was operated as a

---

[2] As of the date of this Answer, Uber still has not been provided a full, un-redacted copy of the Arbitration Award for which Levandowski seeks indemnification, or the record supporting that award. Uber has requested the production of the complete, un-redacted Award and the full arbitration record from both Levandowski and Intervenor Google. Uber reserves the rights to assert additional defenses and affirmative defenses based upon the content of the un-redacted Arbitration Award and the arbitration record.

75

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

division within Google called "Project Chauffeur." In 2016, this project was referred to and established under the name of Waymo.

8.      By February 22, 2016, Uber and Levandowski had entered into a non-binding term sheet for Uber's acquisition of Ottomotto LLC ("Otto"). Prior to agreeing to the transaction, Uber and Otto, through their outside lawyers, hired a third-party forensic investigator, Stroz Friedberg ("Stroz") to gather facts and documents to confirm and ensure that Levandowski and others did not bring any proprietary or confidential Google material to Otto, and would not bring any such information to Uber.

9.      In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

10.     During his interview with Stroz on March 22 and 23, 2016, Stroz asked Levandowski if he had been involved in any "side projects" during his employment at Google. Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but did not disclose a side business called Tyto LiDAR ("Tyto"), which was a company that Levandowski created beginning in 2012, while working at Google, that was originally called Odin Wave. Levandowski had been the owner, investor, and adviser of Tyto and was the "control person" at Tyto.

11.     Levandowski actively concealed from Uber that he had any role at Tyto. Levandowski arranged for Uber to acquire the assets of Tyto through a sale of those assets in May 2016 to Otto, which Uber had agreed to acquire. Unknown to Uber, Google and Waymo had claims to Tyto's LiDAR technology including because Levandowski was concurrently employed by Google and Waymo to develop the same type of LiDAR technology and because Levandowski concealed his involvement in Tyto from Google and Waymo. By arranging for Uber to acquire the Tyto assets and employ persons employed by Tyto, Levandowski fraudulently exposed Uber to substantial claims by Google and Waymo.

12. Levandowski also represented during the Stroz interview that the Google information that was found on his devices and accounts "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession were there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber. Levandowski represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

13. As part of Stroz's due diligence, on April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or other obligations to which I am subject with 'Former Employer']." In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

14. Levandowski did not disclose to Stroz that since 2012, and while working at Google, he was the control person of Tyto and did not disclose Google's potential claim to ownership of Tyto trade secrets and patents related to LiDAR technology.

15. Additionally, contrary to his attestations, his statements during the Stroz interviews and his multiple representations to Uber, Levandowski had intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets after leaving Google. Levandowski never disclosed this fact to Uber. To the contrary, Levandowski consistently assured Uber that he would not bring any confidential Google information to Uber.

16. Uber relied on Levandowski's assurances when it entered into an Indemnification Agreement with him on April 11, 2016.

17. Levandowski fraudulently induced Uber into executing the Indemnification Agreement. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

18. At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google, other than as expressly and fully disclosed to Stroz.

19. If Uber had known Levandowski had been involved with the Tyto business, had misappropriated Google trade secrets, had breached his fiduciary duties to Google, had committed felonious misconduct, or had lied to Stroz, Uber would not have executed the Indemnification Agreement in April 2016 and it would not have completed the Otto acquisition in August 2016.

20. Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, and owed fiduciary duties to Uber.

21. Levandowski committed fraud on Uber while acting in his fiduciary capacity.

22. In October 2016, Google initiated two arbitration proceedings against Levandowski, which were subsequently consolidated. *Google LLC v. Anthony Scott Levandowski and Lior Ron*, JAMS Arbitration Case Reference No. 1100086069 (Consolidated) (the "Google Arbitration"). Levandowski thereafter requested indemnity from Uber pursuant to the Indemnification Agreement.

23. Uber was harmed as a result of its justifiable reliance on Levandowski's fraud, including by incurring millions of dollars of expenses in defending subsequent litigation brought by Google against Uber and Levandowski and advancing Levandowski's defense costs in the Google Arbitration.

24. On August 15, 2019, a grand jury indicted Levandowski on 33 counts of theft and attempted theft of trade secrets. Levandowski was indicted pursuant to 18 U.S.C. § 1832(a)(1), (2), (3) & (4), Theft and Attempted Theft of Trade Secrets, and 18 U.S.C. §§ 1843 and 2323, Criminal

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:105942v1 68564/001
Case 20-30242 Doc# 6398 Filed 10/13/20 Entered 10/13/20 21:09:35 Page 72 of
382 105555

Forfeiture. *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal. filed Aug. 15, 2019).

25.     The indictment and each count incorporates a course of alleged misconduct that includes Levandowski's involvement with: (a) Project Chauffeur/Waymo; (b) Odin Wave/Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets through at least January 2016.

26.     The indictment was not publicly announced until August 27, 2019.

27.     Three days after the indictment was made public, Uber notified Levandowski in a letter dated August 30, 2019, that the Indemnification Agreement was rescinded based on Levandowski's fraudulent inducement. Uber's August 30, 2019 letter also explained that even if the Indemnification Agreement were not rescinded, Levandowski would have no right to enforce it because (a) he had committed a "Post-Signing Specified Bad Act," which was defined in the Agreement to include "retaining, not returning . . . or possessing" confidential information from a former employer, and which rendered any indemnification obligation to Levandowski "null and void" under the Agreement's plain terms, and (b) Levandowski had materially breached the Agreement by refusing to testify and failing to cooperate in the Google Arbitration. Uber also explained that Google's claims related to Levandowski's Tyto conduct were Excluded Claims.

28.     Uber reiterated its rescission of the Indemnification Agreement in letters dated September 11, 2019, September 27, 2019, December 31, 2019, and March 27, 2020.

29.     On December 6, 2019, the Google Arbitration Panel issued a final award against Levandowski. The amount of the award solely against Levandowski was over $174 million, not including amounts for which he was held jointly and severally liable with co-respondent Lior Ron. As discussed below, a primary component of that award was that Levandowski was obligated to disgorge to Google payments for a $126,544,500.00 bonus tied to Google's Project Chauffeur program ("Chauffeur Bonus") and $767,051.95 in salary and regular compensation ("Related Compensation"), to which he was not entitled, as well as to pay prejudgment interest on the same.

30.     On March 4, 2020, the California Superior Court confirmed Google's Final Award against Levandowski, and issued judgment against Levandowski in the amount of $179,047,998.64.

The primary component of the judgment was disgorgement of the Chauffeur Bonus and Related Compensation, which were payments that Levandowski was not entitled to receive, together with prejudgment interest on that amount.

31.     On March 4, 2020, Levandowski filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

32.     On March 19, 2020, federal prosecutors announced that Levandowski had agreed to plead guilty to taking Google trade secret information with the intention of using it for his economic benefit, including at Uber. Levandowski fraudulently concealed that he had taken trade secret information when he negotiated the Indemnification Agreement.

33.     On August 6, 2020, Levandowski was sentenced to one count of Theft and Attempted Theft of Trade Secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). *United States of America v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (Dkt. 99, filed Aug. 6, 2020 "Judgment in a Criminal Case").

34.     At the time Uber agreed to indemnify Levandowski, it did not know about Levandowski's involvement and misconduct in forming the Tyto business, that he had stolen trade secrets from and breached his fiduciary duties to Google, that he had lied to Stroz, or that he had committed felonious conduct. Levandowski actively concealed those facts from Uber.

35.     On July 6, 2020, Uber filed a Proof of Claim (Claim 8-1) in Bankruptcy Petition No. 20-30242.

A.     **The Google Arbitration Award**

36.     As set forth in the Google Arbitration Award, "Google s[ought] an award that would constitute a disgorgement of compensation that was paid to Respondents during the period of time that they were disloyal."

37.     The Google Arbitration Panel ruled that "Google is entitled to an award that orders Levandowski to disgorge and restore to Google the principal sum of $127,311,551.95" in compensation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 20-30242 Doc# 6298 Filed 10/13/20 Entered 10/13/20 20:10:35 Page 83 of
384

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

38.     The Google Arbitration Panel also awarded Google "the sum of $45,547,474.64 from Levandowski as pre-award interest on disgorgement damages."

39.     The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge payments wrongfully obtained from Google.

40.     By law, Uber is not required or permitted to indemnify Levandowski for the disgorgement ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

41.     Section 2.4(b) of the Indemnification Agreement states that "there shall be deducted from such Expenses an amount equal to the amount of any proceeds actually received by any Indemnified Person from any third-party insurer or from any other third parties in connection with such Expenses." The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person. Any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

## B.  The Indemnification Agreement's Post-Signing Specified Bad Acts Provision

42.     The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

43.     Section 2.1(a) of the Indemnification Agreement provides that if Levandowski committed "a Post-Signing Specified Bad Act" after April 11, 2016, the date the Indemnification Agreement was executed, but before the closing of the Otto acquisition in August 2016, then Uber's indemnification obligation to Levandowski would "become null and void and of no further force and effect and there shall be no liability on the part of" Uber or any of its affiliates to indemnify Levandowski.

44.     The definition of "Post-Signing Specified Bad Act" includes, among other things, any of the following if committed after April 11, 2016, and before the closing: (a) "retaining, not

DOCS_SF:105942.1 85694.001
Case: 25-080542   Doc# 6298   Filed 10/13/21   Entered 10/13/21 20:09:35   Page 82 of
385   106555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

returning . . . or possessing" numerous kinds of material, including "machine readable storage media . . . of any Former Employer without the express written consent of such Former Employer," (b) "retaining, storing, not returning . . . or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or any appropriate license from, such Former Employer," and (c) "retaining, storing, not returning . . . or possessing any . . . electronic copy . . . file, data, or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer."  It also includes solicitation of employees of a Former Employer without express written consent of the Former Employer.

45.    Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski.

46.    The amended complaint in *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939-WHA (N.D. Cal.) ("Waymo litigation") alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. To the extent that Levandowski retained confidential documents, information, and trade secrets belonging to Google or Waymo after April 2016, and/or retained and/or accessed confidential documents, information, and trade secrets that were the subject of the Waymo litigation and that belonged to Tyto after April 2016 without Tyto's express written agreement, or to the extent that he knowingly permitted others to do so, his doing so was a Post-Signing Specified Bad Act.

47.    In May 2016, Levandowski arranged for Otto and thus Uber to acquire Tyto without disclosing his interest in it, and thereby caused Otto and Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that belonged to Tyto and as to which, based upon Levandowski's breach of his duty of loyalty, Waymo or Google had a claim. Through this acquisition and his concealment of his role in Tyto, Levandowski solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this conduct.

48.     With respect to Tyto, Levandowski concealed from Uber his role in Tyto and did not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of Levandowski's misconduct that was the subject of a Former Employer Claim, including claims asserted in the Waymo litigation. Upon information and belief, Levandowski committed other Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, including the Google Arbitration.

49.     As but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

**C.   The Indemnification Agreement's Excluded Claims Provision**

50.     Section 2.1(b)(ii) of the Indemnification Agreement provides that an Indemnified Claim shall not include, and that Uber shall not have "any obligation" to indemnity for, an "Excluded Claim." An Excluded Claim is any claim arising out of actions that "either (A) were not truthfully disclosed by [Levandowski] to [Stroz] in response to relevant inquiries in connection with the due diligence performed by [Stroz] or (B) were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]."

51.     In March 2016, Uber engaged Stroz to conduct an independent investigation of Otto employees, including Levandowski. On March 22 and 23, 2016, three employees for Stroz conducted an interview of Levandowski.

52.     Levandowski did not disclose his work on Tyto to Stroz. During those interviews, Stroz expressly asked Levandowski to identify all of the side projects he had worked on while employed at Google. Levandowski concealed from Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, and that he had been the owner, investor, and adviser of the company.

53.     Stroz's report to Uber lists all of the side projects that Levandowski disclosed to Stroz. The list does not include any reference to Tyto or to any entity involved in the development of LiDAR technology.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

54. Levandowski failed to disclose to Stroz his involvement with Tyto. Uber was not aware that Levandowski had any involvement with Tyto or had worked on Tyto as a side project while at Google at the time the Indemnification Agreement was signed.

55. The Google Arbitration Panel found that Google's claims against Levandowski included misconduct attributed to Tyto and Otto.

56. The Google Arbitration Panel found that, during his employment at Google, Levandowski was secretly setting up a series of trusts and LLCs that resulted in him owning and controlling the company that was ultimately known as Tyto. The Google Arbitration Panel found that Levandowski breached his duty of loyalty to Google by setting up Tyto to develop technology that was competitive with Google's self-driving car efforts. Levandowski's misconduct related to Tyto began prior to October 2012 and continued through January 2016 when Levandowski left Google (the "Tyto Misconduct"). Thereafter, on information and belief, Levandowski committed additional Post-Signing Specified Bad Acts related to Tyto by accessing and transferring Tyto trade secrets, patents, and confidential information, as well as by soliciting Tyto employees, without Tyto's express consent.

57. The Google Arbitration Panel also found that Levandowski engaged in misconduct by setting up an entity that later became known as Otto. Levandowski's misconduct related to Otto began in August 2015 at the earliest, and continued until January 2016 when Levandowski left Google (the "Otto Misconduct").

58. Levandowski was part of the program known as Project Chauffeur while employed by Google. Levandowski participated in the Chauffeur Bonus Plan. He also received Related Compensation.

59. The Google Arbitration Panel entered an award against Levandowski requiring disgorgement of the compensation he earned during the period of disloyalty when he was engaged in conduct related to Tyto and Otto. The largest portion of the award was $126,544,000.00 in Chauffeur Bonus payments and $751,051.95 in Related Compensation, as well as prejudgment interest on those amounts of $45,547,474.64.

DOCS_SF:103940.7 85634\1001
Case: 20-80052 Doc# 6298 Filed 10/13/20 Entered 10/13/20 20:09:35 Page 85 of
388 103555

60.     As part of the Chauffeur Bonus Plan, Levandowski's interest vested in 25% annual increments each year from October 2012 to October 2015. By the time Levandowski began his Otto Misconduct in 2015, he had already accrued a right to at least 75% of his Chauffeur Bonus. Levandowski's Tyto Misconduct continued from October 2012 through the termination of his employment.

61.     The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation. Had Levandowski not been paid a bonus for the period of the Tyto Misconduct, he would not have received even a penny of the Chauffeur Bonus. Levandowski's concealment of the Tyto Misconduct is the primary cause of his receipt of the bonus and the primary reason for the disgorgement of that bonus and obligation to pay prejudgment interest on the same.

62.     The Tyto Misconduct is an Excluded Claim. During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

63.     The Otto Misconduct is also an Excluded Claim because Levandowski failed to disclose fully the extent or nature of that misconduct.

64.     Levandowski's claims are barred because the predominant cause of the misconduct is based on Excluded Claims under the plain terms of the Indemnification Agreement.

65.     In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct, and no other misconduct, was occurring. Therefore, at a minimum, 75% or more of the Chauffeur Bonus and Related Compensation (and prejudgment interest thereon) is allocable to Excluded Claims for which Uber has no obligation to indemnify Levandowski under any circumstances.

**D. Levandowski's Refusal to Testify in the Google Arbitration was a Material Breach of the Indemnification Agreement**

66.     The Indemnification Agreement provides that in the event that a claim is brought against Levandowksi by a former employer, Uber "shall direct and control the defense or settlement of the Former Employer Claim."

*67.*     Section 2.2(c) of the Indemnification Agreement further states:

> The Indemnified Person(s) party to such Former Employer Claim (i) shall furnish Purchaser and its Representatives with such information as such Indemnified Person(s) may have with respect to such Former Employer Claim . . . , (ii) shall provide to Purchaser and its Representatives any documents or other materials . . . that may be necessary or useful to the defense of such Former Employer Claim . . . , (iii) shall make himself or herself available to Purchaser upon reasonable notice for interviews and factual investigations and to appear at Purchaser's reasonable request to give testimony (including deposition and trial testimony) with respect to the defense of such Former Employer Claim . . . and (iv) shall otherwise reasonably cooperate with and assist Purchaser and its Representatives in the defense of such Former Employer Claim.

68.     Google sought Levandowski's deposition as part of the Google Arbitration.

69.     In January 2018, Uber learned that Levandowski intended to invoke the Fifth Amendment at his deposition in the Google Arbitration rather than testify at the deposition that was scheduled for later that month.

70.     On January 15, 2018, Uber's counsel emailed Levandowski's attorneys and stated: "It is Uber's view that it would be better for the defense of the claims in the Zing arbitration if Mr. Levandowski would testify to the issues raised in the arbitration, rather than invoke the 5th Amendment." Counsel for Uber also requested a meeting with Levandowski prior to his deposition.

71.     On January 15, 2018, Levandowski's counsel rejected Uber's request that Levandowski testify regarding the issues in the arbitration, stating, "[A]fter extraordinary consideration and discussion, Anthony has decided he needs to continue to broadly assert his Fifth Amendment rights."

72.     Contrary to the terms of the Indemnification Agreement providing that Uber be permitted to direct and control the litigation, Levandowski's counsel refused to meet with Uber's counsel prior to Levandowski's deposition.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

73.     On January 18, 2018, Levandowski sat for his deposition in the Google Arbitration and invoked the Fifth Amendment in response to each and every substantive question posed to him.

74.     On April 2, 2018, counsel for Uber sent Levandowski's counsel a letter that explained, among other things, that Levandowski was in material breach of the Indemnification Agreement because he refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment, and requested that Levandowski reconsider his position in invoking the Fifth Amendment so he could testify at the arbitration hearing.

75.     The April 2, 2018 letter from Uber's counsel also provided notice to Levandowski that Uber intended to exercise all of its rights to disclaim or avoid liability under the Indemnification Agreement based on (1) Levandowski's material breach by refusing to testify based on an unjustifiably broad invocation of the Fifth Amendment, (2) Levandowski's breach of the Indemnification Agreement by refusing to reasonably cooperate with the defense, and (3) the fact that certain of Google's claims were Excluded Claims.

76.     On April 20, 2018, Levandowski submitted a proffer to the Google Arbitration Panel as to issues he would testify to at the arbitration hearing.

77.     On April 24, 2018, the Google Arbitration Panel denied Levandowski's request to testify as to the subject matter that he did not testify to during fact discovery, which were the essential facts that Uber had requested that Levandowski testify to in the Google Arbitration.

78.     Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at the hearing due entirely to Levandowski's refusal to testify during his deposition.

79.     Levandowski failed to perform under and materially breached the Indemnification Agreement. In particular, Levandowski refused to testify in the Google Arbitration upon Uber's reasonable request, and failed to cooperate with Uber in the defense of the Google Arbitration claims, thereby denying Uber the entire consideration it bargained for under the Indemnification Agreement.

80.     Uber's inability to cause Levandowski to testify evidences that at no point was Uber in control of Levandowski's defense in the Google Arbitration.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

81.     Uber never directed Levandowski's counsel to assert any arguments or defenses that they did not independently want to assert, or to refrain from asserting any arguments or defenses that they did want to assert. Uber was prohibited from participating in the dispute and denied access to and information about most of the arbitration hearing, and from presenting an argument on the allocation of Google's damages.

82.     Uber was not permitted to submit evidence of the proper allocation of damages at the Google Arbitration hearing. The Google Arbitration Panel issued its decision without any reasoned consideration or arguments presented on the issue. Both Levandowski and Google had an incentive to reach a damages award that was incorrect as a matter of law and adverse to Uber.

83.     During the Google Arbitration, Levandowski refused to cooperate, refused to testify, and refused to make it possible for rational settlement discussions to take place.

84.     Levandowski's failure to comply with his obligations under the Indemnification Agreement deprived Uber of the benefit it would have derived from the Indemnification Agreement, namely, the right to control any litigation for which it was agreeing to provide indemnification. Uber cannot be adequately compensated for the breach. Levandowski's offer to testify at the hearing came too late and therefore Levandowski did not cure his breach.

85.     Uber expects Levandowski to assert on appeal that his testimony, if allowed, would have changed the outcome of the arbitration. If it is determined that the outcome of the arbitration would have been different if Levandowski testified, then Levandowski's failure to testify was a material breach of the Indemnification Agreement, which excuses Uber's obligation to perform under the Indemnification Agreement, including payment of any Expenses in connection with the Arbitration Award.

### COUNT I
### Declaratory Judgment – No Indemnification
### Based On Disgorgement and Prejudgment Interest

86.     Uber incorporates all of the above paragraphs as though fully set forth herein.

87.     The Arbitration Award and subsequent judgment, for which Levandowski seeks indemnification, ordered Levandowski to disgorge the Chauffer Bonus of $126,544,500.00 and

Related Compensation of $767,051.95 for a total disgorgement of $127,311,551.95 in payments that Levandowski wrongfully obtained from Google.

88.    As a matter of law, those payments never belonged to Levandowski. Levandowski's claims against Uber under the Indemnification Agreement related to the Chauffeur Bonus and Related Compensation, along with prejudgment interest on the same, fail because indemnification for disgorgement is impermissible in California as a matter of public policy.

89.    Uber is not required or permitted to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and prejudgment interest on the same, as ordered in the Arbitration Award and judgment. To the extent that any term in the Indemnification Agreement could be read to indemnify Levandowski against disgorgement, it is void and unenforceable as contrary to public policy.

90.    The amounts awarded for prejudgment interest related to the award of disgorgement is likewise not indemnifiable as a matter of law and policy.

91.    Independent of the prohibition on indemnification for disgorgement, any indemnifiable expenses must be reduced by the amount Levandowski received from third parties pursuant to Section 2.4(b) of the Indemnification Agreement.

92.    The Chauffeur Bonus and Related Compensation were paid by Google, a third party, to Levandowski, an Indemnified Person.

93.    Uber is not obligated to pay any amount that is attributable to the Chauffeur Bonus and Related Compensation under Section 2.4(b) of the Indemnification Agreement, including any prejudgment interest or post-judgment interest on that award.

94.    As a result of the acts described herein, a live controversy exists as to (a) whether Levandowski is entitled to indemnification for the disgorgement of the Chauffeur Bonus and Related Compensation as well as prejudgment interest related to this disgorgement; and (b) whether Levandowski is entitled to indemnification for his obligation to return or repay to Google payments that he received from Google, a third party.

95.    These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:108554.1 08136/001
Case: 20-80042  Doc: #6298  Filed: 10/13/20  Entered: 10/13/2014 20:10:35  Page 99 of
Case 3:16-cv-08640-JCS  Document 29-8  Filed 11/13/20  Entered 11/13/2020 14:09:10:35  Page 99 of
393  of  555

Related Compensation, for the obligation to repay any monies paid to him by Google and any prejudgment interest related to the same.

96.     Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify Levandowski for the disgorgement of the Chauffeur Bonus and Related Compensation, and for the obligation to repay any monies paid to him by Google and any prejudgment interest related to the same.

## COUNT II
### Declaratory Judgment - Levandowski's Claims Are Barred
### By California Civil Code § 2774

97.     Uber incorporates all of the above paragraphs as though fully set forth herein.

98.     California Civil Code § 2774 states: "[a]n agreement to indemnify a person against an act already done, is valid, even though the act was known to be wrongful, unless it was a felony." Cal. Civil Code § 2774 precludes indemnification for losses and damages caused by felonious conduct, without regard to whether the party seeking indemnification is convicted for that crime or not.

99.     Levandowski engaged in felonious acts and those acts were the basis for the Arbitration Award. Any indemnification of Levandowski for the Arbitration Award or any resulting judgment is precluded by Cal. Civil Code § 2774.

100.     Levandowski was charged with 33 felony counts of theft and attempted theft of trade secrets. *See* 18 U.S.C. §§ 1832(a)(1), (2), (3), & (4). The indictment and each count incorporates a course of alleged misconduct that included Levandowski's involvement with: (a) Project Chauffeur; (b) Tyto; (c) the formation of Otto; (d) the move to Uber; and (e) the downloading of trade secrets through at least January 2016. The indictment reflects a course of felonious conduct that substantially overlaps with the conduct that formed the basis of the Arbitration Award.

101.     Levandowski pled guilty to the felony of Theft and Attempted Theft of Trade Secrets for stealing Google trade secrets related to self-driving car technology for use in competing with Google.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

102. Levandowski also engaged in felonious activity in accessing Google computers and data to wrongfully acquire compensation and benefits information regarding the employees he was soliciting to come to Otto, in violation of California Penal Code Section 502. The Google Arbitration Panel found that Levandowski breached his duties to Google by improperly accessing Google employees' salary and performance information and then using that information to attempt to solicit those employees to Otto. This conduct was not only a breach of Levandowski's duties to Google, but it was felonious conduct within the meaning of Cal. Civil Code § 2774 and Cal. Penal Code § 502(c)(1) and (2).

103. Uber is not required or permitted to indemnify Levandowski for any Expense resulting from or associated with his felonious activity.

104. As a result of the acts described herein, a live controversy exists as to whether Levandowski is entitled to indemnification for the Arbitration Award and subsequent judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

105. These issues are ripe for determination and require a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and Judgment, including any part of the Award or subsequent judgment that is based upon felonious conduct.

106. Uber therefore seeks a declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award and subsequent judgment, including any part of the Award or Judgment that is based upon felonious conduct.

**COUNT III**
**Declaratory Judgment - No Indemnification Due To Post-Signing Specified Bad Acts**

107. Uber incorporates all of the above paragraphs as though fully set forth herein.

108. The Indemnification Agreement expressly provides that if an indemnified person, such as Levandowski, commits a "Post-Signing Specified Bad Act," that will render the Agreement null and void and completely unenforceable as to that person.

109. Levandowski committed one or more Post-Signing Specified Bad Acts, rendering the Agreement null and void as to him, and unenforceable by him.

Case: 20-80042 Doc# 6298-2 Filed: 10/13/22 Entered: 10/13/22 10:35:37 Page 92 of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

110.    The definition of Post-Signing Specified Bad Acts includes retaining or using any confidential Google information after the execution of the Indemnification Agreement, as well as solicitation of employees. The expansive definition is set forth more fully in Exhibit A to the Indemnification Agreement and provides that an "Act" may include "knowingly permit[ing] someone else to take" an action.

111.    Levandowski committed one or more Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, rendering the Indemnification Agreement null and void as to him, and unenforceable by him. Both Waymo and Tyto were each Former Employers of Levandowski. The amended complaint filed in the Waymo litigation alleged that Levandowski was a Waymo manager and provided services to Waymo. The Arbitration Panel found that Levandowski provided substantial services to Tyto, including technical and logistical support, and was the "control person" at Tyto. Both the Google Arbitration and the Waymo litigation were Former Employer Claims within the meaning of the Indemnification Agreement.   Levandowski received indemnification of certain legal fees in conjunction with the Google Arbitration. Otto Trucking LLC was an Indemnified Person and received indemnification for certain legal fees related to the Waymo litigation.

112.    Levandowski retained and/or accessed confidential documents, confidential information, patents, and trade secrets belonging to Google, Waymo, and Tyto after April 2016. In May 2016, Levandowski arranged for Otto, and thus upon closing for Uber, to acquire Tyto's assets, including its confidential information and competitive LiDAR technology, as to which Google or Waymo had a claim, without disclosing his involvement in Tyto.

113.    Levandowski's fraudulent concealment of his own involvement in Tyto, as well as his misconduct between April 11, 2016 and August 2016, caused Uber to acquire patents, trade secrets, and confidential information related to LiDAR technology that were purportedly owned by Tyto but in which, based upon Levandowski's breach of his duty of loyalty, Google or Waymo had a claim.

114.    Through this Tyto acquisition and Levandowski's concealment of his role in Tyto after April 11, 2016, Levandowski also solicited Tyto employees to become employees of Otto and thus employees of Uber, without ever disclosing to Uber that these employees had potential

conflicting interests. Neither Tyto nor Waymo provided express written consent for Levandowski to engage in any of this misconduct.

115. With respect to Tyto, Levandowski concealed from Uber his role in Tyto and thus could not secure Tyto's express written consent to his Post-Signing Specified Bad Acts. Waymo also did not expressly consent in writing to any of these. Levandowski's misconduct was the subject of multiple Former Employer Claims, including the claims asserted in the Waymo litigation and claims asserted in the Google Arbitration. The acquisition of Tyto's LiDAR technology, which was arranged for in May 2016 by Levandowski, was at the heart of the Waymo litigation.

116. Additionally, as but one example, the Google Arbitration Award recounts that Levandowski solicited a Google employee, Laila Mattos, to leave Google after she received a bonus in May 2016 and on information and belief that solicitation and/or its concealment continued after April 11, 2016 and prior to August 2016.

117. Uber seeks a final judgment adjudicating that Levandowski committed such Post-Signing Specified Bad Acts that were the subject of a Former Employer Claim and upon the entry of such a Final Judgment, the Indemnification Agreement should be deemed null and void with respect to Levandowski. For purposes of nullifying the Indemnification Agreement as to Levandowski, it is not necessary that he be a party to the Former Employer Claim; it suffices that his Post-Signing Specified Bad Act was the subject of such a claim.

118. As a result of the acts described herein, a live controversy exists as to whether the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

119. This controversy is ripe for determination and requires a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

120. Uber therefore seeks a declaration that the Indemnification Agreement is null and void due to Levandowski's commission of one or more Post-Signing Specified Bad Acts.

**COUNT IV**
**Declaratory Judgment - No Indemnification And/Or Setoff Due To Excluded Claims**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

121. Uber incorporates all of the above paragraphs as though fully set forth herein.

122. During the Stroz investigation and diligence, Levandowski failed to "truthfully disclose" the information about Tyto in response to relevant inquiries. He also failed to provide all the relevant information about Tyto in the materials he gave Stroz. Either one of these failures is sufficient to render all of the Google claims relating to the Tyto Misconduct "Excluded Claims."

123. Levandowski's claims are barred because the predominant cause of the Arbitration Award was misconduct that constitutes one or more Excluded Claims under the plain terms of the Indemnification Agreement.

124. The Tyto Misconduct occurred throughout the entire period during which Levandowski's Chauffeur Bonus was vesting and was the predominant cause of the Arbitration Award that ordered Levandowski to disgorge the Chauffeur Bonus and Related Compensation.

125. Levandowski also failed to disclose the full scope of the misconduct he committed in relation to Otto; thus, any undisclosed misconduct related to Otto also constitutes an Excluded Claim. To the extent that the Arbitration Award was based on the Otto Misconduct, Levandowski's claims are barred because that conduct also constituted an Excluded Claim.

126. In the alternative, at the least, over 75% of the Arbitration Award is attributable to the Tyto Misconduct because at least 75% of the Chauffeur Bonus vested during the period when *only* the Tyto Misconduct was occurring.

127. As a result of the acts described herein, a live controversy exists as to whether the Arbitration Award and any judgment based on it is an Excluded Claim.

128. This controversy is ripe for determination and requires a declaration that the Arbitration Award and any judgment based on it is an Excluded Claim.

129. Uber therefore seeks a declaration that the Arbitration Award, and any judgment based on it, and/or any portion of that Award and judgment related to the Tyto Misconduct are Excluded Claims and not subject to indemnification. In the alternative, Uber seeks a declaration that any indemnification to which Levandowski may otherwise be entitled must be subject to setoff and/or recoupment in the amount of any award or judgment attributable to an Excluded Claim.

**COUNT V**

DOCS_SF:105842v1 85564/001
94

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## **Breach of Indemnification Agreement**

130.    Uber incorporates all of the above paragraphs as though fully set forth herein.

131.    Contrary to Uber's request under the Indemnification Agreement that Levandowski testify in the Google Arbitration, Levandowski did not testify at his deposition or the arbitration hearing.

132.    Levandowski materially breached the Indemnification Agreement by failing to testify at his deposition and the Google Arbitration hearing, and by his other failures to cooperate with the defense. Levandowski failed to perform his obligations under the Indemnification Agreement by failing to comply with Uber's request that he provide relevant testimony at his deposition and at the Google Arbitration hearing and by impeding Uber's ability to have access to the information necessary for Uber to effectively oversee and direct the defense of the dispute. By broadly invoking the Fifth Amendment and declining to meet with Uber's counsel, Levandowski materially breached Sections 2.2(b) and 2.2(c) of the Indemnification Agreement and denied Uber its bargained-for consideration.

133.    Levandowski is expected to assert that the outcome of the Google Arbitration would have been different had he testified at the arbitration hearing.

134.    Levandowski admitted through his last-ditch effort to reverse course in order to try to testify in the Google Arbitration that he believes his testimony and cooperation would have changed the outcome of the arbitration against Google.

135.    If Levandowski's contention that his testimony would have made a difference is correct, then he has materially breached the terms of the Indemnification Agreement so as to excuse Uber's performance of the Indemnification Agreement. At minimum, Levandowski's breach injured Uber by depriving it of the benefits for which it bargained in the Indemnification Agreement.

136.    Uber is entitled to a declaration that Levandowski's breach of the Indemnification Agreement excuses any obligation that Uber may otherwise have to perform under the Indemnification Agreement. Uber is also entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Levandowski's breach of contract.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**COUNT VI**
**Damages Based On Fraud And Fraudulent Inducement**
**And For A Declaration That Such Damages Are Non-Dischargeable**
**Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)**

137.    Uber incorporates all of the above paragraphs as though fully set forth herein.

138.    Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

139.    In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

140.    During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted Tyto from the list.

141.    Levandowski concealed from Stroz and Uber that since 2012 he had been secretly operating a business that competed with Google called Tyto. Levandowski had been the owner, investor, and adviser of Tyto and, as the Arbitration Panel found, he was secretly the control person of Tyto. Levandowski arranged for Otto to purchase Tyto, so as to transfer Tyto's trade secrets and confidential information related to the LiDAR technology to Uber, without Uber ever knowing that Levandowski was involved with Tyto and without Uber ever knowing that Levandowski had used Tyto as a means for secretly establishing a competing business with Google and that Google would have a claim to the very LiDAR technology that Uber was acquiring.

142.    Levandowski also represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

143.    Levandowski represented to Stroz during the interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally. Levandowski also represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

144. At the time of the Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

145. On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

146. In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

147. Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

148. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

149. If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

150. After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

401

151.    Uber is entitled to restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud.

152.    Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

153.    If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, including through his secret control of Tyto, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

154.    But for Levandowski's fraud, Uber would not have acquired any LiDAR technology in which Google or Waymo had a claim, and would not have been subject to the claims asserted against it by Waymo.  Levandowski's fraud, including his concealment of his involvement as the control person in Tyto, was a substantial factor in the Google Arbitration Award and also a substantial factor in causing Uber to provide Waymo consideration valued at approximately $245 million to resolve claims asserted in the Waymo litigation. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Google Arbitration and the Waymo claims.

155.    The sole basis for Uber's inclusion in the Waymo litigation was Uber's acquisition of Otto and agreement to acquire Otto Trucking LLC. Uber would not have closed that transaction or entered into the Indemnification Agreement had it known of Levandowski's fraudulent and other wrongful conduct, and Waymo would not have sued Uber but for that misconduct. The Waymo litigation was a direct consequence of Levandowski's fraudulent conduct.

156.    Uber is entitled to consequential damages caused by Levandowski's fraud committed upon Uber, including but not limited to the value of the consideration that Uber has been required to

Case 2:20-bk-10143 Doc# 6329 Filed 10/03/20 Entered 10/03/20 Page 402 of
402 of 555

provide Waymo in the Waymo litigation to resolve claims arising out of and caused by Levandowski's fraud, including claims for violations of the Trade Secret Act, violations of the California Uniform Trade Secret Act, patent infringements, and violation of the California Business and Professional Code.

157.    Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber against any amounts Uber is found to owe to Levandowski based upon Levandowski's fraud.

158.    Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's claims for recovery of benefits conferred upon Levandowski under the Indemnification Agreement and for all damages incurred as a result of Levandowski's fraud, including recovery of the value of the consideration that Uber provided Waymo in connection with the Waymo litigation. The Court should therefore declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

159.    Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

160.    Levandowski's actual fraud and fraudulent misrepresentations were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## COUNT VII
**Contribution Of The Value Of The Consideration Provided To Settle The Waymo Litigation And For A Declaration That Such Right Of Contribution Is Non-Dischargeable Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)**

161.    Uber incorporates all of the above paragraphs as though fully set forth herein.

162.    Levandowski fraudulently concealed from Uber that Levandowski had committed Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed his retention of Google trade secrets and confidential documents, had wrongfully taken and retained

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

trade secrets in which Waymo or Google had a claim, and had committed Post-Signing Specified Bad Acts.

163. If Uber had known that Levandowski had committed the Tyto Misconduct, had engaged in felonious misconduct, had wrongfully taken and concealed trade secrets in which Waymo or Google had a claim, and/or known that he had committed Post-Signing Specified Bad Acts, it would not have consummated the Otto acquisition.

164. But for Levandowski's fraud, Uber would not have been subject to the claims asserted against it by Waymo and it would not have been necessary for Uber to provide consideration valued at approximately $245 million to resolve those claims. Uber is entitled to contribution from Levandowski for all losses it incurred in connection with the Waymo claims.

165. Levandowski is jointly and severally liable to Waymo for the losses that Waymo claimed in its claims against Uber.

166. Uber is entitled to contribution from Levandowski in the amount equal to the consideration it provided Waymo to settle the Waymo litigation.

167. Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

168. Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

169. Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity, making Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

170. Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

Case 20-30242 Doc# 6329 Filed: 10/13/20 Entered: 10/13/20 20:10:35 Page 100 of
404106555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## COUNT VIII
## Declaratory Judgment For Rescission Based On Fraudulent Inducement

171.    Uber incorporates all of the above paragraphs as though fully set forth herein.

172.    Due to Levandowski's fraudulent inducement, Uber entered into the Indemnification Agreement with Levandowski on April 11, 2016.

173.    In March 2016, Uber engaged Stroz to conduct an independent investigation of Levandowski prior to the signing of the Indemnification Agreement.

174.    During his interview with Stroz on March 22 and 23, 2016, Levandowski "stressed that Google was aware, and approved, of all of his external side projects." Levandowski then proceeded to list nine side projects that he participated in while employed by Google, but omitted the Tyto project from the list.

175.    Levandowski fraudulently concealed from Stroz and Uber that since 2012 he had been secretly operating a side business that competed with Google called Tyto, which was a company that Levandowski created beginning in 2012. Levandowski had been the owner, investor, and adviser of Tyto.

176.    Levandowski fraudulently represented during the Stroz interview that he had not intentionally downloaded, transferred, or accessed any Google information for the purpose of taking it and using it at Uber.

177.    Levandowski fraudulently represented during the Stroz interviews that the Google information that was found on his devices "was stored . . . in the normal course of his work at Google." He made a number of statements and representations to the effect that the Google data and property in his possession was there unintentionally, and he represented to Stroz that he did not intend to rely on any information or data from Google in his work for Uber.

178.    At the time of the Indemnification Agreement's execution, Levandowski expressly promised Uber in writing that he returned and did not retain any confidential Google information when he left Google.

179. On April 11, 2016, Levandowski signed a written attestation stating that, "subject to any matters or information disclosed to Stroz, I have complied with my obligations under any [agreements or obligations to which I am subject with 'Former Employer']."

180. In the same attestation, Levandowski also represented to Uber, "subject to any matters or information disclosed to Stroz, to my best knowledge I returned to Former Employer and have not retained Former Employer confidential or proprietary documents or information or property (including but not limited to hardware and software) after my employment with Former Employer." Levandowski further attested, "(a) I have provided good faith, complete and truthful responses in all material respects to Stroz's questions and (b) all of the information I have provided to Stroz is true and correct in all material respects."

181. Contrary to his attestations, his statements during the Stroz interviews, and his multiple representations to Uber, Levandowski intentionally and deliberately downloaded Google confidential information and trade secrets with the intention of using those trade secrets while at Uber. Levandowski never disclosed this fact to Uber. To the contrary, he expressly promised not to do anything of the kind, and to take every precaution to ensure that no Google trade secrets would come to Uber. Levandowski consistently assured Uber that it would not bring any confidential Google information to Uber.

182. Levandowski made these fraudulent representations and omissions with the intent of deceiving Uber and inducing it to enter into the Indemnification Agreement. Uber reasonably and justifiably relied upon Levandowski's fraudulent misrepresentations in entering into the Indemnification Agreement.

183. If Uber had known Levandowski's statements were fraudulent representations, Uber would not have executed the Indemnification Agreement in April 2016.

184. After learning of Levandowski's fraud, Uber properly rescinded the Indemnification Agreement.

185. As a result of the acts described herein, a live controversy exists as to whether Uber has effectively rescinded the Indemnification Agreement.

Case 2:03-03082 Doc# 6329 Filed: 10/13/20 Entered: 10/13/20 20:19:35 Page 208 of
406 of 555

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

186.     The issue of whether Uber has effectively rescinded the Indemnification Agreement is ripe for determination.

187.     Uber therefore seeks a declaration that it has effectively rescinded the Indemnification Agreement.

**COUNT IX**
**Contribution Of The Amounts Paid For Lior Ron And**
**For A Declaration That Such Amounts Are Non-Dischargeable**
**Pursuant To 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), Or § 523(a)(6)**

188.     Uber incorporates all of the above paragraphs as though fully set forth herein.

189.     The Corrected Final Award and subsequent judgment awarded Google $9,573,096.60 from Lior Ron, individually and jointly and severally with Levandowski.

190.     On February 5, 2020, Uber paid Google, on Ron's behalf, $9,453,135.87 to settle this portion of the award, as well as the much smaller amount awarded solely against Ron.

191.     Ron assigned to Uber his right to seek contribution from Levandowski in the amount proportionate to Levandowski's comparative fault. Levandowski is solely or primarily at fault with respect to that award.

192.     Uber is entitled to contribution from Levandowski in the amount of the joint and several portion of the Google Award that Uber paid on behalf of Lior Ron.

193.     Uber is entitled to setoff and/or recoup any amounts Levandowski owes to Uber for contribution against any amounts Uber is found to owe to Levandowski.

194.     Levandowski's actual fraud and fraudulent misrepresentations resulted in Uber's debts for recovery of contribution damages. The Court should therefore declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

195.     Levandowski was the lead officer responsible for Uber's self-driving car business during his tenure at Uber, occupied a unique position of trust and confidence, owed fiduciary duties to Uber, and committed a fraud on Uber while acting in his fiduciary capacity making, Uber's claims non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

196.     Levandowski's actual fraud and fraudulent misrepresentations which give rise to Uber's claims for contribution were wrongful acts, which Levandowski committed intentionally and

which necessarily caused Uber injury, and were done without just cause or excuse. The Court should therefore also declare that all of Uber's claims for contribution are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

**COUNT X**
**Incorporation Of Proof Of Claim**

197. Uber incorporates all of the above paragraphs as though fully set forth herein.

198. Uber incorporates by reference as though fully set forth herein its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") in Bankruptcy Petition No. 20-30242 pending in the United States Bankruptcy Court for the Northern District of California and reasserts those claims herein.

199. On March 4, 2020, Levandowski filed a voluntary Chapter 11 individual bankruptcy petition in the Bankruptcy Court and filed a "List of Creditors Who Have the Largest Unsecured Claims Against You and Are Not Insiders," naming Uber.

200. On July 6, 2020, Uber filed a Proof of Claim alleging various claims against Levandowski and to the extent not otherwise asserted in these counterclaims, Uber incorporates and reasserts those claims herein, including but not limited to: (1) contribution for the amount of the joint and several portion of the Corrected Final Award in the Google Arbitration that Uber paid on behalf of Lior Ron; (2) restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement entered into between Uber and Levandowski on April 11, 2016, based upon Uber's proper rescission of that agreement as a result of Levandowski's fraud; (3) consequential damages arising out of Levandowski's fraud committed upon Uber; and (4) a defense against indemnification based upon the Excluded Claims provision of the Indemnification Agreement and/or a claim for reimbursement, recoupment and/or setoff as to all amounts subject to the Excluded Claims provision.

201. To the extent not otherwise alleged in these counterclaims, Uber incorporates by reference all claims in its July 6, 2020 Proof of Claim.

**PRAYER FOR RELIEF**

WHEREFORE, Uber prays for the following relief:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

202.    That the Complaint filed by Levandowski be dismissed in its entirety with prejudice, that judgment be entered in favor of Uber and against Levandowski, and that Levandowski be denied all relief requested in his Complaint;

203.    A declaration that Uber has valid claims against Levandowski as alleged in the July 6, 2020 Proof of Claim;

204.    A declaration that Levandowski is not subject to a release from claims;

205.    A declaration that the Indemnification Agreement has been rescinded or is null and void;

206.    A final judgment that Levandowski is not entitled to indemnification under the Indemnification Agreement because Levandowski fraudulently induced Uber to enter into that agreement;

207.    A declaration that Levandowski is not entitled to indemnification for disgorgement of the Chauffeur Bonus and Related Compensation or any prejudgment interest related to the same;

208.    A declaration that Levandowski is not entitled to indemnification for any amounts paid to him by a third party, Google, including the Chauffeur Bonus and Related Compensation, as well as any prejudgment interest associated with the same;

209.    A declaration that Uber has no duty or obligation to indemnify Levandowski for the Arbitration Award or any resulting judgment because Cal. Civil Code § 2774 precludes indemnification due to Levandowski's felonious conduct;

210.    A final judgment determining that Levandowski committed Post-Signing Specified Bad Acts that were the subject of Former Employer Claims, and an order from the Court that the Indemnification Agreement is null and void, including because Levandowski committed Post-Signing Specified Bad Acts;

211.    An final judgment that Levandowski materially breached the Indemnification Agreement and that the agreement is not enforceable against Uber on account of that breach;

212.    An award of consequential damages arising out and caused by Levandowski's fraud committed upon Uber; including but not limited to the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

213. An award of contribution for the value provided by Uber to Waymo in conjunction with its settlement agreement with Waymo;

214. An award of consequential damages arising out of and caused by Levandowski's breach of the Indemnification Agreement;

215. Setoff and/or recoupment of any amounts Levandowski owes to Uber against any amounts Uber is otherwise found to owe to Levandowski;

216. An award of contribution for the portion of the joint and several part of the Corrected Final Award in *Google, LLC v. Anthony Scott Levandowski and Lior Ron* that Uber paid on behalf of Lior Ron;

217. An final judgment providing restitution of benefits conferred on Levandowski by Uber under the Indemnification Agreement based on Uber's rescission of the Indemnification Agreement;

218. An Order from the Court that the amounts that Levandowski seeks to recover under the Indemnification Agreement may not be recovered because they are based upon Excluded Claims, or in the alternative that at least over 75% of the amounts Levandowski seeks to compel Uber to pay, plus attorneys' fees and costs, are Excluded Claims related to the Tyto Misconduct and not subject to indemnification;

219. A declaration that Uber's claims and the damages sought herein are not subject to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6);

220. Prejudgment and post judgment interest on any amounts awarded to Uber;

221. Attorneys' fees and costs incurred by Uber in defending this action, including fees incurred in the Bankruptcy proceeding; and

222. Such other and further relief as is just and proper.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Dated: October 13, 2020

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Debra I. Grassgreen*
Debra I. Grassgreen
Miriam Manning

-and-

David J. Bradford
Catherine Steege
Terri L. Mascherin
Katharine R. Ciliberti
JENNER & BLOCK LLP

*Counsel for Uber Technologies, Inc.*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# EXHIBIT H

1  **KELLER BENVENUTTI KIM LLP**
   TOBIAS S. KELLER (SBN 151445)
2  *tkeller@kbkllp.com*
   DARA L. SILVEIRA (SBN 274923)
3  *dsilveira@kbkllp.com*
   650 California Street, Suite 1900
4  San Francisco, California  94108
   Tel.: (415) 364-6793
5  Fax: (650) 636-9251

6  BRETT SCHUMAN, (SBN 189247)
   *bschuman@goodwinlaw.com*
7  RACHEL M. WALSH, (SBN 250568)
   *rwalsh@goodwinlaw.com*
8  **GOODWIN PROCTER** LLP
   Three Embarcadero Center
9  San Francisco, California  94111
   Tel.: (415) 364-6793
10 Fax.: (650) 636-9251

11 HONG-AN VU (SBN 266268)
   *hvu@goodwinlaw.com*
12 **GOODWIN PROCTER** LLP
   601 S. Figueroa Street, 41st Floor
13 Los Angeles, California  90017
   Tel.: (213) 426-2500
14 Fax: (213) 623-1673

15 Attorneys for Plaintiff and Debtor and
   Debtor in Possession
16 ANTHONY S. LEVANDOWSKI

17            **UNITED STATES DISTRICT COURT**

18           **NORTHERN DISTRICT OF CALIFORNIA**

19              **SAN FRANCISCO DIVISION**

20 In re:                              Bankruptcy Case No. 20-30242 (HLB)
                                       Chapter 11
21 ANTHONY SCOTT LEVANDOWSKI,
                                       Hon. Hannah L. Blumenstiel
22 Debtor.
                                       **Adv. Pro. No. 20-03050 (HLB)**
23 ANTHONY LEVANDOWSKI, an individual,,
                                       **MOTION FOR PARTIAL SUMMARY**
24            Plaintiff,               **JUDGMENT AS TO UBER'S: (1)**
                                       **FRAUD-BASED COUNTERCLAIMS**
25      v.                             **AND DEFENSES, AND (2) EXCLUDED**
                                       **CLAIM DEFENSE; MEMORANDUM**
26 UBER TECHNOLOGIES, INC.,            **OF POINTS AND AUTHORITIES IN**
                                       **SUPPORT THEREOF**
27            Defendant.

28

1             **MOTION FOR PARTIAL SUMMARY JUDGMENT**

2       TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3       PLEASE TAKE NOTICE that Plaintiff Anthony Levandowski ("Mr. Levandowski") will

4 and does hereby move for partial summary judgment as to Defenses Nos. 5 (Excluded Claim), 7

5 (Fraudulent Inducement), and 9 (Reimbursement for Excluded Claim), and Counterclaims IV

6 (Declaratory Judgment re Excluded Claim), VI ( Fraud Damages), VII (Contribution to Waymo

7 Settlement), and IX (Contribution to Ron Settlement) as alleged in the Answer to Debtor's First

8 Amended Complaint for Declaratory Relief, Specific Performance, Damages, and Objection to

9 Claim; Affirmative Defenses; and Counterclaims (Dkt.. 63) ("Answer").

10       This motion seeks a ruling as a matter of law that based on the undisputed facts,

11 Mr. Levandowski did not intentionally misrepresent or fail to disclose any material information to

12 Uber or its agents.  In addition, Mr. Levandowski did not make any false statement which would

13 cause a claim to be an Excluded Claim under the Indemnification Agreement.

14       This Motion is based upon this Notice of Motion, the attached Memorandum of Points and

15 Authorities in support thereof, the Omnibus Declaration of Hong-An Vu in Support of Motions

16 for Partial Summary Judgment ("Vu Decl.") and all exhibits thereto, the pleadings from this case

17 on file with the Court, filed contemporaneously herewith, all papers from this case on file with the

18 Court, all other matters of which the Court may take judicial notice, any further evidence or

19 argument offered to the Court at the hearing on this Motion, and any other matters that the Court

20 may consider.

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | Dated: February 23, 2021 |
| 2 | |

GOODWIN PROCTER LLP

3    By: */s/ Brett M. Schuman*

Brett Schuman
*BSchuman@goodwinlaw.com*
Rachel M. Walsh
*RWalsh@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, California 94111
Tel.: (415) 733-6000
Fax.: (415) 677-9041

Hong-An Vu
*HVu@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, California 90017
Tel.: (213) 426-2500
Fax: (213) 623-1673

Tobias S. Keller
*tkeller@kbkllp.com*
Dara L. Silveira
*dsilveira@kbkllp.com*
**KELLER BENVENUTTI KIM LLP**
650 California Street, Suite 1900
San Francisco, California 94108
Tel.: (415) 364-6793
Fax: (650) 636-9251

*Attorneys for Plaintiff and Debtor and
Debtor in Possession*
ANTHONY S. LEVANDOWSKI

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION. ............................................................................................................ 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS................................................. 1

III.  LEGAL STANDARD ...................................................................................................... 3

IV.   UBER'S FRAUD-BASED CLAIMS AND DEFENSES ALL FAIL AS A
      MATTER OF LAW. ........................................................................................................ 3

      A.    IT IS UNDISPUTED THAT MR. LEVANDOWSKI TRUTHFULLY
            DISCLOSED TO UBER HIS RETENTION OF A SUBSTANTIAL
            AMOUNT OF GOOGLE CONFIDENTIAL INFORMATION:
            "EVERYTHING YOU NEED TO CREATE A SELF-DRIVING CAR."............. 4

      B.    IT IS UNDISPUTED THAT MR. LEVANDOWSKI DID NOT
            MISREPRESENT HIS RELATIONSHIP WITH TYTO ...................................... 8

V.    CONCLUSION. ............................................................................................................. 12

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ach v. Finkelstein*,
    264 Cal. App. 2d 667 (1968) ................................................................. 3

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................... 3, 9, 10

*Barnett v. Centoni*,
    31 F.3d 813 (9th Cir. 1994) ................................................................. 3

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................. 3

*Gasaway v. Northwestern Mut. Life Ins. Co.*,
    26 F.3d 957 (9th Cir. 1994) ................................................................. 3

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC*,
    816 F. Supp. 2d 793 (N.D. Cal. 2009) ................................................. 9

*United States ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) ................................................................. 3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................. 3

*Romero v. Securus Technologies, Inc.*,
    216 F. Supp. 3d 1078 (S.D. Cal. 2016) ................................................ 8

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626, 630 (9th Cir. 1987) ....................................................... 11

*Watt v. Brink's Inc.*,
    114 F.3d 1197 (9th Cir. 1997) ............................................................. 10

*Watt v. Patterson*,
    125 Cal. App. 2d 788 (1954) ................................................................. 3

**Other Authorities**

Decl., Exs. 21 ................................................................................................ 7

Fed. R. Civ. P. 56(c) .................................................................................... 3

Uber. *Third* ................................................................................................... 7

# I.   INTRODUCTION.

Mr. Levandowski is entitled to summary judgment as a matter of law on all of Uber's fraud-based claims and defenses. Uber's fraud-based claims and defenses are all based on allegations that Mr. Levandowski: (i) misrepresented that he had not taken or retained Google's confidential information with the intent to use such information at Uber; and (ii) concealed his role with respect to a company named Tyto LiDAR ("Tyto"). Uber's Defenses Nos. 5 (Excluded Claim), 7 (Fraudulent Inducement), and 9 (Reimbursement for Excluded Claim), and Counterclaims IV (Declaratory Judgment re Excluded Claim), VI ( Fraud Damages), VII (Contribution to Waymo Settlement), and IX (Contribution to Ron Settlement) (collectively, "Fraud-Based Claims and Defenses") are all premised on these two alleged misrepresentations. However, Uber cannot identify any misrepresentation whatsoever, let alone a material one. For this reason, summary judgment is warranted.

# II.   STATEMENT OF UNDISPUTED MATERIAL FACTS.

At the center of this dispute is the Indemnification Agreement between Uber and Mr. Levandowski, dated April 11, 2016. In that agreement, Uber agreed broadly to indemnify Mr. Levandowski for claims that Google might assert against him. Debtor's First Amended Complaint ("FAC") (ECF No. 49), ¶ 10, Ex. A ("Indemnification Agreement") (ECF No. 49-1). Prior to executing the Indemnification Agreement, Uber engaged a forensic investigator, Stroz Friedberg ("Stroz"), to conduct an investigation of Mr. Levandowski. Vu Decl., Ex. 20, at 3. The Indemnification Agreement contains an exclusion for claims resulting from events that occurred pre-signing that either: (A) were not truthfully disclosed by Mr. Levandowski in response to inquiries by Uber's investigators at Stroz; or (B) were not contained in due diligence materials provided to Stroz by Mr. Levandowski. Indemnification Agreement, § 2.1(b)(ii).

As part of Uber's investigation, in March 2016, Mr. Levandowski provided Stroz with 45 devices and accounts (*e.g.*, email, cloud storage), which contained hundreds of documents relating to Tyto (f/k/a, Odin Wave). *Id.*, Vu Decl., Exs. 37; 65, 66 (summarizing the many Tyto related documents on Mr. Levandowski's devices and produced by Stroz from his devices). ■

*Id.*, Ex. 26, 276:23-278:9, 280:1-11; Ex. 19, at 3, Ex. 1; Ex. 86, at STROZ_0016307. ████

████ *Id.*, Ex. 26, 281:25-283:9. ████

████ *See id.*, 291:20-292:3, 282:20-283:9; 287:8-23; 291:20-292:3.

During a March 2016 interview with Stroz, Mr. Levandowski identified folders on his devices and accounts that contained Google confidential information and Stroz's forensic examination confirmed Mr. Levandowski's disclosures. *Id.*, Exs. 19, 18-19; 15, at 139:19-140:14. Uber received Stroz's final report prior to the closing of the Otto-Uber transaction, which occurred on or about August 23, 2016. *Id.* at Ex. 10. In that final report, Stroz informed Uber that it found, among other things, that Mr. Levandowski: (a) downloaded 24,000 driverless car design files from Google's server; (b) possessed tens of thousands of other Google files and emails on his devices; (c) downloaded Google documents shortly before he left and had accessed at least some of those documents after he left; (d) met with several Google employees regarding Otto; (e) met with Uber executives, before leaving Google, about forming a new company; and (f) destroyed confidential Google information concerning self-driving cars that he stored on his personal storage disks. *Id.*, Ex. 20, at 8, 12.

In October 2016, Google commenced two arbitrations against Mr. Levandowski. FAC, ¶ 76, Ex. D ("Google Arbitration Demands") (ECF No. 49-6). Google's allegations included the very things that Uber now says were not truthfully disclosed to Uber. *Id.*, at 10-14, 20, 32-34, 39-42, 47. In November 2016, after Uber's counsel interviewed Mr. Levandowski regarding the allegations in the Google Arbitration Demands, Uber accepted Mr. Levandowski's tender of indemnity under the Indemnification Agreement. Vu Decl., Ex. 38, at 1. Uber proceeded to control and defend the arbitration for nearly three years, even after Waymo sued Uber for trade secret misappropriation. FAC, at ¶ 120; Answer, at ¶ 120; *see also* ¶¶ 13. It was only when it became clear that the arbitration would have an unfavorable result that Uber changed course and suddenly

argued that it had no obligation to indemnify Mr. Levandowski.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,  322 (1986).  Neither the "mere existence of some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)," nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "establish *evidence* on which a reasonable jury could find for the [nonmoving party]." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 330 (9th Cir. 2017).  Mere allegations or denials do not defeat a moving party's allegations. *Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994).  Rather, "[i]f a nonmoving party bears the burden of proof at trial, he must establish each element of his claim with significant probative evidence tending to support the complaint." *Barnett v. Centoni*, 31 F.3d 813, 815 (9th Cir. 1994) (internal quotations and citations omitted).

## IV.    UBER'S FRAUD-BASED CLAIMS AND DEFENSES ALL FAIL AS A MATTER OF LAW.

The elements of fraud "consist of a false representation of a material fact, made with knowledge of its falsity and with the intent to induce reliance thereon, upon which plaintiff justifiably relies to his injury." *Watt v. Patterson*, 125 Cal. App. 2d 788, 792 (1954).  A failure to show any element is fatal to the claim or defense.  *See Ach v. Finkelstein*, 264 Cal. App. 2d 667, 674 (1968).

Uber's Fraud-Based Claims and Defenses all are based on Mr. Levandowski's alleged misrepresentations regarding his possession of Google confidential information and his connection to Tyto.  Each of these claims and defenses fails for the same reason: Uber cannot identify any

misstatement of fact, let alone a material one.[1]

**A.    It Is Undisputed That Mr. Levandowski Truthfully Disclosed To Uber His Retention Of A Substantial Amount Of Google Confidential Information:**

**"Everything You Need To Create A Self-Driving Car."**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ *See id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ *Id.*

Eric Tate of Morrison & Foerster LLP ("MoFo") oversaw Uber's investigation of Mr. Levandowski and hired an investigative firm, Stroz, to conduct the investigation. *Id.*, Exs. 14, ¶¶ 2, 9; 15, 64:16-66:8; Ex. 16 (████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████."). Uber has represented that MoFo's knowledge of Stroz's investigation and findings is imputed on Uber. *Id.*, Ex. 52; *see also id.*, Ex. 17, 5:6-6:18. Mr. Tate admits that both he and Uber knew before April 11, 2016, that Mr. Levandowski possessed Google confidential information because, "████████████████████████████." *Id.*, Exs. 15, 139:19-140:14; 143:3-146:10; 18.

The Stroz investigation uncovered that Mr. Levandowski had extraordinary amounts of

---

[1] Uber's Fraud-Based Claims and Defenses fail for additional reasons, including because Uber cannot prove that it justifiably relied on the alleged misrepresentations by Mr. Levandowski. Mr. Levandowski is not, however, moving for summary judgment on Uber's lack of justifiable reliance.

1  Google information in his possession. ███████████████████████████████████

2  █████████████████████████████████████████████████████████████████████████

3  █████████████████████████████████████████████████████████████████████████

4  ████████████████████ *Id.*, Ex. 19, at 4; Ex. 15, 139:19-140:14. █████████████

5  ███████████████████████████████████████████████████████ *Id.*, Ex. 19, at 2.

6       Although the Stroz investigation remained ongoing as of April 11, 2016, the date the

7  Indemnification Agreement was executed, Uber asked Stroz to provide Uber with its preliminary

8  findings.  On April 2, 2016, Stroz provided Uber with a memorandum titled, "DRAFT Summary

9  Interview of Anthony Levandowski," which informed Uber, among other things, that: ██

10 █████████████████████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████████████████████

14 █████████████████████████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████; Ex. 15, at 139:19-

18 140:14.

19 ████████████████████████████████████████████████████████████████████████

20 █████████████████████████████████████████████████████████████████████████

21 █████████████████ *Id.*, Ex. 21, at 3-4 (*e.g.*, "████████████████████████████

22 █████████████████████████████████████████████████████████████████████████

23 █████████████████████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████).  By April 11,

25 2016, Uber knew that Mr. Levandowski had retained, after he left Google, highly confidential

26 Google information, including "███████████████████████████████." *Id.*, Ex. 18; Ex.

27 15, 139:19-140:14; 143:3-146:10.

28       Uber asked Mr. Levandowski to sign two attestations regarding some of Stroz's findings.

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ███████████████████████ *Id.* § B.

In the second attestation, dated April 11, 2016 (the "the April 11 Attestation"), Uber requested that Mr. Levandowski certify his compliance with his obligations to Google, including that he returned any confidential information to Google, and that he did not solicit Google employees. *Id.*, Ex. 23. Following heavy negotiation, Uber agreed that nearly every statement in the April 11 Attestation would be substantially qualified. For example, Mr. Levandowski's representations excluded any information he provided to Stroz. *Id.* ¶ 1 ("***Subject to any matters or information disclosed to Stroz***, I have complied with my obligations under any Agreements") (emphasis added), ¶¶ 3-4 (containing a similar qualification). Mr. Levandowski's representation as to his cooperation with Stroz was also substantially qualified: "***With the exception of questions to which I did not respond because I was not certain the questions were relevant***, ***to the best of my knowledge***, (a) I have provided good faith, complete and truthful responses in all ***material respects*** to Stroz's questions and (b) all of the information I provided to Stroz is true and correct in all ***material respects***." *Id.* ¶ 6.

On August 6, 2016, Uber received Stroz's final report. Vu Decl., Ex. 46. The final report confirmed and expanded on Stroz's interim reporting. In particular, Stroz reported that Mr. Levandowski downloaded 24,000 driverless car design files from Google's server, that he possessed tens of thousands of other Google files, and that he downloaded Google documents shortly before leaving Google and accessed at least some of those documents after he left. *Id.*, Ex. 20, at 8, 12. For example, Stroz informed Uber in the final report that on February 24, 2016 (about a month after his departure from Google), Mr. Levandowski manually accessed a file named "Chauffeur TL weekly updates - Q4 2015 – Google Sheets." *Id.*, Exs. 20, at 12; 37, at 5 n.3. After receiving this final report from Stroz, Uber proceeded to close the Otto-Uber transaction on August

23, 2016. *See* Ans. at ¶ 198.

Uber cannot stave off summary judgment by arguing that, even though Uber was aware that Mr. Levandowski possessed tens of thousands of confidential Google files, it did not know of Mr. Levandowski's alleged intent to use such Google confidential information at Uber. *Id.*, Ex. 11. This argument fails for at least reasons. *First*, Uber knew that Mr. Levandowski had ███ ████████████████████████████ and it proceeded to sign and close the Otto-Uber transaction anyway. *Id.*, Ex. 18; Ans. ¶ 198. *Second*, whether or not Mr. Levandowski concealed an intent to use Google's confidential information at Uber is irrelevant to Uber's indemnity obligation. Mr. Levandowski's alleged intent to use Google confidential information for Uber's was not an element of any of the claims Mr. Levandowski was found liable for in the Google Arbitration (and for which he seeks indemnification in this proceeding). Uber knew that it was exposed to liability under the Indemnification Agreement the day it signed that agreement based on what it knew about Mr. Levandowski's possession of Google confidential information, and any concealment of Mr. Levandowski's true intentions are immaterial. *Third*, Uber itself has repeatedly taken the position that Mr. Levandowski did not use any Google confidential information during his short tenure as an Uber employee. *Id.*, Ex. 76 at 1 (arguing that the premise that Mr. Levandowski "brought thousands of confidential Waymo documents to Uber to build a copycat LiDAR . . . [is] demonstrably false"); *id.*, Ex. 80 at 2 (listing "evidence showing that Uber does not have—and has never had—the alleged 'downloaded materials'"); *id.* 79 at 1-2 ("Discovery has now shown that Uber never received the files Levandowski allegedly downloaded and took. Uber never wanted those files, never possessed those files, and never used those files."). *Fourth*, ████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Vu Decl., Exs. 21, at 3-4 ; 20, at 11-12; 19, at 14-15, 19.[2] Despite Stroz's findings, there is no evidence that Uber conducted any further investigation to determine whether and how Mr. Levandowski used this material.

---

[2] In fact, the Stroz Report noted that, on February 24, 2016 (about a month after his departure from Google), Mr. Levandowski last accessed a file named "Chauffeur TL weekly updates - Q4 2015 – Google Sheets" and that such access was likely deliberate. Vu Decl., Exs. 20, at 12; Ex. 37, at 5 n.3. Despite Stroz's findings, there is no evidence of any further inquiry into the matter by Uber.

1    In sum, Mr. Levandowski truthfully disclosed to Stroz his possession of Google confidential

2    information.  Uber knew of Mr. Levandowski's possession of Google confidential information

3    before signing the Indemnification Agreement, and it obtained additional evidence as to his

4    retention and accessing of Google confidential files when it received Stroz's final report just before

5    the Otto-Uber transaction closed.  Uber knew Mr. Levandowski accessed Google information about

6    self-driving car technology after leaving Google and that he destroyed Google information after

7    leaving Google.  Notwithstanding Uber's knowledge of all of Mr. Levandowski's truthful

8    disclosures, Uber proceeded to sign and close the transaction.  It is an undisputed fact that Uber

9    knew all about Mr. Levandowski's possession of Google confidential information before signing

10   and closing the transaction.  This prong of Uber's Fraud-Based Claims and Defenses fails as a

11   matter of law.

## B.   It Is Undisputed That Mr. Levandowski Did Not Misrepresent His Relationship With Tyto.

14   Uber's Fraud-Based Claims and Defenses fail as a matter of law because Mr. Levandowski

15   truthfully responded to questions related to side projects and never misrepresented his relationship

16   with Tyto.  *See Romero v. Securus Technologies, Inc*., 216 F. Supp. 3d 1078, 1092 (S.D. Cal. 2016)

17   (allegation for fraud must include a "misrepresentation (false representation, concealment, or

18   nondisclosure)") (citing *Robinson Helicopter Co. v. Dana Corp*., 34 Cal. 4th 979, 990 (2004));

19   Indemnification Agreement § 2.1(b)(ii) (allowing Uber to exclude claims that were not "truthfully

20   disclosed" or not on Mr. Levandowski's devices).

21   The undisputed facts are that Mr. Levandowski never misrepresented his relationship with

22   Tyto.  By April 11, 2016, ██████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   Vu Decl., Ex. 24, 454:6-22; Ex. 25, 31:5-19; Ex. 26,214:16-217:13.[3]

25   In March 2016, Mr. Levandowski provided Stroz with 45 devices and accounts that

_____

[3] In May 2016, Uber sought to capitalize on Mr. Levandowski's relationship with Tyto by having Otto acquire Tyto instead of Uber.  Uber believed that Mr. Levandowski could make a deal with Tyto "faster . . . because we knew he knew them from previous relationships" and that Otto could get a lower price for Tyto than Uber.  *Id.*, Ex. 43, 454:9-15; *id.*, Ex. 87, 1759:10-1760:7.

contained hundreds of documents relating to Tyto (f/k/a, Odin Wave).  *Id.*, Exs. 65, 66 (summarizing the many Tyto related documents on Mr. Levandowski's devices and produced by Stroz from his devices).  ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████  *Id.*, Exs. 27; 28; 29, 196:12-199:19; Ex. 85.  Indeed, Google used the documents on Mr. Levandowski's devices to prove its claims in the Google Arbitration.  Answer, Ex. 1; FAC, Ex. F (identifying documents cited in Final Award found on Mr. Levandowski's devices).  Three of the five main documents used by the panel to discuss Tyto were documents that could be located using the same search terms that Mr. Levandowski's counsel provided to Uber's counsel prior to April 11, 2016.  FAC, Ex. F at 4. It is undisputed that Mr. Levandowski provided Stroz with devices containing documents showing his relationship with Tyto.

Uber also contends that Mr. Levandowski fraudulently concealed his relationship with Tyto by not identifying it during his interview with Stroz.  Answer, at 64.  However, Uber has no evidence supporting this contention.  *Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, 816 F. Supp. 2d 793, 795 (N.D. Cal. 2009) ("On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

The only people in the interview room when Stroz was questioning Mr. Levandowski were Mr. Levandowski and the Stroz's interviewers.  *See* Vu Decl., Ex. 19, at 1.  ███████████████████

████████████████████████████████████████████

███████████████████████████████████  *Id.*, Exs. 33, 56:12-57:16; 34, 158:2-

15.  ████████████████████████████████████████████

████████████████████████  *Id.*, Exs. 33, 145:11-14; 140:23-141:4; 34, 156:11-14; 35,

176:2-4.  Indeed, Stroz's 30(b)(6) representative repeatedly testified that he was not in the room

during the interview and does not know the exact question that was asked. *Id.*, Ex. 33, 145:7-10; 146:14-25; 255:10-23; 256:22-25.

Mr. Levandowski's recollection is consistent with Stroz's understanding that its inquiries concerned projects related to driverless cars. *See id.*, Ex. 19. ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████ *Id.*, Ex. 26, 276:23-278:9, 280:1-11]. ████████████████████████████ *Id.*, Exs. 30, 331:23-332:24; 32; 31, 212:15-214:3. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ *Id.*, Ex. 26, 291:20-292:3. ████████████████████████████████ *Id.*, 282:20-283:9; 287:8-23; 291:20-292:3. ████████████████████████████████ *See id.* at 38 at p. 3 (████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████; FAC at Ex. D at p. 32 ¶ 15.

Moreover, Uber cannot present evidence in attempt to undermine Mr. Levandowski's credibility because, for years, Uber has used privilege and work product protections as a shield to bar inquiries into Mr. Levandowski credibility during the Stroz investigation. ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████. *See e.g.* Vu. Decl., Ex.59 195:7-22; 252:6-252:11; 222:24-223:19. ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ *Id.*, Ex. 49 216:8-217:5; *Id.* at 262:17-263:6. *Id.*. ████████████████████████████████████████████████████████████████

1  ███████████████████████████████████████████████████████ *Id*., Ex. 44, 171:10-

2  174:4; *Id*. at 273:17-274:24.

3  Judge Montali determined that Uber was required to either waive privilege over

4  communications that relate to justifiable reliance, such as communications about mental

5  impressions about Mr. Levandowski's credibility, or concede this element. *Id*., Exs. 88 , 7:2-8;

6  Ex. 17 , 8:20-23, 49:16-50:15; ECF No. 106 (Order on Privilege Waiver Dispute).  Courts have

7  consistently held that the attorney-client privilege cannot be used simultaneously as a sword and a

8  shield.  *See Dietz v. Meisenheimer & Herron*, 177 Cal. App. 4th 771, 793 (Cal. Ct. App. 2009)

9  (explaining that "fundamental fairness" requires that "the privilege which protects attorney-client

10 communications may not be used both as a sword and a shield.") (*citing Chevron Corp. v.*

11 *Pennzoil Co*., 974 F.2d 1156, 1162 (9th Cir. 1992)); *Columbia Pictures Television, Inc. v.*

12 *Krypton Broadcasting of Birmingham, Inc*., 259 F.3d 1186, 1196 (9th Cir. 2001) (affirming

13 exclusion of evidence that party relied on advice of counsel because party had refused to answer

14 questions at deposition, and "[t]he privilege which protects attorney-client communications may

15 not be used both as a sword and a shield.") (citation omitted); *Chevron Corp. v. Penzoil Co*., 974

16 F.2d 1156, 1163 (9th Cir. 1992) (stating that "Pennzoil cannot invoke the attorney-client privilege

17 to deny Chevron access to the very information that Chevron must refute in order to demonstrate

18 that Pennzoil's Schedule 13D is materially misleading.").  Thus, Uber cannot present evidence on

19 Mr. Levandowski's credibility in response to this motion.

20 Lacking any conflicting evidence from Stroz on the subject of Mr. Levandowski's responses

21 to Stroz's questions regarding Tyto, Uber cannot avoid summary judgment simply by questioning

22 the credibility  of Mr. Levandowski's testimony.  *See Anderson*, 477 U.S. at 256-57 (affirming that

23 summary judgment cannot be defeated without any significant probative evidence tending to

24 support the complaint and that discredited testimony is not normally considered sufficient) (*citing*

25 *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)) (other citation

26 omitted); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

27 (" the nonmoving party may not merely state that it will discredit the moving party's evidence at

28 trial and proceed in the hope that something can be developed at trial in the way of evidence to

1 support its claim.").

2     In sum, Uber has no evidence supporting its contention that Mr. Levandowski made any

3 material misrepresentations to Stroz (or that he concealed anything from Stroz) regarding his

4 relationship to Tyto. It is undisputed that Mr. Levandowski provided numerous devices to Stroz

5 containing files and documents reflecting his connection to Tyto. It also is undisputed that

6 Mr. Levandowski truthfully answered the limited questions put to him by Stroz investigators as he

7 understood those questions.

8 **V.     CONCLUSION.**

9     For the foregoing reasons, the Court should grant summary judgment in favor of

10 Mr. Levandowski on the following Uber claims and defenses: Defenses Nos. 5 (Excluded Claim),

11 7 (Fraudulent Inducement), and 9 (Reimbursement for Excluded Claim), and Counterclaims IV

12 (Declaratory Judgment re Excluded Claim), VI ( Fraud Damages), VII (Contribution to Waymo

13 Settlement), and IX (Contribution to Ron Settlement) as alleged in the Answer to Debtor's First

14 Amended Complaint for Declaratory Relief, Specific Performance, Damages, and Objection to

15 Claim; Affirmative Defenses; and Counterclaims.

16 Dated: February 23, 2021        By: /s/*Brett M. Schuman*

17     Brett Schuman
    *bschuman@goodwinlaw.com*
    Rachel M. Walsh

18     *rwalsh@goodwinlaw.com*
    Hong-An Vu

19     *hvu@goodwinlaw.com*
    **GOODWIN PROCTER** LLP

20

21     Tobias S. Keller
    *tkeller@kbkllp.com*

22     Dara L. Silveira
    *dsilveira@kbkllp.com*

23     **KELLER BENVENUTTI KIM LLP**

24     *Attorneys for Plaintiff and Debtor and*
    *Debtor in Possession*

25     ANTHONY S. LEVANDOWSKI

26

27

28

# EXHIBIT I

Debra I. Grassgreen (CA Bar No. 169978)
Miriam Manning (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:    (415) 263-7000
Facsimile:    (415) 263-7010
E-mail:dgrassgreen@pszjlaw.com
          mmanning@pszjlaw.com

David J. Bradford (admitted *pro hac vice*)
Terri L. Mascherin (admitted *pro hac vice*)
Catherine Steege (admitted *pro hac vice*)
Katharine R. Ciliberti (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Telephone:    (312) 222-9350
E-mail:dbradford@jenner.com
          csteege@jenner.com
          tmascherin@jenner.com
          kciliberti@jenner.com

*Counsel for Uber Technologies, Inc.*

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>     Debtor. | Case No. 20-30242 (HLB)<br><br>Chapter 11<br><br>Adv. Pro. No. 20-03050 (HLB) |
| ANTHONY SCOTT LEVANDOWSKI,<br><br>     Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC.,<br><br>     Defendant. | **UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO UBER'S: (1) FRAUD-BASED COUNTERCLAIMS AND DEFENSES, AND (2) EXCLUDED CLAIM DEFENSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Date:  April 1, 2021**<br>**Time:  2:00 PM**<br>**Place:  Video or Telephone** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I. INTRODUCTION .................................................................................... 1

II. STATEMENT OF FACTS ........................................................................ 1

    A. The Arbitration Award For Which Mr. Levandowski Seeks Indemnification Resulted Primarily From His Involvement In Tyto. ................................................. 1

    B. Mr. Levandowski Created, Formed, and Financed Tyto, and Concealed His Involvement in the Company from Both Google and Uber. .................................... 2

    C. Mr. Levandowski's Tyto Misconduct Violated Numerous Duties And Obligations to Google, Which Violations Mr. Levandowski Later Concealed From Uber. .......................................................................... 4

    D. Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz During Its Diligence Process. .......................................... 5

    E. Mr. Levandowski Continued to Conceal His Role in Tyto after the Indemnification Agreement Was Entered. ....................................... 6

    F. Mr. Levandowski Lied About His Involvement in Tyto During the November 3, 2016 Meeting. ................................................................. 8

    G. Mr. Levandowski Lied About His Theft Of Google Proprietary Information. ...... 9

III. LEGAL STANDARD ............................................................................. 12

IV. ARGUMENT ......................................................................................... 12

    A. Uber's Claims and Defenses Based on the Excluded Claim Provision Are Contractual, Not Fraud-Based, and They Are Supported by Ample Evidence. .... 12

        1. The Indemnification Agreement Excludes Claims Arising From Bad Acts Mr. Levandowski Did Not Truthfully Disclose. ............................. 13

        2. Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz. .............................................................. 14

        3. There Is Evidence That Mr. Levandowski's Involvement in Tyto Is Not Reflected in the Due Diligence Materials Provided to Stroz. ............ 16

    B. Uber's Contribution Claims Stand Even Without Fraud, and There Is Ample Evidence Supporting Contribution Based on Fraud. ............................... 18

    C. There Are Material Disputes of Fact Related to Uber's Fraud Claims (Counterclaim Count VI and Defense 7) . ........................................ 21

        1. Mr. Levandowski Did Not Disclose to Uber that He Retained Google Confidential Material With an Intent to Benefit Himself and Uber. ......... 21

2.    Mr. Levandowski Made Numerous Misrepresentations to Uber Concealing his Role in Tyto and Did Not Disclose to Uber His Involvement in Tyto.................................................................22

V.    CONCLUSION...........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
 398 U.S. 144 (1970) ..........................................................................................................12

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ..........................................................................................................12

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ..........................................................................................................12

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
 771 F.3d 1119 (9th Cir. 2014) ....................................................................................12, 22

*Houge v. Ford*,
 285 P.2d 257 (Cal. 1955) ..................................................................................................13

*Icon Enter. Int'l, Inc. v. Am. Prods. Co.*,
 No. CV 04-1240, 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ........................................16

*Knorr-Naehrmittel Aktiengesellchaft v. Knorr Sols., Inc.*,
 No. CV 10-8155, 2011 WL 13217674 (C.D. Cal. Sept. 30, 2011)....................................19

*Lazar v. Super. Ct.*,
 12 Cal. 4th 631 (1996) ..................................................................................................... 21

*Pavoni v. Chrysler Grp. LLC*,
 789 F.3d 1095 (9th Cir. 2015) ..........................................................................................12

*Sara Lee Corp. v. Kraft Foods, Inc.*,
 276 F.R.D. 500 (N.D. Ill. 2011) ........................................................................................16

*Trovata, Inc. v. Forever 21, Inc.*,
 No. CV 07-01196, 2009 WL 10671582 (C.D. Cal. Mar. 4, 2009) ....................................16

*Valdez v. Super. Ct. of San Bernardino Cty.*,
 No. E070656, 2019 WL 1236932 (Cal. Ct. App. Apr. 4, 2019)........................................13

**Statutes**

11 U.S.C. § 523(a) ...................................................................................................................21

**Other Authorities**

Fed. R. Civ. P. 56(a) ...............................................................................................................12

# I. INTRODUCTION

Plaintiff Anthony Levandowski ("Mr. Levandowski") moves for partial summary judgment as to Uber Technologies, Inc.'s ("Uber") Defenses Nos. 5 (Excluded Claim), 7 (Fraudulent Inducement), and 9 (Reimbursement for Excluded Claim), and Counterclaims IV (Declaratory Judgment re Excluded Claim), VI (Fraud Damages), VII (Contribution to Waymo Settlement), and IX (Contribution to Ron Settlement) (the "Motion").[1] (Mot. at 1.) In his Motion, Mr. Levandowski paints with a broad brush, erroneously suggesting that Uber's claims and defenses based upon fraud, plus the Excluded Claim defense and Contribution claims, all require proof of the elements of common law fraud. In fact, only Defense 7 (Fraudulent Inducement) and Counterclaim VI (Fraud Damages) depend on proof of fraud, and the remaining claims and defenses do not. Further, there is ample evidence to support each of these claims and defenses, and numerous disputes of material facts that preclude summary judgment as to the single claim and defense that depend on proof of Mr. Levandowski's fraud. For these reasons and as set forth below, the Motion should be denied in its entirety.

# II. STATEMENT OF FACTS [2]

Mr. Levandowski's purported "Statement of Undisputed Material Facts"—and his Motion generally—ignore numerous disputed issues of material fact that preclude summary judgment. The following are just some of the core facts he ignores—some of which are undisputed in *Uber's* favor, and others of which are hotly disputed.

### A. The Arbitration Award For Which Mr. Levandowski Seeks Indemnification Resulted Primarily From His Involvement In Tyto.

Mr. Levandowski seeks indemnification for a judgment confirming an arbitration award (the "Award") in the amount of approximately ███████████. (Am. Compl. ¶ 161, Dkt. 49; Ex. U-1, Award at 123.)[3] The largest component of that Award constituted disgorgement of about

---

[1] Although Mr. Levandowski moves for summary judgment on Counterclaims VII and IX, he fails to even mention these claims in the body of his Motion. For that reason, Uber only briefly addresses them in Part IV.B below.

[2] To avoid repetition, Uber sets forth here facts that are relevant not just to this opposition to the Motion, but also to Uber's opposition to Mr. Levandowski's separate Motion for Partial Summary Judgment Based on Statute of Limitations (Dkt. 122).

[3] Uber's exhibits in support of this opposition are attached to the Omnibus Declaration of Katharine Ciliberti in Support of Uber's Opposition to Mr. Levandowski's Motions for Partial Summary Judgment, and are referenced hereinafter with the following designations: Ex. U-1, Ex. U-2, Ex. U-

█████████ in compensation that Mr. Levandowski received when he left Google, plus ████████ ████████ on that compensation. (Ex. U-1, Award at 123.) That ████████ component of the ████████ Award was based mainly on the Panel's finding that, during the multiple years he earned that compensation, Mr. Levandowski breached his employment agreements with, and the duty of loyalty to, Google by creating, funding and controlling a competing business, Tyto LiDAR, LLC ("Tyto") (collectively the "Tyto misconduct").[4] The Arbitration Panel concluded that █████████████

████████████ (Ex. U-1, Award at 47.) The Panel also found, and Mr. Levandowski now admits, that ████████████████████████████████████████████████

████████ (Ex. U-1, Award at 34; Ex. U-62, Levandowski Dep. 251:20-253:7.) Although Mr. Levandowski was disloyal to Google in other ways as well, the Tyto misconduct occurred continuously throughout the entire period that Mr. Levandowski acted disloyally and the entire period during which his ████████████████████ (Ex. U-1, Award at 34, 46-47, 59-61, 68, 82.)

As discussed in the next several sections, there is summary judgment-defeating substantial evidence that Mr. Levandowski hid his true role in Tyto from Uber. Mr. Levandowski admits he did not disclose his involvement with Tyto to Stroz in response to relevant questions during his interview, and argues only that Stroz should have somehow been able to locate needle-in-a-haystack documents on his computers and divine from them ████████████ (Mot. at 9-10.)

**B.** ████████████████████████████████████

████████████████ As the Panel found, Mr. Levandowski ████████████████████████████████████████████████████████████████████████████████ Mr. Levandowski deceived Uber by ████████████████

---

3, etc. References to exhibits cited by Mr. Levandowski have the following designations: Ex. L-1, Ex. L-2, Ex. L-3, etc.

[4] Tyto was previously known as Odin Wave, LLC. (Ex 23, Feb. 7, 2014, Amendment to Articles of Organization of Odin Wave; Ex. 60, Gardner Dep. 30:6-8.) In this Opposition, Uber will refer to the company as "Tyto."

███████████████████████████████ Mr. Levandowski entered into both the Indemnification Agreement ("Indemnification Agreement" or "Agreement") and a merger agreement between Uber and his company, Ottomotto LLC ("Otto"), on April 11, 2016, ███████████ ███████████████ Then, in May 2016, Mr. Levandowski engineered the acquisition of Tyto by Otto, ████████████████████████ Because Uber later closed the transaction to merge with Otto in August 2016, █████████████████████████████ ████████████████████████████████

As the Panel found,

- ████████████████████████████
- ████████████████████████████
- ████████████████████████████
- ████████████████████████████
- ████████████████████████████
- ████████████████████████████
- ████████████████████████████

████████████████████████████████████

• ████████████████████████████████████

• ████████████████████████████████████
████████████████████████████████████

• ████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████

**C.    Mr. Levandowski's Tyto Misconduct Violated Numerous Duties And Obligations to Google, Which Violations Mr. Levandowski Later Concealed From Uber.**

When Mr. Levandowski took these actions with respect to ████████████████ he was serving as Software Engineer Manager and Project Founder of the team ████████████████████████████████████ (Ex. U-9, Jan. 1, 2012 Employment Agreement at 1; Ex. U-1, Award at 25; Ex. U-72, Arb. Hearing Tr. at 587:25-588:3 (Bailey).)

The Arbitration Panel found that ███████████████████████████████████████████████████████████████████████████ (Ex. U-1, Award at 47, 68, 82, 84; *see also* Exs. L-32; U-83; U-84; U-85 (Google Codes of Conduct).)  The Panel further found that ███████████████████████████████████████████ (Ex. U-1, Award at 86-87.)

Mr. Levandowski cannot pretend he thought Google allowed this type of competitive activity. In early 2011, he entered into the two NCNS Agreements. In those agreements, he agreed that he would ████████████████████████████████████

(Ex. U-1, Award at 26-29; *see also* Exs. U-7; U-8 (NCNS Agreements).)  Aware his Tyto misconduct constituted a breach of loyalty, ███████████████████

██████  (Ex. U-1 Award at 34; *see also* Ex. U-57, Cooper Dep. 184:4-185:8.)

**D.    Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz During Its Diligence Process.**

Prior to April 11, 2016, Uber's and Otto's counsel, retained Stroz, a third-party forensic examiner, to conduct due diligence on Mr. Levandowski and the other principals of Otto. (Ex. U-29, March 4, 2016 Engagement Ltr.; Ex. U-73, M. Fulginiti Genow Decl. ¶ 4 (hereinafter "Genow Decl.").)

Stroz professionals interviewed Mr. Levandowski extensively for two days on March 22 and 23, 2016.  (Ex. L-19, April 2, 2016 Memo at 1; Ex. U-73, Genow Decl. ¶¶ 6-25; Ex. U-62, Levandowski Dep. 271:9-12.)  They asked him, among other things, to identify all side projects he was involved in while he worked for Google, including any project where he was an owner, investor (either direct or indirect) or had any role in advising (whether paid or unpaid).  (Ex. U-73, Genow Decl. ¶¶ 18-20, 23.)  In response to Stroz's request that Mr. Levandowski identify ████████████████

███████████████████████████████████  (Ex. L-19, April 2, 2016 Memo at 2-3); Ex. U-73, Genow Decl. ¶¶ 17-22, 24.)  Mr. Levandowski admits this. (Mot. at 10.)  Many of the businesses that Mr. Levandowski identified had nothing to do with the type of work he did at Google.  (Ex. L-19, April 2, 2016 Memo at 2-3.)  Tyto, by contrast, involved LiDAR, which was precisely what he worked on at Google.  (Ex. U-62, Levandowski Dep. 90:12-17; Ex. U-1, Award at 20-21.)  During the interview, Mr. Levandowski also ███████████████████████

███████  which clearly was not true as to Tyto.  (Ex. L-19, April 2, 2016 Memo at 2-3 (emphasis added); *see also* Ex. U-73, Genow Decl. ¶¶ 22-23.)

Following that interview, Mr. Levandowski's counsel, Mr. Gardner (who had drafted the documents to create Tyto) reviewed a list of proposed search terms for Stroz's forensic review.  (Ex. L-85, April 3, 2016 Gardner email.)  That list included the names of all of the side businesses that Mr.

Levandowski had disclosed to Stroz, but omitted "Tyto" and "Odin Wave." (*Id.*; Gardner Dep. 171:10-173:14 (██████████████████████████████████).) Gardner did not tell Stroz it should search for "Tyto" or "Odin Wave." (*Id.*)

In addition, on April 11, 2016, Mr. Levandowski signed an attestation in connection with the Stroz process. (Ex. L-23, April 11, 2016 Attestation.) He falsely attested:



Contrary to those attestations, Mr. Levandowski (a) did not disclose to Stroz his involvement in Tyto, which breached several fiduciary, contractual, and statutory duties and obligations to Google, and (b) did not disclose certain agreements with Google, including the two 2011 NCNS Agreements that he had violated. (Ex. L-23, April 11, 2016 Attestation; Ex. L-22, April 10, 2016 Attestation; Ex. L-19, April 2, 2016 Memo at 2-3.)[5]

### E. Mr. Levandowski Continued to Conceal His Role in Tyto after the Indemnification Agreement Was Entered.

Even after April 11, 2016, Mr. Levandowski continued to conceal from Uber his role in Tyto. In early May 2016, Mr. Levandowski arranged for Otto to acquire Tyto, including its LiDAR technology, patents, trade secrets, and confidential information. (Ex. U-36, May 5, 2016 Asset Purchase Agreement; Ex. U-39, May 9, 2016 Bill of Sale.) Uber's approval was required before Otto could acquire Tyto, because of the pending merger between Uber and Otto. (Ex. U-33, Ottomotto Merger Agreement. § 4.3(j).)

---

[5] In fact, this attestation was false and fraudulent in several other ways as well, including for reasons discussed below in Part G. Uber details all the ways in which this attestation was false in its response to Mr. Levandowski's Fourth Set of Interrogatories, attached as Exhibit L-48.

Mr. Levandowski persuaded Uber to authorize Otto to acquire Tyto's LiDAR technology and hire its personnel, while concealing his controlling role. (Ex. U-62, Levandowski Dep. 380:17-382:1; Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 162:15-163:6; Ex. U-67, Sept. 29, 2017 Poetzscher Dep. 661:24-662:18, 664:15-666:12.)  While Mr. Levandowski was advocating with Uber to approve the acquisition, he was also secretly outlining with Tyto's manager, Ognen Stojanovski, both the terms that Tyto wanted and what Tyto would do with the proceeds of the deal. (Ex. U-34, April 28, 2016 email; Ex. U-35, April 30, 2016 email.)  At the same time, he was discussing with Mr. Stojanovski how to keep Uber from finding out about his "████████████████████" with Tyto.  (Ex. U-30, March 29, 2016 email.)

Prior to Otto's acquisition of Tyto, Mr. Levandowski never disclosed to Uber his role in ████████████ Tyto. (Ex. U-62, Levandowski Dep. 224:23-225:21, 228:1-229:9.) Nor did Mr. Levandowski disclose his involvement in ████████████████████ (*Id.* at 224:18-22, 230:19-24.)  Instead, Mr. Levandowski told Uber only that "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (Ex. L-65, Levandowski's Supp. Resp. to Uber's First Set of Interrogatories at 4; Ex. U-62, Levandowski Dep. 215:19-216:1, 217:20-218:5.)  Regarding Tyto's ownership, Mr. Levandowski told Cameron Poetzscher, Uber's head of corporate development, that "████████████████████████████████████████████████████ (Ex. U-62, Levandowski Dep. 401:2-15; Ex. U-38, May 5, 2016 email).

Before Uber approved the acquisition, Mr. Poetzscher asked Lior Ron, one of the other principals of Otto, "████████████" referring to Mr. Levandowski's statement.  (Ex. U-38, May 5, 2016 email.) ████████████████████████████████████████ (Ex. U-68, Ron Dep. 127:7-13.)  Thus, Mr. Ron unwittingly furthered the deception, ████████████████████████████████████████████████ (Ex. U-38, May 5, 2016 email).

This acquisition caused Uber to acquire technology from Otto that Waymo and Google claimed used Google confidential information that Mr. Levandowski acquired while working at Google. (*See* Ex. U-86, Expert Report of L. Hesselink ¶¶ 376-384.)   Thus, the acquisition exposed Uber to substantial trade secret claims by Waymo, which were to be tried to the jury until the Uber-Waymo settlement.  (*Id.*; *see also Waymo LLC v. Uber Technologies, Inc.*, No. 3:17-cv-00939-WHA ("Waymo Litigation"), Dkt. 2520, Second Amended Joint Proposed Pre-trial Order at 1:5-3:25 (listing nine alleged trade secrets Waymo claimed Uber misappropriated to be presented at trial, including "trade secret 90," which Waymo alleged came from Tyto).)   Uber never would have acquired Otto, or permitted Otto to acquire Tyto, if it had known that ██████████████████████████████ ████████████████████████████ Mr. Poetzscher has testified, ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ (Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8; *see id.* 169:20-170:14.)

### F. Mr. Levandowski Lied About His Involvement in Tyto During the November 3, 2016 Meeting.

Mr. Levandowski continued to conceal his relationship with Tyto from Uber even after Google initiated arbitration against him and Waymo initiated litigation against Uber.  On November 3, 2016, counsel for Uber, Eric Tate, together with Uber in-house counsel, Justin Suhr, interviewed Mr. Levandowski about Google's allegations.  During the interview, Mr. Tate asked Mr. Levandowski ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████ (Ex. U-71, Tate Dep. 230:15-231:3; *see also id.* at 232:23- 233:5, 236:7-18.)

In response, Mr. Levandowski continued to mislead Uber, ████████████ ████████████████████████████████████████████ (Ex. U-70, Suhr Dep. 143:14-23;  *see also* Ex. U-62, Levandowski Dep. 445:6-10; Ex. L-38, Tate Notes.)   Uber's understanding, from the interview, was ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ (Ex. U-70, Feb. 8, 2021 Suhr Dep. 143:14-23.)  Mr. Levandowski also assured Uber he never disclosed

any Google intellectual property to Tyto. (Ex. L-38, Tate Notes at 3.) He admitted only that he

████████████████████████████████████████████████████████████
████████████████████ (Ex. L-38, Tate Notes at 2-3; *see also* Ex. U-71, Tate Dep. 238:13-239:3.)

**G.** **Mr. Levandowski Lied About His Theft Of Google Proprietary Information.**

In addition to Mr. Levandowski's concealment of the Tyto misconduct, there is ample evidence that Mr. Levandowski concealed from Uber his theft of trade secrets from Google. Although Mr. Levandowski contends that Uber knew or should have known about his theft, at a minimum, the evidence gives rise to a material disputed issue of fact as to whether Uber was defrauded.

The evidence shows that at no time prior to his guilty plea for theft of trade secrets in March 2020 did Mr. Levandowski disclose to Uber that he had taken Google confidential information with the intent to use it to benefit himself and (supposedly) Uber. (Ex. L-23, April 11, 2016 Attestation ¶ 1.) Prior to April 11, 2016, in discussions with Uber senior management, Mr. Levandowski ████████ (Ex. U-66, June 19, 2017 Poetzscher Dep. 103:9-104:16.) Mr. Poetzscher testified, ████████████████████ (*Id.* at 103:9-17; *see also id.* at 80:6-81:19, 108:5-109:4, 262:3-16; Ex. U-61, Kalanick Dep. 44:10-45:9, 58:15-20.) When Stroz interviewed him and found some Google information on his laptop, Mr. Levandowski stated that Google information was stored there ████████████████████████████████████████████ (Ex. L-19, April 2, 2016 Memo at 4, *see also id.* at 4-15, 17-19.) Mr. Levandowski represented that ████████████████████████████████ (*Id.* at 19 (emphasis added).) He acted surprised at the amount of Google-related information that was on his laptop, and he said ████████████████████████████████████ (*Id.*)[6] He stated that

_____

[6] Mr. Levandowski points to the Stroz Report showing that a file titled "Chauffer TL weekly updates Q4 2015" was accessed after he left Google. (Ex. L-20 at 12.) Stroz was never able to determine whether that file was accessed by a human as opposed to a system process, and Mr. Levandowski attested that he did not recall accessing it. (*See, e.g.,* Ex. U-69, Maugeri Dep. 280:11 – 281:9; Ex. U-90, Tate email; *see also* Ex. U-22, April 10, 2016 Attestation.) Mr. Levandowski states his April 11,

██████████████████████████████████████████ and then acted surprised that there were Google emails synced to his computer. (*Id.*) Mr. Levandowski further stated that he ████████████████████ ███████████████████ (*Id.* at 17.) He said that he had never downloaded any Google files to his personal devices with the intention of leaving Google. (Ex. U-73, Genow Decl. ¶¶ 32-33.) In all, he claimed that the Google documents on his devices were there innocently or even accidentally, pursuant to legitimate and permitted activities when he worked for Google; that he had by no means stolen them; and that he had no intent to use them. The falsity of Mr. Levandowski's statements only came to light years later.

On February 23, 2017, Waymo sued Uber for trade secret misappropriation based on Mr. Levandowski's taking of confidential Google proprietary information. (*See* Waymo Litigation, Dkt. 1.) Mr. Levandowski continued to misrepresent to Uber whether and why he took and retained Google confidential information, even after Waymo filed that suit. On March 29, 2017, Mr. Levandowski told Travis Kalanick (then CEO of Uber) and Angela Padilla (then Vice President, Deputy General Counsel of Uber) that he had intentionally downloaded and retained Google files, but not for use at Uber; rather, he claimed he had done so only because he was worried that Google would not pay him his bonus and he wanted to be able to demonstrate the work he had done to earn that bonus. (Ex. L-39, Padilla Decl. ¶ 6; Ex. U-64, Padilla Dep. 82:22-83:12.) This was the first time Mr. Levandowski represented to Uber that he had intentionally taken Google confidential information, and he insisted he had done so only for his own benefit. (*Id.*)

When asked in his deposition whether he told Mr. Kalanick and Ms. Padilla in March 2017 that he had downloaded Google confidential information for the purpose of benefiting *Uber*, Mr. Levandowski testified that he told them he had downloaded the information so that Google would "████████████████████" on his work for Project Chauffeur. (Ex. U-62, Levandowski Dep. 470:19-471:12.) Mr. Levandowski admitted that he "████████████████████████

---

2016 attestation followed "heavy negotiation." (Mot. at 6.) If, by so arguing he intends to suggest that he was trying to hide something from disclosure in the attestation, with hindsight that certainly appears to have been the case. Mr. Levandowski also argues that he told Uber that he possessed "everything you need to create a self-driving car," (*Id.* at 7), but he told Uber executives in March 2016 that he destroyed the discs containing that information. (Ex. L-18; Ex. L-19 at 14-15.)

████████████████████████████████████████

████████████████████████████████████████ (*Id.*)

Mr. Levandowski's theft of trade secrets caused Uber to face serious exposure to Waymo in the Waymo Litigation. In March 2017, upon learning of Mr. Levandowski's intentional downloading of Google files, Judge Alsup, who presided over the Waymo case, entered a preliminary injunction order requiring, among other things, that Uber investigate who had been given access to the information that Mr. Levandowski had taken from Google. (*See* Waymo Litigation, Dkt. 426, May 11, 2017 Order Mot. Prov. Relief at 24:3-28.) Waymo asserted, among other things, that Uber had benefited from Mr. Levandowski's secret use of Google confidential information. (Waymo Litigation, Dkt. 2520, Second Amended Joint Proposed Pre-trial Order at 1:5-3:25 (listing nine alleged trade secrets Waymo claimed Uber misappropriated to be presented at trial).) Waymo also contended that all nine of the trade secrets upon which it based its case at trial were related to Google documents that Mr. Levandowski had downloaded on his devices. (Ex. U-87, Supp. Expert Report of L. Hesselink (opining that the Stroz report and the materials in Stroz's possession confirm that Mr. Levandowski downloaded materials related to alleged Trade Secret Nos. 25, 111, 2, 7, 9, 13, 14, 90, and 96).). In February 2018, Uber entered into a Settlement Agreement agreeing to pay in excess of $250 million in consideration to settle Waymo's claims. (Ex. U-6, Settlement Agreement § 4(b).)

Two years later, on March 19, 2020, Mr. Levandowski pleaded guilty to one felony count of theft of trade secrets, admitting under oath that he "intended to convert a trade secret to the economic benefit of anyone other than the owner thereof;" that he "stole, or without authorization, appropriated, took, carried away, or concealed such information," and that he "intended to use the [trade secret] to benefit [himself] and Uber." (Ex. U-79, Plea Agreement ¶ 1 & p. 3, *United States v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal.) (hereinafter "Plea Agreement"); Ex. U-80, Aug. 4, 2020 Sentencing Tr. at 18.) Mr. Levandowski admitted that he "downloaded at least 20 files from Google Drive between October 2015 and January 2016, including an internal tracking document entitled 'Chauffeur TL weekly updates – Q4 2015," that he "downloaded this file with the intent to use it for the benefit of someone other than Google," and that it "contained a variety of details regarding the status of Google's self-driving car program . . . as well as summaries of technical

challenges currently faced by the program and notes related to previous challenges that had been overcome." (Ex. U-79, Plea Agreement at 3.)

## III. LEGAL STANDARD

Summary judgment should not be granted where there is a "genuine dispute" as to any "material fact." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). It is the moving party's burden to demonstrate the absence of a genuine issue of material fact, and all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 248. Even when the basic facts are undisputed, if reasonable minds could differ on the inferences to be drawn from those facts, summary judgment should be denied. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Pavoni v. Chrysler Grp., LLC*, 789 F.3d 1095, 1098 (9th Cir. 2015).

## IV. ARGUMENT

### A. Uber's Claims and Defenses Based on the Excluded Claim Provision Are Contractual, Not Fraud-Based, and They Are Supported by Ample Evidence.

Mr. Levandowski conflates Uber's fraud-based claims with its contractual defenses and counterclaims based on the Excluded Claim provision in the Indemnification Agreement. The premise of Uber's Excluded Claim defenses and counterclaims is that the Award resulted primarily from Mr. Levandowski's Tyto misconduct, which is an Excluded Claim under the meaning of the Indemnification Agreement, regardless whether Mr. Levandowski acted with intent to deceive and whether Uber reasonably relied upon his false statements. As a matter of contract, the Tyto misconduct is an Excluded Claim because Mr. Levandowski failed to truthfully disclose his involvement in Tyto when Stroz asked whether he was involved with any "side projects" while employed by Google. (Ex. L-19, April 2, 2016 Memo at 2-3.) To assert this contractual defense and counterclaim, Uber does not need to show the elements of fraud; it does not have to show materiality, or that Mr. Levandowski intended to deceive Uber, or that Uber relied on statements made by Mr. Levandowski to its detriment.

Thus, even if Mr. Levandowski were correct that Uber could not prove fraud (he is not), this would not warrant summary judgment on Uber's Excluded Claim defenses and counterclaims.

### 1. The Indemnification Agreement Excludes Claims Arising From Bad Acts Mr. Levandowski Did Not Truthfully Disclose.

Mr. Levandowski argues that Uber "agreed broadly to indemnify [him] for claims that Google might assert against [him]." (Mot. at 1.) But he studiously avoids discussing the actual language of the Indemnification Agreement. Section 2.1 defines the types of claims that will be indemnified, "Indemnified Claims," as well as the types of claims that will not be indemnified, "Excluded Claims." (Ex. U-2, Agreement § 2.1(b).) Section 2.1(b)(ii) defines one category of Excluded Claim: "claims that . . . reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that _**either**_ (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries in connection with the due diligence performed by the Outside Expert _**or**_ (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees to the Outside Expert." (_Id._ § 2.1(b)(ii) (emphasis added).)

Under the plain meaning of that section, only one of (A) _or_ (B) need be established in order for a claim to be an Excluded Claim. This is evident from the use of the disjunctive "either" "or." It is a well-established principle of contract construction that an "either" "or" disjunction means only _one_ of the listed alternatives is required. _See Houge v. Ford_, 285 P.2d 257, 260 (Cal. 1955) ("the words 'protect or collect' were obviously used advisedly and with reference to the two alternative possibilities; and there is no reason here for construing the word 'or' in any way other than in its 'ordinary and popular sense' . . . the function of the word 'or' is to mark an alternative such as 'either this or that'"); _Valdez v. Super. Ct. of San Bernardino Cty._, No. E070656, 2019 WL 1236932, at *2 (Cal. Ct. App. Apr. 4, 2019) (rejecting argument that both factors needed to exist because the rule "used the disjunctive word 'or' instead of the conjunctive word 'and' to connect the two factors, meaning, of course, that the presence of either factor alone is sufficient").[7]

---

[7] While the import of this disjunctive language is clear, the parol evidence makes even more clear that the parties intentionally chose the "either/or" construct. As originally drafted, Section 2.1(b)(ii) used the word "and" between subsections (A) and (B), and did not contain the word "either." Uber changed that to "███████████████," and that language appears in the final contract. (_See_ Ex. U-27, Feb. 9, 2016 draft Indemnification Agreement at 6 (███████████████████████████████).)

Case 3:20-cv-03003 Document 1-28 Filed 08/12/24 Entered 08/12/24 13:45:47 Page 17 of 28
Case 3:20-cv-03003 Doc#1498 Filed 03/18/21 Entered 03/18/21 18:14:35 Page 17 of 447 of 555

As discussed next, the Tyto misconduct is an Excluded Claim for two independent reasons. First, Mr. Levandowski did not disclose it to Stroz in response to relevant questions. And second, Mr. Levandowski cannot show by undisputed evidence that his involvement in Tyto was "contained or reflected" in the terabytes of data that he gave to Stroz.

### 2. Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz.

There is ample evidence that subsection 2.1(b)(ii)(A) was met here: Mr. Levandowski failed to truthfully disclose his involvement with Tyto in response to relevant inquiries by Stroz. Mr. Levandowski admits he did not tell Stroz about his involvement with Tyto. (Mot. at 10; *see* Ex. L-19, April 2, 2016 Memo at 3.) That alone is sufficient to prove the Excluded Claim defense and, at a minimum, to defeat summary judgment.

Mr. Levandowski argues that there is no evidence of precisely what questions Stroz asked him, apparently suggesting that he would have disclosed Tyto if only Stroz had tailored its questions more closely to his scheme. (Mot. at 9-10.) To the contrary, Mary Fulginiti Genow, who led the questioning in the interview, attests that she asked Mr. Levandowski to identify all side projects that he was involved in, including any project where he was an owner, investor, or had any role in advising, and that she did not limit the questions to only side projects in which he invested "directly" in a company or was a "paid" advisor. (Ex. U-73, Genow Decl. ¶¶ 16-20.) She asked about his ownership in any business or project, whether he invested in any business or project, whether he was an advisor to any business or project, and whether he was involved in any business or project. (Ex. U-73, Genow Decl. ¶ 18.) Ms. Fulginiti Genow's outline for the interview, which she used to guide her questioning, reflects that she asked Mr. Levandowski ███████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ (Ex. U-73, Genow Decl. at ¶¶ 12, 16; *id.* at Exhibit C at STROZ_0021143, STROZ_0021147.) Notes of the interview reflect that he was asked about any ███████████████████████████████████████████████████████████████████████ ███████████████████████ (Ex. U-73, Genow Decl. ¶¶ 19-20; *id.* at Exhibit E at STROZ_0021165; Ex. U-58, Fulginiti Genow Dep. 113:8-22.)

For his part, Mr. Levandowski claims he thought he was only asked to disclose projects where he was a "paid advisor." (Mot. at 10 (citing Ex. L-26, Levandowski Dep. 276:23-278:9, 280:1-11).) But Mr. Levandowski admits that he ██████████████████████████████████ (Ex. U-62, Levandowski Dep. 293:10-14.)

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████ (Ex. U-62, Levandowski Dep. 287:25-291:13.) ████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████ (Ex. L-66, Levandowski Resp. to Uber's Second Set of Interrogatories at 10 ("In 2015 to 2016, Mr. Levandowski provided about $925,000 in loans to Sandstone Group LLC"); Ex. U-62, Levandowski Dep. 287:25-291:13; Ex. U-1, Award at 33, 46-47.)

Mr. Levandowski also asserts that he answered Ms. Fulginiti Genow's questions intending to disclose only "side projects" that he thought would be implicated by Google's Code of Conduct or that he thought would be a conflict of interest. (Mot. at 10; Ex. U-62, Levandowski Dep. 278:10-280:10.) Tyto falls within those categories, but Ms. Fulginiti Genow attests that her questions were not so limited. Further, this argument makes no sense. Mr. Levandowski disclosed several side projects that were far afield from the work Google was doing, and therefore would not have been a conflict of interest or a violation of the Code of Conduct—such as a dating app and a real estate development fund. (Ex. L-19, April 2, 2016 Memo at 2-3.) Tyto was by far the most relevant side project Mr. Levandowski was involved in, leading the Arbitration Panel to order disgorgement of his compensation and awarding Google over a hundred million dollars. Accordingly, there is a dispute of fact as to whether Mr. Levandowski possibly could have had an innocent explanation for not mentioning Tyto.

Mr. Levandowski attempts to avoid this evidence by arguing that Uber cannot present evidence of what Ms. Fulginiti Genow asked him because Stroz's Rule 30(b)(6) deponent was not present for the interviews and could not testify to the exact questions asked during the interviews. (Mot. at 9-10.) But Stroz's Rule 30(b)(6) witness's lack of knowledge does not preclude testimony from another Stroz

employee. *Trovata, Inc. v. Forever 21, Inc.*, No. SACV 07-01196, 2009 WL 10671582, at *4-5 (C.D. Cal. Mar. 4, 2009) ("the testimony of a Rule 30(b)(6) designee is not preclusive"); *see also Icon Enter. Int'l, Inc. v. Am. Prods. Co.*, No. CV 04-1240, 2004 WL 5644805, at *6 (C.D. Cal. Oct. 7, 2004) ("statements made by the designee are *not* tantamount to a judicial admission") (emphasis in original). Indeed, the testimony of a non-party Rule 30(b)(6) witness is only admissible in limited purposes, not present here. *See Sara Lee Corp. v. Kraft Foods, Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. Aug. 11, 2011) ("where the Rule 30(b)(6) witness is a non-party, the admission of testimony based on corporate knowledge should be limited to topics that are particularly suitable for Rule 30(b)(6) testimony [including the] corporation's official position . . . corporate policies and procedures, or the corporation's opinion about whether a business partner complied with the terms of a contract").

In response to Stroz's questions, Mr. Levandowski also falsely stated that he had disclosed all of his "side projects" to Google. (Ex. L-19, April 2, 2016 Memo at 3; Ex. U-73, Genow Decl. ¶¶ 21-23.) That was untrue, as Mr. Levandowski now admits ███████████████████████████████ (Ex. U-1, Award at 34; Ex. U-62, Levandowski Dep. 251:20-253:7.) Thus, there is ample evidence that Mr. Levandowski did not "truthfully disclose" his Tyto misconduct to Stroz during the due diligence process. (Ex. U-2, Agreement § 2.1(b)(ii).) At a minimum, this evidence establishes an issue of disputed fact that precludes summary judgment.

### 3. There Is Evidence That Mr. Levandowski's Involvement in Tyto Is Not Reflected in the Due Diligence Materials Provided to Stroz.

In the face of all of this evidence that Mr. Levandowski failed to truthfully disclose his relationship with Tyto to Stroz, Mr. Levandowski argues that his Tyto misconduct is not an Excluded Claim because it turns out there were documents on devices that he turned over to Stroz that contained some information relating to Odin Wave, Tyto's predecessor. (*See* Mot. at 8-9.) He invokes Section 2.1(b)(ii)(B) and appears to contend that the Tyto misconduct is not an Excluded Claim if he shows that the devices provided to Stroz contained a document regarding Tyto. (*Id.*) As shown above, that argument is foreclosed by the language of Section 2.1(b)(ii) —the Tyto misconduct is an Excluded Claim because he did not truthfully disclose his extensive involvement with Tyto in response to direct questions from Stroz, as subsection (A) required. (Ex. U-2, Agreement § 2.1(b)(ii)(A).) But even if

the "either" "or" language of that section could somehow be interpreted as requiring Uber to prove *both* subparts A and B, the claim would still be an Excluded Claim.

The factual evidence at trial will show the complete context in which this argument must be evaluated. Mr. Levandowski provide more than a dozen devices and terabytes of data to Stroz. (Ex. L-19, Interview Memo at 18-20.) The evidence shows that Mr. Levandowski withheld from Stroz the critical information needed to identify, and understand the significance of, documents relating to Tyto. (Ex. U-59, Stroz 30(b)(6) Friedberg Dep. 162:15-163:2.) One of the purposes of the Stroz interview was to aid the forensic examiners in searching the data on his devices to find potentially relevant documents. (Ex. U-73, Genow Decl. ¶¶ 6, 26; Ex. U-59, Stroz 30(b)(6) Friedberg Dep. at 94:8-24.) After the interview, Stroz worked with counsel for Mr. Levandowski, Uber and Otto to develop search terms to run through the data collected from the numerous computers, phones, cloud-based accounts and other devices produced by Mr. Levandowski. (Ex. U-59, Stroz 30(b)(6) Friedberg Dep. 64:9-13, 66:2-8.) Mr. Gardner, who incorporated Tyto, provided a list of search terms to Stroz. His list included the names of all of the "side projects" that Mr. Levandowski disclosed to Stroz, but omitted the terms "Tyto" and "Odin Wave." (Ex. L-85, April 3, 2016 Gardner email; Ex. U-60, Gardner Dep. 172:10-16.) Gardner did not add those terms to the list. Nor did he suggest such terms as "Bismuth," "Beryllium," or "Sandstone," any of which might have led Stroz to discover Tyto-related documents on Mr. Levandowski's devices. Because Mr. Levandowski purposely omitted these terms from the list for forensic review, Stroz was unaware that Tyto had any significance, much less that it was a company █████████████████████████████████████████████████████████████ ████████████████████████████████████ (Ex. U-73, Genow Decl. ¶ 29; Ex. U-1, Award at 47, 68, 84.)

Mr. Levandowski now argues that search terms such as "laser" and "sensor" should have alerted Stroz to materials related to Tyto on Mr. Levandowski's devices. (Mot. at 9.) As the evidence shows, the amount of data on Mr. Levandowski's devices was massive. The search terms "laser" and "sensor," in particular, were so generic as to generate tens of thousands of "hits" on documents from his devices. (Ex. U-31, April 3, 2016 Gardner email; Ex. U-59, Stroz 30(b)(6) Friedberg Dep. 90:2-92:15; Ex. U-42, July 28, 2016 Memo at 3.) As a result, after consulting with Mr. Gardner and the

Case 3:17-cv-00939-WHA Document 2263 Filed 11/22/17 Page 20 of 26
Case 20-30242 Doc# 1498 Filed 03/18/21 Entered 03/18/21 14:35:47 Page 20 of 26
451 of 555

other counsel, Stroz narrowed its searches based on other information provided in the interviews to attempt to focus in on relevant documents. (Ex. U-42, July 28, 2016 Memo at 3.) Mr. Gardner approved Stroz's suggestions, never suggesting that "Tyto," "Odin Wave," "Bismuth," "Beryllium," or "Sandstone" should be used to narrow the search. (Ex. L-85, Gardner email.) Indeed, even if Stroz had stumbled upon Tyto-related documents, they would not have known the significance of any such document or of Tyto, because Mr. Levandowski did not disclose his relationship with the company.

Finally, Mr. Levandowski argues that "Google used the documents on Mr. Levandowski's devices to prove its claims in the Google Arbitration." (Mot. at 9.) But the Indemnification Agreement required Mr. Levandowski to truthfully and in good faith disclose his Tyto connection to Stroz *prior to April 11, 2016.* Instead of disclosing his involvement with Tyto, Mr. Levandowski actively concealed it. The fact that the arbitration Panel cited documents found on Mr. Levandowski's devices after extensive discovery by Google, and with the benefit of hindsight, three years later has no bearing on whether Mr. Levandowski truthfully and in good faith disclosed his involvement in Tyto *prior to April 11, 2016*.

Because there is ample evidence that Mr. Levandowski failed to disclose his relationship with Tyto truthfully to Stroz—the only element necessary to establish that the Tyto misconduct is an Excluded Claim—summary judgment should be denied as to Defenses No. 5 (Excluded Claim), Defense No. 9 (Reimbursement for Excluded Claim), and Counterclaim IV (Declaratory Judgment re Excluded Claim).

**B.** **Uber's Contribution Claims Stand Even Without Fraud, and There Is Ample Evidence Supporting Contribution Based on Fraud.**

Uber seeks contribution from Mr. Levandowski for the $250 million Uber paid to settle the Waymo Litigation, and for the roughly $9 million it paid to cover the portion of the Award that was joint and severable against Mr. Levandowski and Mr. Ron. Uber's right to contribution rests on two distinct legal premises. First, common law contribution: Mr. Levandowski was a joint tortfeasor because Waymo's claims were based upon his alleged theft of trade secrets, and Google's claims were based on his disloyal conduct. Second, fraud: Mr. Levandowski defrauded Uber by concealing his Tyto misconduct and his intentional theft of trade secrets, and that fraud caused Uber to face enormous potential liability to Waymo, and Mr. Ron to face millions of dollars of liability to Google. *See Knorr-*

*Naehrmittel Aktiengesellchaft v. Knorr Sols., Inc.*, No. CV 10-8155, 2011 WL 13217674, at *3 (C.D. Cal. Sept. 30, 2011) (noting "given the presence of common law fraud and negligent misrepresentation claims, it would appear that Third Party Plaintiffs can seek indemnity and contribution under California law on a common law tort theory").

As to the first basis for contribution (and as explained in more detail in Uber's Response to Mr. Levandowski's Motion for Partial Summary Judgment Based on Statute of Limitations ("SOL Opp.")), Mr. Levandowski was a joint tortfeasor with respect to the Waymo Litigation, and he should be required to contribute toward the settlement on that basis. (SOL Opp. at 4-5.) Further, he was a joint tortfeasor with Mr. Ron with respect to the breaches of duties and obligations against Google, and he should be required to contribute toward the joint and several portion of the Arbitration Award on that basis. Setting aside Uber's fraud claims, Uber is entitled to contribution from Mr. Levandowski as a joint tortfeasor under common law contribution principles.

But there is also substantial evidence of fraud that defeats summary judgment on fraud-based contribution. As shown above, Mr. Levandowski lied to Uber regarding his connection to Tyto. (*See* Part II.A-D.) Those lies began before the Indemnification Agreement was signed, and continued while he orchestrated for Otto to acquire Tyto and for Uber to approve that acquisition. (*Id.*) It continued through the time Uber closed the merger with Otto, thereby acquiring Tyto's technology. (*Id.*) Waymo later argued that at least one of the trade secrets upon which it based its case at trial concerned LiDAR technology, that Mr. Levandowski helped Tyto to develop, which in turn Uber acquired through its acquisition of Otto. (Ex. U-86, Expert Report of L. Hesselink ¶¶ 376-384.) These Tyto-based claims survived all pre-trial litigation and were to be tried to the jury, until Waymo and Uber settled the case. (*See* Waymo Litigation, Dkt. 2520, Second Amended Joint Proposed Pre-trial Order at 1:5-3:25 (listing nine alleged trade secrets Waymo claimed Uber misappropriated to be presented at trial, including Trade Secret 90, which it claimed came from Tyto).) Thus, Mr. Levandowski's fraud related to Tyto caused Uber to be exposed to very serious claims of trade secret misappropriation by Waymo, which Uber paid $250 million to settle. (*See* Ex. U-6, Settlement Agreement § 4(b); Wu Decl. ¶ 4.) Had Uber known of Mr. Levandowski's ██████████████ Tyto, including Waymo's claims to Tyto's LiDAR technology, Uber would not have acquired Otto or Tyto and, thus,

would not have been exposed to such liability to Waymo based on Tyto's technology. (Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8; *see id.* 169:20-170:14.)

In addition, Mr. Levandowski defrauded Uber about his theft of Google trade secrets, which also exposed Uber to enormous liability in the Waymo Litigation. Mr. Levandowski initially insisted that any Google information on his devices was there innocently, that he had not intentionally downloaded it, and that he had no intent to use it at Uber. (*See* Part II.G, *supra*.) About a year later, after the acquisition was complete and the Waymo Litigation was filed, Mr. Levandowski reversed course and admitted to intentionally downloading certain files, but insisted that he only did so to prevent Google from cheating him out of his bonus. (Ex. L-39, Padilla Decl. ¶¶ 6, 10.) Years later, Mr. Levandowski finally pleaded guilty to downloading trade secrets with the intent to use them at Uber, purportedly for his own benefit and Uber's. (Ex. U.-79, Plea Agreement at 2-3.) This misconduct was the central focus of the Waymo Litigation. Waymo claimed that Mr. Levandowski "leveraged stolen information to . . . build a comparable LiDAR system" and did so through the "misappropriation and infringement of Waymo's LiDAR technology" (Waymo Litigation, Dkt. 23, Am. Compl. ¶¶ 10–11; *see also id.* ¶¶ 93, 119, 134.) Ultimately, Waymo argued that all nine trade secrets that would be tried were reflected in materials that Mr. Levandowski had downloaded before he left Google. (Ex. U-87, Supp. Expert Report of L. Hesselink (opining that the Stroz report and the materials in Stroz's possession confirm that Mr. Levandowski downloaded materials related to alleged Trade Secret Nos. 25, 111, 2, 7, 9, 13, 14, 90, and 96).) Had Uber known about Mr. Levandowski's trade secret theft, it never would have entered into the Otto transaction, never would have been exposed to Waymo's claims, and never would have been forced to settle them for $250 million. (Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8; *see id.* 169:20-170:14.)

For these reasons, Mr. Levandowski's fraud is an independent basis for Uber's claim for contribution from Mr. Levandowski. Any contribution or damages judgment based on fraud should not be dischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6).

Because the contribution claims do not depend upon fraud and because, even if they did, there is ample evidence of fraud, summary judgment should be denied as to Count VII (Contribution to Waymo Settlement) and Count IX (Contribution to Ron Settlement).

### C. There Are Material Disputes of Fact Related to Uber's Fraud Claims (Counterclaim Count VI and Defense 7).

Mr. Levandowski attacks Uber's fraud claims and defenses, Counterclaim Count VI and Defense 7, solely on the misrepresentation element of fraud. The elements of fraud are "(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996). Summary judgment should be denied because there are disputed issues of fact relevant to these claims and defenses; specifically, as described in the statement of facts, there is ample evidence that Mr. Levandowski lied to Uber about his trade secret theft and his involvement in Tyto. Although Uber is no longer pursuing rescission based on this fraud, it is entitled to pursue damages for it, including the $250 million it was required to pay to settle claims that were primarily founded on Mr. Levandowski's misconduct.

#### 1. Mr. Levandowski Did Not Disclose to Uber that He Retained Google Confidential Material With an Intent to Benefit Himself and Uber.

As set forth above, prior to execution of the Uber merger agreement with Otto and the Indemnification Agreement, Mr. Levandowski represented to Uber senior management that he would not bring any Google confidential information to Uber. (*See* Part II.G, *supra*.) During the Stroz process, when Stroz asked Mr. Levandowski about Google documents found on his computers, he claimed the information was there innocently, and that he had not intentionally taken anything. (Ex. L-19, April 3, 2016 Memo at 3-4, 14-15, 17-19.) He reiterated in a sworn attestation that everything that he said to Stroz was true, and that except for what he truthfully told Stroz, he complied with all his obligations to Google. (Ex. L-23, April 11, 2016 Attestation ¶¶ 1-2, 4, 6.)

Those representations were false. Mr. Levandowski later admitted that he took that information intentionally and that he took it to benefit himself and Uber, including in his 2020 plea agreement where he admitted that he "*intended to convert a trade secret to the economic benefit of anyone other than the owner thereof*" and that he "stole, or without authorization, appropriated, took, carried away, or concealed such information." (Ex. U-79, Plea Agreement ¶ 1 (emphasis added); Ex. U-62, Levandowski Dep. 470:10-17.) Moreover, the Arbitration Panel found that Mr. Levandowski

(Ex. U-1, Award at 83-84.)

Mr. Levandowski's argument that Uber must have known Mr. Levandowski intended to use Google confidential information at Uber (Mot. at 7) is both unsupported and, at most, an inference which cannot be drawn in his favor on summary judgment. *Fresno*, 771 F.3d at 1125 ("The court draws all justifiable inferences in favor of the non-moving party."). Mr. Levandowski also argues that "any concealment of Mr. Levandowski's true intentions are immaterial" because it was not an element in the Google Arbitration. (Mot. at 7.) But the point is that Mr. Levandowski deceived Uber by misrepresenting his intent, and falsely claiming that his possession of Google information was innocent. As shown above in Part II.G, *supra*, there is ample evidence that Mr. Levandowski intentionally deceived Uber about what he had done with Google trade secrets and why he did it, in order to induce Uber to acquire his company and sign the Indemnification Agreement. Uber did *not* know of Mr. Levandowski's intent to use Google confidential information at Uber, and his concealment of his intention to use Google confidential information is not only material, but heavily disputed. Summary judgment should be denied.

### 2. Mr. Levandowski Made Numerous Misrepresentations to Uber Concealing his Role in Tyto and Did Not Disclose to Uber His Involvement in Tyto.

As discussed in detail above, Mr. Levandowski concealed his role in Tyto and made numerous misrepresentations to Uber about his relationship to Tyto. (*See* Part II.A-F, *supra*.) Mr. Levandowski admits that he did not disclose his true relationship with Tyto either before Uber entered into the Indemnification Agreement on April 11, 2016 or before Uber closed on its acquisition of Otto on August 23, 2016. (Ex. U-62, Levandowski Dep. 224:18-225:21, 228:1-4, 229:8-9, 230:19-24.) The best argument Mr. Levandowski can muster in response is that Uber purportedly knew about his relationship with Tyto because he told Uber executives that he "knew the individuals at Tyto," from the company Velodyne, and that he "had helped them get started." (Mot. at 8.) But, even if he did relay these two vague pieces of information, Uber disputes that either statement amounts to disclosure of his true connection to Tyto. As detailed in Part II.A-F, Mr. Levandowski concealed that he was

(*E.g.*, Ex. U-55, Bentley Dep. 51:22-54:1; Ex. U-67, Sept. 29, 2017 Poetzscher Dep.

665:13-25; Ex. U-30, Mar. 29, 2016 email.) He deceived Mr. Poetzscher by telling him that █████████ ███████████████████████████████████████████ (Ex. U-38, May 5, 2016 email.) He hid his role in May 2016, when he was orchestrating for Uber to approve Otto's acquisition of Tyto, and manipulating both sides of the deal. (Ex. U-62, Levandowski Dep. 401:1-15; Ex. U-38, May 5, 2016 email; Ex. U-68, Ron Dep. 125:3-17, 127:7-13.)

Despite all this evidence that Mr. Levandowski concealed his true relationship with Tyto, he argues that Uber cannot claim it believed and relied on his misrepresentations because Uber has asserted attorney-client privilege over certain communications that took place during the negotiation of the Indemnification and Merger Agreements. (Mot. at 10-12.) This argument implicates the element of reliance, which Mr. Levandowski does not purport to be challenging in his motion. (*See* Mot. at 1 ("Uber cannot identify any misrepresentation whatsoever, let alone a material one. For this reason, summary judgment is warranted.").) But in any event, the argument fails because Uber is not relying on privileged communications to demonstrate reliance—rather, there is ample evidence that the Uber business people who negotiated the deal with Mr. Levandowski in fact relied directly on Mr. Levandowski's statements, and on his failure to disclose his relationship with Tyto. (*See, e.g.,* Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).)[8]

By concealing these facts from Uber, Mr. Levandowski fraudulently induced Uber to enter into the Indemnification Agreement and also caused Uber to acquire Tyto's assets and thereby to acquire the patents, trade secrets, and confidential information related to Tyto's LiDAR technology, prompting claims by Waymo against Uber. This fraud caused Uber damages in the amount of the $250 million that it had to pay to settle the Waymo Litigation.

---

[8] Mr. Levandowski does not accurately describe the ruling on attorney-client privilege issued by Judge Montali. Judge Montali ordered Uber to produce communications between Uber and its outside counsel Morrison & Foerster LLP ("MoFo") dated before April 11, 2016 that reflect, refer, or relate to "statements and mental impressions of MoFo attorneys or [Stroz] personnel regarding Mr. Levandowski's truthfulness, credibility, or Uber's ability to justifiability rely on those statements, devices or documents [. . .]." ECF No. 106, ¶ 2 (Order on Privilege waiver Dispute). Judge Montali did not order Uber to "waive privilege over communications that relate to justifiable reliance," as Mr. Levandowski contends. (Mot. at 11; ECF No. 106, ¶ 2.)

In sum, there are significant disputes of fact related to Mr. Levandowski's fraud on Uber related to his trade secret theft and his concealment of his involvement in Tyto. These disputes preclude summary judgment on Uber's Defense No. 7 (Fraudulent Inducement) and Counterclaim VI (Fraud Damages).

## V.     CONCLUSION

For the foregoing reasons, Mr. Levandowski's motion should be denied.

Dated: March 18, 2021                         PACHULSKI STANG ZIEHL & JONES LLP


By      */s/ Debra I. Grassgreen*
        Debra I. Grassgreen
        Miriam Manning

        —and—

        JENNER & BLOCK LLP
        David J. Bradford
        Catherine Steege
        Terri L. Mascherin
        Katharine R. Ciliberti

        *Counsel for Uber Technologies, Inc.*

# EXHIBIT J

Case: 20-30242   Doc# 1298-2   Filed: 12/04/23   Entered: 12/04/23 14:35:47   Page 459 of 555

Debra I. Grassgreen (CA Bar No. 169978)
Miriam Manning (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:     (415) 263-7000
Facsimile:     (415) 263-7010
E-mail:dgrassgreen@pszjlaw.com
          mmanning@pszjlaw.com

David J. Bradford (admitted *pro hac vice*)
Terri L. Mascherin (admitted *pro hac vice*)
Catherine Steege (admitted *pro hac vice*)
Katharine R. Ciliberti (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Telephone:     (312) 222-9350
E-mail:dbradford@jenner.com
          csteege@jenner.com
          tmascherin@jenner.com
          kciliberti@jenner.com

*Counsel for Uber Technologies, Inc.*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>Debtor. | Case No. 20-30242 (HLB)<br><br>Chapter 11<br><br>Adv. Pro. No. 20-03050 (HLB) |
| ANTHONY SCOTT LEVANDOWSKI,<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | **UBER TECHNOLOGIES, INC.'S AMENDED OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO UBER'S: (1) FRAUD-BASED COUNTERCLAIMS AND DEFENSES, AND (2) EXCLUDED CLAIM DEFENSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Date:  April 1, 2021**<br>**Time:  2:00 PM**<br>**Place:  Video or Telephone** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS .................................................................................... 1

     A.    The Arbitration Award For Which Mr. Levandowski Seeks Indemnification Resulted Primarily From His Involvement In Tyto. .................................. 1

     B.    Mr. Levandowski Created, Formed, and Financed Tyto, and Concealed His Involvement in the Company from Both Google and Uber. .................................. 2

     C.    Mr. Levandowski's Tyto Misconduct Violated Numerous Duties And Obligations to Google, Which Violations Mr. Levandowski Later Concealed From Uber. .................................. 4

     D.    Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz During Its Diligence Process. .................................. 5

     E.    Mr. Levandowski Continued to Conceal His Role in Tyto after the Indemnification Agreement Was Entered. .................................. 6

     F.    Mr. Levandowski Lied About His Involvement in Tyto During the November 3, 2016 Meeting. .................................. 8

     G.    Mr. Levandowski Lied About His Theft Of Google Proprietary Information. ... 9

III.   LEGAL STANDARD ......................................................................................... 12

IV.   ARGUMENT ...................................................................................................... 12

     A.    Uber's Claims and Defenses Based on the Excluded Claim Provision Are Contractual, Not Fraud-Based, and They Are Supported by Ample Evidence. .... 12

          1.    The Indemnification Agreement Excludes Claims Arising From Bad Acts Mr. Levandowski Did Not Truthfully Disclose. ............................... 13

          2.    Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz. .................................. 14

          3.    There Is Evidence That Mr. Levandowski's Involvement in Tyto Is Not Reflected in the Due Diligence Materials Provided to Stroz. ............. 16

     B.    Uber's Contribution Claims Stand Even Without Fraud, and There Is Ample Evidence Supporting Contribution Based on Fraud. .................................. 18

     C.    There Are Material Disputes of Fact Related to Uber's Fraud Claims (Counterclaim Count VI and Defense 7) . .................................. 21

          1.    Mr. Levandowski Did Not Disclose to Uber that He Retained Google Confidential Material With an Intent to Benefit Himself and Uber. ......... 21

2.  Mr. Levandowski Made Numerous Misrepresentations to Uber Concealing his Role in Tyto and Did Not Disclose to Uber His Involvement in Tyto......................................................................22

V.  CONCLUSION............................................................................................24

ii

**Cases**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) .........................................................................................12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .........................................................................................12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .........................................................................................12

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
   771 F.3d 1119 (9th Cir. 2014) .....................................................................12, 22

*Houge v. Ford*,
   285 P.2d 257 (Cal. 1955) ................................................................................13

*Icon Enter. Int'l, Inc. v. Am. Prods. Co.*,
   No. CV 04-1240, 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ......................16

*Knorr-Naehrmittel Aktiengesellchaft v. Knorr Sols., Inc.*,
   No. CV 10-8155, 2011 WL 13217674 (C.D. Cal. Sept. 30, 2011) .................19

*Lazar v. Super. Ct.*,
   12 Cal. 4th 631 (1996) ................................................................................... 21

*Pavoni v. Chrysler Grp. LLC*,
   789 F.3d 1095 (9th Cir. 2015) .......................................................................12

*Sara Lee Corp. v. Kraft Foods, Inc.*,
   276 F.R.D. 500 (N.D. Ill. 2011) .....................................................................16

*Trovata, Inc. v. Forever 21, Inc.*,
   No. CV 07-01196, 2009 WL 10671582 (C.D. Cal. Mar. 4, 2009) .................16

*Valdez v. Super. Ct. of San Bernardino Cty.*,
   No. E070656, 2019 WL 1236932 (Cal. Ct. App. Apr. 4, 2019) .....................13

**Statutes**

11 U.S.C. § 523(a) ...............................................................................................21

**Other Authorities**

Fed. R. Civ. P. 56(a) ............................................................................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    INTRODUCTION

Plaintiff Anthony Levandowski ("Mr. Levandowski") moves for partial summary judgment as to Uber Technologies, Inc.'s ("Uber") Defenses Nos. 5 (Excluded Claim), 7 (Fraudulent Inducement), and 9 (Reimbursement for Excluded Claim), and Counterclaims IV (Declaratory Judgment re Excluded Claim), VI (Fraud Damages), VII (Contribution to Waymo Settlement), and IX (Contribution to Ron Settlement) (the "Motion").[1]  (Mot. at 1.)  In his Motion, Mr. Levandowski paints with a broad brush, erroneously suggesting that Uber's claims and defenses based upon fraud, plus the Excluded Claim defense and Contribution claims, all require proof of the elements of common law fraud. In fact, only Defense 7 (Fraudulent Inducement) and Counterclaim VI (Fraud Damages) depend on proof of fraud, and the remaining claims and defenses do not.  Further, there is ample evidence to support each of these claims and defenses, and numerous disputes of material facts that preclude summary judgment as to the single claim and defense that depend on proof of Mr. Levandowski's fraud.  For these reasons and as set forth below, the Motion should be denied in its entirety.

# II.    STATEMENT OF FACTS [2]

Mr. Levandowski's purported "Statement of Undisputed Material Facts"—and his Motion generally—ignore numerous disputed issues of material fact that preclude summary judgment.  The following are just some of the core facts he ignores—some of which are undisputed in *Uber's* favor, and others of which are hotly disputed.

### A.    The Arbitration Award For Which Mr. Levandowski Seeks Indemnification Resulted Primarily From His Involvement In Tyto.

Mr. Levandowski seeks indemnification for a judgment confirming an arbitration award (the "Award") in the amount of approximately ███████████████. (Am. Compl. ¶ 161, Dkt. 49; Ex. U-1, Award at 123.)[3]  The largest component of that Award constituted disgorgement of about

---

[1] Although Mr. Levandowski moves for summary judgment on Counterclaims VII and IX, he fails to even mention these claims in the body of his Motion.  For that reason, Uber only briefly addresses them in Part IV.B below.

[2] To avoid repetition, Uber sets forth here facts that are relevant not just to this opposition to the Motion, but also to Uber's opposition to Mr. Levandowski's separate Motion for Partial Summary Judgment Based on Statute of Limitations (Dkt. 122).

[3] Uber's exhibits in support of this opposition are attached to the Omnibus Declaration of Katharine Ciliberti in Support of Uber's Opposition to Mr. Levandowski's Motions for Partial Summary Judgment, and are referenced hereinafter with the following designations: Ex. U-1, Ex. U-2, Ex. U-

[REDACTED] in compensation that Mr. Levandowski received when he left Google, plus [REDACTED] on that compensation. (Ex. U-1, Award at 123.) That [REDACTED] component of the [REDACTED] Award was based mainly on the Panel's finding that, during the multiple years he earned that compensation, Mr. Levandowski breached his employment agreements with, and the duty of loyalty to, Google by creating, funding and controlling a competing business, Tyto LiDAR, LLC ("Tyto") (collectively the "Tyto misconduct").[4] The Arbitration Panel concluded that [REDACTED]

(Ex. U-1, Award at 47.) The Panel also found, and Mr. Levandowski now admits, that [REDACTED] (Ex. U-1, Award at 34; Ex. U-62, Levandowski Dep. 251:20-253:7.) Although Mr. Levandowski was disloyal to Google in other ways as well, the Tyto misconduct occurred continuously throughout the entire period that Mr. Levandowski acted disloyally and the entire period during which his [REDACTED]. (Ex. U-1, Award at 34, 46-47, 59-61, 68, 82.)

As discussed in the next several sections, there is summary judgment-defeating substantial evidence that Mr. Levandowski hid his true role in Tyto from Uber. Mr. Levandowski admits he did not disclose his involvement with Tyto to Stroz in response to relevant questions during his interview, and argues only that Stroz should have somehow been able to locate needle-in-a-haystack documents on his computers and divine from them his secret involvement in Tyto. (Mot. at 9-10.)

**B.** **Mr. Levandowski Created, Formed, and Financed Tyto, and Concealed His Involvement in the Company from Both Google and Uber.**

As the Panel found, Mr. Levandowski schemed to form, finance, and commercialize Tyto and helped it develop commercially valuable LiDAR technology, in direct competition with his work at Google. This scheme began as early as 2012, and after going to great lengths to conceal it from Google for four years, Mr. Levandowski deceived Uber by concealing his involvement in Tyto in response to

---

3, etc. References to exhibits cited by Mr. Levandowski have the following designations: Ex. L-1, Ex. L-2, Ex. L-3, etc.

[4] Tyto was previously known as Odin Wave, LLC. (Ex 23, Feb. 7, 2014, Amendment to Articles of Organization of Odin Wave; Ex. 60, Gardner Dep. 30:6-8.) In this Opposition, Uber will refer to the company as "Tyto."

direct questions during Uber's due diligence process. Mr. Levandowski entered into both the Indemnification Agreement ("Indemnification Agreement" or "Agreement") and a merger agreement between Uber and his company, Ottomotto LLC ("Otto"), on April 11, 2016, without disclosing his controlling role in Tyto. Then, in May 2016, Mr. Levandowski engineered the acquisition of Tyto by Otto, again concealing his controlling role in Tyto from Uber, and therefore concealing that he stood on both sides of the transaction. Because Uber later closed the transaction to merge with Otto in August 2016, Mr. Levandowski's secret role in Tyto caused Uber to acquire all of Tyto's LiDAR technology – without knowing that Mr. Levandowski had helped Tyto develop that technology while he had been secretly competing with Google between 2012 and January 2016.

As the Panel found,



**C.** **Mr. Levandowski's Tyto Misconduct Violated Numerous Duties And Obligations to Google, Which Violations Mr. Levandowski Later Concealed From Uber.**

When Mr. Levandowski took these actions with respect to ████████████████ he was serving as Software Engineer Manager and Project Founder of the team ████████ ████████████████████████████████████████████████ (Ex. U-9, Jan. 1, 2012 Employment Agreement at 1; Ex. U-1, Award at 25; Ex. U-72, Arb. Hearing Tr. at 587:25-588:3 (Bailey).)

The Arbitration Panel found that ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ (Ex. U-1, Award at 47, 68, 82, 84; *see also* Exs. L-32; U-83; U-84; U-85 (Google Codes of Conduct).) The Panel further found that ████████████████████████████████████████████████████ ██████████ (Ex. U-1, Award at 86-87.)

Mr. Levandowski cannot pretend he thought Google allowed this type of competitive activity. In early 2011, he entered into the two NCNS Agreements. In those agreements, he agreed that he would ████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████ (Ex. U-1, Award at 26-29; *see also* Exs. U-7; U-8 (NCNS Agreements).)  Aware

his Tyto misconduct constituted a breach of loyalty, ███████████████████████

█████████████████████████████████████████████████

██████ (Ex. U-1 Award at 34; *see also* Ex. U-57, Cooper Dep. 184:4-185:8.)

### D. Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz During Its Diligence Process.

Prior to April 11, 2016, Uber's and Otto's counsel, retained Stroz, a third-party forensic examiner, to conduct due diligence on Mr. Levandowski and the other principals of Otto. (Ex. U-29, March 4, 2016 Engagement Ltr.; Ex. U-73, M. Fulginiti Genow Decl. ¶ 4 (hereinafter "Genow Decl.").)

Stroz professionals interviewed Mr. Levandowski extensively for two days on March 22 and 23, 2016.  (Ex. L-19, April 2, 2016 Memo at 1; Ex. U-73, Genow Decl. ¶¶ 6-25; Ex. U-62, Levandowski Dep. 271:9-12.)  They asked him, among other things, to identify all side projects he was involved in while he worked for Google, including any project where he was an owner, investor (either direct or indirect) or had any role in advising (whether paid or unpaid).  (Ex. U-73, Genow Decl. ¶¶ 18-20, 23.)  In response to Stroz's request that Mr. Levandowski identify ███████████

█████████████████████████████████████████████████

████████████████████████████ (Ex. L-19, April 2, 2016 Memo at 2-3); Ex. U-73, Genow Decl. ¶¶ 17-22, 24.)  Mr. Levandowski admits this. (Mot. at 10.)  Many of the businesses that Mr. Levandowski identified had nothing to do with the type of work he did at Google.  (Ex. L-19, April 2, 2016 Memo at 2-3.)  Tyto, by contrast, involved LiDAR, which was precisely what he worked on at Google.  (Ex. U-62, Levandowski Dep. 90:12-17; Ex. U-1, Award at 20-21.)  During the interview, Mr. Levandowski also ████████████████████████████████████████

██████ which clearly was not true as to Tyto.  (Ex. L-19, April 2, 2016 Memo at 2-3 (emphasis added); *see also* Ex. U-73, Genow Decl. ¶¶ 22-23.)

Following that interview, Mr. Levandowski's counsel, Mr. Gardner (who had drafted the documents to create Tyto) reviewed a list of proposed search terms for Stroz's forensic review.  (Ex. L-85, April 3, 2016 Gardner email.)  That list included the names of all of the side businesses that Mr.

Levandowski had disclosed to Stroz, but omitted "Tyto" and "Odin Wave." (*Id.*; Gardner Dep. 171:10-173:14 (admitting he didn't provide Tyto or Odin Wave as search terms).) Gardner did not tell Stroz it should search for "Tyto" or "Odin Wave." (*Id.*)

In addition, on April 11, 2016, Mr. Levandowski signed an attestation in connection with the Stroz process. (Ex. L-23, April 11, 2016 Attestation.) He falsely attested:

- "[. . .] (a) I *have provided good faith, complete and truthful responses in all material respects to Stroz's questions* and (b) all of the information I have provided to Stroz is true and correct in all material respects." (Ex. L-23, April 11, 2016 Attestation ¶ 6 (emphasis added).)

- "I have provided to Stroz copies of and/or otherwise advised Stroz of any agreements or other obligations to which I am subject with 'Former Employer' . . . (collectively, 'Agreements'), and subject to any matters or information disclosed to Stroz, I have complied with my obligations under any Agreements." (Ex. L-23, April 11, 2016 Attestation ¶ 1.)

Contrary to those attestations, Mr. Levandowski (a) did not disclose to Stroz his involvement in Tyto, which breached several fiduciary, contractual, and statutory duties and obligations to Google, and (b) did not disclose certain agreements with Google, including the two 2011 NCNS Agreements that he had violated. (Ex. L-23, April 11, 2016 Attestation; Ex. L-22, April 10, 2016 Attestation; Ex. L-19, April 2, 2016 Memo at 2-3.)[5]

### E. Mr. Levandowski Continued to Conceal His Role in Tyto after the Indemnification Agreement Was Entered.

Even after April 11, 2016, Mr. Levandowski continued to conceal from Uber his role in Tyto. In early May 2016, Mr. Levandowski arranged for Otto to acquire Tyto, including its LiDAR technology, patents, trade secrets, and confidential information. (Ex. U-36, May 5, 2016 Asset Purchase Agreement; Ex. U-39, May 9, 2016 Bill of Sale.) Uber's approval was required before Otto could acquire Tyto, because of the pending merger between Uber and Otto. (Ex. U-33, Ottomotto Merger Agreement. § 4.3(j).)

---

[5] In fact, this attestation was false and fraudulent in several other ways as well, including for reasons discussed below in Part G. Uber details all the ways in which this attestation was false in its response to Mr. Levandowski's Fourth Set of Interrogatories, attached as Exhibit L-48.

Mr. Levandowski persuaded Uber to authorize Otto to acquire Tyto's LiDAR technology and hire its personnel, while concealing his controlling role. (Ex. U-62, Levandowski Dep. 380:17-382:1; Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 162:15-163:6; Ex. U-67, Sept. 29, 2017 Poetzscher Dep. 661:24-662:18, 664:15-666:12.) While Mr. Levandowski was advocating with Uber to approve the acquisition, he was also secretly outlining with Tyto's manager, Ognen Stojanovski, both the terms that Tyto wanted and what Tyto would do with the proceeds of the deal. (Ex. U-34, April 28, 2016 email; Ex. U-35, April 30, 2016 email.) At the same time, he was discussing with Mr. Stojanovski how to keep Uber from finding out about his "debatable indirect relationship" with Tyto. (Ex. U-30, March 29, 2016 email.)

Prior to Otto's acquisition of Tyto, Mr. Levandowski never disclosed to Uber his role in creating, controlling, or funding Tyto. (Ex. U-62, Levandowski Dep. 224:23-225:21, 228:1-229:9.) Nor did Mr. Levandowski disclose his involvement in developing Tyto's LiDAR technology. (*Id.* at 224:18-22, 230:19-24.) Instead, Mr. Levandowski told Uber only that "he knew the Tyto team well, dating back to their time pre-Tyto [*i.e.*, pre-2012] when they were working at Velodyne, and that he helped them get started," and that "he believed Otto could acquire Tyto for around $8 million because of his relationship with the Tyto team." (Ex. L-65, Levandowski's Supp. Resp. to Uber's First Set of Interrogatories at 4; Ex. U-62, Levandowski Dep. 215:19-216:1, 217:20-218:5.) Regarding Tyto's ownership, Mr. Levandowski told Cameron Poetzscher, Uber's head of corporate development, that "one guy had nearly all of [Tyto]" but did not reveal that *he* was that person (through his exclusive ownership and control of Sandstone). (Ex. U-62, Levandowski Dep. 401:2-15; Ex. U-38, May 5, 2016 email).

Before Uber approved the acquisition, Mr. Poetzscher asked Lior Ron, one of the other principals of Otto, "Who is that guy?" referring to Mr. Levandowski's statement. (Ex. U-38, May 5, 2016 email.) Mr. Levandowski hid even from Mr. Ron the fact that he was the sole source of Tyto's funding. (Ex. U-68, Ron Dep. 127:7-13.) Thus, Mr. Ron unwittingly furthered the deception, responding to Mr. Poetzscher that Tyto was "100% owned by an investment holding company managed by Ognen Stojanovski" and that it was "likely family money." (Ex. U-38, May 5, 2016 email).

This acquisition caused Uber to acquire technology from Otto that Waymo and Google claimed used Google confidential information that Mr. Levandowski acquired while working at Google. (*See* Ex. U-86, Expert Report of L. Hesselink ¶¶ 376-384.) Thus, the acquisition exposed Uber to substantial trade secret claims by Waymo, which were to be tried to the jury until the Uber-Waymo settlement. (*Id.*; *see also Waymo LLC v. Uber Technologies, Inc.*, No. 3:17-cv-00939-WHA ("Waymo Litigation"), Dkt. 2520, Second Amended Joint Proposed Pre-trial Order at 1:5-3:25 (listing nine alleged trade secrets Waymo claimed Uber misappropriated to be presented at trial, including "trade secret 90," which Waymo alleged came from Tyto).) Uber never would have acquired Otto, or permitted Otto to acquire Tyto, if it had known that ███████████████████████████████ ███████████████████████████████████. Mr. Poetzscher has testified, ████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████ (Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8; *see id.* 169:20-170:14.)

### F. Mr. Levandowski Lied About His Involvement in Tyto During the November 3, 2016 Meeting.

Mr. Levandowski continued to conceal his relationship with Tyto from Uber even after Google initiated arbitration against him and Waymo initiated litigation against Uber. On November 3, 2016, counsel for Uber, Eric Tate, together with Uber in-house counsel, Justin Suhr, interviewed Mr. Levandowski about Google's allegations. During the interview, Mr. Tate asked Mr. Levandowski "open-ended questions about [Tyto/Odin Wave]; basically . . . do you have any involvement in them? Are you an employee? Owner? Shareholder? Do you get money from them?" (Ex. U-71, Tate Dep. 230:15-231:3; *see also id.* at 232:23- 233:5, 236:7-18.)

In response, Mr. Levandowski continued to mislead Uber, "disclaim[ing] any ownership involvement, investment, or any significant touch points with Tyto LIDAR." (Ex. U-70, Suhr Dep. 143:14-23; *see also* Ex. U-62, Levandowski Dep. 445:6-10; Ex. L-38, Tate Notes.) Uber's understanding, from the interview, was "that Tyto LIDAR was not something that he was responsible for, knew much about, nor was he involved in, and that he outright rejected the allegation that this was something that was a side business of his and that he was competing with Google at the time." (Ex. U-70, Feb. 8, 2021 Suhr Dep. 143:14-23.) Mr. Levandowski also assured Uber he never disclosed

any Google intellectual property to Tyto. (Ex. L-38, Tate Notes at 3.) He admitted only that he "owned the building" where Tyto was located, that Tyto was "[m]anaged by [his] friend," and that he "helped [Tyto]." (Ex. L-38, Tate Notes at 2-3; *see also* Ex. U-71, Tate Dep. 238:13-239:3.)

### G. Mr. Levandowski Lied About His Theft Of Google Proprietary Information.

In addition to Mr. Levandowski's concealment of the Tyto misconduct, there is ample evidence that Mr. Levandowski concealed from Uber his theft of trade secrets from Google. Although Mr. Levandowski contends that Uber knew or should have known about his theft, at a minimum, the evidence gives rise to a material disputed issue of fact as to whether Uber was defrauded.

The evidence shows that at no time prior to his guilty plea for theft of trade secrets in March 2020 did Mr. Levandowski disclose to Uber that he had taken Google confidential information with the intent to use it to benefit himself and (supposedly) Uber. (Ex. L-23, April 11, 2016 Attestation ¶ 1.) Prior to April 11, 2016, in discussions with Uber senior management, Mr. Levandowski "never discussed downloading materials with Google; in fact, quite the opposite." (Ex. U-66, June 19, 2017 Poetzscher Dep. 103:9-104:16.) Mr. Poetzscher testified, "We said [to Mr. Levandowski] we absolutely don't want any third-party IP, Google or otherwise. And he assured us he would not bring or download anything." (*Id.* at 103:9-17; *see also id.* at 80:6-81:19, 108:5-109:4, 262:3-16; Ex. U-61, Kalanick Dep. 44:10-45:9, 58:15-20.) When Stroz interviewed him and found some Google information on his laptop, Mr. Levandowski stated that Google information was stored there ▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (Ex. L-19, April 2, 2016 Memo at 4, *see also id.* at 4-15, 17-19.) Mr. Levandowski represented that ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (*Id.* at 19 (emphasis added).) He acted surprised at the amount of Google-related information that was on his laptop, and he said ▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (*Id.*)[6] He stated that ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

---

[6] Mr. Levandowski points to the Stroz Report showing that a file titled "Chauffer TL weekly updates Q4 2015" was accessed after he left Google. (Ex. L-20 at 12.) Stroz was never able to determine whether that file was accessed by a human as opposed to a system process, and Mr. Levandowski attested that he did not recall accessing it. (*See, e.g.,* Ex. U-69, Maugeri Dep. 280:11 – 281:9; Ex. U-90, Tate email; *see also* Ex. U-22, April 10, 2016 Attestation.) Mr. Levandowski states his April 11,

███████████████████████████ and then acted surprised that there were Google emails synced to his computer. (*Id.*) Mr. Levandowski further stated that he ████████████████████████ ████████████ (*Id.* at 17.) He said that he had never downloaded any Google files to his personal devices with the intention of leaving Google. (Ex. U-73, Genow Decl. ¶¶ 32-33.) In all, he claimed that the Google documents on his devices were there innocently or even accidentally, pursuant to legitimate and permitted activities when he worked for Google; that he had by no means stolen them; and that he had no intent to use them. The falsity of Mr. Levandowski's statements only came to light years later.

On February 23, 2017, Waymo sued Uber for trade secret misappropriation based on Mr. Levandowski's taking of confidential Google proprietary information. (*See* Waymo Litigation, Dkt. 1.) Mr. Levandowski continued to misrepresent to Uber whether and why he took and retained Google confidential information, even after Waymo filed that suit. On March 29, 2017, Mr. Levandowski told Travis Kalanick (then CEO of Uber) and Angela Padilla (then Vice President, Deputy General Counsel of Uber) that he had intentionally downloaded and retained Google files, but not for use at Uber; rather, he claimed he had done so only because he was worried that Google would not pay him his bonus and he wanted to be able to demonstrate the work he had done to earn that bonus. (Ex. L-39, Padilla Decl. ¶ 6; Ex. U-64, Padilla Dep. 82:22-83:12.) This was the first time Mr. Levandowski represented to Uber that he had intentionally taken Google confidential information, and he insisted he had done so only for his own benefit. (*Id.*)

When asked in his deposition whether he told Mr. Kalanick and Ms. Padilla in March 2017 that he had downloaded Google confidential information for the purpose of benefiting *Uber*, Mr. Levandowski testified that he told them he had downloaded the information so that Google would "pay the bonus that was due" on his work for Project Chauffeur. (Ex. U-62, Levandowski Dep. 470:19-471:12.) Mr. Levandowski admitted that he "did not use the words specifically that [he]

---

2016 attestation followed "heavy negotiation." (Mot. at 6.) If, by so arguing he intends to suggest that he was trying to hide something from disclosure in the attestation, with hindsight that certainly appears to have been the case. Mr. Levandowski also argues that he told Uber that he possessed "everything you need to create a self-driving car," (*Id.* at 7), but he told Uber executives in March 2016 that he destroyed the discs containing that information. (Ex. L-18; Ex. L-19 at 14-15.)

downloaded the Chauffeur weekly update to benefit Uber," but claimed that the "situation and the benefit to Uber is implicit in those actions, not as part of the words." (*Id.*)

Mr. Levandowski's theft of trade secrets caused Uber to face serious exposure to Waymo in the Waymo Litigation. In March 2017, upon learning of Mr. Levandowski's intentional downloading of Google files, Judge Alsup, who presided over the Waymo case, entered a preliminary injunction order requiring, among other things, that Uber investigate who had been given access to the information that Mr. Levandowski had taken from Google. (*See* Waymo Litigation, Dkt. 426, May 11, 2017 Order Mot. Prov. Relief at 24:3-28.) Waymo asserted, among other things, that Uber had benefited from Mr. Levandowski's secret use of Google confidential information. (Waymo Litigation, Dkt. 2520, Second Amended Joint Proposed Pre-trial Order at 1:5-3:25 (listing nine alleged trade secrets Waymo claimed Uber misappropriated to be presented at trial).) Waymo also contended that all nine of the trade secrets upon which it based its case at trial were related to Google documents that Mr. Levandowski had downloaded on his devices. (Ex. U-87, Supp. Expert Report of L. Hesselink (opining that the Stroz report and the materials in Stroz's possession confirm that Mr. Levandowski downloaded materials related to alleged Trade Secret Nos. 25, 111, 2, 7, 9, 13, 14, 90, and 96).). In February 2018, Uber entered into a Settlement Agreement agreeing to pay in excess of $250 million in consideration to settle Waymo's claims. (Ex. U-6, Settlement Agreement § 4(b).)

Two years later, on March 19, 2020, Mr. Levandowski pleaded guilty to one felony count of theft of trade secrets, admitting under oath that he "intended to convert a trade secret to the economic benefit of anyone other than the owner thereof;" that he "stole, or without authorization, appropriated, took, carried away, or concealed such information," and that he "intended to use the [trade secret] to benefit [himself] and Uber." (Ex. U-79, Plea Agreement ¶ 1 & p. 3, *United States v. Anthony Scott Levandowski*, Case No. 3:19-cr-00377-WHA (N.D. Cal.) (hereinafter "Plea Agreement"); Ex. U-80, Aug. 4, 2020 Sentencing Tr. at 18.) Mr. Levandowski admitted that he "downloaded at least 20 files from Google Drive between October 2015 and January 2016, including an internal tracking document entitled 'Chauffeur TL weekly updates – Q4 2015," that he "downloaded this file with the intent to use it for the benefit of someone other than Google," and that it "contained a variety of details regarding the status of Google's self-driving car program . . . as well as summaries of technical

challenges currently faced by the program and notes related to previous challenges that had been overcome." (Ex. U-79, Plea Agreement at 3.)

### III.   LEGAL STANDARD

Summary judgment should not be granted where there is a "genuine dispute" as to any "material fact." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). It is the moving party's burden to demonstrate the absence of a genuine issue of material fact, and all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 248. Even when the basic facts are undisputed, if reasonable minds could differ on the inferences to be drawn from those facts, summary judgment should be denied. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Pavoni v. Chrysler Grp., LLC*, 789 F.3d 1095, 1098 (9th Cir. 2015).

### IV.   ARGUMENT

#### A.   Uber's Claims and Defenses Based on the Excluded Claim Provision Are Contractual, Not Fraud-Based, and They Are Supported by Ample Evidence.

Mr. Levandowski conflates Uber's fraud-based claims with its contractual defenses and counterclaims based on the Excluded Claim provision in the Indemnification Agreement. The premise of Uber's Excluded Claim defenses and counterclaims is that the Award resulted primarily from Mr. Levandowski's Tyto misconduct, which is an Excluded Claim under the meaning of the Indemnification Agreement, regardless whether Mr. Levandowski acted with intent to deceive and whether Uber reasonably relied upon his false statements. As a matter of contract, the Tyto misconduct is an Excluded Claim because Mr. Levandowski failed to truthfully disclose his involvement in Tyto when Stroz asked whether he was involved with any "side projects" while employed by Google. (Ex. L-19, April 2, 2016 Memo at 2-3.) To assert this contractual defense and counterclaim, Uber does not need to show the elements of fraud; it does not have to show materiality, or that Mr. Levandowski intended to deceive Uber, or that Uber relied on statements made by Mr. Levandowski to its detriment.

Thus, even if Mr. Levandowski were correct that Uber could not prove fraud (he is not), this would not warrant summary judgment on Uber's Excluded Claim defenses and counterclaims.

### 1. The Indemnification Agreement Excludes Claims Arising From Bad Acts Mr. Levandowski Did Not Truthfully Disclose.

Mr. Levandowski argues that Uber "agreed broadly to indemnify [him] for claims that Google might assert against [him]." (Mot. at 1.) But he studiously avoids discussing the actual language of the Indemnification Agreement. Section 2.1 defines the types of claims that will be indemnified, "Indemnified Claims," as well as the types of claims that will not be indemnified, "Excluded Claims." (Ex. U-2, Agreement § 2.1(b).) Section 2.1(b)(ii) defines one category of Excluded Claim: "claims that . . . reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either*** (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries in connection with the due diligence performed by the Outside Expert ***or*** (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees to the Outside Expert." (*Id.* § 2.1(b)(ii) (emphasis added).)

Under the plain meaning of that section, only one of (A) *or* (B) need be established in order for a claim to be an Excluded Claim. This is evident from the use of the disjunctive "either" "or." It is a well-established principle of contract construction that an "either" "or" disjunction means only *one* of the listed alternatives is required. *See Houge v. Ford*, 285 P.2d 257, 260 (Cal. 1955) ("the words 'protect or collect' were obviously used advisedly and with reference to the two alternative possibilities; and there is no reason here for construing the word 'or' in any way other than in its 'ordinary and popular sense' . . . the function of the word 'or' is to mark an alternative such as 'either this or that'"); *Valdez v. Super. Ct. of San Bernardino Cty.*, No. E070656, 2019 WL 1236932, at *2 (Cal. Ct. App. Apr. 4, 2019) (rejecting argument that both factors needed to exist because the rule "used the disjunctive word 'or' instead of the conjunctive word 'and' to connect the two factors, meaning, of course, that the presence of either factor alone is sufficient").[7]

---

[7] While the import of this disjunctive language is clear, the parol evidence makes even more clear that the parties intentionally chose the "either/or" construct. As originally drafted, Section 2.1(b)(ii) used the word "and" between subsections (A) and (B), and did not contain the word "either." Uber changed that to "███████████████," and that language appears in the final contract. (*See* Ex. U-27, Feb. 9, 2016 draft Indemnification Agreement at 6 ████████████████████████████████████████.)

As discussed next, the Tyto misconduct is an Excluded Claim for two independent reasons. First, Mr. Levandowski did not disclose it to Stroz in response to relevant questions. And second, Mr. Levandowski cannot show by undisputed evidence that his involvement in Tyto was "contained or reflected" in the terabytes of data that he gave to Stroz.

### 2. Mr. Levandowski Did Not Truthfully Disclose His Involvement in Tyto to Stroz.

There is ample evidence that subsection 2.1(b)(ii)(A) was met here: Mr. Levandowski failed to truthfully disclose his involvement with Tyto in response to relevant inquiries by Stroz. Mr. Levandowski admits he did not tell Stroz about his involvement with Tyto. (Mot. at 10; *see* Ex. L-19, April 2, 2016 Memo at 3.) That alone is sufficient to prove the Excluded Claim defense and, at a minimum, to defeat summary judgment.

Mr. Levandowski argues that there is no evidence of precisely what questions Stroz asked him, apparently suggesting that he would have disclosed Tyto if only Stroz had tailored its questions more closely to his scheme. (Mot. at 9-10.) To the contrary, Mary Fulginiti Genow, who led the questioning in the interview, attests that she asked Mr. Levandowski to identify all side projects that he was involved in, including any project where he was an owner, investor, or had any role in advising, and that she did not limit the questions to only side projects in which he invested "directly" in a company or was a "paid" advisor. (Ex. U-73, Genow Decl. ¶¶ 16-20.) She asked about his ownership in any business or project, whether he invested in any business or project, whether he was an advisor to any business or project, and whether he was involved in any business or project. (Ex. U-73, Genow Decl. ¶ 18.) Ms. Fulginiti Genow's outline for the interview, which she used to guide her questioning, reflects that she asked Mr. Levandowski ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (Ex. U-73, Genow Decl. at ¶¶ 12, 16; *id.* at Exhibit C at STROZ_0021143, STROZ_0021147.) Notes of the interview reflect that he was asked about any ███████████████████████████████████████████████████████████ (Ex. U-73, Genow Decl. ¶¶ 19-20; *id.* at Exhibit E at STROZ_0021165; Ex. U-58, Fulginiti Genow Dep. 113:8-22.)

For his part, Mr. Levandowski claims he thought he was only asked to disclose projects where he was a "paid advisor." (Mot. at 10 (citing Ex. L-26, Levandowski Dep. 276:23-278:9, 280:1-11).) But Mr. Levandowski admits that he "do[esn]'t know exactly what questions were asked." (Ex. U-62, Levandowski Dep. 293:10-14.)  And even if Stroz had asked only about businesses for which Mr. Levandowski was a "paid advisor," by his own definition, Tyto would have been responsive to that question.  Mr. Levandowski *did* provide financial support to Tyto, which he considered to be part of the role of a "paid advisor."  (Ex. U-62, Levandowski Dep. 287:25-291:13.)  He provided financial support to Tyto in multiple ways, including (a) loaning $925,000 to Sandstone which, in turn, loaned that money to Tyto, (b) providing Tyto indirect funding through Sandstone and two trusts, and (c) paying directly for equipment for Tyto's use. (Ex. L-66, Levandowski Resp. to Uber's Second Set of Interrogatories at 10 ("In 2015 to 2016, Mr. Levandowski provided about $925,000 in loans to Sandstone Group LLC"); Ex. U-62, Levandowski Dep. 287:25-291:13; Ex. U-1, Award at 33, 46-47.)

Mr. Levandowski also asserts that he answered Ms. Fulginiti Genow's questions intending to disclose only "side projects" that he thought would be implicated by Google's Code of Conduct or that he thought would be a conflict of interest.  (Mot. at 10; Ex. U-62, Levandowski Dep. 278:10-280:10.)  Tyto falls within those categories, but Ms. Fulginiti Genow attests that her questions were not so limited.  Further, this argument makes no sense.  Mr. Levandowski disclosed several side projects that were far afield from the work Google was doing, and therefore would not have been a conflict of interest or a violation of the Code of Conduct—such as a dating app and a real estate development fund.  (Ex. L-19, April 2, 2016 Memo at 2-3.)  Tyto was by far the most relevant side project Mr. Levandowski was involved in, leading the Arbitration Panel to order disgorgement of his compensation and awarding Google over a hundred million dollars.  Accordingly, there is a dispute of fact as to whether Mr. Levandowski possibly could have had an innocent explanation for not mentioning Tyto.

Mr. Levandowski attempts to avoid this evidence by arguing that Uber cannot present evidence of what Ms. Fulginiti Genow asked him because Stroz's Rule 30(b)(6) deponent was not present for the interviews and could not testify to the exact questions asked during the interviews. (Mot. at 9-10.) But Stroz's Rule 30(b)(6) witness's lack of knowledge does not preclude testimony from another Stroz

employee. *Trovata, Inc. v. Forever 21, Inc.*, No. SACV 07-01196, 2009 WL 10671582, at *4-5 (C.D. Cal. Mar. 4, 2009) ("the testimony of a Rule 30(b)(6) designee is not preclusive"); *see also Icon Enter. Int'l, Inc. v. Am. Prods. Co.*, No. CV 04-1240, 2004 WL 5644805, at *6 (C.D. Cal. Oct. 7, 2004) ("statements made by the designee are *not* tantamount to a judicial admission") (emphasis in original). Indeed, the testimony of a non-party Rule 30(b)(6) witness is only admissible in limited purposes, not present here. *See Sara Lee Corp. v. Kraft Foods, Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. Aug. 11, 2011) ("where the Rule 30(b)(6) witness is a non-party, the admission of testimony based on corporate knowledge should be limited to topics that are particularly suitable for Rule 30(b)(6) testimony [including the] corporation's official position . . . corporate policies and procedures, or the corporation's opinion about whether a business partner complied with the terms of a contract").

In response to Stroz's questions, Mr. Levandowski also falsely stated that he had disclosed all of his "side projects" to Google. (Ex. L-19, April 2, 2016 Memo at 3; Ex. U-73, Genow Decl. ¶¶ 21-23.) That was untrue, as Mr. Levandowski now admits ███████████████████████████████. (Ex. U-1, Award at 34; Ex. U-62, Levandowski Dep. 251:20-253:7.) Thus, there is ample evidence that Mr. Levandowski did not "truthfully disclose" his Tyto misconduct to Stroz during the due diligence process. (Ex. U-2, Agreement § 2.1(b)(ii).) At a minimum, this evidence establishes an issue of disputed fact that precludes summary judgment.

### 3. There Is Evidence That Mr. Levandowski's Involvement in Tyto Is Not Reflected in the Due Diligence Materials Provided to Stroz.

In the face of all of this evidence that Mr. Levandowski failed to truthfully disclose his relationship with Tyto to Stroz, Mr. Levandowski argues that his Tyto misconduct is not an Excluded Claim because it turns out there were documents on devices that he turned over to Stroz that contained some information relating to Odin Wave, Tyto's predecessor. (*See* Mot. at 8-9.) He invokes Section 2.1(b)(ii)(B) and appears to contend that the Tyto misconduct is not an Excluded Claim if he shows that the devices provided to Stroz contained a document regarding Tyto. (*Id.*) As shown above, that argument is foreclosed by the language of Section 2.1(b)(ii) —the Tyto misconduct is an Excluded Claim because he did not truthfully disclose his extensive involvement with Tyto in response to direct questions from Stroz, as subsection (A) required. (Ex. U-2, Agreement § 2.1(b)(ii)(A).) But even if

Case 3:17-cv-00939-WHA Document 2298 Filed 04/05/21 Page 20 of 26
Case 3:17-cv-00939-WHA Document 2548 Filed 04/25/21 Entered 04/25/21 19:34:47 Page 20 of 26
479 of 555

the "either" "or" language of that section could somehow be interpreted as requiring Uber to prove *both* subparts A and B, the claim would still be an Excluded Claim.

The factual evidence at trial will show the complete context in which this argument must be evaluated. Mr. Levandowski provide more than a dozen devices and terabytes of data to Stroz. (Ex. L-19, Interview Memo at 18-20.) The evidence shows that Mr. Levandowski withheld from Stroz the critical information needed to identify, and understand the significance of, documents relating to Tyto. (Ex. U-59, Stroz 30(b)(6) Friedberg Dep. 162:15-163:2.) One of the purposes of the Stroz interview was to aid the forensic examiners in searching the data on his devices to find potentially relevant documents. (Ex. U-73, Genow Decl. ¶¶ 6, 26; Ex. U-59, Stroz 30(b)(6) Friedberg Dep. at 94:8-24.) After the interview, Stroz worked with counsel for Mr. Levandowski, Uber and Otto to develop search terms to run through the data collected from the numerous computers, phones, cloud-based accounts and other devices produced by Mr. Levandowski. (Ex. U-59, Stroz 30(b)(6) Friedberg Dep. 64:9-13, 66:2-8.) Mr. Gardner, who incorporated Tyto, provided a list of search terms to Stroz. His list included the names of all of the "side projects" that Mr. Levandowski disclosed to Stroz, but omitted the terms "Tyto" and "Odin Wave." (Ex. L-85, April 3, 2016 Gardner email; Ex. U-60, Gardner Dep. 172:10-16.) Gardner did not add those terms to the list. Nor did he suggest such terms as "Bismuth," "Beryllium," or "Sandstone," any of which might have led Stroz to discover Tyto-related documents on Mr. Levandowski's devices. Because Mr. Levandowski purposely omitted these terms from the list for forensic review, Stroz was unaware that Tyto had any significance, much less that it was a company ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████. (Ex. U-73, Genow Decl. ¶ 29; Ex. U-1, Award at 47, 68, 84.)

Mr. Levandowski now argues that search terms such as "laser" and "sensor" should have alerted Stroz to materials related to Tyto on Mr. Levandowski's devices. (Mot. at 9.) As the evidence shows, the amount of data on Mr. Levandowski's devices was massive. The search terms "laser" and "sensor," in particular, were so generic as to generate tens of thousands of "hits" on documents from his devices. (Ex. U-31, April 3, 2016 Gardner email; Ex. U-59, Stroz 30(b)(6) Friedberg Dep. 90:2-92:15; Ex. U-42, July 28, 2016 Memo at 3.) As a result, after consulting with Mr. Gardner and the

Case 3:17-cv-00939-WHA Document 2285-47 Filed 04/05/18 Page 20 of 26
Case 3:17-cv-00939-WHA Document 2298-4 Filed 04/05/18 Page 21 of 28
480 of 555

other counsel, Stroz narrowed its searches based on other information provided in the interviews to attempt to focus in on relevant documents.  (Ex. U-42, July 28, 2016 Memo at 3.)  Mr. Gardner approved Stroz's suggestions, never suggesting that "Tyto," "Odin Wave," "Bismuth," "Beryllium," or "Sandstone" should be used to narrow the search.  (Ex. L-85, Gardner email.)  Indeed, even if Stroz had stumbled upon Tyto-related documents, they would not have known the significance of any such document or of Tyto, because Mr. Levandowski did not disclose his relationship with the company.

Finally, Mr. Levandowski argues that "Google used the documents on Mr. Levandowski's devices to prove its claims in the Google Arbitration." (Mot. at 9.)  But the Indemnification Agreement required Mr. Levandowski to truthfully and in good faith disclose his Tyto connection to Stroz *prior to April 11, 2016.*  Instead of disclosing his involvement with Tyto, Mr. Levandowski actively concealed it.  The fact that the arbitration Panel cited documents found on Mr. Levandowski's devices after extensive discovery by Google, and with the benefit of hindsight, three years later has no bearing on whether Mr. Levandowski truthfully and in good faith disclosed his involvement in Tyto *prior to April 11, 2016*.

Because there is ample evidence that Mr. Levandowski failed to disclose his relationship with Tyto truthfully to Stroz—the only element necessary to establish that the Tyto misconduct is an Excluded Claim—summary judgment should be denied as to Defenses No. 5 (Excluded Claim), Defense No. 9 (Reimbursement for Excluded Claim), and Counterclaim IV (Declaratory Judgment re Excluded Claim).

### B. Uber's Contribution Claims Stand Even Without Fraud, and There Is Ample Evidence Supporting Contribution Based on Fraud.

Uber seeks contribution from Mr. Levandowski for the $250 million Uber paid to settle the Waymo Litigation, and for the roughly $9 million it paid to cover the portion of the Award that was joint and severable against Mr. Levandowski and Mr. Ron.  Uber's right to contribution rests on two distinct legal premises.  First, common law contribution: Mr. Levandowski was a joint tortfeasor because Waymo's claims were based upon his alleged theft of trade secrets, and Google's claims were based on his disloyal conduct.  Second, fraud: Mr. Levandowski defrauded Uber by concealing his Tyto misconduct and his intentional theft of trade secrets, and that fraud caused Uber to face enormous potential liability to Waymo, and Mr. Ron to face millions of dollars of liability to Google.  *See Knorr-*

*Naehrmittel Aktiengesellchaft v. Knorr Sols., Inc.*, No. CV 10-8155, 2011 WL 13217674, at *3 (C.D. Cal. Sept. 30, 2011) (noting "given the presence of common law fraud and negligent misrepresentation claims, it would appear that Third Party Plaintiffs can seek indemnity and contribution under California law on a common law tort theory").

As to the first basis for contribution (and as explained in more detail in Uber's Response to Mr. Levandowski's Motion for Partial Summary Judgment Based on Statute of Limitations ("SOL Opp.")), Mr. Levandowski was a joint tortfeasor with respect to the Waymo Litigation, and he should be required to contribute toward the settlement on that basis. (SOL Opp. at 4-5.) Further, he was a joint tortfeasor with Mr. Ron with respect to the breaches of duties and obligations against Google, and he should be required to contribute toward the joint and several portion of the Arbitration Award on that basis. Setting aside Uber's fraud claims, Uber is entitled to contribution from Mr. Levandowski as a joint tortfeasor under common law contribution principles.

But there is also substantial evidence of fraud that defeats summary judgment on fraud-based contribution. As shown above, Mr. Levandowski lied to Uber regarding his connection to Tyto. (*See* Part II.A-D.) Those lies began before the Indemnification Agreement was signed, and continued while he orchestrated for Otto to acquire Tyto and for Uber to approve that acquisition. (*Id.*) It continued through the time Uber closed the merger with Otto, thereby acquiring Tyto's technology. (*Id.*) Waymo later argued that at least one of the trade secrets upon which it based its case at trial concerned LiDAR technology, that Mr. Levandowski helped Tyto to develop, which in turn Uber acquired through its acquisition of Otto. (Ex. U-86, Expert Report of L. Hesselink ¶¶ 376-384.) These Tyto-based claims survived all pre-trial litigation and were to be tried to the jury, until Waymo and Uber settled the case. (*See* Waymo Litigation, Dkt. 2520, Second Amended Joint Proposed Pre-trial Order at 1:5-3:25 (listing nine alleged trade secrets Waymo claimed Uber misappropriated to be presented at trial, including Trade Secret 90, which it claimed came from Tyto).) Thus, Mr. Levandowski's fraud related to Tyto caused Uber to be exposed to very serious claims of trade secret misappropriation by Waymo, which Uber paid $250 million to settle. (*See* Ex. U-6, Settlement Agreement § 4(b); Wu Decl. ¶ 4.) Had Uber known of Mr. Levandowski's ▮▮▮▮▮▮▮▮▮▮ Tyto, including Waymo's claims to Tyto's LiDAR technology, Uber would not have acquired Otto or Tyto and, thus,

would not have been exposed to such liability to Waymo based on Tyto's technology. (Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8; *see id.* 169:20-170:14.)

In addition, Mr. Levandowski defrauded Uber about his theft of Google trade secrets, which also exposed Uber to enormous liability in the Waymo Litigation. Mr. Levandowski initially insisted that any Google information on his devices was there innocently, that he had not intentionally downloaded it, and that he had no intent to use it at Uber. (*See* Part II.G, *supra*.) About a year later, after the acquisition was complete and the Waymo Litigation was filed, Mr. Levandowski reversed course and admitted to intentionally downloading certain files, but insisted that he only did so to prevent Google from cheating him out of his bonus. (Ex. L-39, Padilla Decl. ¶¶ 6, 10.) Years later, Mr. Levandowski finally pleaded guilty to downloading trade secrets with the intent to use them at Uber, purportedly for his own benefit and Uber's. (Ex. U.-79, Plea Agreement at 2-3.) This misconduct was the central focus of the Waymo Litigation. Waymo claimed that Mr. Levandowski "leveraged stolen information to . . . build a comparable LiDAR system" and did so through the "misappropriation and infringement of Waymo's LiDAR technology" (Waymo Litigation, Dkt. 23, Am. Compl. ¶¶ 10–11; *see also id.* ¶¶ 93, 119, 134.) Ultimately, Waymo argued that all nine trade secrets that would be tried were reflected in materials that Mr. Levandowski had downloaded before he left Google. (Ex. U-87, Supp. Expert Report of L. Hesselink (opining that the Stroz report and the materials in Stroz's possession confirm that Mr. Levandowski downloaded materials related to alleged Trade Secret Nos. 25, 111, 2, 7, 9, 13, 14, 90, and 96).) Had Uber known about Mr. Levandowski's trade secret theft, it never would have entered into the Otto transaction, never would have been exposed to Waymo's claims, and never would have been forced to settle them for $250 million. (Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8; *see id.* 169:20-170:14.)

For these reasons, Mr. Levandowski's fraud is an independent basis for Uber's claim for contribution from Mr. Levandowski. Any contribution or damages judgment based on fraud should not be dischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6).

Because the contribution claims do not depend upon fraud and because, even if they did, there is ample evidence of fraud, summary judgment should be denied as to Count VII (Contribution to Waymo Settlement) and Count IX (Contribution to Ron Settlement).

**C.** **There Are Material Disputes of Fact Related to Uber's Fraud Claims (Counterclaim Count VI and Defense 7) .**

Mr. Levandowski attacks Uber's fraud claims and defenses, Counterclaim Count VI and Defense 7, solely on the misrepresentation element of fraud. The elements of fraud are "(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996). Summary judgment should be denied because there are disputed issues of fact relevant to these claims and defenses; specifically, as described in the statement of facts, there is ample evidence that Mr. Levandowski lied to Uber about his trade secret theft and his involvement in Tyto. Although Uber is no longer pursuing rescission based on this fraud, it is entitled to pursue damages for it, including the $250 million it was required to pay to settle claims that were primarily founded on Mr. Levandowski's misconduct.

**1.** **Mr. Levandowski Did Not Disclose to Uber that He Retained Google Confidential Material With an Intent to Benefit Himself and Uber.**

As set forth above, prior to execution of the Uber merger agreement with Otto and the Indemnification Agreement, Mr. Levandowski represented to Uber senior management that he would not bring any Google confidential information to Uber. (*See* Part II.G, *supra*.) During the Stroz process, when Stroz asked Mr. Levandowski about Google documents found on his computers, he claimed the information was there innocently, and that he had not intentionally taken anything. (Ex. L-19, April 3, 2016 Memo at 3-4, 14-15, 17-19.) He reiterated in a sworn attestation that everything that he said to Stroz was true, and that except for what he truthfully told Stroz, he complied with all his obligations to Google. (Ex. L-23, April 11, 2016 Attestation ¶¶ 1-2, 4, 6.)

Those representations were false. Mr. Levandowski later admitted that he took that information intentionally and that he took it to benefit himself and Uber, including in his 2020 plea agreement where he admitted that he "*intended to convert a trade secret to the economic benefit of anyone other than the owner thereof*" and that he "stole, or without authorization, appropriated, took, carried away, or concealed such information." (Ex. U-79, Plea Agreement ¶ 1 (emphasis added); Ex. U-62, Levandowski Dep. 470:10-17.) Moreover, the Arbitration Panel found that Mr. Levandowski

███████████████████████████████████████████████████

██████. (Ex. U-1, Award at 83-84.)

Mr. Levandowski's argument that Uber must have known Mr. Levandowski intended to use Google confidential information at Uber (Mot. at 7) is both unsupported and, at most, an inference which cannot be drawn in his favor on summary judgment. *Fresno*, 771 F.3d at 1125 ("The court draws all justifiable inferences in favor of the non-moving party."). Mr. Levandowski also argues that "any concealment of Mr. Levandowski's true intentions are immaterial" because it was not an element in the Google Arbitration. (Mot. at 7.) But the point is that Mr. Levandowski deceived Uber by misrepresenting his intent, and falsely claiming that his possession of Google information was innocent. As shown above in Part II.G, *supra*, there is ample evidence that Mr. Levandowski intentionally deceived Uber about what he had done with Google trade secrets and why he did it, in order to induce Uber to acquire his company and sign the Indemnification Agreement. Uber did *not* know of Mr. Levandowski's intent to use Google confidential information at Uber, and his concealment of his intention to use Google confidential information is not only material, but heavily disputed. Summary judgment should be denied.

**2.** **Mr. Levandowski Made Numerous Misrepresentations to Uber Concealing his Role in Tyto and Did Not Disclose to Uber His Involvement in Tyto.**

As discussed in detail above, Mr. Levandowski concealed his role in Tyto and made numerous misrepresentations to Uber about his relationship to Tyto. (*See* Part II.A-F, *supra*.) Mr. Levandowski admits that he did not disclose his true relationship with Tyto either before Uber entered into the Indemnification Agreement on April 11, 2016 or before Uber closed on its acquisition of Otto on August 23, 2016. (Ex. U-62, Levandowski Dep. 224:18-225:21, 228:1-4, 229:8-9, 230:19-24.) The best argument Mr. Levandowski can muster in response is that Uber purportedly knew about his relationship with Tyto because he told Uber executives that he "knew the individuals at Tyto," from the company Velodyne, and that he "had helped them get started." (Mot. at 8.) But, even if he did relay these two vague pieces of information, Uber disputes that either statement amounts to disclosure of his true connection to Tyto. As detailed in Part II.A-F, Mr. Levandowski concealed that he was Tyto's founder, source of funding, and control person, and that he had helped Tyto develop its LiDAR technology. (*E.g.*, Ex. U-55, Bentley Dep. 51:22-54:1; Ex. U-67, Sept. 29, 2017 Poetzscher Dep.

665:13-25; Ex. U-30, Mar. 29, 2016 email.) He deceived Mr. Poetzscher by telling him that "one guy" owned all of Tyto, but hiding the fact that he was that "one guy." (Ex. U-38, May 5, 2016 email.) He hid his role in May 2016, when he was orchestrating for Uber to approve Otto's acquisition of Tyto, and manipulating both sides of the deal. (Ex. U-62, Levandowski Dep. 401:1-15; Ex. U-38, May 5, 2016 email; Ex. U-68, Ron Dep. 125:3-17, 127:7-13.)

Despite all this evidence that Mr. Levandowski concealed his true relationship with Tyto, he argues that Uber cannot claim it believed and relied on his misrepresentations because Uber has asserted attorney-client privilege over certain communications that took place during the negotiation of the Indemnification and Merger Agreements. (Mot. at 10-12.) This argument implicates the element of reliance, which Mr. Levandowski does not purport to be challenging in his motion. (*See* Mot. at 1 ("Uber cannot identify any misrepresentation whatsoever, let alone a material one. For this reason, summary judgment is warranted.").) But in any event, the argument fails because Uber is not relying on privileged communications to demonstrate reliance—rather, there is ample evidence that the Uber business people who negotiated the deal with Mr. Levandowski in fact relied directly on Mr. Levandowski's statements, and on his failure to disclose his relationship with Tyto. (*See, e.g.,* Ex. U-65, Uber 30(b)(6) Poetzscher Dep. 198:1-8 (████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████.)[8]

By concealing these facts from Uber, Mr. Levandowski fraudulently induced Uber to enter into the Indemnification Agreement and also caused Uber to acquire Tyto's assets and thereby to acquire the patents, trade secrets, and confidential information related to Tyto's LiDAR technology, prompting claims by Waymo against Uber. This fraud caused Uber damages in the amount of the $250 million that it had to pay to settle the Waymo Litigation.

---

[8] Mr. Levandowski does not accurately describe the ruling on attorney-client privilege issued by Judge Montali. Judge Montali ordered Uber to produce communications between Uber and its outside counsel Morrison & Foerster LLP ("MoFo") dated before April 11, 2016 that reflect, refer, or relate to "statements and mental impressions of MoFo attorneys or [Stroz] personnel regarding Mr. Levandowski's truthfulness, credibility, or Uber's ability to justifiably rely on those statements, devices or documents [. . .]." ECF No. 106, ¶ 2 (Order on Privilege waiver Dispute). Judge Montali did not order Uber to "waive privilege over communications that relate to justifiable reliance," as Mr. Levandowski contends. (Mot. at 11; ECF No. 106, ¶ 2.)

In sum, there are significant disputes of fact related to Mr. Levandowski's fraud on Uber related to his trade secret theft and his concealment of his involvement in Tyto. These disputes preclude summary judgment on Uber's Defense No. 7 (Fraudulent Inducement) and Counterclaim VI (Fraud Damages).

**V.    CONCLUSION**

For the foregoing reasons, Mr. Levandowski's motion should be denied.

Dated: April 5, 2021                              PACHULSKI STANG ZIEHL & JONES LLP


                                                          By    */s/ Debra I. Grassgreen*
                                                                 Debra I. Grassgreen
                                                                 Miriam Manning

                                                                 —and—

                                                                 JENNER & BLOCK LLP
                                                                 David J. Bradford
                                                                 Catherine Steege
                                                                 Terri L. Mascherin
                                                                 Katharine R. Ciliberti

                                                                 *Counsel for Uber Technologies, Inc.*

# EXHIBIT K

**Docket #344 is docket text only.  See docket.**

# EXHIBIT L

1  Debra I. Grassgreen (CA Bar No. 169978)
   Miriam Manning (CA Bar No. 178584)
2  PACHULSKI STANG ZIEHL & JONES LLP
   One Market Plaza, Spear Tower
3  40th Floor, Suite 4000
   San Francisco, CA 94111
4  Telephone:    (415) 263-7000
   Facsimile:    (415) 263-7010
5  E-mail:dgrassgreen@pszjlaw.com
             mmanning@pszjlaw.com
6
7  David J. Bradford (admitted *pro hac vice*)
   Terri L. Mascherin (admitted *pro hac vice*)
8  Catherine Steege (admitted *pro hac vice*)
   Katharine R. McLaughlin (admitted *pro hac vice*)
9  JENNER & BLOCK LLP
   353 N. Clark St.
10 Chicago, IL 60654
   Telephone:    (312) 222-9350
11 E-mail:dbradford@jenner.com
             tmascherin@jenner.com
12           csteege@jenner.com
             kmclaughlin@jenner.com
13
14 *Counsel for Uber Technologies, Inc.*

15             **UNITED STATES BANKRUPTCY COURT**
16             **NORTHERN DISTRICT OF CALIFORNIA**
                   **SAN FRANCISCO DIVISION**
17

| | |
|---|---|
| 18  In re: | Case No. 20-30242 (HLB) |
| 19  ANTHONY SCOTT LEVANDOWSKI, | Chapter 11 |
| 20                      Debtor. | |
| 21  ANTHONY SCOTT LEVANDOWSKI, an | Adv. Pro. No. 20-03050 (HLB) |
|     individual, | |
| 22 | **UBER TECHNOLOGIES, INC.'S TRIAL** |
| 23                      Plaintiff, | **BRIEF** |
| 24           v. | |
| 25  UBER TECHNOLOGIES, INC. | |
| 26                      Defendant. | |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES ......................................................................................iii

SUMMARY OF FACTS TO BE PROVEN AT TRIAL....................................................2

    A.    The Operative Contract—The April 16, 2016 Indemnification Agreement...........2

    B.    The Allegedly Indemnified Claim—The Arbitration Panel's Award....................3

        1.    The "Tyto Misconduct." ...............................................................4

        2.    The "Otto Misconduct." ...............................................................5

    C.    Evidence Establishing That Levandowski Is Not Entitled To Indemnification For The Arbitration Award. ...................................................................5

        1.    Levandowski Lied To Stroz, Making Any Claim Based On His Tyto Misconduct An Excluded Claim. .......................................................5

        2.    After The Agreement Was Signed, Levandowski Secretly Caused Google IP To Be Transferred To Uber, Thereby Committing Post-Signing Bad Acts And Voiding The Agreement. ................................7

            a.    The Waymo Lawsuit Is A "Former Employer Claim." ..................7

            b.    Levandowski's Transfer Of The Planner Code. ...........................8

            c.    Levandowski's Transfer Of Confidential Google Information Related To LiDAR Technology.......................................................9

    D.    Levandowski's Alleged Damages.......................................................9

    E.    Uber's Proof Of Claim.................................................................11

LEGAL THEORIES ON WHICH UBER RELIES.............................................12

I.    The Agreement Is Void.............................................................13

    A.    Levandowski's Multiple Post-Signing Bad Acts (Affirmative Defense 4 and Counterclaim III). ...................................................................13

    B.    Levandowski's Unclean Hands (Affirmative Defense 8)...................................14

    C.    Levandowski's "Knowingly Wrongful Conduct" Precludes Indemnification (Affirmative Defense 3).................................................................16

    D.    Public Policy And The Agreement Bar Indemnification For A Disgorgement Award (Affirmative Defenses 1 and 2, Counterclaim 1)........................................18

i

II.  Most Of The Award Is For An Excluded Claim, For Which Uber Has No Obligation to Provide Indemnity (Affirmative Defenses 5 and 9 and Counterclaim IV)...................19

III.  Any Indemnification That The Court Awards To Levandowski Should Be Less Than $5 Million.....................................................................................................................20

IV.  Levandowski Owes Uber Over $270 Million In Fraud Damages That May Be Setoff Against Any Judgment (Affirmative Defense 10, Counterclaim VI). ..............................24

V.  Uber's Proof of Claim Should Be Allowed And Setoff Against Any Judgment (Count X, Affirmative Defense 10, Counterclaims VII, IX, X). ....................................................24

CONCLUSION.................................................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. Mortg. Co. v. Rothwell*,
    10 Cal. 4th 1226 (1995) ......................................................................................24

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
    225 Cal App. 4th 1451 (2014) ...........................................................................23

*Bank of the West v. Superior Court*,
    2 Cal. 4th 1254 (1992) .................................................................................18, 19

*Bell v. Feibush*,
    212 Cal. App. 4th 1041 (2013) ..........................................................................18

*In re Branford Partners, LLC*,
    No. SV 06-12551-KT, 2008 WL 8448329 (B.A.P. 9th Cir. Oct. 24, 2008) ...........12

*Cleghorn Bar Enters. v. Garlock*,
    No. A114398, 2008 WL 77584 (Cal. Ct. App. Jan. 8, 2008) ...............................3

*CTC Real Estate Servs. v. Lepe*,
    140 Cal. App. 4th 856 (2006) ............................................................................23

*Cty. of San Bernardino v. Walsh*,
    158 Cal. App. 4th 533 (2007) ............................................................................23

*People ex rel. Dep't of Transp. v. Superior Court*,
    26 Cal. 3d 744 (1980) ........................................................................................24

*DeRosa v. Transamerica Title Ins. Co.*,
    213 Cal. App. 3d 1390 (1989) ...........................................................................15

*Federal Trade Commission v. Lucaslaw Ctr., Inc.*,
    No. SACV 09-0770 DOC (ANX), 2010 WL 11506885 (C.D. Cal. June 3, 2010)...............19

*Federal Trade Commission v. Neovi, Inc.*,
    No. 06-CV-1952 JLS (JMA), 2009 WL 10672945 (S.D. Cal. May 18, 2009).......15

*Fladeboe v. Am. Isuzu Motors Inc.*,
    150 Cal. App. 4th 42 (2007) ..............................................................................15

*In re Gnadt*,
    No. 11-10378-BFK, 2015 WL 2194475 (Bankr. E.D. Va. May 7, 2015) ..............21

*Hamilton v. Elite of L.A., Inc.* (*In re Hamilton*),
    584 B.R. 310 (B.A.P. 9th Cir. 2018)..................................................................24

iii

*Houge v. Ford*,
    44 Cal. 2d 706 (1955) ............................................................................................20

*Labor Comm'r v. Ramirez (In re Ramirez)*,
    556 B.R. 446 (Bankr. N.D. Cal. 2016) ...............................................................24

*Lemat Corp. v. Am. Basketball Ass'n*,
    51 Cal. App. 3d 267 (1975) ..................................................................................17

*Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*,
    272 F.3d 908 (7th Cir. 2001) ...............................................................................19

*Mancinas v. Pollard*,
    No. 18-cv-06235-YGR PR, 2020 WL 43266 (N.D. Cal. Jan. 3, 2020) ..................18

*Meissner v. Paulson*,
    212 Cal. App. 3d 785 (1989) ...........................................................................16, 17

*Meister v. Mensinger*,
    230 Cal. App. 4th 381 (2014) ..............................................................................23

*Parks v. Dittmar (In re Dittmar)*,
    618 F.3d 1199 (10th Cir. 2010) ...........................................................................21

*People v. Andrews*,
    165 Cal. App. 2d 626 (1958) ...............................................................................17

*People v. Mahdavi*,
    No. G033693, 2006 WL 711284 (Cal. Ct. App. Mar. 21, 2006) ...........................17

*People v. McCarthy*,
    244 Cal. App. 4th 1096 (2016) ............................................................................18

*Pond v. Ins. Co. of N. Am.*,
    151 Cal. App. 3d 280 (1984) ...............................................................................15

*Prince v. Pac. Gas & Elec. Co.*,
    45 Cal. 4th 1151 (2009) .......................................................................................14

*Rau v. Ryerson (In re Ryerson)*,
    739 F.2d 1423 (9th Cir. 1984) .............................................................................21

*Res-Care Inc. v. Roto-Rooter Servs. Co.*,
    753 F. Supp. 2d 970 (N.D. Cal. 2010) ...........................................................24, 25

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985) .............................................................................................18

*Thayer Plymouth Ctr., Inc. v. Chrysler Motors Corp.*,
    255 Cal. App. 2d 300 (1967) ...............................................................................12

Case: 20-03082 Doc# 1 Filed: 11/24/20 Entered: 11/24/20 15:14 Page 5 of
Case: 20-03052 Doc# 40-2 Filed: 11/24/20 Entered: 11/24/20 23:54:34 Page 5 of
495 32
555

*Unilogic, Inc. v. Burroughs Corp.*,
    10 Cal. App. 4th 612 (1992) ...........................................................................15, 16

*United States v. Levandowski*,
    3:19-cr-00377-WHA, Dkt. 87 ..................................................................................12

*United States. v. Levandowski*,
    No. CR-00377 WHA ...........................................................................................1, 2

*Uzyel v. Kadisha*,
    188 Cal. App. 4th 866 (2010) ....................................................................................23

*Valdez v. Superior Court of San Bernardino Cty.*,
    No. E070656, 2019 WL 1236932 (Cal. Ct. App. Mar. 19, 2019) ............................20

*Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.*,
    238 Cal. App. 4th 468 (2015) ....................................................................................12

*Waymo LLC v. Uber Techs., Inc.*,
    Case No. 3:17-cv-00939-WHA, Dkt. 2219 ..............................................................12

**Statutes**

11 U.S.C. § 502(b)(2) .............................................................................................................10

11 U.S.C. § 523 ...............................................................................................................24, 25

18 U.S.C. § 1832 ......................................................................................................................1

Cal. Civ. Code § 3422 ...........................................................................................................12

Cal. Civ. Code § 3423 ...........................................................................................................12

Cal. Civ. Code § 2773 .....................................................................................................16, 17

Cal. Penal Code § 487(a) .......................................................................................................17

Cal. Penal Code § 186.22(a) ..................................................................................................18

Cal. Penal Code § 484(a) .......................................................................................................17

**Other Authorities**

Restatement (Second) of Agency § 403 .................................................................................23

v

1  Anthony Levandowski was convicted and sentenced to federal prison for a felonious scheme

2  that had at least two victims: Uber Technologies, Inc. ("**Uber**") and his former employer, Google,

3  LLC ("**Google**"). Levandowski engaged in a theft of Google's autonomous vehicle trade secrets and

4  secretly formed, funded, and operated a competing autonomous vehicle laser business, Tyto LiDAR,

5  LLC ("**Tyto**"), during the last four years he was employed by Google.

6  Shortly after he left Google, Levandowski persuaded Uber to purchase a company that he

7  formed called Ottomotto LLC ("**Otto**"). During those negotiations, Levandowski asked for

8  indemnification, explaining that Google was litigious and might sue him out of spite. Uber agreed to

9  do so, but conditioned the indemnity on, among other things, Levandowski not having engaged in any

10  undisclosed misconduct while at Google and on his not taking or using any Google confidential

11  information. Instead of telling Uber the truth, Levandowski falsely represented that he had not

12  improperly taken any Google trade secrets and that he had no competing side businesses while at

13  Google. As a result of those fraudulent representations and Levandowski's criminal trade secret theft,

14  Uber was required to pay Google consideration worth $250 million to settle Google's claims that

15  Levandowski had used the stolen trade secrets after joining Uber.

16  Levandowski's criminal misconduct is an adjudicated fact. On August 15, 2019, at Google's

17  urging, Levandowski was indicted on 33 counts of theft and attempted theft of trade secrets. The

18  indictment alleged that Levandowski downloaded documents from Google's servers intending to use

19  those documents "to the economic benefit" of an entity other than Google. This directly contradicted

20  what Levandowski had repeatedly told Uber.

21  On March 19, 2020, Levandowski pled guilty to one count of theft and attempted theft of trade

22  secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). (Plea Agreement ¶ 1, *United States. v.*

23  *Levandowski*, No. 3:19-CR-00377-WHA (N.D. Cal. Mar. 19, 2020), ECF No. 77.) Levandowski

24  admitted under oath in the plea agreement and before Judge Alsup that he downloaded a Google trade

25  secret file "with the intent to convert [it] to the economic benefit of someone other than the owner. In

26  particular, I intended to use the Chauffeur Tracking Document to benefit myself and Uber." (*Id.* ¶ 2.)

27  As this Court has noted, that admission is the "smoking gun" that proves "that Mr.

28  Levandowski fraudulently concealed his true intent in obtaining and possessing that information: to

use it for his and Uber's benefit at Google's expense." [Dkt. 344 at 57.] In accepting his guilty plea, Judge Alsup commented, "This was the biggest trade secret crime I have ever seen …. [T]here's no doubt in my mind, the reason he stole [the 14,000 files] on December 11th, 2015 was to have [them] at the ready in case he needed [them] when he landed on his feet outside of Waymo." (Tr. of Proceedings at 72-73, *United States v. Levandowski* (N.D. Cal. Aug. 4, 2020), ECF No. 102.) But for a last-minute pardon from former President Trump, Levandowski would be in federal prison today.

Levandowski now seeks to compound the damage he inflicted on Uber by seeking to force Uber to pay Google *a second time* for his own wrongful conduct. At trial, Levandowski will claim that he is entitled to be indemnified against Google's $179 million judgment ordering him to disgorge his entire $126 million bonus (plus interest). In other words, Levandowski—who reported approximately $60 million in assets on his bankruptcy schedules and also deposited an additional $7 million into a spendthrift trust for himself (in total, roughly the amount of compensation he received from Google after income taxes—seeks to retain the compensation he never should have received in the first place and foist liability for all of his misconduct onto Uber. However, as set forth herein, neither the facts nor the law supports a recovery on Levandowski's two remaining contract claims (Counts II and III). Uber will also establish at trial that its proof of claim, which seeks recovery of all of the amounts it was forced to pay on account of Levandowski's wrongful conduct, should be allowed (Count X) and that its claim should be found non-dischargeable (Counterclaims VI, VII, IX and X).

## SUMMARY OF FACTS TO BE PROVEN AT TRIAL

### A. The Operative Contract—The April 16, 2016 Indemnification Agreement.

On April 16, 2016, as part of Uber's agreement to acquire Otto, Uber, Levandowski, and other Otto employees entered into the indemnification agreement (the "**Agreement**") that is the subject of this adversary proceeding. Contrary to Levandowski's arguments, the Agreement was not intended to be a get-out-of-jail-free card for past misconduct or a license to harm Google in the future. Instead, before entering into the Agreement, Uber required Levandowski to certify he had not committed any undisclosed pre-signing bad acts, to undergo a confirmatory due diligence review conducted by an independent firm jointly retained by Uber and Otto, and to promise he would not engage in any post-signing bad acts.

Case: 20-03050   Doc# 498-1   Filed: 01/24/24   Entered: 01/24/24 23:54:47   Page 8 of 498 32 555

On March 4, 2016, counsel for Uber and Otto jointly retained Stroz Frieberg ("**Stroz**"), a third-party forensic examiner, to confirm the truthfulness of Levandowski's certification that he and other principals of Otto had not committed any "Pre-Signing Specified Bad Acts." Uber also required Levandowski and Otto's other principals to certify that they provided complete and truthful cooperation and responses to Stroz, and the preambles to the Agreement acknowledged that these representations and the investigation were a "material inducement" to Uber to sign the Agreement.

In addition to the pre-signing certifications, the Agreement contained several key provisions to ensure that Levandowski would not bring any Google confidential information with him to Uber and had not engaged in undisclosed misconduct while at Google. *First*, Uber required Levandowski to agree that the Agreement would be nullified as to Levandowski if, among other things, he transferred or caused others to transfer Google confidential information to Uber (a "**Post-Signing Bad Act**") and such Post-Signing Bad Act was the subject of a "Former Employer" Claim. (Agreement, § 2.1(a) and Ex. A at 1 and § 2.C.) *Second*, Uber required Levandowski to agree that he would not be indemnified for claims based on any Pre-Signing Bad Acts that he did not truthfully disclose to Uber (the "**Excluded Claim**" provision). (*Id.*, § 2.1(b)(ii).)

### B.   The Allegedly Indemnified Claim—The Arbitration Panel's Award.

Levandowski alleges that Uber breached the Agreement by failing to indemnify him from a judgment entered on March 4, 2020 in favor of Google in the amount of $179,047,998.64. The basis of this judgment is a Corrected Final Award that a JAMS Arbitration Panel entered on December 23, 2019 (the "**Award**"). Because the Award is the basis of Levandowski's indemnification demand, the findings in the Award are determinative for purposes of deciding whether the Award is indemnifiable. *Cleghorn Bar Enters. V. Garlock*, No. A114398, 2008 WL 77584, at *3 n. 7 (Cal. Ct. App. Jan. 8, 2008) (holding "it would not be possible to decide this case without looking to the basis for the award, since the central question is whether or not the indemnity agreement covered the conduct").

The Award found Levandowski liable for breach of his Google employment contracts and his duty of loyalty as an employee, and for unfair competition based on two sets of misconduct: the "**Tyto Misconduct**" and the "**Otto Misconduct**." (Award, 31-40.) It ordered Levandowski to disgorge all of his compensation received during the time period covering both sets of misconduct but found that

Google had not proved that it suffered any actual competitive harm damages.[1] (*Id.*, 92-99.)

### 1. The "Tyto Misconduct."

The Panel held that Levandowski's employment agreements and his duty of loyalty as an employee precluded him from engaging in side businesses that competed with Google. (*Id.*, 42-62, 66-86.) Levandowski had worked on and came to lead Google's self-driving car project, called "Project Chauffeur." The Panel found that at the same time he was employed at Google, starting "as early as May 2012, and at least by August 2012," Levandowski "created, financed, and provided technical support" to a company that became known as Tyto. (*Id.*, 46.) The Panel concluded that Tyto competed with Google because Tyto was engaged in developing a lower-cost LiDAR sensor and LiDAR sensors are a critical component of the technology that Google also was developing as part of its self-driving car project, Project Chauffeur. (*Id.*, 46-47.)

The Panel also found that, at the same time as Levandowski headed Google's LiDAR team, he engaged his personal attorney, John Gardner, to draft the legal documents to create Tyto. (*Id.*, 32.) Gardner created a limited liability company, Sandstone LLC, which became the owner of Tyto. (*Id.*, 33.) Based on the arbitration testimony of Google's expert, John Hartog, which has been admitted by stipulation in this case, the Panel found that Levandowski created two Alaskan trusts, called the Bismuth and Beryllium Trusts and funded them with several million dollars, and the trusts in turn purchased ownership interests in Sandstone LLC, which owned Tyto. (*Id.*) As Hartog testified and as the Panel found, Levandowski "was the major, if not only, source of funding for Tyto," funneling over $2.5 million into Tyto through his two trusts and loaning Tyto $925,000. As Hartog further explained and the Panel found, the only purpose for routing these moneys through two Alaskan trusts and Sandstone was to hide the fact that Levandowski was funding Tyto. (*Id.*, 33.)

Levandowski selected and recruited Tyto's CEO, Brent Schwarz, and its lead engineer, James Haslim. (*Id.*, 32-33.) He approved the original business plan for Tyto and Schwarz' long-term goals, which Schwarz described as "to generate revenue and to find buyers to acquire your [Levandowski's]

---

[1] The panel also awarded $1.25 million in damages equal to retention bonuses that Google paid to retain employees that Levandowski and his business partner, Lior Ron, tried to solicit to Otto, but this amount of the Award was paid when Uber satisfied its indemnity in favor of Levandowski's co-defendant Ron. Thus, this part of the Award is only relevant to Uber's claim for equitable indemnity or contribution against Levandowski.

Case 20-03052   Doc# 40-29   Filed 01/24/23   Entered 01/24/23 15:47   Page 10 of 32
Case 3:20-cv-04298   Document 1   Filed 06/24/20   Page 100 of 555
500 of 555

company." (*Id.*) Levandowski also provided technical and logistical support to Tyto. (*Id.*, 46.) He was instrumental in developing Tyto's LiDAR technology, including outlining key technical tasks, drawing schematics for lasers, and providing "detailed information concerning where to procure the parts necessary to build the laser." (*Id.*, 33, 47, 67.) Waymo (as successor to Google) would later contend, through expert reports submitted in the Waymo litigation, that the Tyto LiDAR reflected Google trade secrets and confidential information.

Levandowski continued his clandestine operation of Tyto from the time he formed it in mid-2012 through the end of his tenure at Google in January 2016 and beyond. During that time, he directly lied to Google when asked about his involvement in Tyto. As Alex Cooper's arbitration testimony establishes, Levandowski assisted Google in evaluating Tyto's technology and deciding whether it should purchase Tyto while concealing that it was his own company. (*Id.*, 34.)

### 2. The "Otto Misconduct."

The Panel found that Levandowski also breached his Google employment agreement and duty of loyalty when he created a company that eventually became known as Otto to develop LiDAR technology for autonomous trucking and self-driving cars, and then negotiated with Uber in the fall of 2015 for Otto to become Uber's sole supplier of LiDAR technology. (*Id.*, 47-48.) The Panel also found that Levandowski's solicitation of Google employees to join Otto in December 2015 and January 2016 also breached Levandowski's employment agreement and his duty of loyalty. (*Id.*, 48-51, 68.)

### C. Evidence Establishing That Levandowski Is Not Entitled To Indemnification For The Arbitration Award.

#### 1. Levandowski Lied To Stroz, Making Any Claim Based On His Tyto Misconduct An Excluded Claim.

Before Uber signed the Agreement, on March 22 and 23, 2016, Stroz examiners asked Levandowski to identify all "side projects," "side businesses," "jobs," or "work" that he engaged in while employed at Google. Levandowski responded that it was common for Google employees to have side projects, and falsely represented that Google was aware of, and approved, all of his external side projects. This was untrue because Google had not approved of Tyto. The outline of the interview prepared by Stroz examiner Mary Fulginiti Genow reflects that she asked Levandowski, "To what extent did you perform work for any other companies during your employment with Former

Case 2:20-cv-03030 Doc# 40-8 Filed 02/24/23 Entered 02/24/23 15:47 Page 10 of
501 of 555

Employer?" "What did you do? Did it relate to your work for Former Employer?" and "While working for Google, did you ever engage in any other business, activities or services similar to Google?" Notes of the interview reflect that she asked about any "side work/projects" and "everything [he] did[,] not related to what [he] did at Google." And the memo Stroz interviewers prepared to summarize the interview shows that in response to these questions, Levandowski identified nine side projects—but he did not identify the only relevant one, Tyto. Levandowski himself admits that he did not tell Stroz about his secret ownership, control, and operation of Tyto. Stroz relied on his answers in developing the search terms for Stroz' forensic review of Levandowski's devices; Stroz included in those terms the names of all the side businesses that Levandowski had disclosed to Stroz, but did not include "Tyto" and "Odin Wave" (the original name of Tyto), because it had no knowledge of those entities.

Levandowski also concealed and lied about his theft of Google confidential information. Uber executives told Levandowski they "absolutely d[id not] want any third-party IP, Google or otherwise" at Uber, and Levandowski "assured [them] he would not bring or download anything." When Stroz interviewed Levandowski and found Google files on his laptop, Levandowski said that "he kept Google files on his personal Apple MacBook Pro laptop to conduct his work [for Google]." Levandowski further stated that he had never downloaded any Google files to his personal devices with the intention of leaving Google, and that he "w[ould] not rely on any information or data from Google." He claimed that the Google documents on his devices were there innocently or even accidentally, pursuant to legitimate and permitted activities when he worked for Google; that he had by no means stolen them; and that he had no intent to use them at Uber or elsewhere.

At the end of his interview with Stroz, Levandowski attested that all the information he provided in the interview was true and correct. In addition, on April 11, 2016, Levandowski signed an attestation in which he swore:

> I have provided good faith, complete and truthful responses in all material respects to Stroz' questions and (b) all of the information I have provided to Stroz is true and correct in all material respects.

> I have provided to Stroz copies of and/or otherwise advised Stroz of any agreements or other obligations to which I am subject with 'Former Employer' … (collectively, 'Agreements'), and subject to any matters or information disclosed to Stroz, I have complied with my obligations under any Agreements.

6

Contrary to those attestations, Levandowski did not disclose to Stroz (i) his involvement in Tyto, which breached several fiduciary, contractual, and statutory duties and obligations to Google, and (ii) that he had taken Google's confidential information for his personal benefit.

**2. After The Agreement Was Signed, Levandowski Secretly Caused Google IP To Be Transferred To Uber, Thereby Committing Post-Signing Bad Acts And Voiding The Agreement.**

Levandowski committed at least two Post-Signing Bad Acts that were the subjects of a Former Employer Claim: the transfer of the code for Google's "planner" and certain confidential information related to its LiDAR technology. Both Bad Acts were the subject of a Former Employer Claim.

**a. The Waymo Lawsuit Is A "Former Employer Claim."**

On February 23, 2017, Google's affiliate, Waymo LLC ("**Waymo**"), filed suit against Uber, Otto, and Otto Trucking, LLC, for trade secret misappropriation by Levandowski. The Waymo Lawsuit is a Former Employer Claim because it is an action against two indemnified parties—Otto and Otto Trucking—brought by a "Former Employer"—Waymo. There can be no dispute about this; when Levandowski sought indemnification from Uber for his criminal indictment, Levandowski himself claimed that Waymo's suit was a "Former Employer Claim."

Waymo is a "Former Employer" even though Levandowski never technically worked for Waymo (Levandowski worked on Project Chauffeur when it was housed within Google, but it was later spun off into a separate entity, Waymo). That is because the Agreement defines a "Former Employer" to include "Affiliates" of any "Person" that "such Employee has previously ... provided services to as an employee...." (Agreement, § 1.) Uber, Google, Levandowski, and non-party Waymo have stipulated that Waymo is a Google Affiliate: "[f]rom its inception on August 5, 2016 to date, Waymo LLC ... has been a controlled subsidiary of Alphabet Inc.," and "[f]rom its inception until September 30, 2017, Waymo LLC was also a controlled subsidiary of Google Inc. (which was renamed Google LLC on September 30, 2017 and is also a controlled subsidiary of Alphabet Inc.)." [Dkt. 102 at 2.] Accordingly, Google and Waymo are and were "Affiliates" within the meaning of the Ottomotto Merger Agreement and the Agreement. (Ottomotto Merger Agreement Ex. A ("Affiliate" definition); Agreement § 1 ("Definitions").) Because Waymo is an Affiliate of Google, and Google was a former

Case 2:20-03-002 Doc #40298 Filed 01/24/22/23 Entered 01/24/22/23 15:14:35:47 Page 18 of
503 32 555

employer of Levandowski, Waymo meets the definition of a "Former Employer" of Levandowski. (*Id.* § 1 ("Former Employer" definition).)

Under the Post-Signing Bad Act provisions, any Indemnified Person, including Levandowski, forfeits the right to indemnification for all purposes if a Final Judgment (to be entered in this case) determines that he committed a Post-Signing Bad Act that was the subject of a Former Employer Claim against any other Indemnified Person. Two of Waymo's trade secret allegations against Otto and Otto Trucking (both Indemnified Persons) established Post-Signing Bad Acts that Levandowski directed or caused: (i) the transfer of the "planner code" that was the subject of Dr. Gerdes' independent analysis; and (ii) the transfer of Google confidential LiDAR information through the sale of Tyto to Otto.

### b. Levandowski's Transfer Of The Planner Code.

One of Waymo's claims against Uber, Otto, and Otto Trucking related to the allegation that in May 2016, Otto Transferred a certain planner code to Uber and that the planner code allegedly included Google trade secrets. As discussed below, Mr. Levandowski's directive to transfer this code constitutes a Post-Signing Bad Act.

As part of the settlement agreement in the Waymo case, Uber agreed with Waymo to jointly engage an independent, leading autonomous-vehicle expert, Dr. J. Christian Gerdes, to determine whether Uber's technology incorporated any of a number of Google's trade secrets. Dr. Gerdes conducted an extensive analysis, receiving multiple written submissions from Waymo and Uber, interviewing several witnesses, and reviewing highly proprietary source code and technology for both Waymo's and Uber's autonomous-vehicle programs. He concluded, in a binding and non-appealable expert analysis to which he will testify in this case, that the planner code that Levandowski caused to be transferred from Otto to Uber in May 2016 (before Uber acquired Otto), contained a Google trade secret.[2] Prior to Dr. Gerdes' analysis, Uber had no knowledge that this intellectual property, which Otto's employees asserted they had developed independently, in fact reflected Google trade secrets.

---

[2] In the context of autonomous vehicles, the "planner" is the software that determines the vehicle's speed and trajectory.

Case 3:20-03002  Doc #40298 Filed Filed 01/24/22/04/23 Entered 01/24/22/04/23 14:35:47 Page 14 of 504 32 555

1  Levandowski directed those Otto employees to send Otto's planner code to Uber for
2  incorporation into Uber's autonomous vehicle technology. Jur Van den Berg will testify that he sent
3  the code only because Levandowski directed him to do so, as an "advertisement" for why Uber should
4  close its pending acquisition of Otto.

### c. Levandowski's Transfer Of Confidential Google Information Related To LiDAR Technology.

The second relevant Post-Signing Bad Act was Levandowski's conduct in causing Otto to
acquire Tyto in May 2016. In its lawsuit, Waymo alleged that Tyto's LiDAR technology reflected the
same LiDAR technology that Google was using and that constituted Google confidential information.

In the lead-up to Uber's acquisition of Otto, Levandowski urged Uber to allow Otto to acquire
Tyto. When Uber was deciding whether to grant the permission required under the Otto merger
agreement, it had no idea that Tyto was a company Levandowski controlled and that the approval
could ultimately lead Uber to inadvertently acquire technology that was developed using Google's
confidential information at Levandowski's direction. In response to Uber's inquiries about Tyto's
ownership, Levandowski told Cameron Poetzscher, Uber's vice-president of corporate development,
that "one guy had nearly all of [Tyto]" without telling Uber he (Levandowski) was the "one guy."
Relatedly, Levandowski also concealed his involvement in developing Tyto's LiDAR technology.

### D. Levandowski's Alleged Damages.

Levandowski asks for damages equal to the Award plus unspecified consequential damages
and pre-judgment interest. As set forth below, Levandowski is not entitled to any damages because
the Agreement is void based on his commission of Post-Signing Bad Acts. Further, as set forth in
Uber's separate *Motion In Limine Barring Evidence And Argument In Support Of Plaintiff's Alleged
Consequential Damages Claim* [Dkt. 391], neither the Agreement nor the evidence supports the
request for consequential damages. In addition, because interest is not running on Google's judgment
due to the bankruptcy filing (*see* 11 U.S.C. § 502(b)(2)), the Agreement, which limits a recoverable
"Expense" to "interest ... that is out-of-pocket," also bars the imposition of pre-judgment interest.

In the event the Court finds that Levandowski is entitled to some indemnification, it will be
necessary to determine how much of the Google judgment is indemnifiable. The Panel ordered

9

Levandowski to disgorge all monetary compensation he received between August 2012 and January 27, 2016, consisting of $767,051.95 in salary and $126,544,500 in deferred compensation received pursuant to the Project Chauffeur Bonus Plan (the "**Plan**"). As the Award reflects, the Tyto Misconduct occurred during the entire 44 months that the deferred compensation was earned. The Otto Misconduct overlapped with the Tyto Misconduct only for the last four months of that 44-month period.

Case 20-30242   Doc# 40498  Filed 01/24/23   Entered 01/24/23 15:47   Page 16 of
506 of 555

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

### E.    Uber's Proof Of Claim.

The evidence will establish that Uber's proof of claim should be allowed and it has offset rights amounting to at least $270,241,203.31. The evidence is undisputed that Uber paid: (i) $250 million in consideration to Google for Levandowski's misconduct; (ii) $9,453,135.87 to indemnify Lior Ron; and (iii) $10,788,067.41 in attorneys' fees and costs on Levandowski's behalf.

Levandowski's criminal theft of trade secrets was at the heart of the Waymo case and the primary reason why Uber paid $250 million (as well as agreed to Dr. Gerdes' independent review) to settle that case. Levandowski cannot reasonably complain that the settlement was "too rich," when his criminal misconduct made the case very difficult to defend, and his invocation of the Fifth Amendment and continued lies to Uber about his theft of trade secrets only compounded that difficulty. Initially, Levandowski assured everyone at Uber that he had not taken any trade secrets to use at Uber. In an Uber "all hands" meeting soon after Waymo filed suit, Levandowski claimed he downloaded information while at Google in order to work from home. Later, he told Uber he had downloaded some files because "he was worried that Google was not going to pay him his bonus and he wanted to be able to demonstrate the work he had done in order to earn that bonus." Uber relied upon those continued lies.

Levandowski's trade secret theft created significant exposure for Uber. Judge Alsup, who presided over the case, granted Waymo's motion for preliminary injunctive relief early in the case, noting that Waymo "ha[d] show[n] compelling evidence that ... Anthony Levandowski, downloaded over 14,000 confidential files from Waymo immediately before leaving his employment there[,]" that "Levandowski had taken and retained possession of Waymo's confidential files[,]" that the "files likely contain[ed] at least some trade secrets[,]" and that "provisional relief [was] warranted." He also observed that Waymo's decision to sue only Uber, and not Levandowski, was merely a strategic choice

to avoid having to arbitrate the case. (*Waymo LLC v. Uber Technologies, Inc.*, Case No. 3:17-cv-00939-WHA, Dkt. 2219.) Even Levandowski admitted that "[a]lthough [he] was not a party to Google/Waymo's lawsuit, *he was unquestionably at its center*" because "Google's case was premised on its allegation that, when Levandowski chose to leave Project Chauffeur, he stole some 14,000 files, representing 'billions' of dollars in value, with the intent of replicating Google's LiDAR devices at Uber." (*See United States v. Levandowski*, 3:19-cr-00377-WHA, Dkt. 87 (emphasis added).) Principally because of Levandowski's misconduct, and not because of any misconduct of its own, Uber was required to pay Waymo (as successor to Google) $250 million to settle the case. Under basic principles of equitable indemnity, Levandowski should bear full responsibility for that loss and at a minimum should be held liable for at least 90% of the loss.

## LEGAL THEORIES ON WHICH UBER RELIES

In his two remaining claims after summary judgment—Counts II and III—Levandowski alleges that Uber is in breach of the Agreement; in Count II he seeks "specific performance" and in Count III he seeks contract damages. Levandowski's claim to specific performance should be easily rejected. "Specific performance of a contract will not be compelled when an adequate remedy exists at law, and if monetary damages afford adequate relief and are not extremely difficult to ascertain, an injunction cannot be granted." *Thayer Plymouth Ctr., Inc. v. Chrysler Motors Corp.*, 255 Cal. App. 2d 300, 306 (1967) (citing *Morrison v. Land*, 169 Cal. 580 (1915)); *accord* Cal. Civ. Code § 3422(1)-(2); Cal. Civ. Code § 3423(e). Here, by seeking a "precise amount of money" in "indemnity" from Uber, Levandowski "disclosed the legal remedy of damages was adequate" and he therefore is "not entitled to specific performance." *Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.*, 238 Cal. App. 4th 468, 492 (2015) (holding plaintiff could not seek specific performance of indemnification agreement); *In re Branford Partners, LLC*, No. SV 06-12551-KT, 2008 WL 8448329, at *15 (B.A.P. 9th Cir. Oct. 24, 2008) (party was not entitled to specific performance after it "made a specific demand for recovery of monetary damages"). Accordingly, Count II should be dismissed.

Both Counts II and III also fail for the additional reasons set forth below.

Case 20-30242 Doc# 402 Filed 01/24/23 Entered 01/24/23 15:41:35 Page 18 of 32
508 of 555

**I.     The Agreement Is Void.**

    **A.     Levandowski's Multiple Post-Signing Bad Acts (Affirmative Defense 4 and Counterclaim III).**

The Agreement's Post-Signing Bad Acts provision nullifies Levandowski's right to indemnification. Agreement Section 2.1(a) provides that if any Diligenced Employee (of which Levandowski was one) is found to have committed a Post-Signing Bad Act that was the subject of a "Former Employer Claim," then "Purchaser's indemnification obligation to [that person] pursuant to this Agreement *shall immediately become null and void* and of no further force and effect …." (Agreement, § 2.1(a) (emphasis added).) The definition of a Post-Signing Bad Act includes inducing or directing another person to "transfer[] ... any ... electronic copy, or any other form of confidential document, file, data or information of any Former Employer [here Google] ... without the express written consent of such Former Employer." (*Id.*, Ex. A at 1; § 2.C.)

Section 2.1(a) was intended to provide a fire wall that would protect Uber in the event any Diligenced Employee had misappropriated Google proprietary information. This important provision also incented Levandowski not to encourage or direct another person to share Google confidential information with anyone at Uber.

The evidence will establish that Levandowski committed at least two Post-Signing Bad Acts: (i) he "directed, caused, and [or] induced" Jur van den Berg to send Uber the planner code in May 2016 and (ii) he urged Uber to let Otto acquire Tyto, resulting in Uber's ultimate possession of Google confidential information related to the LiDAR technology. Both of these Bad Acts occurred after the Agreement was signed, became the subject of a Claim by a Former Employer, and involved conduct— the improper transfer of confidential information—that the Agreement prohibited. Thus, they each meet the definition of a Post-Signing Bad Act and result in the Agreement becoming "null and void." (Agreement, § 2.1(a).)

Levandowski has no serious defense to his commission of these Post-Signing Bad Acts. As to the planner, Levandowski may contend that he, like Uber, did not know the planner code contained Google confidential information. Regardless whether that is true, the Agreement allocates that risk of ignorance to Levandowski, who was in the best position to protect against a Post-Signing Bad Act.

Further, California law supports the allocation that the parties agreed to, because California law disfavors private indemnification agreements and strictly construes them against the indemnitee. *Prince v. Pac. Gas & Elec. Co.,* 45 Cal. 4th 1151, 1158 (2009) (citing *Crawford v. Weather Shield Mfg. Inc.,* 44 Cal. 4th 541, 552 (2008)). The protection Uber bargained for includes the nullification of all indemnification for any otherwise Indemnified Person (here Levandowski) who "directed, caused, induced, knowingly contributed to, or knowingly permitted" someone else to engage in a prohibited transfer. (Agreement, 1.) Thus, the definition explicitly includes both knowing and unknowing conduct. As between Levandowski and Uber, the risk allocation was reasonable: Levandowski, as former leader of Google's Project Chauffeur and head of Otto, was in a far better position than Uber to investigate and determine whether the code that he directed Van den Berg to transfer contained Google confidential information and whether Tyto's technology reflected Google confidential information.

Likewise, Levandowski cannot argue that Uber should have known of his misconduct, because reliance is not an element of Section 2.1(a) for the basic reason that it governs conduct *after* the Agreement was executed. Accordingly, the Court should enter judgment for Uber on Levandowski's breach of contract claims (Counts II and III) and Uber's Affirmative Defense 4 and Counterclaim III.

Finally, while Levandowski may argue that Uber willingly accepted the planner code, he cannot establish that Uber gave "prior written consent" to the May 10, 2016 transfer of Google confidential information (in the planner code), as is his burden under Appendix A of the Indemnification Agreement. To the contrary, Uber had made clear that it didn't want any Google IP and Levandowski didn't tell Uber that the Planner code contained Google IP. In fact, it was not until much later, when Waymo claimed the Planner incorporated its trade secrets, that this issue even arose.

## B.      Levandowski's Unclean Hands (Affirmative Defense 8).

Levandowski's criminal misconduct and fraud also present a paradigm case for applying the doctrine of unclean hands. Simply put, Levandowski should not benefit from a contract that he procured through fraud. Under California law, unclean hands is a complete defense to a legal claim for breach of contract. To prevail on unclean hands, Uber need only show Levandowski acted in "bad faith, or inequitabl[y]" in connection with the Agreement. *See Fladeboe v. Am. Isuzu Motors Inc.*, 150

Cal. App. 4th 42, 56 (2007).

Here, Levandowski's inequitable misconduct relates "directly to the transaction concerning which the complaint is made," specifically, the Agreement that he procured by concealing his massive felony trade secret theft and clandestine control of Tyto. *Pond v. Ins. Co. of N. Am.*, 151 Cal. App. 3d 280, 289-90 (1984). With unabashed hubris, Levandowski comes before the bankruptcy court seeking to use the Agreement as a means to retain $127 million-plus in deferred compensation that he was not entitled to receive and that he has been ordered to disgorge to Google. Foisting responsibility on Uber to pay Google, so that Levandowski can keep the economic benefit of fraudulently procured monies to which he has no entitlement, would be inequitable in the extreme. Indeed, it would defeat the very purpose of disgorgement, which is not to compensate the victim, but rather "to deprive the wrongdoer of his ill-gotten gain." *Federal Trade Commission v. Neovi, Inc.*, No. 06-CV-1952 JLS (JMA), 2009 WL 10672945, at *2 (S.D. Cal. May 18, 2009).

Analogous cases have applied the doctrine of unclean hands to bar breach of contract claims based on the plaintiff's prior misconduct, including the plaintiff's dishonest conduct in procuring the contract in the first place. *See, e.g., Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 620-21 (1992) (applying unclean hands doctrine in action for breach of joint development project). Courts have found unclean hands based on misconduct far less egregious than Levandowksi's brazen and extensive fraud and theft. For example, where an investor concealed facts about his conveyance of and ownership interest in a property, his behavior was not found to be fraudulent but nonetheless constituted inequitable conduct that barred him from recovering on a contract. *See DeRosa v. Transamerica Title Ins. Co.*, 213 Cal. App. 3d 1390, 1396 (1989) ("The doctrine does not require the party seeking relief to be guilty of fraud; it is sufficient if he merely acted unconscientiously."); *see also Pond*, 151 Cal. App. 3d at 291 ("[a]ny unconscientious conduct ... [by a party] which is connected with the controversy [before the court]" is sufficient).

The scope and gravity of Levandowski's misconduct in procuring the Agreement is beyond dispute. This Court has already stated that Levandowski's guilty plea is "smoking gun" evidence "that Mr. Levandowski fraudulently concealed his true intent" in stealing Google trade secrets. [Dkt. 344 at 56.] The Court also ruled that Levandowski made "patently false" misrepresentations to conceal his

ownership and control of Tyto [*id.*, 37], and answered with "explicit lies in response to Stroz' direct questioning." [*Id.*, 66]. And, as discussed below, Levandowski's conduct in obtaining the $127 million in deferred compensation under false pretenses also was felonious.

During the very time that he was negotiating the Agreement in early 2016, Levandowski was committing what Judge Alsup described as "the biggest trade secret crime I have ever seen." Levandowski was rightfully concerned that his $127 million in deferred compensation from Google would not be paid if Google discovered either his Tyto fraud or his massive theft of trade secrets. As part of his scheme to retain the economic benefits of this ill-gotten $127 million, he fraudulently induced Uber to indemnify him, including by representing that "bad feelings between him and Google management" might result in a "retaliatory legal action" by Google. This Court ruled in denying summary judgment that "[t]he record strongly indicates that Mr. Levandowski made material misrepresentations of fact [to Uber] with respect to his relationship to Tyto and his intent in possessing Google/Waymo confidential information." [*Id.*, 84.] The trial record will conclusively establish his material misrepresentations.

Levandowski's inequitable conduct persisted as Uber determined whether to close the acquisition of Otto. After the Agreement was signed, Levandowski caused Otto to acquire Tyto, still concealing from Uber his control of Tyto. He also caused Otto to transfer to Uber source code for the planner that contained purloined Google trade secrets. This continued inequitable conduct "affect[ed] the equitable relationship between the litigants" and bars Levandowski from collecting here. *Unilogic*, 10 Cal. App. 4th at 621. Accordingly, the Court should enter judgment for Uber on Levandowski's breach of contract claims (Counts II and III).

### C. Levandowski's "Knowingly Wrongful Conduct" Precludes Indemnification (Affirmative Defense 3).

California Civil Code Section 2773 bars private agreements to indemnify someone for future conduct that is "known ... to be unlawful." Similarly, Section 2774 prohibits indemnification of past wrongful conduct, if it is established, to a civil standard of proof, that the conduct was felonious. *See Meissner v. Paulson*, 212 Cal. App. 3d 785, 788-89 (1989) (relying upon §2774 to deny indemnification claim even though no felony charges were ever brought). "Both section 2773 and

section 2774 are intended to prevent the encouragement of illegal acts," and "when both past and future acts are covered by an indemnity agreement, section 2773 should apply." *Lemat Corp. v. Am. Basketball Ass'n*, 51 Cal. App. 3d 267, 279 (1975).

Levandowski's course of wrongful conduct in obtaining a bonus to which he knew he was not entitled is quintessential "knowingly wrongful conduct." Levandowski took affirmative acts to conceal his misconduct, which was so "pervasive and antithetical to his duties to Google" that the Panel found it required return of all of his compensation. (Award, 93.) Levandowski undisputedly knew that his trade secret theft and Tyto misconduct was wrongful—and for that reason went to great lengths to conceal that misconduct both from Google and Uber. Indisputably, part of his motivation for concealing that misconduct was his desire to obtain the $127 million in deferred compensation that Google paid him in two installments, in December 2015 and August 2016. Because Levandowski engaged in knowingly wrongful conduct in procuring these bonus payments under false pretenses, Section 2773 precludes indemnification for the disgorgement of those bonus payments.

Indeed, even though it is only necessary to prove "knowingly wrongful conduct" under Section 2773, Levandowski's misconduct was so egregious it also qualifies as felonious misconduct that precludes indemnification under Section 2774. Obtaining his bonus under false pretenses was grand theft, which is a felony under California law. California Penal Code Section 484(a) states that "Every person who shall ... knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money ... is guilty of theft." And that theft constitutes "grand theft," which is presumptively a felony, when the amount taken exceeds $950. Cal. Penal Code § 487(a).

California courts have recognized that obtaining compensation under false pretenses is a felony. *See, e.g., People v. Mahdavi,* No. G033693, 2006 WL 711284, at *1-2 (Cal. Ct. App. Mar. 21, 2006) (employee committed felony grand theft when she obtained a $5,000 bonus under false pretenses by concealing that she failed her CPA examination); *People v. Andrews,* 165 Cal. App. 2d 626, 638-39 (1958) (same); Cal. Penal Code § 484(a) (offense encompasses theft by false pretenses). And it is no defense for Levandowski to claim that he was not *charged* with a felony for receiving his two deferred compensation payments under false pretenses. Section 2773 does not require felonious conduct, and Section 2774 does not require a criminal charge or conviction. In *Meissner*, a California

Appellate Court applied Section 2774 to bar indemnification, even though the arsonist who set a building on fire was never charged. 212 Cal. App. 3rd at 788-89. *Meissner* is consistent with a long line of California court decisions recognizing that unless a statute explicitly requires a felony "conviction," courts should not read such a requirement into the statute. In *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1049 (2013), for example, the court awarded treble damages in a civil case based on Penal Code Section 496 even though the defendant was never convicted in a criminal case, holding that "[i]t is not this court's role to replace the word 'violation' with the word 'conviction' in the statute."[3]

Accordingly, judgment should be entered against Levandowski and in favor of Uber on Counts II and III and Affirmative Defense 3.

### D. Public Policy And The Agreement Bar Indemnification For A Disgorgement Award (Affirmative Defenses 1 and 2, Counterclaim 1).

Both as a matter of the Agreement and of California law, Levandowski also cannot recover because the basis of the Award is disgorgement of compensation that he received from Google.

Section 2.4(b) of the Agreement requires the Court to deduct from any indemnified amount (termed an "Expense" under the Agreement) "an amount equal to the amount of any proceeds actually received by any Indemnified Person from ... any other third parties in connection with such Expense." Here, Levandowski received a payment from a third party—Google—equal to the amount of the compensation he was required to disgorge and for which he seeks indemnity. Thus, under the Agreement, Uber is not required to indemnify Levandowski for the $127.3 million he received from Google or the related prejudgment interest of $45.5 million. When those amounts are eliminated from the Award and one subtracts the amounts that Uber paid on behalf of co-defendant Ron, the only remaining unpaid, indemnifiable part of the Award is the separately awarded attorneys' fees of $1,869,596.27 and costs of $57,468.38.

---

[3] *Accord Mancinas v. Pollard*, No. 18-cv-06235-YGR PR, 2020 WL 43266, at *5-7 (N.D. Cal. Jan. 3, 2020) (court reasoned that California Penal Code Section 186.22(a) applies to a defendant "who willfully promotes, furthers, or assists in any felonious criminal conduct," and thus does "not require a conviction"); *People v. McCarthy*, 244 Cal. App. 4th 1096, 1107 (2016) (same); *see also Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488 (1985) (refusing to read a conviction requirement into the RICO statute where "[t]he word 'conviction' [did] not appear in any relevant portion of the statute").

In addition, as set forth more fully in Uber's Rule 12(c) Motion [Dkt. 70], the California Supreme Court has held that public policy prohibits indemnification for disgorgement of wrongfully obtained monies. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1269 (1992). The clear "public policy rationale" behind this rule is that "[w]hen the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law." *Id.* "Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer." *Id.* (citations omitted). Stated differently, "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 911 (7th Cir. 2001).

Here, there can be no dispute the Award against Levandowski was an order of disgorgement (Award, 93), the purpose of which was to "deprive [Levandowski] of [his] ill-gotten gains." *Federal Trade Commission v. Lucaslaw Ctr.*, *Inc.,* No. SACV 09-0770 DOC (ANx), 2010 WL 11506885, at *8 (C.D. Cal. June 3, 2010). Thus, if the Court enters any judgment here, the amount should be at most limited to the separately awarded attorney's fees and costs totaling $1,927,064.65.

## II. Most Of The Award Is For An Excluded Claim, For Which Uber Has No Obligation to Provide Indemnity (Affirmative Defenses 5 and 9 and Counterclaim IV).

Even if the Agreement is not void, Levandowski still is not entitled to indemnification for most of the Award because the Award is primarily based on an Excluded Claim—his Tyto Misconduct. Section 2.1(b)(ii) of the Agreement precludes indemnification for an "Excluded Claim." An Excluded Claim includes any claim arising out facts that "***either*** (A) were not truthfully disclosed by [Levandowski] to [Stroz] in response to relevant inquiries in connection with the due diligence performed by [Stroz] ***or*** (B) were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]." (Agreement, § 2.1(b)(ii) (emphasis added).)

The use of the disjunctive terms "either" and "or" means that only one of (A) *or* (B) need be satisfied in order for a claim to be an Excluded Claim. It is a well-established principle of contract construction that an "either" "or" disjunction means only *one* of the listed alternatives is required. *See*

*Houge v. Ford*, 44 Cal. 2d 706, 712 (1955) ("the function of the word 'or' is to mark an alternative such as 'either this or that'"); *Valdez v. Superior Court of San Bernardino Cty.*, No. E070656, 2019 WL 1236932, at \*2 (Cal. Ct. App. Mar. 19, 2019) (rejecting argument that both factors needed to exist because of the choice of "the disjunctive word 'or' instead of the conjunctive word 'and' to connect the two factors, meaning, of course, that the presence of either factor alone is sufficient").[4] Further, reliance is not an element of this contract defense.

Although only one prong needs to be satisfied to meet the definition of Excluded Claim, in this case, Levandowski's misrepresentations and material omissions satisfy both prongs. *First*, as detailed above, Levandowski admits that he did not tell Stroz about his funding and control over Tyto even though he was asked directly to disclose all of his side businesses. In addition, he lied when he provided Uber with certifications that he had provided truthful and complete answers to Stroz' questions. *Second*, by not disclosing Tyto as an entity that he financed and controlled, Levandowski prevented Stroz from learning the significance of Tyto so that it could investigate his Tyto Misconduct when it searched the millions of documents imaged from his devices. Based on this evidence, the Tyto Misconduct constitutes an Excluded Claim under the Agreement and Uber has no contractual obligation to provide indemnity for that claim. Accordingly, the Court should rule against Levandowski and in favor of Uber on Affirmative Defenses 5 and 9 and Counterclaim IV.

## III. Any Indemnification That The Court Awards To Levandowski Should Be Less Than $5 Million.

According to Levandowski, even though he was engaged in the Tyto Misconduct for the entire disgorgement period of 44 months and only engaged in the Otto Misconduct for, at most, 4 months, all but $6,050,300 of Google's total judgment (or only 3.3%) should nonetheless be attributed to his Otto Misconduct. Levandowski's argument goes like this: (i) it is impossible to allocate as between the Otto and Tyto Misconduct during the time period in which this misconduct overlapped (September 30, 2015 through January 27, 2016); (ii) therefore, the Court should assume that Levandowski was

---

[4] The parol evidence makes even more clear that the parties intentionally chose the "either/or" construct. As originally drafted, Section 2.1(b)(ii) used the word "and" between subsections (A) and (B). Uber edited the provision to replace the conjunctive word "and" with the disjunctive language "either (A) ... or (B)" that appears in the final contract.

fired on September 29, 2015 and determine what he would have been entitled to receive under the Plan had he left Google on that date; and (iii) because he supposedly only would have been entitled to receive $6,050,300 of his deferred compensation on September 29, 2015, the Court should treat the balance of his deferred compensation (96.7%) as attributable solely to the four-month period when the Otto and Tyto Misconduct overlapped and find that it is entirely indemnifiable.

Each step of this argument fails for multiple reasons. For starters, it is possible to allocate between the Tyto and Otto Misconduct, a point this Court recognized when it denied Levandowski's summary judgment motion. [Dkt. 344, at 81-83.] One way to allocate is to compare the overall time period of each type of misconduct. The Tyto Misconduct occurred for 44 months; the Otto Misconduct for four months. Thus, 91.6% (44/48) of the total time of misconduct is attributable to Tyto Misconduct and 91.6% of the Award should be deemed an Excluded Claim.

Another means of allocation is to look at when the deferred compensation was actually *earned* as opposed to when it was *received*—as bankruptcy courts routinely do when considering whether deferred compensation and bonuses are part of the estate. *Rau v. Ryerson (In re Ryerson)*, 739 F.2d 1423, 1426 (9th Cir. 1984) (holding an employee's right to payment is property of the estate if based on pre-petition work, even if payment was at the company's option and would be due post-petition); *accord Parks v. Dittmar (In re Dittmar)*, 618 F.3d 1199, 1205 (10th Cir. 2010) (holding that debtor's interest in an equity participation plan was a pre-petition asset part of the bankruptcy estate and subject to creditor claims, even though the condition to payment occurred post-petition); *In re Gnadt*, No. 11-10378-BFK, 2015 WL 2194475, at *5 (Bankr. E.D. Va. May 7, 2015) (deferred compensation under an IRC 409A plan was property of the estate because debtor's rights vested based on pre-petition work).

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ███████████████████

Levandowski's second assumption—that the Court should measure what Levandowski might have been entitled to claim as deferred compensation if he had been terminated on September 29, 2015—proves too much. The premise of Levandowski's argument necessarily is that nothing he did in the first 40 months of his misconduct impacted his right to receive the deferred compensation Google paid to him. Thus, he urges the Court to measure what he would have received if he was terminated on September 29, 2015 when addressing how much of the deferred compensation is allocable to the Tyto Misconduct-only period. But if, as Levandowski argues, none of the 40 months of service in the Tyto-only time period is relevant to the deferred compensation Levandowski received, then the Court must measure what deferred compensation Levandowski would have received if he worked only from September 30, 2015 through January 27, 2016. The answer is indisputable: he would have received no deferred compensation and the only compensation subject to disgorgement would have been his salary. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

Put differently, even if Levandowski is entitled to full indemnification for the four months during which he committed both the excluded Tyto Misconduct and the indemnifiable Otto Misconduct, his indemnification should be limited solely to what he *earned* between September 30, 2015 and January 27, 2016. ████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

[redacted] This argument suffers from the same equitable and legal flaws as his other allocation arguments.

Levandowski's "date of increase in value" argument also misapplies California law. "The general rule ... is that profits subject to disgorgement include any form of consequential gains or other secondary enrichment that is identifiable and measurable on the facts of the case and not unduly remote." *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 894 (2010) (internal citations and quotation marks omitted); *see also Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (disgorgement must include any "consequential gain[] that is identifiable and measurable and not unduly remote"); *Am. Master Lease LLC v. Idanta Partners, Ltd.,* 225 Cal App. 4th 1451, 1488-89 (2014) (erroneous to consider only the value of benefits at the time they were acquired, because restitution must include any later net profit attributable to the underlying wrong); *Cty. of San Bernardino v. Walsh,* 158 Cal. App. 4th 533, 543 (2007) (disgorgement extends to "all advantages ... gained"); *CTC Real Estate Servs. v. Lepe,* 140 Cal. App. 4th 856, 858 (2006) (disgorgement includes later earned profits from sale of wrongfully obtained property); Restatement (Second) of Agency § 403 ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal."). Thus, under well-established California law, any later increase in value of the deferred compensation that vested during the Tyto Misconduct period is subject to disgorgement because of that misconduct and is an Excluded Claim.

Any other result would unjustly enrich Levandowski by allowing him to retain tens of millions

Case 3:20-03002 Doc# 402 Filed 04/24/23 Entered 04/24/23 15:47 Page 20 of
519 of 555

of dollars that he was never entitled to receive and evade the terms of the Agreement, thereby defeating the fundamental public policy limitations that disfavor private indemnification for misconduct.

## IV. Levandowski Owes Uber Over $270 Million In Fraud Damages That May Be Setoff Against Any Judgment (Affirmative Defense 10, Counterclaim VI).

Although the Court held that Uber could not recover affirmatively on its fraud claim, Uber is entitled to establish the claim for purposes of offsetting any judgment against it. [Dkt. 344, at 45-47.] Levandowski's fraud also makes Uber's Claim non-dischargeable. 11 U.S.C. § 523(a)(2)(A); (a)(4); (a)(6). The evidence establishes that Levandowski lied to Uber about his misappropriation of Google's confidential information. Uber justifiably relied upon those misrepresentations in providing indemnity and closing the Otto transaction. Uber repeatedly insisted that Levandowski not bring any Google IP with him, because it recognized that its entire program could be jeopardized if it were infected with improperly acquired IP. As a result of Levandowski's fraudulent concealment of his trade secret theft, the entire purpose of the Otto acquisition was defeated. As a result, Uber was damaged in the amount of $270,241,203.31 that may be set off against any judgment Levandowski obtains. *See All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995) (setting forth elements of a fraud claim); *Labor Comm'r v. Ramirez (In re Ramirez)*, 556 B.R. 446, 451-52 (elements of § 523(a)(2)(A) claim); *Hamilton v. Elite of L.A., Inc.* (*In re Hamilton*), 584 B.R. 310, 318-22 (B.A.P. 9th Cir. 2018) (elements of § 523(a)(6) claim).

## V. Uber's Proof of Claim Should Be Allowed And Setoff Against Any Judgment (Count X, Affirmative Defense 10, Counterclaims VII, IX, X).

Under California law, the right to equitable indemnity arises "where two or more parties are jointly liable on an obligation and one of them makes payment of more than his share." *Res-Care Inc. v. Roto-Rooter Servs. Co.*, 753 F. Supp. 2d 970, 986 (N.D. Cal. 2010) (internal citation omitted). The right to contribution can arise whether the payment is made pursuant to a final judgment or pursuant to a settlement where the settlement includes payment for a concurrent tortfeasor's wrongful conduct. *Id.*; *People ex rel. Dep't of Transp. v. Superior Court*, 26 Cal. 3d 744, 747 (1980).

There are two components to Uber's equitable indemnity claim. *First*, Uber is entitled to equitable indemnity from Levandowski because it paid $250 million to settle a lawsuit in which it was sued for what Levandowski did. As set forth above, all of the allegations in the Waymo lawsuit

24

centered around Levandowski and his misconduct. Uber's only share in the fault was that it failed to discover what Levandowski had done because of Levandowski's lies. Accordingly, a fair allocation would attribute all of the fault to Levandowski, and certainly no more than 10% to Uber.

The second component of Uber's claim is a contribution claim based upon the $9,453,135.87 that Uber paid to Google to satisfy the portions of the Award that were joint and several against Ron and Levandowski. (Award, 123.) Ron assigned his contribution claim to Uber. By definition, Levandowski was a joint tortfeasor as to the joint and several portions of the Award. (*See* Award, 101, 106, 112-13, 120-21, 123.) Because Uber paid that entire amount, and extinguished liability that applied to Levandowski, Uber is entitled to contribution from Levandowski for his share of that payment. *See Res-Care*, 753 F. Supp. 2d at 986.

The Arbitration Panel ruled that, as between Levandowski and Ron, "Levandowski's conduct occurred over a period of time three times longer than Ron's," and that much of the arbitration was focused on Levandowski's disloyalty with respect to Tyto, of which Ron was not a part. (Award, 120.) Further, Levandowski was the key wrongdoer here. Accordingly, Uber submits that Levandowski should be held liable for the full Award, but in any event, at least 80%, or $7,562,509.

Accordingly, Uber's proof of claim should be allowed in the amount of $232,562,509.00 and held to be non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

## CONCLUSION

For the foregoing reasons and based on the facts Uber will prove at trial, Uber is entitled to judgment in its favor on all of Levandowski's claims and all of Uber's counterclaims and defenses.

Dated: January 24, 2022

PACHULSKI STANG ZIEHL & JONES LLP

By      */s/ Debra I. Grassgreen*
      Debra I. Grassgreen
      Miriam Manning
      --and—
      JENNER & BLOCK LLP
      David J. Bradford
      Terri L. Mascherin
      Catherine Steege
      Katharine R. McLaughlin

      *Counsel for Uber Technologies, Inc.*

1    STATE OF CALIFORNIA         )

2    CITY OF SAN FRANCISCO      )

3        I, Oliver Carpio, am employed in the city of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is One Market Plaza, Spear Tower, 40th Floor, Suite 4000, San Francisco, California 94105.

On January 24, 2022, I caused to be served the following documents in the manner stated below:

- **UBER TECHNOLOGIES, INC.'S TRIAL BRIEF**

☑    (BY EMAIL) On, I caused the above-described document(s) to be sent by e-mail to the parties identified below at the e-mail addresses listed.

| Attorneys for Google LLC | Attorneys for Anthony S. Levandowski |
|---|---|
| **MUNGER, TOLLES & OLSON LLP**<br>Thomas B. Walper (thomas.walper@mto.com)<br>John W. Berry (john.berry@mto.com)<br>Alexander S. Gorin (alex.gorin@mto.com) | **KELLER BENVENUTTI KIM LLP**<br>Tobias S. Keller (tkeller@kbkllp.com)<br>Dara L. Silveira (dsilveira@kbkllp.com) |
| **KEKER, VAN NEST & PETERS LLC**<br>Rachael E. Meny (rmeny@keker.com)<br>Thomas E. Gorman (tgorman@keker.com)<br>Reid P. Mullen (rmullen@keker.com | **GOODWIN PROCTER LLP**<br>Brett Schuman (bschuman@goodwinlaw.com)<br>Rachel M. Walsh (rwalsh@goodwinlaw.com)<br>Andrew Ong (aong@goodwinlaw.com) |

I declare under penalty of perjury, under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on January 24, 2022 at San Francisco, California

*/s/ Oliver Carpio* _____
Legal Assistant

# EXHIBIT M

1  TOBIAS S. KELLER (SBN 151445)
   *TKeller@kbkllp.com*
2  DARA L. SILVEIRA (SBN 274923)
   *DSilveira@kbkllp.com*
3  **KELLER BENVENUTTI KIM LLP**
   650 California Street, Suite 1900
4  San Francisco, California 94108
   Tel.: (415) 364-6793
5  Fax: (650) 636-9251

6  BRETT SCHUMAN (SBN 189247)
   *BSchuman@goodwinlaw.com*
7  JENNIFER BRIGGS FISHER (SBN 241321)
   *JFisher@goodwinlaw.com*
8  **GOODWIN PROCTER LLP**
   Three Embarcadero
9  San Francisco, California 94111
   Tel.: (415) 733-6000
10 Fax.: (415) 677-9041

11 Attorneys for Plaintiff and Debtor and
   Debtor in Possession ANTHONY S. LEVANDOWSKI
12
            **UNITED STATES DISTRICT COURT**
13         **NORTHERN DISTRICT OF CALIFORNIA**
              **SAN FRANCISCO DIVISION**
14

15 | In re: | Bankruptcy Case
                No. 20-30242 (HLB)
16 ANTHONY SCOTT LEVANDOWSKI, | Chapter 11

17 Debtor. | **Adv. Pro. No. 20-03050 (HLB)**

18 _____

19 ANTHONY LEVANDOWSKI, an individual, | **TRIAL BRIEF OF ANTHONY LEVANDOWSKI**

20        Plaintiff,
                                    Trial Date:  Feb. 14, 2022
21        v.                        Time:        9:00 AM
                                    Before:     Hon. Hannah L. Blumenstiel
22 UBER TECHNOLOGIES, INC.,

23        Defendant.
   _____

24

25

26            **REDACTED PUBLIC VERSION**

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION. ................................................................................................ 1

II. SUMMARY OF FACTS AND LEGAL THEORIES TO BE PROVEN BY MR. LEVANDOWSKI. ................................................................................................ 4

    A. MR. LEVANDOWSKI IS A PIONEER IN THE AUTONOMOUS VEHICLE SPACE. ................................................................................ 4

    B. UBER'S "EXISTENTIAL" NEED TO BE IN THE GAME. ................................ 5

    C. UBER KNEW THAT MR. LEVANDOWSKI RETAINED COPIOUS AMOUNTS OF CONFIDENTIAL GOOGLE INFORMATION, FORMED OTTO, AND SOLICITED NUMEROUS GOOGLE EMPLOYEES TO JOIN OTTO – AND IT AGREED TO INDEMNIFY HIM FOR THESE AND OTHER "BAD ACTS" ANYWAY. ................................ 6

    D. THE INDEMNIFICATION AGREEMENT. ........................................................ 9

    E. AFTER GOOGLE ASSERTS CLAIMS AGAINST MR. LEVANDOWSKI, AND AFTER UBER INVESTIGATES THOSE CLAIMS, UBER AGREES TO DEFEND AND INDEMNIFY MR. LEVANDOWSKI. ........................................................................................ 10

    F. UBER ATTEMPTS TO RESCIND THE INDEMNIFICATION AGREEMENT. .................................................................................................. 12

    G. LEGAL THEORIES TO BE PROVEN AT TRIAL. ............................................. 12

III. UBER'S DEFENSES TO INDEMNITY WILL FAIL AT TRIAL. ............................... 13

    A. UBER'S UNCLEAN HANDS DEFENSE WILL FAIL. ..................................... 13

    B. UBER'S FRAUDULENT INDUCEMENT DEFENSE WILL FAIL. ................. 15

        1. UBER'S THEORY OF FRAUD REGARDING TYTO WILL FAIL. ............................................................................................... 15

        2. UBER'S THEORY OF FRAUD REGARDING GOOGLE'S TRADE SECRETS WILL FAIL. ........................................................ 17

    C. UBER POST-SIGNING SPECIFIED BAD ACT DEFENSE WILL FAIL. ........ 18

    D. UBER WILL BE UNABLE TO PROVE THAT THE MAJORITY OF THE GOOGLE JUDGMENT IS ATTRIBUTABLE TO ANY TYTO EXCLUDED CLAIM. ........................................................................................ 20

IV. UBER'S EQUITABLE INDEMNITY COUNTERCLAIM WILL FAIL. ...................... 21

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Blain v. Doctor's Co.*,
222 Cal. App. 3d 1048 (Cal. Ct. App. 1990) ........................... 13

*Catastrophe Servs., Inc. v. Manuel*,
No. 2:20-CV-1083-TLN, 2021 WL 4261499 (E.D. Cal. Sept. 20, 2021)............................... 22

*CrossTalk Prods., Inc. v. Jacobson*,
65 Cal. App. 4th 631 (Cal. Ct. App. 1998) ........................... 13

*Expressions at Rancho Niguel Ass'n v. Ahmanson Devs., Inc.*,
86 Cal. App. 4th 1135 (Cal. Ct. App. 2001) ..................... 22

*Insurance Co. of North America v. Liberty Mutual Insurance Co.*,
128 Cal. App. 3d 297 (Cal. Ct. App. 1982) ..................... 14

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945)......................................... 13

*Republic Molding Corp. v. B. W. Photo Utils.*,
319 F.2d 347 (9th Cir. 1963)............................... 13

*Serv. by Medallion, Inc. v. Clorox Co.*,
44 Cal. App. 4th 1807 (Cal. Ct. App. 1996) ............ 15

*Tomerlin v. Canadian Indem. Co.*,
61 Cal. 2d 638 (1964) ............................................. 4

**Statutes**

Cal. Civil Code § 1431.1................................................. 22

## I. INTRODUCTION.

The essential context for this case – and the two litigations that preceded it, *Waymo v. Uber* and *Google v. Levandowski et al.* – is Uber Technologies, Inc.'s ("Uber") decision to go to "war" with Intervenor Google LLC ("Google") over autonomous or "self-driving" car technology. By late 2014, Uber's then-CEO Travis Kalanick believed it was "existential" for his company to win the race with Google to be the first to commercialize this technology: "The minute it became clear to us that our friends in Mountain View were going to be getting in the ride-sharing space, we needed to make sure there is an alternative [self-driving car]." Decl. Ex. 1 at 4. [1]

The problem for Uber was that, by late 2014, Google was many years ahead of Uber in developing this cutting-edge technology. That head start was due in large part to Anthony Levandowski ("Mr. Levandowski"). Mr. Levandowski is a widely recognized pioneer in the autonomous vehicle industry, and he was one of the founding members of Google's self-driving car initiative called Project Chauffeur. Mr. Levandowski's outsized contribution to Google's development of this technology should be undisputed: when Google created a special bonus program for members of Project Chauffeur, Mr. Levandowski was awarded ███████████ ████████████████████████████████████████████.

So Uber and Mr. Kalanick had to move fast. In early 2015, Uber acquired a group of engineers in Pittsburgh to begin work on autonomous vehicle technology. That group included, among others, John Bares, who will testify (via pre-trial deposition) during this trial. But Uber realized this was not going to be enough. When Mr. Kalanick, who also will testify during trial, learned that Mr. Levandowski was considering leaving Google to launch a self-driving truck start up, he pursued Mr. Levandowski and his team of mostly former Google Project Chauffeur engineers. Uber knew that the best way to catch up to Google was to hire a substantial part of the Google team that put Google in the lead in the first place and knew everything about Google's technology.

To get these things from Google, Uber was willing to enter into what can only be

---

[1] All references to "Decl. Ex. __" in this document refer to the exhibits attached to the concurrently submitted Declaration of Jennifer Briggs Fisher.

characterized as an extraordinary Indemnification Agreement[2] with Mr. Levandowski as part of the April 2016 transaction whereby Uber acquired Mr. Levandowski's two new start-ups: Ottomotto LLC ("Otto") and Otto Trucking LLC ("Otto Trucking"). In most M&A transactions, the seller typically indemnifies the buyer for pre-acquisition liabilities. In this case, the Indemnification Agreement obligates the buyer, Uber, to indemnify the sellers, including Mr. Levandowski. And in this Indemnification Agreement, Uber agreed to indemnify Mr. Levandowski for so-called "Bad Acts" he committed against his former employer Google, including willful trade secret misappropriation, willful breach of fiduciary duty or duty of loyalty, and willful breach of any non-solicitation or non-competition obligations that Mr. Levandowski owed to Google. Uber was aware of the possibility of "super duper" litigation with Google resulting from its acquisition of Mr. Levandowski and his team from Google and, in the final Indemnification Agreement, Uber's potential liability is uncapped.

As part of its diligence on the transaction, Uber learned that Mr. Levandowski had retained lots of Google confidential information and trade secrets; that he had accessed some of those files after leaving Google's employ; that he had solicited Google engineers to leave Google with him, including his direct reports at Project Chauffeur; and that he and another Google employee, Lior Ron, had planned and formed Otto while Mr. Levandowski was still employed by Google. Several high-ranking Uber executives warned Mr. Kalanick not to proceed with the transaction – including Uber's General Counsel – but, notwithstanding all of these red flags and warnings, Uber went ahead with the transaction and the agreement to indemnify Mr. Levandowski anyway.

As everyone – including Uber – expected, Google took action promptly after Uber's acquisition of Mr. Levandowski's companies was announced in August 2016. Google initiated two arbitrations against Mr. Levandowski. In one of its arbitration demands, Google alleged that Mr. Levandowski was involved with a company called Tyto LiDAR in violation of his obligations to Google. Mr. Levandowski tendered his defense of these arbitration demands to Uber under the Indemnification Agreement. In early November 2016, Uber's counsel Eric Tate from the Morrison

_____
[2] "Indemnification Agreement" refers to Dkt. No. 49-1, which is Exhibit A to the First Amended Complaint.

& Foerster LLP ("MoFo") firm interviewed Mr. Levandowski about Google's allegations, including the allegations relating to Tyto. Uber in-house lawyers were present for this interview too. In response to Mr. Tate's questions, Mr. Levandowski confirmed as true many of the allegations set forth in Google's arbitration demand and, importantly, expressly admitted that he had failed to disclose Tyto to Uber previously. *See* Dkt. 344 at 37. Following this interview and knowing that Mr. Levandowski did not expressly disclose Tyto to Uber or its agents during diligence on the Uber-Otto transaction, Uber made the decision to accept Mr. Levandowski's tender. Uber initially appointed MoFo to represent Mr. Levandowski; it later replaced MoFo with Goodwin Procter LLP ("Goodwin"). Uber fully exercised its contractual right to direct and control Mr. Levandowski's defense of the arbitration. Uber paid all defense counsel and expert expenses; it requested and received regular reports about the progress of the arbitration; it approved all material litigation strategy decisions, including regarding settlement opportunities; it requested and received daily reports from Mr. Levandowski's Uber-appointed defense counsel on the progress of the final arbitration hearing. Uber's direction and control materially limited Mr. Levandowski's options for defending against Google's claims during the arbitration – for example, he couldn't implead Uber or make certain assertions against Uber during the arbitration while Uber was controlling and paying for his defense. After the arbitrators issued an initial decision in favor of Google, Uber purported to rescind the Indemnification Agreement. Following the arbitrators' final award, and confirmation of that award by the San Francisco Superior Court, Uber refused to pay Google on the resulting judgment. Uber's refusal forced Mr. Levandowski to file this bankruptcy to stay Google's execution on the judgment. Mr. Levandowski subsequently commenced this adversary proceeding to hold Uber to its indemnity obligation.

The evidence at trial will show that Uber is liable under the Indemnification Agreement to pay most if not all of the Google judgment against Mr. Levandowski. Although Uber has now abandoned its initial attempt to rescind the Indemnification Agreement, it has put up myriad defenses that will all fail to vitiate its indemnity obligation to Mr. Levandowski. Importantly, even if Uber could prove that its liability under the Indemnification Agreement is excused or somehow limited to less than the full amount of the Google judgment, Uber should be estopped by its conduct

from refusing to indemnify Mr. Levandowski now.  *Tomerlin v. Canadian Indem. Co*., 61 Cal. 2d 638, 648-50 (1964).  Uber's counterclaims will also fail at trial.

## II.  SUMMARY OF FACTS AND LEGAL THEORIES TO BE PROVEN BY MR. LEVANDOWSKI.

### A.  Mr. Levandowski Is A Pioneer In The Autonomous Vehicle Space.

Mr. Levandowski graduated from UC-Berkeley in 2003 with bachelor's and master's degrees in Industrial Engineering and Operations Research.  He is a hardware engineer.

In 2003, Mr. Levandowski and fellow UC Berkeley engineers started building an autonomous motorcycle, nicknamed Ghost Rider, for the 2004 DARPA Grand Challenge.  Ghost Rider was the only autonomous two-wheeled vehicle in the competition.  Ghost Rider finished in second place in the 2004 competition.  In 2007, Mr. Levandowski donated the Ghost Rider to the Smithsonian National Museum of American History, where it now resides.

In 2007, Mr. Levandowski joined Google to work initially on its "Street View" project.

In 2008, Mr. Levandowski was approached by the director of Discovery Channel's *Prototype This!* Television show with a request to use Ghost Rider in an episode to deliver a pizza using an unmanned vehicle.  But Ghost Rider was already in the Smithsonian, so Mr. Levandowski offered to build a self-driving Toyota Prius for the show.  Google did not want to be involved, out of concern for potential liability.  But with Google's approval Mr. Levandowski built the "PriBot," which was a self-driving Toyota Prius with one of the first spinning Lidar laser ranging units and the first-ever to drive on public roads.  For the show footage, the police cleared the road and escorted Mr. Levandowski's PriBot from San Francisco across the Bay Bridge.

In early 2009, Google approved the launch of a project within Google to develop self-driving cars.  Levandowski was a founding member of that project.  This project eventually became known as Project Chauffeur.  Project Chauffeur catapulted Google into the lead in autonomous driving when, in 2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of one-hundred miles.  By 2012, Google had logged over 300,000 miles of

autonomous driving.[3]  Mr. Levandowski was a key contributor in helping Google achieve these milestones. ████████████████████████████████████, Google invited Mr. Levandowski to participate in the Chauffeur Bonus Plan—an incentive plan that paid its participants ████████████████████████████████████— and gave him ████████████████████████████████████. Decl. Ex. 3 at 18:23-20:16.

By late 2014, Google was considered the leader in the self-driving car space.

**B.    Uber's "Existential" Need To Be In The Game.**

By late 2014, Uber wanted to ████████████  Decl. Ex. 4 at 127:25; Decl. Ex. 1. ████

████████████████████████████████████  Decl. Ex. 4 at 127:25-128:4. Mr. Kalanick viewed developing and commercializing autonomous vehicles as "existential for us." Decl. Ex. 1 at 4.  For this reason, Uber initially recruited a team of Carnegie Mellon engineers to try to close the gap with Google; but still Uber was three to four years behind Google.  Decl. Ex. 4 at 129:8-130:12.

Mr. Levandowski's earliest discussions with Uber were with its CEO, Mr. Kalanick, beginning in May 2015.  By September 2015, Mr. Levandowski began to engage with others at Uber.  By that time, Mr. Levandowski had become disillusioned with Project Chauffeur, primarily because of Google's conservatism with the project.  Mr. Levandowski wanted to move faster than the program's (and Google's) senior leadership to commercialize the technology. Mr. Levandowski was considering leaving Google to form his own start-up venture.

Initially, the discussions with Uber centered around Uber purchasing lasers used for autonomous vehicles from Mr. Levandowski's yet-to-be-formed start-up.  Dkt. No. 127-19 at 17. But by early Fall 2015, Uber, Mr. Levandowski and his Otto co-founder Mr. Lior Ron began meeting more frequently to discuss a potential transaction.  *See* Decl. Ex. 5 at 1764:17-20, 1765:6-15; Decl. Ex. 6 (September 2015 term sheet).  By that time, Mr. Levandowski had identified numerous Google engineers—including some of his direct reports—to recruit to leave Google and

---

[3] Sometime shortly thereafter, Mr. Levandowski met Uber's co-founders, Travis Kalanick and Garret Camp, and gave Mr. Kalanick a ride in Google's self-driving car.

1  join his start-up.  Decl. Ex. 7 ("Corrected Final Award" or "CFA") at 38; Dkt. No. 127-19 at 4-6;

2  Decl. Ex. 8 at 3-4; Decl. Ex. 9 at 2-4; Decl. Ex. 10 at 260:18-264:10; Decl. Ex. 11 at 5-7, 10.

3       Mr. Ron left Google on January 13, 2016.  He incorporated the new company, Otto, and

4  took other actions to launch the new company.  Decl. Ex. 11 at 9-10.

5       Mr. Levandowski left Google on January 27, 2016.  By that time, with Uber's knowledge

6  and encouragement, Mr. Levandowski and Mr. Ron had recruited (and reported to Uber that they

7  recruited) sixteen Google employees to join Otto.  Decl. Ex. 12 at 233:22-234:15; Decl. Ex. 13 at

8  1.  In fact, Uber affirmatively incentivized Mr. Levandowski's recruiting from Google by offering

9  Mr. Levandowski a premium for each Google engineer he brought to Uber with him.  Decl. Ex. 10

10  at 67:5-68:6; Decl. Ex. 14 at 6, 9 (Bares document re benefits of Mr. Levandowski's team); Decl.

11  Ex. 12 at 139:11-17 (testimony re Decl. Ex. 14); *see also* Decl. Ex. 15 at 2 (identifying "Newco,"

12  i.e., Otto, as having 20-25 Google employees).

13  **C.    Uber Knew That Mr. Levandowski Retained Copious Amounts Of
        Confidential Google Information, Formed Otto, And Solicited Numerous
14        Google Employees To Join Otto – And It Agreed To Indemnify Him For
        These And Other "Bad Acts" Anyway.**

15

16       Mr. Levandowski told Uber that Google would likely take aggressive action if Uber

17  acquired his new companies.  Both he and Mr. Ron insisted that Uber defend and indemnify them

18  from this anticipated Google response.  Uber agreed to do so in the Indemnification Agreement.

19  The Indemnification Agreement was one of the agreements signed on April 11, 2016, along with

20  the many other documents relating to Uber's acquisition of Otto and Otto Trucking.  In other words,

21  indemnification was part-and-parcel of Mr. Levandowski's agreement to sell his companies to

22  Uber.

23       Before Uber executed the Indemnification Agreement, it required Mr. Levandowski (and

24  others) to submit to a diligence process led by MoFo and Stroz Friedberg LLC ("Stroz"), the firm

25  engaged to conduct the investigation.  *See e.g.*, Dkt. No. 127-14 at ¶¶ 3, 5, 7, 9, 10, 12, 13.  On

26  March 22 and 23, 2016, Mr. Levandowski identified over thirty-five devices and ten electronic

27  accounts (such as email and cloud storage) that were available to Stroz for forensic examination.

28  Dkt. No. 127-19 at 4, 18-19.

Also on March 22 and 23, 2016, Mr. Levandowski sat for two days of interviews with Stroz. *See id.* at 1. Stroz focused these interviews on Mr. Levandowski's treatment and use of Google confidential information while still employed by Google and after. Mr. Levandowski identified several folders on his devices that contained Google confidential information. Stroz also asked Mr. Levandowski questions regarding his employment agreements with Google, including questions regarding side projects and whether Google approved or was even aware of them. Mr. Levandowski did not expressly disclose his connections to Tyto LiDAR in response to the questions put to him during the Stroz interview. *See* Dkt. No. 128-3 at 281:1-11; 281:25-283:9.

Among other things, Mr. Levandowski told Stroz about a particular hard drive – the "Drobo 5D" drive – that contained a substantial amount of Google confidential information. Dkt. No. 127-19 at 14-15. As Mr. Levandowski told Stroz, he had already disclosed this to Uber and, during his meeting with Uber regarding the drive, he understood Uber to have instructed him to destroy it. *Id.* Mr. Levandowski followed that instruction from Uber and had the hard drive taken to a scrap yard to be destroyed. Dkt. No. 127-19 at 14-15. Stroz and MoFo undertook substantial efforts to try to verify the details of this information provided by Mr. Levandowski. Dkt. No. 127-20 at 11-12 ; Decl. Ex. 16 at 94:13-20; 99:14-104:13; Decl. Ex. 17 at 1-5.

On April 1, 2016, Stroz interviewed Mr. Levandowski again regarding his downloading practices and destruction of certain Google documents. *See* Dkt. No. 127-19 at 3.

By early April, Uber wanted to sign the deal to acquire Mr. Levandowski's companies. But Stroz was nowhere near done with its diligence process. Decl. Ex. 18 at 1. Stroz requested additional time to complete its diligence process; Uber said no. Decl. Ex. 19 at 39:9-18. Uber asked Stroz to provide preliminary results of its investigation and Stroz complied with these requests. The information Stroz provided to Uber in early April 2016 put Uber on notice that it would be subject to potentially significant liability if it went forward with the transaction and indemnified Mr. Levandowski. For example, Stroz provided Uber with forensic metadata that included a report showing the time of last access for documents on Mr. Levandowski's personal devices identified by him during his interview. Decl. Ex. 20. In just this one report, Uber could determine that Mr. Levandowski had accessed over 130 documents and photos containing Google

information after he left Google on January 27, 2016.  *See* Decl. Ex. 20.  These documents included files such as █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████  *Id.*

As MoFo's Eric Tate, who supervised the Stroz investigation for Uber, pithily summarized the situation for Uber, Mr. Levandowski retained ████████████████████████████████████ Dkt. No. 127-18; Dkt. No. 127-15 at 139:19-140:14; 143:3-146:10; *see also* Dkt. No. 127-19 at 18-19.

On April 8, 2016, Uber sent an updated draft of the Indemnification Agreement to the Otto team, taking out the requirement that the Stroz due diligence investigation be completed before execution of the Indemnification Agreement.  Decl. Ex. 22.  Later that day, because Mr. Levandowski's team was concerned about Uber dispensing with this requirement, his counsel proposed language providing that Uber was agreeing to the Indemnification Agreement despite the fact that Stroz had not yet issued a final report.  *Id.*  Uber rejected Mr. Levandowski's proposed language and instead decided to proceed, despite the fact that the investigation was incomplete. *See id.*

On April 9, 2016, Uber's counsel continued to push Mr. Levandowski to move forward with the deal, writing, ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████

███████  *See* Decl. Ex. 23 at 1.  In fact, on April 10, 2016, Stroz requested a follow-up interview with Mr. Levandowski to discuss further his access to the files containing Google's information. Decl. Ex. 24 at 1. But Uber was rushing to get the deal signed, so they agreed that Mr. Levandowski did not need to submit to any additional interviews with Stroz.  Decl. Ex. 25 at 238:4-240:9.  The next day, on April 11, 2016, Uber executed the Indemnification Agreement along with the other transaction documents to acquire Mr. Levandowski's companies, Otto and Otto Trucking.

Stroz continued its process after the deal was signed.  On August 5, 2016 – before the deal for Uber to acquire Otto and Otto Trucking closed – Stroz provided Uber with a Summary Report of its findings.  In this report, Stroz told Uber, among other things, that Mr. Levandowski: "(a)

possessed Google confidential information; (b) solicited a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars." Dkt. No. 127-20 at 9. Stroz also noted that Mr. Levandowski had downloaded Google documents shortly before he left Google and had accessed at least some of those documents after he left. *See id.* at 13 ("A review of the internet history shows access to Google Docs on January 26, 2016, the day of Levandowski's resignation. In particular, he accessed a file named 'Chauffeur TL weekly updates - Q4 2015 – Google Sheets.' . . . The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google)"). It also noted discrepancies in Mr. Levandowski's interview responses and its forensic findings and alerted Uber to the fact that Mr. Levandowski had destroyed files and communications in advance of the investigation. *Id.* at 14-15.

Senior executives at Uber warned Uber's CEO, Mr. Kalanick, against proceeding with the Uber-Otto transaction, including former General Counsel Salle Yoo. Decl. Ex. 26 at 1-2. But Uber proceeded with the transaction anyway. On August 18, 2016, Uber closed the Otto transaction.

### D. The Indemnification Agreement.

There is no dispute that Uber undertook to indemnify Mr. Levandowski (and others) for claims that might be asserted against him by Google, including claims for breach of duty of loyalty, misappropriation of Google's trade secrets and confidential information, breach of a non-solicitation obligation, among others:

**2.1 Indemnification.**

(a) ***Purchaser will indemnify*** and hold harmless each Diligenced Employee[4] and the Company Group, to the maximum extent permitted by applicable Law (subject to the limitations and exclusions set forth herein), ***from and against any and all Expenses incurred by such Diligenced Employee or any member of the Company Group, as applicable***, ***arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against*** any member of the Company Group or ***such Diligenced Employee***, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company

---

[4] The Diligenced Employees were: Mr. Levandowski; Mr. Ron; Soren Juelsgaard; Colin Sebern; and Don Burnette.

Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims"); . . .

Indemnification Agreement § 2.1 (emphasis added).

Thus, under the terms of the Indemnification Agreement, Uber is required to indemnify Mr. Levandowski for "any claim brought or threatened in writing by any Former Employer of such Diligenced Employee"—which means Google in this case—if the claim is "alleged to arise out of" (1) a patent/trade secret/confidential information claim (Indemnification Agreement § 2.1(a)(i)), (2) a breach of loyalty/fiduciary duty claim (*id.* § 2.1(a)(ii)), and/or (3) a breach of non-solicitation, non-competition, or confidentiality agreement claim (*id.* § 2.1(a)(iii)). Moreover, Uber specifically contemplated and voluntarily accepted the risk that Mr. Levandowski might be found liable for intentionally undertaking any number of "Bad Acts," including "fraud," "willful, intentional or deliberate" "trade secret" "misappropriation," "willful and/or intentional breach . . . of loyalty," and "willful and/or intentional breach of . . . non-solicitation . . . [and] confidentiality agreements." *Id.* at 1-2.

### E. After Google Asserts Claims Against Mr. Levandowski, And After Uber Investigates Those Claims, Uber Agrees To Defend And Indemnify Mr. Levandowski.

On October 28, 2016, Google commenced two arbitration proceedings against Mr. Levandowski (including one demand asserting claims against Mr. Levandowki's colleague, Lior Ron, Otto's co-founder). Dkt. No. 49-6 (Ex. D ("Google's Arbitration Demand")) at 9-20, 29-49. Mr. Levandowski promptly tendered his defense to Uber.

On November 3, 2016, Uber's outside counsel, MoFo's Eric Tate, interviewed Mr. Levandowski about Google's claims. Dkt. No. 128-15 at 2. Among other things, Mr. Tate walked through Google's allegations against Mr. Levandowski with respect to his connections to Tyto LiDAR. *Id.* at 2-4. Mr. Levandowski truthfully answered all of Mr. Tate's questions regarding Tyto LiDAR. At this point, Uber knew that: (1) Mr. Levandowski did not expressly

disclose his connections to Tyto during the Stroz interview process; and (2) Uber was potentially subject to liability for Google's claim against Mr. Levandowski based on Tyto if Uber accepted Mr. Levandowski's tender. Nevertheless, after this November 3, 2016 interview with Mr. Levandowski, Uber accepted the tender and agreed to defend and indemnify Mr. Levandowski in the *Google v. Levandowski* arbitration. Google's Arbitration Demand at 10-14, 20, 32-34, 39-42, 47; Dkt. No. 128-15 at 2.

Uber initially appointed MoFo to defend Mr. Levandowski, which it did until Uber replaced MoFo with Goodwin as Mr. Levandowski's counsel. Uber controlled Mr. Levandowski's defense and paid for Mr. Levandowski's legal representation during the arbitration. Dkt. No. 49 (First Amended Complaint ("FAC")) ¶ 120; Dkt. No. 63 ("Answer") ¶ 120; *see also id.* at ¶ 13. Uber approved all material litigation decisions and Uber received regular updates on developments in the arbitration from Mr. Levandowski's Uber-appointed defense counsel. Uber's control of the defense materially impacted the defense. For example, Mr. Levandowski could not serve subpoenas on Uber. Mr. Levandowski also could not settle the case without Uber's approval.

In March 2019, the arbitrators issued an interim award in favor of Google. *See* CFA at ii. The panel found Mr. Levandowski liable for three of the four claims asserted against him by Google. *Id.* at 47; 66; 67, 74; 84; 86-87.

First, the arbitrators found Mr. Levandowski liable for breaching the duty of loyalty to Google. The panel found "that Google proved that, commencing in May 2012 and continuing to August 2015, Mr. Levandowski's conduct with respect to Tyto LiDAR was competitive with Google and that this conduct breached his duty of loyalty." *Id.* at 47. With regard to Mr. Levandowski's creation of Otto and subsequent sale of Otto to Uber, the panel found Mr. Levandowski's "conduct was competitive with Google and breached [his] duty of loyalty." *Id.* at 48. Further, the panel found that Mr. Levandowski wrongfully solicited Google employees while employed at Google. *Id.* at 51.

Second, the panel found Mr. Levandowski <u>not</u> liable to Google for breach of fiduciary duty. *Id.* at 66.

Third, the panel found Mr. Levandowski liable for breaching his non-competition and non-

solicitation agreements with Google based on his actions with respect to Tyto and Otto. *Id.* at 67, 74 (the panel found that Mr. Levandowski also breached a non-competition agreement, but found the provision invalid), 84.

Fourth, the panel found, based on Mr. Levandowski's breach of loyalty, that Mr. Levandowski also violated California's Unfair Competition Law. *Id.* at 86-87.

**F.      Uber Attempts to Rescind the Indemnification Agreement.**

On August 30, 2019, Uber informed Mr. Levandowski that it was rescinding the Indemnification Agreement and would not pay the award in favor of Google. Answer ¶ 118; Dkt. No. 49-11 (FAC Ex. I). Once the judgment was entered confirming the arbitration award in favor of Google, Uber refused to pay the judgment. Answer ¶¶ 126, 127. Mr. Levandowski therefore had to file this bankruptcy to stay execution on the judgment by Google. *See* Answer ¶ 131.

**G.      Legal Theories To Be Proven At Trial.**

The judgment in favor of Google arises from claims expressly covered under the Indemnification Agreement. Google is Mr. Levandowski's former employer, and it brought the arbitration claim against Mr. Levandowski based on his work at Google. *See* Indemnification Agreement § 2.1; CFA at 1 ("In this arbitration, Claimant Google LLC ('Google') seeks disgorgement of salary and bonuses, damages and other relief from two of its former employees, Respondent Anthony Scott Levandowski ('Levandowski') and Respondent Lior Ron ('Ron').").

The panel found Mr. Levandowski liable for breaching the duty of loyalty, breaching his non-solicitation and non-competition agreements, and violating California's Unfair Competition Law based on his breach of his duty of loyalty during his employment at Google. CFA at 47; 66; 67; 74; 84; 86-87. Those three claims "arise out" of the claims identified in the Indemnification Agreement at Section 2.1, including specifically the claims listed in Section 2.1(a)(ii) and (iii). Indemnification Agreement § 2.1.

While Uber may raise specific defenses at trial (some of which are addressed below), there is no real dispute that, if those defenses fail, Uber is obligated to indemnify Mr. Levandowski under the Indemnification Agreement.

# III. UBER'S DEFENSES TO INDEMNITY WILL FAIL AT TRIAL.

Uber has $200 million reasons to try to avoid its indemnity obligation to Mr. Levandowski. Uber has raised myriad potential defenses during pre-trial proceedings, but it is unclear which of these defenses Uber actually intends to pursue. Like its rescission defense, and its now-dismissed claim that Mr. Levandowski breached the Indemnification Agreement by now allowing Uber to direct and control his defense, Uber may expressly withdraw or simply fail to pursue at trial some of the many defenses and theories it has raised or suggested to date. Therefore, Mr. Levandowski only succinctly addresses some of the defenses Uber has raised to date below, and he reserves his right to respond fully to all defenses, theories and counterclaims that Uber may decide to pursue at trial.

## A. Uber's Unclean Hands Defense Will Fail.

It is axiomatic that a party seeking to invoke the unclean hands defense must have its own hands clean. *See CrossTalk Prods., Inc. v. Jacobson*, 65 Cal. App. 4th 631, 647 (Cal. Ct. App. 1998) ("[H]e who comes into equity must come with clean hands.") (quoting 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 8, p. 684); *see also Blain v. Doctor's Co.*, 222 Cal. App. 3d 1048, 1062 (Cal. Ct. App. 1990) (finding that the doctrine of unclean hands should not "[deny] relief to one party against another when both have been engaged in a fraudulent transaction . . .") (quoting *Clark v. Millsap*, 197 Cal. 765, 785-86 (1926)); *Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347, 350 (9th Cir. 1963) ("In the interests of right and justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public. Rather the court must weigh the substance of the right asserted by plaintiff against the transgression which, it is contended, serves to foreclose that right."). The Supreme Court described this "equitable maxim" as "far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

The evidence at trial will show that Uber's hands are very unclean and, therefore, its unclean

1  hands defense will fail.  By way of example only, Uber encouraged – and even financially
2  incentivized – Mr. Levandowski to solicit people from Google.  Decl. Ex. 10 at 67:5-68:6; Decl.
3  Ex. 14 at 6, 9 (internal Uber emails detailing the benefits of Mr. Levandowski's Google team);
4  Decl. Ex. 12 at 139:11-17 (testimony re emails); *see also* Decl. Ex. 15 at 2  (Newco deal review).
5  This is some of the very conduct that Mr. Levandowski was found liable to Google for and that he
6  is seeking indemnity for from Uber.  Further, Uber hired Mr. Levandowski and his team specifically
7  because it wanted to acquire and leverage their unique knowledge of Google's self-driving car
8  technology.  Uber knew that Mr. Levandowski had left Google with █████████████████████
9  █████████████████████  and that he had accessed at least some of that information after he left Google.
10 Dkt. No. 127-18; Dkt. No. 127-15 at 139:19-140:14; 143:3-146:10; *see also* Dkt. No. 127-19 at 18-
11 19.  Knowing all of this, Uber undertook to indemnify Mr. Levandowski for claims asserted against
12 him by Google and it should be precluded from invoking unclean hands to avoid that obligation
13 now.

14        Further, it also is axiomatic that a defendant who has profited from the wrongful conduct
15 cannot invoke an unclean hands defense.  For example, in *Insurance Co. of North America v.*
16 *Liberty Mutual Insurance Co.*, 128 Cal. App. 3d 297 (Cal. Ct. App. 1982), the Court of Appeal
17 affirmed the trial court's denial of demurrer on an unclean hand defense.  *Id.* at 307–08.  This case
18 pertained to co-insurance obligations where Insurance Company of North America ("INA") and
19 Liberty both were insurers in the dispute.  *Id.* at 300.  Liberty claimed that INA's refusal to tender
20 defense to the insured precluded them from participating in the underlying action by reason of
21 unclean hands.  *Id.* at 307.  The Court of Appeal found that INA's refusal caused no harm to Liberty
22 and, in fact, benefitted Liberty as it was able to maintain exclusive control of the defense and
23 settlement negotiations.  *Id.* at 307-308.  It explained, "[a]s a general rule, the doctrine of unclean
24 hands is applicable only when the party seeking to invoke it was injured by the alleged wrongful
25 conduct. . . .  A fortiori, where the defendant has profited by the wrongful conduct, he is in no
26 position to invoke the maxim." *Id.* at 308.

27        Here, Uber has profited massively from its acquisition of Mr. Levandowski's companies,
28 Otto and Otto Trucking.  To state the obvious, Uber continued to benefit from the technology it

acquired from Otto and from the employees – including key employees from Google's Project Chauffeur – that came over to Uber as a result of the transaction. In December 2020, Uber sold its Advanced Technologies Group – which included the people and technology that Uber acquired from Otto – to Aurora Innovation, Inc. for a 26% ownership interest in Aurora on a fully diluted basis. Decl. Ex. 27 at 2. The transaction valued Aurora at $10 billion. *Id.* And, in September 2021, Uber Freight – which is the Uber business unit based on Uber's acquisition of Mr. Levandowski's Otto Trucking company – was valued at $3.5 billion. Decl. Ex. 28 at 1. In a series of transactions that are the subject of claims that have been bi-furcated and that will not be tried in the upcoming trial, Uber cut Mr. Levandowski out of receiving any of the benefits he otherwise would have received from Uber's ongoing profiteering from its acquisition of Otto and Otto Trucking.

**B.     Uber's Fraudulent Inducement Defense Will Fail.**

Uber alleges two narrow theories of fraud: (1) Uber alleges it was induced into signing the Indemnification Agreement when Levandowski allegedly failed to tell Uber about his involvement in forming Tyto while at Google, and (2) Uber alleges that Mr. Levandowski lied not about the fact that he had retained Google trade secrets and confidential information—Uber indisputably knew about that—but about <u>why</u> he had done so. Uber cannot avoid its indemnity obligation to Mr. Levandowski based on either of these theories.

**1.     Uber's Theory Of Fraud Regarding Tyto Will Fail.**

In order for the alleged frauds to defeat Mr. Levandowski's claim, they must have been material to the transaction. "[A] false representation which cannot possibly affect the intrinsic merits of a business transaction must necessarily be immaterial because reliance upon it could not produce injury in a legal sense." *Serv. by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1818 (Cal. Ct. App. 1996) (quoting *Hill v. Wrather*, 158 Cal. App. 2d 818, 824 (Cal. Dist. Ct. App. 1958)).

Uber alleges that Mr. Levandowski's failure to expressly disclose his connection to Tyto was fraud and that it either would not have acquired Otto or would not have agreed to indemnify Mr. Levandowski if he had been more forthcoming about his connection to Tyto. This allegation

will fail at trial for at least the following reasons.

*First*, it is undisputed that Mr. Levandowski provided devices to Stroz containing documents showing his connections to Tyto. Indeed, most of the Tyto-related documents that Google used in the underlying *Google v. Levandowski* arbitration to obtain the judgment against Mr. Levandowski came from those very devices. Uber had custody, control and access to those devices since Mr. Levandowski turned them over to Stroz in March 2016.

*Second*, it is undisputed that Uber knew about Mr. Levandowski's connections to Tyto by no later than November 3, 2016, when its counsel, Mr. Tate, interviewed Mr. Levandowski about Tyto specifically, among other things. Uber also knew by no later than that date that Mr. Levandowski did not expressly disclose Tyto to Stroz. Yet, following that November 3, 2016 meeting, and the supposedly new information it learned at that meeting, Uber nevertheless agreed to accept Mr. Levandowski's tender and control his defense of the *Google v. Levandowski* arbitration through the final hearing and interim award.

*Third*, the evidence at trial will show that Tyto was not material. Tyto was a tiny company that Uber was content to let Otto acquire without asking many questions. Uber's litigation-inspired contention that it would not have done the Uber-Otto deal or agreed to indemnify Mr. Levandowski if it had only known of his connections to Tyto is not credible in the light of the potentially massive risk and exposure that Uber was already knowingly undertaking by proceeding with the Otto transaction in the face of all of the other red flags it received and warnings not to do so. Uber already knew that it faced substantial indemnity exposure for Mr. Levandowski's solicitation of Google employees, yet it encouraged Mr. Levandowski to take those risks because it needed to employ Google engineers and scientists catch up to Google. Uber also knew that Mr. Levandowski sought to assist Uber—Google's competitor—while he worked at Google, risking that Mr. Levandowski (and therefore Uber) would be required to pay damages for a breach of his duty of loyalty. Uber even agreed to indemnify Mr. Levandowski for "willful, intentional, and deliberate" breaches of his duties of loyalty, breaches of his non-competition agreement, breaches of his non-solicitation agreement, and misappropriation of trade secret confidential Google information. Indemnification Agreement at 2 ("Bad Acts" definition). Uber agreed to take on this

1   exposure because of the ██████████████ to compete with Google. Decl. Ex. 29 at 2.

2   Uber executives believed that if Uber did not get to market first in self-driving, it ████████

3   ██████   Decl. Ex. 12 26:25-27:9, 27:10-20, 28:9-20. Uber was preparing to go to war with

4   Google. Decl. Ex. 30 at 166:19-167:7.

5              **2.      Uber's Theory Of Fraud Regarding Google's Trade Secrets Will Fail.**

6          When Uber acquired Mr. Levandowski and his team of mostly former Google engineers, it

7   plainly wanted what they knew about Google's self-driving car technology. And, Uber does not

8   deny knowing that Mr. Levandowski had retained copious amounts of Google IP when he left

9   Google – including ████████████████████████ Dkt. No. 127-18; Dkt. No.

10  127-15 at 139:19-140:14; 143:3-146:10; *see also* Dkt. No. 127-19 at 18-19. In short, the evidence

11  at trial will show that Uber wanted Google information and explicitly pushed for Mr. Levandowski

12  to bring with him numerous Google employees, many of whom had knowledge of and worked on

13  Google's self-driving car technology. Therefore, Uber will not be able to prove that

14  Mr. Levandowski defrauded Uber, including with respect to the file that Mr. Levandowski admitted

15  taking for his and Uber's benefit many years later in his criminal plea agreement.

16         Uber also knew – because it was flagged for Uber by Stroz – that Mr. Levandowski had _and_

17  had accessed after leaving Google the very file that was the subject of Mr. Levandowski's criminal

18  plea agreement many years later. Dkt. No. 127-20 at 13 ("A review of the internet history shows

19  access to Google Docs on January 26, 2016, the day of Levandowski's resignation. In particular,

20  he accessed a file named 'Chauffeur TL weekly updates - Q4 2015 – Google Sheets.' . . . The file

21  was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his

22  departure from Google)"). Given this evidence, Uber will be unable to prove at trial that

23  Mr. Levandowski's reasons for taking this file were material to its decision to proceed with the

24  Uber-Otto transaction, including Uber's decision to indemnify Mr. Levandowski for claims Google

25  may assert against him.

26          In short, Uber will not be able to show that Mr. Levandowski's state of mind in taking this

27  file is material to any issue in the case. Most importantly, neither this file, nor Mr. Levandowski's

28  intent in taking it with him when he left Google, came up at all in the *Google v. Levandowski*

arbitration for which Mr. Levandowski is seeking indemnification here. Google made the very strategic decision not to assert any trade secret misappropriation claim against Mr. Levandowski in that arbitration. Furthermore, in the *Waymo v. Uber* case, in which Waymo asserted that Uber misappropriated 121 different trade secrets, Mr. Levandowski's alleged intent was not a basis for Uber's defense in that case. Instead, even though it knew Mr. Levandowski had retained lots of Google confidential information, Uber simply denied that any trade secrets that Mr. Levandowski or others may have taken from Google made their way to Uber or into Uber's technology. And Uber settled the case before any adjudication could be made one way or the other on that issue.

### C. Uber Post-Signing Specified Bad Act Defense Will Fail.

Uber's attempt to avoid its indemnity obligation to Mr. Levandowski by arguing that Mr. Levandowski engaged in a "Post-Signing Specified Bad Act" ("PSSBA") will fail. The operative provision is as follows:

> **2.1 Indemnification.**
>
> Purchaser will indemnify and hold harmless each Diligenced Employee and the Company Group, to the maximum extent permitted by applicable Law (subject to the limitations . . . *provided*, that notwithstanding the foregoing, if . . . following the Closing (if the Closing occurs), **it is _determined by a Final Judgment_ that a Post-Signing Specified Bad Act _(that was the subject of a Former Employer Claim)_ was committed by such Diligenced Employee** on behalf of any member of the Company Group and/or was committed by such Diligenced Employee prior to the Closing, then, . . . Purchaser's indemnification obligation to such Diligenced Employee pursuant to this Agreement shall immediately become null and void and of no further force and effect . . . .

Indemnification Agreement § 2.1 (emphasis added).

The provision does not nullify the Indemnification Agreement based on just any "Post-Signing Specified Bad Act." The only PSSBAs that nullify the Indemnification Agreement are those that both (1) have been "determined by a Final Judgment" and (2) that were "the subject of a Former Employer Claim." *Id.*

Throughout these proceedings, Uber's allegations and contentions relating to the alleged PSSBA(s) committed by Mr. Levandowski have been a moving target. Regardless of which PSSBA(s) that Uber tries to prove at trial, it will be unsuccessful. For example, Uber has argued previously that Mr. Levandowski committed a PSSBA when he allegedly asked another Otto employee, Jur van den Berg, to send a piece of software known as the "Otto planner" to Uber in

Case 3:20-03085 Doc# 408 Filed 02/12/24 Entered 02/12/24 15:45:47 Page 20 of 26

May 2016.[5]  This argument will fail for at least the following reasons.

*First*, Mr. Levandowski did not play any role in developing the Otto planner software.  Mr. Levandowski is a <u>hardware</u> engineer, not a software engineer.  The Otto planner software was created entirely by Don Burnette and Jur van den Berg, both of whom will testify at the trial.

*Second*, the evidence will show that Uber actually asked Mr. Levandowski to send the Otto planner software to it during the PSSBA time period.  Uber knew that Otto was working on this software; a team at Uber was at that time working on similar software.  Because Uber was in a race against Google, it did not want to wait until after the closing of the Uber-Otto transaction to start combining the two companies' motion planning software.  So it asked Mr. Levandowski to have the Otto engineers actually working on the software send it to Uber, which he did.  Because Uber asked for and consented to receiving the Otto planner code in May 2016, it cannot now argue that Mr. Levandowski's compliance with that request is a PSSBA that vitiates entirely Uber's indemnity obligation.[6]

*Third*, Uber cannot prove that the alleged PSSBA with respect to the Otto planner is the subject of any "Former Employee Claim," which is a requirement for a PSSBA under the Indemnification Agreement.  The sole Former Employee Claim that exists against Mr. Levandowski is Google's claim decided by the arbitration panel on December 7, 2019.  Google's arbitration claims had nothing to do with Mr. Levandowski's alleged misappropriation of Google's trade secrets.  *See generally* CFA.  In fact, in the arbitration, Google repeatedly argued,

---

[5] Following the settlement of the *Waymo v. Uber* litigation, Dr. Christian Gerdes, who was retained jointly by Waymo and Uber to investigate whether certain Waymo trade secrets made their way to Uber, concluded that the Otto planner software contained three of Waymo's trade secrets.  Decl. Ex. 31 at 42.  Dr. Gerdes has admitted that, as part of his work examining the Otto planner code, he did not form any opinions as to whether Mr. Levandowski ████████████████████████████████████████ Decl. Ex. 32 at 67:19-69:3.

[6] Further, the definition of "Bad Acts," which is a subpart of "Post-Signing Specified ***Bad Acts***" specifies that the Post-Signing Specified Bad Act include only "fraud," and several types of "willful, intentional, or deliberate" conduct.  For example, a "Bad Act" is where an employee such as Mr. Levandowski engages in "willful, intentional or deliberate conduct . . . that constitutes or directly leads or contributes to the . . . misappropriation . . . trade secrets of such Employee's Former Employer."  Indemnification Agreement at 2.  Uber will be unable to prove that Mr. Levandowski himself participated in (or directed) the alleged trade secret misappropriation found in the Otto planner or that Mr. Levandowski knew that the planner software Mr. van den Berg shared with Uber contained any Waymo trade secrets.  *See generally* Decl. Ex. 31; *see also* Decl. Ex. 33 at 61:16-25, 65:9-67:24; 76:14-77:10; 101:6-19; Decl. Ex. 34 at 50:5-9; 53:23-55:1.

Case 3:20-cv-03032 Document 408 Filed 02/12/24 Entered 02/12/24 15:45:47 Page 20 of
545 26 555

and the panel agreed, that the trade secret misappropriation claims in the *Waymo* litigation were separate and distinct from Google's arbitration claims. *See, e.g.*, Decl. Ex. 35 at 1 (Google arguing that "Google has not asserted claims in this arbitration for trade secret theft . . . . Thus, unlike the federal litigation in *Waymo LLC v. Uber Technologies, Inc.*, this action does not involve the theft of trade secrets by Levandowski . . ."). Given that trade secret misappropriation was not at issue in the arbitration, the alleged transfer of Google's trade secret planner code could not have been the subject of Google's claims. *See generally* CFA. Thus, there is no Post-Signing Specified Bad Act here that was the subject of a Former Employer Claim.

*Fourth*, because the arbitration had nothing to do with the transfer of Otto's planner code to Uber in May 2016, there is no Final Judgment determining that Mr. Levandowski engaged in a Post-Signing Specified Bad Act. A Final Judgment is required. *See* Indemnification Agreement § 2.1.

**D.      Uber Will Be Unable To Prove That The Majority Of The Google Judgment Is Attributable To Any Tyto Excluded Claim.**

Even if the Court were to find that Tyto is an Excluded Claim under the Indemnification Agreement, Uber will be unable to prove that any significant portion of the claim should be attributed solely to Google's Tyto claim.

Uber apparently intends to argue that 75% of Google's judgment is solely attributable to Tyto and therefore Uber should only be required to indemnify Mr. Levandowski for 25% of the Google judgment. Uber's apportionment theory is based on the timing of Mr. Levandowski's involvement with Tyto and the start of Mr. Levandowski's efforts to found Otto. Relying on the opinions of its expert, Ms. Bennis, Uber attempts to allocate the judgment amount between two periods of time: (1) when the panel found that Mr. Levandowski was involved with only Tyto, but not Otto—August 31, 2012 to September 29, 2015 ("the Tyto Period"), and (2) when the panel found he was involved with both Tyto and Otto—September 30, 2015 through January 27, 2016 (the "Tyto/Otto Period"). Ms. Bennis provides two methods for allocating Google's judgment, but both methods are based on the incorrect assumption that a ▮▮▮▮▮▮▮▮ of Project Chauffeur applied equally throughout the Tyto Period and the Tyto/Otto Period. *See* Decl. Ex. 36

1    at 7, 8, 14, 17.  For this reason, Ms. Bennis's allocation opinions should be rejected.

2         On this issue, the Court also will hear testimony and receive evidence from Google's

3    Compensation Manager, Michael Xing ███████████████████, and from

4    Mr. Levandowski's retained expert, Mr. Carl Saba.  These witnesses will present evidence

5    regarding ████████████████████████████████████████

6    ██████████████████████████████████████████████

7    ██████████  This evidence will demonstrate a fundamental flaw in Ms. Bennis's analysis,

8    because Mr. Levandowski's compensation ███████████████████████

9    ████████ he earned ████████████████████████████—not

10    ██████████ as Ms. Bennis incorrectly assumes in her analysis.

11         Mr. Saba will provide a corrected approach that takes into account ████████

12    ██████████████████████████████████████████████

13    ██████████████████████████████████████████████

14    ██████████████████████████████████████████████

15    ██████████████████████████████████████████████

16    ██████████████████████████████████████████████

17    ██████████████████████████████████████████████

18    ██████████████████████████████████████████████

19    ██████████████████████████████████████████████

20    ██████████████████████████████████████████████

21    ██████████████████████████████████████████████

22    ██████████████████████████████████████████████

23    ████████████████████Uber has exposure for this amount *even if* the Court were to

24    find that Tyto is an Excluded Claim under the Indemnification Agreement.

25    **IV.   UBER'S EQUITABLE INDEMNITY COUNTERCLAIM WILL FAIL.**

26         In its September 22, 2021 Order regarding Mr. Levandowski's Motion for Partial Summary

27    Judgment, the Court determined that Uber's "contributions claims . . . are more accurately

28    characterized as claims for equitable indemnity."  Dkt. No.  344 at 76:1-9.  "The elements of a

cause of action for indemnity are (1) a showing of *fault* on the part of the indemnitor and (2) resulting damages to the indemnitee for which the indemnitor is contractually or equitably responsible." *Expressions at Rancho Niguel Ass'n v. Ahmanson Devs., Inc*., 86 Cal. App. 4th 1135, 1139 (Cal. Ct. App. 2001).

Uber alleges that it is entitled to equitable indemnity because it "provide[d] consideration valued at approximately $245 million to resolve" claims asserted against it in the Waymo litigation. Dkt. No. 34 ¶ 164. Uber bases its claim on its assertion that, but for Mr. Levandowski's alleged fraud (*i.e.*, the alleged nondisclosure of Tyto and concealed retention of Google trade secrets), it would not have closed the Otto transaction nor been subject to Waymo's trade secret claims and, thus, not obligated to settle the Waymo litigation. As discussed above, Uber was fully aware of Mr. Levandowski's retention of Google confidential and trade secret information months before it closed the Otto transaction. And there was no claim in the *Waymo v. Uber* case based on Mr. Levandowski's alleged failure to expressly disclose Tyto to Uber/Stroz prior to the closing of the Uber-Otto transaction, so Uber cannot possibly prove that its unilateral decision to settle that case mid-trial was based on Tyto. Notably, nearly three months *before* Waymo commenced litigation against Uber, Uber knew about Mr. Levandowski's connections to Tyto, but it agreed to defend and indemnify Mr. Levandowski anyway. Uber's actions suggest that its "but for" basis for equitable indemnity was manufactured with hindsight. Uber is therefore not entitled to equitable indemnity for its settlement with Waymo.

Additionally, Uber cannot possibly prove that its unilateral decision to settle the *Waymo* litigation was based *entirely* on Mr. Levandowski's conduct, and it also cannot apportion its settlement with Waymo. Uber's claim is subject to comparative fault analyses, such that a factfinder must determine the parties' percentages of responsibility.[7] *See Catastrophe Servs., Inc. v. Manuel*, No. 2:20-CV-1083-TLN, 2021 WL 4261499, at *7 (E.D. Cal. Sept. 20, 2021). As discussed above, Uber's hands are far from clean and its decision to settle the Waymo case cannot possibly be attributed entirely to Mr. Levandowski. In response to Mr. Levandowski's

---

[7] Uber's Contribution Counterclaim is likewise subject to apportionment, rendering Uber (on Mr. Ron's behalf) "liable in closer proportion to [his] degree of fault." Cal. Civil Code § 1431.1.

interrogatory requesting, in part, that Uber disclose "the amount Uber seeks from Levandowski . . . [and] all factual bases that support [Uber's] claim for [indemnity]," Uber offered no factual basis to substantiate its assertion that Mr. Levandowski's alleged misconduct is "at least 90% of the total fault." Dkt. No. 127-1 at 9. Uber's expert Melissa Bennis offers no opinion supporting Uber's proposed apportionment.

In sum, Uber's allegation that Mr. Levandowski should bear full responsibility for the amount Uber decided to pay to settle the *Waymo* case fails to take into account any other tortfeasor, including Uber itself, or Mr. Ron, or others who contributed to Waymo's and Google's claimed damages.

Dated: January 24, 2021                    By: /s/ Brett Schuman

Brett Schuman
*bschuman@goodwinlaw.com*
Jennifer Briggs Fisher
*JFisher@goodwinlaw.com*
**GOODWIN PROCTER** LLP

Tobias S. Keller
*tkeller@kbkllp.com*
Dara L. Silveira
*dsilveira@kbkllp.com*
**KELLER BENVENUTTI KIM LLP**

*Attorneys for Plaintiff and Debtor and Debtor in Possession*
ANTHONY S. LEVANDOWSKI

23

Case 20-30242   Doc# 898   Filed 01/27/21   Entered 01/27/21 15:45:47   Page 26 of 26
Case 3:20-cv-03202   Doc# 40   Filed 04/12/23   Entered 04/12/23 14:55:47   Page 26 of 555
549 of 555

# EXHIBIT N

TOBIAS S. KELLER (SBN 151445)
*TKeller@kbkllp.com*
DARA L. SILVEIRA (SBN 274923)
*DSilveira@kbkllp.com*
**KELLER BENVENUTTI KIM LLP**
650 California Street, Suite 1900
San Francisco, California 94108
Tel: (414) 364-6793

BRETT M. SCHUMAN (SBN 189247)
*BSchuman@goodwinlaw.com*
JENNIFER BRIGGS FISHER (SBN 241321)
*JFisher@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero
San Francisco, California, 94111
Tel: (415) 733-6000
Fax: (415) 677-9041

ANDREW S. ONG (SBN 267889)
AOng@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 Marshall Street
Red Wood City, California, 90017
Tel: (650) 752-3100
Fax: (650) 853-1038

*Counsel for Anthony Levandowski*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | Case No. 20-30242 (HLB) |
| ANTHONY SCOTT LEVANDOWSKI, | Chapter 11 |
| Debtor. | |
| ANTHONY SCOTT LEVANDOWSKI, an individual, | Adv. Pro. No. 20-03050 (HLB) |
| Plaintiff, | **JOINT STIPULATION TO DISMISS ADVERSARY PROCEEDING** |
| v. | |
| UBER TECHNOLOGIES, INC. | |
| Defendant. | |

Plaintiff Anthony Levandowski ("Plaintiff") and Defendant Uber Technologies, Inc. ("Uber") by and through their respective counsel of record, pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure and Rule 7041 of the Federal Rules of Bankruptcy Procedure, hereby stipulate and agree that this Adversary Proceeding, including Plaintiff's Claims and Defendant's Counterclaims, should be dismissed with prejudice, each party to bear their own costs.

Dated: May 19, 2022

GOODWIN PROCTER LLP

By      */s/ Brett M. Schuman*
          Brett M. Schuman
          Jennifer Briggs Fisher

--and--

KELLER BENVENUTTI KIM LLP
Tobias S. Keller
Dara L. Silveira

*Counsel for Plaintiff and Debtor and Debtor in Possession Anthony Levandowski*

PACHULSKI STANG ZIEHL & JONES LLP

By      */s/ Debra I. Grassgreen*
          Debra I. Grassgreen
          Miriam Manning

--and--

JENNER & BLOCK LLP
David J. Bradford
Catherine Steege
Terri L. Mascherin
Katharine R. McLaughlin
*Counsel for Uber Technologies, Inc.*

# EXHIBIT O

**Entered on Docket**
**May 20, 2022**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1   TOBIAS S. KELLER (SBN 151445)
    *TKeller@kbkllp.com*
2   DARA L. SILVEIRA (SBN 274923)
    *DSilveira@kbkllp.com*
3   **KELLER BENVENUTTI KIM LLP**
    650 California Street, Suite 1900
4   San Francisco, California 94108
    Tel: (414) 364-6793
5
    BRETT M. SCHUMAN (SBN 189247)
6   *BSchuman@goodwinlaw.com*
    JENNIFER BRIGGS FISHER (SBN 241321)
7   *JFisher@goodwinlaw.com*
    **GOODWIN PROCTER LLP**
8   Three Embarcadero
    San Francisco, California, 94111
9   Tel: (415) 733-6000
    Fax: (415) 677-9041
10
    ANDREW S. ONG (SBN 267889)
11  AOng@goodwinlaw.com
    **GOODWIN PROCTER LLP**
12  601 Marshall Street
    Red Wood City, California, 90017
13  Tel: (650) 752-3100
    Fax: (650) 853-1038
14
    *Counsel for Anthony Levandowski*
15

**Signed and Filed: May 20, 2022**

_____
**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

16              **UNITED STATES BANKRUPTCY COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
17                  **SAN FRANCISCO DIVISION**

18  | In re: | Bankruptcy Case |
19  | ANTHONY SCOTT LEVANDOWSKI, | No. 20-30242 (HLB) Chapter 11 |
20  | Debtor. | **Adv. Pro. No. 20-03050 (HLB)** |
21  | ANTHONY LEVANDOWSKI, an individual, | **ORDER GRANTING JOINT STIPULATION TO DISMISS** |
22  | Plaintiff, | **ADVERSARY PROCEEDING** |
23  | v. | |
24  | UBER TECHNOLOGIES, INC. | |
25  | Defendant. | |
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court having considered the Joint Stipulation To Dismiss Adversary Proceeding; and good cause appearing;

**IT IS HEREBY ORDERED THAT** this Adversary Proceeding, including Plaintiff's claims and Defendant's counterclaims, is dismissed with prejudice, each party to bear its own costs.

*** END OF ORDER ***