

**Signed and Filed: January 24, 2025**

_____
**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Case No. 20-30242 HLB |
| | ) |
| ANTHONY SCOTT LEVANDOWSKI, | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| ———————————————— | ) |

### MEMORANDUM OPINION AND ORDER

This case comes before the court following entry of an "Opinion Reversing and Remanding Tax Order; Affirming in Part and Remanding in Part Confirmation Order" by the United States District Court for the Northern District of California.[1] The District Court Order vacated and remanded this court's order of May 2, 2022,[2] which concluded that a payment made by Uber Technologies, Inc. ("Uber") to Google LLC ("Google") (the "Uber Main Payment") pursuant to a settlement between Debtor Anthony Scott Levandowski, Uber, and Google[3] did not constitute taxable gross income to Mr. Levandowski.

---

[1] Dkt. 1271 (the "District Court Order").

[2] Dkt. 1028 (the "Tax Order").

[3] Dkt. 831-1 (Redacted Settlement Agreement); Dkt. 835 (Unredacted, Sealed Settlement Agreement). The court will refer to this document as the "Settlement Agreement".

The District Court Order also remanded this court's May 2, 2022 order[4] finally approving and confirming Mr. Levandowski's combined disclosure statement and Chapter 11 plan dated March 29, 2022,[5] with instructions to consider whether the Confirmation Order must be modified or otherwise vacated given vacatur and remand of the Tax Order. The District Court Order further concluded that this court erred as to its determination of setoff rights but affirmed its conclusion that the Plan was not initially confirmed for tax avoidance purposes.

Consistent with a Stipulation[6] by and between Mr. Levandowski, Mr. Peter Kravitz (as Trustee of the Levandowski Residual Litigation Trust, formed under the Plan), the California Franchise Tax Board (the "FTB"), and the United States Internal Revenue Service (the "IRS"), which the court approved on September 5, 2023[7] (as modified by a subsequent stipulation and order),[8] the parties filed the following pleadings:

- Reorganized Debtor's Opening Brief on Remand;[9]
- FTB's Response Brief on Remand;[10]
- Request for Judicial Notice in Support of FTB Response;[11]

---

[4] Dkt. 1030 (the "Confirmation Order").

[5] Dkt. 940 (the "Plan").

[6] Dkt. 1289.

[7] Dkt. 1291.

[8] Dkts. 1294 and 1296.

[9] Dkt. 1292 (the "Opening Brief").

[10] Dkt. 1297.

[11] Dkt. 1298.

1  • IRS' Response Brief on Remanded Issues;[12] and

2  • Reorganized Debtor's Reply Brief on Issues on Remand.[13]

3  After the parties filed the foregoing pleadings, the court took

4  the remanded issues under advisement.

5      The court has carefully analyzed the parties' briefs and

6  other pleadings, along with other relevant portions of its

7  record.  For the reasons stated herein, the court finds and

8  concludes that the Uber Main Payment constituted gross income to

9  Mr. Levandowski.  The court further finds and concludes that the

10 Uber Main Payment is not excludable from gross income as

11 analogous to nontaxable insurance; that the "Tax Benefit Rule"

12 does not render the Uber Main Payment nontaxable; that the Uber

13 Main Payment was not a nontaxable Working Condition Fringe; and

14 that the Uber Main Payment was not a deductible reimbursement for

15 Mr. Levandowski's services on Uber's behalf.

16     This memorandum opinion and order does not address the

17 parties' setoff rights, does not vacate or modify the

18 confirmation order, and does not liquidate any of Mr.

19 Levandowski's tax liability.  The court will issue a separate

20 order setting a status conference at which the court will discuss

21 with the parties how and when it might address those issues.

22 Nothing in this order should be construed as impacting the

23 validity or enforceability of the Settlement Agreement.

24

25

26 _____

27 [12] Dkt. 1300.

28 [13] Dkt. 1301.

**A.  Jurisdiction**

Consistent with Ninth Circuit authority,[14] the District Court Order determined that this court had statutory authority to enter the Tax Order under 11 U.S.C. § 505(a)(1).  Accordingly, this contested matter constitutes a dispute in which this court may enter final orders and judgment.

**B.  Background[15]**

Mr. Levandowski is an engineer who was employed by Google between 2007 – January 27, 2016.  In approximately 2009, Mr. Levandowski helped found Google's autonomous vehicle project and was in charge of an engineering team that developed LiDAR laser technology, which was the technological backbone of that project.

The contracts governing Mr. Levandowski's employment by Google included provisions prohibiting him from engaging in activities that conflicted with his obligations to Google or that competed with Google and from soliciting or recruiting Google employees within a certain period of time following any termination of his relationship with Google.  These contracts also required Mr. Levandowski to maintain Google's confidential information (such as trade secrets and intellectual property) in the strictest confidence.  And he agreed in writing to abide by Google's Code of Conduct, which addressed conflicts of interest and protection of confidential information.

---

[14] Central Valley AG Enters. v. U.S., 531 F.3d 750, 759 (9th Cir. 2008); In re Bunyan, 354 F.3d 1149, 1151 (9th Cir. 2004).

[15] These facts are taken from the Corrected Final Award entered in Google LLC v. Anthony Scott Levandowski, et al., JAMS Arbitration Case Reference No. 1100086069 (the "Google Arbitration"), issued December 2019 (the "Corrected Final Award").  AVP No. 20-3050 Dkt. 16-1 (Redacted Corrected Final Award).

While employed by Google, and notwithstanding the foregoing promises, Mr. Levandowski formed companies that utilized Google's confidential information for the purpose of competing with Google in the autonomous vehicle industry, all without telling Google. One such company was Ottomotto LLC ("Otto").

In Fall 2015, Mr. Levandowski began serious, secret negotiations with Uber aimed at forming a major partnership between Uber and Otto. Ultimately, this transaction morphed into Uber's acquisition of Otto, which took place in mid-2016. During this period, Mr. Levandowski also began soliciting Google employees to leave Google and join Otto, again without informing Google.

Mr. Levandowski resigned from Google on January 27, 2016. On April 11, 2016, Uber finalized its agreement to acquire Otto and entered into an indemnification agreement with Mr. Levandowski and other employees who left Google to join Otto.[16] While employed by Google, Mr. Levandowski received salary and bonuses totaling approximately $134,000,000.

Approximately two months after Uber publicly announced its acquisition of Otto, Google commenced the Google Arbitration. Google alleged that Mr. Levandowski had breached his fiduciary duties to Google (including his duty of loyalty), had breached his contracts with Google, and had violated California's Unfair Competition Law.[17]

---

[16] Dkt. 918-1 (the "Indemnification Agreement").

[17] Cal. Bus. & Prof. Code § 17200, *et seq.*

The Google Arbitration concluded with entry of the Corrected Final Award in favor of Google and against Mr. Levandowski. On March 4, 2020, the San Francisco Superior Court confirmed the Corrected Final Award and entered a judgment against Mr. Levandowski totaling $179,047,998.64 (the "Google Judgment").[18] Just hours later, Mr. Levandowski sought relief in this court by filing a voluntary petition under Chapter 11.

Approximately four months after filing this case, Mr. Levandowski sued Uber in this court[19] arguing, among other things, that Uber should pay the Google Judgment pursuant to the Indemnification Agreement. The court permitted Google to intervene in the AVP.[20]

On the eve of trial in the AVP, the parties settled. The Settlement Agreement provided for a payment from Uber to Mr. Levandowski totaling $2,000,000 to fund the Plan, as well as for the Uber Main Payment, which was substantially larger. Mr. Levandowski moved for approval of the settlement on February 10, 2022.[21] No one opposed the 9019 Motion, so the court issued an electronic Docket Text Order indicating that it would grant the 9019 Motion, instructing Mr. Levandowski's counsel to upload an appropriate order, and vacating the relevant hearing.

---

[18] AVP Dkt. 49, Ex. M.

[19] Levandowski v. Uber Technologies, Inc., Adv. Proc. No. 20-3050 (Bankr. N.D. Cal.) (the "AVP"). The court will cite to pleadings and documents in the AVP record as "AVP Dkt.____".

[20] AVP Dkt. 35.

[21] Dkt. 831 (the "9019 Motion").

Mr. Levandowski then asked that the hearing on the 9019 Motion be restored to calendar,[22] advising for the first time that "tightening liquidity" required "fuller disclosures regarding whether the [Uber Main Payment] is taxable . . ." This led to Mr. Levandowski filing a "Motion to (I) Determine Tax Effect of Settlement Payment or, in the Alternative (II) Find the Debtor's Plan Feasible Without Reserving for Taxes Thereon."[23] The Tax Motion drew opposition from the IRS[24] and the FTB;[25] Mr. Levandowski replied.[26]

On April 21, 2022, the court convened hearings on the 9019 Motion and the Tax Motion and also considered final approval of Mr. Levandowski's disclosures and confirmation of the Plan. During the April 21, 2022 hearing, the court issued an oral ruling on the Tax Motion, concluding that the Uber Main Payment did not constitute taxable gross income to Mr. Levandowski because it was akin to insurance. On May 2, 2022, the court entered the Tax Order,[27] an order approving the 9019 Motion,[28] and the Confirmation Order.[29]

---

[22] Dkt. 872.

[23] Dkt. 917 (redacted) and Dkt. 946 (unredacted) (the "Tax Motion").

[24] Dkt. 952.

[25] Dkt. 953.

[26] Dkt. 966.

[27] Dkt. 1028.

[28] Dkt. 1029.

[29] Dkt. 1030.

C. **Analysis**

1. **Scope of the Issues to be Decided on Remand of Tax Order**

Mr. Levandowski contends that, on remand, this court need only revisit its "base premise", i.e., its finding that *all* insurance should be excluded from taxable gross income. Only the FTB responds to this contention, arguing that the District Court's instructions on remand were much broader and that this court can and should consider all of the parties' arguments concerning whether the Uber Main Payment constitutes taxable gross income to Mr. Levandowski. The court agrees with the FTB.

The District Court Order directed this court to conduct what amounts to a "do-over" of its analysis of the issues raised by the Tax Motion. This includes revisiting whether the Uber Main Payment constitutes gross income, as well as whether the Uber Main Payment can be found nontaxable under any of the theories Mr. Levandowski has advanced.

2. **The Uber Main Payment Constitutes Gross Income to Mr. Levandowski**

The United States Internal Revenue Code[30] defines "gross income" as "all income from whatever source derived."[31] IRC §§ 61(a)(1)-(14) set forth a nonexclusive list of items included in

---

[30] The Internal Revenue Code (the "IRC") is codified in Title 26 of the United States Code, and it governs much of the analysis in this opinion and order. The court will cite provision of this statute as "IRC § ___". And, while separate statutory and regulatory schemes govern taxes under California state law, the FTB represents that California law tracks the IRC with respect to the issues before the court.

[31] IRC § 61(a).

gross income.  Among these is "income from discharge of indebtedness."[32]

The Supreme Court of the United States ("SCOTUS") has "repeatedly emphasized the sweeping scope" of IRC § 61(a).[33]  As a corollary to IRC § 61(a)'s broad construction, "exclusions from income must be narrowly construed."[34]

Mr. Levandowski argues that SCOTUS has defined income for tax purposes as "accession [] to wealth, clearly realized, and over which [the owner] has complete dominion," citing Glenshaw Glass[35] and Getty.[36]  According to Mr. Levandowski, the Uber Main Payment did not represent any accession to wealth for him, and he never had dominion over it, given that it was a payment made by Uber directly to Google.

The IRS and FTB urge the court to disregard the definition Mr. Levandowski draws from Glenshaw Glass and Getty and to focus on the fact that the Uber Main Payment (partially) satisfied a debt Mr. Levandowski owed to Google, namely, the Google Judgment.  According to the IRS and FTB, discharge of indebtedness constitutes gross income.  The court agrees with the IRS and FTB.

First, neither Getty nor Glenshaw Glass defined income in the way Mr. Levandowski suggests.  The court in Glenshaw Glass found that the payment at issue represented a clearly realized

---

[32] IRC § 61(a)(11).

[33] Comm'r v. Schleier, 515 U.S. 323, 327-28 (1995) (citing, among other cases, Comm'r v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955)).

[34] Schleier, 515 U.S. at 328.

[35] Glenshaw Glass, 348 U.S. at 431.

[36] Getty v. Comm'r, 913 F.2d 1486, 1490 (9th Cir. 1990).

accession to the wealth of the taxpayer, over which they exercised complete dominion, but the court did not offer those characteristics as a binding definition. Neither did <u>Getty</u>. To the extent Mr. Levandowski argues otherwise, he is mistaken.

Mr. Levandowski next argues that the Uber Main Payment is analogous to the types of insurance expressly excluded from gross income under IRC § 61(b): accident insurance, health insurance, and insurance payments in connection with damage and destruction of a principal residence. He insists that, under authority pertinent to these allegedly comparable forms of insurance, insurance payments intended to replace lost profits are taxable, while those intended to replace capital are not. According to Mr. Levandowski, the Uber Main Payment was intended to repay Google for salary, benefits, and bonuses it paid to Mr. Levandowski and that the Corrected Final Award ordered him to disgorge, which means that the Uber Main Payment more closely resembles a recovery of capital rather than recovery of lost profits.

Mr. Levandowski's attempted analogy does not fly. The court finds and concludes – as explained in detail in the next section of this opinion – that Uber made the Uber Main Payment pursuant to the Settlement Agreement and not pursuant to the Indemnification Agreement, which dooms any effort to analogize this situation to an insurance context. But beyond that, Mr. Levandowski's examples offer no fair comparison, as they all involve situations in which the taxpayer received the insurance payment. Here, the Uber Main Payment went directly to Google, and Mr. Levandowski suffered no loss. He retained the benefit of

Case: 20-30242   Doc# 1318   Filed: 01/24/25   Entered: 01/24/25 11:55:51   Page 10 of 33

the salary and bonuses he wrongfully obtained from Google. His analogy simply does not work.

The weight of authority supporting the conclusion that the Uber Main Payment constituted gross income from the discharge of debt, as argued by the FTB and IRS, overwhelms Mr. Levandowski's arguments. SCOTUS has recognized, for example, that the payment by an employer of income taxes assessed to its employee represented income to the employee, and that it was "immaterial" that the employer paid those taxes directly to the government.[37] Perhaps the Ninth Circuit Court of Appeals said it best: "If A owes B a debt, and C pays the debt on A's behalf, it is elementary that C's payment is income to A as well as to B."[38]

The parties do not dispute that the Uber Main Payment partially satisfied the Google Judgment. Ample, binding authority dictates that this resulted in gross income to Mr. Levandowski.[39] The question then becomes whether Mr. Levandowski

---

[37] Old Colony Trust Co. v. Comm'r, 279 U.S. 716, 729 (1929).

[38] Sinyard v. Comm'r, 268 F.3d 756, 758 (9th Cir. 2001); see also Wall v. U.S., 164 F.2d 462, 464 (4th Cir. 1947) ("[i]t cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer") (citations omitted); U.S. v. Hendler, 303 U.S. 564, 566 (1938) (corporate debt satisfied by another company during its acquisition of the corporate debtor constituted taxable income to the corporate debtor, which benefited from that payment and its "gain was as real and substantial as if the money had been paid it and then paid over by it to its creditors"); Reading & Bates Corp. v. U.S., 40 Fed. Cl. 737, 750 (1998) (recognizing that an indemnification agreement "results in taxable income" to a taxpayer because it "contractually discharges" the taxpayer's obligation) (citing Old Colony Trust, 279 U.S. at 729); Huff v. Comm'r, 80 T.C. 804, 820 (1983) (holding that employer's payment of taxpayer/employee's civil penalties assessed in litigation resulted in gross income taxable to the taxpayer/employee).

[39] In a footnote in his Opening Brief, Mr. Levandowski states: "In addition to these arguments demonstrating that the [Uber Main Payment] results in no gross income to [him], if the [Uber Main Payment] were to result in gross income, [Mr. Levandowski] would take the position that his taxes arising from

has satisfied his burden[40] of proving that the Uber Main Payment can be nontaxable under any of his alternative theories.

**3.     The Indemnification Agreement and Uber Main Payment are not akin to Nontaxable Insurance**

Mr. Levandowski argues that Uber made the Uber Main Payment pursuant to the Indemnification Agreement, and he urges the court to declare the Indemnification Agreement and the Uber Main Payment analogous to nontaxable insurance under "general insurance principles."  Mr. Levandowski points to Milenbach[41] as instructive.

Milenbach addressed the tax consequences of several different transactions, one of which was a settlement payment received by a taxpayer in eminent domain litigation.  The United States Tax Court held that the settlement payment constituted a recovery of lost profits and was taxable; the Ninth Circuit affirmed.

The Ninth Circuit recognized that "[w]hen a claim is resolved by settlement, the relevant question for determining the tax treatment of a settlement award is:  'In lieu of what were

---

such gross income would be reduced under the 'claim of right' doctrine . . . Under that doctrine, [Mr. Levandowski] would be permitted to offset any taxes owed for the Uber Main Payment against the amount he already paid in connection with the receipt of his salary, compensation, and bonuses."  Mr. Levandowski does not mention the Claim of Right doctrine again and certainly does not brief it.  Accordingly, the court will not consider its applicability.

[40] Getty, 913 F.2d at 1492 (taxpayer bears burden of proving the merits of their claim by a preponderance of the evidence); Milenbach v. Comm'r, 318 F.3d 924, 933 (9th Cir. 2003) (taxpayer bears burden of proof, citing Getty).

[41] 318 F.3d 924.

the damages awarded'?"[42] "We take a 'broad approach in determining the true nature and basis of a party's claim' . . ."[43] "Although the allocation set forth in a settlement agreement by the parties is one factor in determining the nature of a settlement payment, '[w]hen assessing the tax implications of a settlement agreement, courts should neither engage in speculation nor blind themselves to a settlement's realities . . .' A court should take a broad approach in determining the nature of a settlement payment and is not bound by any allocation made by the parties in their settlement agreement if there is evidence that the payment represented something else."[44]

The Ninth Circuit determined that the settlement payment received by the taxpayer represented a recovery of lost profits, notwithstanding language to the contrary in the relevant settlement agreement, because the taxpayer's statement of damages strongly supported the court's conclusion, as did the broad recovery permitted under the operative statutory scheme.[45] In short, the Ninth Circuit found that the taxpayer had not satisfied their burden of providing some basis for declaring the settlement payment nontaxable.[46]

Mr. Levandowski essentially insists that the Uber Main Payment would not have been paid but for the Indemnification

---

[42] 318 F.3d at 932 (citations omitted).

[43] Id. (citations omitted).

[44] Id. at 933-34 (citations omitted).

[45] Id. at 934.

[46] Id.

Agreement and that the court should treat the Uber Main Payment and the Indemnification Agreement as analogous to insurance. He argues that "[g]iven their similarities, indemnity agreements are generally interpreted in the same way insurance agreements are," citing Centex Homes.[47] Centex Homes stands for no such thing.

Centex Homes addressed whether a subcontractor (R-Help) owed a duty to defend to a developer (Centex) in a personal injury case, pursuant to an indemnity clause in a contract between the subcontractor and the developer. Both parties relied on cases involving both indemnity and insurance contracts in support of their respective positions. The court found a case involving an insurance contract dispositive, even though it recognized that "there are some differences in treatment between insurance policies and other indemnity agreements."[48] In making that statement, the court noted that R-Help had cited "no authority for a difference in treatment as it relates to the prospective application of extinguishing a duty to defend."[49]

The court's statement regarding R-Help's failure to cite authority offering guidance as to whether insurance contracts and indemnity agreements should be treated differently does not in any way suggest that no such authority exists. And in fact, Crawford[50] – on which Centex Homes relies[51] – recognizes that

_____

[47] Centex Homes v. R-Help Constr. Co., Inc., 32 Cal. App. 5th 1230 (Cal. Ct. App. 2019).

[48] 32 Cal. App. 5th at 1238 (citations omitted).

[49] Id.

[50] Crawford v. Weather Shield Mfg., Inc., 44 Cal. 4th 541 (2008).

[51] 32 Cal. App. 5th at 1238.

"[t]hough indemnity agreements resemble liability insurance policies, rules for interpreting the two classes of contracts do differ significantly."[52] The court rejects Mr. Levandowski's contention that indemnity agreements and insurance contracts are cut from the same cloth and must be analyzed in identical fashion.

Analysis of the Settlement Agreement reveals little in terms of what the parties intended for the Uber Main Payment to represent, other than that they meant to put an end to years of litigation. The court cannot conclude that the Uber Main Payment was made out of some tacit acknowledgement that Uber was bound by the Indemnification Agreement as the Settlement Agreement expressly states that no party admits to the validity of any other party's position, and Mr. Levandowski and Uber vigorously contested the viability and enforceability of the Indemnification Agreement in the AVP. The only truth the court can draw from the Settlement Agreement is that the parties wished to put an end to exhausting, expensive litigation.

The court's conclusion that the Uber Main Payment was not made pursuant to the Indemnification Agreement should end the debate as to whether the Uber Main Payment constitutes insurance. But even if the court believed the Uber Main Payment was made pursuant to the Indemnification Agreement, it would still find that the Indemnification Agreement and the Uber Main Payment are

---

[52] 44 Cal. 4th at 552.

not analogous to nontaxable insurance under <u>Amerco</u>,[53] a case on which Mr. Levandowski heavily relies.

<u>Amerco</u> involved a parent corporation (Amerco); approximately 250 affiliated corporations that were subsidiaries of Amerco and that filed consolidated tax returns ("<u>P2</u>") and that made up most of the U-Haul rental system; and Republic Western Insurance Company ("<u>RWIC</u>"), an affiliate of P2 wholly owned by Amerco that did not participate in P2 consolidated tax returns. RWIC was a licensed, qualified insurer in several states and sold various types of insurance to P2, as well as to unrelated insureds. Transactions with unrelated insureds comprised more than 50% of RWIC's business.

The IRS assessed deficiencies against P2 and RWIC, based on its conclusion that some of the transactions between P2 and RWIC did not constitute the purchase of insurance. Accordingly, the question before the <u>Amerco</u> court was what constitutes insurance for tax purposes, and it set out a four-part test governing that question: **(1)** an insurance transaction must involve "insurance risk"; **(2)** insurance "involves risk-shifting and risk-distributing"; **(3)** in the absence of a statutory definition, "insurance" should be defined in its "commonly accepted sense"; **and (4)** "matters of Federal income taxation must be resolved with principles of Federal income taxation in mind."[54]

---

[53] <u>Amerco and Subsidiaries, and Republic Western Ins. Co. v. Comm'r</u>, 96 T.C. 18 (1991).

[54] 96 T.C. at 38.

In his Opening Brief, Mr. Levandowski does little to marshal these factors.  As to insurance risk, he simply argues that the IRS and FTB have admitted that it existed.  As to risk-shifting or risk distribution, Mr. Levandowski urges the court to remain true to its prior conclusion that the Indemnification Agreement addressed the risk of highly complex, very expensive litigation and distributed this risk among the employees to whom the Indemnification Agreement pertained.

As to the existence of insurance in the "commonly accepted sense," Mr. Levandowski offers only that his labor for Uber should be construed as payment of insurance premiums.  Mr. Levandowski's Opening Brief makes no effort to address how or why principles of Federal income taxation should impact the court's analysis.  The court will address each of the _Amerco_ factors, as well as the IRS' and FTB's arguments, in turn.

**a.  Presence of Insurance Risk**

As _Amerco_ recognized:  "Basic to any insurance transaction must be risk.  An insured faces some hazard; an insurer accepts a premium and agrees to perform some act if or when the loss event occurs.  If no risk exists, then insurance cannot be present.  'Insurance risk' is required; investment risk is insufficient. If parties structure an apparent insurance transaction so as to effectively eliminate the effect of insurance risk therein, insurance cannot be present."[55]

The IRS contends that no insurance risk existed because Mr. Levandowski's bad acts, which were the subject of the

---

[55] 96 T.C. at 38–39.

Indemnification Agreement, had already occurred when that agreement became effective. The IRS also argues that, if the Indemnification Agreement managed risk, it was simple business risk, not insurance risk. And finally, the IRS reiterates that the Uber Main Payment was made pursuant to the Settlement Agreement – not the Indemnification Agreement. The FTB contends that the Indemnification Agreement covered typically uninsurable risk – willful misconduct.

It is true that the Indemnification Agreement appears intended to help Mr. Levandowski and the other indemnitees manage the risk of any litigation Google might commence against them based on certain conduct described in the Indemnification Agreement. But the court agrees with the IRS that this was more in the nature of business risk than the type of risk that could or should be the subject of an insurance policy.

Mr. Levandowski's negotiations with Uber concerning its acquisition of Otto and its execution of the Indemnification Agreement took months. Vigorous negotiations like this are not typical prior to signing contracts of insurance. "An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured."[56] As Crawford observed, "[t]hough indemnity agreements resemble liability insurance policies, rules for interpreting the two classes of contracts do differ significantly . . . In noninsurance contexts . . . it is the *indemnitee* who may often

---

[56] Idris v. Hanson, 8 F.3d 27, 1993 WL 385449, *2 (9th Cir. Sept. 29, 1993) (quoting Brakeman v. The Potomac Ins. Co., 472 Pa. 66, 72 (1977)).

have the superior bargaining power, and who may use this power
unfairly to shift to another a disproportionate share of the
financial consequences of its own legal fault."[57]

Uber and Mr. Levandowski viewed the risk of litigation as a
business risk that they chose to manage through contract.
Business risk such as this does not constitute the type of
insurance risk contemplated by Amerco.

The court also cannot lose sight of its conclusion that the
Uber Main Payment was not a payment under the Indemnification
Agreement but under the Settlement Agreement. The court declines
to ignore reality in order to shoehorn this dispute into a neat
resolution. Mr. Levandowski has not met his burden of proving
the existence of insurance risk under Amerco.

### b. Risk-Shifting and Risk Distribution

Under Amerco, "[r]isk shifting means one party shifts his
risk of loss to another, and risk-distributing means that the
party assuming the risk distributes his potential liability, in
part, among others."[58] Both risk-shifting and risk-distributing
must exist in order for a transaction to be deemed analogous to
insurance.[59]

Neither the IRS nor the FTB contend that the Indemnification
Agreement does not shift risk, and it clearly does. It shifts
the risk of potentially crippling litigation expenses from the
indemnitees to Uber.

---

[57] Crawford, 44 Cal. 4th at 552 (citations omitted; emphasis in original).

[58] 96 T.C. at 40 (citation and internal quotation marks omitted).

[59] Id. (citation omitted).

Risk distribution is a different story. "The concept of risk-distributing emphasizes the pooling aspect of insurance: that it is the nature of an insurance contract to be part of a larger collection of coverages, combined to distribute risk between insureds."[60] This simply does not exist here.

The Indemnification Agreement covered several indemnitees, including Mr. Levandowski. But the Indemnification Agreement arose from a single set of events: Uber's acquisition of Otto and its employment of the indemnitees.

"Distributing risk allows the insurer to reduce the possibility that a single costly claim will exceed the amount taken in as a premium and set aside for the payment of such a claim. Insuring many independent risks in return for numerous premiums serves to distribute risk. By assuming numerous relatively small, independent risks that occur randomly over time, the insurer smoothes out losses to match more closely its receipt of premiums . . . Risk distribution incorporates the statistical phenomenon known as the law of large numbers. This law is reflected in the financial world by the diversification of investment portfolios and in the day-to-day world by the adage 'Don't put all your eggs in one basket'."[61]

Here, as the IRS contends, all of Uber's eggs were in one basket. It agreed to indemnify certain employees if Google commenced litigation, and the events from which that litigation

---

[60] 96 T.C. at 41.

[61] Clougherty Packing Co. v. Comm'r, 811 F.2d 1297, 1300 (9th Cir. 1987) (citations omitted).

might arise were common to all indemnitees.  This was not a situation in which Uber assumed numerous, small independent risks; it assumed one gigantic risk on behalf of all the indemnitees.

While Mr. Levandowski has proven that risk-shifting existed under the Indemnification Agreement, he has not satisfied his burden of proving the existence of risk distribution.

### c. Insurance in the Commonly Accepted Sense

Mr. Levandowski's argument with respect to this factor is weak, as he offers only that his labor on Uber's behalf should be construed as premiums for the "insurance" embodied in the Indemnification Agreement.  The FTB does not directly address this factor, but the IRS points to and attempts to marshal several factors identified as relevant in R.V.I.[62]

In R.V.I., certain leasing companies, manufacturers, and financial institutions leased or provided financing for the lease of passenger vehicles, commercial real estate, or commercial equipment.  R.V.I. Guaranty Co. Ltd. sold to these companies "residual value insurance," which protected the "insureds" against the risk that the actual value of the leased asset upon termination of the lease would be significantly lower than expected.  If that turned out to be true, R.V.I. would pay the difference to its "insured."

After an audit, the IRS concluded that the contracts between R.V.I. and its customers did not constitute insurance for Federal income tax purposes.  The IRS based its conclusion on its

---

[62] R.V.I. Guaranty Co. Ltd & Subsidiaries v. Comm'r, 145 T.C. 209 (2015).

determination that the risk was not an insurance risk, but an investment risk, and that therefore, R.V.I. was not an insurance company.  The Tax Court found in favor of R.V.I., based in part on its analysis of the Amerco factors.[63]

When analyzing whether the transactions fell within "commonly accepted notions of insurance," the R.V.I. court pointed to several relevant factors, including:  **(1)** whether the alleged insurer is organized, operated, and regulated as an insurance company in accordance with the law of the states in which it operates; **(2)** whether the alleged insurer was adequately capitalized; **(3)** whether the insurance policies are valid and binding; **(4)** whether the alleged insurance premiums are reasonable in relation to the risk of loss; **and (5)** whether premiums are duly paid and loss claims are duly satisfied.[64] R.V.I. pointed to the first factor as having "particular significance" because, as recognized in Amerco, "Congress as delegated to the states the exclusive authority (subject to exception) to regulate the business of insurance."[65]

In his Reply, Mr. Levandowski does not argue that these factors do not govern the court's analysis, but he makes no effort to argue that an analysis of them weighs in his favor.  He has provided no evidence proving:  that Uber was organized, operated, or regulated as an insurance company; whether Uber was adequately capitalized in comparison to the risks covered by the

---

[63] Id. at 225.

[64] Id. at 231.

[65] Id. (citing Amerco, 96 T.C. at 42).

Indemnification Agreement; or whether the alleged insurance premiums (according to Mr. Levandowski, the value of his services to Uber) bore any reasonable relationship to the magnitude of potential exposure to litigation costs.

As to whether the alleged insurance agreement (the Indemnification Agreement) could be enforced against Uber, this court has made no such determination and never will, as the Settlement Agreement acknowledged its termination. Certainly, the validity and enforceability of the Indemnification Agreement was a hotly contested issue.

Finally, even if this court accepts that Mr. Levandowski paid "insurance premiums" by working for Uber, there has been no showing that Uber paid losses under the Indemnification Agreement and, in fact, this court has determined that Uber made the Uber Main Payment pursuant to the Settlement Agreement, not the Indemnification Agreement.

Mr. Levandowski has not satisfied his burden of proving that the Indemnification Agreement or Uber Main Payment were consistent with insurance in the commonly accepted sense.

**d.  General Principles of Federal Income Taxation**

Neither Mr. Levandowski nor the FTB offer any argument as to this factor. The IRS contends that recognizing the Uber Main Payment or the Indemnification Agreement as analogous to nontaxable insurance would offend federal income taxation principles by allowing Mr. Levandowski to evade taxation. The IRS' argument misses the mark.

Under _Amerco_, this element requires the court to examine "both the substance and form of a transaction."[66]  This court has concluded that Uber made the Uber Main Payment pursuant to the Settlement Agreement, not the Indemnification Agreement.  It has also recognized that the Indemnification Agreement did not feature risk distribution or bear most of the other hallmarks typically consistent with the concept of insurance.  And the court must respect that exceptions to the broad definition of what constitutes gross income must be narrowly construed.[67]  Given these considerations, the court finds and concludes that the general principles of Federal income taxation require a determination that the Indemnification Agreement and the Uber Main Payment were not analogous to insurance.

**4.  The Tax Benefit Rule Does Not Apply**

The "Tax Benefit Rule" is a judicially created doctrine that requires taxpayers to include in their taxable income amounts that they had deducted from taxable income in a prior tax year, if an event occurs in the subsequent tax year that renders the prior deduction improper.[68]  This is known as the inclusionary component of the Tax Benefit Rule.  In declaring income pursuant to the Tax Benefit Rule, however, taxpayers need only recognize income in an amount equal to the tax benefit they received from the (later nullified) deduction or loss.[69]  This is known as the

---

[66] _Amerco_, 96 T.C. at 42.

[67] _Schleier_, 515 U.S. at 328.

[68] _Hillsboro Nat'l Bank v. Comm'r_, 460 U.S. 370, 377 (1983).

[69] _Id._ at 384-85.

Case: 20-30242   Doc# 1318   Filed: 01/24/25   Entered: 01/24/25 11:55:51   Page 24 of 33

exclusionary component of the Tax Benefit Rule, and it is codified in IRC § 111(a).[70]

The Tax Benefit Rule is a ruling of timing, "used by courts to adjust income and deduction inconsistencies between tax years."[71]  The Tax Benefit Rule "must be applied on a case-by-case basis.  A court must consider the facts and circumstances of each case in light of the purpose and function of the provisions granting the deductions."[72]

"The basic purpose of the [Tax Benefit Rule] is to achieve rough transactional parity in tax . . . and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous.  Such an event, unforeseen at the time of an earlier deduction, may in many cases require the application of the [Tax Benefit Rule]."[73]

Mr. Levandowski argues that the Uber Main Payment represented his "recoupment of, and directly attributable to him, the expense" he incurred in partial payment of the Google Judgment.  He argues that because IRC § 67(g) deprives him of the ability to deduct this expense under IRC §§ 162 or 165,[74] the

---

[70] IRC § 111(a) states:  Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by this chapter.

[71] Schwartz Rojas v. Comm'r, 901 F.2d 810, 812 (9th Cir. 1990).

[72] Hillsboro, 460 U.S. at 385.

[73] Id. at 383.

[74] IRC § 162 permits a deduction for business expenses incurred in carrying out a trade or profession; IRC § 165 permits deductions for losses incurred in a trade or profession or in transactions entered into for profit but not

court must apply the Tax Benefit Rule to prohibit the unfairness of having to include the Uber Main Payment in his taxable gross income without a corresponding deduction for his loss or expense.

There are two principal problems with Mr. Levandowski's position. First, the Uber Main Payment (the income component of this analysis) and its partial satisfaction of the Google Judgment (the expense component of this analysis) occurred in the same tax year. Second, Mr. Levandowski did not – and could not, thanks to IRC § 67(g) – take a deduction of this expense.

As to the timing concern, Mr. Levandowski acknowledges that IRC § 111(a) requires that the loss or expense and its later recovery occur in different tax years. But he contends that, because the Tax Benefit Rule is a judicially created doctrine, the court is free to ignore this constraint. Mr. Levandowski cites no authority in support of this argument, which the court rejects.

As the IRS notes, if the income and expense occur in the same tax year, they would simply cancel each other out. SCOTUS acknowledges this in Hillsboro by repeatedly referring to the transactions as having occurred in different tax years,[75] and by repeatedly emphasizing that the Tax Benefit Rule is intended to resolve unfairness to the Government and taxpayers that might

connected with a trade or business. These "miscellaneous itemized deductions" however, were temporarily prohibited by IRC § 67(g) ("no miscellaneous itemized deductions shall be allowed for any taxable year beginning after December 31, 2017, and before January 1, 2026").

[75] 460 U.S. at 381-82, 383-84, 384-85, 389.

arise from a tax system based on annual accounting (as opposed, for example, to accrual accounting).[76]

Mr. Levandowski would also have this court ignore the fact that he has not and cannot take a deduction for the "expense" he says he incurred through the Uber Main Payment's partial satisfaction of the Google Judgment. He acknowledges that IRC § 67(g) prohibits a miscellaneous itemized deduction for such an expense, but nevertheless argues that the court should apply the Tax Benefit Rule to bless a deduction that Congress has prohibited. The court can do no such thing.[77]

The court finds and concludes that Mr. Levandowski has not sustained his burden of proving that the court should apply the Tax Benefit Rule to exclude the Uber Main Payment from his taxable gross income.

### 5. The Uber Main Payment was not a Working Condition Fringe

IRC § 132(d) defines a "working condition fringe" as "any property or services provided to an employee of the employer to the extent that, if the employee paid for such property or services, such payment would be allowable as a deduction under Section 162 or 167." Under IRC § 132(a)(3), "[g]ross income shall not include any fringe benefit which qualifies as a . . . working condition fringe."

Mr. Levandowski argues that the Indemnification Agreement (and the Uber Main Payment, which he argues was made pursuant to

---

[76] Id. at 381-82, 383-84, and 388-89.

[77] Hudspeth v. Comm'r, 914 F.2d 1207, 1212 (9th Cir. 1990) (Tax Benefit Rule may not be used to nullify the IRC).

the Indemnification Agreement) constitute a Working Condition Fringe. He contends that Uber entered into the Indemnification Agreement to induce Mr. Levandowski to join Uber as an employee, noting that after Google commenced the Google Arbitration, Uber (for a time) paid his litigation expenses under the Indemnification Agreement while he remained employed by Uber.

As to the Uber Main Payment, Mr. Levandowski acknowledges that, under Treas. Reg. § 1.132-5(a)(1)(v), in order for a cash payment to "qualify as a working condition fringe, employers must require the employee to **(A)** use the payment for expenses in connection with a specific or pre-arranged activity or undertaking for which a deduction is allowable under [IRC §§ 162 or 167], **(B)** verify that the payment is actually used for such expenses, **and (C)** return to the employer any part of the payment not so used."

Mr. Levandowski also acknowledges that any such cash payment for a "property or service is not deductible with respect to a trade or business of an employee *other than* the employee's trade or business of being an employee of the employer," citing Treas. Reg. § 1.132-5(a)(2)(i). In order for this requirement to be satisfied, Mr. Levandowski represents that the "employer must derive a substantial benefit from the payment that is distinct from the benefit that it would derive from the mere payment of additional compensation."

Mr. Levandowski argues that "Uber derived a substantial business benefit from providing the indemnity to [him] beyond what it could have through mere payment of additional compensation" because without the Indemnification Agreement, he

would not have agreed to Uber's acquisition of Otto and would not have become Uber's employee. According to Mr. Levandowski, the Indemnification Agreement allowed him and the other indemnitees to focus on their work for Uber without worrying about litigation expenses, and Uber obtained a talented team of engineers who helped turned Uber's autonomous vehicle projects into highly successful ventures.

Mr. Levandowski also argues that he solicited Google employees while still employed by Google in anticipation of his employment by Uber, and that this conduct benefited Uber by allowing it to close the Otto transaction more quickly and staff Otto with employees. Lastly, he asserts that had he made the Uber Main Payment himself – and IRC § 67(g) did not exist – he would have been able to deduct that expense under IRC § 162.

There are several problems with Mr. Levandowski's arguments. First, if one accepts Mr. Levandowski's view, one must also accept that the Uber Main Payment was made under the Indemnification Agreement. The court has already concluded that this was not the case, which by itself defeats Mr. Levandowski's contention that the Uber Main Payment constitutes a Working Condition Fringe.

He also ignores that, when Uber made the Uber Main Payment, he was no longer an Uber employee. Mr. Levandowski attempts to argue that this does not matter, again because the Uber Main Payment was made pursuant to the Indemnification Agreement, into which he and Uber and the other indemnitees entered in *anticipation of* employment by Uber. He also posits that Google commenced the Google Arbitration that resulted in the Google

Judgment while he was Uber's employee and that this also serves to tie the Uber Main Payment to his employment at Uber to a degree sufficient to justify treating it as a Working Condition Fringe.  Neither of these points carry the day.

For purposes of IRC § 132(a)(3), "employee" means "any individual who is *currently* employed by the employer."[78]  The fact that the Uber Main Payment was made to settle litigation between Mr. Levandowski and his former employers does not overcome the plain language of the statute and applicable regulations.  The same is true for the single revenue ruling Mr. Levandowski cites, for the reasons expressed by the IRS and the FTB.

Finally, Mr. Levandowski ignores that IRC § 67(g) prohibits any miscellaneous itemized deduction under IRC § 162 for the partial payment of the Google Judgment through the Uber Main Payment.  This fact, too, is sufficient to defeat Mr. Levandowski's argument because deductibility of the expense under IRC § 162 (or IRC § 167, which does not apply) is an express prerequisite for any benefit to meet the definition of a Working Condition Fringe set forth in IRC § 132(d).

Mr. Levandowski has not sustained his burden of proving that the Uber Main Payment was a nontaxable Working Condition Fringe.

**6.  The Uber Main Payment was not a Reimbursable Employee Expense**

Mr. Levandowski's last argument is that the Uber Main Payment should be deemed an expense that he incurred on Uber's

---

[78] Treas. Reg. § 1.132-1(b)(2)(i) (emphasis added).

behalf, as its employee, and that he should be allowed to use it to reduce his gross income (i.e., as an "above the line" deduction), rather than account for it as an itemized deduction (which fails in light of IRC § 67(g)).  He asserts once again that the Uber Main Payment was made pursuant to the Indemnification Agreement, which he argues is an "accountable plan," pursuant to which payments are excludable from wages and not taxable.

IRC § 62(a)(2)(A) excludes from adjusted gross income certain deductions, including those authorized by IRC § 162, if they "consist of expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer."  Under <u>Biehl</u>, "[f]or a reimbursable employee expense to qualify for an above the line deduction, not only must it be attributable to a trade or business, but is must also have been incurred during the course of performance of services as an employee."[79]  It is not sufficient for the expense to be simply connected or related to employment.[80]  For reasons similar to those that doom Mr. Levandowski's Working Condition Fringe arguments, the court finds and concludes that the Uber Main Payment was not a reimbursable employee expense.

---

[79] <u>Biehl v. Comm'r</u>, 351 F.3d 982, 986 (9th Cir. 2003) *cert. den.* 543 U.S. 1145 (2005) (citing IRC § 62(a)(2)(A); internal quotation marks and other punctuation omitted).

[80] <u>Id.</u>

The court has already concluded that the Uber Main Payment was made pursuant to the Settlement Agreement, not the Indemnification Agreement, and was not made during Mr. Levandowski's employment by Uber. These two conclusions mean that Mr. Levandowski cannot show that the Uber Main Payment was a reimbursable employee expense under IRC § 62(a)(2)(A).

**D.    Conclusion**

For the foregoing reasons, the court finds and concludes that the Uber Main Payment constitutes taxable gross income to Mr. Levandowski.

**END OF ORDER**

**Court Service List**